UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**WAYNE R. GOLD**, Regional Director    \*
of Region Five of the National Labor    \*
Relations Board, for and on behalf    \*
of the **NATIONAL LABOR RELATIONS**    \*
**BOARD**,    \*
   \*
     103 S. Gay Street, 8th Floor    \*
     Baltimore, MD 21202    \*
              **Petitioner**    \*
     v.    \*
   \*
   \*
**STATE PLAZA, INC.,**    \*
**A WHOLLY-OWNED SUBSIDIARY**    \*
**OF RB ASSOCIATES, INC.,**    \*
**D/B/A STATE PLAZA HOTEL**    \*
   \*
     Mr. James Marten, President    \*
     State Plaza Inc., A Wholly-Owned    \*
     Subsidiary of RB Associates, Inc.,    \*
     d/b/a State Plaza Hotel    \*
     2117 E Street, NW    \*
     Washington, DC  20037    \*
              **Respondent**    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CIVIL No. 1:06-CV-00329**
**Judge Kollar-Kotelly**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

### I.  INTRODUCTION

This memorandum chronicles an unremedied course of continuing unlawful conduct by

Respondent, **State Plaza, Inc., a wholly-owned subsidiary of RB Associates, Inc., d/b/a State**

**Plaza Hotel,** in response to protected, concerted and Union activity among its employees in the

recently certified bargaining unit.  The unfair labor practices alleged are violations of the most

basic employee rights and require interim injunctive relief.  There are no facts, credibility

resolutions, or complex legal issues for the Court to decide.  Thus, injunctive relief pending a

final administrative determination requires no evidentiary hearing. In fact, in the interests of

judicial economy, the Court granted Petitioner's motion to hear this matter on the basis of the

record developed before Administrative Law Judge Karl H. Buschmann at hearing held March

13 through 17, 2006. Therefore, the Court need only determine whether injunctive relief is "just

and proper," based on a finding that there is reasonable cause for the Petitioner to believe that the

Respondent violated labor law as alleged in the Petition. Interim injunctive relief is "just and

proper" given the record facts and argument specifically cited below.

The record facts establish that the loss of majority support relied on by Respondent when

withdrawing recognition from the Union on July 5, 2005, was tainted by and directly attributable

to Respondent's instructions to employee agents to seek signatures for decertification petitions

with promises of substantial wage increases, Respondent's direct sponsorship and involvement in

the circulation of the petitions, and Respondent's coercive conduct, including recurring

interrogation about union activity, repeated creation of the impression of surveillance of union

activity, recurring promulgation of overly broad no-distribution rules, and iteration of coercive

statements, all which were directed at employees during the four months when the petitions were

circulated. This egregious misconduct occurred in the context of Respondent's prior,

unremedied, unfair labor practices in Case 5-CA-31346, where Administrative Law Judge David

L. Evans found that Respondent unlawfully discharged a leading Union organizer, threatened

employees that Respondent would sell its business if employees voted for the Union, solicited

and promised to remedy employee grievances, and granted wage increases and other benefits to

discourage Union activity.[1]  See G.C. Exh. 49. p. 16-17.[2]

---

[1]  That case, JD-44-04, 2004 WL 1149361, is currently pending before the Board on Respondent's
exceptions to the judge's decision.

In these circumstances, Petitioner shows that interim injunctive relief is just and proper to prevent irreparable harm to the Union's level of support and employees' free exercise of Section 7 rights and to restore the lawful status quo ante in order to preserve the remedial purposes of the Act. The employees, their certified bargaining representative, and the public interest, whose rights are involved here, cannot wait for lengthy administrative procedures, which may last several years. The employees are mostly unskilled and low-paid housekeeping employees, who speak little English and are among the most vulnerable of this Nation's workers. Their certified bargaining agent wrongfully has been displaced. The public interest is held hostage to protracted adjudication. Interim 10(j) injunctions became part of federal law to prevent such situations.

## II. STATEMENT OF THE CASE

This proceeding is before the Court on a February 24, 2006 Petition filed by the Regional Director of Region 5 of the National Labor Relations Board (herein called Petitioner or the Board), pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149; 73 Stat. 544; 29 U.S.C. 160(j)); herein called the Act), for a preliminary injunction pending final disposition of Case 5-CA-32594, pending before Judge Buschmann and the Board on charges of unfair labor practices filed by Hotel and Restaurant Employees, Local 25, UNITE HERE International Union (herein called the Union). Those charges allege that that State Plaza, Inc., a wholly-owned subsidiary of RB Associates, Inc., d/b/a State Plaza Hotel (herein called Respondent or Hotel), has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1), (3), and (5) of the Act (29 U.S.C. 158(a)(1),(3) and (5) respectively), which proscribe an employer from interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the Act; discriminating in

---

2 For ease of reference, the documentary exhibits are referred to as "G.C. Exhs." in lieu of "Pet. Exhs." and followed by the exhibit number, as that is how the evidence was marked and received in the administrative hearing.

regard to hire or tenure or terms and conditions of employment in order to discourage membership in a labor organization; and failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of employees.

Petitioner, Wayne R. Gold, is the Regional Director of Region Five of the Board, acting for and on behalf of the Board, which unanimously authorized this Petition.  Respondent is a District of Columbia corporation that maintains an office and place of business in Washington, DC, within this judicial district.  Respondent owns and operates a hotel and provides food, beverage, and lodging to its customers.[3]  The Petition is predicated upon showing, as set forth in the Amended Complaint, Petition and administrative record, that there is reasonable cause to believe and a substantial likelihood of demonstrating that Respondent Hotel is engaging in the unfair labor practices charged.  The Amended Complaint and Notice of Hearing based upon an original and three amended charges filed by the Union,[4] was issued on December 27, 2005, as

---

[3] During the preceding twelve months, a representative period, in the course and conduct of its business operations, Respondent derived gross revenues in excess of $500,000, and purchased and received goods, supplies, and services valued in excess of $5,000 directly from points located outside the District of Columbia.  Respondent admits that at all times material herein, it has been an "employer" as defined in Section 2(2) of the Act, engaged in "commerce" and in operations "affecting commerce" as defined in Section 2(6) and (7) of the Act, respectively, and that the Union is now, and has been at all material times herein, a labor organization within the meaning of Section 2(5) of the Act.  See Amended Complaint and Notice of Hearing, G.C. Exhs 1-M and 2, and Amended Answer, G.C. Exh. 1-R, along with the original and Amended Charges, G.C. Exhs. 1-A, 1-C, 1-E, and 1-G, discussed below.

[4] The Union filed the original charge and all three of the amended charges here and has requested Section 10(j) injunctive relief.  On July 25, 2005, the Union filed its original unfair labor practice charge with the Board alleging in Case 5-CA-32594 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.  See G.C. Exh. 1-A.  On August 11, 2005, the Union filed a first amended unfair labor practice charge with the Board alleging in Case 5-CA-32594 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.  See G.C. Exh. 1-C.  On October 14, 2005, the Union filed a second amended unfair labor practice charge with the Board alleging in Case 5-CA-32594 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.  See G.C. Exh. 1-E.  On October 31, 2005, the Union filed a third amended unfair labor practice charge with the Board alleging in Case 5-CA-32594 that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1), (3), and (5) of the Act.  See G.C. Exh. 1-G.

amended at hearing,[5] and was litigated fully at the five-day hearing before Judge Buschmann on March 13 through 17, 2006.[6] As set forth in the Petition and Amended Complaint and as demonstrated herein, interim injunctive relief is just and proper to prevent irreparable harm to the Union's level of support and employees' Section 7 rights as a result of Respondent's flagrant, continuing, and unremedied unfair labor practices, and to restore the lawful status quo ante in order to preserve the remedial purposes of the Act.

Petitioner's showing is based on the specific record evidence, argument and precedent cited below. The Petition and Amended Complaint allege repeated and continuing violations by Respondent of Sections 8(a)(1), (3), and (5) of the Act, including recurring interrogations about union activity, repeated creation of impressions of surveillance of union activity, recurring promulgation of overly broad no-distribution rules, sponsorship and solicitation of decertification petitions, threats of discharge because of union activity, repeated promises of substantial wage increases to employees if they signed the decertification petitions being sponsored, withdrawal of recognition from the Union in the context of the tainted decertification efforts, and direct dealing with employees by granting them promised wage increases after unlawful withdrawal of recognition. This egregious misconduct eviscerates employees' Section 7 rights to organize and support the Union for the purpose of collective bargaining free of coercion, and erodes the

---

[5] See G.C Exh. 2.

[6] On October 31 and December 27, 2005, respectively, following administrative investigation by the Petitioner, the General Counsel of the Board, on behalf of the Board, by the Petitioner as the Regional Director of Region Five of the Board, issued a Complaint and Notice of Hearing and an Amended Complaint and Notice of Hearing, as amended at hearing, under Section 10(b) of the Act, alleging in Case 5-CA-32594 that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of Section 8(a)(1), (3), and (5) of the Act. See G.C. Exhs. 1-M and 2. On November 14, 2005 and January and March 9, 2006, respectively, Respondent filed an Answer and Amended Answers in Case 5-CA-32594. See G.C. Exhs. 1-K, 1-O and 1-R. After issuance of the Amended Complaint (G.C. Exh. 1-M), Petitioner immediately requested that the Board authorize interim injunctive relief while the unfair labor practice allegations were litigated. The unanimous Board (Chairman Battista and Members Liebman, Schaumber, Kirsanow, and Walsh) authorized interim injunctive relief under Section 10(j) of the Act on February 15, 2006.

Union's ability to bargain on behalf of employees in an atmosphere free from the taint of debilitating unfair labor practices. Absent interim injunctive relief, any eventual Board Order directing Respondent to recognize and bargain with the Union will come too late and will permit the Respondent's continued and blatant disregard for the Union's rightful representational role to irreparably deprive employees of the benefits of collective bargaining pending administrative adjudication, thereby inevitably leading to further erosion of employee support for the Union. The background evidence and record facts supporting the immediate need for interim injunctive relief are detailed below and unquestionably establish a substantial likelihood that Respondent has committed and continues to engage in the extensive and unremedied violations alleged, and that injunctive relief is now "just and proper."

### III. BACKGROUND

In the spring of 2003, the Union began an organizing campaign among Respondent's employees. In July 2003, the Union filed a petition for representation in Case 5-RC-15599. Tr. 340-41; G.C. Exh. 46. The parties stipulated that a Board election was held on September 5, 2003 and the employees voted by secret ballot for representation by the Union by a vote of 44 to 21. Tr. 341-42; G.C. Exh. 47. After the election, Region 5 issued a Complaint against Respondent in Case 5-CA-31346, alleging that Respondent engaged in unfair labor practices in violation of Section 8(a)(1) and (3) of the Act. Tr. 342; G.C. Exh. 48. A trial was held in that case on February 2004. On May 19, 2004, Administrative Law Judge David L. Evans issued his Recommended Decision and Order finding that Respondent: (1) threatened employees that its owners would sell the Hotel if employees voted for the Union; (2) solicited employee grievances and granted benefits to deter employees from unionizing; and (3) fired a lead employee organizer for engaging in protected, concerted activity. Tr. 343; G.C. Exh. 49. On June 16, 2004,

Respondent filed exceptions to the judge's Recommended Decision and Order. Case 5-CA-31346 remains pending before the Board on exceptions from Respondent. Tr. 343.

In the interim, the Union first requested bargaining for an initial contract on November 26, 2003. G.C. Exh. 48(a). Respondent declined to bargain and chose to file objections to the election, which were heard by the Board's Chief Administrative Law Judge Robert A. Giannasi on January 23 and 30 and March 2, 2004. Judge Giannasi overruled the Respondent's objection by Recommended Decision and Order dated March 23, 2004. Tr. 343; G.C. Exh. 50. Thereafter, Respondent filed exceptions to the Recommended Decision with the Board. On June 30, 2004, the Board adopted Judge Giannasi's decision, overruled Respondent's objection, and certified the Union as exclusive bargaining representative.[7] Tr. 347; G.C. Exh. 53.

Shortly before Board certification, Respondent advised the Union that it intended to close its restaurant indefinitely for renovations and layoff food and beverage department employees. Tr. 346; G.C. Exh. 51. The Union requested decision and effects bargaining and certain information. G.C. Exh. 52. A week later, the parties engaged in brief effects bargaining to agreement concerning the partial closure. Tr. 348; G.C. Exh. 55.

On July 2, 2004, after certification, Union counsel wrote Respondent with its demand to bargain for the entire unit. Tr. 347; G.C. Exh. 54. During a discussion initiated by the Union on July 7, Respondent advised that it would be difficult to schedule bargaining in July or August,

---

[7] The Unit certified was: All full-time and regular part-time employees, including cooks, prep cooks, dishwashers, pantry, utility, waiters, busers, hosts, bartenders, room servers, servers, housekeepers, room attendants, lobby attendants, housemen, turn-down attendants, laundry attendants, guest service agents, bellmen, bell captains, mini-bar attendants and restaurant cashiers, employed by the Employer at the State Plaza Hotel in Washington, D.C, excluding all reservation sales representatives, office clericals, engineers, painters, guards, and supervisors as defined by the Act. The certified unit included food and beverage department employees who were laid off in late June 2004 when Respondent's restaurant was closed indefinitely for renovations. The Petitioner determined that the food and beverage department employees are no longer in the unit because they have no reasonable expectation of recall. The unit now consists of approximately 40 employees.

but Respondent would contact the Union with a schedule for bargaining dates. Tr. 349. By e-mail dated August 2, 2004, the Union again requested bargaining dates for an initial contract, but Respondent never obliged. Tr. 350-51; G.C. Exh. 56(a).

On August 9, 2004, the Union began separate multi-employer negotiations with the Hotel Association of Washington, D.C., which culminated in a contract in January 2005.[8] Tr. 351-53. The Union continued to devote resources toward communicating and meeting with unit employees from July through December 2004. Indeed, on December 2, 2004, the Union demanded bargaining from Respondent for the fourth time, together with information necessary for bargaining. Tr. 353-354; G.C. Exh. 57. Respondent balked and did not provide any information requested by the Union until February 22, and did not begin bargaining until nearly four months later on March 30. Tr. 354-375; G.C. Exh. 58-72. Rather, Respondent sponsored, and directed employee agents Alexandra Guillen and Reina Lozano to circulate, the March 21, May 6, and June 23/July 1 decertification petitions (G.C. Exh. 3, 4, and 5) with promises of substantial pay raises, as further described below. See Tr. 124-126, Tr. 130-32, 215-17, 222, 289-293, 469-70, 474-75, 857-861. During this period, the parties conducted seven collective-bargaining sessions between late March and June 2005, but did not reach agreement on an initial contract. Tr. 375-414; see also G.C. Exhs. 74-86, and 87-95.[9] On July 5, just a few days after expiration of the certification year, Respondent withdrew recognition from the Union and told assembled housekeeping employees that because the problem with the Union was over, Respondent would now grant them pay raises (as promised) to $12.50 per hour effective July 8. Tr. 577; see also Tr. 252-55, 295-96, 446. On July 8, Respondent granted all housekeeping

---

[8]  All dates hereafter are in 2005, unless noted otherwise.

[9] Although, paragraph 18 of the Amended Complaint alleges that Respondent, by it overall conduct, failed to engage in good-faith bargaining in violation of Sec. 8(a)(5) of the Act, the General Counsel did not seek and the Board did not authorize interim injunctive relief on that specific allegation.

employees who had been earning less than $12.50 per hour, a substantial and unprecedented wage increase to $12.50 per hour. Tr. 116, 211-12, 286-87, 438, 467, G.C. Exhs. 9-10(a) and 116-147. This conduct affected about 35, or well over a majority of, unit employees. G.C. Exhs. 9-10(a) and 116-147.

### IV. Factual Summary

Prior to bargaining, in late-March 2005, Respondent called a meeting with all employees in a Hotel conference room to discuss alleged mistreatment of employees by supervisors. Tr. 116-17. After the meeting, employees Gloria Castro, Gladis Bonilla, and Adriana Nunez stayed behind. Tr. 117. Castro asked the Respondent's General Manager, Corrado Palenzona, how they could get rid of the Union. Tr. 120. Palenzona told the employees they could get rid of the Union if a majority signed a decertification petition and that he would call his attorney to find out how to do so. Tr. Palenzona then made a phone call in the employees' presence. Tr. 121. After the call, Palenzona told the employees present, "[w]e'll get a petition out on the Union and we'll no longer have any problems with the Union at this hotel," and instructed them not to tell anyone else about the conversation. Tr. 123. This conversation was overheard by Nunez, who testified about the exchange in vivid detail and against her interest, as Palenzona sat in the courtroom. Tr. 116-123. Based on this evidence, Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent told employees it was going to rid itself of the Union by sponsoring a decertification petition in violation of Section 8(a)(1) of the Act as alleged in paragraph 10(a) of the Petition. Tr. 123.

About five minutes later, Palenzona directed two of the most senior employees, Alexandra Guillen and Reina Lozano, who were responsible for filling the mini-bars in each of the rooms, to collect signatures for the petition that Respondent was sponsoring by going from

room-to-room and approaching employees while they were working in the Hotel rooms. Tr. 124-26. When Lozano asked Palenzona what they should do if employees indicated that they did not want to sign the petition, Palenzona replied, "why wouldn't they sign. Everyone will sign because they want a raise." Tr. 126  This conversation was overheard by employee Adriana Nunez. Id. Based on Nunez's testimony and the conduct of Respondent and its agents consistent therewith, Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent told and instructed employees to solicit a decertification petition in violation of Section 8(a)(1) of the Act as alleged in paragraph 15 of the Petition.  As more fully explained below at page 23-24, Petitioner also has reasonable cause to believe and has shown a substantial likelihood of proving that Guillen and Lozano thereafter became agents of the Respondent for purposes of circulating the decertification petitions, and, within the scope of that agency, promising employees substantial pay raises if they signed the petitions, and interrogating and coercing employees about their failure to sign the petitions.

Over the next few months from late March until late June, Guillen and/or Lozano solicited employees' signatures for three separate petitions during work time and in work areas, telling employees by word and/or gesture that Palenzona had sent them to obtain signatures and that if they signed, they would receive a pay raise of $2.50 to $12.50 per hour from the Respondent. Tr. 130-32 (Nunez), 215-17, 222 (Velasquez), 289-293 (Majano), 436-37 (Jiron), 469-70, 474-75 (Melgar), 857-861 (Nguyen).  The first petition was circulated on or about March 21; the second, on or about May 6; and the third petition was circulated on or about June 23 and July 1. See G.C. Exhs. 3, 4, and 5.  During the same time period, in meetings with employees in March and April 2005, Palenzona blamed the Union for Respondent's inability to give them a raise by telling employees that he could not give them a raise because the Union was

there. Tr. 222, 287-88; cf. Tr. 575-77. In late March, Palenzona interrogated employee Nunez about why she had not signed the March 21 petition and told her that the petition was to get rid of the Union and if the majority of employees signed the petition, the Hotel would get rid of the Union and not have any more problems with the Union and the employees would receive a $2.50 per hour pay raise. Tr. 134-35. When Nunez approached Palenzona about two days later and asked to sign the petition, Palenzona replied that Nunez was with the Union and that he wanted nothing to do with the Union and was fed up with the Union. Tr. 135-36. Similarly, agent Alexandra Guillen interrogated employee Gloria Melgar in late June about why she had not signed the most recent petition by telling her that Palenzona wants to know why she had betrayed him by not signing the petition circulated on or about June 23. Tr. 478-79. Agent Guillen then attempted to induce Melgar to sign the June petition by stating that "they didn't want the owner to sell the Hotel", i.e., a reiteration of a threat to sell the Hotel previously found by Judge Evans in Case 5-CA-31346. Tr. 479; G.C. Exh. 49, p. 2-4.

Based on the testimony of Nunez, Velasquez, Jiron, Majano, Melgar and/or Nguyen cited above, Petitioner has reasonable cause to believe and a substantial likelihood of proving that: Respondent violated Section 8(a)(1) as alleged in paragraph 14 of the Petition when agents Guillen and Lozano solicited signatures from employees for the petitions during work time and in work areas, as instructed by Palenzona; Respondent violated Section 8(a)(1) as alleged in paragraph 13 of the Petition when employee agents Guillen and/or Lozano, and Respondent's General Manager Palenzona (as testified to by Nunez), promised a substantial pay raise to $12.50 per hour if employees signed the petitions; Respondent, through Palenzona and Guillen, violated Section 8(a)(1) as alleged in paragraph 12 of the Petition by interrogating employees about their union activity; and that Palenzona independently violated Section 8(a)(1) of the Act as alleged in

paragraph 10(b) of the Petition by telling employee Nunez that he does not want anything to do with Union supporters and that he was fed up with the Union.

On or about April 19, May 12, and July 8, Palenzona told employees Marleni Jiron, Margarito Velasquez, and Ana Majano, respectively, that they could not distribute Union flyers in the Hotel and that Union "propaganda" was prohibited in the facility. Tr. 438-445 (April 19-Jiron), see also G.C. Exhs. 39 and 40; Tr. 232-234 (May 12-Velasquez), see also G.C. Exhs. 37; 107, 108, 109, and 115; Tr. 296-98 (about July 8-Majano), see also Tr. 138 and 430 and G.C. Exhs. 29 and 30.[10] Palenzona also made statements to Jiron and Velasquez suggesting that he knew that they had distributed Union literature in the Hotel and he interrogated Jiron, Velasquez, and Majano about such activity. Tr. 443 (Jiron); Tr. 229-30 (Velasquez); Tr. 297-98 (Majano). Although Palenzona denied such conduct (Tr. 72-75), his credibility was impeached by extrinsic evidence of a Spanish recording with certified English translation of a nine and one-half minute conversation between Palenzona and Velasquez that occurred in Palenzona's office on May 12. Tr. 75-92, 175-186, 235-249, 874-75; G.C. Exhs. 107 (CD copy of original six-hour recording), 115 (original recording opened under seal), 108 (Spanish transcription of recorded nine and one-half minute conversation between Palenzona and Velasquez), 109 (certified English translation of recorded nine and one-half minute conversation between Palenzona and Velasquez). That evidence (G.C. Exhs. 107-09 and 115) was also received substantively to corroborate Velasquez's testimony. Tr. 235-249 and 874-75. Based on the testimony of Jiron, Velasquez and Majano, and G.C. Exhs. 107-109 and 115, Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent promulgated overly broad no-distribution

---

[10] The July 8 allegations concerning Majano were amended into the Amended Complaint at administrative hearing (see G.C. Exh. 2, para. 10(e) and were not part of the February 24, 2006 Petition.

rules, created the impression of surveillance of union activity, and interrogated employees about union activity, in violation of Section 8(a)(1) as alleged in Petition paragraphs 10(c), 11 and 12.

In June, employee agent Alexandra Guillen asked housekeeping employee Gloria Melgar to sign another decertification petition. Guillen told Melgar that the housekeeping employees would receive a raise to $12.50 if employees signed the petition to get rid of the Union. Tr. 474-75. Melgar refused to sign the new petition Guillen was circulating and told Guillen that the Union had visited Melgar the day before and that Melgar was now back with the Union again. Tr. 475-76. The next day, Palenzona approached Melgar while she was cleaning a room, asked if it was true that the Union recently had visited her, asked further what the Union had wanted, and instructed Melgar to tell him if the Union was bothering her by home visits. Tr. 476-78.

As noted, in late June, employee agent Guillen again approached employee Melgar, asked why Melgar had not signed the petition yet, told Melgar that Palenzona had sent her (Guillen) to find out why Melgar had not signed the most recent decertification petition circulated on or about June 23, and further stated that Palenzona wanted to know why Melgar had betrayed him by not signing the petition. Tr. 478-79. Agent Guillen then attempted to induce Melgar to sign the petition by telling her "they didn't want the owner to sell the hotel." Tr. 479. Based on Melgar's testimony, Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent created the impression of surveillance of and interrogated employees about union activity, promised employees a raise to $12.50 if they signed a petition to decertify the Union, solicited employees to sign a decertification petition, and coerced employees by stating they have betrayed Respondent by not signing a decertification petition, in violation of Section 8(a)(1) as alleged in Petition paragraphs 9 and 11-14.[11]

---

[11] The Sec. 8(a)(1) allegation concerning Respondent's attempt to induce Melgar to sign a decertification petition by telling her that they don't want the owner to sell the Hotel was amended into the Amended

In short, between March and July 1, Respondent's alleged agents Guillen and Lozano solicited signatures for three separate decertification petitions and told employees by word and/or gesture that if they signed, they would receive a pay raise of $2.50 to $12.50 per hour from the Respondent. Tr. 130-32, 215-17, 222, 289-293, 436-37, 469-70, 474-75, 857-861. The third petition circulated during late June and the first day of July, purportedly contains the signatures of 36 employees, many of whom had signed the first two petitions. See G.C. Exh. 5. Respondent's agents Guillen and Lozano separately solicited certain employees to sign the third petition by promising a pay raise, which was discussed among several of the employees who signed. Tr. 474-79, 860-61, 870; cf. 868. Respondent did not solicit employees who previously had refused to sign the first two petitions and were active union supporters who distributed Union flyers in the Hotel. Tr. 132, 437.

On July 5, just a few days after expiration of the certification year, Respondent told assembled housekeeping employees that because the problem with the Union was over, the Hotel was withdrawing recognition from the Union and would now give housekeeping employees a raise to $12.50 per hour in their next paychecks, effective July 8. Tr. 577; see also Tr. 252-55, 295-96, 446. On or about July 8, Respondent granted all housekeeping employees who had been earning less than $12.50 per hour, a substantial and unprecedented wage increase to $12.50 per hour. Tr. 116, 211-12, 286-87, 438, 467, G.C. Exhs. 9-10(a) and 116-147. This conduct affected about 35 unit employees, well over a majority of unit employees. G.C. Exhs. 9-10(a), 116-147.

Based on the testimony and documentary evidence cited above, Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent's July 5 withdrawal of recognition violated Section 8(a)(5) of the Act as alleged in paragraph 19 of the Amended

---

Complaint at administrative hearing (see G.C. Exh. 2, para. 10(f)) and is not part of the February 24, 2006 Petition.

Complaint, as amended at hearing (see G.C. Exh. 2), and paragraph 18 of the Petition, because that withdrawal of recognition was causally related to and tainted by Respondent's unfair labor practices in violation of Section 8(a)(1) of the Act as set forth in paragraphs 9, 10, 11, 12, 13, 14, and 15 of the Petition. Specifically, the unfair labor practices that taint Respondent's withdrawal of recognition include Respondent's sponsorship and orchestration of the decertification efforts, Respondent's instructions and directions to employee agents Guillen and Lozano to seek signatures for the petitions with promises of substantial wage increases, and Respondent's coercive conduct involving recurring interrogations, impressions of surveillance, promulgation of overly broad no-distribution rules, and coercive statements, all of which took place during the four-month time frame when the petitions were circulated. Based on the testimony and documentary evidence cited above, Petitioner also has reasonable cause to believe and a substantial likelihood of proving that after Respondent unlawfully withdrew recognition from the Union based on the tainted decertification efforts, the Respondent further violated Section 8(a)(5) of the Act as alleged in paragraphs 19 and 23 of the Petition, by dealing directly with employees regarding a unilateral change in wage rates, i.e. the July 8 wage increases, and violated Section 8(a)(3) and (5) of the Act as alleged in paragraphs 16, 19, and 23 of the Petition by granting wage increases on July 8 after the unlawful withdrawal of recognition on July 5.

In mid-July, after Respondent unlawfully withdrew recognition and unlawfully granted employees the wage increases previously promised to induce them to sign the petitions, several employees distributed Union flyers to protest the suspension and subsequent discharge of leading Union organizer, Marleni Jiron.[12] Tr. 137-140, 256-57, 296-299, 430; 482; G.C. Exhs. 29-32. Those flyers included a group photograph of the Union supporters and expressed their continued

---

[12] That discharge is not alleged to have been unlawful.

Union support by stating, inter alia, "WE STAND WITH MARLENI. WE STAND WITH THE UNION! IF YOU FIRE MARLENI, YOU WILL NOT STOP US! G.C. Exhs. 29 and 30. Over the next several days, three admitted supervisors, Night Shift Supervisor Abdoulaye Ba, Housekeeping Manager Lisa Alvarado, and Housekeeping Supervisor Fanny Reird, separately approached employee Adriana Nunez, who was included in the group photograph. Supervisor Ba told Nunez to be careful because Palenzona did not want the Union in the Hotel, and Palenzona might run Union supporters out of the Hotel and there would be no more work, i.e., "trabajo." Tr.141-42. Similarly, Housekeeping Manager Alvarado specifically mentioned Nunez's picture in the flyer and told Nunez, "I like how you work, but don't get in trouble ... if Corrado (Palenzona) dismisses you, I can't do anything for you." Tr. 143. Finally, Supervisor Reird asked Nunez if she was still involved with the Union by stating, "[O]h Adriana, ... I thought that you had changed, that you no longer went around with those Union people." When Nunez replied that Reird was mistaken and that Nunez continued to support the Union, Reird told Nunez, "be careful with those flyers you are passing out because due to that, they can dismiss you." Tr. 144. Based on Nunez's testimony, Petitioner has reasonable cause to believe and a substantial likelihood of proving that the Respondent violated Section 8(a)(1) of the Act by threatening employees with discharge if they continued to support the Union as alleged in paragraph 11 of the Amended Complaint, and by interrogating employees about continued Union support and activity as alleged in paragraph 12 of the Amended Complaint.[13]

---

[13] The Sec. 8(a)(1) allegations concerning Respondent's threats to discharge employees if they continued their Union activities and Respondent's mid-July interrogation of employees about their union activities were not included in the Petition solely because Respondent's pre-Petition Amended Answer to the Amended Complaint had denied the supervisory status of Alvarado, Va, and Reird. Petitioner notes that Respondent's post-Petition Amended Answer (G.C. 1-R) now admits that these individuals are statutory supervisors, but Petitioner declines for pragmatic reasons to amend the Petition to include those allegations at this time.

# V.  LEGAL ARGUMENT

## A.  Standards for 10(j) Relief

Preliminary injunctive relief under Section 10(j) of the Act is warranted upon a showing

that there is reasonable cause to believe that violations of the Act, as charged, have been

committed and that such relief is "just and proper."  See International Union, U.A.W. v. NLRB

(Ex-Cell-O Corp.), 449 F.2d 1046, 1051 (D.C. Cir. 1971) (Section 10(e) (29 U.S.C. Section

160(e) temporary injunction case), citing NLRB v. Aerovox Corporation of Myrtle Beach, South

Carolina, 389 F.2d 475, 477 (4th Cir. 1967) (equating 10(e) standards with 10(j) criteria).  In

such circumstances, Section 10(j) authorizes United States district courts to grant temporary

relief pending the Board's resolution of unfair labor practice proceedings.[14]  Congress recognized

that because the Board's administrative proceedings often are protracted, a respondent could

accomplish its unlawful objective before being placed under any legal restraint, absent interim

relief.  See S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at I Legislative

History of the Labor Management Relations Act of 1947 414, 433 (Government Printing Office

1985).  Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the

Board's remedial authority caused by the passage of time inherent in Board administrative

litigation.  See, e.g., Aguayo v. Tomco Carburetor Co., 853 F.2d 744, 749 (9th Cir. 1988), citing

---

[14]  Section 10(j) (29 U.S.C. Section 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b)
> [of this section] charging that any person has engaged in or is engaging in an unfair labor
> practice, to petition any United States district court, within any district wherein the unfair
> labor practice in question is alleged to have occurred or wherein such person resides or
> transacts business, for appropriate temporary relief or restraining order.  Upon the filing
> of any such petition the court shall cause notice thereof to be served upon such person,
> and thereupon shall have jurisdiction to grant to the Board such temporary relief or
> restraining order as it deems just and proper.

Angle v. Sacks, 382 F.2d 655, 659 (10th Cir. 1967); Kobell v. United Paperworkers International Union, 965 F.2d 1401, 1406 (6th Cir. 1992).[15]

To resolve a 10(j) petition, Petitioner submits that the district court in the District of Columbia need only consider two issues: whether there is "reasonable cause to believe" that the Act has been violated and whether the "remedial purposes of the law will be served by pendente lite [injunctive] relief." See International Union, U.A.W. v. NLRB (Ex-Cell-O Corp.), 449 F.2d at 1051, citing NLRB v. Aerovox Corporation of Myrtle Beach, South Carolina, 389 F.2d at 477. Most circuits have adopted this two-part standard, the second half of which is also characterized as whether temporary injunctive relief is "just and proper." See, e.g., Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 371 (11th Cir. 1992) and the cases cited therein.

Thus, the United States Court of Appeals for the District of Columbia Circuit has applied a traditional two-part reasonable cause and just and proper test to resolve 10(j) petitions in the District of Columbia district court. Petitioner emphasizes that the four-part test articulated by the

_____

[15] Section 10(j) and its companion provision, Section 10(l) (29 U.S.C. 160(1)), were enacted as part of the 1947 Taft Hartley amendments to the Act, P.L. 80, 61 Stat. 136, 149. Congress enacted these provisions because:

*Time is usually of the essence in these matters, and consequently the relatively slow procedure of the Board hearing and order, followed many months later by an enforcing decree in the circuit court of appeals, falls short of achieving the desired objectives -- the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practices and procedures of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices.*

*Experience under the National Labor Relations Act had demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury had been done. Under the present act the Board is empowered to seek interim relief only after it had filed in the appropriate court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the Act to accomplish their unlawful objective before being placed under any legal restraint and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation. In subsections (j) and (l) to Section 10 the Board is given additional authority to seek injunctive relief.* **Senate Report No. 105, 80th Congress, 1st Session, at p. 8 and p. 27; I Legist. Hist. LMRA 414, 433.**

district court in D'Amico v. U.S. Service Industries, Inc., 867 F.Supp. 1075 (D.D.C. 1994), is not

binding on the district court in this case.[16]  In any event, as shown herein, even under the

balancing approach applicable in the four-part test, the Board's threshold "likelihood of success"

showing, as litigated at the administrative hearing, supports issuance of an interim injunction

here because Petitioner shows: (1) that the public interest favors preservation of the lawful status

quo ante until the completion of Board proceedings; (2) that Respondent's conduct irreparably

harms employee rights under the Act and erodes the Union's employee support for good-faith

collective bargaining under the Act; and (3) that interim relief merely requires Respondent to do

what the law already requires.  Thus, Petitioner must merely make out a substantial case on the

merits at hearing to demonstrate likelihood of success under the "just and proper" analysis.

D'Amico v. U.S. Service Industries, Inc., 867 F.Supp. at 1085, citing Washington Metropolitan

Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977).

### 1. Reasonable Cause Standard

The Regional Director has a minimal burden to establish reasonable cause to believe that

the Act has been violated; he or she need meet only a low threshold of proof.  Kobell v.

Suburban Lines, Inc., 731 F.2d 1076, 1084 (3d Cir. 1984).  The District Court may not decide the

merits of the case.  See, e.g., Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 372-73.  Nor

should it resolve contested factual issues or credibility disputes within the purview of Judge

Buschmann and the Board.  See, e.g., Scott v. El Farra Enterprises, Inc., 863 F.2d 670, 673 n. 6

(9th Cir. 1988), citing Fuchs v. Hood Industries, Inc., 590 F.2d 395, 397 (1st Cir. 1979);

Gottfried v. Frankel, 818 F.2d 485, 493 and 494 (6th Cir. 1987).  See also D'Amico v. U.S.

Service Industries, Inc., 867 F.Supp. at 1088, 1091.  Rather, the Court should consider the

---

16  See Fund for Animals v. Mainella, 335 F. Supp. 2d 19, 27 (D. D.C. 2004) ("a decision by a district court has no precedential effect"); Flowers v. Executive Office of the President, 142 F. Supp. 2d 38, 42 (D. D.C. 2001) (district court decisions "do not establish the law of the district.")(citation omitted).

evidence "in the light most favorable to the Board" (Arlook v. S. Lichtenberg & Co., Inc., 952

F.2d at 371-72) and limit its inquiry to whether factual issues and credibility disputes could

ultimately be resolved by the Board in favor of the Regional Director.  Fuchs v. Hood Industries,

590 F.2d at 397; D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1088, 1091.

Similarly, on propositions of law, the Petitioner need only establish that his legal theories

are not insubstantial and frivolous.  Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 371-72

("substantial, non-frivolous, coherent legal theory"); Pascarell v. Vibra Screw Inc., 904 F.2d 874,

882 (3d Cir. 1990) ("substantial, non-frivolous legal theory, implicit or explicit").  The record

evidence cited above demonstrates that Petitioner has a substantial likelihood of success on the

merits by proving to Judge Buschmann and the Board that Respondent's conduct as plead in the

Amended Complaint and Petition, violated Sections 8(a)(1), (3), and (5) of the Act.

### 2. The Just and Proper Standard

As the District of Columbia Circuit has recognized, interim injunctive relief is

appropriate to protect the remedial purposes of the Act and, in particular, to preserve the Board's

remedial powers from compromise by the passage of time inherent in obtaining a final Board

order.  International Union, U.A.W. v. NLRB (Ex-Cell-O Corp.), 449 F.2d at 1051, citing NLRB

v. Aerovox Corp., 389 F.2d at 477; Angle v. Sacks, 382 F.2d at 659.  Thus, Section 10(j) relief is

appropriate when "the circumstances of a case create a reasonable apprehension that the efficacy

of the Board's final order may be nullified, or the administrative procedures will be rendered

meaningless" unless such relief is granted.  Id. at 660.  See also, e.g., Aguayo v. Tomco

Carburetor, 853 F.2d at 749; Pascarell v. Vibra Screw Inc., 904 F.2d at 878 (injunctive relief is

warranted when the alleged violations "are likely to jeopardize the integrity of the bargaining

process and thereby make it impossible or not feasible to restore or preserve the status quo

pending litigation").[17]  In determining what interim relief is "just and proper," the district court

should consider what is necessary to preserve or restore as nearly as possible the status quo

before the alleged violations occurred.  See Angle v. Sacks, 382 F.2d at 661; Kobell v. United

Paperworkers Intern., 965 F.2d 1401, 1410 (6th Cir. 1992); International Union, U.A.W. v.

NLRB (Ex-Cell-O Corp.), 449 F.2d at 1051, n. 25.

### B.  The Standards For Injunctive Relief Have Been Satisfied Here

#### 1.  The Reasonable Cause Standard Has Been Met

The facts establish reasonable cause to believe and a substantial likelihood of establishing

that employees' statutory rights under Section 7 of the Act were violated.  Employees rights

under the Act are set forth in Section 7, which provides in pertinent part:

> *Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....*

These rights are protected against employer actions by Section 8, which provides, inter alia, that:

> *Sec. 8(a)  It shall be an unfair labor practice for an employer--*
>
> *(1)     to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7 [section 157 of this title].....*
>
> *(3)     by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.....*
>
> *(5)     to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a) [section 159(a) of this title].*

The facts outlined above establish an unremedied course of continuing unlawful conduct by

Respondent in response to protected, concerted and union activity by its employees in the

---

17  Under this standard, the Board is not required to meet the traditional equitable criteria for injunctions, such as "irreparable injury." See International. Union , U.A.W. v. NLRB (Ex-Cell-O Corp.),  supra, 449 F. 2d at 1051; Fleischut v. Nixon Detroit Diesel, Inc., 859 F. 2d 26, 30 n. 3 (6th Cir. 1988).  See also Penello v. International Union, United Mine Workers, 88 F. Supp. 935, 942-43 (D.D.C. 1950).

certified bargaining unit. This case highlights not only Respondent's continued and focused threats and promises of benefits, but new and more extensive unfair labor practices aimed at union supporters, including: interrogations; impressions of surveillance; repeated promulgation of overly broad no-distribution rules; ominous threats of discharge in response to union activity; sponsorship and solicitation of decertification petitions; promises of substantial wage increases for signing the unlawfully sponsored decertification petitions; withdrawal of recognition from the Union in the context of tainted decertification efforts; and direct dealing with employees by unilateral grant of promised wage increases. More importantly, apart from Respondent's continued disregard of employees' Section 7 rights, Respondent's tainted withdrawal of recognition and unlawful wage increases linger and inevitably erode employee support for the Union over time, thereby preventing unit employees from gaining the benefits of collective bargaining and precluding the Union from establishing an effective representational role as certified bargaining representative.

Application of well-established Board law to these facts shows that Petitioner has reasonable cause to believe and has demonstrated a substantial likelihood of success in proving that Respondent violated Sections 8(a)(1), (3), and (5) of the Act, as alleged in the Amended Complaint and set forth in the attached Petition. First and foremost, there is reasonable cause to believe and a substantial likelihood of proving that employees Guillen and Lozano are agents of Respondent for purposes of circulating the decertification petitions, and, within the scope of that agency, of promising employees substantial wage increases if they signed the petitions, and of interrogating employees and making other coercive statements about why they had not signed the petitions. As noted, employee Nunez, who testified against interest with General Manager Palenzona present in the courtroom, heard Palenzona direct Guillen and Lozano to collect

signatures by going room-to-room and promising pay raises. Tr. 124-26. Thereafter, from late

March until late June, Guillen and Lozano collected signatures from employees by going room-

to-room as instructed during work time and in work areas and promising substantial wage

increases form Respondent to $12.50 per hour if employees signed the petitions. Tr. 130-32,

215-17, 222, 289-293, 436-37, 469-70, 474-75, 857-861. In addition, Palenzona made

statements to employees establishing that he knew of the decertification efforts of his agents.

Specifically, Palenzona questioned employee Nunez about her refusal to sign the March petition

that had been presented to her by Guillen and Lozano, and told her that if the majority of

employees signed the petition, the Hotel would not have any more problems with the Union and

the employees would receive a $2.50 per hour pay raise. Tr. 134-35. Palenzona also

interrogated employee Melgar in June about the Union's contact with her after Melgar informed

Guillen about the Union's home visit during Guillen's June solicitation of Melgar to sign the

most recent petition with the promise that the housekeeping employees would receive a raise to

$12.50 if they signed to get rid of the Union. Tr. 474-78. Finally, the timing of the grant of the

promised wage increases to about 35 unit employees, immediately after withdrawal of

recognition (G.C. Exhs. 9-10(a) and 116-147), further supports a finding of employee agency.

See Equipment Trucking Co., 336 NLRB 277, 286 (2001); Dentech Corp., 294 NLRB 924

(1989); see also 29 U.S.C. Sec. 152(13) and Restatement, Agency 2d, Secs. 7-8, 26-27, and 83.

Since employees Guillen and Lozano, as agents of Respondent, solicited signatures from

their coworkers for the decertification petitions and repeatedly informed employees that a raise

was promised if a sufficient number of them signed the petitions (Tr. 130-32, 215-17, 222, 289-

293, 436-37, 469-70, 474-75, 857-861), and since Respondent, in fact, followed through on its

promises and granted all housekeeping employees substantial and unprecedented raises to $12.50

shortly after the third petition (Tr. 116, 211-12, 286-87, 438, 467, G.C. Exhs. 9-10(a) and 116-147), there is reasonable cause to believe and a substantial likelihood of demonstrating that Respondent sponsored the petitions, directed agents to circulate the petitions with promises of substantial pay raises to employees if they signed, and that the petitions and entire decertification efforts were tainted. See Microimage Display Division of Xidex Corp. v. NLRB, 924 F.2d 245, 253-54 (D.C. Cir. 1991); AT Systems West, Inc., 341 NLRB No. 12, slip op. at 4 (2004).

Thus, Board precedent and the factual record of the hearing herein, establish that Petitioner has reasonable cause to believe and a substantial likelihood of proving that Respondent violated Section 8(a)(1) of the Act when employee agents Guillen and Lozano solicited signatures from the employees for the petitions during work time and in work areas, as instructed by Palenzona, with repeated promises of substantial wage increases from the Hotel if the employees signed the petitions. See Equipment Trucking, 336 NLRB at 282-283, 285-86 (affirmative bargaining order warranted where two employee agents of employer unlawfully promised wage increases to employees for signing decertification petition used to unlawfully withdraw recognition); Royal Motor Sales, 329 NLRB 760, 761 and 764 (1999) (supervisor promised bonus to employee for circulating decertification petition). Petitioner has also shown reasonable cause to believe and a substantial likelihood that the Respondent violated Section 8(a)(1) when Palenzona told an employee in late March that they would all get raises if enough employees signed the petition (Tr. 134-35). See Equipment Trucking, 336 NLRB at 286.

There is also reasonable cause to believe and a substantial likelihood that Respondent violated Section 8(a)(1) when Palenzona interrogated employees about their union activity (Tr. 134-35 (Nunez); 229-30 (Velasquez ); 297-98 (Majano); 443 (Jiron), 476-78 (Melgar)), see e.g., United Services Automotive Association, 340 NLRB 784, 786 (2003) and Norton Audubon

Hospital, 338 NLRB 320, 320-21 (2002); created the impression of surveillance of their union

activity ( Tr. 443 (Jiron); 229-30 (Velasquez); 297-98 (Majano); 476-78 (Melgar)), see e.g.,

Spartech Corp, 344 NLRB No. 72 (2005) and Avondale Industries, 329 NLRB 1064, 1265

(1999);[18] and promulgated overbroad no-distribution rules.  Tr. 443 (Jiron); 229-30 and G.C.

Exhs. 107-09 received to impeach Palenzona and to substantively to corroborate Velasquez's

testimony (see Tr. 235-249 and 874-75) (Velasquez); and 297-98 (Majano)).  See Krystal

Enterprises, Inc., 345 NLRB No. 15, slip op. at 22 (2005); Stoddard-Quirk Mfg. Co., 138 NLRB

615 (1962).[19]  In addition, Petitioner has reasonable cause to believe and substantial likelihood of

proving that Respondent violated Section 8(a)(1) when three admitted supervisors threatened

employee Nunez with discharge for her continued support of the Union, and indicated by

interrogation or otherwise that Nunez should be careful distributing and posing for Union flyers

because Palenzona would fire union supporters and there would be no more "trabajo."  Tr. 141-

44; G.C. Exhs. 29-32.  See e.g., Zurn/N.E.P.CO, 345 NLRB No. 1, slip op. at 61 (2005) ("you

guys are walking on thin ice . . . if you value your job you'll take the button off" held to be threat

of job loss); American Wire Products, 313 NLRB 989, 993 (1994).

---

[18] Board precedent establishes that the test for finding creation of an impression of surveillance is
whether an employee could reasonably assume from an employer's statement that his union involvement
has been placed under surveillance. Fred'k Wallace & Son, Inc., 331 NLRB 914 (2000). When the
employer indicates that it is closely monitoring the degree of the union involvement of the employees, an
unlawful impression of surveillance is created.  Flexsteel Industries, 311 NLRB 257 (1993).  As the
Board explained in Flexsteel, "[t]he idea behind finding "an impression of surveillance" …is that
employee should be free to participate in union organizing campaigns without the fear that members of
management are peering over their shoulders, taking note of who is involving union activities, and in
what particular ways." Id.
    Under this standard, the remarks of Palenzona and other supervisors, as pled in paragraph 11 of the
Petition, clearly gave employees the impression that the Respondent was endeavoring to keep track of
who was engaged in union activities, and the remarks would reasonably tend to discourage participation
in union activities.

[19] Respondent's promulgation of no-distribution rules prohibits employee distribution of literature in any
place within the Hotel at any time.  Respondent's promulgated rule is facially overbroad and violates
Section 8(a)(1) of the Act because it prohibits solicitation on the employees own time, see Republic
Aviation Corp. v. NLRB, 324 U.S. 793 (1945), and prohibits distribution of literature in nonworking
areas (cafeteria and locker areas) during nonworking time.  Stoddard-Quirk Mfg., 138 NLRB 615 (1962).

Finally and most importantly, Petitioner has shown reasonable cause to believe and a substantial likelihood of proving that Respondent violated Section 8(a)(5) of the Act by withdrawing recognition from the Union based on a decertification petition that was tainted by Respondent's numerous unfair labor practices during the four months immediately preceding the withdrawal of recognition. See Microimage Display Division of Xidex Corp. v. NLRB, 924 F.2d at 253-54 (employer cannot rely on petition or loss of majority based on employer-orchestrated campaign to remove union); AT Systems West, Inc., 341 NLRB No. 12, slip op. at 4 (2004) (solicitation of decertification petition and direct dealing tainted employee disaffection); Bridgestone/Firestone, Inc., 332 NLRB 575, 576 (2000), enfd. in relevant part sub nom. Teamsters v. NLRB, 47 Fed. APPX. 449 (9th Cir. 2002)(unpublished) (same); see also Penn Tank Lines, 336 NLRB 1066, 1067 (2001).

It is well established that evidence in support of a withdrawal of recognition "must be raised in a context free of unfair labor practices *of the sort likely*, under all the circumstances, to affect the union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." Lee Lumber & Building Material Corp., 322 NLRB 175, 177 (1996) (Lee Lumber II), enfd. in relevant part and remanded in part 117 F.3d 1454 (D.C. Cir. 1997) (citing Guerdon Industries, 218 NLRB 658, 659, 661 (1975)) (emphasis added). The criteria for determining whether a causal relationship has been established include: (1) the length of time between the unfair labor practice(s) and the withdrawal of recognition; (2) the nature of the violation(s), including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violation(s) to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union." 322 NLRB at 177, n.16, citing Master Slack Corp., 271 NLRB 78, 84 (1984).

Applying these criteria to the facts here, Petitioner has shown reasonable cause to believe and a substantial likelihood that Respondent's numerous unfair labor practices were of the sort likely to cause the union's loss of majority support. Specifically, the facts establish that the loss of majority support relied on by Respondent when withdrawing recognition on July 5 was tainted by and directly attributable to Respondent's sponsorship and involvement in monitoring the circulation of the petitions, Respondent's instructions to employee agents to seek signatures for the petitions with promises of wage increases, and Respondent's and its agents' coercive conduct, including interrogating employees about the petitions and their union activity, creating impressions of surveillance of union activity, making coercive statements about failure to sign the petitions, and promulgating overly broad no-distribution rules to several union supporters, all which took place during the few months from March through July 1, when the petitions were circulated. The timing and nature of these violations, which were directed at Union supporters shortly before Respondent's hasty withdrawal of recognition at the expiration of the certification year,[20] were designed to have a detrimental and lasting effect on employee support for the Union. The tendency of Respondent's unfair labor practices to do so cannot be gainsaid. In fact, Respondent's misconduct surrounding the decertification efforts that it sponsored affected a majority if not all employees in the unit who received the promised pay raises, and arose in the context of lingering and unremedied unfair labor practices already found by Administrative Law Judge Evans in Case 5-CA-31346.

In these circumstances, the manifest erosion of employee confidence in the Union as expressed in the third decertification petition circulated just after the expiration of the certification year, can reasonably be tracked and directly attributable to Respondent's

---

[20] Board certifications are normally considered final and binding for one year after date of certification. Brooks v. NLRB, 348 U.S. 96 (1954). Thereafter, they raise a rebuttable presumption of continuing majority status. United States Gypsum Co., 157 NLRB 652 (1966).

sponsorship and direct involvement in the circulation of the decertification petitions; Respondent's instructions to employees to seek signatures for the petitions with promises of substantial and unprecedented wage increases; and Respondent's other coercive conduct, including interrogating employees about union activity, promulgating overly broad no-distribution rules, and utterance of coercive statements about failure to sign the petitions, all which took place during the time the petitions were circulated. Cf. <u>Matthews Readymix, Inc.</u>, 324 NLRB 1005, 1008 (unlawful interrogation in job application caused employee disaffection).

In short, Respondent orchestrated the entire decertification effort in an atmosphere of antiunion coercion. There is no showing of loss of majority support prior to Respondent's unlawful conduct. In light of these considerations, Respondent's serious unlawful conduct reasonably undercut the Union's support among the employees and led to the expressions of disaffection from the Union in the form of a decertification petition submitted just after the certification bar expired on the heels of Respondent's unremedied unfair labor practices.

Since the withdrawal of recognition was tainted, Petitioner has also shown reasonable cause to believe and a substantial likelihood of proving that Respondent further violated Section 8(a)(5) on July 8 when Respondent bypassed the Union and dealt directly with employees regarding a unilateral change, i.e. by granting the unlawfully promised wage increases as reward for signing the petitions (Tr. 577; see also Tr. 252-55, 295-96, 446). See <u>Matthews Readymix</u>, 324 NLRB at 1009 (finding that because respondent unlawfully withdrew recognition from the union, respondent also violated Section 8(a)(5) and (1) by unilaterally instituting new terms and conditions of employment); <u>Sonic Automotive</u>, 343 NLRB No. 116, slip op. at 4 (2004), citing <u>Georgia Power Co.</u>, 342 NLRB No. 18, slip op. at 3-4 (2004); see also <u>Southern California Gas Co.</u>, 316 NLRB 979, 982 (1995) (direct dealing occurs when respondent communicates directly

with the union-represented employees for the purpose of establishing or changing terms and conditions of employment or undercutting the Union's role in bargaining).

Finally, Petitioner has shown reasonable cause to believe and a substantial likelihood of proving that the actual granting of the wage increases after Respondent withdrew recognition violated Section 8(a)(3) and (5) of the Act (G.C. Exhs. 9-10(a) and 116-147). See Equipment Trucking, 336 NLRB at 287 (wage increase after tainted withdrawal of recognition based on coercive conduct of employee agents, who were responsible for circulating decertification petition and promising wage increases, violates Sections 8(a)(3) and (5) of the Act); Flying Foods, 345 NLRB No. 10 (2005) (respondent violated Section 8(a)(5) by withdrawing recognition and making subsequent unilateral changes, and violated Section 8(a)(3) by unilateral wage increase); Holly Farms Corp., 311 NLRB 273, 274 (1993) (wage increase unlawful where unscheduled, addressed primary employee concern, and entirely discretionary), enfd. 48 F.3d 1360 (4th Cir. 1995), affd. 517 U.S. 392 (1996); cf. Dealers Mfg. Co., 320 NLRB 947 (1996) (post-election wage increase violates Section 8(a)(3) where respondent failed to prove past practice or other legitimate justification for timing of increase in response to union activities).

In sum, Petitioner clearly has met the reasonable cause standard and has shown a substantial likelihood of success on the merits of the Petition.

### 2.    The Just and Proper Standard Has Been Met Here

The resolution of economic disputes in private industry through the peaceful mechanism of collective bargaining lies at the foundation of the Congressional purpose for the Act. See Section 1 of the National Labor Relations Act, 29 U.S.C. Sec. 151 ("the Act"); NLRB v. American National Insurance Co., 343 U.S. 395, 401-402 (1952). Promotion of good-faith negotiations also is a primary consideration underlying the enactment of Section 10(j) in 1947.

See S. Rep. No. l05, 80th Cong., 1st Sess. 8 (1947), reprinted in I Legislative History of the

Labor Management Relations Act, l947, at 4l4 (l985)(hereinafter Legislative History); 93 Cong.

Rec. 1912 (Mar. 10, 1947)(statement of Sen. Morse), reprinted in II Legislative History, at 985.[21]

 Therefore, interim injunctive relief under Section 10(j) is appropriate particularly in

refusal-to-bargain cases to ensure that legitimate bargaining rights "should not be lost or frittered

away through the actions of persons violating the Act . . . ." Brown v. Pacific Telephone &

Telegraph Co., 218 F.2d 542, 545 (9th Cir. 1955)(as amended)(Pope, C. J., concurring).  As the

Supreme Court has recognized,  "in the labor field, as in few others, time is crucially important

in obtaining relief."  NLRB v. C & C Plywood Corp., 385 U.S. 42l, 430 (l967).  This is because a

union's collective strength, an essential element for meaningful collective bargaining, can be

seriously eroded during the litigation process when good-faith negotiations are not occurring

because of a tainted withdrawal of recognition, as in this case.  As the D.C. Circuit has observed,

> Employee interest in a union can wane quickly as working conditions remain
> apparently unaffected by the union or collective bargaining.  When the company
> is finally ordered to bargain with the union some years later, the union may find
> that it represents only a small fraction of the employees.

International Union of Electrical Workers v. NLRB (Tiidee Products, Inc.), 426 F.2d l243, l249

(D.C. Cir. 1970), cert. denied, 400 U.S. 950 (l970).  In addition, an employer that chooses to

unlawfully refuse to bargain with a union pending the outcome of Board litigation "reaps from

his violation of the law an avoidance of bargaining which he considers an economic benefit;"

and, even when the Board finally does order bargaining, the employer "may reap a second

benefit from his original refusal to comply with the law; he may continue to enjoy lower labor

---

[21]  Accord Aguayo v. Tomco Carburetor Co., 853 F.2d at 749; Sachs v. Davis & Hemphill, Inc., 295 F. Supp. 142, 149 (D. Md. 1969), affd., 71 LRRM 2126, 2129 (4th Cir. 1969), opinion withdrawn and dismissed as moot, 72 LRRM 2879 (4th Cir. 1969).

expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively." Id.[22]

In other words, an employer's unlawful refusal to bargain has an inherent tendency to undermine a union's support among employees. See Frye v. Specialty Envelope, Inc., 10 F.3d 1221, 1227 (6th Cir. 1993); Asseo v. Centro Medico del Turabo, Inc., 900 F.2d 445, 454-55 (1st Cir. 1990); Brown v. Pacific Telephone & Telegraph Co., 218 F.2d at 544. Cf. Fall River Dyeing and Finishing Corp. v. NLRB, 482 U.S. 27, 49-50 (1987)("'the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages membership in unions.'")(quoting Franks Bros. v. NLRB, 321 U.S. 702, 704 (1944)). A Board order in due course cannot restore this loss of employee support. See Asseo v. Centro Medico del Turabo, 133 LRRM 2722, 2729 (D. P.R. 1989), affd., 900 F.2d 445, 454 (1st Cir. 1990); Squillacote v. U.S. Marine Corp., 116 LRRM at 2665; Levine v. C & W Mining Co., 465 F. Supp. 690, 694 (N.D. Ohio 1979), affd in relevant part 610 F.2d 432, 436-437 (6th Cir. 1979). As noted, Congress enacted Section 10(j) precisely to allow the Board, in its discretion, to seek injunctive relief from the district court where a Board order in due course could not adequately restore the status quo ante. See S. Rep. No. 105, 80th Cong., 1st Sess. 27 (1947), reprinted in I Legislative History, at 433.[23] In addition, courts often have recognized in 10(j) proceedings that interim rescission of unilateral changes in working conditions is necessary to enable the parties to engage in effective collective bargaining

---

22  Accord NLRB v. Schill Steel Products, Inc., 480 F.2d 586, 590 (5th Cir. 1973).

23  Further, to the extent that an interim bargaining order will promote industrial peace and prevent unwarranted labor unrest and strikes, it is "just and proper" under Section 10(j) for a district court to grant such relief here. See e.g., Rivera-Vega v. ConAgra, Inc., 876 F. Supp. at 1370 (absent a bargaining order, the "unlawful refusal to bargain will inevitably exacerbate the dispute between the parties and prolong the industrial unrest"), affd., 70 F.3d 153, 161, 164 (1st Cir. 1995); see also Squillacote v. U.S. Marine Corp., 116 LRRM at 2666; DeProspero v. House of the Good Samaritan, 474 F. Supp. at 559. Such an injunction promotes the Congressional policy underlying the Act to free interstate commerce from labor disruptions. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41-43 (1937).

while the case is pending before the Board.[24]  That is, interim rescission often is necessary to curb the loss of employee support for a union caused by the unilateral changes, damage that an eventual Board order likely cannot remedy.[25]  Accordingly, interim relief fosters the public interest by protecting the parties' collective-bargaining relationship.

The facts of the instant case, however, extend well beyond Respondent's tainted withdrawal of recognition and lingering unilateral increase in wages rates and highlight Respondent's continued threats and promises of benefits, and its extensive unfair labor practices aimed at Union supporters, including interrogations, impressions of surveillance, repeated promulgation of overly broad no-distribution rules to Union supporters while disparately permitting solicitations designed to undermine the Union's representative status, ominous threats of discharge in response to Union activity; solicitation of decertification petitions; repeated promises of wage increases for signing the unlawfully sponsored decertification petitions; withdrawal of recognition from the Union in the context of tainted decertification efforts; and direct dealing with employees by grant of promised wage increases.  This flagrant misconduct warrants an interim injunction with broad cease and desist relief, the affirmative grant of an interim bargaining order, and, on request of the Union, interim rescission of the unilateral wage increases, as contemplated by Congress under Section 10(j) of the Act.

---

[24]  See Silverman v. Major League Baseball Player Relations Committee, Inc., 880 F. Supp. 246, 259, 148 LRRM 2922 (S.D.N.Y.), affd. 67 F.3d 1054, 1062, 150 LRRM 2390 (2d Cir. 1995)(interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations).  Accord Sheeran v. American Commercial Lines, Inc., 683 F.2d 970, 979, 110 LRRM 3168 (6th Cir. 1982); Squillacote v. Advertisers Mfg. Co., 677 F.2d 544, 547, 110 LRRM 2355, 2357-58 (7th Cir. 1982); Kobell v. United Refining Co., 159 LRRM 2762, 2767 (W.D. Pa. 1998)(unilateral changes during bargaining for initial agreement); Overstreet v. Thomas Davis Medical Centers, 9 F. Supp.2d 1162, 1167, 159 LRRM 2547 (D. Ariz. 1997).

[25]  See Eisenberg v. Suburban Transit Corp., 112 LRRM 2708, 2712-2713 (D. N.J.), affd. per curiam, 720 F.2d 661 (3d Cir. 1983).

Where a union, as here, has only recently obtained its initial certification and has been deprived of the ability to bargain effectively for an initial labor agreement because of the effects of Respondent's unfair labor practices, an interim bargaining order is necessary to protect the parties' nascent collective-bargaining relationship and guarantee that in the future the Respondent will bargain in good faith in an atmosphere untainted by misconduct designed to oust the union. Indeed, courts have recognized that such unions especially are vulnerable to employer misconduct.[26] Furthermore, because Respondent unilaterally increased employees wages, as promised, to buy their support for Respondent's tainted decertification efforts after its unlawful withdrawal of recognition, interim rescission of those changes, upon the request of the Union,[27] is necessary to protect the collective-bargaining process, to protect the Board's ability to fashion an appropriate final remedy,[28] and to prevent irreparable harm to the status of this newly certified Union as the employees' exclusive collective-bargaining representative.[29] The failure to

---

[26] See Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 373, 139 LRRM 2297 (11th Cir. 1992); Pascarell v. Vibra Screw Inc., 904 F.2d 874, 880-81, 134 LRRM 2458 (3d Cir. 1990); Reynolds v. Curley Printing Co., 247 F. Supp. 317, 323-324, 60 LRRM 2413 (M.D. Tenn. 1965).

[27] See, e.g., Children's Hospital of San Francisco, 312 NLRB 920, 931 (1993), enfd. sub nom. California Pacific Medical Center v. NLRB, 87 F.3d 304, 311, 152 LRRM 2593 (9th Cir. 1996). This same remedy can be obtained in a district court under Section 10(j). See Morio v. North American Soccer League, 501 F. Supp. 633, 640, 106 LRRM 2761 (S.D.N.Y.), affd., 632 F.2d 217, 106 LRRM 2767 (2d Cir. 1980)(per curiam).

[28] See, e.g., Silverman v. Major League Baseball Player Relations Committee, Inc., 880 F. Supp. 246, 259, 148 LRRM 2922 (S.D.N.Y.), affd., 67 F.3d 1054, 1062, 150 LRRM 2390 (2d Cir. 1995)(interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations). Accord Squillacote v. Advertisers Mfg. Co., 677 F.2d 544, 547, 110 LRRM 2355, 2357-58 (7th Cir. 1982); Kobell v. United Refining Co., 159 LRRM 2762, 2767 (W.D. Pa. 1998); Overstreet v. Thomas Davis Medical Centers, 9 F. Supp.2d 1162, 1167 (D. Ariz. 1997).

[29] See Calatrello v. NSA, a Div. of Southwire Co., 164 LRRM 2500, 2503 (W.D. Ky. 2000)(vulnerability of recently certified union bargaining for first labor contract). The Respondent's unilateral changes cause irreparable harm to the newly certified Union's status as exclusive representative and its ability to engage in effective collective bargaining for an initial labor agreement by demonstrating to employees that the Union is powerless to achieve a wage increase that Respondent refused to proffer at the bargaining table but quickly granted as a reward for the decertification efforts it sponsored. Such a unilateral change strikes at the heart of the Union's ability to represent employees by allowing Respondent to enjoy the fruits of its unlawful conduct and to gain an undue bargaining advantage. See The Little Rock Downtowner, Inc., 168 NLRB 107, 108 (1967), enfd. 414 F.2d 1084, 72 LRRM 2044

grant an interim bargaining order and provide the option of rescission here, would permit Respondent to carry out its illegal objective of irreparably undermining employee support for the Union before the Board can complete its administrative processes. Respondent would thereby reap the benefits of its own misconduct and frustrate the policies and remedial purposes of the Act. This is precisely the result Section 10(j) of the Act was intended to prevent.[30]

In stark equitable contrast, while Respondent is benefiting from its unlawful refusal to bargain pending Board litigation, the unit employees contemporaneously and irreparably suffer the loss of Union support and the benefits of good-faith collective bargaining. That loss extends well beyond the lingering, unilateral increase in wages that Respondent unlawfully granted to fulfill its promises to reward employees who signed the decertification petitions that it sponsored and circulated, the proverbial "fist inside the velvet glove." See NLRB v. Exchange Parts, 375 U.S. 405, 409-410 (1964). Irreparable employee losses also include significant employment terms such as job security, safety and health conditions, and the protection of a grievance-arbitration procedure, all of which cannot be made whole by a Board order in due course. See e.g., Bloedorn v. Francisco Foods, d/b/a Piggly Wiggly, 276 F.3d 270, 299 (7th Cir. 2001);

---

(8th Cir. 1969); Herman Sausage Co., 122 NLRB 168, 172 (1958), enfd. 275 F.2d 229, 45 LRRM 2829 (5th Cir. 1960). See also NLRB v. Katz, 369 U.S. 736, 744, 50 LRRM 2177 (1962)(unilateral changes frustrate the statutory objective of establishing working conditions through collective bargaining). Thus, interim rescission of the Respondent's unilateral wage increases, upon Union request, is necessary to avoid irreparable harm to the parties' nascent collective-bargaining relationship and to allow the parties to engage effectively in good faith collective bargaining while the unfair labor practice case is pending before the Board. Interim rescission restores a level playing field to the parties' collective bargaining. Otherwise, Respondent can use restoration of the working conditions as "bargaining bait" to force acceptance of other bargaining proposals. See Southwest Forest Indus., Inc. v. NLRB, 841 F.2d 270, 275 (9th Cir. 1988)(restoration of status quo ensures "meaningful bargaining").

30 Kaynard v. Palby Lingerie, Inc., 625 F.2d at 1055; Levine v. C & W Mining Co., Inc., 465 F. Supp. 690, 694 (N.D. Ohio 1979), affd. in rel. part, 610 F.2d 432, 436-37 (6th Cir. 1979); I Legislative History, at 433. As the district court in Silverman v. Imperia Foods, Inc., 646 F. Supp. 393 (S.D.N.Y. 1986), cogently observed in granting an interim bargaining order under Section 10(j), it is "essential not to freeze the [unlawfully created] situation, but rather to re-establish the conditions as they existed before the employer's unlawful campaign," 646 F. Supp. at 400 (citing Seeler v. Trading Port, Inc., 517 F.2d at 38).

Pascarell v. Gitano Group, Inc., 730 F. Supp. 616, 625 (D. N.J. 1990); Asseo v. Centro Medico

del Turabo, 133 LRRM at 2729.[31]

By contrast, the imposition of an interim bargaining order is not unduly burdensome for

Respondent Hotel because "'there is nothing permanent about any bargaining order.'" Seeler v.

Trading Port, Inc., 517 F.2d at 40 (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 613

(1969)). Indeed, an interim bargaining order that restores the lawful status quo ante will not

inevitably result in a labor contract that calls for increased wages and/or benefits. The proposed

10(j) order would require only that Respondent meet with the Union and bargain in good faith --

it would not compel agreement by Respondent to any particular term or condition of

employment. See Section 8(d) of the Act, 29 U.S.C. 158(d) (the "obligation [to bargain] does not

compel either party to agree to a proposal or require the making of a concession").[32]

In these circumstances, a balancing of the potential injuries to the public interest and the

parties clearly weighs in favor of granting the interim injunction and bargaining order. See

Asseo v. Centro Medico del Turabo, Inc., 900 F.2d at 454-55. As the First Circuit recognized,

"If the goal of the labor laws and regulations is to strengthen the bargaining process . . . then

ordering bargaining to commence cannot be contrary to the public interest." Id. at 455 (citation

omitted). Since Section 10(j) is an equitable provision designed to prevent violations of the Act,

---

[31] Cf. Ex-Cell-O Corp., 185 NLRB 107, 109-110 (1970)(Board will not order employer to pay
employees monetary damages for its unlawful refusal to bargain; Board suggests "full resort" to Section
10(j) relief), remanded in relevant part, 449 F.2d 1046 (D.C. Cir. 1971), remand vacated sua sponte and
Board order enforced, 449 F.2d 1058 (D.C. Cir. 1971).

[32] Accord Overstreet v. Thomas Davis Medical Centers, 9 F. Supp.2d 1162, 1166 (D. Ariz. 1997);
Penello v. UMW, 88 F. Supp. 935, 943 (D. D.C. 1950). See also H.K. Porter Co. v. NLRB, 397 U.S. 99
(1970)(Board has no authority to order agreement to a particular bargaining proposal). Moreover, "any
agreement [reached between the parties under a Section 10(j) decree] can contain a condition subsequent
to take into account the possibility of the Board's rejecting the Regional Director's [theory of violation]."
Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1054 (2d Cir. 1980). Moreover, if Respondent reaches a
good-faith impasse in bargaining, it would be free to implement its last proposal over which it has reached
impasse. See, e.g., Town & Country Mfg. Co. v. NLRB, 316 F.2d 846, 847 (5th Cir. 1963).

courts should grant interim relief "in accordance with traditional equity practice 'as conditioned by the necessities of the public interest which Congress has sought to protect.'" Seeler v. Trading Port, Inc., 517 F.2d at 39-40 (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329-330 (1944)). A district court's discretion to deny an injunction in this statutory proceeding is therefore limited because a Section 10(j) injunction "is sought for the protection of the public interest and in aid of a policy which Congress itself has made plain . . . ." Brown v. Pacific Telephone & Telegraph Co., 218 F.2d at 544 (Pope, J., concurring in reversal of denial of interim bargaining order).[33]

In sum, Respondent's violations are flagrant and repeated and continue unremedied. Section 10(j) injunctive relief is "just and proper" to prevent the inevitable erosion of employee support for the Union over time; to prevent unit employees from losing the benefits of collective bargaining pending Board decision, to restore the Union's rightful representational role while employee support still exists, and to insure the efficacy of the Board's final order. The delay attendant to the Board's ordinary remedial processes undoubtedly will have a detrimental impact on the Union's representational function and ability to retain support of employees in the face of Respondent's tainted withdrawal of recognition, direct dealing, refusal to bargain, and extensive

---

[33] See also Seeler v. Trading Port, Inc., 517 F.2d at 39-40 ("legislative provisions calling for equitable relief to prevent violations of a statute require the courts to act in accordance with traditional equity practice 'as conditioned by the necessities of the public interest which Congress has sought to protect.'")(quoting Hecht Co. v. Bowles, 321 U.S. 321, 329-330 (1944)). Accord Miller v. California Pacific Medical Center, 19 F.3d 449 (9th Cir. 1994)(en banc)(public interest in maintaining integrity of collective-bargaining process).

The public interest is always an important factor in the exercise of the Court's equitable discretion under Section 10(j). D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1085, citing Miller v. California Pacific Medical Center, 19 F. 3d at 460. The National Labor Relations Act was enacted to protect the integrity of the collective bargaining process, and "the passage of the statute is itself an implied finding by Congress that violations will harm the public." D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1086, citing Miller v. California Pacific Medical Center, 19 F. 3d at 459 (brackets omitted). As the Ninth Circuit observed, the public interest in a Section 10(j) case is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the unfair labor charge. 19 F. 3d at 460. As noted above, Section 10(j) provides the mechanism for protecting this interest by preserving the Board's remedial power while it processes the unfair labor practice allegations.

coercive conduct, thus demonstrating that a future Board order cannot undo the irreparable harm

Respondent is causing to the lawful status quo ante. Clearly, in these circumstances, interim

injunctive relief is just and proper, particularly an interim bargaining order and interim

restoration, on Union request, of the unilaterally changed working conditions.

### C. Respondent's Arguments Lack Persuasive Appeal In Equity

During administrative investigation, Respondent argued to Petitioner that interim

injunctive relief was unwarranted because Petitioner could not demonstrate reasonable cause to

believe that the alleged unfair labor practices occurred. As shown above by specific citation to

the administrative record, this argument lacks any merit as Petitioner has shown a substantial

likelihood of success of the merits. Although Respondent undoubtedly will argue that the

erosion of Union support is attributable to the Union's purported lack of interest in bargaining

for the Unit and the fact that employees complained to the Hotel about unwanted or harassing

home visits by the Union in early April 2005, the record evidence establishes that any purported

loss of majority support arose after Respondent delayed bargaining from December 2004 through

mid-March and was tainted by and causally related to the coercive atmosphere created by

Respondent's unremedied and continuing unfair labor practices beginning in March 2005.

Moreover, even assuming that a few employees became disenchanted with the Union after

Respondent's unlawful conduct began back in Case 5-CA-31346, it is undisputed that any

significant loss of employee support arose in late March through July 2005, when Respondent

embarked on a new and more intensified campaign and orchestrated the entire decertification

effort in an atmosphere of antiunion coercion, as fully described above. Indeed, considering

Respondent's use of employee agents since late March to solicit signatures on the petitions, to

promise unprecedented pay raises in exchange for those signatures, and to engage in other

coercive conduct outlined above, this Court should properly reject any argument that there was an uncoerced loss of majority status. Likewise, courts have refused to deny interim injunctive relief on the basis of the "clean hands" defense set forth in Respondent's amended Answer, since the Board acts in vindication of public rather than private rights.[34]

Any argument that Respondent did not implement or promulgate overbroad no-distribution rules is belied by probative record evidence. Similarly, any argument that the purpose of the wage increase was to bring the Hotel's employees in line with the wages of employees at other RB Associates Hotels is predicated erroneously on the assumption that Respondent had no duty to bargain with the Union, and directly collides with record evidence establishing that Respondent announced and granted the wage increases because the employees signed the tainted petitions to oust their Union. Consequently, in light of Respondent's tainted withdrawal of recognition, Respondent was not free to grant an unprecedented wage increase to $12.50 to fulfill unlawful promises that employees would receive such rewards if they signed petitions to oust the Union, which Respondent's agents were directed to circulate; nor could Respondent unilaterally implement the wage increase without bargaining.

Finally, Respondent's argument that interim injunctive relief is not "just and proper" lacks any persuasive appeal. Petitioner has satisfied each prong of the traditional four-part equitable test for injunctive relief by showing a substantial likelihood of success on the merits; that Petitioner will suffer irreparable harm if the relief is denied; that neither Respondent nor

---

[34] See Henderson v. IUOE Local 701, 420 F.2d 802, 808, (9th Cir. 1969); Schauffler v. Brewery and Beer Distributor Drivers Local 830, 162 F. Supp. 1, 9-10, (E.D. Pa. 1958). This is especially true when the public rights to be protected through an interim injunction are those to be exercised by Respondent's employees and through their certified and exclusive bargaining representative.

other interested parties will suffer substantial harm if injunctive relief is granted; and that the

public interest favors such relief , or at least that such relief is not adverse to the public interest

Having shown a substantial likelihood of success as outlined above, Petitioner briefly

addresses the remaining equitable criteria. As noted, the unanimous Board concluded that

injunctive relief, including an order to recognize and bargain with the Union, is necessary here

prevent irreparable harm to the Union's level of support and employees' Section 7 rights.[36] In

recent tainted withdrawal-of-recognition cases, the Board has authorized injunctive relief to

prevent these harms and restore the status quo.[37] Absent such interim relief here, the

Respondent's continued disregard for the Union's representational role will deprive employees

of the benefits of collective bargaining and inevitably lead to further erosion of employee supp

for the Union. The Respondent's unfair labor practices have had a chilling impact on employe

support for the Union as reflected by the large number of signatures on the petitions and by

affiants' reluctance to cooperate with the Region's investigation for fear of retaliation.

In these circumstances, the Court should properly reject Respondent's primary contenti

that an interim bargaining order would defeat the employees' "voluntary" choice to reject the

---

[35] See D'Amico v. United States Service Industries, Inc., 867 F. Supp. 1075, 1085 (D.D.C. 1994), citii
inter alia, Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); Washington
Metropolitan Area Transit Comm'n v. Holiday Tours, Inc. 559 F. 2d. 841, 842-44 (D.C. 1977). These
factors are properly assessed as a continuum, i.e., more of one factor compensates for less of another.
Consequently, the necessary degree of likely success will vary according to the court's assessment of th
other factors; when the other three factors strongly favor interim relief, a court may grant such relief
where Petitioner has merely shown a "substantial case" on the merits. D'Amico v. United States Servi
Industries, Inc., 867 F. Supp. at 1085, citing Holiday Tours, 559 F. 2d at 843.

[36] See D'Amico v. Townsend Culinary, Inc., 22 F. Supp.2d 480, 490 (D.Md. 1998)(injunction grante
tainted withdrawal of recognition case); Dunbar v. Park Associates, Inc., 23 F.Supp.2d 212, 217-218
(N.D.N.Y. 1998) , affd. 166 F.3d 1200 (2d Cir. 1998) (table)(same).

[37] See Kindred Healthcare, Inc. d/b/a Mountain Valley Care, 19-CA-29390, Section 10(j) proceeding:
authorized on February 16, 2005 (settled); HCM, Inc., 26-CA-21484, Section 10(j) proceedings
authorized on April 16, 2004 (settled); Laneko Engineering Co., Inc., Case 4-CA-31660, Section 10(j)
proceedings authorized on November 14, 2003 (injunction granted, 2003 WL 23139070, 174 LRRM
2395 (E.D. Pa. 2003)).

Union. Rather, as explained above, the anti-Union petitions were tainted by the Respondent's unlawful conduct, which continued unabated while the petitions were circulated. The Respondent has produced no untainted evidence that an uncoerced majority of employees oppose Union representation. Indeed, before the Respondent's coercive conduct, the employee majority supported the Union.

In its Amended Answer as a third affirmative defense, Respondent argues that "the Complaint is deficient in that it does not rely on the evidence actually used by Respondent to withdraw recognition, in that the petition relied on by Respondent as evidence of actual loss of majority support is untainted and there is no allegation of taint." This defense lacks merit. As shown above, the Amended Complaint at paragraph 19 pleads the numerous unfair labor practices that provide the requisite causal relationship to taint the withdrawal of recognition. That is, Respondent's sponsorship and direct involvement in the circulation of the decertification petitions; Respondent's instructions to employees to seek signatures for the petitions with promises of substantial wage increases; and Respondent's coercive conduct, including interrogating employees about union activity, creating impressions of surveillance of such activity, promulgating overly broad no-distribution rules, and uttering coercive statements, all which took place during the late March to early July time period when the petitions were circulated, tainted any effort by Respondent to withdraw recognition on July 5.[38]

Thus, contrary to Respondent's third affirmative defense, the petition purportedly signed by employees on June 23 and July 1 was an unreliable indicator of uncoerced employee

---

[38] Cf. United Supermarkets, 287 NLRB 119 (1987) (five-year passage of time between commission of unfair labor practices in underlying case and appearance of decertification petition found insufficient to dissipate coercive impact and lingering effect of taint on unit employees from unremedied unfair labor practices). Williams Enterprises, 312 NLRB 937, 939 (1993), enfd. 50 F.3d 1280 (4th Cir. 1995) (mere passage of four months between employer's misconduct and decertification petition insufficient to dissipate the effects of the unfair labor practices).

sentiment because Respondent has not remedied the taint from proximate unfair labor practices, including those as late as agent Guillen's and agent Lozano's June 2005 statements to employees Gloria Melgar and Sang Nguyen, respectively, that housekeeping employees would receive a raise if enough employees signed the petition to get rid of the Union; Palenzona's subsequent interrogation of Melgar; and agent Guillen's late June statements that Palenzona sent her to find out why employee Melgar had betrayed him by not signing the petition circulated on or about June 23. Those violations, as late as June, conjoined with extensive misconduct in March, April, and May, confirm that Respondent orchestrated the entire decertification effort and withdrew recognition in an atmosphere poisoned by coercion. As emphasized above, there is no showing of loss of majority support prior to Respondent's unlawful conduct.[39]

The Court also properly rejects any contention that the two-year passage of time since the election renders injunctive relief inappropriate. The issue is not the passage of time since the election, but rather whether injunctive relief would be ineffective due to delay. Here, there has been no significant delay. Respondent withdrew recognition only nine months ago, complaint issued after full investigation about three months ago, the unanimous Board promptly authorized injunctive relief, and a full trial already has expeditiously concluded. Moreover, delay in initiating Section 10(j) proceedings does not, per se, preclude injunctive relief. Delay is only relevant if it precludes a district court from restoring the lawful status quo ante or renders

---

[39] Finally, any attempt by Respondent to rely on a petition dated November 14, 2005 is unavailing. That petition postdates and was not relied upon to justify the July 5 withdrawal of recognition. Judge Buschmann properly excluded it from evidence. Tr. 537-38; R. Exh. 4. More importantly, as with the third petition, Respondent's lingering taint does not just magically disappear because Respondent avers that a new employee has circulated a new petition. Finally, not only has Respondent failed to remedy the lingering taint surrounding the first three petitions, Respondent added to that unremedied and tainted atmosphere since its July 5 withdrawal of recognition by granting the promised and unprecedented pay raises to well over a majority of unit employees on July 8, 2005. Each payday serves as a lasting reminder that Respondent's coercion undermined the Union and replaced the employees' rightful bargaining representative. Thus, any reliance that Respondent now places on any petition to justify its withdrawal of recognition lacks merit.

restoration of the status quo unnecessary. Here, there is no evidence that the brief passage of time would preclude the court's ability to restore the status quo, particularly since the Union has shown its continued interest in representing this unit by active bargaining and by its pursuit of injunctive relief. In these circumstances, Section 10(j) relief can prevent any further loss of support and is far superior to a Board order, which is not self-enforcing, and may issue months and perhaps years hence, when employee support for the Union may be extinct.[40]

The fact that there are no longer restaurant employees in the unit is irrelevant to assessing the need for an interim injunction. The Respondent has produced no evidence to show any untainted disaffection among current unit employees and has made no effort to clarify any unit it believes is inappropriate.[41] The alleged violations occurred last spring, and if their deleterious effects endure, the public interest requires restoration of the lawful status quo ante.[42] Any argument that returning to the bargaining table would upset the status quo because the Union lost majority status, begs the ultimate issue and completely disregards substantial record evidence establishing that the withdrawal of recognition was tainted by pervasive violations.

---

[40] See, e.g., Gottfried v. Frankel, 818 F.2d 485, 495, 125 LRRM 2321 (6th Cir. 1987) (court not required to consider delay; appropriate inquiry is whether return to the status quo ante is necessary and still possible). See also, Hirsch v. Dorsey Trailers, Inc., 147 F.3d 243, 248-49, 158 LRRM 2491 (3d Cir. 1998) (14-month passage of time no bar to §10(j) injunction).

[41] Indeed, Respondent's Amended Answer admits the appropriateness of the unit. Moreover, the D.C Circuit has recently affirmed Board findings that turnover of employees is not a fundamental change in the unit justifying an employer's refusal to bargain based on unusual circumstances. King Electric v. NLRB, 179 LRRM 2129, 2131-32 (D.C. Cir. 2006).

Mattina v. Duane Reade, 177 LRRM 2803 (S.D.N.Y. 2005), relied on by the Respondent during the investigation, is currently pending the Board's appeal of the denial of an interim bargaining order. Although the district court granted the incumbent union access and information it had requested, it improperly relied on Gissel factors, particularly turnover, to conclude that a majority of current employees no longer supported the Union. That case is inapposite because it did not involve the tainted disaffection present here.

[42] The public interest clearly favors the granting of relief where, as here, there is substantial basis for Amended Complaint allegations that Sections 8(a)(1), (3), and (5) of the Act have been violated. Certainly, however, the granting of interim relief is not adverse to the public interest. D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1086, comparing Brown v. Artery Org., Inc., 654 F. Supp. 1106, 1119 (D.D.C. 1987). In sum, the public interest here is fostered by a return to the lawful status quo ante in order to permit violations of the Act to be remedied effectively.

Petitioner has also shown immediate, irreparable harm to unit employees if interim relief is denied. Many of Respondent's employees are immigrants with a poor command of English and little familiarity with their statutory rights. They toil in low-end housekeeping jobs. They are extremely vulnerable to coercive conduct by Respondent. Absent a temporary injunction, the foreseeable result of Respondent's continuing coercion, which triggered its unlawful refusal to recognize and bargain, is dissipation of any remaining Union support. It is axiomatic that Respondent's sponsorship of the petitions, promises of unprecedented pay raises to induce employee disaffection, threats of discharge and other coercion targeted at union supporters, and eventual withdrawal of recognition based on such conduct, risks serious adverse impact on employee interest in unionization and collective-bargaining. Cf. Kaynard v. Palby Lingerie, Inc., 625 F. 2d at 1053. The lingering effects of that coercive conduct, including the unlawfully motivated wage increases and ongoing refusal to bargain, may repel union supporters and send the message that the Union is powerless as the employees' certified bargaining representative. Any further dissipation of Union support is fatal. Moreover, in light of Respondent's recidivism following Judge Evans's findings in Case 5-CA-31346, Respondent's unlawful conduct likely will continue unabated, absent injunctive relief. Cf. Arlook v. S. Lichtenberg & Co., 952 F.2d at 372. Thus, Respondent's misconduct precludes many employees from ever exercising statutory rights and renders ineffective any final Board remedy.

Finally, as Petitioner has demonstrated that the public interest favors interim relief, that Respondent's conduct irreparably harms employee rights, and that interim relief merely requires Respondent to do what the law already requires, Petitioner must only make out a substantial case on the merits to show likelihood of success under the "just and proper" analysis. D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1088, citing Holiday Tours, 559 F.2d at

843. It is not necessary for this Court to determine the merits of the unfair labor practice case. That is the Board's function, after recommended decision of Judge Buschmann, who determines the credibility of witnesses to resolve factual disputes. Although the Court cannot predict how the Board will resolve such disputes, Petitioner certainly has a substantial case on the merits.

In sum, under the "reasonable cause" standard, which Petitioner requests this Court adopt, the Court views the evidence in the light most favorable to Petitioner to determine whether a rational fact finder could rule in his favor. Arlook v. S. Lichtenberg & Co., 952 F.2d at 373; Eisenberg v. Lenape Products, Inc., 781 F.2d 999, 1003 (3d Cir. 1986); Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir. 1988); Seeler v. Trading Port, Inc., 517 F.2d 33, 36-37 (2d Cir. 1975). Even assuming, however, that the Court rejects this standard, Petitioner has demonstrated a substantial likelihood of success on the merits by specific citation to substantial evidence in the administrative record. See D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1088. The Petition, Amended Complaint, and record evidence detail repeated and continuing violations of Sections 8(a)(1), (3), and (5) of the Act, as outlined above. Therefore, Petitioner has demonstrated a substantial likelihood of success on the merits that Respondent violated Section 8(a)(1), (3), and (5) of the Act as alleged in the Petition.

## IV. CONCLUSION

For all the foregoing reasons, Section 10(j) injunctive relief is just and proper to preserve the Board's ultimate ability to render effective and meaningful relief. Petitioner has demonstrated at least a substantial likelihood that it will prove in the Board proceeding that Respondent has been using and is likely to continue to use coercive interrogations, impressions of surveillance, promulgations of overly broad no-distribution rules, threats of discharge, solicitation of decertification petitions, repeated promises of substantial wage increases if

employees sign decertification petitions that Respondent sponsored, tainted withdrawal of recognition, and direct dealing to discourage its employees from engaging in their protected right to organize for the purposes of collective bargaining or other mutual aid or protection. There is substantial evidence that the impact of Respondent's activities on union support has already been considerable, that because of such activities Respondent has unlawfully withdrawn recognition from the Union, and that if such activities are allowed to continue unabated, they will irreparably harm Respondent's employees, the Union and the public interest by denying employee rights at the heart of the Act. Having shown that Petitioner has reasonable cause to believe and a substantial likelihood of demonstrating that Respondent has violated and will continue to violate Sections 8(a)(1), (3), and (5) of the Act, and that the public interest and balance of equities favor interim injunctive relief pending resolution of the underlying Board proceedings, it is just and proper for the Court to issue a temporary injunction under Section 10(j) of the Act, requiring Respondent to cease and desist from said unfair labor practices and to affirmatively bargain with the Union and rescind unilateral changes, on request, as set forth in the Proposed Findings of Fact and Conclusions of Law and Proposed Order Granting Temporary Injunction. Accordingly, it is respectfully submitted that the Court should grant the relief prayed for in the Petition herein.

Dated in Baltimore, Maryland, this 4th day of April 2006.

_____/s/_____
Albert W. Palewicz, Regional Attorney
National Labor Relation Board, Region 5
103 S. Gay Street, 8th Floor
Baltimore, MD 21202


_____/s/_____
Thomas P. McCarthy, Counsel for Petitioner
National Labor Relations Board, Region 5, WRO
1099 14th Street, N.W., Room 5528
Washington, DC 20570