# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Wayne R. Gold,** Regional Director of Region Five of the National Labor Relations Board, for and on behalf of the **NATIONAL LABOR RELATIONS BOARD,**<br><br>103 S. Gay Street, 8th Floor<br>Baltimore, MD  21202<br><br>**Petitioner**<br><br>v.<br><br>**STATE PLAZA, INC.,**<br>**A WHOLLY-OWNED SUBSIDIARY**<br>**OF RB ASSOCIATES, INC.,**<br>**D/B/A STATE PLAZA HOTEL**<br><br>**Respondent** | Civil No. 1:06-CV-00329<br>Judge Kollar-Kotelly<br><br>**(Oral Argument Requested)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE NATIONAL LABOR RELATIONS BOARD'S MOTION FOR TEMPORARY INJUNCTIVE RELIEF UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT

Table of Contents

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS ..................................................................... 4

III. ARGUMENT: PETITIONER HAS FAILED TO SHOW THAT AN
     INJUNCTION WOULD BE "JUST AND PROPER" AS REQUIRED BY
     SECTION 10(J) OF THE NLRA .......................................................... 11

     A.   THE NLRB HAS FAILED TO ESTABLISH A SUBSTANTIAL
          LIKELIHOOD OF SUCCESS ON THE MERITS................................ 13

          1.   Petitioner Fails to Demonstrate a Likelihood of Success on the
               Merits that Petitions were Tainted by Respondent's Alleged Unfair
               Labor Practices. ............................................................... 15

          2.   Petitioner Fails to Demonstrate a Likelihood of Success on the
               Allegations that Lozano and Guillen are Agents of Respondent
               Hotel ............................................................................. 23

          3.   The Three Year Old Unfair Labor Practice Case 5-CA-31346
               Pending Before the Board is Irrelevant to This Action Hotel.................... 26

     B.   PETITIONER HAS NOT ESTABLISHED IRREPARABLE INJURY ............ 28

     C.   INJUNCTIVE RELIEF WILL HARM INTERESTED THIRD
          PARTIES AND WOULD BE CONTRARY TO PUBLIC INTEREST.............. 31

     D.   INJUNCTIVE RELIEF WOULD BE INEFFECTIVE GIVEN THE
          REGIONAL DIRECTOR'S DELAY IN PETITIONING FOR
          TEMPORARY RELIEF ...................................................................... 35

IV.  CONCLUSION ...................................................................................... 36

i

## TABLE OF AUTHORITIES

### CASES

Anderson v. United States, 612 F.2d 1112 (9th Cir. 1979) ................................13

Asseo v. Pan Am. Grain Co., 805 F.2d 23 (1st Cir. 1986) ................................14

Avecor, Inc. v. NLRB, 931 F.2d 924 (D.C. Cir. 1991) ......................................33

Boire v. Pilot Freight C, Inc., 515 F.2d 1185 (5th Cir. 1975)..........................35

Caterair Int'l v. NLRB, 22 F.3d 1114 (D.C. Cir. 1994) .........................32, 33, 37

Central Washington Hospital, 279 N.L.R.B. 60 (1986)......................................18

Chavarry v. ELC Electric, Inc., 2004 U.S. Dist. LEXIS 19591 (S.D. Ind. 2004) .............12

Cogburn Health Center v. NLRB, 05-1017 (D.C. Cir. 2006)..............................28

Cornelle A. Overstreet v. Tucson Ready Mix, Inc., 11 F. Supp. 2d 1139 (D. Arizona, 1998) ........................................................................27

D'Amico v. USSI, Inc., 867 F. Supp. 1075 (D.D.C. 1994)..............................11, 14, 29, 30

Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243 (D.C. Cir. 1994) ............................13

Kaynard v. Mego Corp., 484 F. Supp. 167, aff'd 633 F.2d 1026, 1033-34 (2nd Cir. 1980) ........................................................................1

Kikumura v. Hurley, et al., 242 F.3d 950 (10th Cir. 2001) ................................12

Kinney v. Pioneer Press, 881 F.2d 485 (7th Cir. 1989)......................................11

Kobell v. Suburban Lines, Inc., 731 F.2d 1076 (3rd Cir. 1984) .........................35

Laneko Engineering Co. Inc., 2004 NLRB LEXIS 82 (2004)......................24, 25

LTD Ceramics, Inc., 341 N.L.R.B. 3 (2004) .........................................15, 16, 17

Lee Lumber and Building Material Corp. v. NLRB, 117 F.3d 1454 (D.C. Cir. 1997) ........................................................11, 13, 15, 16, 17

Levitz Furniture Co. of the Pacific, Inc., 333 N.L.R.B. 717 (2001) ...................15

Mar-Jac Poultry Co., 136 N.L.R.B. 785 (1962) ................................................30

Master Slack Corp., 271 N.L.R.B. 78 (1984) ..................................................27

Mattina, Acting Regional Director Region 2, NLRB v. Duane Reade, 177
    L.R.R.M. 2803 (S.D.N.Y. 2005)...............................................................27

Miller v. California Pacific Medical Center, 19 F.3d 449 (9th Cir. 1994)(en banc) ..........11

NLRB v. Electro-Voice Incorporated, 83 F.3d 1559 (7th Cir. 1995)............................3, 29

NLRB v. Gissel Packing Co., 395 U.S. 575 (1969)............................................................13

NLRB v. Williams Enterprises, Inc., 50 F.3d 1280 (5th Cir. 1995)...................................27

Nott Co., 345 N.L.R.B. No. 23 (NLRB Ag. 27, 2003) .......................................................32

Peoples Gas Sys. Inc., v. NLRB, 629 F.2d 35 (D.C. Cir. 1980)...................................13, 33

Placke Toyota, Inc., 215 N.L.R.B. 395 (1974) ...................................................................18

Rosemary Pye, Regional Director Region One, NLRB v. Young Women's
    Christian Ass'n Western Mass., 2006 U.S. Dist. LEXIS 5406 (D. Mass Feb.
    13, 2006) .............................................................................................................14

Saint Gobain Abrasives Inc., 342 N.L.R.B. No. 39 (2004) .........................................16, 32

Schaub v. Detroit Newspaper Agency, 14 F.3d 276 (6th 1998) .........................................36

Seaport Printing & Ad Specialties, Inc., 344 N.L.R.B. No. 34 (2005)...............................15

Sharp v. Miller Waste Mills, Inc., 22 F. Supp. 2d 1006 (D. Minn. 1998) ...................12, 33

Sportpaint, Inc., 2004 NLRB LEXIS 112 (March 15, 2004)...............................................18

Sullivan v. Indus. V. NLRB, 957 F.2d 890 (D.C. Cir. 1992) ..............................................33

Szabo v. PIE Nationwide, Inc., 878 F.2d 207 (7th Cir. 1989)............................................29

Technodent Corp., 294 NLRB. 924,(1989) ........................................................................24

Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d
    841 (D.C. Cir. 1977) ..........................................................................................12

Waterbed World, 286 N.L.R.B. 425 (1987) .......................................................................25

Wire Products Mfg., Corp, 326 N.L.R.B. 625 (1998) ........................................................18

iii

## I.    **PRELIMINARY STATEMENT**

Respondent, State Plaza, Inc., by counsel hereby submits this Memorandum of Points and Authorities in Opposition to the Regional Director's Petition for 10(j) Injunctive Relief.

The National Labor Relations Board ("NLRB" or "Board") is petitioning for an extreme order which disregards the explicit sentiments of State Plaza employees. The Regional Director asked this Court, and the Court agreed, to hear this matter based on the full evidentiary record developed before NLRB Administrative Law Judge Buschmann at the hearing held March 13 to 17, 2006. In its Memorandum, however, the Regional Director ignores the evidence developed at the hearing, and has completely failed to offer any evidence whatsoever as to why injunctive relief in this matter, at this time, would be "just and proper." A heavy burden rests with the Board on its application pursuant to Section 10(j) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 160(j).[1] The Board must show that a temporary injunction would be "just and proper" under all the circumstances, and that without interim relief, the alleged unfair labor practices "threaten to render the Board's purposes "totally ineffective" by precluding a meaningful remedy. Kaynard v. Mego Corp., 484 F.Supp 167 (E.D.N.Y.), aff'd 633 F.2d 1026, 1033-34 (2nd Cir. 1980). This is plainly not the case here.

Based on the full evidentiary record from the administrative hearing, it cannot be disputed (and in fact was not disputed) that an overwhelming majority of employees have

---

[1]    Section 10(j) of the Act provides, "The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

disavowed UNITE HERE, Local 25 ("Union" or "Local 25") as their bargaining representative.[2]

The employees continually have made this clear to the Union, the NLRB, and the State Plaza.  At

the administrative hearing, State Plaza employees unequivocally testified that they do not wish to

be represented by Local 25.  <u>See</u> Tr. 517: 18-19, 24-25: 518: 1; 523: 13-16; 664: 24-25, 665: 1,

699: 6-13; 702: 2-3; 706: 16-19; 713: 1-3; 722: 18-19; 724: 7-10; 738: 15-20; 746: 18-20; 759:

16-18; 767: 12; 771: 16-19; 774: 24-25; 775: 1; 781: 23-24. <u>See</u> <u>also</u> Declarations of Reginald

Washington, Aubrey Elliot, Allioune Fall, Maria Caintic, Abdelouhab Hanchaoui, Mario

Sandiford, and Consuelo Esmeralda Mejia attached here to as Opposition Exhibit 1 (a)-(g).[3]

These employees testified, without rebuttal, that they came to the decision to disavow the Union

on their own, and free from any alleged unfair labor practices.  To issue a temporary injunction

would force Local 25 on these employees in the face of their clear and unequivocal disaffection

of the Union.

     To be sure, it is in the rarest of cases in which the NLRB seeks a temporary injunction

under Section 10(j).  For example, in Fiscal Year 2005 the NLRB sought injunctive relief only in

15 cases out of the 1,440 complaints issued by NLRB Regional Directors.  <u>See</u> NLRB General

Counsel Memoranda at www.nlrb.gov[4]  These numbers reinforce the Court's need to assure

---

[2]  Rather than supporting their initial filing with evidence, the Regional Director requested that the Court hear its Petition on the basis of the <u>full</u> evidentiary record developed before the NLRB Administrative Law Judge. Petitioners Memorandum, however, does not present evidence from the full evidentiary record.  The Regional Director is not being candid with the Court when it completely ignores the testimony of fifteen (15) State Plaza employees who testified at the hearing.  The Regional Director's statement such as "Respondent has no evidence," "undisputed evidence," "Respondent produced no untainted evidence," (Pet. Br. P. 40) is simply unsupported by the record.

[3]  These declarations are provided as further evidence that injunctive relief is not "just and proper," an issue not reserved for the ALJ, and are attached hereto as Exhibit 1(a-g).  The Declaration of Consuelo Esmeralda Mejia, 1(g) includes an original Spanish Statement and Statement translated into English.

[4]  In FY 2004, out of a total of 1,965 unfair labor practice complaints in only in 14 cases nationwide did the NLRB seek 10(j) relief.

itself that the well established administrative remedies are wholly inadequate to effectuate the purposes of the Act. See NLRB v. Electro-Voice Incorporated, 83 F.3d 1559, 1566 (7th Cir. 1995) (Section 10(j) relief should be granted only in those situations in which the effective enforcement of the NLRA is threatened by delays inherent in the NLRB dispute resolution process). These staggering numbers show that in over 99% of the NLRB's unfair labor practice cases, injunctive relief under 10(j) was found by the Board to be unnecessary. This Petition does not even come close to the notion that this is the less than 1% case that warrants such an extreme remedy – especially considering the employees important Section 7 NLRA, 29 U.S.C. §157, rights which are at issue here.[5]

On the contrary, the Regional Director's conclusory assertions, without a shred of evidentiary support, that the alleged unfair labor practices will render the Board's processes meaningless and permanently threaten the employees NLRA Section 7 rights is no substitute for evidence. Clearly, there is no way for the Regional Director to demonstrate to this Court that the allegations set forth in the Petition establish that granting temporary relief is "just and proper." The Regional Director has provided this Court with no compelling evidence to support the extraordinary relief sought. In fact, the Petitioner cites no evidence to support its position that injunctive relief is "just and proper." The undisputed facts demonstrate that there is no meaningful union support among the employees of the State Plaza. Erosion of support has been caused by the Union's own actions. An injunction at this time would further no legitimate interests, and would be harmful to the interests of State Plaza employees, whom the Act is

---

[5]    Section 7 of the NLRA provides: "Employees shall the right to self-organize, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and not to engage in other concerted activities for the purpose of collective bargaining or other natural aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right to refrain from and or all such activities may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a)(3). 29 U.S.C. § 157. (Emphasis added).

designed to protect.    Respondent respectfully requests that the Petition be dismissed immediately, with prejudice.

## II.    **STATEMENT OF FACTS**

State Plaza, Inc. is a subsidiary of RB Associates.  RB Associates owns four other hotels in the D.C. area-the Washington Plaza, the Hotel Lombardy, the Morrison-Clark Inn, and the Henley Park Hotel.  In or around the end of February 2005, RB Associates, implemented wage adjustments at each of these properties raising housekeeping wages to $12.50 per hour.  See Tr. 827: 1-16.  The company did not implement this wage adjustment at the State Plaza Hotel because the employees were represented by Local 25 and the Hotel and Union were in negotiations.[6]  See Tr. 827: 21-24.

Reina Lozano is an employee in the Housekeeping department and helps with the continental breakfast and mini-bar at the Hotel.  See Tr. 511: 5-13.  Lozano helped bring the union to the Hotel.  She campaigned for Local 25 and attended union meetings.  See Tr. 513: 14-24.  Alexandra Guillen worked as a waitress in the Hotel's restaurant until it was closed in the summer of 2004.  She was the most senior food and beverage employee, who, pursuant to an agreement between the Hotel and the union, remained with the hotel after the restaurant closed. See G.C. Exh. 55.  Guillen currently works continental breakfast and minibar at the Hotel.  See Tr. 592.  As the restaurant is closed, there is no restaurant manager.  Instead, Lozano and Guillen meet with General Manager, Corrado Palenzona, to discuss food and beverage issues.  See Tr. 540: 12-19; 597: 11-20.  The Regional Director has alleged that Lozano and Guillen are Respondent's agents.

---

[6]    During the relevant time period State Plaza, Inc. continued to give housekeeping employees their annual wage increases on their anniversary date of employment.  See Tr. 47: 1-20.  Employees are reviewed each year on or around their anniversary date and receive a percentage increase at that time.  See id.  The Union was fully aware that Respondent continued this practice during the election, challenge and negotiations process.

In March 2005, Lozano "got disappointed with the union because of what Ms. Olga said."[7] Tr. 516: 1-2.  Lozano asked Olga how things were going with the contract and Olga told her the Union was very busy with other campaigns for other hotels and "for the six of you, we won't have a good contract.  You are wasting our time and your time."  See Tr. 516-517.  Lozano told Olga "if you think we are wasting our time, then I won't participate in local 25 anymore."  Tr. 517: 7-9.  Sylvia Romero and Anita Viera, State Plaza employees, were also present at meeting and corroborated Lozano's testimony regarding Olga's statements.  See Tr. 663: 22-24; 664: 8-21; 775: 10-11.  Romero testified she stopped supporting the union "because of the version they gave the last time we had a meeting with them."  See Tr. 662: 19-25.  Romero testified that Olga said in order to get a contract, all the employees had to attend meetings.  Romero said they asked Olga to speak to each of the employees so that they would attend the meetings and Olga told her they did not have time because they had to devote time to other hotel contracts.  See Tr. 664: 8-14.  Olga also told the employees they were just wasting their time and wasting the union's time to which Romero responded "well, if we're just wasting our time and wasting yours too, we won't come back if we don't bring everybody with us." Tr. 664: 18-21.  Viera testified that Olga said that "she couldn't do anything with only seven people." Tr. 775: 10-11.  All three women lost interest in the Union and decided to stop supporting the Union as a result of this meeting and as a result of Olga's statements.  See Tr. 517: 18-19, 24-25; 518: 1-2; 523: 13-16; 664: 24-25, 665: 1, 775: 12-16.[8]

---

[7]    Olga is a Local 25 organizer/business agent. See Tr. 516: 3-4.

[8]    Lozano, Romero, and Viera's testimony regarding Olga's statements went unrebutted by Petitioner.  Further, testimony of Devki Virk echo's Olga's sentiment that the Union was too busy with other hotel contracts to pay any attention to State Plaza employees. Tr. 350: 12-25; 351; 352: 1-7.

After this meeting, Lozano informed her co-workers what Olga had said and this caused other employees to stop supporting the Union.[9] See Tr. 518: 21-23.  Based on the information, other housekeepers decided they would not support the union. See id.  The housekeepers then talked about how to get rid of the union and decided to write a letter. See Tr. 521: 1-11; 597: 1-4.

- **"This was all of us, we, all the workers who signed this particular document, we decided that we didn't want the union.  That's why we signed the document."** Tr. 713: 1-3. [Paul Kulanda]

- **"[W]e created [G.C. Exh. 3] among all our housekeepers we created this document."** Tr. 762: 5-6. [Maria Levia].

- **"We wanted to sign it.  We asked for it...Because we – I – we don't want the union. We simply do not."** Tr. 724: 7-10. [Gloria Castro]

- **"This was a decision that a little group of us employees of the hotel took."** Tr. 666: 6-7 .  **"This we did it."** Id. at 11. [Silvia Romero]

Lozano also told Guillen about the Olga meeting and asked Guillen for help.  On March 21, Alexandra Guillen, drafted a letter for Lozano and the housekeepers (G.C. Exh. 3) because she could write in English. See Tr. 594: 20-24; 595: 7-12; 604: 1-6; 519: 10-14, 17-21. Palenzona did not instruct Lozano or Guillen to draft the petition and did not tell Lozano or Guillen what to write on the petition. See Tr. 519: 15-16, 24-25; 596: 2-4, 11-14.  Guillen contacted her brother who worked with a union and he told her how to draft a petition. See Tr. 596: 4-10; 520: 3-5.

Both Guillen and Lozano collected signatures.  Neither Lozano nor Guillen made the housekeepers any promises to sign G.C. Exh. 3. See Tr. 521: 12-14; 522: 5-6 [Lozano]; 598: 18-20 [Guillen]; 666: 12-16, 22-24; 667: 6-8 [Romero]; 681: 13-22 [Mejia]; 698: 6-19 [Chumpitaz]; 712: 14-22; 713: 9-14 [Kulanda]; 723: 11-18 [Castro]; 738: 13-20 [H. Gonzales]; 746: 24-25;

---

[9]    Many of the employees had already stopped supporting the Union by this time and/or had never the supported the Union. See Tr. 681: 23-25; 682: 1; 767: 12; 772: 20-25; 773: 1.

747: 1, 13-15 [Cruz]; 756: 14-19 [Bonilla]; 762: 7-8 [Levia]; 774: 10-13 [Viera]; 781: 10-11 [Fuentes].

Andriana Nunez, Margarito Velasquez and Marleni Jiron[10] did not sign G.C. Exh. 3. See Tr. 143: 22-23 [Nunez]; 217: 21-22 [Velasquez]; 437: 8-12 [Jiron];[11] Ana Majano and Gloria Melgar signed G.C. Exhibit 3. See Tr. 289 [Majano]; 470 [Melgar].

Lozano and Guillen delivered G.C. Exh. 3 to the Union office on or about March 21, 2005. See Tr. 604: 9-11. In a phone call Lozano told Miguel, a union representative, why the employees wrote the letter—"because of what Olga has said." See Tr. 524: 4-16.[12]

On or about March 25 or 26, 2005, the housekeepers called a meeting in the Diplomat Room at the Hotel. See Tr. 150: 1-13. Palenzona and President of Classic Hospitality, Stephen Bello, were present at this meeting, as well as most of the employees in the housekeeping and laundry departments. See Tr. 19-25. Nunez alleges that after this meeting, housekeeping employees Gladis Bonilla and Gloria Castro stayed behind to speak with Palenzona. See Tr. 117: 18-25. Nunez stayed behind because she saw Bonilla and Castro indicate they wished to speak with Palenzona. See Tr. 118: 1-4. Nunez testified that Bonilla and Castro asked about a wage increase and Palenzona told them "that the raise was a matter of bargaining between the Union and the hotel, but there was nothing he could say on that." Tr. 119: 20-22. Bonilla responded "that's exactly what I don't want, bargaining..." Tr. at 120: 1-2. Nunez further testified that it was Castro who asked Palenzona if there was a way the employees could get rid of the union. See Tr. 120: 4-5. Nunez lied and pretended she did not want the union and also asked how the

---

[10]   Jiron is no longer employed at the Hotel. See Tr. 430: 2-3. She was terminated for fighting with Sang Nyguen who was also terminated for fighting. See Tr. 862.

[11]   In fact, Jiron testified that no one ever asked her to sign a paper against the union. See 437: 13-15.

[12]   Again this testimony went unrebutted.

employees could get rid of the union. See Tr. 120: 6-11. Nunez testified that it was **after** this meeting in the Diplomat Room, while eavesdropping from a hallway, she allegedly heard Palenzona tell Guillen and Lozano, located in an office, to circulate a petition.[13]

In April 2005, Lozano began receiving threatening phone calls saying "she would pay for what [she's] done to the union and Olga." Tr. 525: 16-18; 23-25; 526: 1; 527: 8-18; see also Respondent's Exh. 3. Lozano reported these calls to Palenzona and a union representative named Miguel. See Tr. 526: 2-4; 527: 2-7.

Other employees testified they received unwanted home visits from the Union. See Tr. 609: 22-25; 610: 1-9; 699: 14-25; 755: 12-21. As a result of threats and safety concerns, Hotel Management held a meeting with the Hotel staff in the laundry room in April 2005. See Tr. 608: 2-6; 813: 12-18. Guillen translated for Palenzona and Bello in this meeting. See Tr. 607:16-25. Neither management nor the employees discussed raises at this meeting. See Tr. 815: 12-19.

Like G.C. 3, the *employees* decided to create the second petition—G. C. Exh. 4. "This one too we also decided on a group of us employees, a group of us – a group of employees who had been visited by the union." Tr. 668: 2-4. Guillen drafted G.C. Exh. 4 for in May 2005. See Tr. 610: 10-11. No supervisor told her to create the petition and/or told her what to write in the petition. See Tr. 612: 17-25. A number of employees circulated this petition including Cruz. See Tr. 715:6-7. None of the employees circulating the petition promised employees would get a raise if they signed the petition to get rid of the union. See Tr. 532: 23-25; 533: 1-10; 612: 6-13; 667: 23-25; 682: 14-21; 714: 19-21; 724: 5-10; 748: 8-19; 757: 9-14; 774: 10-13.

---

[13]     The employees already had circulated and signed a petition at the time Nunez allegedly heard the conversation between Palenzona, Guillen and Lozano. Further, even if Nunez got her dates wrong, her time line is not plausible. Nunez testified she overheard the conversation after an employee meeting in the Diplomat room and that Lozano and Guillen approached her the following day. See Tr. 127. G.C. Exh. 3 was created and circulated on March 21, 2005, which was a Monday. This would mean the employee meeting occurred on a Sunday which is not conceivable.

Nunez, Velasquez, Jiron, Majano and Melgar did not sign G.C. Exh. 4. See Tr. 143: 22-23; 217: 21-22; 310: 5-10; 437. Majano testified she did not sign the petition because she did not choose to. Tr. 310:10. There is no evidence that Melgar was asked to sign G.C. Exh. 4.

On or about June 23, 2005, the employees created a third petition—G.C. Exh. 5. Aida Fuentes created the first page of G.C. 5. See Tr. 780: 17-22. Fuentes is a front desk employee. See Tr. 779: 11-15. The names on the first page of G.C. Exh. 5 are all Front Desk employees and Bellmen. See 781: 2-3. The Front Desk and Bell staff did not receive a market adjustment in July 2005. See Opposition Exh. 1 (a)-(g).

Lozano did not draft the language on the second page of G.C. Exh. 5, and does not recall who did. See Tr. 534: 15-21. Lozano, Romero, and Mejia collected signatures on the petition. See Tr. 534: 24-25; 535: 1, 17-18; 724: 19-20. Lozano, Romero and Mejia did not promise any employees they would get a $2.50 raise if they signed the petition and got rid of the union. See Tr. 535: 8-14; 536: 4-6; 615: 4-9; 669: 14-15, 21-24; 682: 22-25; 682: 1-3; 699: 4-13; 715: 8-10; 724: 21-23; 740: 7-9, 14-19; 748: 8-19; 758: 7-12; 762: 18-23; 766: 22-25; 767: 1-4; 768 4-6; 770: 22-25; 771: 1-5. Guillen did not participate in the creation of G.C. Exh. 5 or in soliciting signatures for the petition. See Tr. 614: 19-22; 534: 22-24.

Nunez, Velasquez, Jiron, Majano and Melgar did not sign G.C. Exh. 5. See Tr. 143: 22-23; 217: 21-22; 310: 5-10; 437: 8-12; 476: 12-13.

A group of housekeepers delivered either G.C. Exh. 4 or 5 to the Union offices.[14] The group included Romero, Castro Levia, Bonilla, Mejia, and Cateres. See Tr. 670: 758. When they delivered the letter to the union, they spoke with Olga and another woman from the Union. See

---

[14]    Some of the housekeepers believed it was G.C. Exh. 4 and others G.C. Exh. 5 and others were not sure which letter, but were present when a group of housekeepers delivered a petition to the union. See e.g. Tr. 669-670; 683; 758.

Tr. 670; 759: 16-18. The employees told the union representatives that "we were bringing this letter because we didn't want them to come bothering us anymore, to send us any more papers or anything." Tr. 759.[15] "We went to deliver a letter saying that we had no part with the union, that nobody was forcing us to be part of the union and it was just or initiative not to be a part of the union." Tr. 771: 16-19.

On July 5, 2005, Respondent held a meeting with the housekeeping employees in the cafeteria. Palenzona and Executive Housekeeper, Lisa Alvarado, were the management employees present at this meeting. Alvarado translated this meeting for Palenzona. See Tr. 620: 19-20; 621: 2-4. During this meeting, Palenzona told the employees he had been informed that a majority of the employees do not want the union;[16] that the Hotel was acting as if the union was not in place; and that the Hotel was going to give the employees a wage adjustment like it had done at the other Hotels. See Tr. 797: 8-13. The wage adjustment went into affect on July 8, 2005. Guillen also did not receive a market adjustment in July 2005. See 621: 12-13.

On or about November 14, 2005, Mejia drafted another petition because they had not received any answer from the Union. See Mejia Declaration. Mejia said she created the letter because she wanted the union to stop. There are no allegations that Mejia acted as an agent of Respondent. There are no allegations that employees were coerced to sign the November 14, 2005 letter.

---

[15]    There is evidence the employees did not read the union material distributed at the Hotel. Testimony demonstrates that the employees left the papers on the table or the floors or gave it to their supervisor Lisa Alvarado. See Tr. 803: 4-12; 804: 2-8.

[16]    The Hotel's withdrawal of recognition was based on the July petition which was signed by thirty-four employees. See G.C. Exh. 5. As of that date there were 50 employees in the unit.

### III.    ARGUMENT

### PETITIONER HAS FAILED TO SHOW THAT AN INJUNCTION WOULD BE "JUST AND PROPER" AS REQUIRED UNDER SECTION 10(J) OF THE NLRA

This Court must consider whether the issuance of 10(j) relief is "just and proper." D'Amico v. USSI, Inc. 867 F.Supp. 1075 (D.D.C. 1994).[17] Section 10(j) does not direct district courts to ignore traditional equitable criteria when evaluating petitions for temporary injunctive relief. Id. "Just and proper" is another way of saying "appropriate" or "equitable." Id, quoting Miller v. California Pacific Medical Center, 19 F.3d 449, 458 (9th Cir. 1994) (en banc).  Even though § 10(j) is an exception to the primary jurisdiction of the NLRB on labor disputes, it reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests. Miller, 19 F.3d at 458.  As such, in determining whether interim relief is "just and proper" under § 10(j), the Court must consider traditional equitable criteria, but through the prism of the underlying purpose of Section 10(j), which is to protect the integrity of the collective bargaining process and employee's rights under Section 7 of the Act, and to preserve the Board's remedial power while it processes the unfair labor practice charges.  Id at 459-60. The relief sought by the Board cannot be designed to protect the Union, but to protect Respondent's employees who seek to exercise their right to self organization (and to refrain from such activities) under the NLRA. See D'Amico 867 F.Supp. at 1088.  For this reason alone, the Petition must be denied as it would protect only the Union, and would be contrary to the stated and explicit interests of an overwhelming majority of Respondent's employees. See Lee Lumber

---

[17]   Judge Friedman in D'Amico, which is the most recent 10(j) case in this Court, rejected the "reasonable cause" standard espoused by Petitioner. Judge Friedman concluded that "reasonable cause" was a standard that could be used by the Regional Director as to whether to file an administrative complaint, but courts in 10(j) cases should employ the standards customarily used in suits seeking injunctions. See 867 F.Supp at 1085; citing Kinney v. Pioneer Press, 881 F.2d 485 (7th Cir. 1989); Miller, 19 F.3d at 460 .

11

and Building Material Corp. v. NLRB, 117 F.3d 1454 (D.C. Cir. 1997) (core principal of the NLRA is employee free choice).

The "just and proper" standard necessarily subsumes the traditional test for injunctive relief; a 10(j) temporary injunction is an equitable remedy and courts consider (1) the likelihood of success on the merits, (2) the movant will suffer irreparable harm if the relief is denied, (3) that other interested parties will not suffer substantial harm if injunctive relief is granted; and that (4) the public interest favors the granting of relief or, at least, that the granting of relief is not adverse to the public interest. See id.; see also Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc. 559 F.2d 841, 842-44 (D.C. Cir. 1977).

These factors must be viewed as a continuum, more of one factor compensating for less of another. Id. An order maintaining the "status quo"[18] is only appropriate only when a serious legal question is presented, the public interest is served, and denial of the requested relief would inflict irreparable injury on the movant and when little, if any, injury would befall the respondent. Id. at 844. Where an injunction, as here, (1) would disturb the status quo, (2) would be mandatory rather than permissive, or (3) would provide substantially all relief the movant would obtain after a full trial on the merits, the movant bears a heightened burden and must show that the four factors for consideration "weigh heavily and compellingly in movant's favor" before a preliminary injunction may issue. Kikumura v. Hurley, et al. 242 F.3d 950, 955 (10th

---

[18]  The "status quo" is that which existed prior to the alleged unfair labor practices. Chavarry v. ELC Electric, Inc. 2004 U.S. Dist. LEXIS 19591 (S.D. Ind. 2004). The employees testified that their support for the union eroded prior to the alleged unfair labor practices. See Tr. 517: 18-19, 24-25; 518: 1-2, 523; 775: 12-16. In addition, a court is not required to take affirmative steps to recreate the status quo. In this regard, a 10(j) injunction, if granted, must be narrowly tailored to ensure that the purposes of the Act will not be frustrated by actions that nullify or render meaningless a final order by the NLRB in a pending proceeding. This may require preserving the current status quo. Sharp v. Miller Waste Mills, Inc., 222 F.Supp 2d 1006, 1011 (D Minn. 1998). The injunction sought by the Regional Director herein is not narrowly tailored, as it gives no weight to the substantial evidence regarding the employees Section 7 NLRA rights to "refrain" from union activity.

Cir. 2001) (emphasis added).   The injunction the Regional Director seeks is a mandatory injunction requiring heightened scrutiny.   The Regional Director seeks, among other things, to force Respondent to recognize and bargain with the union as a minority union.   The injunction, then would be in the nature of a "Gissel" bargaining order.[19]   Such bargaining orders are extraordinary and disfavored remedies for a violation of the Act.   NLRB v. Gissel Packing Co., 395 U.S. 575, 602 (1969); Lee Lumber, 117 F.3d 1454, 1461 ("In numerous cases, we have reminded the Board that a bargaining order is an "extraordinary remedy" that may not be imposed in run-of-the-mill cases).   The injunction also would seek to provide the union with all of the relief it can obtain through litigating the 8(a)(5) claim arising from Respondent's withdrawal of recognition from the union – which is that Respondent be forced to recognize and bargain with the union, a minority union.   Lastly, granting the injunction would disturb the status quo and foist upon State Plaza a union the employees have clearly and unequivocally disavowed.  Thus, unlike other prohibitory injunctive requests that could be made, the request here requires the Regional Director to show that the equitable considerations for issuing an injunction "weigh heavily and compellingly" in its favor.   Id; see also Anderson v. United States, 612 F.2d 1112, 1114-15 (9th Cir. 1979).   The Regional Director cannot carry its burden.

A.    **THE NLRB HAS FAILED TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

The Regional Director has not presented any compelling evidence to show that it has a substantial case on the merits and that its requested remedy will ultimately be granted by the Board.  It is the Regional Director's burden to demonstrate a substantial likelihood of success on

---

[19]   This Circuit has held that when analyzing whether the extreme bargaining order remedy is appropriate there is no distinction to be made between non-incumbent and incumbent unions.  See  Lee Lumber, 117 F.3d at 1461; see also Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243, 1249 (D.C. Cir. 1994); Peoples Gas Sys. Inc., v. NLRB, 629 F.2d 35, 46 (D.C. Cir. 1980).

the merits. Its burden is not lifted simply because it has filed this action. See D'Amico, 867 F.Supp at 1088. This Court must determine whether the evidence presented, whether by affidavit or witness testimony, demonstrates a substantial likelihood of success on the merits, or at least a substantial case on the merits in the underlying complaints pending before the Board. Id; Rosemary Pye, Regional Director Region One, NLRB v. Young Women's Christian Ass'n Western Mass., 2006 U.S. Dist. LEXIS 5406 (D. Mass. February 13, 2006) (when Board seeks recognition in a 10(j) case, interim relief sought is essentially final relief and the likelihood of success should be strong). In a case such as this, where the NLRB is seeking an Order requiring State Plaza to recognize and negotiate with the union in the face of compelling employee Section 7 rights, the Board's threshold is particularly high. See Id.; Asseo v. Pan Am. Grain Co., 805 F.2d 23, 29 (1st Cir. 1986).

Respondent does not suggest the Court make factual determinations in this proceeding, however, in order to determine the likelihood of success on the merits, it is necessary to engage in some examination of the facts, as presented at the administrative hearing.[20]  The Regional Director opted to submit its Memorandum of Points and Authorities in Support of its Petition for Preliminary Injunction on the *complete* Administrative record, but has conveniently decided to ignore more than half of that record. While Courts have held evidence to is to be viewed in a light most favorable to Board, this does not translate into the Court only considers evidence presented by the Regional Director. Petitioner has painted a very skewed picture of the facts in this case and to evaluate the Regional Director's likelihood of success, the Court should consider the complete record before it. Upon such review, it is evident that the Regional Director does

---

[20]  Indeed it is Petitioner who placed the full administrative record before the Court. Petitioner filed this 10(j) injunction prior to there being an administrative record. It is telling that once the record has been developed, Petitioner has chosen to ignore it.

not have a substantial likelihood of success on the merits of its claims.    Thus, a temporary injunction is not appropriate in the present case.

> **1.    Petitioner Fails to Demonstrate a Likelihood of Success on the Merits that Petitions were Tainted by Respondent's Alleged Unfair Labor Practices.**

Respondent withdrew recognition based on an employee petition disavowing the union as their bargaining representative.  Based on this employee petition, there was actual evidence that the union had lost majority status. See Levitz Furniture Co. of the Pacific, 333 NLRB 717, 725 (2001).  Under the "actual loss of majority support" standard enunciated by the Board in Levitz, an employer, such as Respondent, can defeat a post-withdrawal refusal to bargain allegation if it shows, as a defense, the Union's actual loss of majority status.  Id; see also, LTD Ceramics, Inc. 2004 NLRB LEXIS 41; 341 NLRB No. 14 (employer validly withdrew recognition based on a decertification petition received after the certification year but signed by employees during certification year); Lee Lumber, 117 F.3d at 1458.[21]  It is undisputed that Respondent's withdrawal of recognition was based on evidence of an actual loss of majority support for the Union.

The Board, however, may challenge the withdrawal of recognition based on alleged unfair labor practices which it claims "taint" the employee petition (or evidence of actual loss of majority support).  See Lee Lumber, 117 F.3d at 1458; see also LTD Ceramics, Inc. 341 NLRB at 9.  In the context of a Board challenge to a withdrawal of recognition when the employer has allegedly committed unfair labor practices, the Board considers whether the unfair labor

---

[21]  An employer, like Respondent here, who presents evidence that, at the time it withdrew recognition, the Union had lost majority support should ordinarily prevail in an NLRA § 8(a)(5) case if the General Counsel does not come forward rebutting the employer's evidence.  Seaport Printing & Ad Specialties, Inc. 344 NLRB No. 34 (2005). (Slip Op.)  In this case there is no challenge to the fact that Respondent withdrew recognition based on evidence of an actual loss of majority support.

practice(s) "tended to (1) have a detrimental or lasting effect upon employees; (2) cause employee dissatisfaction with the Union; or (3) disrupt employee morale, deter their organization activities, and discourage their membership in the Union." Lee Lumber, 17 F.3d at 1458; LTD Ceramics, Inc., 341 NLRB 3.

Not every unfair labor practice will taint evidence of a union's subsequent loss of majority support; in cases involving unfair labor practices other than a general refusal to recognize and bargain[22] there must be specific proof of a causal relationship between the unfair labor practice and the ensuing events indicating a loss of support. Id. For example, in LTD Ceramics the employer committed an unfair labor practice in violation of § 8(a)(5) of the Act by unilaterally implementing a new attendance policy. Several weeks after the unilateral implementation of the policy, the employer withdrew recognition right after the certification year expired. The withdrawal of recognition was based on an employee decertification petition signed by 97 out of 171 employees in the bargaining unit.[23] The Board found that the employer's implementation of a new attendance policy did not taint the petition, thus finding the withdrawal of recognition lawful. Likewise, in Saint Gobain Abrasives Inc., 342 NLRB No. 39 (2004) (Slip Op.), the Board held that a hearing was required on the issue of whether there was a causal nexus between an employer unfair labor practice and withdrawal of recognition. Without such a hearing, "the employees are deprived, at least for now, of their Section 7 rights on the question of union representation." (Emphasis added).

---

[22] There is no allegation of refusal to bargain or recognize prior to the withdrawal of recognition based on the actual loss of majority support. There is no allegation of bad faith bargaining. In fact, according to the Regional Director's Amended Complaint, Respondent and the Union did engage in negotiations and there was never a refusal to negotiate prior to the withdrawal of recognition at the conclusion of the certification year. See Amended Complaint ¶ 18.

[23] By contrast, the loss of majority support in this case is far greater.

Here, the overwhelming testimony supports the contention that the employees' decision was not tainted by any alleged unfair labor practices and that it was the Union's actions that tended to have a detrimental or lasting effect upon employees, caused employee dissatisfaction with the Union, and discouraged employees' membership in the Union. The petition was signed by an overwhelming majority of the bargaining unit members. Thus, applying the <u>Lee Lumber</u> and <u>LTD Ceramics</u> standard to the complete record of facts in this case, the Regional Director <u>cannot</u> show a likelihood of success on the merits, and therefore, fails to demonstrate that temporary injunctive relief is necessary.

Petitioner is less than candid with the Court when it asserts there is no evidence that the employees lost interest in the Union prior to Respondent's alleged unfair labor practices. In fact, there is unrebutted testimony that as a result of the <u>Union's</u> actions, employees lost interest and decided to create the March petition—G.C. Exh. 3. Lozano testified that it was the Union, and specifically Olga's statements—the union is very busy with other hotels; the union cannot do anything if only a few people show up; and the employees are wasting their time and the Union's time—that caused her to stop supporting the union. <u>See</u> Tr. 516: 1-25, 517: 1-9. Likewise, Romero and Viera said Olga's statements that they are just wasting their time if only a few people show up causing them to lose interest. <u>See</u> Tr. 663: 22-24; 664: 8-21; 775: 10-11. Lozano told Olga and other employees present that she no longer would be involved with the union. <u>See</u> Tr. 517: 18-19, 24-25, 518: 1-2. After the March Union meeting, Lozano told her co-workers what Olga had said this caused other employees to stop supporting the union, as well. <u>See</u> Tr. 518: 21-23. On March 21, 2005, the employees circulated a petition to get rid of union because of this treatment and Lozano and Guillen delivered it on or about the same day. This is unrebutted evidence that employees were disenchanted with the Union before any alleged unfair

labor practices and told the Union this fact. Furthermore, it demonstrates the Union was frustrated because State Plaza employees were not attending meetings, yet another indication that employees did not support the Union prior to any alleged unfair labor practices.

Moreover, even Petitioner's witnesses' testimony contradicts the sweeping and inaccurate claim that there was no evidence of untainted discontent amongst the employees. Nunez testified that the meeting in the Diplomat Room occurred either on March 25 or 26, 2005. Thus, according to Nunez's testimony, G.C. Exh. 3, created and delivered on or about March 21, was signed, sealed, and delivered to the Union, **before** the Diplomat Room meeting; **before** Nunez took part in the alleged conversation between Palenzona, Bello, Bonilla and Castro; and **before** she allegedly overheard Palenzona instruct Guillen and Lozano to circulate a petition while eavesdropping; and thus, **before** any of the alleged unfair labor practices.[24]

Further, Nunez testimony highlights employees' discontent prior to any alleged unfair labor practice in that Nunez testified it was the two employees, Bonilla and Castro, who approached Palenzona and asked how the employees could get rid of the Union. According to Nunez, when Palenzona told the employees that Local 25 and the Hotel were negotiating, Bonilla responded **"that's exactly what I don't want, bargaining...."** Tr. 120: 1-2. Presumably, the employees were not asking Palenzona how to get rid of the union because they wanted the Union to continue acting as their bargaining representative. Further, "an employer may answer questions by employees who have already decided to pursue an effort to get rid of their bargaining representative and/or provide them with strictly ministerial assistance." Sportpaint, Inc., 2004 NLRB LEXIS 112 (2004); Wire Products Mfg., Corp, 326 NLRB 625 (1998); Central Washington Hospital, 279 NLRB 60, 64 (1986); Placke Toyota, Inc., 215 NLRB 395 (1974).

---

[24]     If Nunez was incorrect as to the dates of the meeting, she testified that the petition was circulated the day <u>after</u> the meeting. March 21 was a Monday. Thus, no meeting would have taken place on a Sunday.

Additionally, the Regional Director has failed to show that there is a causal relationship between the alleged unfair labor practices and the withdrawal of recognition. Fifteen witnesses testified there was no taint to the petitions; that they were not promised (and/or did not promise) a $2.50 raise to sign a petition to get rid of the Union; and that they do not want to be represented by the Union. Petitioner chooses to ignore this testimony and the witnesses' proffered reasons for signing the petition and loosing interest in the Union, none of which include promises or inducements on the part of Guillen, Lozano, Palenzona or the Hotel. Specifically, Hilda Gonzales testified "**I signed [G.C. Exh. 3] because I had attended the union meetings several times and it was always the same. There was never an answer. So what I wanted was to get rid of it.**" Tr. 738: 18-20. Gonzales testified no one promised her a raise in exchange for her signature on G.C. Exh. 3 or 5.[25] See id. at 738: 13-15.

Consuelo Esmeralda Mejia testified that Union was promising employees more money, so why would she go with $12.50 when the Union promised $14 per hour, plus vacation, plus holidays, plus free insurance. See Tr. 684: 5-8, 22-25; 685: 1-8. No one promised Mejia $12.50 an hour or a raise to get her to sign G.C. Exh. 3, 4, or 5. See Tr. 681: 13-22; 684: 3-8. Mejia testified that she passed around the third petition G.C. Exh. 5 (see 682: 19-21), that Palenzona did not direct her to collect signatures, and that she did not promise any employees a raise. See Tr. 682 22-25; 683: 103. "No, because I wasn't receiving any raise. Why would I say to my co-workers that they were going to get a raise?" See id.

No one promised Gladis Bonilla a $2.50 raise to sign the petitions. See Tr. 756: 11-19; 757:9-11; 758: 7-12. "No. We wanted to sign." Id. at 757:11. "**We didn't want the union to have any more demonstrations in front of the hotel**." Id. at 758: 24-25. She delivered a letter

---

[25]    Gonzales testified that she did not sign G.C. Exh. 4 because she was on vacation. See 739: 9-12.

to the union and told the union people "**we told them that we were bringing this letter because we didn't want them to come bothering us anymore, to send us any more papers or anything.**" Id. at 759: 16-18.

Paul Kulanda testified that he was not promised anything to sign G.C. Exhs. 3, 4, or 5 and that Palenzona did not ask him to sign. See Tr. 712: 21-24; 713: 9-14; 714: 19-23; 715: 8-10. "**This was all of us, we, all the workers who signed this particular document, we decided that we didn't want the union. That's why we signed the document.**" Id. 713: 1-3.

Gloria Castro testified that she recognized G.C. Exh. 3 "because it is the document that we signed because we don't want to have the union." Tr. 722: 18-19. Castro testified that no one promised her anything to sign G.C. Exh. 3, 4, or 5. See id. at 723: 11-18; 724: 5-7, 20-23. "**We wanted to sign it. We asked for it...Because we – I – we don't want the union. We simply do not.**" Id. 724: 7-10.

Romero, who went to almost all of the union meetings (see Tr. 674: 14-16), testified she was not promised anything to sign the petitions. See Tr. 666: 12-16, 22-24, 25; 667: 1-8, 23-25; 668: 1-4. She signed because she did not want the union anymore after what Olga said. See id. at 662: 19-25; 664: 16-21. Moreover, Romero collected signatures on G.C. Exh. 5 and did not tell any employee they would receive a raise if they signed or that Palenzona told her to collect signatures and that he would give the employees a raise. See id. 669: 14-24.

Maria Levia testified that "**we created – among all our housekeepers we created this document [G.C. Exh. 3].**" Tr. 762: 5-6. Levia was not promised anything to sign the petitions. See id. at 762: 7-8, 18-23.

Veronica Cruz testified that she signed G.C. Exh. 3 because she "did not want any more union, that's all." Tr. 746: 17-18. No one made her any promises to get her to sign the petitions. See 746: 24-25; 747: 1, 10-15; 748: 8-16.

Maria Chumpitaz testified that she was not promised a raise to sign the petitions, G.C. Exh. 3, 4, or 5. "That's false. Never." Tr. 698: 6-19; 699: 4-13. Furthermore, Chumpitaz testified that the information on the union flyers was false. "We all said how it was false that what it was saying there was that they were going to give us a raise, that we were obligated to, well, I don't know, but yes, it was all false what was written on that paper." Tr. at 701: 5-8

Juanita Perez that testified no one promised her anything to sign G.C. Exh. 5. See Tr. 766: 22-25; 767: 1-4. She also testified that she does not want the union at the Hotel, that she never belonged to the union. See id. at 767: 11-12; 768: 1-6.

Yessenia Cateres testified that she signed G.C. Exh. 5 and no one promised that she would get a raise if she signed the petition. See Tr. 770: 22-25; 771:1-5. She signed the petition because "[her] husband used to belong to the union and while he was working he would have to pay some fee to the union. So by the time when he was not working still he was required to pay fees to the union." Id. 771: 7-10. Cateres went with the women to **to deliver a letter saying that we had no part with the union, that nobody was forcing us to be a part of the union and it was just or initiative not to be a part of the union."** Id. at 771: 16-19.

The Regional Director's only evidence to support its allegation of a tainted petition is Majano and Melgar's testimony that they signed the first petition—G.C. Exh. 3 in March 2005. Nunez, Jiron and Velasquez never signed any petition and thus, were not coerced into anything. Majano and Melgar testified they signed the first petition because Lozano and/or Guillen's promise of a raise. Both, however, acknowledged they did not receive a raise after signing G.C.

Exh 3, and both acknowledge that they did not sign the other petitions because the did not want to. Consequently, they too were not coerced and Petitioner cannot demonstrate that any employees were coerced by unfair labor practices to sign the petition used as the basis for withdrawal.

Further, despite Petitioners repeated accusations of continued threats, interrogations, impressions of surveillance and repeated promulgation of overly broad no-distribution rules (Dkt. No. 12 at 32), the Regional Director has failed to link these alleged unfair labor practices to the petitions or any taint on the withdrawal. Specifically, Petitioner's witnesses testifying as to interrogations and surveillance did not sign the petition. Likewise the individuals testifying to Respondent's allegedly overbroad distribution policy did not sign the petition. Moreover, after Palenzona allegedly promulgated these overbroad rules, the employees told Palenzona they planned to continue distributing union material in the Hotel, and in fact, did continue to distribute union material inside the Hotel. See Tr. 279: 7-13; 444; 457; 482. Such distribution even took place in the presences of Hotel management. See Tr. 279: 11-13; 799: 1-5. No employees were reprimanded, terminated, or disciplined in any manner for distributing union material inside the Hotel. The Regional Director fails to offer any connection between these alleged unfair labor practices, any distribution, interrogation or threats, and the employees' petitions. The Regional Director's witnesses chose not to sign the petitions.

Lastly, the surreptitiously recorded tape, to which the Regional Director points as evidence of Respondent's promulgation of an overly broad no distribution policy, contradicts the allegations that the Hotel was coercing employees into disavowing the Union. Palenzona told Velasquez to "do what your heart tells you," and "[e]verything that you want, it is all right with me," and "[y]ou have the right to do what your heart and mind want to do, I respect you...." See

G.C. Exh. 109.[26]  There is no mention of a petition, sponsorship of a petition, getting the Union out of the Hotel, or even any mention of the Union in this tape.  At most, the conversation discusses distribution of material and further suggests that the reason for the conversation was that Palenzona was concerned that non-employees were in the building. See id.  There is no link, however, between this conversation and the employees' petitions or withdrawal of recognition.

Collectively, all this evidence demonstrates that the employees **do not** want the Union; that their decision did not have anything to do with the Hotel or promises of a $2.50 raise; and that Petitioner does not have a likelihood of success on the merits of tainted petitions allegations.[27]  Thus, it demonstrates that injunctive relief is not necessary in the present case.

### 2. Petitioner Fails to Demonstrate a Likelihood of Success on Allegations that Lozano and Guillen are Agents of Respondent Hotel.

The NLRB Complaint and the Regional Director's Petition alleges that many of the unfair labor practices were carried out by two alleged "agents" of the employer, Guillen and Lozano, and accordingly, a majority of Petitioner's claims rest solely on its ability to demonstrate that the two employees were, in fact, agents.  The Regional Director fails to set forth any evidence that these two hourly employees, who were members of the barging unit, are statutory agents and thus, Petitioner has failed to demonstrate a likelihood of success on the merits of this claim.

To succeed on its underlying claim (and thus to demonstrate a likelihood of success on that claim)  that Guillen and Lozano acted as Respondent's agents, Petitioner must demonstrate

---

[26]    This taped conversation which was secretly taped by Velasquez at the request of the Union (see Tr. 224: 9-17), was in Spanish.  The Regional Director translated it to English from Spanish.  At the hearing, the Regional Director repeatedly highlighted Palenzona use of the word propaganda and any negative connotations of that word. However, the word "propaganda" translates in Spanish as "advertising." See Cassell's Spanish Dictionary (1978).

[27]    This also highlights the inappropriateness of an affirmative bargaining order in the present case.  See Argument Section C. below.

that either (1) Respondent gave Guillen and Lozano actual authority to act on its behalf; or (2) that Guillen and Lozano had apparent authority to act, there was some manifestation by Respondent to third party, and the employees had a reasonable belief that the Hotel authorized Guillen and Lozano to perform the acts in question. See Laneko Engineering Co. Inc., 2004 NLRB LEXIS 82 (2004); see also Technodent Corp., 1989 NLRB LEXIS 311, **8-9)("Thus either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or the principal should realize that this conduct is likely to create such belief").  In light of complete record, even in a light most favorable to Petitioner, the Regional Director is not likely to succeed under either theory of agency, and consequently, is not entitled to injunctive relief.

Petitioner's only evidence of agency is the testimony of one witness, Nunez, who admitted to lying in order the assist the union (see Tr. 157), and claims that, while eavesdropping, she allegedly heard Palenzona tell Guillen and Lozano to circulate a petition and promise employees a $2.50 raise.  Petitioner, however, again ignores the unrebutted testimony that Lozano, Guillen and, in fact, a group of housekeepers decided to create this petition after the Olga union meeting and before Nunez heard the alleged instruction to circulate a petition. See Tr. 594: 20-24; 595: 7-12; 604: 1-6; 666: 6-7; 713: 1-3; 762: 5-6.

Petitioner ignores the evidence that employees other than Lozano and Guillen circulated the petitions and there are no allegations (and no evidence even suggesting) that these women acted at the direction of Respondent or promised employee's raises in exchange for their signatures and support. See Tr. 715; 6-11; 724: 19-23; 770: 15-19.  Petitioner also ignores that Fuentes, a front desk employee, created the first page of G.C. Exh. 5 and gathered signatures of other front desk employees on that petition, and that the Front desk employees and Bell Staff did

not receive the $2.50 market adjustment in July 2005. See Tr. 780: 12-24; see also Exh. 1. Thus, the Front Desk and Bell Staff employees had no incentive to sign the petition other than the exercise of their Section 7 rights stating they do not want Local 25 to bargain for them.

Finally, Petitioner ignores testimony that shows that if Lozano and Guillen told employees they would receive a raise if they signed the petition, employees still did not have a reasonable belief that this "promise" came from management or that Guillen or Lozano were "reflecting company policy and speaking and acting for management." See Laneko Engineering, at *48 (citing Waterbed World, 286 NLRB 425, 426-427 (1987)).[28]  In March, April, and May, as corroborated by Petitioners witnesses, management repeatedly responded to employees' inquiries about raises and the Union that the Hotel could not give a raise, and that raises would come from the collective bargaining process. Nunez testified that at the meeting in the Diplomat Room, Palenzona said the hotel would continue in discussions with the Union, in the bargaining with the Union (see Tr. 221: 13-15), and that "the raise was a matter of bargaining between the Union and the hotel, but that there was nothing he could say on that." Tr. 119: 20-22.  Velasquez testified that Palenzona told the employees "no one could receive a raise because the hotel was still involved in bargaining with the union and that the raise would come when the bargaining and reached an agreement." Tr. 222: 8-9.  Majano testified that at the meeting in the laundry room Palenzona and Bello stated "that they couldn't give a raise because they were bargaining." Tr. 305:4-5.  Further, Lozano testified when she asked Palenzona if the employees could have a raise, Palenzona stated, that was something that he couldn't talk about with us and that it was something that concerned us therefore he couldn't talk to us about it. See Tr. 541: 1-3.  Mejia

---

[28]    The witnesses testimony actually demonstrates that Lozano and Guillen did not promise raises at all, however, for arguments sake, even if they did tell employees they would get a raise, the Regional Director has no evidence that the employees had a reasonable belief Lozano and Guillen were acting on behalf of Respondent, and therefore, cannot demonstrate they have a likelihood of success on the merits.

testified she did not talk to Palenzona about the union because "he would not allow it." Tr. 682:2-4. Castro testified she never talked to Palenzona about the petition—"No, um-hum, they don't have anything to do with this." Tr. 724: 24-25. Thus, even if Lozano and Guillen told employees they would receive a raise, the employees (including the Regional Director's witnesses) did not have a reasonable belief that this was Respondent's message because the Hotel was saying the exact opposite.

Once again, based on the record, as submitted by Petitioner, the evidence demonstrates that Petitioner does not have a likelihood of success on its claims that Guillen and Lozano acted as agents, and consequently, fails to demonstrate a likelihood of success on the merits of this claim all weighing against granting injunctive relief in this case.

### 3.      The Three Year Old Unfair Labor Practice Case 5-CA-31346 Pending Before the Board Is Irrelevant to This Action

The Regional Director mistakenly relies on case 5-CA-31346, JD-44-04, 2004WL 1149361, which was filed by the Union on July 16, 2003. That case alleged certain "pre-representation petition" conduct by State Plaza from the Spring of 2003 prior to the Union's filing a representation petition.[29] The Union filed a representation petition in July 2003, and an election was held September 5, 2003. The Union won the election. Clearly, the alleged unfair labor practices from that case had no affect on the outcome of the September, 2003, election and are not even remotely relevant to the issues surrounding the State Plaza's withdrawal of recognition at issue here – nearly three years later.

---

[29]   The allegations in that case pre-dated the filing of a representation petition with the Board and the election. The allegations had no bearing on the filing of the election petition by the Union, and clearly had no bearing on the outcome of the election, as the Union won.

The Board considers four factors when determining whether unremedied unfair labor practices tainted subsequent expressions of employee disaffection, i.e., decertification petitions: 1) the length of time between the unfair labor practices and the withdrawal of recognition; 2) the nature of the illegal acts; 3) any possible tendency to cause employee disaffection from the union; and 4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union; Master Slack Corp., 271 NLRB 78, 84 (1984); NLRB v. Williams Enterprises, Inc. 50 F.3d 1280, 1288 (5th Cir. 1995); Cornelle A. Overstreet v. Tucson Ready Mix, Inc. 11 F.Supp 2d 1139 (D. Arizona, 1998). Each of these factors weighs heavily against consideration of 5-CA-31346 in this proceeding. First, the alleged unfair labor practices from 5-CA-31346 took place in the Spring of 2003, before a representation petition was filed. The withdrawal of recognition at issue here occurred in July, 2005. See Mattina, Acting Regional Director Region 2, NLRB v. Duane Reade, 177 LRRM 2803 (S.D.N.Y. 2005) (no 10(j) relief where election occurred two years before). Second, and most significantly, the Union won the September, 2003 election even during the pendency of the outstanding unfair labor practice charges. Thus, these charges had no bearing on the outcome of the election and, evidently no detrimental effect on the Union's organizational activities or membership. Moreover, these alleged unfair labor practices clearly did not cause any disaffection from the Union since subsequent to the alleged acts, the union petitioned the NLRB for an election, and won the election.

It is questionable why the Regional Director even deems it necessary to refer to these alleged unfair labor practices as grounds for injunctive relief. First, no references are made to these charges in the underlying complaint (5-CA-32594). Second, it is doubtful the current employees are even aware that such charges are even pending, let alone unremedied. There

certainly was no testimony adduced at the recent hearing on the affect of those charges. Moreover, there has been substantial change in the management staff at the hotel, and significant turnover in the unit since the Spring of 2003. See Tr. 754: 8-25; 779: 22-25; 780: 1-7. John Rish, the former General Manager who is alleged to have committed the unfair labor practices in early 2003 has not been employed at the hotel for some time. In fact, there have been two General Managers at the hotel since Rish's departure, as well as a change in the management staff.[30] See id. This Circuit has held that the change in company management is an important factor which the Board must consider. Cogburn Health Center v. NLRB, 05-1017 (D.C. Cir. 2006).

It is also disingenuous and a misrepresentation of the record for the Regional Director to "argue" that ALJ Evans "found that Respondent unlawfully discharged a leading union organizer in 2003." Dkt. No. 12 at 2. On the contrary, ALJ Evans found specifically that State Plaza had no knowledge of this employees union activities and dismissed the 8(a)(3) charge.[31] To be sure, the Regional Director refers to this pending charge because he lacks evidentiary support of the allegations at issue in this proceeding and in an attempt to manufacture arguments of "taint," when none exist.

## B.    PETITIONER HAS NOT ESTABLISHED IRREPARABLE INJURY

As part of its burden to show that issuance of preliminary relief is "just and proper," Petitioner must demonstrate irreparable injury in the absence of relief by a preponderance of the

---

[30]    The Executive Housekeeper, who is the head supervisor in the housekeeping department, has changed since 2003. See Tr. 796 Since 2004 the State Plaza closed its restaurant, where a significant portion of the unit employees were employed. G.C. Exhs. 51, 55. State Plaza bargained with the union regarding this closure, and the closure is not an issue here except for the composition of the existing unit.

[31]    The ALJ did find that the employee engaged in protected activity, but that such activity was unrelated to union activity. See Case 5-CA-31346.

evidence. See Electro-Voice, Inc., 83 F.3d 1567. Mere speculation that employees' rights would be chilled does not create irreparable harm and does not support the need for injunctive relief. See Szabo v. P*I*E Nationwide, Inc., 878 F.2d 207, 210 (7th Cir. 1989). Here, the Regional Director speculates, again without any evidence, that the lengthy period of time to resolve its complaint might, without preliminary relief, result in further erosion or support for the Union. See Pet. ¶ 33. In fact, Petitioner failed to produce any evidence that the labor effort would be irreparably harmed absent an injunction; there is nothing on the record below and nothing to supplement the record here. See D'Amico, 867 F. Supp. at 1087 (proof of actual harm to remedial powers necessary). Based on the undisputed evidence, from the full administrative record, a large majority of the employees have not supported the Union for a period of time prior to the alleged unfair labor practices. Respondent's evidence of complete erosion includes:

- No employee participation in collective bargaining negotiations;

- Employees did not show up or participate in Union meetings. (In fact, the Union informed employees that unless they had more support there was nothing they could do for them, and they were wasting their time);

- Employee's requests to the Hotel that they not be contacted by the Union;

- Four employee petitions to the Union telling the Union that they no longer wish union presentation. The most recent was after the filing of the NLRB Complaint;

- Employees did not read the union material and said what was written on the papers were lies;

- Direct and unrebutted testimony that the employees do not want the union;

- Employees' requests that the Hotel not engage in bargaining with the union; and

- Closure of the Hotel Restaurant, representing a drastic change in the composition and number of employees of the bargaining unit.

- Declarations from Front Desk employees and Bell Staff that they do not want to be represented by the union.

It is hard to imagine that Union support could erode any further or failure to grant the relief sought will result in irreparable harm. Petitioner is seeking the ultimate remedy it could obtain from the Board. Should the Union ultimately obtain its remedy before the Board it will be designated as bargaining remedy regardless of any supposed erosion of support.[32] As such, the Board's speculative and unsupported arguments fail to establish irreparable harm. An injunction in this instance would only help the Union and trump the employees Section 7 rights, which the Act is designed to protect.[33]

Moreover, based on the record, it is clear that it is Respondent that will suffer an irreparable harm if the Court grants Petitioner's temporary injunction and forces the Hotel to bargain with a union. The employees do not want to be Represented by the Union. If the Court forces Respondent's hand without any outlet to explain to the employees why, despite their repeated expressions that is "exactly what they do not want" (bargaining) (see Tr. 120), it will

---

[32]     It is significant that in its administrative Complaint the General Counsel seeks a remedy under Mar-Jac Poultry Co. 136 NLRB 785 (1962) (See Cmpt. P. 8-9). There, the Board enunciated a rule that in certain cases alleging failure to bargain that the union be granted a period of one (1) year (or some other reasonable time of actual bargaining before a decertification petition can be filed. Thus, should the Board ultimately grant the full relief requested in the complaint, the union would have a period of bargaining before it could be decertified. Therefore, temporary injunctive relief in the form of a bargaining order is unnecessary to protect the relief requested by the Regional Director.

[33]     Petitioner's statement that State Plaza employees "toil in low paying jobs" and are immigrants with little familiarity with their statutory rights (Petitioner's Memorandum of Points and Authorities at 43), is not only contradicted by the evidence, but is an insult to the many long term employees who have worked at the State Plaza, with the same employer and to the Respondent. Petitioner seems to lift, this argument from the D'Amico case, almost word for word (see 867 F. Supp. at 1086), where USSI had a 250 percent turnover rate (its cleaning contracts had thirty day cancellation clauses), and the company actively discharged may union supporters which was the basis of the injunction. None of those factors are present in this case.

result in a toxic work atmosphere, create disgruntled employees and will force Respondent to act against the wishes and rights of its employees.[34]

### C.    INJUNCTIVE RELIEF WILL HARM INTERESTED THIRD PARTIES AND WOULD BE CONTRARY TO PUBLIC INTEREST

Based on the overwhelming evidence that the employees do not want Local 25 as their bargaining representative, the remedy Petitioner seeks will harm the interested third parties-the employees of the State Plaza Hotel.  Further, imposition of an affirmative bargaining order will directly contradict public interest, as such an order would completely disregard the employees Section 7 rights and the explicit purpose of the NLRA—to protect employees' rights.

In claiming no third party interest will be harmed if the Court grants Petitioner's remedies, the Regional Director ignores the most important third party of all—the employees. The Regional Director seeks an option to rescind the employees' market adjustment and asks this Court to mandate collective bargaining when the record demonstrates that such "relief" is diametrically opposed to the wishes and exercise of employees section 7 rights.

Interestingly, in quoting Section 7 of the Act, Petitioner stops short of the language "and shall also have the right to refrain from any or all of such activities."  Such an omission is telling because it is that language that truly is at issue in the present case.  The State Plaza employees exercised their right to refrain from engaging in organization activities and Local 25 has refused to accept and/or acknowledge this exercise of rights.[35]  Now the Regional Director joins Local 25

---

[34]    The State Plaza employees did not even participate in the collective bargaining process.  The employees have unequivocally stated that they want to deal directly with the employer, not through a collective bargaining representative.  See Exh. 1.  Granting the injunction here would compel bargaining when it is not warranted and would force State Plaza to bargain with an agent a majority of its employees want nothing to do with.

[35]    It is significant that the employees have been harassed and threatened by the Union.  See Respondent Exh. 1. In fact, in Case No. 5-CB-9669 the Regional Director issued a complaint against the Union for such harassment and threats of Respondent's employees (Respondent Exh. 1).  Such harassment and threats have contributed to employee disaffections.

in its overt disregard of the voices of the employees, despite the fact it is unclear how they could make their message any more loud and clear.

The Board has cautioned Regional Directors not to take employees Section 7 rights to disavow union representation lightly—even in the face of unfair labor practice charges. Indeed, in Saint Gobain Abrasives, Inc., 342 NLRB No. 39 (2004), the Board reversed a Regional Director's dismissal of a decertification petition because of outstanding unfair labor practices. The Board stated:

> The Regional Director's finding of causal nexus was made without a hearing. The result is that the employees are deprived, a least for now, of their Section 7 rights on the question of union representation.

Id. (Emphasis added).

The employees have unequivocally expressed this sentiment on several occasions, most recently after the issuance of the Complaint. See Respondent Exh. 4; see also Exh. 1(*). The undisputed evidence shows that the employees came to this sentiment prior to any alleged unfair labor practices. The Regional Director is aware of these employee petitions disavowing the Union and, as such, the Regional Director cannot ignore the State Plaza employees' expression of their Section 7 rights to disavow union representation. See Nott Co., 345 NLRB No. 23 (NLRB Ag. 27, 2003)(employee free choice is at the heart of the Act).[36] The danger of infringement on these third party rights outweighs the need for any temporary relief in light of the complete record.

---

[36] "Decertification bars thus touch at the very heart of employees' rights under the National Labor Relations Act, and may have the effect of squelching, albeit temporarily, the right of employees 'to form, join, or assist labor organizations [and] to bargain collectively through representatives of their own choosing.'" Caterair Int'l v. NLRB, 22 F.3d 1114, 1122 (D.C. Cir. 1994) (citing 29 U.S.C. § 157).

Moreover, the imposition of an affirmative bargaining order in the present case would be contrary to the public interest. The purpose of the NLRA is to protect an employee's choice to engage in, *or refrain from*, organization activity. See Peoples Gas System, Inc. v. NLRB, 629 F.2d 35, 45. In the instance case, to a impose a bargaining order on employer, the Court must be willing to disregard the purpose of the Act and essentially tell the employees that the Union's interests trump their Section 7 rights. Such action surely is contrary to the public interest.

Even assuming Petitioner has met its burden, and the Court determines some form of temporary injunctive relief is warranted, issuance of an affirmative bargaining order is not an appropriate remedy and would not be "just and proper" in the present case. Court's have repeatedly stated affirmative bargaining orders are an "extreme remedy." Caterair Int'l, 22 F.3d 1114, 1122 (D.C. Cir. 1994), (citing Sullivan v. Indus. V. NLRB, 957 F.2d 890, 903 (D.C. Cir. 1992). Bargaining orders should be reserved for egregious violations. "[A] bargaining order is not a snake-oil cure for whatever ails the workplace; it is an 'extreme remedy' that must be applied with commensurate care." Caterair, at 22 F.3d at 1123 (citing Avecor, Inc. v. NLRB, 931 F.2d 924, 938-39 (D.C. Cir. 1991)). Moreover, even where courts do grant temporary injunctions, they recognize the injunction must be narrowly tailored. See Sharp v. Miller Waste Mills, Inc., 22 F. Supp. 2d 1006, 1011 (D. Minn. 1998) (interim bargaining order denied where Board made a "bold assertion that the mere absence of bargaining will cause further harm [to the union]"). Petitioner's sweeping request for relief is not narrowly tailored and not appropriate in the present case. Where it is clear, as in the instant case, that the Union has lost majority status, any Board decision affirming the decertification, would be frustrated by an affirmative bargaining order requiring Respondent to bargain, ignoring the employees' exercise of section 7 rights not to engage in organization activities.

Here, the record demonstrates the employees, independent from any alleged unfair labor practice, lost interest in and pulled their support from the Union, and that it was the Union's conduct that was the catalyst for loss of support. Petitioner has failed to demonstrate it has a substantial likelihood of demonstrating the contrary. Respondent did not terminate any employee or discipline any employee for engaging in union activity. None of Respondent's alleged conduct deterred any employee's organization activities. In fact, employees testified they ignored Respondent's alleged overbroad distribution polices and continued to engage in union activity and continued to distribute union material in the Hotel.[37] Thus, the alleged unfair labor practices did not deter or coerce employees' organization activities and should not weigh against the validity of the employees decertification petitions.

Further, not only does an affirmative bargaining order wholly ignore the employees' Section 7 rights, it offers little chance that bargaining will have any positive outcome. In Sharp, 22 F. Supp. 2d at 1008-1012, the court refused to issue an affirmative bargaining order under similar factual circumstances and held:

> Although disaffection with the union among bargaining unit workers is a concern, the anti-union petition makes clear that much of the damage already may have been done. Moreover, given the history of dealings between [Respondent] and the Local Union, there appears little chance that bargaining will lead to any positive outcome during the pendency of the administrative procedures...The NLRB has failed to demonstrate that requiring the parties to bargain would purge any existing taint or is necessary to preserve the Local Union's ability to enforce its rights before the Board.

In the present case, the employees have created four petitions expressing their discontent with the Union and their desire not to have Local 25 act as their exclusive bargaining representative. Petitioner has failed to demonstrate that an affirmative bargaining order would be "just and

---

[37]    See, e.g. Tr. 279; 444; 457; 482.

proper." Petitioner has failed even to offer any evidence to support its contentions. More importantly, issuance of a bargaining order would be directly contrary to the wishes of State Plaza employees and effectively would strip them of their rights under Section 7 of the Act, the very right the Petitioner is supposed to be protecting.

The imposition of an affirmative bargaining order would completely disregard the employees' expressed choice not to be represented by the union and would deprive them of their right to continue to express this choice. Accordingly, an affirmative bargaining order is not an appropriate remedy in the present case.

### D.  INJUNCTIVE RELIEF WOULD BE INEFFECTIVE GIVEN THE REGIONAL DIRECTOR'S DELAY IN PETITIONING FOR TEMPORARY RELIEF

Based on the July, 2005 employee petition, State Plaza withdrew recognition of Local 25. Local 25 almost immediately filed an unfair labor practice charge based on the withdrawal. The Regional Director initiated an investigation into the unfair labor practice charge in July, 2005. The Regional Director dismissed many of the charges during its investigation, but issued a complaint on the withdrawal of recognition on October 31, 2005. The Regional Director filed the instant petition for temporary injunctive relief, based on the October 31 Complaint, on February 24, 2006, and then requested that it be heard based on the administrative hearing to be held commencing March 17, 2006. Over nine (9) months has lapsed since State Plaza withdrew recognition. During this time period, State Plaza employees again have notified the Union as well as the Regional Director that they do not want wish union representation. See Respondent's Exh. 4. Delay by the Board, such as here, constitutes relevant evidence that interim injunctive relief is not truly necessary. See Kobell v. Suburban Lines, Inc. 731 F.2d 1076, 1092 (3rd Cir. 1984); Schaub v. Detroit Newspaper Agency, 14 F.3d 276, 280 (6th Cir. 1998). Delays as short as three months have been ruled significant. See e.g., Boire v. Pilot Freight Carriers, Inc., 515

F.2d 1185, 1193 (5th Cir. 1975). The Regional Director acknowledges that the issue of delay can be considered by the Court in determining whether to issue interim relief. Pet. Br. at 42. It would be impossible to restore the status quo in this instance given the employees clear and explicit instructions that the Hotel not engage in bargaining, and that the Union not negotiate on their behalf. Moreover, while the Regional Director states that "the Union has continued interest in representing this unit by active bargaining," it has no evidentiary support for such a statement. Not one employee, including witnesses offered by the Regional Director, testified that they want active bargaining.[38] In fact, the evidence shows otherwise – that during the certification year the Union had lost interest in State Plaza employees, and State Plaza employees lost interest in the Union. This evidence is unrebutted. Accordingly, the delay in filing the Petition is relevant evidence that interim relief is unnecessary and unwarranted in this instance.

## IV. **CONCLUSION**

For the foregoing reasons, Respondent respectfully requests that the Court deny the Regional Director's petition for Preliminary Injunction under Section 10(j) of the National Labor Relations Act. Further, due to the complex issues at hand and the severity of the remedy sought by Petitioner, Respondent requests an oral argument before the Court.

---

[38] Significantly, <u>none</u> of the witness who testified for the Regional Director, including Local 25 representatives, testified that there was any level of support for the Union at the Hotel among current employees.

Date:  April 24, 2006

Respectfully submitted,


_____/s/_____
Jonathan W. Greenbaum (Bar No. 412408)
Emily K. Hargrove (Bar No. 482906)
NIXON PEABODY LLP
401 9th Street, N.W.,
Suite 900
Washington, DC 20004-2128
(202) 585-8000
*Attorneys for Employer, State Plaza, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was served via First Class Mail on the parties listed below on this 24th day of April, 2006.

Thomas P. McCarthy
NATIONAL LABOR RELATIONS BOARD
1099 14th Street, NW
Suite 5530 E
Washington, DC 20570
(202) 501-8659
Email: thomas.mccarthy@nlrb.gov

BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, NW
Washington, DC 20005
(202) 842-2600
Fax: 202-842-1888
Email: dvirk@bredhoff.com

                              /s/
                              _____
                              Jonathan W. Greenbaum
                              NIXON PEABODY LLP
                              401 9th Street, N.W.
                              Suite 900
                              Washington, DC 20004-2128
                              *Attorneys for Employer, State Plaza, Inc.*