UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| **WAYNE R. GOLD**, Regional Director of Region Five of the National Labor Relations Board, for and on behalf of the **NATIONAL LABOR RELATIONS BOARD** | \* \* \* \* \* \* |
| 103 S. Gay Street, 8th Floor Baltimore, MD 21202 | \* \* |
| **Petitioner** | \* |
| v. | \* |
| | \* |
| **STATE PLAZA, INC., A WHOLLY-OWNED SUBSIDIARY OF RB ASSOCIATES, INC., D/B/A STATE PLAZA HOTEL** | \* \* \* \* \* |
| Mr. James Marten, President State Plaza Inc., A Wholly-Owned Subsidiary of RB Associates, Inc., d/b/a State Plaza Hotel 2117 E Street, NW Washington, DC 20037 | \* \* \* \* \* \* |
| **Respondent** | \* |

**CIVIL No. 1:06-CV-00329**
**Judge Kollar-Kotelly**

* * * * * * * * * * * * * * * * * * * * * * * * *

## PETITIONER'S REPLY MEMORANDUM

I.  **Respondent's July 5 Withdrawal of Recognition is Tainted by Respondent's Numerous Unfair Labor Practices Immediately Preceding the July 1 Decertification Petition Expressly Relied on to Withdraw Recognition from the Union**

Contrary to Respondent's arguments, there is no evidence that the purported loss of majority support occurred prior to the taint generated by the onslaught of Respondent's unfair labor practices in late March through early July 2005. The record facts establish that the July 1 purported loss of majority support (G.C. Exh. 5) relied on by Respondent when withdrawing recognition was tainted by instructions from General Manager Palenzona to employee agents Guillen and Lozano in late March to seek signatures for the decertification effort with promises

of substantial wage increases, Respondent's sponsorship and coercive monitoring of the petitions, and Respondent's overall coercive conduct when the petitions were circulated.[1]

Alleged agent Guillen tried to solicit decertification on behalf of Respondent's owner in November 2004, when Guillen approached former employee Segovia and told her Mr. Bernstein wanted to know why employees had gone Union and asked Segovia to solicit housekeeping employees to sign a petition to oust the Union so Bernstein could give them better wages and benefits and stop paying attorneys. Tr. 315-318.[2] Segovia refused Respondent's solicitation because she wanted the Union to obtain better wages and benefits for employees. Tr. 317.

Thereafter, in late March 2005, prior to belated commencement of bargaining on March 30,[3] Respondent unlawfully told employees Bonilla and Castro (who did not deny it), and Nunez (who confirmed it) that Respondent was going to rid itself of the Union by sponsoring a decertification petition in violation of Section 8(a)(1) as alleged in paragraph 10(a) of the Petition. Tr. 116-23.[4] Five minutes later, Palenzona directed senior employees Guillen and

---

[1] Contrary to Respondent's argument, prior unfair labor practices in Case 5-CA-31346 are relevant because the instant taint occurred while that misconduct remains unremedied. See United Supermarkets, 287 NLRB 119, 120 (1987) (decertification petition supported by 90 percent of unit is unreliable indicator of uncoerced employee sentiment because respondent, as here, had not remedied its many unfair labor practices); Robertshaw Controls Co., 263 NLRB 958, 959-60 (1982).

[2] Guillen also told Segovia that Bernstein "had helped her very much economically with her family." Tr. 318. Segovia believed that Guillen spoke on behalf of Bernstein because when Bernstein had visited the restaurant, he would ask Guillen to serve him personally, and they "would always greet each other with hugs and they would always be together talking together and eating together." Tr. 320. No other employees had similar privileged interaction with Respondent's owner. Tr. 320-21.

[3] Contrary to Respondent's argument at n. 22, the administrative complaint at paragraph 18 (see G.C. Exh. 1-M) does allege bad-faith bargaining through Respondent's overall conduct, including its decertification sponsorship and promises and grant of benefits if employees signed the decertification petition, but Petitioner does not seek interim injunctive relief for overall bad-faith bargaining.

[4] Respondent attempts to place this meeting on March 25 or 26, after the March 21 date on the first petition (G.C. Exh. 3), which Respondent does not rely on to justify its withdrawal of recognition. There is no evidence, however, that G.C. Exh. 3, a two-page petition with about 38 signatures, was circulated only on March 21. Rather, Nunez clearly testified that it was circulated to her by Guillen and Lozano with the Hotel's promise of a $2.50 wage increase the day after the late March meeting, and there were only five signatures on the one-page petition at the time. Tr. 127-130; see G.C. Exh. 28. Velasquez testified that in early April, Guillen and Lozano told him they were collecting signatures to get rid of the Union because the boss (Palenzona) says he will give us a raise. Tr. 215-26. Majano testified that

Lozano to collect petition signatures during work time by going from room-to-room while filling the mini bars. Tr. 124-26. When Lozano asked what to do if employees did not want to sign, Palenzona replied, "why wouldn't they sign. Everyone will sign because they want a raise." Tr. 126. [5] Based on Nunez's probative testimony against interest and the subsequent conduct of Respondent consistent therewith, Petitioner has a substantial likelihood of proving that Respondent unlawfully told employees Bonilla, Castro, and Nunez that it was going to rid itself of the Union by sponsoring a decertification petition, and instructed employees Guillen and Lozano to solicit a decertification petition, in violation of Section 8(a)(1) as alleged in paragraphs 10(a) and 14 of the Petition, respectively. More importantly, Guillen and Lozano, by grant of <u>actual</u> authority from Palenzona, became Respondent's decertification agents and, within the scope of that agency, promised substantial pay raises if employees signed the petitions, and interrogated and coerced them about their failure to sign.[6]

From late March until late June, Guillen and/or Lozano collected signatures from housekeeping employees by going room-to-room as instructed during work time and promising substantial wage increases from Respondent to $12.50 per hour if employees signed the petitions. Tr. 130-32, 215-17, 222, 289-293, 436-37, 469-70, 474-75, 857-861. Palenzona intimately knew about his agent's decertification efforts. He coercively interrogated Nunez about her refusal to sign the March petition and promised her that employees would receive a $2.50 raise if a majority signed. Tr. 134-35.[7] He coercively interrogated Melgar in June about a Union visit that Melgar had conveyed during Guillen's solicitation of Melgar to sign the June

---

Guillen and Lozano told her in April that Palenzona would give employees a $2.50 raise if they signed the petition. Tr. 289-92. Clearly, in these circumstances, Respondent's unfair labor practices beginning in late March, preceded any loss of majority support, especially the purported loss of majority support based on the July 1 petition that Respondent expressly relied on to withdraw recognition.

[5] This far exceeds "ministerial assistance" as Respondent mischaracterizes it. See R. Opp. at 18.

[6] See <u>Equipment Trucking Co.</u>, 336 NLRB 277, 286 (2001); <u>Dentech Corp.</u>, 294 NLRB 924 (1989); see also 29 U.S.C. Sec. 152(13) and Restatement, Agency 2d, Secs. 7-8, 26-27, and 83.

[7] See <u>Equipment Trucking</u>, 336 NLRB at 286.

petition (G.C. Exh. 5) with the promise that the housekeeping employees would receive a raise to $12.50 if they signed. Tr. 474-78.[8] The timing of the raises granted to 35 housekeepers shortly after withdrawal of recognition (see G.C. Exhs. 9-10(a) and 116-147) further supports agency.

Because Guillen and Lozano were actually authorized and directed to solicit signatures for the decertification petitions, and repeatedly informed Union supporters while doing so that a $2.50 per hour raise was promised by Respondent if a majority of employees signed the petitions (Tr. 124-26, 130-32, 215-17, 222, 289-293, 436-37, 469-70, 474-75, 857-861), and since Respondent followed through on its promises and granted all housekeeping employees unprecedented raises to $12.50 shortly after the third petition (Tr. 116, 211-12, 286-87, 438, 467, G.C. Exhs. 9-10(a) and 116-147), the Petitioner has established a substantial likelihood of proving that Respondent violated Section 8(a)(1) by unlawfully sponsoring the petitions and directing agents to circulate the petitions with promises of pay raises to employees if they signed, and violated Section 8(a)(5) and (1) by withdrawing recognition from the Union based on a decertification effort that was tainted by Respondent's numerous unfair labor practices during the four months immediately preceding the withdrawal of recognition.[9]

Respondent concedes that evidence in support of a withdrawal of recognition "must be raised in a context free of unfair labor practices *of the sort likely*, under all the circumstances, to affect the union's status, cause employee disaffection, or improperly affect the bargaining

---

[8] Petitioner established that Respondent violated Section 8(a)(1) when Palenzona interrogated employees about their union activity; created the impression of surveillance of their union activity and promulgating overbroad no-distribution rules. See Pet. Memo. at 24-25, citing record evidence and authorities.

[9] See Microimage Display Division of Xidex Corp. v. NLRB, 924 F.2d 245, 253-54 (D.C. Cir. 1991) (employer cannot rely on petition or loss of majority based on employer-orchestrated campaign to remove union); AT Systems West, Inc., 341 NLRB No. 12, slip op. at 4 (2004) (solicitation of decertification petition and direct dealing tainted employee disaffection); Equipment Trucking, 336 NLRB at 82-283, 285-86 (affirmative bargaining order warranted where employee agents promised wage increases for signing decertification petition used to unlawfully withdraw recognition).

relationship itself."[10]  Respondent failed to satisfy this test.  Applying the <u>Master Slack</u> criteria, the erosion of Union support expressed in the third decertification petition used to withdraw recognition just after the certification year expired can reasonably be tracked and directly attributable to Respondent's sponsorship and direct involvement in the circulation of the decertification petitions; Respondent's direction to employee agents to solicit signatures for the petitions with promises of unprecedented wage increases; and Respondent's coercive interrogations, impressions of surveillance, promulgations of overly broad no-distribution rules, and utterance of coercive statements about failure to sign the petitions, all which took place during the time the petitions were circulated.  The timing and nature of Respondent's violations, directed at Union supporters shortly before Respondent's withdrawal of recognition, were of the sort likely to have a detrimental and lasting effect on employee support for the Union.[11]

Despite Respondent's protestations, <u>there is absolutely no showing of loss of majority support relied on by Respondent prior to its unlawful conduct.</u>[12]  Even assuming that a few employees became disenchanted with the Union after a meeting in March and Union home visits in April, it is undisputed that the July 1 loss of employee support (G.C. Exh. 5) actually relied on to withdraw recognition arose after Respondent orchestrated the entire decertification effort and

---

[10] <u>Lee Lumber & Building Material Corp.</u>, 322 NLRB 175, 177 (1996), enfd. in relevant part and remanded in part 117 F.3d 1454 (D.C. Cir. 1997).  Respondent concedes that the criteria for determining whether a causal relationship has been established include: (1) the length of time between the unfair labor practice(s) and the withdrawal of recognition; (2) the nature of the violation(s), including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violation(s) to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union.  322 NLRB at 177, n.16, citing <u>Master Slack Corp.</u>, 271 NLRB at 84.

[11] For additional authority see <u>Bridgestone/Firestone, Inc.</u>, 332 NLRB 575, 576 (2000), enfd. in relevant part sub nom. <u>Teamsters v. NLRB</u>, 47 Fed. APPX. 449 (9th Cir. 2002)(unpublished); <u>Penn Tank Lines</u>, 336 NLRB 1066, 1067 (2001).

[12] Respondent erroneously argues that the loss of majority support is attributable to the Union's purported lack of interest in bargaining as expressed through hearsay testimony about statements allegedly made by a union representative to a few employees at a Union meeting in March 2005, and to the fact that a few employees complained about unwanted home visits by the Union in early April 2005, which resulted in the May petition (G.C. Exh. 4).

was tainted by the coercive atmosphere created by unremedied unfair labor practices beginning in late March 2005.[13] Respondent hangs its defense on the actual effect of the unfair labor practices based on subjective testimony and proffered declarations of a majority of petition signers. The law is contrary. Respondent's misconduct bars "any reliance on a tainted decertification petition even though a majority of the petition signers profess ignorance of their employer's misconduct."[14]

Given Respondent's use of employee agents since late March to solicit signatures on the petitions, its promises of unprecedented pay raises for those signatures as discussed at employee meetings and disseminated amongst employees (Tr. 221-22, 857-61), and its other coercive conduct outlined above, Respondent's argument that there was an uncoerced loss of majority status and that employees were freely expressing their section 7 right to refrain from Union support should be rejected. Similarly, Respondent's claim that an affirmative bargaining order would defeat employees' "voluntary" choice to reject their Union lacks merit.[15] In short, the petition signed on June 23 and July 1 (G.C. Exh. 5) was an unreliable indicator of uncoerced employee sentiment because Respondent has not remedied the taint from proximate unfair labor

---

[13] See Overnight Transp. Co., 333 NLRB 1392 (2001) (dismissing petition under Master Slack analysis because of objective tendency of unremedied misconduct to undermine union support, not actual effect).

[14] Beltway Transp. Co., 336 NLRB 850, 857 n. 29, 858-59 (2001); Hearst Corp., 281 NLRB 764, 765 (1986), affd. mem. 837 F.2d 1088 (5th Cir. 1988).

[15] See Marion Hospital Corp. v. NLRB, 321 F. 3d 1178, 1187-88 (D.C. Cir. 2003); NLRB v. Williams Enterprises, Inc., 50 F.3d 1280, 1290 (4th Cir. 1995); Equipment Trucking, 336 NLRB at 282-283, 285-86. Respondent's Answer asserts that "the decertification petition relied on by Respondent is untainted and there is no allegation of taint by the Regional Director regarding this petition." This affirmative defense lacks merit. The Amended Complaint at paragraph 19 (G.C. Exh. 2) pleads the numerous unfair labor practices that provide the requisite causal relationship to taint the July 5 withdrawal of recognition, all which took place during the time the petitions were circulated. Cf. United Supermarkets, 287 NLRB 119 (1987); Williams Enterprises, 312 NLRB 937, 939-40 (1993), enfd. 50 F.3d 1280 (4th Cir. 1995).

practices.[16] Respondent cannot undo the taint without remedying its misconduct and bargaining in good-faith with the certified representative.[17]

Respondent's argues that administrative delay renders an interim bargaining order ineffective. There has been no administrative delay.[18] Petitioner is allowed reasonable time to investigate and prosecute. Delay is only relevant if it precludes the Court's interim restoration of the lawful status quo ante or renders such restoration unnecessary.[19] There is no evidence that the brief passage of time would preclude the Court's ability to restore the lawful status quo ante by an interim bargaining order. Several employees still support the Union as evidenced by their testimony against interest, and the Union has shown continuing interest in representing this unit by active bargaining until withdrawal of recognition, and by pursuit of injunctive relief and participation herein as amicus curiae. Finally, Respondent's argument that interim relief is contrary to the public interest, harms non-party employees who signed the petitions, and upsets the current status quo of lost majority support, begs the ultimate issue and ignores substantial

---

[16] These include agent Guillen's and agent Lozano's June 2005 statements to employees Melgar and Nguyen, respectively, that housekeeping employees would receive a raise if enough employees signed the petition to get rid of the Union; Palenzona's subsequent interrogation of Melgar; and agent Guillen's late June statements that Palenzona sent her to find out why employee Melgar had betrayed him by not signing the petition circulated on or about June 23. These violations, as late as June, conjoined with extensive misconduct in March, April, and May, confirm that Respondent orchestrated the entire decertification effort and withdrew recognition in an atmosphere poisoned by coercion.

[17] Respondent's disingenuous attempt to rely on a petition dated November 14, 2005 is unavailing. That petition postdates and was not relied upon to justify the July 5 withdrawal of recognition. Judge Buschmann properly excluded it from evidence. Tr. 537-38; R. Exh. 4. More importantly, Respondent's lingering taint does not magically disappear because a new employee has circulated a new petition. In fact, Respondent added to the tainted atmosphere after its July 5 withdrawal of recognition by granting the promised pay raises to over a majority of unit employees on July 8. Each payday is a lasting reminder that Respondent's coercion undermined and displaced the employees' rightful bargaining representative.

[18] Respondent withdrew recognition only nine months ago, the amended complaint issued after full investigation in late December 2005, only four months ago. The unanimous Board promptly authorized injunctive relief. A full trial already has expeditiously concluded.

[19] Some courts require a heavier burden of proof for a mandatory preliminary injunction that goes well beyond maintaining the status quo pendent lite. Columbia Hospital for Women Foundation, Inc., 15 F.Supp. 2d 1, 4-5, (D.D.C. 1997). In this case, unlike Columbia Hospital, Petitioner is merely attempting to preserve the lawful status quo ante. Glasser v. Heartland Health Care Center, 333 F. Supp. 2d 607, 615 (E.D. Mich. 2003) (interim bargaining order in withdrawal of recognition case maintains status quo ante before unfair labor practices began).

record evidence establishing that the current status quo results from Respondent's unremedied illegality and tainted withdrawal of recognition.

### II.     Interim Injunctive Relief is Just and Proper

Having shown substantial likelihood of success on the merits, Petitioner addresses the remaining equitable criteria: (1) that Petitioner, the employees, and the Union will suffer irreparable harm if interim relief is denied; (2) that neither Respondent nor other interested parties will suffer substantial harm if relief is granted; and (3) that interim relief advances or is not adverse to the public interest.[20] Interim relief is necessary to prevent irreparable harm to the Union's continued level of support <u>and</u> employees' uncoerced exercise of Section 7 rights.[21] Respondent's unfair labor practices have had a chilling impact on uncoerced employee support for the Union as reflected by the number of signatures on the tainted petitions and lingering disaffection resulting from the tainted withdrawal of recognition.[22] Respondent benefits from its unlawful refusal to bargain pending litigation and stymies the Union's representational role thereby depriving employees of the benefits of collective bargaining and leading to further erosion of employee support.[23] Respondent's petition sponsorship, promises of unprecedented

---

[20] See <u>D'Amico v. United States Service Industries, Inc.</u>, 867 F. Supp. 1075, 1085 (D.D.C. 1994), citing, inter alia, <u>Sea Containers Ltd. v. Stena AB</u>, 890 F.2d 1205, 1208 (D.C. Cir. 1989); <u>Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc</u>. 559 F. 2d. 841, 842-44 (D.C. 1977). These factors are properly assessed as a continuum, i.e., more of one factor compensates for less of another.

[21] See <u>D'Amico v. Townsend Culinary, Inc.</u>, 22 F. Supp.2d 480, 490 (D.Md. 1998)(injunction granted in tainted withdrawal of recognition case); <u>Dunbar v. Park Associates, Inc.</u>, 23 F.Supp.2d 212, 217-218 (N.D.N.Y. 1998) , affd. 166 F.3d 1200 (2d Cir. 1998) (table)(same); <u>Laneko Engineering Co., Inc.</u>, 2003 WL 23139070, 174 LRRM 2395 (E.D. Pa. 2003)(injunction granted for these purposes).

[22] Withdrawal of recognition erodes support from and causes impotence of the union, and makes it difficult to preserve the collective bargaining process and extant terms of employment from unilateral change. <u>Bloedorn v. Francisco Foods, d/b/a Piggly Wiggly</u>, 276 F.3d 270, 298-99 (7th Cir. 2001); <u>Moore-Duncan v. Horizon House Development Services</u>, 155 F.Supp. 2d 390, 396-97 (E.D. Pa. 2001)

[23] A union's collective strength, essential for meaningful collective bargaining, can be seriously eroded during the litigation process when good-faith negotiations are not occurring because of a tainted withdrawal of recognition.  See <u>International Union of Electrical Workers v. NLRB (Tiidee Products, Inc.</u>), 426 F.2d 1243, 1249 (D.C. Cir. 1970), cert. denied, 400 U.S. 950 (l970).  Thus, an employer's unlawful refusal to bargain has an inherent tendency to undermine a union's support among employees.

pay raises to induce employee disaffection, coercion targeted at union supporters, and tainted withdrawal of recognition, cause serious adverse impact on employee interest in unionization and collective bargaining.[24] Irreparable employee losses include good-faith negotiation over significant employment terms such as job security, safety and health conditions, and the protection of a grievance-arbitration procedure, which cannot be made whole by a Board order in due course.[25] Absent interim relief, the Union is powerless as the employees' certified representative. Given Respondent's recidivism, its unlawful conduct likely will continue, precluding free exercise of statutory rights and rendering any final Board remedy ineffective.[26]

In stark equitable contrast, an interim bargaining order rectifies Respondent's unlawful self-help and merely requires Respondent to do what the law already requires, i.e., meet with the certified Union and bargain in good faith to agreement or impasse. It is not unduly burdensome because such bargaining order is temporary.[27] It dissolves by operation of law when the Board issues its Order. The Board's Order becomes permanent when the D.C. Circuit enforces it.[28] In

---

See Frye v. Specialty Envelope, Inc., 10 F.3d 1221, 1227 (6th Cir. 1993); Asseo v. Centro Medico del Turabo, Inc., 900 F.2d 445, 454-55 (1st Cir. 1990); Cf. Fall River Dyeing and Finishing Corp. v. NLRB, 482 U.S. 27, 49-50 (1987)("'the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages membership in unions.'")(quoting Franks Bros. v. NLRB, 321 U.S. 702, 704 (1944)).

[24] Cf. Kaynard v. Palby Lingerie, Inc., 625 F. 2d at 1053.
[25] Bloedorn v. Francisco Foods, 276 F.3d at 299.
[26] Arlook v. S. Lichtenberg & Co., 952 F.2d at 372.
[27] Seeler v. Trading Port, Inc., 517 F.2d 33, 40 (2d Cir. 1975).
[28] Respondent misreads D.C. Circuit law on enforcement of affirmative bargaining orders. Under Caterair Int'l v. NLRB, 22 F.3d 1114 (D.C. Cir. 1994), the D.C. Circuit will enforce a Board order to recognize and bargain with this Union under a cease and desist order. More importantly, under Marion Hospital Corp., 321 F.3d 1178, 1188 (D.C. Cir. 2003), the Circuit will enforce an affirmative bargaining order to rectify a tainted withdrawal of recognition where the Board articulates its reasons as explained in Lee Lumber, 117 F.3d at 1461-62.

Sharp v. Miller Waste Mills, Inc., 22 F.Supp. 1006 (D. Minn. 1998) is inapposite. The court there did issue an interim injunction requiring the company to recognize the union and refrain from unilateral changes, but declined an interim order for contract bargaining based on unique facts establishing that the parties had a lawful but unsuccessful bargaining history before the unfair labor practices arose. Here, by contrast, at the time Respondent belatedly entered negotiations on March 30, it had already sponsored and directed the decertification effort, and its unfair labor practices continued throughout bargaining, which was truncated by tainted withdrawal of recognition once the certification year expired.

Case 1:06-cv-00329-CKK   Document 16   Filed 04/28/2006   Page 10 of 10

these circumstances, a balancing of the potential injuries to the public interest, the parties, and the employees' uncoerced right to representation by their certified bargaining representative,[29] clearly weighs in favor of granting the interim bargaining order.[30]

### III.  CONCLUSION

Respondent's violations are flagrant and repeated and continue unremedied.  Section 10(j) relief is "just and proper" to prevent the inevitable erosion of employee support for the Union and the irreparable loss of the benefits of collective bargaining pending Board decision; to restore the Union's rightful representational role while support still exists; and to insure the efficacy of the Board's final order.  The delay attendant to the Board's ordinary adjudicatory processes will have a detrimental impact on the Union's representational function and ability to retain employee support in the face of Respondent's tainted withdrawal of recognition, direct dealing, ongoing refusal to bargain, and extensive coercion.  The papers filed in this case thoroughly address the issues before the Court and oral argument is unnecessary.  If the Court desires oral argument, Petitioner requests that it be scheduled expeditiously.

Dated in Baltimore, Maryland, this 28th day of April 2006.

| /s/ | /s/ |
|---|---|
| Albert W. Palewicz, Regional Attorney | Thomas P. McCarthy, Senior Trial Specialist |
| National Labor Relation Board, Region 5 | National Labor Relation Board, Region 5, WRO |
| 103 S. Gay Street, 8th Floor | 1099 14th Street, NW, Room 5528 |
| Baltimore, MD 21202 | Washington, DC 20570 |

---

[29] Respondent narrowly focuses on the Section 7 rights of employees to refrain from Union support after Respondent has poisoned the atmosphere, but the Supreme Court has recognized that "[t]he Board is entitled to suspicion when faced with an employer's benevolence as its workers' champion against their certified union.  There is nothing unreasonable in giving a short leash to the employer as vindicator of its employees' organizational freedom."  See Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 790 (1996).

[30] See Asseo v. Centro Medico del Turabo, Inc., 900 F.2d at 454-55.  As the First Circuit recognized, "If the goal of the labor laws and regulations is to strengthen the bargaining process . . . then ordering bargaining to commence cannot be contrary to the public interest."  Id. at 455.  Indeed, the NLRA protects the integrity of the bargaining process, and "the passage of the statute is itself an implied finding by Congress that violations will harm the public."  D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1086, citing Miller v. Cal. Pacific Med. Center, 19 F. 3d at 459.  Section 10(j) provides the mechanism for protecting this interest by preserving the Board's remedial power while it adjudicates.

10