## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WAYNE R. GOLD, Regional Director of Region 5 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>       Petitioner,<br><br>    v.<br><br>STATE PLAZA, INC., a wholly-owned subsidiary of RB ASSOCIATES, INC., d/b/a STATE PLAZA HOTEL,<br><br>       Respondent. | Case No. 1:06-CV-00329<br>Judge Kollar-Kotelly |

## REPLY MEMORANDUM OF AMICUS CURIAE HOTEL & RESTAURANT EMPLOYEES, LOCAL 25, UNITE HERE INTERNATIONAL UNION, IN SUPPORT OF PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

### Introduction

In a secret ballot election conducted by the NLRB more than thirty months ago,

employees of the State Plaza Hotel ("Hotel" or "Respondent") voted by a 2-1 margin to designate

Hotel & Restaurant Employees, Local 25 ("the Union" or "Local 25") as their collective

bargaining representative.  See G.C. Exh. 47 (tally of ballots in Sept. 5, 2003 election).  Now,

after engaging in a lengthy campaign of illegal acts designed to erode employees' support of the

Union – including variously threatening, coercing, and, most centrally, promising and granting

employees a substantial wage increase to renounce the Union -- the Hotel appears before the

Court and contends that ordering it to engage in good faith bargaining with the Union would

"effectively strip [State Plaza employees] of their right" *not* to be represented by the Union.

Resp. Br. at 35.

This argument is breathtaking in its boldness; for, of course, the "choice" that the Hotel asks the Court to respect is not the *free* choice contemplated by national labor policy, but a decision coerced by the Hotel's *own unlawful conduct*. The best evidence of the uncoerced wishes of State Plaza workers can be found in their overwhelming vote for Union representation: a choice that the Hotel, contrary to its current solicitude on behalf of its workforce, has manifestly *not* respected. As we show below, this case is four-square the type of situation for which Section 10(j) of the National Labor Relations Act ("NLRA"), which authorizes the District Court to issue an injunction to "prevent the continuation of unfair labor practices from nullifying the effect of any relief ultimately ordered by the Board," Beverly Health & Rehabilitation Servs. v. Feinstein, 103 F.3d 151, 153 n.1 (D.C. Cir. 1996) (citing with approval D'Amico v. United States Service Indus., 867 F. Supp. 1075, 1081 (D.D.C. 1994)), was designed.

## **FACTS**

1. The State Plaza Hotel.

The State Plaza, an all-suite hotel[1] located near George Washington University in the Foggy Bottom neighborhood, is one of a group of five hotels held by R.B. Associates, Inc., a Washington, D.C.-based real estate holding company owned by Richard Bernstein.[2] Tr. 44-45 (Palenzona). Operation of the hotels is coordinated at the corporate level by Steve Bello, president of Classic Hospitality, Inc., another subsidiary of R.B. Associates, and by James (Jim) Martens, an officer of R.B. Associates. See Tr. 808 (Bello); Tr. 47 (Palenzona). On a day-to-day basis, the Hotel's general manager, Corrado Palenzona, works on-site to oversee and exercise

---

[1] *See* http: //www.stateplaza.com for a detailed description and pictures of the guest suites, all of which include a full kitchen.

[2] The other four hotels are the Hotel Lombardy, the Morrison-Clark Inn, the Henley Park Hotel, and the Washington Plaza Hotel. *See* http://www.classichospitality.com.

general authority over the State Plaza.  Tr. 39 (Palenzona).   At the time of the Union election in

2003, the Hotel employed sixty-eight hourly workers, including housekeeping staff, front desk

and bellstand staff, and restaurant and kitchen employees, who were within the group of

employees the Union sought to represent.

        2.      <u>The Hotel's Prior Unlawful Conduct.</u>

This case is not the first time that the Hotel has been cited by the NLRB for similar

unlawful conduct.  During the union organizing campaign in the summer of 2003 before the

election was conducted, the Hotel tried to induce employees in the housekeeping department (the

largest department of the Hotel by far) to reject the union with a combination of threats and

promises.

Specifically, the Administrative Law Judge presiding in that case found that the Hotel's

general manager told housekeeping employees that if the Union won the election, the Hotel

would be sold. *See* G.C. Exh. 49 (slip op.), at p. 2.  In addition, he asked housekeepers why they

wanted to belong to the Union and, when advised of their various complaints – including

complaints about the "quota" or number of suites they were required to clean each shift, the lack

of supplies provided to perform their work, and the bad quality of the cafeteria food --  the

general manager promised to remedy the problems. *Id.* at pp. 2-3.  Moreover, the Hotel made

good on that promise, dropping the housekeepers' quota from 13 suites to 12, increasing the

payments made to housekeepers who cleaned rooms over and above their required quota,

providing them with supplies and free coffee, and improving the food served.  *Id.*  In concluding

that the Hotel had "grant[ed] employees [these] benefits in order to dissuade them from

supporting the Union" – in other words, that the Hotel had attempted to bribe employees to vote

against Union representation -- and had therefore violated federal labor law, *id.* at 6, the ALJ

specifically discredited the general manager's contrary testimony, finding it "incredible." *Id.* at 5.[3] The Hotel did not comply with the ALJ's order, and the case remains pending before the Board on exceptions.

As the record developed in the instant case demonstrates, in 2004-2005 the Hotel repeated this mix of threats and benefits – its *modus operandi* – to convince employees to abandon the Union.

3.    The Delay in the Union's Certification and the Efforts to Meet.

Despite the Hotel's campaign to discourage support for the Union, its employees overwhelmingly elected representation in September 2003. However, the Hotel refused to recognize the results of the vote and instead filed meritless charges and objections to contest the results of the election. See G.C. Exh. 48(a) (Letter from J. Greenbaum, attorney for Hotel, to J. Boardman, Executive Secretary-Treasurer of Local 25 (Nov. 26, 2003)). Full litigation of these claims, all of which were ultimately dismissed, delayed issuance of the Union's official certification until June 29, 2004, almost a year after the election was held. See G.C. 50 (Recommended Decision on Objection (Mar. 23, 2004)); G.C. Exh. 53 (Decision and Certification of Representative) (Jun. 29, 2004)). At around this same time, the Hotel also notified the Union that its restaurant, which employed approximately eighteen of the sixty-eight employees in the certified bargaining unit, would be closed for renovations "indefinitely." *See* G.C. Exh. 51 (Letter from J. Greenbaum to J. Boardman (Jun. 23, 2004)).

---

[3] In addition, the ALJ found that the Hotel had discharged an employee of the restaurant for engaging in protected activity, and ordered reinstatement of that employee. *Id.* at p. 16.

After the certification issued, the Union repeatedly requested that the parties schedule dates to begin bargaining an initial contract for the Hotel employees, and that the Hotel supply certain basic information about its workforce and their existing terms and conditions of employment.  *See* G.C. Exh. 54 (Jul. 2, 2004 request to bargain); G.C. Exh. 56(a)(Aug. 2, 2004 request to bargain); G.C. Exh. 57 (Dec. 2, 2004 request to bargain and information request); G.C. Exh. 58 (Jan. 3, 2005 request to bargain).  The Hotel ignored these requests.  Finally, on January 28, 2005, the Union threatened to file unfair labor practice charges based on the Hotel's continued failure to respond.  G.C. Exh. 59.  Only at that point did the Hotel's attorney, Jonathan Greenbaum, offer any dates to meet; even then, the Hotel offered no more than one date at once, that date was characterized as "tentative" and was, in any case, four weeks away.  *See* G.C. Exhs. 60-62.  In fact, due to a series of cancellations by the Hotel, the parties did not in fact hold this initial meeting until March 30, 2005.  *See* G.C. Exhs. 62-71 (exchange of correspondence).

    4.    <u>The Unlawful Campaign to Oust the Union: Recruitment of Lozano and Guillen</u>.

Notwithstanding the Hotel's indifferent responses to the Union's demands for bargaining, its activities inside the Hotel during this period demonstrate that it was anything *but* indifferent to the prospect of collective bargaining.  The Hotel's campaign to oust the Union began in late 2004, at approximately the same time that the Union stepped up its demands for bargaining, with the Hotel's recruitment of two senior employees, Reina Lozano and Alexandra Guillen.

Ms. Lozano had supported the Union during the election campaign and was a leader among the housekeeping staff.  In late 2004, she approached the Hotel's general manager, Corrado Palenzona, and asked him for extra hours because she needed money to pay the mortgage on a new house.  Tr. 562-563.  Mr. Palenzona agreed, and, in December 2004,

transferred Ms. Lozano to a position assisting another employee, Alexandra Guillen, in preparing the continental breakfast served to guests, checking and restocking the Hotel's mini-bars.  Tr. 565; Tr. 593 (description of duties).  Since December 2004, Ms. Lozano, who had been a housekeeper at the Hotel cleaning a full quota of guest suites for fifteen years, has never cleaned another suite.  Tr. 566; Tr. 588.[4]

Ms. Guillen is a 25-year employee who worked as a waitress in the restaurant until its closure in July 2004.  Ms. Guillen was retained after the closure to prepare and serve the continental breakfast for Hotel guests.  Tr. 640; *see also* G.C. Exh. 55.  At that time, she was also asked to perform the mini-bar work and received a wage increase from $7.42 per hour to $10.00 per hour.  *See* G.C. Exh. 146a (A. Guillen personnel action forms).[5]  In addition, beginning in December 2004, Ms. Guillen (sometimes assisted by Ms. Lozano) began to service banquets and other functions held at the Hotel.  Tr. 654-655; 659-660.  For performing the banquet work, Ms. Guillen receives gratuities (a portion of the service charge by the Hotel to the party holding the function) in addition to her hourly pay.  At trial, Ms. Guillen testified that these banquets were "maybe once a week or twice, you know . . . minor things, two or three banquets, you know, a month."  However, her payroll records show that she earned *almost $20,000* in gratuities in 2005

_____

[4] There is no evidence that the position into which Ms. Lozano was transferred was ever posted; moreover, the Hotel never advised the Union that a position had been created, or that Ms. Lozano had been transferred into it.  Indeed, as of March, 2005, the Hotel was still telling the Union that Ms. Lozano was in the housekeeping department.  *See* G.C. Exh. 90 (Mar. 25, 2005 fax from J. Greenbaum listing classifications and wage rates).

[5] Neither the assignment of mini-bar duties to Ms. Guillen nor her $2.58 per hour wage increase was discussed with the Union.

– a figure that amounts to nearly half of her total annual income. *See* G.C. Exh. 155-156 (2005-2006 pay records for A. Guillen).[6]

     5.     <u>The Unlawful Campaign to Oust the Union: The $12.50 Wage Increase and the Circulation of the Petitions by Lozano and Guillen with Support and Authorization of the Hotel</u>

In March 2004, Ms. Lozano and Ms. Guillen met with general manager Palenzona in his office. Ms. Lozano asked Mr. Palenzona if she could receive a raise. Tr. 564 (Lozano). Mr. Palenzona said that no raises could be given because the Union had – as Ms. Lozano phrased it – "a claim against" the Hotel. *Id.* However, Mr. Palenzona agreed to speak with the Hotel's attorney, Mr. Greenbaum, "to see what they could do about the raise," *id.*, and informed the two women that "perhaps when the problem with the union was resolved, the hotel could give all of the employees a raise of pay up to $12.50 per hour," similar to the wages earned by employees in other R.B. Associates hotels. Tr. 564-565 (Lozano).

After that meeting, Ms. Lozano and Ms. Guillen circulated a petition among their coworkers disavowing the Union. *See* G.C. Exh. 3. The circulation was done during working time, with Ms. Lozano and Ms. Guillen going between floors to check the mini-bars in each guest room and, in the course of that activity, approaching housekeeping staff on the elevators or in the rooms to ask them to sign the petition. *See, e.g.,* Tr. 290 (Majano).

This solicitation of employees was done with the full support and knowledge of the Hotel. Another housekeeper, Adriana Nunez, testified that, in March, Mr. Palenzona and Mr. Bello stayed after a departmental meeting to talk with herself and two other housekeepers. Tr. 118-122. The housekeepers inquired about a wage increase, and, when Mr. Palenzona told them

---

    [6] As of the week of July 5, 2005, when the Hotel withdrew recognition from the Union, Ms. Guillen had earned $11,928 in gratuities in the year 2005.

that the raise had to be bargained with the Union, one of Ms. Nunez's co-workers said that she didn't want that, and asked if there was a way to "get rid of the Union." Tr. 119-120. Mr. Palenzona told them that a majority of employees needed to sign a petition, and had them wait while he and Mr. Bello called the Hotel's attorney. Tr. 120-121. When he finished the telephone call, Mr. Palenzona informed the employees that "everything will be worked out. We'll get a petition out on the Union and we'll no longer have any problems with the Union and this hotel." Tr. 122. He also instructed the employees that "what was said was simply among us" and "not to say anything to any of the other employees about what we had spoken [about]." Tr. 122. Later that afternoon, Ms. Nunez saw Mr. Palenzona meeting with Ms. Lozano and Ms. Guillen in the food and beverage office and eavesdropped when she realized "that they were speaking about the petition." Tr. 124. She heard Mr. Palenzona instruct the two women to "go from door-to-door with the petition to get the signatures of the Housekeeping employees." Tr. 125. Ms. Lozano asked Mr. Palenzona, "What will happen if they don't want to sign?" Mr. Palenzona responded, "Why wouldn't they sign? Everyone will sign because they want a raise." Tr. 125-126.

The next day, Ms. Guillen and Ms. Lozano approached Ms. Nunez with a petition disavowing the Union, Tr. 127-128, and told her that the petition "comes with a $2.50 raise"; Ms. Nunez declined. Tr. 131. Later that evening, when she went to clean Mr. Palenzona's office, he inquired as to why she hadn't signed the petition, and asked, "Don't you want a raise?" Tr. 134.

Although Ms. Lozano denied receiving instructions from Mr. Palenzona, she acknowledged that, in circulating the petition, she told her coworkers that "perhaps the hotel would give us a pay raise of $12.50 like the other hotels if the issue with the union was resolved." Tr. 573-575 (Lozano). Ms. Lozano testified that she made this statement because it was her "opinion" and that she didn't mention Mr. Palenzona's name. Tr. 575. However, several

employees whom she and/or Ms. Guillen approached testified otherwise.  Tr. 129-132 (Nunez) (Guillen said "the petition comes with a $ 2.50 increase" if "the majority sign this document" and, when Nunez hesitated, Lozano said "or perhaps you don't want the raise"); Tr. 291-293 (Majano) (Lozano stated that she had spoken with "Mr. Corrado" and that "Mr. Corrado had decided to give us a $2.50 raise" if people signed the petition); Tr. 470 (Melgar) (Lozano said that "Mr. Corrado had said that if we got rid of the Union, we were going to have the raise to $12.50"); Tr. 856-857 (Nguyen) (Lozano and Guillen "said to me that [the petition] said that if I don't join the union then the boss would pay me higher salary," and Lozano rubbed her thumb and forefinger together to indicate money).

6.      The Hotel's Unlawful Campaign: Intimidation and Coercion of Union Supporters.

At the very same time that Lozano and Guillen were circulating, on working time and work areas, and with full knowledge of the Hotel, a petition to oust the Union, the Hotel was interrogating, intimidating and threatening discipline against Union supporters who were distributing pro-union literature in *non-work areas* on *non-working time*.  *See* Pet. Br. in Support of Prelim. Injunction (Apr. 4, 2006), at pp. 12-13 (detailing evidence).

7.      The Hotel's Unlawful Campaign: Withdrawal of Recognition and Granting of $12.50 Wage Increase

The first petition was delivered to the Union in late March or early April, 2005.  A second petition, asking the Union to cease "harassment" of employees, was circulated in April or May and delivered to the Union in early May.  *See* G.C. Exh. 4 (May 2005 petition).  During this same period, the Hotel and the Union met several times, and the Union provided the Hotel with a comprehensive proposal.  G.C. Exh. 86.  The  Hotel never submitted any written proposals; its chief negotiator commented that the Union's proposal was that it appeared expensive, and the

owner would selll the Hotel rather than operate at break-even or a loss.  Tr. 389; Tr. 396.  As to

wages, the Hotel proposed to increase the wages of housekeeping staff to $11.00 per hour.  Tr.

404.

Beginning in late June, Ms. Lozano and others circulated a third petition.  G.C. Exh. 5.

Again, the solicitation of signatures was conducted on working time in working areas – indeed,

one witness testified that the petition was laid out on a desk in a vacant guest suite; employees

entered the room to sign their names, and then left to return to their duties.  Tr. 858-859

(Nguyen).   This final petition was delivered to the Hotel's general manager in early July, 2005.

Tr. 98 (Palenzona).  On July 5, the Hotel called a meeting of the employees, and Mr. Palenzona

told the assembled group that "the problem with the union is over," and "now the hotel can give

[employees] a raise up to $12.50." Tr. 576 (Lozano).  The same day, the Hotel's attorney advised

the Union that the Hotel was withdrawing recognition based on evidence of a loss of the Union's

majority support.  G.C. Exh. 96.  The Hotel did not provide the Union with a copy of this

"evidence"; nor did any employee ever send or deliver the last petition to the Union.  Tr. 870-871

(Shykula).

On July 8, 2005, all housekeeping department employees received their first paychecks

calculated with their new wage rate.  Prior to that date, housekeeping staff (who comprise almost

three-quarters of the bargaining unit) earned between $ 9.35 and $11.50 per hour.  *See* G.C. Exh.

90 (Mar. 25, 2005 list).[7]  Sixteen out of thirty-six earned less than $10.00 per hour, and twenty-

three out of thirty-six earned less than $11.00 per hour.  *Id.*   Prior to the July 2005 increase,

housekeepers routinely received annual hourly increases in the range of $ 0.30 – 0.40, about 3%.

_____

[7] Housekeeping department employees include laundry attendants, lobby attendants,
turndown attendants, and housekeepers.

*See, e.g.*, G.C. Exh. 83 (wage increase history of State Plaza employees prepared by Hotel).  For most of the housekeeping department, the July 2005 increase amounted to between $ 1.50 – 2.50, representing a raise of 15 – 25%.  At no time during its meetings with the Union did the Hotel ever propose the wage increase that it implemented on July 5.

## ARGUMENT

Section 10(j) of the NLRA was enacted in recognition that "[t]ime is usually of the essence [in labor disputes] and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives [of the Act]," including the "encouragement of the practice and procedure of free and private collective bargaining."  *Miller v. California Pacific Med. Center*, 19 F.3d 449, 455 n.3 (9th Cir. 1994) (quoting Sen. Rep. No. 105, 80th Cong. 1st Sess. 8 (1947)).  Congress therefore adopted Section 10(j) to provide the Board with a means by which to obtain interim relief during the pendency of the agency proceedings; absent this remedy, it would be "possible for persons violating the [A]ct to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation."  *Id.*

The Board and the Hotel disagree as to the precise formulation of the standard the Court should apply in determining whether 10(j) relief is "just and proper."  *See* Pet. Br. at pp. 17-18; Resp. Br. at 11-12 & n.17.  The Union does not believe that there are, in fact, any substantive differences between the formulations urged by the parties.  Even if there were, however, those differences would mean nothing in this case:  injunctive relief is warranted under *any* standard.

A.     <u>The Record  Contains Ample Evidence that the Hotel Unlawfully Withdrew Recognition.</u>

1.  The NLRA requires an employer to meet "at reasonable times" for the purpose of bargaining in good faith with the chosen representative of a majority of its employees.  *See* NLRA, §§ 8(d), 8(a)(5).  The "fundamental policies of the [NLRA] are to protect employees' right to choose or reject collective-bargaining representatives, to encourage collective bargaining, and to promote stability in bagaining relationships."  *Levitz Furniture*, 333 NLRB 717, 723 (2001).  This "means that collective-bargaining relationships must be given an opportunity to succeed, without continual baseless challenges."  *Id.*  To ensure these goals are met, the Board has long held that an employer is required to presume that a union freely elected by its employees enjoys continuing support from a majority of the workforce, and is required to recognize and try to reach an agreement with that union.  *Id.*

Where, as here, a union is duly certified by the Board, this "presumption of majority status" is irrebutable for one year following the issuance of certification.  Following that initial "certification year," an employer still must presume the union enjoys majority support and continue to recognize the union bargain with it in good faith; only if an employer can prove with "objective evidence" that "the union has, in fact, lost the support of a majority of employees in the bargaining unit," that an employer may – but need not -- withdraw its recognition and cease bargaining.  *Id.* at 725.  Indeed, the Board has emphasized that even an employer who possesses such "objective" proof of the union's loss of support "withdraws recognition at its peril."  *Id.*

It goes without saying that this rule assumes "that the employer did not commit any unfair labor practice"; that is, it assumes that any loss of support amongst the employees is the product of the employees' *own free choice*, uninfluenced by the employer.  *See, e.g.*, *Lee Lumber v. NLRB*, 117 F.3d 1454, 1458 (D.C. Cir. 1997).  To the extent that the employer's illegal conduct

is of the kind that "tend[s] to" "cause employee dissatisfaction with the union," "have a

detrimental or last-ing effect upon employees," or "disrupt employee morale, deter their

organization activities, and discourage their membership in the union," that conduct will be

considered to have "tainted" the employer's withdrawal of recognition, and the withdrawal will

itself be unlawful. *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1236 (D.C. Cir. 1992); *see

also Lee Lumber*, *supra*, 117 F.3d at 1458.[8]

2. Such is the case here, as is amply demonstrated in the record.[9]  From December

through March, the Hotel, while on the one hand staving off the Union's efforts to meet, was

recruiting Reina Lozano and Alexandra Guillen to its cause by providing them with easier jobs

and opportunities to earn extra money; telling them that, so long as the Union was in the picture,

wages would have to be "bargained," but "when the problem with the union was resolved, the

hotel could give all of the employees a raise of pay up to $12.50 per hour"; was authorizing and

---

[8] The Hotel's brief repeatedly asserts that "[i]t is undisputed that" the withdrawal of recognition "was based on evidence of an actual loss of majority support for the Union."  *See, e.g.*, Resp. Br. at 15 & n.21.  Of course, the number of signatures found on the June petition can plainly be counted; but the central dispute for Judge Buschmann's decision is whether those signatures represent employees' true, *uncoerced* desires regarding representation by the Union – in other words, whether there was an "actual" loss of majority support, as that is meant in *Levitz*, or whether the loss of majority support was manufactured by the employer.

[9] The Court's review of the facts is necessarily limited and deferential, in recognition of the Board's primary responsibility to adjudicate unfair labor practices.  *See, e.g.*, *Silverman v. Major League Baseball Players' Relations Comm.*, 67 F.3d 1054, 1058  (2d Cir. 1995) ("The court need not make a final determination that the conduct in question is an unfair labor practice" but need "only find reasonable cause to support such a conclusion.  Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed."); *D'Amico v. United States Serv. Indus.*, 867 F. Supp. at 1082 ("District Courts in Section 10(j) situations . . . lack authority to *decide* the merits of the unfair labor practice charge"). *See also* Resp. Br. at 14 (acknowledging that the Court is not empowered to "make factual determinations in this proceeding.").

instructing Ms. Lozano and Ms. Guillen to go "door-to-door" within the Hotel, on working time, to solicit signatures on a petition to oust the Union. *See supra* at pp. 7-8; Pet. Br. at pp. 9-16.

Of course, the Hotel denies that Mr. Palenzona instructed Ms. Lozano or Ms. Guillen to circulate the petition, and specifically contests the direct testimony of Ms. Nunez regarding the conversation she overheard between Mr. Palenzona and the two women. Resp. Br. at 17-18. It acknowledges, however (as it must) that Ms. Lozano and Ms. Guillen are considered "agents" of the Hotel if they possessed *either* actual *or* apparent authority to act on its behalf. Resp. Br. at 23-24. Here, the record is replete with evidence of both: Ms. Lozano and Ms. Guillen both met frequently with Mr. Palenzona, often in the employee cafeteria, in full view of all of the employees;[10] Mr. Palenzona condoned their solicitation of signatures in working areas while they and their co-workers were on the clock;[11] there even is evidence that Mr. Palenzona interrogated employees about information that had been conveyed directly to Ms. Lozano or Ms. Guillen.[12]

---

[10] *See, e.g.,* Tr. 540 (Lozano) (admitting to "frequent" meetings with Mr. Palenzona after December 2004); Tr. 468 (Melgar); Tr. 319-320 (Segovia). Ms. Guillen, in addition, served as a Spanish translator for managers, including Mr. Palenzona and Mr. Bello, in employee meetings. Tr. 607. Finally, Ms. Guillen, a very senior employee, had told other employees about her close relationship with the owner, Richard Bernstein, served him all of his meals at the Hotel (and ate with him on occasion). Tr. 320-321 (Segovia). Thus, when Ms. Guillen, in circulating the petition, claimed to be doing so on behalf of the owner, employees reasonably could – and did – believe her. Tr. 480 (Melgar); Tr. 317-318 (Segovia) (discussing conversation with Ms. Guillen in late 2004 concerning circulating petition).

[11] There is no question that Mr. Palenzona knew of the activities of Ms. Lozano and Ms. Guillen. Not only was their conduct brazen, but at least one employee demanded to know why Mr. Palenzona was permitting it, particularly when he was warning her not to distribute pro-union flyers in the Hotel. Tr. 441-444 (Jiron). Although Mr. Palenzona professed ignorance at the time. In any event, after that conversation, Ms. Lozano and Ms. Guillen (and others) continued to circulate anti-union petitions within the Hotel as freely as they had previously.

[12] E.g., Tr. 475-477 (Melgar) (interrogation by Palenzona about union sympathies after conversation with Guillen about home visit by Union); Tr. 127-134 (Nunez) (inquiry by Palenzona after refusal to sign petition).

- 14 -

Based on all of these circumstances, a reasonable employee would be likely to believe that Ms. Lozano and Ms. Guillen spoke for management.[13]

3.  The Hotel attempts to deflect this evidence in three ways.  First, the Hotel points out that the front desk and bellstand employees who signed the petition did not receive the $12.50 raise, and therefore could not have been influenced by any unlawful conduct.  Second, the Hotel argues that persons other than Ms. Lozano and Ms. Guillen circulated the final petition and thus, since the record contains no similar evidence that these other persons were acting on behalf of management, no unlawful "taint" occurred.  Finally, it claims that employees were independently disillusioned by the union because of remarks allegedly made by Olga, a union organizer, at a meeting.  Resp. Br. at 24-25.  These arguments are red herrings, as we show below.

As an initial matter, the Hotel's claims ignore controlling law.  The determination of whether an employer's unlawful conduct tainted its withdrawal of recognition is not premised on the subjective statements of employees as to their motives; rather, the question is whether the employer "committed unfair labor practices that ha[ve] the tendency to undermine the union." *AT Systems West*, 341 NLRB No. 12 (Jan. 30, 2004), slip op. at 4 (discussing and citing leading case of *Master Slack Corp.*, 271 NLRB 78, 84 (1984)).  Contrary to the Hotel's complaints that the Board is disregarding the desires of employees, *see, e.g.*, Resp. Br. at 18-24, 34-35, a subjective test in these circumstances – where the precise question is the extent the employer's unlawful conduct *affected* employees' decisions – would be entirely unreliable indicator of employees' actual wishes.  And, again and again in similar factual settings, the Board has determined that an employer's solicitation of decertification, its "direct dealing" with employees

---

[13] Tellingly, the Hotel's brief dismisses a theory of apparent authority in one conclusory footnote, unsupported by any record citations or case law.  *See* Resp. Br. at 25 n.28.

(rather than dealing with their elected representative), and promises of benefits constitute exactly the type of unlawful conduct that "reasonably would lead to employee disaffection with the Union." *AT Systems West*, *supra*, slip op. at 4.

Although the Hotel struggles to connect the sudden, wholesale disavowal of the Union to a few remarks allegedly made by one union organizer at one union meeting, *see* Resp. Br. at 17, that effort collapses upon examination of the record.   The meeting in question admittedly occurred in early March, 2005, Tr. 562 (Lozano), months *after* the Union redoubled its efforts to bring the Hotel to the bargaining table.  *See* supra at 4-5 (describing bargaining demands in July, August, and December, 2004, and January, 2005, and Hotel's failure to respond).   Further, the delay in obtaining a contract was specifically cited by two of the Hotel's witnesses as cause for their frustration.   One of those witnesses was Ms. Lozano, the Hotel's principal witness and a admitted leader in circulating all three petitions, who testified on direct examination that she became "disappointed" "[b]ecause of what Olga has said, that we were wasting their time *and we were also tired of waiting and waiting for the contract to come out and it never happened.*"  Tr. 524 (Lozano); *see also* Tr. 516-517 (testifying that she told Olga at that meeting "that maybe the other people were also disappointed *because so much time was happening and nothing was coming out concerning the contract.*").  *See* also Tr. 666 (S. Romero) (testifying that she and others signed the petition because "[w]e were very disillusioned to have waited so long.").   Their disappointment is not surprising, given the length of time that had passed since the election and the difficulties the Union experienced in getting the Hotel to the table; but the responsibility for that conduct lies squarely on the shoulders of the Hotel.[14]   Further, even in the unlikely event that

_____

[14] The Hotel asserts that the Union "lost interest" in the State Plaza employees, Resp. Br. at 36, and claims that the Union admits that it "was too busy with other hotel contracts to pay any

(continued . . .)

the employees' "initial spark" of disaffection grew from dissatisfaction with the Union, the Hotel

remains responsible for "nurtur[ing] the initial spark into fire" by its unlawful conduct and is

barred from withdrawing recognition on that basis. *Bridgestone/Firestone, Inc.*, 332 NLRB 575,

576 (2000), enf'd in relevant part sub nom. *Allied Indus. Employees v. NLRB*, 47 Fed. Appx. 449

(9th Cir. 2002).

The Hotel's contention that disaffection stemmed from Union "harassment" are likewise

devoid of any record support.   There is no evidence that the telephone calls Ms. Lozano claims

to have received were made by any Union official – indeed, Ms. Lozano testified that she

contacted the Union to inform them about the calls.  Tr. 570-571 (Lozano).   She also admitted

that after receiving these calls, she invited Union officials into her home for a conversation that

lasted "almost" an hour, something she would not reasonably have done if she believed the

Union to be harassing her.  Tr. 571-571 (Lozano).  In fact, although some employees who

testified at the hearing testified that they did not want the Union to contact them at home, *none* of

them pointed to a single instance of harassment or inappropriate conduct by the Union.[15]

---

attention to State Plaza employees," *id.* at 5 n.8.  No such admission was ever made.  Although
the Union was involved in bargaining a city-wide master agreement from August 2004 through
January 2005, it continued to meet with State Plaza employees during this period, and, most
importantly, made repeated attempts to bring the Hotel to the table – all of which were ignored
until the Union threatened legal action.  *See supra* at 4-5.

[15] The Hotel cites to the complaint issued by the Board in Case No. 5-CB-5669 (Resp.
Exh. 1) as grounds for its assertion that "the employees have been harassed and threatened by the
Union."  Resp. Br. at p. 31 n.35.  The complaint says no such thing:  the "employees" referenced
therein were employees at another R.B. Associates hotel, the Washington Plaza, and the conduct
alleged against the Union was confined to engaging in a "mass demonstration" that may have
resulted in "brief" confrontation and "possible physical contact" between employees and
demonstrators, and in the blocking of ingress and egress.   Resp. Exh. 1 ¶ 6.  The demonstration,
which occurred in April 2004, was held to protest the State Plaza's refusal to bargain following

(continued . . .)

**B.**     <u>A Temporary Injunction Requiring the Hotel to Restore Recognition and Refrain from Further Unlawful Conduct is Warranted to Ensure Meaningful Relief under the Act</u>

The real question for the Court's consideration is whether injunctive relief would be "just and proper." Assuming that the granting of a 10(j) remedy is governed by this Circuit's traditional formulation of the standard for injunctive relief,[16] the four-part test "must be viewed as a continuum – more of one factor compensating for less of another." *D'Amico v. United States Serv. Indus.*, 867 F. Supp. at 1085. *See also Scott v. Stephen Dunn & Assoc.*, 241 F.3d 652, 661 (9th Cir. 2001) (adopting a "sliding scale . . . where the required degree of irreparable harm increases as the probability of success decreases" and holding that converse is also true, *i.e.*, "if the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury.").

1.     Where, as here, the Board has pointed to overwhelming evidence in support of the underlying charges, the showing of irreparable injury is easily met. The Hotel is a recidivist actor, and has succeeded in frustrating the collective bargaining process for two-and-a-half years. Absent "legal restraint," the Hotel will surely succeed in eradicating all support for the Union, thereby "accomplish[ing its] unlawful objective" and rendering any eventual Board-ordered remedy a nullity. *Miller v. California Pacific Med. Center*, *supra*, 19 F.3d at 455 n.3 (quoting from legislative history of Section 10(j)). Certainly, a significant erosion of support has, in all likelihood, already occurred. But, notwithstanding the Hotel's claims to the contrary,[17] there can

---

the election. Without admission, the Union resolved the NLRB charge and has fully complied with the settlement.

    [16] *See D'Amico v. United States Serv. Indus.*, 867 F. Supp. at 1084-1085, 1082 n.5 (reviewing varying standards adopted by other Circuits and previous district courts in this Circuit).

    [17] *See* Resp. Br. at 36 & n.38.

be no doubt that a strong core of employee support remains:  one need look no further than the four current employees who testified and were subjected to cross-examination in open court, before the Hotel's general manager, against their interest, who spoke with courage and conviction --  Margarito Velasquez, Adriana Nunez, Gloria Melgar, and Ana Majano, all members of the Hotel's housekeeping department.  The Union has pursued this cause vigorously and stands ready to engage in meaningful contract negotiations with the Hotel; however, as the Hotel will not voluntarily come to the table, an injunction ordering it to do so plainly is necessary.

2.      The Hotel's arguments against injunctive relief all boil down to one claim:  that an order requiring the Hotel to restore recognition of the Union would run contrary to its employees' stated wishes.  Of course, this claim rises or falls on whether the petitions in fact *do* represent the uncoerced will of a majority of the State Plaza employees – which, in turn, is a central factual and legal issue in the underlying case.  To characterize this reasoning as circular confers too much credit.

As the Board has observed, "[e]mployers' invocation of employee free choice as a rationale for withdrawing recognition has, with good reason, been met with skepticism." *Levitz Furniture*, *supra*, 333 NLRB at 724 n.45.  A court "is accordingly entitled to suspicion when faced with an employer's benevolence as its workers' champion against their certified union . . . There is nothing unreasonable in giving a short leash to the employer as vindicator of its employees' organizational freedom." *Id.* (quoting *Auciello Iron Works v. NLRB*, 517 U.S. 781, 790 (1996).  Surely it is no coincidence that this employer supports the rights of its employees only to be free of the Union; when employees made a different choice during the summer and fall

of 2003, the Hotel violated, rather than supported, those rights, and subsequently refused to recognize the overwhelming wishes of its employees to be represented by the Union.

* * *

Two and a half years ago, the employees of the State Plaza voted overwhelmingly for the Union.  If there is to be any hope of achieving what they set out to do – obtaining a fair and reasonable collective bargaining agreement governing their terms and conditions of employment – the Hotel's campaign of threats and promises must stop, and the Hotel must return to the bargaining table and attempt in good faith to reach an agreement.   Absent injunctive relief, the sheer passage of time – the months and even years necessary for the Board's processes to conclude, and the further time to obtain an order of enforcement from the Court of Appeals – will surely eviscerate any meaningful remedy.

## CONCLUSION

For all of the foregoing reasons, the Union respectfully requests that the Petition be granted in all respects.


/s/ Devki K. Virk
Devki K. Virk (No. 459418)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C.  20005
(202) 842-2600 (telephone)

*Counsel for Hotel & Restaurant Employees,
Local 25, UNITE HERE International
Union, Amicus Curiae*

Dated: April 28, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, Reply Memorandum of Amicus Curiae Hotel & Restaurant Employees, Local 25, UNITE HERE International Union in Support of Petitioner's Request for Preliminary Injunction, was filed on April 28, 2006 using the Court's CM/ECF system, and was automatically served on all counsel as follows:

Thomas P. McCarthy
Senior Trial Attorney
National Labor Relations Board
Region 5 – Washington Resident Office
1099 Fourteenth Street, N.W. – Room 5528
Washington, D.C.  20570-0001
E-mail: Thomas.McCarthy@nlrb.gov

Jonathan W. Greenbaum
Emily K. Hargrove
Nixon Peabody, LLP
401 Ninth Street, N.W. – Suite 900
Washington, D.C. 20004-2128
E-mail: Jgreenbaum@nixonpeabody.com
E-mail: Ehargrove@nixonpeabody.com

/s/ Devki K. Virk
Devki K. Virk