BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

**STATE PLAZA, INC., a wholly**
**owned subsidiary of R.B.**
**ASSOCIATES, INC., d/b/a STATE**
**PLAZA HOTEL,**

                Respondent,

    and

**HOTEL AND RESTAURANT EMPLOYEES**
**LOCAL 25, UNITE HERE**
**INTERNATIONAL UNION,**

              Charging Party.

Case No. **5-CA-32594**

The above-entitled matter came on for hearing pursuant to

Notice, before **KARL H. BUSCHMANN,** Administrative Law Judge,

at **National Labor Relations Board, 1099 14th Street, N.W.,**

**Washington, D.C. 20570-0001,** on **Monday, March 13, 2006,** at

**10:00 a.m.**

<u>A P P E A R A N C E S</u>

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

**Counsel for the General Counsel:**

THOMAS P. McCARTHY, ESQ.
National Labor Relations Board
Region 5
1099 14th Street N.W.
Washington, D.C. 20570-0001
(202) 501-8859

STEPHANIE COTILLA, ESQ.
National Labor Relations Board
Region 5
103 South Gay Street
Baltimore Maryland 21202


**On behalf of the Charging Party:**

DEVKI VIRK, ESQ.
Bredhoff & Kaiser, PLLC
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600

**On Behalf of the Respondent:**

JONATHAN W. GREENBAUM, ESQ.
EMILY K. HARGROVE, ESQ.
Nixon Peabody, LLP
401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8326

**Also Present:**

CHARLES BECKER
Spanish Interpreter

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Corrado Palenzona | 37 | 101 | -- | -- | -- |
| Adriana Nunez | 110 | 143 | 167 | -- | -- |
| Jennifer Shykula | 171 | 186 | 194 | -- | -- |

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## E X H I B I T S

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-1(a) through 1(s) | 7 | 9 |
| GC-2 | 9 | 9 |
| GC-3 | 91 | 92 |
| GC-4 | 93 | 95 |
| GC-5 | 97 | 98 |
| GC-7 | 71 | Not Offered |
| GC-9 | 63 | 66 |
| GC-10 | 63 | 66 |
| GC-11 | 66 | 68 |
| GC-12 | 59 | 61 |
| GC-13 through 15 | 48 | 50 |
| GC-16 | 61 | 62 |
| GC-17 | 56 | 58 |
| GC-18 through 20 | 56 | 58 |
| GC-21 | 50 | 55 |
| GC-26 | 113 | 114 |
| GC-27 | 114 | 114 |
| GC-28 | 127 | 128 |
| GC-29 and 30 | 136 | 138 |

## E X H I B I T S

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-31 and 32 | 137 | 138 |
| GC-107 | 181 | -- |
| GC-108 | 84 | -- |
| GC-110 | 184 | 185 |
| GC-112 | 92 | 95 |
| GC-113 | 94 | 95 |
| GC-114 | 62 | 63 |
| GC-114(a) and (b) | 64 | 64 |
| GC-115 | 176 | -- |
| GC-116 | 194 | Withdrawn - 195 |

1                      P R O C E E D I N G S

2                                    (Time Noted:  10:00 a.m.)

3      JUDGE BUSCHMANN:  On the record.

4      This is a formal proceeding before the National Labor

5  Relations Board in the matter of State Plaza, Inc., a wholly

6  owned subsidiary of R.B. Associates, Inc., doing business as

7  State Plaza Hotel, and Hotel and Restaurant Employees Local

8  25, UNITE HERE International Union, case 5-CA-32594.

9      The Administrative Law Judge conducting this case is Karl

10  H. Buschmann.  Buschmann is spelled B-u-s-c-h-m-a-n-n, Karl

11  with a K.

12      Will counsel and other representatives identify

13  themselves, please, for the record?

14      Counsel for the General Counsel?

15      MR. McCARTHY:  Yes, Your Honor.  Thomas Patrick McCarthy,

16  Senior Trial Specialist with the National Labor Relations

17  Board, for the General Counsel.  The address is 1099 14th

18  Street N.W., Washington, D.C. 20570.

19      MS. COTILLA:  Stephanie Cotilla, C-o-t-i-l-l-a, counsel

20  for the General Counsel with the National Labor Relations

21  Board.  Address is 103 South Gay Street, Baltimore Maryland

22  21202.

23      JUDGE BUSCHMANN:  Is counsel for the Charging Party

24  present?

25      MS. VIRK:  Devki Virk, V-i-r-k, Bredhoff and Kaiser, 805

1   15th Street N.W., Washington, D.C. 20005, Your Honor.

2        JUDGE BUSCHMANN:  Thank you.

3        And counsel for the Respondent?

4        MR. GREENBAUM:  Yes, Your Honor.  Jonathan Greenbaum with

5   Nixon Peabody for the Respondent, 401 9th Street N.W.

6        MS. HARGROVE:  Emily Hargrove of Nixon Peabody, also

7   counsel for the Respondent.  Address is the same as

8   Mr. Greenbaum.

9        JUDGE BUSCHMANN:  Thank you.

10       Mr. McCarthy, would you introduce the formal papers at

11  this time?

12       MR. McCARTHY:  Certainly, Your Honor.

13       Your Honor, the formal papers set forth and summarized in

14  an index and description of formal documents have been shown

15  to both counsels in this matter.

16       And at this time, General Counsel would move GC Exhibits

17  1(a) through 1(s), 1(a) being the original charge filed on

18  July 25th, 2005, three times amended, and 1(s) being an index

19  and description of the formal documents.

20  **(General Counsel Exhibits 1(a) through 1(s) marked for**

21  **identification.)**

22       JUDGE BUSCHMANN:  Ms. Virk, do you wish me to call on

23  you, or can I assume that you agree with the matters that

24  General Counsel presents?

25       In other words, I would ordinarily ask you now whether or

1  not you have an objection to the documents.

2      MR. VIRK:  Yes, sir, Your Honor, I think it would

3  expedite matters if you could automatically assume that the

4  Charging Party agrees with the General Counsel.

5      JUDGE BUSCHMANN:  Okay.

6      MR. VIRK:  We do not intend to present any evidence in

7  the case.  We intend to stand on the General Counsel's

8  submissions.

9      JUDGE BUSCHMANN:  So if you have anything to say, you

10  just say it, right?  Make a motion.

11      MR. VIRK:  I will do that, Your Honor.  Thank you.

12      JUDGE BUSCHMANN:  All right.  Mr. Greenbaum, any

13  objection to the formal papers?

14      MR. GREENBAUM:  No objection, Your Honor.  However, I

15  would like to note, just for the record, that one of the

16  amended charges, or some of the amended charges, it's our

17  position, do not contain allegations as set forth in the

18  amended Complaint.  So our position is that the charge

19  doesn't really relate to the Complaint.

20      JUDGE BUSCHMANN:  I see.  In other words, the formal

21  papers contain charges that are unrelated to the Complaint?

22      MR. GREENBAUM:  Well, we understand that a Complaint was

23  not issued on.  There's numerous charges set forth in the

24  charge and a Complaint was issued not on everything, but on

25  some of the charges.

1        JUDGE BUSCHMANN:  And the charges were filed first --

2        MR. GREENBAUM:  Yes.

3        JUDGE BUSCHMANN:  -- and the Complaint issued later?

4        MR. GREENBAUM:  Yes.  Yes, Your Honor.

5        JUDGE BUSCHMANN:  Okay.  I understand what you're saying.

6        I hereby admit General Counsel's Exhibit 1.

7    **(General Counsel's Exhibit 1(a) through (s) received into**

8    **evidence.)**

9        JUDGE BUSCHMANN:  Are there any other exhibits,

10   Mr. McCarthy, that you wish to enter by stipulation or by

11   motion?

12        MR. McCARTHY:  Yes, Your Honor.  At this time, General

13   Counsel would move General Counsel's Exhibit 2, which is a

14   March 1st, 2006 letter that was sent to Respondent by the

15   General Counsel with copies to Your Honor and to Ms. Devki

16   Virk, the representative for the Charging Party, and to which

17   I note, Your Honor, that Respondent has filed an amended

18   answer as set forth in the formal papers at GC Exhibits 1(r).

19   **(General Counsel's Exhibit 2 marked for identification.)**

20        JUDGE BUSCHMANN:  Any objection to that exhibit?

21        MR. GREENBAUM:  No objection.

22        JUDGE BUSCHMANN:  General Counsel's 2 is hereby admitted.

23   **(General Counsel's Exhibit 2 received into evidence.)**

24        JUDGE BUSCHMANN:  Any additional exhibits?

25        MR. McCARTHY:  No additional exhibits at that time, Your

1  Honor.

2      JUDGE BUSCHMANN:  How about you, Mr. Greenbaum?  Are

3  there any matters such as stipulations or motions that you

4  want to make at this time --

5      MR. GREENBAUM:  No, Your Honor.

6      JUDGE BUSCHMANN:  -- with respect to documents?

7      MR. GREENBAUM:  No, Your Honor.

8      JUDGE BUSCHMANN:  All right.  Mr. McCarthy, then do you

9  have an opening statement?

10     MR. McCARTHY:  I do, Your Honor, but there are some

11 motions that the General Counsel would like to make.

12     JUDGE BUSCHMANN:  Okay.

13     MR. McCARTHY:  Initially, the General Counsel would move

14 for sequestration of witnesses.  Your Honor, there is going

15 to be quite a few witnesses involved in this case.  I believe

16 it's a contentious case with differences of opinion on both

17 sides.

18     And the General Counsel respectfully requests for

19 sequestration because credibility is going to be a key issue

20 that Your Honor is going to have to determine and the

21 witnesses should not be in the courtroom when they would be

22 testifying about events that are being testified about to in

23 the courtroom, nor talk about their testimony with other

24 witnesses.

25     JUDGE BUSCHMANN:  Any objection to that sequestration

1  motion, Mr. Greenbaum?

2     MR. GREENBAUM:  Well, no objection.  However, I would

3  note that we have a representative, Mr. Palenzona, who is

4  going to be our representative here throughout the hearing,

5  and he's also going to be a witness.  He's also under

6  subpoena.

7     And we have Mr. Cotton, who is the HR Director for R.B.

8  Associates Classic Hospitality.  He's not a witness, but he

9  is at least here present as the custodian of records.  I

10  don't believe he's going to be a witness.  We're not going to

11  call him and I would request that he be permitted to stay as

12  well.

13     JUDGE BUSCHMANN:  Mr. McCarthy, would you object to the

14  presence of those two individuals?

15     MR. McCARTHY:  I do not object to the presence of those

16  two individuals, Your Honor.  However, I would note that

17  Mr. Palenzona as the Company's representative, in fact, he

18  hears the testimony of all the other witnesses, Your Honor

19  should certainly take that into account when assessing his

20  credibility.

21     JUDGE BUSCHMANN:  Okay.

22     MR. GREENBAUM:  Thank you, Your Honor.

23     With regard to --

24     JUDGE BUSCHMANN:  Well, as you know -- I mean each party,

25  as you know, is entitled to a representative.

1        Do you have a designated representative with you?

2        MR. McCARTHY:  Yes, Your Honor.  The General Counsel

3   would designate a Union representative, Salvatore Gian as the

4   General Counsel's representative, although Mr. Gian is not

5   currently present in the courtroom, but will be present

6   throughout the hearing.

7        JUDGE BUSCHMANN:  Okay.

8        MR. McCARTHY:  And I believe the Charging Party would

9   also like to designate a representative.

10       JUDGE BUSCHMANN:  Ms. Virk?

11       MR. VIRK:  Yes, Your Honor.  Ms. Jennifer Shykula, the

12   Union's Organizing Director is representative for the

13   Charging Party.  I understand she may be called as a witness,

14   Your Honor.

15       JUDGE BUSCHMANN:  So if I grant the motion for

16   sequestration, which means that all witnesses and potential

17   witnesses have to be excluded from the hearing at this time,

18   because it is a matter of credibility that's at issue, and we

19   want to have the original recollection of the witnesses here

20   before us rather than matters that they may have heard from

21   other witnesses.

22       So, therefore, are there any witnesses in the courtroom

23   present that are going to be testifying?

24       If so they should be excluded and there's a room right

25   across the hall where they can sit.

1      Mr. Greenbaum?

2      MR. GREENBAUM:  Yes, Your Honor.  I notice that

3  Mr. Bello, the President of Classic Hospitality is here and

4  he may be a witness.  And if I could move the Court to let me

5  talk to him and excuse him out of the courtroom?

6      JUDGE BUSCHMANN:  Yes.

7      MR. McCARTHY:  Thank you, Your Honor.

8      **JUDGE BUSCHMANN:  We'll go off the record for a moment.**

9  **(Off the record.)**

10     **JUDGE BUSCHMANN:  Back on the record.**

11     You had motions.  Do you have any additional motions?

12     MR. McCARTHY:  No, Your Honor, that's the only motion

13  that the General Counsel has at that time.

14     JUDGE BUSCHMANN:  All right.  Then you have an opening

15  statement at that time?

16     MR. McCARTHY:  Yes, Your Honor.

17     JUDGE BUSCHMANN:  Proceed.

18     MR. McCARTHY:  Good morning, Judge Buschmann.

19     JUDGE BUSCHMANN:  Good morning, Mr. McCarthy.

20     MR. McCARTHY:  Good morning, Mr. Greenbaum.

21     MR. GREENBAUM:  Good morning.

22     MR. McCARTHY:  Counsel Virk.  Co-counsel.

23     Thank you for the opportunity to make an opening

24  statement.

25     May it please the Court, on February 15th, 2006, the

1  unanimous National Labor Relations Board, Chairman Battista

2  and Members Liebman, Schaumber, Kirsanow, and Walsh

3  authorized interim injunctive relief under Section 10(j) of

4  the Act in this case.

5      And on February 24th, 2006, the General Counsel

6  petitioned the United States District Court for the District

7  of Columbia for interim injunctive relief under Section 10(j)

8  of the Act and moved the Court to hear that petition on the

9  basis of the administrative record developed in this case

10 before Your Honor.

11     On March 1st, 2006, United States District Judge Colleen

12 Kollar-Kotelly granted that motion.  The case is set for

13 expedited hearing following completion of this administrative

14 hearing.

15     The factual background is summarized as follows.  In the

16 spring of 2003, the Charging Party/Union, Hotel and

17 Restaurant Employees Union Local 25, UNITE HERE International

18 Union, began an organizing campaign amongst the employees of

19 Respondent, State Plaza Hotel, Inc., a wholly owned

20 subsidiary of R.B. Associates, Inc., doing business as State

21 Plaza Hotel.

22     On July 11, 2003, the Union filed its representation

23 petition.  On July 16th, 2003, as amended on August 12th,

24 2003, the Union filed unfair labor practice charges against

25 the hotel in Case 5-CA-31346.  The Regional Director issued a

1    Complaint in that matter on October 30, 2003, and set the

2    matter for hearing in February of 2004.

3        In the interim, a secret ballot election was held on

4    September 5th, 2003 and the tally of ballots showed that 44

5    ballots were cast for the Union and 21 against the Union,

6    with one challenged ballot, an insufficient number to affect

7    the results of the election.

8        The Respondent filed objections to that election and the

9    matter was set for hearing before Chief Administrative Law

10    Judge Robert Giannasi, who issued his recommended decision on

11    objections, overruling Respondent's objections.

12        On June 29th, 2004, the Board Members Liebman, Schaumber,

13    and Walsh found no merit to those exceptions and issued its

14    decision and certification of representative, certifying the

15    Union on June 20th, 2004 as the exclusive bargaining

16    representative of Respondent's employees in the petitioned

17    for unit.

18        Now, a week before that decision came down, the

19    Respondent notified the Union that the hotel was closing its

20    restaurant operations indefinitely for renovations.  On the

21    same day that the Board issued its certification, namely,

22    June 29, 2004, the Union demanded bargaining over the

23    decision and effects of that closure and requested certain

24    information.  The parties negotiated a partial closure

25    agreement in July of 2004.

1    In the interim, Your Honor, back in February 2004,
2  Administrative Law Judge David Evans heard evidence in Case
3  31346.  In May 2004, Judge Evans issued his Recommended
4  Decision and Order, finding that the Respondent unlawfully
5  discharged the leading Union organizer, threatened employees
6  that Respondent would sell its hotel to a University if the
7  employees voted for the Union, solicited and promised to
8  remedy employee grievances and granted wage increases and
9  other benefits to discourage Union activity, and that
10 decision is currently pending before the Board on the
11 Respondent's exceptions.
12    It is noteworthy that those unfair labor practices remain
13 unremedied and it is in this context that the Respondent
14 escalated its unlawful conduct in this case.
15    After conducting extensive citywide negotiations with the
16 Washington D.C. Hotel Association, and reaching agreement on
17 all contentious issues, the Union requested bargaining from
18 Respondent on December 2nd, 2004.  The Respondent delayed
19 bargaining with the Union, however, for nearly four months,
20 four months until late March 30th, 2005.
21    The parties conducted approximately six collective
22 bargaining sessions between late March and June 2005, but
23 they did not enter into a contract.  The facts in this case,
24 Your Honor, show why no contract had been reached.
25    That is as specifically pled in Paragraph 18 of the

1   amended Complaint, Respondent by its overall conduct, both at

2   and away from the bargaining table, particularly its

3   sponsorship of decertification petitions and its repeated

4   promises and eventual grant of a substantial wage increase to

5   employees because they signed those decertification petitions

6   that Respondent was sponsoring, failed and refused to bargain

7   in good faith with the Union in violation of Section 8(a)(5)

8   of the Act, as pled in Paragraph 18 of the amended Complaint.

9        The evidence will show that prior to bargaining on March

10  30th, 2005, in late March 2005 Respondent called a meeting

11  with all of its employees in a hotel conference room to

12  discuss the alleged mistreatment of employees by supervisors.

13       After the meeting, certain employees asked Respondent's

14  general manager, Corrado Palenzona, who's present here in the

15  courtroom, how they could get rid of the Union.  Palenzona

16  told the employees that they could get rid of the Union with

17  a decertification petition and that he would call his

18  attorney to find out how to do so.

19       Mr. Palenzona then made a phone call in the employees'

20  presence.  After the call, Mr. Palenzona turned to the

21  employees present and he told them that they were going to

22  get rid of the Union with a decertification petition, and

23  instructed them shhh, not to tell anybody about the

24  conversation.  This conversation was overheard by a current

25  employee, who will testify against interest in this

1  proceeding.

2      Based on this conduct, Respondent told employees that

3  Respondent was going to get rid of the Union by sponsoring a

4  decertification petition, in violation of Section 8(a)(1), as

5  pled in Paragraph 9 of the amended Complaint.

6      About ten minutes later, Mr. Palenzona directed two

7  employee agents, Alex Guillen and Reina -- Alex Guillen, a

8  longtime employee of the Respondent, who was close to the

9  Respondent's owner, Mr. Bernstein and, in fact, had

10  personally served him when he came into the restaurant and

11  was the only employee kept on Respondent's payroll from the

12  restaurant operation after the partial closing, and another

13  employee agent who had befriended Alex, Reina Lozano, who

14  Respondent transferred in late 2004 from her demanding

15  housekeeping job with Alex -- I'm sorry -- to work with Alex

16  Guillen in a much easier job at greater pay, going room-to-

17  room in the hotel where the housekeepers worked, filling the

18  minibars that are in the room with beverages and other

19  matters, to solicit employees to sign decertification

20  petitions that the Respondent was sponsoring by going from

21  room-to-room and approaching employees while they were

22  working.

23      That agency relationship is established by common law

24  principles, both through apparent authority and more

25  importantly by direct evidence regarding instruction and

 1  ratification of that agency by Respondent's general manager,

 2  Corrado Palenzona who, after calling his lawyer, was

 3  overheard telling employees that the hotel was going to

 4  circulate a petition to get rid of the Union and then was

 5  overheard telling and instructing Alex and Reina to go room-

 6  to-room while filling the minibars to obtain employees'

 7  signatures on the decertification petitions, and promise a

 8  substantial pay raise to $12.50 an hour in order to ensure

 9  that the employees would sign those petitions they were

10  circulating.

11       Now, over the next few months, from late March until late

12  June or early July 2005, Alex and Reina solicited employee's

13  signatures for three separate petitions during work time and

14  in work areas, telling employees that Mr. Palenzona had sent

15  them to obtain signatures and that if they signed, they would

16  receive a pay raise from the hotel.

17       The first petition was circulated on or about March 21st.

18  The second petition was circulated on or about May 6th.  And

19  the third petition was circulated on or about June 23rd and

20  July 1st, 2005.

21       Numerous employees will testify that Alex, Reina, and

22  Mr. Palenzona himself promised employees a pay raise if they

23  signed the petition to get rid of the Union.  Indeed, in late

24  March, Mr. Palenzona interrogated an employee about why the

25  employee had not signed and told the employee that the

```
 1   petition was to get rid of the Union.  And when enough
 2   employees had signed the petition, they would receive raises.
 3        When the employee approached Mr. Palenzona about two days
 4   later and asked to sign the petition, Mr. Palenzona replied
 5   that he wanted nothing to do with the employee because the
 6   employee was with the Union.
 7        On April 19th, May 12th, and July 8th, 2005,
 8   respectively, Mr. Palenzona told three separate employees
 9   that they could not distribute Union flyers in the hotel and
10   that Union propaganda was prohibited in the facility.
11        During these conversations Mr. Palenzona also made
12   statements to each of these employees suggesting that he knew
13   that they had distributed Union literature in the hotel and
14   interrogated them about such activities.
15        Based on this conduct, Respondent interrogated employees
16   about their Union activity, traded the impression of
17   surveillance of their Union activity, and promulgated the
18   overly broad no solicitation -- I'm sorry, no distribution
19   rules on three separate occasions.
20        In June 2005, alleged Agent Alex Guillen, asked another
21   housekeeping employee to sign another decertification
22   petition.  Ms. Guillen told the employee that the
23   housekeeping employees would all receive a raise if enough
24   employees signed the petition to get rid of the Union.
25        The employee refused to sign the new petition that Alex
```

1  Guillen was circulating and told Alex that the Union had

2  visited the employee the day before, and the employee was now

3  back with the Union again.

4      The next day Mr. Palenzona approached this employee while

5  the employee was cleaning room and asked if it was true that

6  the Union had recently visited her, and asked what the Union

7  had wanted, and instructed the employee to tell him if the

8  Union was bothering the employee by home visits.

9      Thereafter, later in June 2005, alleged agent Guillen

10 again approached this employee to interrogate the employee

11 about why the employee had not signed the most recent

12 petition and told the employee that Mr. Palenzona wants to

13 know why the employee had betrayed him by not signing the

14 most recent petition.

15     On July 5th, 2005, Respondent called a meeting and

16 informed employees that it withdrew recognition from the

17 Union, and the Respondent was now free to grant the employees

18 the raise that it had promised them their next paycheck.  A

19 couple of days later, Respondent granted all housekeeping

20 employees, who had been earning less than $12.50 per hour, a

21 pay raise to $12.50 per hour effective in July, in their July

22 8th paychecks.

23     This was a substantial pay raise, Your Honor, more than

24 the two or three percent annual wage increases that

25 Respondent was customarily giving each year.  Some of the

1    increases were 25 percent, 33 percent of the wage rate that

2    employees were currently making.

3          And this pay raise affected 35 employees, well over a

4    majority of unit employees.  Incidentally, Respondent never

5    offered more than $11 at the bargaining table.

6          In these circumstances, Alex Guillen and Reina Lozano

7    clearly are agents of Respondent for purposes of circulating

8    the decertification petitions, for purposes of promising

9    employees a substantial wage increase if they signed the

10   petition, and for purposes of interrogating employees about

11   why they had not signed the petitions, based on direct

12   evidence of agency, Your Honor, and common law principles of

13   apparent authority.

14         In short, Mr. Palenzona was overheard telling Alex and

15   Reina to collect signatures for the petition by going room-

16   to-room and refilling the minibars.  The evidence will show

17   that Alex and Reina, in fact, did collect signatures from

18   employees by going room-to-room as instructed during work

19   time and in work areas, and promised a substantial wage

20   increase if employees signed the petition.

21         In addition, Mr. Palenzona himself made unlawful

22   statements to employees establishing that he knew of the

23   decertification efforts of his agents.  He questioned an

24   employee about the employee's refusal to sign the petition,

25   and questioned another employee about the Union's

1    communications with her right after this employee had

2    informed his agent, Alex, that the Union had paid the

3    employee a home visit.

4        Finally, Your Honor, the timing of the actual grant of

5    the wage increases immediately after withdrawal of

6    recognition further supports a finding of agency status.

7        The General Counsel relies on, among other agency cases,

8    Equipment Trucking Company, 336 NLRB 277 at 286.  The year

9    was 2001.  And Dentech Corp., 294 NLRB 924 (1989).

10       In sum, since agents of Respondent solicited signatures

11   for decertification petitions and repeated informed employees

12   that a raise was promised if a sufficient number of them

13   signed the petition, and since Respondent, in fact, followed

14   through on its promises and granted employees an

15   unprecedented and substantial raise following the third

16   petition, the entire decertification efforts were tainted.

17       Consequently, Respondent violated Section 8(a)(5) by

18   withdrawing recognition from the Union based on

19   decertification efforts that were tainted by Respondent's

20   unfair labor practices.

21       See, for example, Microimage Display Division of Xidex

22   Corp. v. NLRB, 924 F.2d at 253-54, wherein the Ninth Circuit

23   found that an Employer cannot rely on a petition or loss of

24   majority based on an Employer orchestrated campaign.

25       Also, AT&T Systems West, Inc., 341 NLRB 12, slip opinion

1  at 4, dated 2004, finding that solicitation of

2  decertification petition and direct dealing tainted employee

3  decertification.

4      It is well established, Judge Buschmann, as you're aware,

5  that evidence in support of a withdrawal of recognition must

6  be raised in the context free of unfair labor practices of

7  the sort likely under all the circumstances to affect the

8  Union's status and cause employee disaffection or improperly

9  affect the bargaining relationship itself.

10     That's the Lee Lumber and Building Material Corp. case,

11  322 NLRB 175 at 177 (1996), called Lee Lumber 2.  The

12  criteria for determining whether a causal relationship has

13  been established includes:

14     One, the length of time between the unfair labor

15  practice, or practices, and the withdrawal of recognition;

16     Two, that the nature of the violations, including the

17  possibility of a detrimental or a lasting effect on

18  employees, such as a substantial wage increase;

19     Three, the tendency to cause employee disaffection;

20     And four, the effect of the unlawful conduct on

21  employees' morale, organizational activities, and membership

22  in the Union.  And that's the Master Slat Corporation case,

23  271 NLRB 78 at 84 (1984), subsequently cited in Lee Lumber.

24     Applying this criteria to the facts at issue here, Your

25  Honor, the General Counsel will establish that the

1  Respondent's numerous unfair labor practices were of the sort
2  likely to cause the Union's loss of majority support.

3      Specifically, the facts establish that the loss of
4  majority support relied on by Respondent when withdrawing
5  recognition on July 5th was tainted by and directly
6  attributable to Respondent's instructions to employee agents
7  to seek signatures for the petitions with the promise of a
8  wage increase.

9      It's direct involvement in the circulation of the
10 petitions.  And it's course of conduct, such as interrogating
11 employees about their Union activity, creating the impression
12 of surveillance of that activity, repeatedly promulgating
13 overly broad no distribution rules and making course of
14 statements to employees, all of which took place during the
15 time these petitions were circulating.

16     The timing and the nature of the unfair labor practices
17 that were directed at Union supporters shortly before
18 Respondent's hasty withdrawal of recognition at the
19 expiration of the certification here were designed to have a
20 detrimental and a lasting effect on employees support for the
21 Union.

22     The tendency of Respondent's unfair labor practices,
23 particularly an unprecedented wage increase, to do so cannot
24 be gainsaid.  In fact, Respondent's misconduct surrounding
25 the decertification campaign that it sponsored affected the

1  majority, if not all employees, in the unit.

2      And it self-arose in the context of other unfair remedy,

3  other unfair labor practices that remain unremedied, as found

4  by Judge Evans.

5      In these circumstances, Your Honor, the manifest erosion

6  of employee confidence in the Union, as expressed in the

7  third decertification petition circulated just prior to the

8  expiration of the certification year, which Respondent will

9  rely on to justify the withdrawal of recognition, can

10 reasonably be tracked and directly attributable to

11 Respondent's sponsorship and direct involvement in the

12 circulation of the decertification petitions during the

13 preceding four months to Respondent's instructions to

14 employees to seek those signatures with promise of a

15 substantial wage increase, and to Respondent's course of

16 conduct previously outlined, all of which took place during

17 the short timeframe just before the withdrawal of

18 recognition.

19     In this case, the evidence shows that the Respondent

20 orchestrated the entire decertification effort in an

21 atmosphere of anti-Union coercion.  Moreover, there is no

22 showing of a loss of majority support prior to the

23 Respondent's unlawful conduct.

24     In light of these considerations, Respondent's unlawful

25 conduct reasonably undercut the Union's support among

1   employees and led to expressions of disaffection from the

2   Union in the form of the decertification petition that was

3   submitted just after the certification bar expired on the

4   heels of Respondent's unremedied unfair labor practices.

5       Now, since the withdrawal of recognition was tainted,

6   Your Honor, the actual granting of the wage increases after

7   Respondent withdrew recognition, is also a violation of both

8   Section 8(a)(3) and a unilateral change in direct dealing in

9   contravention of Section 8(a)(5).

10      See the Equipment Trucking case, again cited as 336 NLRB

11  at 287, where the Board found that a wage increase that

12  followed a tainted withdrawal of recognition, based on course

13  of conduct of employee agents responsible for circulating

14  that decertification petition, and promising wage increases,

15  found violative of both 8(a)(3) and 8(a)(5).  And also the

16  Flying Foods case, Your Honor, 344 NLRB 10 (2005).

17      Finally, in mid-July 2005, after the Respondent

18  unlawfully withdrew recognition, and unlawfully granted

19  employees the promised wage increase, in violation of 8(a)(3)

20  and 8(a)(5), several Union supporters distributed flyers to

21  protest the suspension and subsequent discharge of another

22  lead employee organizer, Marleni Jiron, who will testify

23  before you.

24      That discharge of Ms. Jiron is not alleged to be

25  unlawful.  Those flyers, however, included a group photograph

1   of approximately seven Union supporters, and expressed their

2   continued Union support by stating inter alia, "We stand with

3   Marleni.  We stand with the Union.  If you fire Marleni, you

4   will not stop us."

5       In the face of such bold Union support over the next

6   several days, three admitted supervisors separately

7   approached an employee who was included in this photograph.

8   Night supervisor Abdullah Va told the employee to be careful

9   regarding the flyer because Mr. Palenzona did not want the

10  Union in the hotel, and Mr. Palenzona would fire Union

11  supporters.

12      Similarly, housekeeping manager Lisa Alvarado told this

13  employee that the Respondent did not want the Union in the

14  hotel and that Ms. Alvarado would not be able to help this

15  employee.  Still, a third housekeeping supervisor, Fanny

16  Reid, asked the employee if she was still involved with the

17  Union.

18      Based on this conduct, Your Honor, Respondent further

19  violated Section 8(a)(1) by threatening employees with

20  discharge if they continued Union support and by

21  interrogating them about their Union activity.

22      In conclusion, Judge Buschmann, application of well

23  established Board law to these facts demonstrates that

24  Respondent violated Sections 8(a)(1), (3), and (5) of the Act

25  as alleged in the amended Complaint.

```
 1      The evidence will show consistent with the facts outlined
 2  above, including Judge Evans' decision, a deliberate,
 3  unremedied course of continuing and escalated unlawful
 4  conduct by Respondent in response to protected concerted and
 5  Union activity amongst its employees in the certified
 6  bargaining unit.
 7      The evidence will show not only Respondent's continued
 8  and focused threats and promises of that, but new and more
 9  extensive unfair labor practices aimed at Union supporters,
10  including interrogations, impressions of surveillance,
11  repeated promulgation of the overly broad no distribution
12  rules, ominous threats of discharge in response to Union
13  activity, solicitation of decertification petitions, repeated
14  promises of wage increases for signing the unlawfully
15  sponsored decertification petitions, withdrawal of
16  recognition from the Union in the context of tainted
17  decertification efforts, the ultimate goal, and direct
18  dealing with employees by grant of promised wage increases.
19      Accordingly, Your Honor, the General Counsel respectfully
20  requests that after careful consideration of the evidence and
21  the testimony that's presented to you, and you make findings
22  of fact and conclusions of law consistent with the amended
23  Complaint allegations, issue a recommended Cease and Desist
24  Order requiring Respondent to refrain from its unlawfully
25  conduct and recommend an Order affirmatively requiring
```

1   Respondent to bargain in good faith with the Union on request

2   for an extended certification year under <u>Mar-Jac Poultry</u>

3   <u>Company</u>.

4       That bargaining Order is particularly appropriate in this

5   case, given Respondent's overall conduct both at and away

6   from the bargaining table, which demonstrates, Your Honor,

7   that the Respondent was engaged in a sophisticated bargaining

8   charade until the certification year clock ran out.

9       And thus, not bargaining in good faith with the Union

10  that's required by the Act.  Thank you, Judge Buschmann, for

11  your patience and attention to these matters.

12      JUDGE BUSCHMANN:  Thank you, Mr. McCarthy.

13      Mr. Greenbaum, any reply?

14      MR. GREENBAUM:  Yes, Your Honor.  Thank you, Your Honor.

15      It's a good thing that opening statements aren't

16  evidence.  There's no facts in this case -- that's what the

17  General Counsel wants to prove.  There are no facts in this

18  case where we stand right now and it's interesting that the

19  General Counsel did file for an injunction.

20      However, that petition, which he alluded to, and which we

21  informed the Judge we didn't want brought up in this

22  proceeding because it shouldn't taint this proceeding, was

23  not supported by any evidence which is contrary to the

24  District Court rules, contrary to the Board's own rules.

25      It wasn't supported by an affidavit.  It wasn't supported

1  by any declarations.  It wasn't supported by any evidence

2  whatsoever; it was just allegations, and that's all we have

3  as of now.

4      If we were to believe all of the allegations set forth by

5  the General Counsel right now, I would pack up and go home

6  because, yes, he did allude to conduct that would be a

7  violation of the Act, as does the Complaint.  The problem is,

8  it's not supported by the evidence.

9      What we have here in this case is a loss of majority

10  support voluntarily and on the employees' own free will.  And

11  you will hear evidence from employees, testimony from

12  employees as to why they petitioned to decertify the Union,

13  how that petition was circulated, and their reasons for

14  disavowing the Union.

15      There wasn't anything management did to further this

16  petition.  Management was not involved in the petition.

17  There is no evidence that Ms. Guillen and Reina Lozano are

18  agents of the Employer. No evidence -- there will be no

19  evidence of that and the employees will testify to that.

20      They don't speak for the Employer.  They are line

21  employees who were members of the bargaining group.  In fact,

22  Ms. Lozano will testify that she was a Union supporter, but

23  she lost interest in the Union because the Union simply

24  ignored them.  It's interesting that the General Counsel

25  states that the Union requested bargaining in December of '04

1  and he does note that the Union was involved in lengthy

2  negotiations with the Hotel Association.

3      State Plaza's not in the Hotel Association.  The Union

4  ignored the State Plaza employees for a year and a half.  A

5  year and a half went by and the Union simply ignored State

6  Plaza employees.  And you'll hear that from the employees

7  themselves.  And you'll hear from the employees who were at a

8  meeting with the Union where one of the Union organizers, an

9  employee of Local 25, told these employees we don't have time

10 for you, we can't do anything for you.  If you only have a

11 couple of people show up to our meetings, we're just wasting

12 our time.

13     And with that, the employees said, well, we don't want

14 you to waste our time.  We're done.  We're done with the

15 Union.  We've lost interest.  Now, what did the Union do in

16 response to that?  And one thing Mr. McCarthy leaves out,

17 here's another case, 5-CB-9669, which involved an assault by

18 Local 25 employees on employees of the Washington Plaza

19 Hotel, which is also owned by R.B. Associates.

20     Now, that's important because this course of conduct of

21 intimidation and coercion by the Union resulted in the loss

22 of majority support.  You will hear from employees who will

23 testify that after this first petition in March, which was

24 circulated by the employees themselves, not at the direction

25 of Mr. Palenzona, by employees themselves.

1          And you'll hear from employees who circulated that
2    petition and who gathered signatures and employees who signed
3    that on their own free will, free of promises, free of
4    coercion, free of threats, that once that petition was signed
5    and brought to the Union's attention, they brought that
6    petition to the Union's attention to say we're not interested
7    any more.

8          What did the Union do in response to that?  They started
9    going to people's houses.  They have a right to do that, but
10    the employees didn't want to be bothered.  They felt
11    threatened and intimidated by these visits and the Union kept
12    coming to their houses.  And those employees ultimately did
13    go to management because they felt unsafe, knowing what
14    happened at the Washington Plaza, knowing that they felt
15    intimidated and coerced at home.

16          Now, the General Counsel sets forth a case which Judge
17    Evans heard, which is now pending before the Board.  That
18    case has no bearing on this matter, especially considering
19    the Lee Lumber case.  That case involved alleged pre-petition
20    conduct.  Ultimately, the Union did win the election.
21    There's no causal relationship.

22          But there is a misrepresentation made by the General
23    Counsel, which he stated that one of the allegations there
24    was a termination of a Union supporter.  There's a specific
25    finding of fact by Judge Evans in that case that that

1    allegation -- there was no evidence to support that

2    allegation.

3        Judge Evans found that that employee was terminated for

4    protected activity, but it wasn't Union related protected

5    activity.  There was a specific finding on that.  We submit

6    that case has absolutely no bearing on this case.

7        In addition, you will hear evidence that this

8    decertification petition was voluntarily done by the

9    employees, that these two individuals are not agents of the

10   Employer.  One did not receive a pay raise.  We don't know

11   where that allegation came in.

12       We've provided the General Counsel with the personnel

13   files.  There is nothing in there to support that allegation.

14       I would note that the remedy the Board is seeking is an

15   extraordinary remedy.  And in our conference call on Friday,

16   we were discussing whether this would constitute a Gissel

17   Bargaining Order.  Our position is this case does implicate

18   Gissel.

19       The D.C. Circuit does not make a distinction between

20   incumbent and non-incumbent Unions.  The case is Lee Lumber,

21   117 F.3d 1454, Page 1461, where the D.C. Circuit says they

22   don't recognize the distinction, that a Gissel Bargaining

23   Order is an extreme Order and especially in a case such as

24   this where important Section 7 rights are implicated.

25       And what the General Counsel didn't set forth was there

1    was not only three petitions, there was a fourth petition.

2    The employees were so upset that there was a Complaint in

3    this case, that they had thought that their communications

4    with the Union would end this.

5        There's a petition that the employees voluntarily

6    distributed and, again, gave to the Union after the Complaint

7    was issued in November, saying they don't want to be bothered

8    any more, showing that there are important Section 7 rights

9    here.

10        Now, it's interesting that the General Counsel set forth

11    the issue of the closure of the restaurant.  It's the

12    Employer that initiated bargaining with respect to closure of

13    the restaurant.  And the Employer sat down with the Union to

14    discuss a closure agreement, and that agreement was set

15    forth.

16        There's no allegation that the closure of this restaurant

17    was somehow an unfair labor practice.  The restaurant remains

18    closed with no intention on this Employer to have a food and

19    beverage restaurant facility.  It was closed for legitimate

20    business related reasons.  The restaurant was losing money.

21        We, the Employer, had showed the Union its profit and

22    loss statement for the restaurant, and the restaurant remains

23    closed with no intention of reopening.  But what's important

24    is, there were approximately 20, maybe a little more,

25    employees, food and beverage employees in the restaurant.

1          The bargaining unit has significantly changed in numbers

2     after this closure because there is really no restaurant

3     operation where we stand today.

4          So, Your Honor, what this case presents is an issue of

5     important Section 7 rights.  The employees have disavowed the

6     Union on numerous occasions.  There is a loss of majority

7     support.  It's a clear loss.  It was uncoerced.  And the

8     issue of a no solicitation/no distribution rule is really --

9     should not be an issue at all.

10         No employee -- there is no such rule in the hotel.  Even

11    after the Complaint was issued, there were instances of

12    distribution and solicitation in the hotel during work hours

13    in the cafeteria.  No one was disciplined; no one was talked

14    to.  There were no threats made.  And for a period of time,

15    such distribution continues, and it continues to this day.

16         And the employees will testify that there are leaflets

17    left in the cafeteria.  Some ignore them, some read them, but

18    there are no actions taken with respect to that.  There is

19    just no such rule.

20         Thank you, Your Honor.

21         JUDGE BUSCHMANN:  Thank you, Mr. Greenbaum.

22         And now, Mr. McCarthy, you may call your first witness.

23         MR. McCARTHY:  Yes, Your Honor.

24         Ms. Cotilla is going to handle the General Counsel's

25    first witness.

1    JUDGE BUSCHMANN:  All right.

2    MS. COTILLA:  Your Honor, I call Corrado Palenzona to the

3    stand.

4    JUDGE BUSCHMANN:  Sir, step up here and raise your right

5    hand.

6    (Whereupon,

7                    **CORRADO PALENZONA**

8    was called as a witness by and on behalf of the General

9    Counsel and, having been first duly sworn, was examined and

10   testified on his oath, as follows:)

11   JUDGE BUSCHMANN:  Please be seated.

12                  **DIRECT EXAMINATION**

13   Q.   BY MS. COTILLA:  Mr. Palenzona, my name is Stephanie

14   Cotilla, and I'm an attorney at the National Labor Relations

15   Board.

16   A.   Yes.

17   Q.   And I'm going to be asking you some questions.

18        Are you currently employed?

19   A.   Yes.

20   Q.   And --

21   JUDGE BUSCHMANN:  Could you ask the witness to identify

22   or spell his name for the record?

23   MS. COTILLA:  Yes, sir.

24   Q.   BY MS. COTILLA:  May you spell your name for the record,

25   please?

1  A.   Yes.  My name is Corrado, first name, C-o-r-r-a-d-o.

2  Last name is Palenzona, P-a-l-e-n-z-o-n-a.

3      MS. COTILLA:  Would you like an address, Your Honor?

4      JUDGE BUSCHMANN:  That's up to you.  I don't need that.

5  I think the name is sufficient.

6  Q.   BY MS. COTILLA:  Are you currently employed,

7  Mr. Palenzona?

8  A.   Yes, I am.

9  Q.   And where are you employed?

10  A.   I'm employed -- I'm the General Manager of the State

11  Plaza Hotel.

12  Q.   And since when have you been the General Manager of the

13  State Plaza Hotel?

14  A.   Since September 2004.

15  Q.   And what was your job title before you became General

16  Manager of the State Plaza Hotel?

17  A.   I was the Assistant General Manager at the Henley Park

18  Hotel.

19  Q.   And who hired you to work as General Manager at the State

20  Plaza Hotel?

21  A.   I was promoted by Stephen Bello, which is the President

22  of Classic Hospitality.

23  Q.   And what's the name of the company that owns the State

24  Plaza Hotel?

25  A.   It's a company called Classic Hospitality, which is a

 1  subsidiary of R.B. Associates.

 2  Q.   And so does Classic Hospitality also own the Henley Park

 3  Hotel?

 4  A.   Yes, ma'am.

 5  Q.   Now, you're testifying here today because Mr. McCarthy

 6  sent you a subpoena?

 7  A.   Yes.

 8      MS. COTILLA:  Your Honor, I request permission to

 9  question Mr. Palenzona pursuant to Rule 611(c) of the Federal

10  Rules of Evidence.  He's an adverse party.

11      JUDGE BUSCHMANN:  Any objection?

12      MR. GREENBAUM:  No objection.

13      JUDGE BUSCHMANN:  Granted

14  Q.   BY MS. COTILLA:  And as General Manager, you're

15  responsible for the overall operation of the State Plaza

16  Hotel, correct?

17  A.   Yes.  Yes, correct.

18  Q.   So your duties include overseeing sales?

19  A.   Yes, operations, front office, the entire operation.

20  Q.   And is there -- there's a Housekeeping Department at the

21  State Plaza Hotel, isn't there?

22  A.   Yes, there is.

23  Q.   Lisa Alvarado is the manager of that Housekeeping

24  Department?

25  A.   Yes, exactly.

1  Q.   And she reports directly to you, correct?

2  A.   Yes.

3  Q.   The Housekeeping Department has several supervisors who

4  then report to Lisa Alvarado, correct?

5  A.   Yes.

6  Q.   And Lidia Hernandez is a Housekeeping supervisor?

7  A.   Yes.

8  Q.   Karen Martinez is another Housekeeping supervisor?

9  A.   Yes.

10  Q.   Fanny Reid?

11  A.   Right.

12  Q.   And Abdullah Va is a night supervisor?

13  A.   Yes.  He mainly works in the --

14  Q.   And Lidia Hernandez, Karen Martinez, Fanny Reid, and

15  Abdullah Va --

16  A.   Yes.

17  Q.   -- all report directly to Lisa Alvarado, correct?

18  A.   Yes.

19  Q.   And the housekeepers and the housemen who work at the

20  State Plaza Hotel then report to the supervisors, Lidia,

21  Karen, Fanny, and Abdullah?

22  A.   And Lisa also.

23  Q.   And Lisa also.

24       And the State Plaza Hotel has two buildings, right?

25  A.   Correct.

1    Q.    There's a North building and then there's a South

2    building?

3    A.    That's the way we call it.

4    Q.    And your office is located on the first floor of the

5    South building, is that right?

6    A.    Yes, correct.

7    Q.    And your office gets cleaned by one of the housekeepers,

8    is that right?

9    A.    Correct.  The entire executive office; not only my

10   office.   In fact, we have an office space which is contained

11   four or five offices and gets cleaned by the lobby lady.

12   That's what we call it.

13   Q.    Okay.

14   A.    A lady who cleans the lobby, the first floor, and the

15   offices, and the cafeteria.

16   Q.    And the State Plaza Hotel also has a Food and Beverage

17   Department, doesn't it?

18   A.    The State Plaza Hotel has -- we only serve Continental

19   breakfast in the morning.

20   Q.    All right.  I'm asking you yes or no questions.

21        Let me ask again and you tell me.

22   A.    I would say yes, yes.

23   Q.    Okay.

24   A.    I'm sorry.

25   Q.    And the Food and Beverage Department has an office space

1    inside the hotel, correct?

2    A.    Yes, they do.

3    Q.    And it's a pretty small office, isn't it?

4    A.    Well, it's an office plus a storage so it becomes a good

5    size.

6    Q.    But it's pretty small?

7    A.    No, I would say not that small for -- it's two rooms in

8    one.

9    Q.    A medium sized room?

10   A.    Medium sized room.

11   Q.    And that office is used by the Food and Beverage

12   Department located in the North building, is that right?

13   A.    Correct.

14   Q.    And is it near elevators?

15   A.    Yes.

16   Q.    And you have a secretary, correct?

17   A.    I have an administrative assistant.

18   Q.    Administrative assistant?

19         And is her name Bernadette?

20   A.    No longer Bernadette, but she used to.

21   Q.    Bernadette used to be your administrative assistant?

22   A.    Yes.

23   Q.    What's the name of your current administrative assistant?

24   A.    Gilani Hipolito.  Would you like me to spell it for you?

25   Q.    Yes, please.

```
 1   A.    G-i-l-a-n-i.  Hipolito is H-i-p-o-l-i-t-o.

 2   Q.    And then you also have an assistant, is that right?

 3   A.    An Assistant General Manager?

 4   Q.    No.  Someone named Stephano.

 5         Who is that person?

 6   A.    Stephano is my Assistant General Manager and he just came

 7   on board ten months ago.

 8   Q.    Okay.  How many months?

 9   A.    Ten months ago -- one.

10   Q.    One month.  And you also speak Italian, correct?

11   A.    Yes.  My first language actually.

12   Q.    And you speak a little bit of Spanish, right?

13   A.    I understand well.  I do speak very poorly, but I can

14   communicate.

15   Q.    So sometimes you speak to the employees in Spanish, don't

16   you?

17   A.    I have, yes.

18   Q.    And they understand you, right?

19   A.    Yes.

20   Q.    And sometimes you have someone interpret for you from

21   English to Spanish, is that right?

22   A.    Yes.

23   Q.    Sometimes you have Alexandra Guillen translate for you?

24   A.    She did it once.

25   Q.    Okay.
```

1  A.    Because I couldn't find any management who could

2  translate.

3  Q.    And other than Alexandra Guillen, who else translates for

4  you?

5  A.    Lisa Alvarado, who speaks English and Spanish very well,

6  which is Housekeeper manager.

7  Q.    Have you used anyone else to translate for you?

8  A.    As far as I remember, no.

9  Q.    You testified that R.B. Associates owns the State Plaza

10  Hotel, right?

11  A.    Correct.

12  Q.    And Richard Bernstein is one of the owners of the State

13  Plaza Hotel, is that right?

14  A.    He's the owner of R.B. Associates.

15  Q.    Okay.  And you know who Mr. Bernstein is, right?

16  A.    Yes.

17  Q.    You've met him?

18  A.    Yes.

19  Q.    And you've had -- Mr. Bernstein is the sole owner of R.B.

20  Associates, is that right?

21  A.    I believe so.  I really don't know, to answer that

22  question.  I really don't know.  I believe he is.

23  Q.    And you've had conversations with Mr. Bernstein about the

24  hotel, right?

25  A.    Yeah, he comes in the summer sometime.  He came to visit

1   the hotel and we just talk about it, yes.

2   Q.   And Steve Bello is the President of all of the hotels

3   that R.B. Associates owns, correct?

4   A.   Correct.  It's called Classic Hospitality.

5   Q.   And can you name the hotels that Classic Hospitality

6   owns?

7   A.   State Plaza Hotel, Washington Plaza Hotel, Henley Park

8   Hotel, Morrison Plaza and Hotel Lombardy.

9   Q.   I'm sorry, what was that last name?

10  A.   Hotel Lombardy.

11  Q.   And when you said Mr. Bernstein had come to visit the

12  hotel, was that sometime in the summer of this year or last

13  year -- I'm sorry, of last year?

14  A.   Last year.

15  Q.   And you've had conversations with Mr. Bello about the

16  hotel, correct?

17  A.   Of course.  That's my President.  I report to him.

18  Q.   You report directly to Mr. Bello.

19       And Mr. Bello had visited the State Plaza Hotel --

20  A.   Several times, yes.

21  Q.   And has he visited in the period between March and

22  July --

23  A.   I'm sure, yes.

24  Q.   -- of 2005?

25       Is that yes?

1  A.    Yes.

2  Q.    And, in fact, Mr. Bello attended some of the employee

3  meetings that were held at the State Plaza Hotel --

4  A.    Yes.

5  Q.    -- during that time between March and July of 2005?

6  A.    Yes.

7  Q.    And Mr. Jim Martens, was he Executive Vice President and

8  Chief Financial Officer of R.B. Associates?

9  A.    He's the Chief Financial Officer.

10  Q.    Does he currently hold that position?

11  A.    Yes, but I cannot give you all these answers because I

12  really don't know for sure what is his title, but I know he

13  represents the owner.

14  Q.    You just testified he's the Chief Financial Officer, is

15  that correct?

16  A.    Yes, but I don't know if there is any other.  I just

17  wanted to make sure for the record that I really cannot

18  communicate the position.

19  Q.    Okay.  I'll move on now.

20        State Plaza Hotel gives its employees an annual wage rate

21  increase, isn't that right?

22  A.    According to performance.

23  Q.    And in general, that annual wage rate increase is given

24  to employees around the same time as their anniversary date,

25  when their performance evaluation is given?

1    A.    Yes.

2    Q.    And the date of that annual wage increase then

3    corresponds to the date that the employee was first hired to

4    work at the hotel?

5    A.    It's the first of the month following.

6    Q.    The first of the month following the month they were

7    hired?

8    A.    We do a review in the middle of the month.  Let's say

9    somebody was hired on January 10th.  We do the review on the

10   15th and February 1st they'll get the raise.

11   Q.    And these changes in employee wages, they're approved and

12   they're reviewed by corporate office, someone in R.B.

13   Associates, right?

14   A.    Correct.

15   Q.    And who is it that approves and reviews the wage rate

16   increases, do you know?

17   A.    First our Human Resources Manager.

18   Q.    And what's that person's name?

19   A.    Richard Cotton.

20   Q.    Does anyone else review those?

21   A.    Mr. Bello, the President, and then it gets approved by

22   corporate, I believe Mr. Marten's final signature.

23   Q.    And that's Jim Martens?

24   A.    Yes.

25   Q.    And do you know who Marleni Jiron is, correct?

1  A.    Correct.

2  Q.    She was employed as a housekeeper at State Plaza,

3  correct?

4  A.    Correct.

5  Q.    I have some exhibits that we're going to hand out.

6  **(Whereupon, documents were distributed.)**

7  Q.    BY MS. COTILLA:  Mr. Palenzona, if you could find --

8  locate General Counsel's Exhibits 13, 14, and 15 in the

9  packet?  I think it's going to be on the left-hand side of

10  the packet.

11  **(General Counsel's Exhibits 13, 14 and 15 marked for**

12  **identification.)**

13  A.    You said 13, 14, and 15?

14  Q.    Right.  First, if you could find 13?

15  A.    Okay.

16  Q.    If you take a look at 13, it's a two-page document.

17  A.    Okay.

18  Q.    You recognize this document, correct?

19  A.    Yes.

20  Q.    It's a personnel action form for Marleni Jiron, right?

21  A.    Yes.

22  Q.    And now if you would turn to the next one, which is

23  General Counsel's Exhibit 14, you also recognize this

24  document, right?

25  A.    I recall the document, but it was not signed by me.

1    Q.    Okay.  But you recognize it?

2    A.    Yes.

3    Q.    And it's also a personnel action form for Marleni Jiron?

4    A.    Yes.

5    Q.    And now if you'd turn to General Counsel's Exhibit 15, do

6    you recognize -- you recognize that document as well, right?

7    A.    Yes.

8    Q.    And that's another personnel action form for Marleni

9    Jiron, correct?

10   A.    Yes.

11   Q.    Now, in 2003, 2004, and 2005, Marleni Jiron received a

12   wage increase of three percent, correct?

13   A.    Yes.

14   Q.    And these three documents, General Counsel's Exhibit 13,

15   14, and 15, they're maintained in the regular course of

16   business at State Plaza Hotel, correct?

17   A.    They're maintained in a file, personnel file.

18   Q.    At the State Plaza Hotel?

19   A.    Yes.

20       MS. COTILLA:  Your Honor, at this point I'd offer General

21   Counsel's Exhibits 13, 14, and 15 into evidence.

22       JUDGE BUSCHMANN:  Mr. Greenbaum?

23       MR. GREENBAUM:  No objection.

24       JUDGE BUSCHMANN:  General Counsel's 13, 14, and 15 are

25   hereby admitted.

1    **(General Counsel's Exhibits 13 through 15 received into**

2    **evidence.)**

3    Q.    BY MS. COTILLA:  Now, if you look for General Counsel's

4    Exhibit 21 in your packet.

5    **(General Counsel's Exhibit 21 marked for identification.)**

6    A.    Okay.

7    Q.    You recognize that document, correct?

8    A.    21, right?

9    Q.    Yes.

10   A.    Yes.

11   Q.    It's a personnel action form for Sang Nguyen dated March

12   4, 2001, correct?

13   A.    Correct.

14   Q.    And that's when Mr. Nguyen was hired to work at the State

15   Plaza Hotel, wasn't it?

16   A.    If he says hire date, yes.  I don't have my recollection,

17   but according to this, yes.  I really don't know off the top

18   of my head.

19   Q.    And this is a document maintained in the personnel file

20   in the regular course of business at the State Plaza Hotel?

21   A.    Yes.

22        MS. COTILLA:  Your Honor, I offer General Counsel's

23   Exhibit 21 into evidence.

24        JUDGE BUSCHMANN:  21.

25        MR. GREENBAUM:  Objection.

```
 1        JUDGE BUSCHMANN:  No objection?

 2        MR. GREENBAUM:  I object.

 3        JUDGE BUSCHMANN:  All right.

 4        MR. GREENBAUM:  We object.  It's irrelevant.  I don't

 5   know why it's being offered.  It looks like a personnel

 6   action form that was not signed -- it was signed before

 7   Mr. Corrado started employment.  It looks to be a business

 8   record of the State Plaza Hotel.

 9        We object on the grounds of relevance.

10        JUDGE BUSCHMANN:  Relevance, not authenticity?

11        MR. GREENBAUM:  Yes.

12        MS. COTILLA:  May I respond, Your Honor?

13        JUDGE BUSCHMANN:  Yes.

14        MS. COTILLA:  I was trying to introduce them before I

15   began asking the witness substantive questions about the

16   documents, but he has testified that this is a document

17   maintained in the regular course of business at the hotel,

18   and they were produced to us as part of the investigation in

19   this case.

20        And I --

21        JUDGE BUSCHMANN:  And your objection goes to the

22   relevance, not to the authenticity.  And I think what we'd

23   like to know is to what extent is 21 relevant to the inquiry

24   and you want to have the document in the record before you

25   ask questions concerning the relevance.
```

1      MS. COTILLA:  Your Honor, this document relates to other

2  documents, which is 17 through 20, and then this is 21 and

3  it's going to be showing the wage rate of Mr. Nguyen and the

4  kind of wage rate increase he received throughout several

5  years following his initial hire date and it is limited to

6  four -- five documents with regard to this particular

7  employee.

8      JUDGE BUSCHMANN:  Mr. Greenbaum, do you understand the

9  relevancy now?

10     MR. GREENBAUM:  No, Your Honor.

11     JUDGE BUSCHMANN:  It's the progression of pay raises.

12     MR. GREENBAUM:  I don't understand the relevance.

13     The witness testified that they get an anniversary wage

14  increase.  I believe Ms. Jiron was terminated for getting in

15  a fight with this individual, the one that's set forth in

16  Exhibit 21, Mr. Sang, and the Charging Party filed an unfair

17  labor practice Complaint, complaining that Ms. Jiron was

18  wrongfully terminated in violation of the Act.

19     There was no Complaint issued on that.  In fact, as the

20  General Counsel set forth in his opening statement, that

21  claim was dismissed.

22     I don't know, this seems to me to be a backhanded way of

23  getting that issue out on the record, and it's completely

24  irrelevant to this --

25     JUDGE BUSCHMANN:  It's irrelevant, right?

1    MR. McCARTHY:  Your Honor, may I be heard on this?

2    JUDGE BUSCHMANN:  Yes.

3    MR. McCARTHY:  These documents are offered to show annual

4  wage increases that were given to each of the employees and

5  we also intend to offer other documents with regard to each

6  employee, Your Honor.

7    They were paid a particular amount when they were

8  initially hired.  Each year they received an annual increase

9  of two to three percent.  On July 8th, as explained in

10  General Counsel's opening statement, Respondent gave an

11  unprecedented substantial wage increase much greater than two

12  to three percent.

13    It goes directly to the 8(a)(3) wage allegation issue,

14  Your Honor, that in fact the Respondent was motivated in

15  giving the raise increase because of the Union activity in

16  that this was an unprecedented increase.  These particular

17  documents just show the wage increase for this individual

18  Sang.

19    JUDGE BUSCHMANN:  So are you introducing the entire

20  personnel action documents that are not just Exhibit 21

21  relating to Mr. Sang.  There's Exhibit 16, you mentioned

22  Exhibit 16 and you mentioned subsequent documents in there,

23  which are all indications of pay raises, or various hourly

24  rates.

25    MS. COTILLA:  That's correct.  13, 14, and 15 were the

1  prior ones that I was directing the witness to.

2      MR. McCARTHY:  Your Honor, these were the only documents

3  that the General Counsel received and during the

4  investigation Respondent essentially attached these documents

5  to its position statement.  And --

6      JUDGE BUSCHMANN:  I don't have any problem with

7  introducing Exhibit 21.  It's authentic and developments --

8  it will probably show itself so --

9      MR. GREENBAUM:  Your Honor, I just want to respond.  The

10  reason they were provided because there was an allegation of

11  a wrongful termination and that's why that was provided

12  because --

13      JUDGE BUSCHMANN:  But apparently that's not in issue.

14      MR. GREENBAUM:  It's not in issue, but I would like to

15  note for the record that we're throwing around a lot of

16  words, you know, wage increases, three percent, two percent.

17      What the document shows is the employees are always given

18  -- were given an annual raise throughout.  What General

19  Counsel is talking about is a market adjustment that was

20  given at the other hotels.  So the two --

21      JUDGE BUSCHMANN:  Well, you can show that.  The point is

22  that my criteria here is, is the document relevant, or is it

23  authentic, and you have no problem with the authenticity and

24  I'm relying on the representation that these documents are

25  relevant because they go to the very issue in this case

1   dealing with pay raises.

2       So I understand your concern that they may relate to some

3   other unrelated issue in this case and we'll ignore that.  At

4   this time --

5       MR. McCARTHY:  They're not offered for that purpose, Your

6   Honor.  They're offered solely on the issue of the wages.

7       JUDGE BUSCHMANN:  Right.  I understand.  So you're only

8   offering at this time 21, General Counsel's 21.

9       I'll hereby admit 21, General Counsel's 21.

10  **(General Counsel's Exhibit 21 received into evidence.)**

11  Q.   BY MS. COTILLA:  Mr. Palenzona, can you look again at

12  General Counsel's Exhibit 21?

13  A.   Yes.

14  Q.   Do you have that in front of you?

15  A.   Yes.

16  Q.   And this personnel action form for Sang Nguyen is dated

17  March 4th, 2001, correct?

18  A.   Correct.

19  Q.   And that's when Mr. Nguyen was hired to work at the State

20  Plaza Hotel?

21  A.   I believe so.

22  Q.   And his initial salary was $9.35 an hour, correct?

23  A.   I can't say that is correct.  And according to this --

24  Q.   Okay.

25  A.   -- form it's correct.  I don't have my own records.

1  Q.   If you look at this document, you testified that that was

2  when he was hired, correct, March 4th, 2001?

3  A.   I believe so if the document says that.  At that time, I

4  was not at the State Plaza so I don't -- can't say.

5  Q.   And there's a box that says salary changes and current

6  rate.

7       It says $9.35 per hour, correct?

8  A.   If that says so, yes.

9  Q.   Okay.

10 A.   Again, I was not there in 2001, so I really don't know

11 for a fact.

12 Q.   And now if you would turn to General Counsel's Exhibit

13 17.

14      Have you located that one?

15 **(General Counsel's Exhibit 17 marked for identification.)**

16 A.   Yes.

17 Q.   If you could review that one as well as 18, 19, and 20?

18 **(General Counsel's Exhibits 18 through 20 marked for**

19 **identification.)**

20 Q.   BY MS. COTILLA:  I'd like you to take a look at 17, 18,

21 19, and 20.

22 A.   Okay.

23 **(Whereupon, the witness reviewed documents.)**

24 Q.   BY MS. COTILLA:  You've looked at all four of them?

25 A.   Yes.

1  Q.   You recognize those four documents, correct?

2  A.   Yes.  They're personnel action forms.  Only one is signed

3  by me, the first.

4  Q.   But there are personnel action forms that are maintained

5  in the regular course of business at the State Plaza Hotel,

6  isn't that correct?

7  A.   Correct.

8  Q.   And now if you look at General Counsel's Exhibit 20?

9  A.   Okay.

10  Q.   On March 8th, 2002, Mr. Nguyen did not receive an annual

11  wage increase, isn't that right?

12  A.   According to this, it is.  But you should --

13  Q.   There's no question pending.

14        Now, if you look at General Counsel's Exhibit 19, which

15  is the one just prior to that?

16  A.   Yes.

17  Q.   In 2003, Mr. Nguyen received two percent wage rate

18  increase, isn't that correct?

19  A.   According to this paper, yes.

20  Q.   And now if you look at General Counsel's Exhibit 18, the

21  one prior to that --

22  A.   Okay.

23  Q.   -- in 2004, he received a three percent wage increase,

24  correct?

25  A.   Yes, according to this paper.

1  Q.   And if you now look at General Counsel's Exhibit 17 --

2       JUDGE BUSCHMANN:  You know, Ms. Cotilla, it strikes me

3  that this witness is merely reflecting in his testimony what

4  the documents say.  He's testified that the documents are

5  kept in the regular course of business and that he's familiar

6  with the kinds of documents that are kept in this business.

7       I think the documents speak for themselves.  I don't

8  think the witness has to go through each document in

9  particular because he has not testified from his independent

10 knowledge.

11      MS. COTILLA:  Okay.  I understand, Your Honor.

12      At this point, I offer General Counsel's Exhibits 17, 18,

13 19, and 20 into evidence.

14      JUDGE BUSCHMANN:  Any objections?

15      MR. GREENBAUM:  Same objection, Your Honor, irrelevant.

16      JUDGE BUSCHMANN:  Yes.  17 through 20?

17      MS. COTILLA:  That's correct.

18      JUDGE BUSCHMANN:  I hereby admit General Counsel's

19 Exhibits 17 through 20.

20 **(General Counsel's Exhibits 17 through 20 received into**

21 **evidence.)**

22 Q.   BY MS. COTILLA:  Mr. Palenzona, you can close that now.

23      Now, isn't it correct that on July 5th, 2004, Marleni

24 Jiron received a wage increase of 22.3 percent?

25 A.   2004?

1  Q.    2005.   July 5th, 2005.

2  A.    Yes, I believe so.

3  Q.    And if you would look at what's been marked in your

4  packet again as General Counsel's Exhibit 12?

5  **(General Counsel's Exhibit 12 marked for identification.)**

6  A.    Okay.

7  Q.    You recognize that document, correct?

8  A.    Yes.

9  Q.    It's another personnel action form for Marleni Jiron?

10  A.    Yes.

11  Q.    Dated July 8th, 2005, correct?

12  A.    Yes.

13  Q.    And this document, again, is maintained in the regular

14  course of business in Marleni Jiron's personnel file?

15  A.    Yes.

16       MS. COTILLA:  Your Honor, I offer General Counsel's

17  Exhibit 12 into evidence.

18       JUDGE BUSCHMANN:  Any objection?

19       MR. GREENBAUM:  Same objection, Your Honor.

20       JUDGE BUSCHMANN:  Is she also involved in that --

21       MR. GREENBAUM:  Yes, Your Honor.

22       JUDGE BUSCHMANN:  -- other indication?  Okay.

23       MS. COTILLA:  May I respond, Your Honor?

24       JUDGE BUSCHMANN:  Yes.

25       MS. COTILLA:  Although she was involved in the other

1  cases, she no longer works at the hotel.  She did work at the

2  hotel in the time period when that wage rate increase was

3  given back on July 5th of 2005.  And for that purpose, it

4  does show that she received the kind of wage increase.

5      And we're able to look at the prior wage increases that

6  she received each year before that and compare that prior to

7  that it was relatively, usually, a three percent wage

8  increase and here on July 5th, 2005 it indicates a 22.3

9  percent increase.  So it goes towards that issue, towards the

10  8(a)(3) wage increase.

11      MR. GREENBAUM:  Your Honor?

12      JUDGE BUSCHMANN:  Yes.

13      MR. GREENBAUM:  It's not a wage increase statement.  It

14  doesn't show that.  And if you look at Exhibit 12, direct the

15  Judge to Exhibit 12, it's marked off wage adjustment.  And if

16  you compare that with Exhibit, for example, 14, for

17  Ms. Jiron, it's checked off annual increase.  So these are

18  apples and oranges.

19      JUDGE BUSCHMANN:  Yes.  But you object still to 12 even

20  though the document is clear what it states, as you pointed

21  out?

22      MR. GREENBAUM:  It's irrelevant, Your Honor.  They're

23  putting it in to show that for some reason she got a 22

24  percent increase, wage increase, when it -- it was an

25  adjustment.  It wasn't an increase.  They don't relate to the

1   other exhibits.

2       JUDGE BUSCHMANN:  Understand.  That's going to be part of

3   your case, correct, Mr. Greenbaum?

4       MR. GREENBAUM:  Yes, Your Honor.

5       JUDGE BUSCHMANN:  But you're not contesting the accuracy

6   of this exhibit?

7       MR. GREENBAUM:  No, Your Honor.

8       JUDGE BUSCHMANN:  General Counsel Exhibit 12 is hereby

9   received.

10  **(General Counsel Exhibit 12 received into evidence.)**

11  Q.   BY MS. COTILLA:  Mr. Palenzona, if you could now look at

12  General Counsel's Exhibit 16, what's been marked as GC-16?

13  **(General Counsel's Exhibit 16 marked for identification.)**

14  A.   Yes.

15  Q.   And you recognize that document, correct?

16  A.   The same as the one before, yes.

17  Q.   It's a personnel action form for Sang Nguyen dated July

18  5th, 2005, correct?

19  A.   Correct.

20  Q.   And this document is maintained in the regular course of

21  business in Mr. Nguyen's personnel file at the State Plaza

22  Hotel?

23  A.   Yes, yes.

24      MS. COTILLA:  Your Honor, I offer General Counsel's

25  Exhibit 16 into evidence for the same purpose that

1  Ms. Marleni Jiron's personnel action form was just admitted

2  and received into evidence.

3      JUDGE BUSCHMANN:  Same objection?

4      MR. GREENBAUM:  Same objection, Your Honor.

5      JUDGE BUSCHMANN:  General Counsel Exhibit 16 is hereby

6  received.

7  **(General Counsel's Exhibit 16 received into evidence.)**

8      MS. COTILLA:  Your Honor, may I approach the witness?

9      JUDGE BUSCHMANN:  Yes.

10 Q.  BY MS. COTILLA:  I'm showing you what's been marked as

11 General Counsel's Exhibit 114.

12     If you could look at that, please?

13 **(General Counsel's Exhibit 114 marked for identification.)**

14 Q.  BY MS. COTILLA:  Mr. Palenzona, you recognize this

15 document, correct?

16 A.  Yes.

17 Q.  It's a personnel action form for Maria Chumpitaz?

18 A.  Yes.

19 Q.  And Maria Chumpitaz is a housekeeper at State Plaza

20 Hotel, correct?

21 A.  Correct.

22 Q.  And this document is maintained in the regular course of

23 business at the State Plaza Hotel, isn't that correct?

24 A.  Correct.

25 Q.  And the date of this document is July 5th, 2005?

1  A.    Correct.

2      MS. COTILLA:  Your Honor, I offer General Counsel's

3  Exhibit 114 into evidence.

4      JUDGE BUSCHMANN:  No objection, Mr. Greenbaum?

5      MR. GREENBAUM:  Same objection.

6      JUDGE BUSCHMANN:  Now, is this person also involved in

7  this other incident?

8      MR. GREENBAUM:  No, Your Honor.

9      JUDGE BUSCHMANN:  But you still have an objection to this

10  document?

11     MR. GREENBAUM:  Yes, Your Honor.

12     JUDGE BUSCHMANN:  Because you are talking about a wage

13  adjustment versus a pay raise?

14     MR. GREENBAUM:  Yeah.  It's irrelevant.

15     JUDGE BUSCHMANN:  I see.

16     MS. COTILLA:  If I could respond, Your Honor?

17     JUDGE BUSCHMANN:  It's okay.  General Counsel Exhibit 114

18  is hereby received.

19  **(General Counsel's Exhibit 114 received into evidence.)**

20  Q.    BY MS. COTILLA:  And now if you would turn to General

21  Counsel's Exhibits 9 and 10 again in your packet?  We're back

22  to the packet.

23  **(General Counsel's Exhibits 9 and 10 marked for**

24  **identification.)**

25     MS. COTILLA:  Your Honor, before I continue, it's been

1  brought to my attention General Counsel's Exhibit 114 has

2  three documents attached, stapled together, and there's a

3  114(a), and a 114(b), and I just wanted to -- I'm also

4  offering those into evidence along with 114.  It's the entire

5  package.

6  **(General Counsel's Exhibits 114(a) and (b) marked for**

7  **identification.)**

8      JUDGE BUSCHMANN:  I see.  Mr. Greenbaum, were you aware

9  of 114(a) and (b)?

10     MR. GREENBAUM:  Yes.

11     JUDGE BUSCHMANN:  But you are again not attacking the

12 accuracy of this Exhibit 114?

13     MR. GREENBAUM:  No, Your Honor.

14     JUDGE BUSCHMANN:  My ruling is that the document 114(a)

15 and (b) included is also received.

16 **(General Counsel's Exhibits 114(a) and (b) received into**

17 **evidence.)**

18     MS. COTILLA:  Thank you.

19 Q.  BY MS. COTILLA:  Now, have you located General Counsel's

20 Exhibit 9, Mr. Palenzona?

21 A.  Yes.

22 Q.  And General Counsel's Exhibit 9 is a payroll document,

23 correct?

24     You recognize the document?

25 A.  Yes.

1  Q.   And it's a payroll record for the period ending July 9th,

2  2005?

3  A.   I can't read it.

4  Q.   If you turn to the second page of General Counsel's

5  Exhibit 9?

6  A.   Yes.

7  Q.   And this payroll record is maintained in the regular

8  course of business at the State Plaza Hotel?

9  A.   Correct.

10 Q.   And the next one, which is General Counsel's Exhibit 10,

11 you also recognize that document, correct?

12 A.   Number 10?  I don't find Number 10, no.  Oh, here it is.

13 Okay.

14 Q.   All right.  You recognize General Counsel's Exhibit 10,

15 correct?

16 A.   Yes.

17 Q.   And this is also payroll records maintained by State

18 Plaza Hotel?

19 A.   Yes.

20 Q.   And as with General Counsel's 9, this Exhibit 10 is also

21 maintained in the regular course of business at State Plaza

22 Hotel?

23 A.   Correct.

24 Q.   And Genial Counsel's Exhibit 10 is for the payroll period

25 ending July 2nd, 2005, correct?

1   A.   According to the report, yes.

2        MS. COTILLA:  Your Honor, I offer General Counsel's

3   Exhibits 9 and 10 into evidence.

4        JUDGE BUSCHMANN:  Yes.  Mr. Greenbaum?

5        MR. GREENBAUM:  No objection.

6        JUDGE BUSCHMANN:  9 and 10 are hereby received.

7   **(General Counsel's Exhibits 9 and 10 received into evidence.)**

8   Q.   BY MS. COTILLA:  Mr. Palenzona, if you would turn to

9   what's been marked as General Counsel's Exhibit 11?

10  **(General Counsel's Exhibit 11 marked for identification.)**

11  Q.   BY MS. COTILLA:  Do you recognize that document?

12  A.   It looks like -- yes.

13  Q.   And it's a document that lists the name, the position,

14  hire date, and hourly rate of employees at the State Plaza

15  Hotel, correct?

16  A.   Correct.

17  Q.   The document was created by State Plaza Hotel, wasn't it?

18  A.   I believe so, yes.

19  Q.   And to the best of your knowledge, the information on

20  that document is accurate, correct?

21  A.   No.  The laundry attendant is not accurate.

22  Q.   Okay.

23  A.   The raise -- the pay.

24  Q.   And where is the inaccuracy, which names?

25  A.   McQueen, Susana; Velasquez, Margarito; Sorto, Fredesvinda

1    are also $12.50 an hour.

2    Q.    And this document was as of August 11, 2005, correct?

3          It was current as of August 11, 2005?

4    A.    Yes.

5    Q.    And this document was provided to the National Labor

6    Relations Board along with the position statement in this

7    case, is that correct?

8    A.    I believe so.  I didn't provide that information.

9          MS. COTILLA:  Your Honor --

10         MR. GREENBAUM:  I'm going to object, Your Honor.

11         MS. COTILLA:  I haven't offered it yet, Your Honor.

12         MR. GREENBAUM:  I'm going to object to the

13   characterization.  This document was provided to a Board

14   Agent, Luis Duran in response to his checking the petition

15   with the -- against a list of employees.  I do not believe

16   the document was provided on a position statement.

17         MS. COTILLA:  I will accept that representation.  It was,

18   nevertheless, given to the National Labor Relations Board

19   during the investigation of the matter.

20         JUDGE BUSCHMANN:  It may become important as to whether

21   or not this document was part of a position paper, but

22   apparently it was not.

23         MS. COTILLA:  And I will accept his stipulation.

24         MR. McCARTHY:  We'll check on that, Your Honor, but at

25   this point in time Mr. Greenbaum has indicated that it was

1  given to the National Labor Relations Board during the

2  investigation and that's how we received it.

3       JUDGE BUSCHMANN:  You offered this exhibit?

4       MS. COTILLA:  Not yet, Your Honor.

5  Q.   Mr. Palenzona, if you would look where it says F&B and

6  there is a name there.  It says Guillen, Alexandra --

7  A.   Correct.

8  Q.   Server.  Is the hourly rate listed there accurate as of

9  August 11, 2005?

10 A.   Correct.

11      MS. COTILLA:  Your Honor, at this point I offer General

12 Counsel's Exhibit 11 into evidence.

13      JUDGE BUSCHMANN:  Any objection?

14      MR. GREENBAUM:  No objection.

15      JUDGE BUSCHMANN:  11 is hereby admitted.

16 **(General Counsel's Exhibit 11 received into evidence.)**

17 Q.   BY MS. COTILLA:  Mr. Palenzona, you can now close your

18 packet.

19      You gave a declaration in connection with this case,

20 correct?

21 A.   Correct.

22 Q.   And that declaration was prepared by the attorney for

23 State Plaza, Mr. Greenbaum, isn't that right?

24 A.   I believe I came here to give an affidavit.

25 Q.   Okay.  But I --

1  A.   To Agent Duran.

2  Q.   But there were two affidavits, isn't that right?

3  A.   Correct.

4  Q.   But there was also a declaration that was prepared by --

5  that you worked with your attorney to prepare that

6  declaration, correct?

7  A.   Correct.  It's not -- yes.

8  Q.   And you signed that declaration, right?

9  A.   Correct.

10  Q.   And you signed it on September 13th of 2005?

11  A.   I believe so, yes.

12  Q.   And before you signed it, you had an opportunity to

13  review the declaration and make any changes, right?

14  A.   Yes, of course.

15  Q.   And were you present when this document was prepared,

16  that declaration?

17  A.   Yes.

18  Q.   Where was it prepared?

19  A.   In Mr. Greenbaum's office.

20  Q.   Was anyone else present?

21  A.   I believe Mr. Greenbaum's assistant.

22  Q.   And you didn't make any changes or corrections to that

23  declaration, correct?

24  A.   As far as I know, no.

25  Q.   Now, when you signed it, you declared under penalty of

1  perjury, that the statements you made in that declaration

2  were true and correct, isn't that right?

3  A.   Yes.

4  Q.   And you stated in that declaration that you never told

5  employees that they could not distribute Union pamphlets in

6  the hotel, isn't that right?

7  A.   Correct.

8  Q.   And you also stated in that declaration that you did not

9  tell any employees that such papers were prohibited, isn't

10  that correct?

11  A.   Correct, because they'd been distributing all along.

12  Q.   And you declared that you never interrogated any

13  employees about bringing Union propaganda into the hotel,

14  isn't that right?

15  A.   As far as I remember, yes.

16  Q.   And you also declared that you never interrogated

17  employees about distributing Union materials in the hotel,

18  correct?

19  A.   Yes.

20  Q.   And you said you never told employees that the hotel is

21  monitoring the distribution of pro-Union literature, right?

22  A.   Yes, I never said that.

23  Q.   And then you also established you gave two Board

24  affidavits in this case.

25  A.   Correct.

1  Q.    And that's when you came here and spoke to a Board

2  investigator.

3  A.    Correct.

4  Q.    And one of the affidavits was on January 6, 2006, right?

5  A.    I believe so.  It says so.  I'm no good on dates.

6  Q.    Okay.  Would it help you if I showed you the declaration?

7  A.    That -- yes, please.

8  **(Whereupon, Ms. Cotilla handed a document to the witness.)**

9  A.    Thank you very much.

10  Q.    I'm showing you what's been marked for identification

11  only as General Counsel's Exhibit 7.

12  **(General Counsel's Exhibit 7 marked for identification.)**

13  Q.    BY MS. COTILLA:  And if you turn to the last page of --

14  I'm sorry, not the last page.

15      If you turn to Page 4, you signed this declaration on

16  January 6, 2006, correct?

17  A.    Yes.

18  Q.    Now, if you'd put that to the side, that affidavit was

19  taken by a Board Agent of the National Labor Relations Board,

20  right?

21  A.    Correct.

22  Q.    And that Board Agent gave you an oath and you swore to

23  tell the truth when you gave that affidavit, correct?

24  A.    Correct.

25  Q.    And you had an opportunity to review that affidavit

1  before you signed it, right?

2  A.   Correct.

3  Q.   And you did review it, didn't you?

4  A.   Yes, I did.

5  Q.   And you signed the affidavit after you affirmed the

6  truthfulness under oath, right?

7  A.   Yes.

8  Q.   And when you signed it, you testified that it was true

9  and correct to the best of your --

10     JUDGE BUSCHMANN:  Ms. Cotilla, I think you're going

11 beyond what -- I think you're repeating yourself.  I think

12 that the record is clear that the witness knew he was signing

13 and that he signed it under oath.

14     MS. COTILLA:  Yes, Your Honor.  I'll move on.

15 Q.   BY MS. COTILLA:  And in that affidavit, you stated that

16 you had never prevented or attempted to prevent employees

17 from distributing literature in the cafeteria, correct?

18 A.   Correct.  I only said no litter.  It's a different --

19 Q.   Okay.  The question I asked you is you said that --

20 A.   Correct.

21 Q.   And you also gave another affidavit on January 12, 2006,

22 correct?

23 A.   Correct.

24 Q.   And in that Board affidavit, which you also signed, you

25 certified -- you stated that you did not tell any employee

1  that they were not allowed to distribute pro-Union literature

2  inside the hotel at any time, correct?

3  A.   Yeah.  I never stopped them.

4  Q.   And you also said in that other affidavit, that you had

5  never told any employee that pro-Union literature is

6  prohibited at the hotel, correct?

7  A.   Correct.

8  Q.   And you stated that you never created the impression

9  among employees that their Union activities were under

10  surveillance, correct?

11  A.   Correct.

12  Q.   And you said that you had never interrogated employees

13  about their Union activities.

14  A.   Correct.

15  Q.   Is that still your testimony here today?

16  A.   Yes.

17  Q.   You never interrogated Margarito Velasquez about

18  distributing Union propaganda at the hotel?

19  A.   No.

20  Q.   But you knew that employees were distributing flyers at

21  the hotel cafeteria, correct?

22  A.   Yes.

23  Q.   And you knew that because your managers had brought you

24  some of the flyers?

25  A.   The employee, actually.

1  Q.   The employees.  And the managers as well had brought this

2  to your attention?

3  A.   Mainly the employees.  Once -- twice some managers.

4  Mainly the employees brought it to my attention.

5  Q.   And you referred to Union flyers as propaganda, haven't

6  you?

7  A.   Never said that word.

8  Q.   You've never used the word propaganda --

9  A.   No.

10 Q.   -- to refer to Union literature?

11 A.   No, I don't think so.

12 Q.   And you know who Margarito Velasquez is, right?

13 A.   Yes.

14 Q.   And he's one of the housemen at the State Plaza Hotel?

15 A.   Yes.

16 Q.   And you had a conversation with Margarito Velasquez in

17 your office on or about May 12th, 2004, isn't -- 2005, isn't

18 that right?

19 A.   I have a lot of employees come to my office.  I

20 communicate with them on a daily basis, so it's possible,

21 yes.

22 Q.   Okay.  Do you have a recollection of that conversation on

23 May 12th?

24 A.   Well, I talk to Margarito a lot, so it's possible.

25      MS. COTILLA:  May I have a minute, Your Honor?

1    **(Whereupon, a tape was played.)**

2    JUDGE BUSCHMANN:  Ms. Cotilla, is there a question

3    pending or what?

4    MS. COTILLA:  There will be, Your Honor.  The problem is

5    there are only certain segments of the tape I can go to and

6    it's digital, so I have to -- it will just be a second before

7    I go to the part where I will ask a question, but I will be

8    asking questions related to what's on this recording.

9    JUDGE BUSCHMANN:  Well, I think you should have some sort

10   of a foundation before you start playing this recording.

11   MS. COTILLA:  Yes.  And I'm about to ask -- I'm about to

12   have Mr. Palenzona identify the voices on the recording.

13   JUDGE BUSCHMANN:  I think you should indicate to the

14   Court and to us for the record what you're about to do.

15   Q.   BY MS. COTILLA:  Mr. Palenzona --

16   MR. GREENBAUM:  Your Honor, I'm going to object.  I mean

17   this appears to be some type of tape recording.  When was it

18   recorded?  How was it recorded?  Was there permission to

19   record?  Is the recording even lawful?

20   These are questions that need a foundation and just to

21   hit the witness with some tape recording --

22   MS. COTILLA:  Your Honor --

23   MR. GREENBAUM:  -- with no foundation, I don't even know

24   what I'm reading here.

25   MS. COTILLA:  Your Honor, at this point I'm impeaching

1  Mr. Palenzona based on affidavits and statements that he's

2  already testified here to as to the -- when we offer this

3  tape recording and these two documents into evidence, we will

4  do that.

5      We will establish a foundation and we will do that both

6  through Mr. Palenzona and through other witnesses that the

7  General Counsel intends to call today and at a later time

8  tomorrow.  For now --

9      MR. McCARTHY:  Yes.  At this point, Your Honor, under

10 Federal Rule of Evidence 613(b), this is extrinsic evidence

11 of prior inconsistent statement, and offered for that purpose

12 to impeach the testimony of the witness, the inconsistent

13 statement being the evidence on the tape itself.

14     JUDGE BUSCHMANN:  Well, we don't have any statements.  We

15 have the tape and we have a translation.

16     MR. McCARTHY:  Correct.  We have a transcription of the

17 tape and then a certified translation of the tape.  And the

18 foundation for the taking of the tape will subsequently be

19 established by other witnesses of the General Counsel.

20     MR. GREENBAUM:  I object, Your Honor.  There's no

21 foundation for this tape.

22     MS. COTILLA:  Your Honor, it hasn't even been offered at

23 this point.

24     JUDGE BUSCHMANN:  I know, but you're playing it so --

25     MS. COTILLA:  I'm about to use it.

1        JUDGE BUSCHMANN:  You're about to play this.

2        MS. COTILLA:  Right.

3        JUDGE BUSCHMANN:  And I think I'm having a little problem

4    here with this because Mr. Greenbaum and I seem to indicate

5    or seem to say that you need a foundation for this and not

6    just play a tape into the record that may or may not be

7    relevant.

8        MS. COTILLA:  Well, Your Honor, if I could -- the first

9    thing is that even though I'm going to play it into the

10   record, I don't believe it will be able to be transcribed

11   because it's in Spanish.

12       The purpose of my playing it is to have Mr. Palenzona

13   hear it and then impeach him, ask him questions about it.  We

14   have provided the actual recording, as well as the Spanish

15   transcript, and the English translation of the transcript.

16   And those three exhibits are the ones I intend to offer after

17   I've used it to impeach Mr. Palenzona.

18       According to Rule 613(b) of the Federal Rule of Evidence,

19   as Mr. McCarthy has pointed out, we may use extrinsic

20   evidence to impeach a witness and that's what I'm about to

21   begin doing now.

22       MR. GREENBAUM:  It has to be evidence, Your Honor, and

23   this isn't evidence.  Without a foundation, it isn't

24   evidence.

25       JUDGE BUSCHMANN:  You're impeaching your own witness.

 1      MS. COTILLA:  Yes.  Rule 607 of the Federal Rules of

 2   Evidence say that you can impeach any witness, including a

 3   witness that I, myself, have called.  This particularly

 4   applies to this situation because Mr. Palenzona is an adverse

 5   witness to me.

 6      JUDGE BUSCHMANN:  So how long is this tape?

 7      MS. COTILLA:  The portion that I will be playing is nine

 8   minutes.  However, I will be asking questions.  I don't

 9   intend to just have those nine minutes run.  And I have

10   marked -- I know what segments of the tape I'm going to be

11   going to and that's what I intend to do.

12      JUDGE BUSCHMANN:  So what you're doing, or about to do, I

13   think that should be -- you should make that clear for the

14   record and I shouldn't have to substitute my impressions of

15   what you're doing for that of what you're about to do.

16      But what you're trying to do is to play a statement or

17   submit a statement to the witness via the recorded statement

18   and see whether or not this particular witness agrees or

19   disagrees with what is on the tape.  That's what you're

20   doing.

21      MS. COTILLA:  That's correct, Your Honor.

22      MR. McCARTHY:  And then the foundation for the tape

23   itself, Your Honor, will be laid by other witnesses when

24   the -- the portions of the tape that go to impeachment will

25   be offered as extrinsic evidence of impeachment at this time.

1        Then the rest of the tape, the foundation will be laid

2   when the whole tape is offered into evidence at that time by

3   two subsequent witnesses of the General Counsel.

4        JUDGE BUSCHMANN:  So when you're offering yourself up, I

5   think you will have the entire testimony stricken if that

6   tape is not going to be authenticated by some other

7   witnesses, it seems to me.

8        MR. McCARTHY:  The tape will be authenticated by the

9   witnesses, Your Honor.

10       MR. GREENBAUM:  Your Honor, I would note that it's a CD.

11   I mean they're going to have to authenticate the CD because I

12   don't know how it was taped, under what circumstances.

13       JUDGE BUSCHMANN:  Yes, we don't know.

14       MR. GREENBAUM:  We just don't know and I don't know what

15   this is.  And then you were handed a translation.  Apparently

16   the conversation was in Spanish.  Mr. Palenzona has already

17   testified that Spanish, he's so-so in Spanish.  He can

18   understand, but his speaking isn't that good.  He uses a

19   translator frequently.

20       This whole thing is very suspect and there should be a

21   proper foundation laid before it's even introduced in this

22   hearing.  And this whole issue seems very surreptitious to

23   us.  I don't know.  Did the Board direct this taping?  Did

24   the Union direct this taping?

25       Why was this person wired for ground?  Did Mr. Palenzona

1    know about it?  Did he consent to being taped?

2        JUDGE BUSCHMANN:  I understand, Mr. Greenbaum.  I'm

3    considering your points and I'm thinking about what the

4    appropriate procedure is.

5        I seem to agree that the use of the tape should really be

6    based upon a foundation, whether or not you're going to ask

7    the witness -- if you were to take any statement out of thin

8    air and ask the witness have you ever said XYZ, and the

9    witness says no, that's the end of it.

10       And so it does not have any authority because the tape is

11   just right now is nothing.  It's the absolute unfounded --

12   it's an unsubstantiated conversation that is, on top of it,

13   is in Spanish, I assume.

14       MS. COTILLA:  That's right, but I do want to point out

15   and I don't know if it's been made clear yet, that

16   Mr. Palenzona is speaking in this tape.  He is one of the

17   parties to this conversation.

18       When I play it, you'll recognize his voice.  The fact

19   that it's in Spanish, you're going to hear on the tape

20   Mr. Palenzona speaking in Spanish and understanding what an

21   employee is telling him, having a conversation in Spanish, so

22   I don't believe that that's a barrier because this is himself

23   on the tape, his own voice.

24       JUDGE BUSCHMANN:  Okay.  Then I think there are two ways

25   to deal with this.  Either you have a foundation for this

1    tape first, when, where, why, and by whom, and then we call a

2    witness and ask the witness questions pertaining to this.

3        Or I think you can see whether this witness recalls the

4    conversation, whether the witness recalls his own voice,

5    recognizes his own voice and proceed along that basis, but I

6    think just playing this thing into the courtroom, which to us

7    is meaningless at this point, seems inappropriate.

8        MS. COTILLA:  I understand and I believe I'll attempt to

9    see if Mr. Palenzona won't recall his own voice once he hears

10   it on the -- and we'll take it from there, Your Honor, based

11   on what you've stated.

12       MR. GREENBAUM:  Well, Your Honor, we would prefer the

13   first method set forth by Your Honor, which was --

14       JUDGE BUSCHMANN:  I know, but --

15       MR. GREENBAUM:  Well, we would like some time to review

16   even whether this tape is admissible for any purpose; whether

17   there's some other -- something else behind here; whether

18   this tape is even lawful in the District of Columbia.  So

19   that I think using the first method, for them to lay their

20   foundation, will give us some time to look at that issue.

21       JUDGE BUSCHMANN:  Other than this, what more do you have

22   of this witness?

23       MS. COTILLA:  I do have a few other -- I had a few more

24   exhibits that I intended to use with this witness.

25       JUDGE BUSCHMANN:  So we wouldn't be finishing with this

1  witness before lunch any way, would we?

2      MS. COTILLA:  No, if we were going to take a lunch at

3  noon.

4      JUDGE BUSCHMANN:  I think it would probably be a good

5  time to take a luncheon break at this time and identify it

6  when we come back and focus on how to proceed with this.

7      MR. McCARTHY:  Your Honor, if I may just be heard one

8  more time?

9      JUDGE BUSCHMANN:  Yes.

10     MR. McCARTHY:  Federal Rule of Evidence 613(b), what the

11 General Counsel is proffering is extrinsic evidence of an

12 inconsistent statement by this witness that conflicts with

13 the statements he's already testified to under oath today.

14     JUDGE BUSCHMANN:  We don't know, we don't know whether it

15 is a statement that this witness made.  We don't know.

16     MR. McCARTHY:  This witness will be able to -- just like

17 I show the witness an affidavit and ask with regard to a

18 writing, is this your affidavit, this witness can testify as

19 to whether, in fact, this is his voice on the recording.

20     And once he authenticates his voice, the inconsistent

21 statement should be admitted under the Federal Rules, even

22 without the foundational requirement, Your Honor, because the

23 Federal Rules of Evidence do not require a foundation to be

24 laid prior to impeaching of a witness.

25     JUDGE BUSCHMANN:  Why don't you show the witness the

1  material and see whether he recognizes or recalls the

2  conversation?

3       MS. COTILLA:  Without hearing anything, Your Honor?

4       JUDGE BUSCHMANN:  At this time, because I'm not really

5  clear.  This is highly unusual to me to all of a sudden come

6  up with a CD, which we all know has so far been

7  unsubstantiated.  And the only way that we can deal with, I

8  think, is if the witness recalls these matters and identifies

9  with it, or identifies, let's say, or if someone else

10  identifies it.

11      But I think just at this time playing it and then in

12  Spanish is, it seems to me, somewhat unusual.

13      MS. COTILLA:  I just would like to point out though that

14  similar to in the Comcast trial where Respondent's attorney

15  was able to use a tape recording of EEOC recordings to

16  impeach a witness of the General Counsel, in the same vein,

17  in the same manner, that's what we're attempting to do here,

18  but I will ask the witness if he recalls this conversation

19  ever having occurred.

20  Q.   BY MS. COTILLA:  Mr. Palenzona, if you look at what's

21  been marked as -- are you able to read Spanish,

22  Mr. Palenzona?

23  A.   Yes.

24  Q.   So look at what's been marked --

25      MR. GREENBAUM:  Your Honor, what are we proceeding on?

1      JUDGE BUSCHMANN:  She's asking whether or not this

2  witness recognized the conversation as per Exhibit 108.

3  **(General Counsel's Exhibit 108 marked for identification.)**

4      MR. GREENBAUM:  Okay.  Just for the record, Your Honor,

5  I'm setting forth an objection based on lack of foundation.

6  It appears to be hearsay.  It doesn't appear to be credible.

7  With no foundation, there's no way to tell and I reserve my

8  rights on the lawfulness of this type of conduct.

9  Q.  BY MS. COTILLA:  Mr. Palenzona, if you look at General

10  Counsel's Exhibit 108?

11      Have you had a chance to look over that?

12  A.  No, but it looks like conversation between me and

13  Margarito Velasquez.

14  Q.  Okay.  It looks like conversation between you and

15  Margarito, isn't that correct?

16  A.  Correct.  It looks like.

17      MS. COTILLA:  Your Honor, at this point, I believe we

18  have established at least enough foundation to proceed with

19  listening to the tape, have him hear it, and I will be --

20      JUDGE BUSCHMANN:  Well, we don't have to listen to the

21  tape then.

22      MS. COTILLA:  I'm sorry?

23      JUDGE BUSCHMANN:  Then we don't have to listen to the

24  tape.

25      MS. COTILLA:  Okay.  Okay, I'll continue asking him

1  questions.

2      MR. GREENBAUM:  Your Honor, I object.  All this

3  establishes that the written words here are written by I

4  don't know who.  I presume they were written by General

5  Counsel.

6      JUDGE BUSCHMANN:  No, we have the witness' testimony that

7  he recalls a conversation with this particular witness.

8      THE WITNESS:  I didn't say I recall.  I said it looks

9  like a conversation I may have had with Margarito Velasquez.

10  That's what I recognize it, my name and Margarito, that's

11  all, but I don't know if I had this conversation.  I don't

12  remember.

13      JUDGE BUSCHMANN:  Can you look at that document and find

14  out whether you recall a conversation of that nature, because

15  we're going to have this disk here to deal with one way or

16  the other.

17      It just depends on whether or not we're going to do it

18  now or at some other time once it's substantiated.  It would

19  be easier if you recall this conversation one way or another.

20  **(Whereupon, the witness reviews a document.)**

21      THE WITNESS:  Your Honor, the only thing I can say is I

22  have several conversations with my employees on a daily

23  basis.  I don't recognize to have been exact this

24  conversation with that specific employee.

25      But in order to run my affairs, I have to talk to my

1    employees.  On a daily basis, I do communicate with my

2    employees.

3        JUDGE BUSCHMANN:  Can you read this in Spanish?

4        THE WITNESS:  More or less, yes.

5        JUDGE BUSCHMANN:  And you also have an English statement.

6        Do you recall that conversation?

7        THE WITNESS:  Not specifically, no, but I do remember

8    that I do talk to these people.

9        JUDGE BUSCHMANN:  Could you have had this conversation

10   with this particular employee and which features what you

11   said and what she said?

12       THE WITNESS:  Oh, sure I could.

13       JUDGE BUSCHMANN:  You could have?

14       THE WITNESS:  Yes.

15       JUDGE BUSCHMANN:  Is there a date on this?

16       MS. COTILLA:  The conversation --

17       THE WITNESS:  Two days ago.  No, Friday's date.

18       MS. COTILLA:  No, that was when the translation was

19   prepared.  On or about May 12th, 2005.  And I would, at this

20   point, Your Honor, if I could, play the tape to see if that

21   refreshes his recollection about the conversation.

22       JUDGE BUSCHMANN:  Okay.  I think maybe -- I think that is

23   probably appropriate at this time to see whether the printed

24   material is substantiated by the recording, and whether the

25   witness recognizes his own voice and the voice of that

1  particular person.

2      But we still have not identified this particular tape, by

3  whom it was done.  But I think the witness has indicated that

4  this conversation could have taken place.

5      MS. COTILLA:  And just so I'm clear, Your Honor, you want

6  me to play only as much as it takes for him to see whether or

7  not he recalls, or do you want me to play the entire --

8      JUDGE BUSCHMANN:  No, I don't think that the -- the

9  entire tape is meaningless to us here --

10     MS. COTILLA:  Okay.

11     JUDGE BUSCHMANN:  -- because it's in Spanish and I think

12  the Court Reporter will not be able to record it --

13     MS. COTILLA:  Correct.

14     JUDGE BUSCHMANN:  -- so it's meaningless to anyone other

15  than people who speak Spanish and he can understand what is

16  being said.  But for the record, I think you merely should

17  play the tape to see the extent to which the witness recalls

18  the conversation and the voices on them.

19     MS. COTILLA:  Okay.

20  **(Whereupon, the tape was played.)**

21  Q.   BY MS. COTILLA:  Mr. Palenzona, after listening to that

22  portion of the recording, do you recall a conversation that

23  you had with Margarito Velasquez in your office on or about

24  May 12, 2005?

25  A.   I don't recall the date.  I recall I do speak with

1   Margarito, like every other employee, on several occasions.

2   Q.   And on that tape recording, wasn't that your voice on the

3   recording?

4   A.   Sounds like, yeah.

5   Q.   And wasn't it also Margarito Velasquez's voice on that

6   tape recording?

7   A.   I cannot recognize that.

8        JUDGE BUSCHMANN:  Would you recognize her voice if you

9   heard it?

10       THE WITNESS:  The voice sounds like me, yes.

11       MR. McCARTHY:  Margarito is actually a he, Your Honor.  I

12   made the same mistake initially.  It's not a woman.

13       JUDGE BUSCHMANN:  I see.  Would you be able to recognize

14   his voice if you heard it?

15       THE WITNESS:  Maybe.

16       JUDGE BUSCHMANN:  Maybe you ought to play some more and

17   see whether he can recognize -- whether the witness

18   recognizes the voice.

19       MS. COTILLA:  Okay.

20   **(Whereupon, the tape was played.)**

21       JUDGE BUSCHMANN:  All right.  That's enough.

22       Do you recognize that voice as --

23       THE WITNESS:  It's still me, you know.

24       JUDGE BUSCHMANN:  Oh, that's still you talking?

25       THE WITNESS:  Yeah.  He only say, yeah, yeah.  That's

1  all.  I can hear it from the other --

2      MS. COTILLA:  Would you like me to move it, perhaps?

3      JUDGE BUSCHMANN:  Move up to the point where the other

4  witness speaks.

5      MS. COTILLA:  Okay.

6  **(Whereupon, the tape was played.)**

7      THE WITNESS:  It's definitely a Spanish male.  I can't

8  guarantee that it's Margarito, but I --

9      MR. GREENBAUM:  Your Honor, I'm going to object.  There's

10  no foundation to this tape and we're --

11      JUDGE BUSCHMANN:  I know, I know.

12      Do you recognize that as the voice of this other person?

13      THE WITNESS:  I only recognize it's a Spanish speaking

14  male.  I can't --

15      JUDGE BUSCHMANN:  Could have been the other person?

16  Could have been?

17      THE WITNESS:  It could have been.

18      COURT REPORTER:  But you don't know.

19      MR. McCARTHY:  Your Honor, there's one more question in

20  this tape where the witness addresses the male by name in the

21  tape and if it's possible, we'd like to play that por --

22      JUDGE BUSCHMANN:  I'll tell you what.  I think that the

23  witness has indicated that the conversation that he's

24  familiar with his own voice on the tape and we have a

25  translation of it.

1    The witness has not disavowed it, but in fact believes

2    that the conversation occurred.

3    Mr. Greenbaum, isn't that accurate?  And so therefore, I

4    think we should wait with any further identification until

5    the tape is authenticated in full and then go from there.

6    MS. COTILLA:  Okay.

7    MR. GREENBAUM:  Thank you, Your Honor.  And we would like

8    to note for the record that our position is that this tape

9    was type of setup.  I've read the transcript here.  It

10   doesn't really say anything.

11   He's asking about if it's accurate.  It talks about

12   people coming in form outside the hotel during the evenings

13   or something when management's not there.  That's what this

14   appears to be.  It appears to go to those issues.  It doesn't

15   appear to have anything to do with this case.

16   So I don't know why, you know, the English word

17   propaganda appears in here.  I don't know how that translates

18   into Spanish.  There's a whole host of issues opened up here.

19   One, is it even lawful to do this?

20   JUDGE BUSCHMANN:  Yes, I understand that.  We'll cross

21   that bridge when we get to it later.

22   MR. GREENBAUM:  Thank you, Your Honor.

23   JUDGE BUSCHMANN:  But in the meantime can you finish with

24   this witness before we go -- before we break for lunch, or is

25   it going to take a while longer?

1     MS. COTILLA:  I would say that there's probably another

2  20 minutes, other than what I intended to do with the tape.

3     JUDGE BUSCHMANN:  We're finished with the tape now.

4     MS. COTILLA:  Right.  I'll recall him, yes.

5     JUDGE BUSCHMANN:  And another 15 minutes.

6     Is that all right, Mr. Greenbaum, if we go through

7  another 15, 20 minutes before we break for lunch?  Is that

8  okay with you?

9     MR. GREENBAUM:  Yes, Your Honor.  And then I could do

10  cross after lunch?

11     JUDGE BUSCHMANN:  Yes.

12     MR. GREENBAUM:  Okay.

13  Q.   BY MS. COTILLA:  Okay.  Mr. Palenzona, if you could look

14  at what's been marked in your packet as General Counsel's

15  Exhibit 3?

16  A.   Yes.

17  Q.   You recognize that document, correct?

18  **(General Counsel's Exhibit 3 marked for identification.)**

19  A.   This is one of the petitions.

20  Q.   And the employees gave you a copy of that petition

21  sometime in March of 2005, isn't that right?

22  A.   Correct.  I don't remember that date, but they gave me a

23  copy, yes.

24  Q.   And who was it that gave you the petition?

25  A.   I believe Reina Lozano, but I'm not sure.

1  Q.   And you know that the employees also gave this petition,

2  which has been marked for identification as GC Exhibit 3,

3  directly to the Union, isn't that right?

4  A.   I don't know that.

5  Q.   And this is a copy of the petition that you provided to

6  the National Labor Relations Board during the investigation

7  of this matter, correct?

8  A.   I believe so.

9      MS. COTILLA:  Your Honor, I offer General Counsel's

10 Exhibit 3 into evidence.

11     JUDGE BUSCHMANN:  Any objections?

12     MR. GREENBAUM:  No objection.

13     JUDGE BUSCHMANN:  3 is hereby received.

14 **(General Counsel's Exhibit 3 received into evidence.)**

15     MS. COTILLA:  At that time this point, I'm going to hand

16 out two exhibits that were not part of the packet that I will

17 be using.

18 Q.   BY MS. COTILLA:  I direct your attention now to what's

19 been marked for identification as General Counsel's Exhibit

20 112.

21 **(General Counsel's Exhibit 112 marked for identification.)**

22 Q.   BY MS. COTILLA:  You recognize that document, correct?

23 A.   It's the same one you showed me before.

24 Q.   Okay.

25 A.   Exhibit 3.

1  Q.   And this is the one, General Counsel's Exhibit 112, that

2  you provided pursuant to the subpoena that we issued,

3  correct?

4  A.   I believe so.

5  Q.   Okay.

6  A.   I don't --

7       JUDGE BUSCHMANN:  Is 112 the same as 3?

8       MS. COTILLA:  Your Honor, there are some differences.

9  There are two names crossed out on General Counsel's Exhibit

10  3, which is the one that they provided to us during the

11  investigation, whereas the one they provided pursuant to the

12  subpoena has no names crossed out.

13      For that reason, I'm offering both of them into evidence.

14      JUDGE BUSCHMANN:  Any objection?

15      Have you inquired about Exhibit 113?

16      MS. COTILLA:  Not yet, Your Honor.

17      JUDGE BUSCHMANN:  Go ahead and inquire about that then,

18  as well.

19      MS. COTILLA:  113?

20      JUDGE BUSCHMANN:  Yes.

21  Q.   BY MS. COTILLA:  If you could look, Mr. Palenzona, at

22  General Counsel's Exhibit 4?  It's in the packet.

23  **(General Counsel's Exhibit 4 marked for identification.)**

24  A.   Yes.

25  Q.   You recognize that document, correct?

1  A.   It looks like another petition.

2  Q.   And that's the petition that employees signed on or about

3  May 6th, 2005?

4  A.   I don't know.  Possible.

5  Q.   If you look at the top does it say --

6  A.   Right.

7  Q.   And you received a copy of that petition, correct?

8  A.   Yes.

9  Q.   And now if you look at what's been marked for

10 identification as General Counsel Exhibit 113?

11      I'm going to hand it out to you.

12 **(General Counsel's Exhibit 113 marked for identification.)**

13 A.   Okay.

14 Q.   You recognize this document, right?

15 A.   Yes.

16 Q.   It's a petition also dated May 6th, 2005.

17 A.   Okay.

18 Q.   And this petition, General Counsel's Exhibit 113, was

19 provided pursuant to the subpoena that we issued on State

20 Plaza, isn't that correct?

21 A.   Possible.

22 Q.   And General Counsel's Exhibit 4, which is in your packet,

23 was provided to the National Labor Relations Board by State

24 Plaza Hotel during the investigation, isn't that correct?

25 A.   I don't know what to say.  I just received a copy from my

1    employees to put in an envelope to put in my office.  That's

2    all I know.

3    Q.   Okay.

4        MS. COTILLA:  Your Honor, I offer General Counsel's

5    Exhibit 4, 113, 3 and 112 into evidence.

6        JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

7        MR. GREENBAUM:  I'm just noting for the record, Your

8    Honor, I don't know which one was produced when and how it

9    got to be where it is.  I'm just objecting for the record,

10   you know, no formal objections, just noting my -- noting

11   those comments for the record.

12       JUDGE BUSCHMANN:  Yeah.  I hereby admit General Counsel's

13   Exhibits 3, 4, 112, and 113.

14   **(General Counsel's Exhibits 4, 112, and 113 received into**

15   **evidence.)**

16   Q.   BY MS. COTILLA:  And now I direct your attention to

17   what's been received into evidence as General Counsel's

18   Exhibit 3.

19        On the second page, Number 27, there's a line across

20   Felicia Johnson's name, correct?

21   A.   Yes.

22   Q.   And on Exhibit 112, if you turn to the second page, on

23   Number 27, there's no line across Felicia Johnson's name,

24   correct?

25   A.   Correct.

1  Q.   Do you recall which of these two you saw, whether it

2  was --

3  A.   No, I don't.

4  Q.   Okay.  And if you look at General Counsel's Exhibit 3 --

5  A.   Yes.

6  Q.   -- the second page, Number 37 has Veronica Cruz's name,

7  correct?

8  A.   37?

9  Q.   37.

10  A.   It does, yes.

11  Q.   And the name is written out twice on General Counsel's

12  Exhibit 3, isn't that correct?

13  A.   Yes.

14  Q.   And then if you look at General Counsel's Exhibit 112, on

15  the second page, Number 37, Veronica Cruz's name is just

16  written once, correct?

17  A.   Yes.

18  Q.   Do you recall which of these two was it that you saw,

19  whether Veronica Cruz's name was written twice on the

20  document or just one time?

21  A.   No, I don't --

22  Q.   Okay.

23  A.   -- remember.

24  Q.   And on General Counsel's Exhibit 4, do you see that

25  Alexandra Guillen and Reina Lozano, those two names are

1  crossed out, correct?

2  A.    Yes.

3  Q.    And then if you compare that to the second page of

4  General Counsel's Exhibit 113 --

5  A.    Yes.

6  Q.    -- Alexandra Guillen and Reina Lozano's names are not

7  crossed out, isn't that correct?

8  A.    Correct.

9  Q.    Do you recall which of these two versions it was that you

10  saw?

11  A.    No, I don't.

12  Q.    Now, if you would turn in your packet to what's been

13  marked for identification as General Counsel's Exhibit 5?

14  **(General Counsel's Exhibit 5 marked for identification.)**

15  A.    Yes.

16  Q.    You recognize that document, correct?

17  A.    Yes.

18  Q.    This is another petition and it's dated -- at the top it

19  says July 1st, 2005, isn't that right?

20  A.    Yeah.

21  Q.    And the names and signatures that appear on that document

22  are those of employees at the State Plaza Hotel, correct?

23  A.    Correct.

24  Q.    And you received a copy, or you received this petition in

25  early July, isn't that right?

1  A.    I believe so.  It's true, I guess.

2  Q.    And Alexandra Guillen, she's the one who gave you that

3  copy or that petition, isn't that right?

4  A.    I believe one page was given to me by the front desk;

5  Aida Fuentes, and the other page was given to me by, I guess,

6  Alexandra Guillen.

7  Q.    Okay.

8  A.    I'm just not sure 100 percent, but it was given to me.

9        MS. COTILLA:  I offer General Counsel's Exhibit 5 into

10  evidence.

11        JUDGE BUSCHMANN:  Any objection?

12        MR. GREENBAUM:  No objection.

13        JUDGE BUSCHMANN:  5 is hereby admitted.

14  **(General Counsel's Exhibit 5 received into evidence.)**

15        MS. COTILLA:  Judge, at this point I reserve the right

16  to recall Mr. Palenzona as a witness, both for the subpoenaed

17  issues because he is custodian of records, and also to

18  continue impeachment with regard to the tape.  But I will

19  first, before doing that, I will put on additional evidence

20  to authenticate the tape.

21        JUDGE BUSCHMANN:  So you're finished with the witness

22  without --

23        MS. COTILLA:  Yes, Your Honor.  For this afternoon, yes.

24  For just now, for lunch.

25        MR. GREENBAUM:  Your Honor, I --

1          JUDGE BUSCHMANN:  I don't necessarily -- wait a minute.

2          I don't necessarily agree with you that you have a right

3     to recall this witness with respect to the tape.  This is an

4     issue that I'm going to determine once you believe that you

5     have to recall the witness for that purpose.

6          But I don't disagree with you that you have subpoenaed

7     the witness for the purpose of him being the custodian of the

8     record and, therefore, you may recall him back.  But the

9     other issue I think may be determined by the fact of the

10    authenticity of the particular recording and so forth.

11         MS. COTILLA:  I understand.

12         JUDGE BUSCHMANN:  Okay.  Mr. Greenbaum, you said

13    something.

14         MR. GREENBAUM:  I would -- you said it for me, Your

15    Honor.

16         JUDGE BUSCHMANN:  All right.  Thank you.

17         So we stand adjourned until when, Mr. McCarthy, what

18    time?

19         MR. McCARTHY:  It's certainly up to the Court, Your

20    Honor.

21         JUDGE BUSCHMANN:  We have a little tight schedule then

22    because of the 10(j) injunction issue.  You have to finish

23    this within a certain number of days.

24         Isn't that correct?

25         MR. McCARTHY:  Correct.

1     JUDGE BUSCHMANN:  So how do you suggest that we're

2  proceeding, fairly well or slow or what?

3     MR. McCARTHY:  I think we're doing fine, Your Honor.  I

4  would suggest 1:15.  Is that --

5     JUDGE BUSCHMANN:  1:15?  That's fine.  Fine with me.

6     Mr. Greenbaum?

7     MR. McCARTHY:  Your Honor, if it would be possible to

8  obtain the subpoenaed documents that haven't been turned over

9  at this time, so we could review those during the lunch hour?

10     I assume Mr. Greenbaum has those with him.

11     MR. GREENBAUM:  I would just like to note that we are not

12  under any time constraints because of the 10(j).  It was a

13  schedule we set up among ourselves.  The Court was not

14  involved, because the Court knows they have really nothing

15  before it.  There's no evidence before it.

16     JUDGE BUSCHMANN:  Right.

17     MR. GREENBAUM:  They said they would be flexible

18  depending upon this hearing, so there is really no time

19  constraint.  I would like to get this done as soon as

20  possible, but there really is no time constraint.

21     As to documents, if we have any that we haven't given, we

22  would give.

23     JUDGE BUSCHMANN:  Yes.  Okay.  We stand adjourned until

24  1:15.

25     **(Whereupon, a luncheon recess was taken, to reconvene at**

1    1:15 p.m.)

2

3

4

5

6

7

8

9

10

11                  A F T E R N O O N    S E S S I O N

12                              (Time Noted:  1:15 p.m.)

13        JUDGE BUSCHMANN:  We're on the record.

14        MR. GREENBAUM:  Your Honor, this will be our cross-

15   examination of Mr. Palenzona.  I will note that Mr. Palenzona

16   will be a witness in our case-in-chief, and I'm not going to

17   exhaust him with all the questions now.  I'll just be focused

18   on the cross aspect.

19        JUDGE BUSCHMANN:  Yes.

20                        CROSS-EXAMINATION

21   Q.   BY MR. GREENBAUM:  Mr. Palenzona, you indicated during

22   your testimony, in questions from the General Counsel, that

23   on occasion you asked Alex Guillen to translate for you.

24        Do you recall that?

25   A.   Yes.

1   Q.   What's Ms. Guillen's position at the hotel?

2   A.   She's a -- the position is a waiter, but not having a

3   restaurant she does the breakfast and the minibar.

4   Q.   She's in the Food and Beverage Department?

5   A.   Yes.

6   Q.   Is she a supervisor?

7   A.   No.

8   Q.   Is she a manager?

9   A.   No.

10  Q.   Does she have any authority to hire, fire?

11  A.   No.

12  Q.   What's her hourly rate, if you can recall?

13  A.   10.35, I believe.

14  Q.   That's an hour?

15  A.   Yeah.

16  Q.   Why is it that you asked Ms. Guillen to translate for

17  you?

18  A.   Because usually I try to use a manager.  There's a lot.

19  Not being available, she's the only one that can speak both

20  languages fluently.

21  Q.   Now, when you ask her to translate are you always there?

22  A.   Yes.

23  Q.   And are you saying what to say and then she translates?

24  A.   Yes, exact word-for-word.

25  Q.   Did you ever have her go talk to another employee for

 1  you?

 2  A.   No.

 3  Q.   I want to direct you to some of those exhibits in front

 4  of you, that -- yes.

 5  A.   Yes.

 6  Q.   I want to direct your attention to General Counsel's

 7  Exhibit Number 3.

 8  A.   Yes.

 9  Q.   Let me know when you have it.

10  A.   I have it.

11  Q.   And just for the record, General Counsel Exhibit Number 3

12  is a letter dated March 21, 2005.

13       Do you see that?

14  A.   Yes.

15  Q.   And there's some writing on top.  The first paragraph

16  looks like it's in English and the second in Spanish.

17  A.   Yes.

18  Q.   Do you see that?

19  A.   Yes.

20  Q.   Did you direct any employee at the State Plaza Hotel to

21  compile this?

22  A.   No.

23  Q.   Are these your words?

24  A.   No.

25  Q.   Did you translate this?

1    A.    No.

2    Q.    Did you direct employees to distribute this to employees?

3    A.    No.

4    Q.    Did you collect signatures?

5    A.    No.

6    Q.    Did you ask any employee to collect signatures?

7    A.    No.

8    Q.    Did you ask Alexandra Guillen to collect signatures?

9    A.    No.

10   Q.    How about Reina Lozano?

11   A.    No.

12   Q.    And you indicated that, I believe your testimony was that

13   Ms. Lozano gave this to you?

14   A.    Yes.  Exactly correct, yes.  I'm not 100 percent sure

15   about that.

16   Q.    Did either Alexandra Guillen or Reina Lozano ask you if

17   they could do this?

18   A.    No.

19   Q.    Did they ask you how to do it?

20   A.    No.

21   Q.    Did they ask you -- strike that.

22         Turn your attention to General Counsel Exhibit Number 4.

23   A.    Okay.

24   Q.    This looks like another letter.

25         Do you see that?

1  A.  Yes.

2  Q.  The first one's in Spanish, second in English?

3  A.  Yes.

4  Q.  Did you instruct any employee there to do this?

5  A.  No.

6  Q.  Are these your words?

7  A.  No.

8  Q.  Did you tell any employee to put these words on paper?

9  A.  No.

10  Q.  Did you tell any employees to solicit signatures?

11  A.  No.

12  Q.  Did you ask Alex Guillen or Reina Lozano to do this?

13  A.  No.

14  Q.  Did they ask for permission to do this?

15  A.  No.

16  Q.  Turn your attention to General Counsel Exhibit Number 5,

17  and Number 5 is a couple of pages.

18      Do you see that?

19  A.  Yes.

20  Q.  Same questions.

21      Did you ask any employee to distribute this?

22  A.  No.

23  Q.  Are these your words?

24  A.  No.

25  Q.  Did any management level employee -- was any management

1   level employee involved in this petition?

2   A.   No, as far as I know.

3   Q.   Did you instruct Alex Guillen to do this for you?

4   A.   No.

5   Q.   Now, General Counsel Exhibit Number 5 is the petition.

6   It looks like the top one is dated July 1, '05.

7        Do you see that?

8   A.   Yes.

9   Q.   Who gave this to you?

10  A.   As I remember, the first page was given to me by Aida

11  Fuentes, which is an employee of the front desk.

12  Q.   Okay.

13  A.   And the second one, I believe was Reina Lozano.

14  Q.   And what's Ms. Lozano's position at the hotel?

15  A.   Ms. Lozano helps Alex Guillen to serve the breakfast, do

16  the minibar, and clean the breakfast room.  And they will be

17  in kitchen.

18  Q.   When did she assume that position?

19  A.   She assumed that position -- she -- we used to have

20  another lady that was doing the weekends and this lady

21  resigned, so she offered to do it just on the weekend in

22  order to do overtime, being a housekeeper five days a week

23  and two days, Saturday and Sunday, work as a minibar

24  attendant.

25       And then, because the work was so much, there was a lot

1    of cleaning to be done in all the kitchens, then she started

2    to work with Alex for, I would say, January 2005.

3    Q.    Who resigned?

4    A.    I don't remember the name.  I think it was -- I'd really

5    never met her because she never showed up for the first three

6    weekends I was there and then she sent me a fax to resign.

7    Q.    And how did it come --

8    A.    Gracie I think was her first name.  I don't remember the

9    last name.

10   Q.    Okay.  How did it come that Ms. Lozano got that job over

11   other employees?

12   A.    She's the only one who came to ask for it.

13   Q.    So it's not something you did?

14   A.    No.  She came to me.

15   Q.    She came to you?  And what was the reason for her coming

16   to you?

17   A.    Well, she came to me and said, I know that you have a

18   problem in covering the weekend.  I can do it for you if you

19   like.  I'm a housekeeper, but I can do the Saturday and

20   Sunday for you.  I'm usually off.  So I took the offer.

21         MR. GREENBAUM:  No further questions, Your Honor.

22         JUDGE BUSCHMANN:  Okay.

23         MS. COTILLA:  No further questions either, Your Honor.

24         THE WITNESS:  Thank you very much.

25         JUDGE BUSCHMANN:  You may step down and thank you very

1    much.

2    **(Witness excused.)**

3        JUDGE BUSCHMANN:  Mr. McCarthy, you have some -- I see

4    some new faces in the courtroom.

5        Are we sure that they're not potential witnesses or

6    witnesses?

7        MR. McCARTHY:  Yes, Your Honor.  I don't know about this

8    gentleman that's sitting with Mr. Palenzona.  I believe that

9    Mr. Greenbaum indicated he may be a potential witness, but

10   he's identified as Mr. Colton -- or Mr. Cotton.

11       He's the Human Resources Director, and I believe you

12   indicated that he may be, in fact, a witness or custodian of

13   records with regard to subpoenaed documents.

14       MR. GREENBAUM:  Yes.  I don't anticipate calling him as a

15   witness.

16       MR. McCARTHY:  Well, I anticipate calling the custodian

17   of the records if we can't work out subpoena issues tomorrow

18   morning, Your Honor, so perhaps with that representation, he

19   should be excused from --

20       JUDGE BUSCHMANN:  If the only issue is being the

21   custodian of the record --

22       MR. McCARTHY:  Yes.

23       JUDGE BUSCHMANN:  -- it's not a particular -- it's not an

24   issue that really goes to the credibility of any of the

25   issues here, don't you think?

1          MR. McCARTHY:  Okay.  I agree with Your Honor.

2          MR. GREENBAUM:  I think we discussed that this morning.

3     However, I will note that Mr. Cotton does have jury duty this

4     week, and if he is out because of jury duty, we would call a

5     different custodian of records.

6          JUDGE BUSCHMANN:  I see.

7          Please come forward.

8          We're still on the record, correct?

9          COURT REPORTER:  Correct.

10         MR. McCARTHY:  Your Honor, General Counsel would call

11    Adriana Nunez to the witness stand.

12         JUDGE BUSCHMANN:  All right.  Ms. Nunez, please step

13    forward.

14         Does she speak English?

15         MR. McCARTHY:  Very little, Your Honor.

16         JUDGE BUSCHMANN:  Ms. Nunez, I have to swear you in.

17         Do you understand an oath?

18         THE INTERPRETER:  Your Honor, shall I interpret the oath,

19    or perhaps take one myself to interpret for the Court?

20         JUDGE BUSCHMANN:  Yes.  I have to swear you in first as

21    an Interpreter.

22         THE INTERPRETER:  Correct.

23    (Whereupon,

24                          **CHARLES BECKER**

25    was called to interpret the questions from English into

1  Spanish and the answers from Spanish into English to the best

2  of his ability and, having been first duly sworn, translated

3  as follows:)

4      THE INTERPRETER:  I do.  For the record, Charles Becker

5  interpreting for the Court, Your Honor.

6      JUDGE BUSCHMANN:  Thank you.  And now I have to swear in

7  the witness.

8  (Whereupon,

9                       **ADRIANA NUNEZ**

10  was called as a witness by and on behalf of the General

11  Counsel and, having been first duly sworn, was examined and

12  testified through the Interpreter, on her oath, as follows:)

13      JUDGE BUSCHMANN:  Please sit down.

14      THE INTERPRETER:  And with your permission, I will

15  instruct the witness to please speak up so that I can hear

16  her as I interpret.

17  **(Whereupon, the Interpreter instructed the witness.)**

18                   **DIRECT EXAMINATION**

19  Q.   BY MR. McCARTHY:  Good afternoon, Ms. Nunez.

20  A.   Good afternoon.

21  Q.   Would you please state your name and address for the

22  record and spell your last name?

23  A.   A-d-r-i-a-n-a N-u-n-e-z.

24  Q.   And your address, ma'am?

25  A.   3435 Holdman Place N.W., Apartment 504, Washington, D.C.

1    20010.

2    Q.    Thank you.  Do you speak English or Spanish or both?

3    A.    Spanish.

4    Q.    Can you read Spanish?

5    A.    Yes.

6    Q.    How much education have you had?

7    A.    In my country up to 9th grade.

8    Q.    Are you testifying here pursuant to my subpoena?

9    A.    Yes.

10    Q.    Who is your current Employer?

11    A.    The State Plaza Hotel.

12    Q.    How long have you worked for the State Plaza Hotel?

13    A.    April 6th will make three years.

14    Q.    When you first started working for the hotel on April

15    6th, 2003, what job did you perform?

16    A.    Housekeeping in the Laundry Department.

17    Q.    And are there two buildings in the hotel?

18    A.    Yes.

19    Q.    Which building is the Laundry Department in?

20    A.    On the south side.

21    Q.    And what hours did you work in the Laundry?

22    A.    From 2:00 in the afternoon till 10:30.

23    Q.    And what job do you currently now perform at the State

24    Plaza Hotel?

25    A.    Housekeeping, cleaning rooms.

1  Q.   And when did you begin housekeeping and cleaning the

2  rooms, what month of what year?

3  A.   That was in the month of August 2005.

4  Q.   And what hours do you currently work as a housekeeper

5  since August 2005?

6  A.   From 8:00 in the morning until 4:30 in the afternoon.

7  Q.   And what are your duties as a housekeeper from 8:00 in

8  the morning until 4:30 in the afternoon?

9  A.   That schedule is to clean 12 rooms.

10  Q.   And who is your immediate supervisor?

11  A.   Well, there are three supervisors, but the immediate one

12  is Lisa, who's also the Housekeeping manager.

13  Q.   And do the other hotel supervisors, namely Lidia, Fanny,

14  and Karen, report to Lisa?

15  A.   Yes.

16  Q.   And do these supervisors speak to you in English or in

17  Spanish?

18  A.   The three of them in Spanish.

19  Q.   And what about Lisa?

20  A.   In Spanish.

21  Q.   Who assigns you work each day?

22  A.   Well, when I get there, the one who gives me my work

23  slate is the supervisor.

24  Q.   And does that supervisor vary from day-to-day?

25  A.   Yes.  I've been changed several times.

1   Q.   And do you receive a list of work assignments each day?

2   A.   Yes.

3   Q.   And do you have an assigned floor for your housekeeping

4   duties?

5   A.   No, I do not.  I go from floor-to-floor.

6   Q.   Who is the hotel manager?

7   A.   Mr. Corrado Palenzona.

8   Q.   And do you know how long he had been the general manager

9   of the hotel, approximately?

10  A.   I recall that it's two years.

11       JUDGE BUSCHMANN:  Mr. McCarthy, I think some of the

12  questions are already clear on the record.  They don't really

13  have to be asked, right, like the last question.

14  Q.   BY MR. McCARTHY:  Does Mr. Palenzona --

15       MR. McCARTHY:  Yes, Your Honor.

16  Q.   BY MR. McCARTHY:  Does Mr. Palenzona speak to you in

17  Spanish?

18  A.   Yes.

19  Q.   I'd ask you now to open the exhibit file in front of you

20  and I will direct your attention to General Counsel's Exhibit

21  26 on the right-hand side.

22  **(General Counsel's Exhibit 26 marked for identification.)**

23  Q.   BY MR. McCARTHY:  Do you see General Counsel's Exhibit

24  26, ma'am?  26.

25       Do you recognize that document?

1  A.   Yes, that's my check stub.

2  Q.   And when you started working at the hotel was that your

3  starting wage rate of $9.35 per hour?

4  A.   Yes.

5  Q.   And then directing your attention to the next document,

6  GC-27, do you recognize that document?

7  **(General Counsel's Exhibit 27 marked for identification.)**

8  A.   Yes.  That's also my check stub.

9  Q.   And does that reflect an annual increase from $9.35 to

10  $9.63?

11  A.   Yes.

12      MR. McCARTHY:  Your Honor, I offer General Counsel's

13  Exhibit 26 and 27.

14      JUDGE BUSCHMANN:  Any objection?

15      MR. GREENBAUM:  No objection.

16      JUDGE BUSCHMANN:  26 and 27 are hereby admitted.

17  **(General Counsel's Exhibits 26 and 27 received into**

18  **evidence.)**

19      MR. McCARTHY:  Thank you, Your Honor.

20  Q.   BY MR. McCARTHY:  What is your current hourly wage rate?

21  A.   12.50.

22  Q.   When did you begin making 12.50 per hour?

23  A.   That I recall, it was in the month of July of 2005.

24  Q.   And do you recall the specific day that you started

25  making 12.50?

1  A.   I don't recall the exact date, but I only know it was

2  after July 5th.

3  Q.   Now, prior to July 2005 had you ever received that large

4  a wage increase before?

5  A.   Never.

6  Q.   While you were working in the Laundry Department, before

7  August 2005, do you recall ever meeting with other employees

8  in the Diplomat Room?

9  A.   Yes.

10 Q.   Where in the hotel is the Diplomat Room located?

11 A.   It's in the North building.

12 Q.   Do you recall what month you had a meeting with other

13 employees in the Diplomat Room?

14 A.   It was late March 2005.

15 Q.   What was the purpose of the meeting?

16 A.   To speak about the mistreatment from supervisors.

17 Q.   Do you recall whose idea it was to have the meeting?

18 A.   Marleni Jiron.

19 Q.   Was Marleni Jiron active in organizing the Union?

20 A.   Yes.

21 Q.   And was Marleni fired in mid July of 2005, along with an

22 employee named Sang?

23 A.   Yes.

24 Q.   Were most of the employees in the Housekeeping/Laundry

25 Department present at this meeting in the Diplomat Room in

1  late March 2005?

2      THE INTERPRETER:  I beg your pardon.  Were most --

3  Q.   BY MR. McCARTHY:  Were most of the employees in the

4  Housekeeping and Laundry Department present at this meeting

5  in late March 2005 in the Diplomat Room?

6  A.   Yes.

7  Q.   And do you recall who was present from management?

8  A.   That day, Mr. Corrado Palenzona was present along with

9  Mr. Bello.

10  Q.   And does Mr. Bello speak Spanish?

11  A.   No.

12  Q.   Who did most of the talking at this meeting?

13  A.   Marleni did.

14  Q.   And was Marleni speaking in English or in Spanish?

15  A.   In Spanish.

16  Q.   And while Marleni was talking, was anyone translating for

17  Mr. Bello?

18  A.   Yes, Mr. Palenzona.

19  Q.   And do you recall whether Mr. Palenzona said anything at

20  the meeting?

21  A.   Yes.

22  Q.   What did he say?

23  A.   After Marleni, he said for them to respect us, we had to

24  respect them.

25  Q.   And how long did the meeting last?

1   A.    Approximately 20 minutes.

2   Q.    And after the meeting was over did most employees go back

3   to work?

4   A.    Yes.

5   Q.    Did any other employees stay around?

6   A.    Yes, two more did.

7   Q.    Who stayed?

8   A.    The ones who stayed were Gladis Bonilla, Gloria Castro,

9   and myself.

10  Q.    And why did you stay around?

11  A.    I was going together with the employees outside.  I

12  stayed back when Ms. Bonilla and Castro indicated they wished

13  to speak to Mr. Corrado.

14  Q.    And did you join in the conversation?

15  A.    I did.

16  Q.    And who was present for this conversation?

17  A.    Mr. Corrado and Mr. Bello were, and the three of us in

18  Housekeeping.

19  Q.    And do you see Mr. Corrado present in the courtroom as

20  you testify?

21  A.    Yes, I do.

22  Q.    Now, how close were you all during this conversation?

23  A.    The three of us women were very close to each other.

24  They too were also close to one another, seated as so in some

25  chairs.

1    Q.    And was the conversation in Spanish, or English?

2    A.    We women and Mr. Corrado, in Spanish.

3    Q.    And how close were you to Gloria, Gloria Castro and

4    Gladis Bonilla?

5    A.    The three of us were very close together seated on one

6    side in a chair, and the other two gentlemen on the other

7    side seated.

8    Q.    And approximately how many feet away were Mr. Palenzona

9    and Mr. Bello from you, Gloria, and Gladis?

10   A.    Very close by, about three feet away.

11   Q.    And what did you hear the employees say to the hotel

12   manager, Mr. Palenzona, and Mr. Palenzona state to them?

13        THE INTERPRETER:  I'm going to ask the witness to repeat.

14        THE WITNESS:  Gloria and Gladis spoke about a wage

15   increase.  Yes, they stayed behind to discuss a wage

16   increase, but they also said to him that everything that

17   Marleni had said was untrue.

18   Q.    BY MR. McCARTHY:  And did Palenzona say anything?

19   A.    He said that he did not know who was telling the truth.

20   Q.    And did anyone say anything to you at that point?

21   A.    Yes, Ms. Gladis did.

22   Q.    And what did she say?

23   A.    Not to say anything about what we were speaking about.

24   Q.    And did you respond?

25   A.    I told her okay, that's fine.

1  Q.   What else, if anything was said during this conversation?

2  A.   They spoke about the raise.  Mr. Corrado said that the

3  raise was a matter of bargaining between the Union and the

4  hotel, but there was nothing he could say on that.

5  Q.   And did Gloria Bonilla respond?

6  A.   Gladis Bonilla.

7  Q.   And what did Gladis Bonilla say?

8  A.   She said that's exactly what I don't want, bargaining,

9  because that will never end.

10  Q.   Did Gloria Castro ask any questions at that point?

11  A.   Yes.  She asked Mr. Corrado whether there wasn't any way

12  to get rid of the Union.

13  Q.   And did you say anything at that point?

14  A.   I said something the same, how could we get rid of the

15  Union.

16  Q.   And why did you say that?

17  A.   To see what he would say to show I was on his side and to

18  get rid of the Union.

19  Q.   And did Mr. Palenzona say anything at that point in time?

20  A.   He said, yes, there is a way to get rid of the Union.

21  Q.   Did Mr. Palenzona say anything else?

22  A.   Yes.  He said that if the majority of us employees signed

23  a petition to get rid of the Union, we could get rid of the

24  Union.

25  Q.   And do you recall whether Mr. Palenzona said anything

1  else?

2  A.    Yes.  He said he was going to call his attorney to let

3  him know -- strike that -- to let them know that there was a

4  way to get rid of the Union.

5  Q.    And did Mr. Palenzona say this in English or in Spanish?

6  A.    He spoke to us in Spanish and he said it to the other

7  man, he translated it to the other man.  He said it to

8  Mr. Bello.

9  Q.    And could you understand what he was saying to Mr. Bello

10  in English?

11  A.    What I understood is that he said it was good news what

12  the ladies were saying.  That it would be necessary to call

13  the attorney and he got the number.

14  Q.    After Mr. Palenzona spoke to Mr. Bello, did you see

15  anyone make a phone call?

16  A.    Yes.  Mr. Bello was speaking.

17  Q.    On what phone?

18  A.    On Mr. Palenzona's.

19  Q.    Who punched in the -- who punched in to dial the phone

20  number?

21  A.    Mr. Palenzona.

22  Q.    And did you observe anyone speak on the phone initially?

23  A.    Yes, Mr. Palenzona.

24  Q.    And then did Mr. Palenzona give the phone to anyone else?

25  A.    Yes.  To Mr. Bello.

1    Q.    And did you understand what Mr. Palenzona said before he
2    gave the phone to Mr. Bello?
3    A.    I only understood that he told him he had good news, but
4    that the one that would tell him this was Mr. Bello.
5    Q.    And then did you see Mr. Bello speak on the phone?
6    A.    Yes, he spoke.
7    Q.    And was Mr. Bello speaking in English or in Spanish to
8    the person on the other end of the phone?
9    A.    In English.
10   Q.    And then who hung up the phone after the call?
11   A.    Mr. Bello did.
12   Q.    And how long did the call last?
13   A.    It was very brief, like three minutes.
14   Q.    Did Mr. Palenzona say anything at that point?
15   A.    Yes.  He bid us goodbye.  He said, okay, ladies, time to
16   go to work, everything will be worked out.  We'll get a
17   petition out on the Union and we'll no longer have any
18   problems with the Union at this hotel.
19   Q.    And do you recall whether Mr. Palenzona said anything
20   else to the employees present?
21   A.    He said that what we said was simply among us, that we
22   were the only ones that would know about this, and not to say
23   anything to any of the other employees about what we had
24   spoken.
25   Q.    Now, after this conversation with Mr. Palenzona and

1  Bello, did the employees go back to work?

2  A.   Yes.

3  Q.   And did you return to the laundry room in the South

4  building?

5  A.   Yes.

6  Q.   And when you returned to the laundry room, did you see

7  any supervisors?

8  A.   Yes, the night supervisor.

9  Q.   And what is the night supervisor's name?

10  A.   Abdullah.

11  Q.   And do you know his last name?

12  A.   Va.  I know his name is Abdullah Va.

13  Q.   And did Abdullah Va direct you to do anything?

14  A.   Yes, immediately.

15  Q.   What did he direct you to do?

16  A.   He sent me to leave towels in a room in the North

17  building.

18  Q.   And approximately how long after the conversation with

19  Mr. Palenzona and Mr. Bello did Abdullah Va direct you to

20  leave towels at the north side of the hotel?

21  A.   It was some five minutes after.

22  Q.   Now, when you returned to the north side of the hotel,

23  did you head towards the elevator banks?

24  A.   Yes, I went to the elevators.

25  Q.   And did you pass the Food and Beverage office on your way

1   to the north side elevator banks?

2   A.   Yes, the office is in the hallway.

3   Q.   And approximately how far is the Food and Beverage office

4   from the elevator banks?

5   A.   It's about 15 feet.

6   Q.   And did you immediately get on the elevators?

7   A.   No.

8   Q.   Why not?

9   A.   I stood by to listen.  Mr. Corrado was in the Food and

10  Beverage office with two other employees.

11  Q.   And could you see who he was in the Food and Beverage

12  office with?

13  A.   Yes.

14  Q.   Who did you see him with?

15  A.   With Ms. Reina Lozano and with Alexandra Guillen.

16  Q.   And were there other people waiting for the elevator at

17  that time?

18  A.   Yes.

19  Q.   Did you stay behind and wait for the elevator to return?

20  A.   Yes.  I was waiting for the elevator, but I was very

21  close to the door where he was with the employees.

22  Q.   And was the door to the Food & Beverage Office opened or

23  closed?

24  A.   It was open a little way.

25  Q.   And approximately how many feet away were you when you

1  overheard the conversation between Palenzona, Reina and Alex?

2  A.   I was very close by, about three feet from the door.

3  Q.   And what were you doing at the time?

4  A.   Listening, because I heard they were speaking about the

5  petition.

6  Q.   And did you move closer to the Food and Beverage office,

7  or the elevator?

8  A.   I got closer to the office.

9  Q.   And could you hear Mr. Palenzona say anything to Alex

10 Guillen and Reina Lozano?

11 A.   Yes.

12 Q.   What did you hear Palenzona say?

13 A.   I heard said that they would go from door-to-door with

14 the petition to get the signatures of the Housekeeping

15 employees.

16 Q.   Who said that?

17 A.   Mr. Palenzona did.

18 Q.   And did you hear Reina ask Mr. Palenzona any questions at

19 that point?

20    MR. GREENBAUM:   Objection, Your Honor.   Hearsay and move

21 to strike.

22    MR. McCARTHY:   It's not offered for the truth of the

23 matter asserted, Your Honor.   It's just offered for what she

24 said at that time and then I'm going to ask whether

25 Mr. Palenzona responded.

 1      JUDGE BUSCHMANN:  Objection overruled.

 2  Q.  BY MR. McCARTHY:  Did you hear Reina ask Mr. Palenzona

 3  any questions at that point?

 4  A.  She asked what will happen if they don't want to sign.

 5  Q.  And did Mr. Palenzona respond to her question?

 6  A.  He said why wouldn't they sign?  Everyone will sign

 7  because they want a raise.

 8  Q.  And is there a linen closet nearby?

 9  A.  Close by there's a room where all sorts of articles are

10  stored, the vacuums are kept there, and bags, mops.

11  Q.  And did anyone see you at this point?

12  A.  Yes.

13  Q.  Who saw you?

14  A.  Alexandra did.

15  Q.  How do you know Alexandra saw you?

16  A.  It was her.  She came to the door and I saw her.

17  Q.  And did she do anything?

18  A.  No.  She just gestured to the gentlemen that somebody was

19  listening there.

20  Q.  And then what happened?

21  A.  They shut the door.

22      THE INTERPRETER:  Strike that.  They slammed the door.

23  And the witness has just added they shut the door.

24  Q.  BY MR. McCARTHY:  Did you hear anything else at that

25  point?

1    Did you hear anything else after that point?

2  A.   No, not then.  I went to the room where I had been going.

3  Q.   Did you return to work, to deliver the towels to an upper

4  level floor?

5  A.   Yes.

6  Q.   Did you work the next day?

7  A.   Yes.

8  Q.   And do you recall what time you reported to work the next

9  day?

10  A.   Yes.  I worked to 2:00 in the afternoon.

11  Q.   And did you ride the elevator that day?

12  A.   Yes.

13  Q.   And where did you ride the -- I'm sorry, strike that.

14    Where did you get on the elevator?

15  A.   In the south side on the basement.

16  Q.   And did the elevator stop at the first floor?

17  A.   Yes, it did.

18  Q.   And did anyone get on the elevator at that point?

19  A.   Yes, Ms. Reina Lozano and Alexandra Guillen got on.

20  Q.   And did anyone get off the elevator at that point?

21  A.   Yes, Ms. Silvia Romero got off.

22  Q.   And did you ride the elevator with Reina and Alex?

23  A.   Yes.

24  Q.   And was there anyone else present on the elevator when

25  you rode the elevator with Reina and Alex?

1  A.   On the elevator, no.  Ms. Silvia had gotten off already

2  when we continued up.

3  Q.   Did Reina and Alex have anything with them when you rode

4  the elevator with them?

5  A.   Yes.

6  Q.   Did either of them ask you to sign anything?

7  A.   Yes, Ms. Lozano did.

8  Q.   And directing your attention to General Counsel's Exhibit

9  28, do you recognize that document?

10  **(General Counsel's Exhibit 28 marked for identification.)**

11  A.   Yes.  It's the petition that Ms. Lozano was holding.

12  Q.   And is the petition that Reina asked you to sign?

13  A.   Yes, this is it.

14  Q.   And were all the signatures on the document when Reina

15  asked you to sign it?

16  A.   No, just the one where Ms. Silvia Romero's appears.

17  Q.   So were there only five signatures on the document up to

18  Silvia Romero's signature?

19  A.   Yes.

20  Q.   And was Silvia the woman that just got off the elevator?

21  A.   Yes.

22  Q.   And General Counsel Exhibit 28 is merely a one-page

23  document.

24      Did Reina ask you to sign a one-page document or a two-

25  page document?

1  A.   A single page document.

2      MR. McCARTHY:  Your Honor, I offer General Counsel's

3  Exhibit 28.  Well, actually, let me ask a few more questions

4  before I offer the document.

5  Q.   BY MR. McCARTHY:  Do you recognize the handwriting on the

6  top two paragraphs of the document?

7  A.   Yes, I recognize it.

8  Q.   And whose handwriting is it?

9  A.   Ms. Guillen's.

10 Q.   Have you seen Alex Guillen's handwriting before?

11 A.   Yes.  On occasion she left a note for the nightshift

12 supervisor, who was with me, and I know her handwriting well.

13     MR. McCARTHY:  Your Honor, I offer Genera Counsel Exhibit

14 28, which is actually the one-page document that was shown to

15 the witness up to Signature 5, the first page being -- the

16 first page of the document, which is in evidence, is GC-3.

17     JUDGE BUSCHMANN:  Any objection?

18     MR. GREENBAUM:  No objection.

19     JUDGE BUSCHMANN:  28 is hereby received.

20 **(General Counsel's Exhibit 28 received into evidence.)**

21     MR. McCARTHY:  Thank you, Your Honor.

22 Q.   BY MR. McCARTHY:  Did you finish the conversation after

23 the elevator reached your floor?

24 A.   Yes.  Upon reaching the floor, we concluded our -- we

25 stopped talking.

1  Q.    And what did you say when Reina asked you to sign GC-48?

2  A.    I asked her what it concerned.  She says to me it's a

3  petition to get the Union out.

4  Q.    And did Alex say anything at that point in time?

5  A.    Yes.  Alex said that the petition comes with a 2.50

6  increase.  If we sign the petition, we will get a 2.50

7  increase.  And also she said that it was 2.50 plus other

8  benefits, but I don't know what the other benefits are.

9  Q.    Now, after Alex told you that if he signed the petition

10 to get rid of the Union, the hotel would give you 2.50

11 increase and other benefits, do you recall whether anything

12 else was said?

13      Well, I'm sorry.  Do you recall whether you said

14 anything?

15 A.    Yes.  I said, well, this might mean my dismissal.  And

16 Alex said, no, it's not going to be your dismissal.  It's to

17 get rid of the Union, and if we get rid of the Union, the

18 people will be better off.  We'll have better benefits and

19 higher wages.

20 Q.    Was the word hotel mentioned in the translation?

21      Did Alex say anything about the hotel; use the word

22 hotel?

23      MR. GREENBAUM:  Objection, leading.

24      MR. McCARTHY:  Objection.  I'm objecting as to the

25 translation, Your Honor, whether the word hotel was used.

1   I'd like to re-ask the question if possible, Your Honor.

2   Q.   BY MR. McCARTHY:   What did Alex say, if anything?

3        THE INTERPRETER:   Shall the Interpreter explain to the

4   witness there's an objection as to my -- an allegation --

5        JUDGE BUSCHMANN:   Just ask the question over again and I

6   think it will clear it up.

7   **(Whereupon, the Interpreter repeated the question in**

8   **Spanish.)**

9        THE WITNESS:   I would say I don't know what it

10  concerned.  And I said it could mean my dismissal.  I don't

11  know.  And she said, no, how could you think it would result

12  in your dismissal?  She said that if the majority sign this

13  document, they will receive their salary increase, because

14  this is about the Union and if the Union leaves the hotel,

15  all of the employees will be better off.

16  Q.   BY MR. McCARTHY:   And did she indicate who would give

17  employees a raise?

18  A.   She said that the hotel would give the raise if the

19  petition were signed.

20  Q.   And do you recall whether Reina asked you anything at

21  that point?

22  A.   She said or perhaps you don't want the raise.

23  Q.   And did you respond?

24  A.   I told her, yes, I want a raise, but not like this

25  because all of us employees wanted an increase through the

1   negotiations with Local 25.

2   Q.   And did you sign GC-28?

3   A.   No.

4   Q.   How did the conversation end?

5   A.   It just ended that way.  I said that I didn't like this

6   way of getting --

7        THE INTERPRETER:  Strike that.  It ended like that.  I

8   said I didn't like getting an increase fighting this way, and

9   that was it.

10  Q.   BY MR. McCARTHY:  Okay.  What jobs were Alex Guillen and

11  Reina Lozano performing at that time?  Let me strike that.

12  Let me strike that.

13       What jobs were Alex and Reina performing at the time?

14  A.   The minibar.

15  Q.   And when refilling the minibar must one move from room-

16  to-room?

17  A.   Yes.

18  Q.   And After that day that Reina and Alex asked you to sign

19  GC-28, did Alex or Reina ever ask you to sign a petition to

20  get rid of the Union again?

21  A.   No.  After that time, they didn't.

22  Q.   Now, later that same afternoon, after Alex and Reina

23  asked you to sign GC-28, did you clean Mr. Palenzona's

24  office?

25  A.   Yes.

1   Q.   And is Mr. Palenzona's office near the lobby?

2   A.   Yes.

3   Q.   And is it on the first floor of the South building?

4   A.   Yes.

5   Q.   And was Mr. Palenzona present when you entered his

6   office?

7   A.   Yes, he was there.

8   Q.   Was anyone else present?

9   A.   No.

10  Q.   Why did you go to Mr. Palenzona's office?

11  A.   Part of my work.  It was part of my work to clean his

12  office at nighttime and the entire lobby.

13  Q.   And did you have a conversation with Mr. Palenzona at

14  that time?

15  A.   It wasn't a conversation; it was a question that he asked

16  me.

17  Q.   And did he ask you a question in English or Spanish?

18  A.   In Spanish.

19  Q.   And do you recall what Mr. Palenzona asked you?

20  A.   Yes.

21  Q.   What did he ask?

22  A.   He asked me why I hadn't signed the petition.

23  Q.   And did you answer his question?

24  A.   I told him that I didn't know what it concerned.

25  Q.   And did Mr. Palenzona then explain to you what the

1  petition concerned?

2  A.   Yes.  He said the same thing as the other two employees

3  did.

4  Q.   And what did he say, specifically?

5  A.   He said the petition was to get rid of the Union.  That

6  if the majority of employees signed the petition, we would

7  get rid of the Union, and then the hotel would not have any

8  more problems with the Union.

9  Q.   And did the translation include anything about a raise?

10  A.   The same thing, that if the petition were signed, we

11  would get a 2.50 raise.

12  Q.   Do you recall whether Mr. Palenzona asked you any more

13  questions?

14  A.   He only said to me, don't you want a raise?

15  Q.   And did you respond?

16  A.   That I did, but not that way.

17  Q.   And how did the conversation in Mr. Palenzona's office

18  end?

19  A.   We spoke that way.  He asked me didn't I want a raise.  I

20  said I did.  I mentioned the Union.  He got angry and that's

21  how it finished.

22  Q.   Did you have a conversation with Mr. Palenzona a few days

23  later?

24  A.   Yes.  I spoke to a work colleague about what had happened

25  and she said, go back to him and tell him you want to sign

1  and see what happens.

2  Q.   And did you go back to speak to Mr. Palenzona at that

3  time?

4  A.   Yes, I went back to the office one more time.

5  Q.   And was anyone else present?

6  A.   No.

7  Q.   And who initiated this conversation?

8  A.   I went.  I told him I had decided I was going to sign the

9  petition.

10  Q.   And did he respond?

11  A.   No, that I had said I didn't want to sign, that I was

12  Union, that he didn't want anything to do with the Union, and

13  that he was fed up with the Union.

14  Q.   Did you work on the July 4th, 2005 holiday?

15  A.   Yes, I always work on holidays.

16  Q.   And was there a meeting at the hotel the next day, July

17  5th?

18  A.   Yes.

19  Q.   Where?

20  A.   In the cafeteria.

21  Q.   And what time?

22  A.   It was at 4:00 in the afternoon.

23  Q.   And who was present from management?

24  A.   Mr. Palenzona was.

25  Q.   And were all the employees, or most of the employees

1    present at that time?

2    A.    Yes, most of the employees were.

3    Q.    Who spoke at the meeting?

4    A.    Mr. Palenzona spoke and Lisa, the manager, translated for

5    him.

6    Q.    And what did Mr. Palenzona say as translated by Lisa, the

7    Housekeeping manager?

8    A.    I recall that he said that the hotel has decided to give

9    us a 2.50 raise.  I don't recall as of which date it was to

10   start and that it had been decided.

11        He said we have decided not to negotiate any longer with

12   Local 25 and that they had advised Local 25 that they would

13   no longer negotiate with them.

14   Q.    And did Mr. Palenzona have anything with him at the time?

15        Did he have a paper, or was he reading from a paper?

16   A.    No, I don't remember.  I don't remember very well because

17   when he was speaking and he said no more bargaining, I was

18   speaking with Marleni and I don't remember what he said after

19   that.

20   Q.    Did you receive a pay raise to $12.50 an hour a few days

21   after the July 5th meeting?

22   A.    Yes.

23   Q.    And was this pay raise a larger percentage increase than

24   you had received in the past?

25   A.    Yes.

1  Q.    Now, I want to direct your attention to General Counsel's

2  Exhibit 29 and 30.

3       Do you recognize those documents?

4  **(General Counsel's Exhibits 29 and 30 marked for**

5  **identification.)**

6  A.    Yes.

7  Q.    And what are they?

8  A.    These are the photos they took when -- no, 29 is the

9  first -- the photos they took when Mr. Corrado suspended

10 Marleni.

11 Q.    And what is General Counsel's Exhibit 30?  I'm sorry.

12      So General Counsel's Exhibit 29 is in English and General

13 Counsel's Exhibit 30 is in Spanish, correct?

14 A.    Um-hum.

15 Q.    And were you present when these pamphlets were created?

16 A.    Yes.

17 Q.    And where were these pamphlets created?

18 A.    At the Union office.

19 Q.    And you recall what language or languages the pamphlets

20 were written in?

21 A.    In Spanish.

22 Q.    And do you recall about when Marleni Jiron was suspended?

23 A.    Yes.

24 Q.    About what month?

25 A.    It was late July.

1  Q.   Did the employees do anything with these pamphlets, GC-29

2  and 30?

3  A.   Yes.  We passed them out in the cafeteria.

4  Q.   And did you help pass them out?

5  A.   Yes.

6  Q.   And on or about what date did you help pass them out?

7  A.   I don't recall the date, but yes, we did pass it out,

8  pass them out when she was suspended and then when she was

9  thrown out.

10  Q.   Now, were you on work time or break time when you

11  distributed GC-29 and GC-30 in the cafeteria after Marleni

12  was suspended?

13  A.   We were on dinner break.

14  Q.   And now I want to direct your attention to General

15  Counsel's Exhibit 30 and 31.  I'm sorry, 31 and 32.

16  **(General Counsel's Exhibits 31 and 32 marked for**

17  **identification.)**

18  Q.   BY MR. McCARTHY:  Do you recognize those documents?

19  A.   Yes.

20  Q.   And what are they?

21  A.   These were when Marleni was dismissed.

22  Q.   And were you present when these flyers were created?

23  A.   With this one, I was not because I was off, but I did

24  know that they had been passed out.

25  Q.   And did you participate in handing out GC-31 and 32?

1  A.    Yes, the prior ones.

2  Q.    And were any supervisors present?

3  A.    In the morning, I don't recall, but in the evening, yes,

4  there was a female supervisor.

5  Q.    Did you get the pamphlet or the flyers to any

6  supervisors?

7  A.    Not give it to her, but yes, one of the supervisors there

8  on the nightshift saw the flyer.

9  Q.    And who was that?

10  A.    Fanny.

11  Q.    Now, did you pass out flyers at the time of Marleni's

12  suspension and then flyers at the time of his discharge about

13  a week later?

14  A.    Yes.  One week was when he was suspended and another when

15  he was dismissed.

16      MR. McCARTHY:  And, Your Honor, I offer General Counsel's

17  Exhibits 29, 30, 31, and 32 at this time.

18      JUDGE BUSCHMANN:  Any objections?

19      MR. GREENBAUM:  I don't believe so, Your Honor.  I just

20  want to make sure.  30, 31 -- no objections.

21      JUDGE BUSCHMANN:  General Counsel's Exhibits 21 (sic)

22  through 32 are hereby admitted.

23      MR. McCARTHY:  Thank you, Your Honor.

24  **(General Counsel's Exhibits 29 through 32 received into**

25  **evidence.)**

1    Q.    BY MR. McCARTHY:    Now, a few days after you distributed

2    the second set of documents concerning Marleni's discharged,

3    namely, GC-31 and GC-32, do you recall speaking to any

4    supervisor during dinner?

5    A.    Yes, with the nightshift supervisor.

6    Q.    And I believe you testified that that was Abdullah Va,

7    correct?

8    A.    Yes.

9    Q.    Does Abdullah Va speak any Spanish?

10   A.    He speaks a tiny bit of Spanish.

11   Q.    How does he normally converse with you, in English, or

12   Spanish, or a little bit of both?

13   A.    Mixed together.

14   Q.    And where were you when he spoke to you a few days after

15   you distributed the second set of pamphlets?

16   A.    When we spoke, we were in the cafeteria having dinner.

17   Q.    And was anyone else present?

18   A.    There was -- I believe there were other people, but I

19   don't believe anyone who spoke Spanish.

20   Q.    Do you recall what Abdullah said to you?

21   A.    Yes.

22   Q.    What did he say to you?

23   A.    He told me to be careful with the vote.

24   Q.    And did you respond?

25   A.    Yes.  I asked him why.

1   Q.   And did he respond?

2   A.   He said, well, to be careful because there are people

3   there who don't want the Union, that the Union is a danger

4   and that Mr. Corrado doesn't want it.  And it could result in

5   dismissals.

6   Q.   Did Abdullah use any Spanish word that you recall?

7   A.   Yes.  He said be careful with Corrado.  If you go around

8   in the Union, there may not be more work, things like that.

9   Q.   And did Abdullah use the word "trabajo?"

10  A.   Yes.  He always uses the word work, trabajo.

11  Q.   And what did he say about trabajo?

12  A.   He said that those of us who are with the Union might be

13  run out of the hotel and not have any more work.

14  Q.   Did he mention Mr. Corrado's name during this

15  conversation?

16  A.   Yes.

17  Q.   What did he say about Mr. Corrado?

18  A.   (In English)  And then he said be careful.  The people no

19  want Union here.  Corrado no more "trabajo," work.

20       THE INTERPRETER:  I will ask the witness to --

21       THE WITNESS:  Be careful.  The people don't want Union

22  here.  Corrado no trabajo.

23       THE INTERPRETER:  He said be careful.  The people no want

24  Union here.  Corrado no more trabajo, trabajo, work.

25       MR. McCARTHY:  Could the record reflect, Your Honor, that

1    she said that in English?

2    Q.    BY MR. McCARTHY:    Now, how did the conversation end?

3    A.    Oh, that's how it ended.    I said, okay, fine that you

4    told me.

5    Q.    The following day, after this conversation with Abdullah

6    Va in the cafeteria, did you perform any work in the laundry

7    room?

8    A.    Yes, I was in the laundry.

9    Q.    Did anyone help you with the laundry?

10    A.    Yes, Lisa the Housekeeping manager helped me.

11    Q.    Do you recall whether Lisa said anything to you at that

12    time?

13    A.    She said, oh, what a shame.    And I said why?    I said do

14    you have some crime about my work?    She said, no, but I saw

15    you in the photo.    And I said, well, what's wrong about that?

16    And she said, no, you're with the Union.

17         And I said is that anything wrong?    And she said to me, I

18    like how you work, but don't get into trouble.    And she said,

19    if Corrado dismisses you, I can't do anything for you.

20    Q.    Do you recall whether she said anything else in the

21    conversation?

22    A.    No.    No, I don't think I said anything else to her.

23    Q.    Now, a few days after this conversation with Housekeeping

24    manager Lisa Alvarado in the laundry room, do you recall

25    whether anyone else approached you during dinner?

1  A.    After that, Fanny spoke to me also about the photo.

2  Q.    And where were you?

3  A.    In the cafeteria.

4  Q.    And were you alone?

5  A.    We were -- there were just the two of us.

6  Q.    Do you recall whether there were any people from the

7  front desk there?

8  A.    Yes, there were three or four people, but nobody who

9  speaks Spanish.

10  Q.    And what were you talking about?

11  A.    We were talking and then the topic of conversation

12  changed and she said, oh, Adriana, I thought that you had

13  changed.

14  Q.    Who said that?

15  A.    Fanny did.

16  Q.    And did she say anything else?

17  A.    Yes.  She said, I thought you had changed, that you no

18  longer went around with those Union people.  And I told her,

19  no, you're mistaken because I continued with the Union.

20        And she told me the same as the others, be careful.  She

21  told me be careful with those photos you're passing out

22  because due to that, they can dismiss you.

23  Q.    Did you sign any petition against the Union?

24  A.    No, never.

25        MR. McCARTHY:  Your Honor, if I may have just a moment to

1   look over at this point?

2       **JUDGE BUSCHMANN:  Off the record.**

3   **(Off the record.)**

4       **JUDGE BUSCHMANN:  On the record.**

5       Would you repeat that please, Mr. McCarthy?

6       MR. McCARTHY:  I'm sorry, Your Honor.

7       Your Honor, I have no further questions of the witness at

8   this point.

9       JUDGE BUSCHMANN:  So, Mr. Greenbaum.

10      MR. GREENBAUM:  Yes, Your Honor.

11                        **CROSS-EXAMINATION**

12  Q.  BY MR. GREENBAUM:  Good afternoon, Ms. Nunez.

13      MR. McCARTHY:  Your Honor, may I just suggest, perhaps,

14  that we -- I mean I think the Translator had indicated to me

15  prior to the commencement of the hearing that at least from

16  the Translator's perspective, he would like a short break --

17      JUDGE BUSCHMANN:  Yes, that's fine.

18      MR. GREENBAUM:  -- in order to maintain the accuracy of

19  the translation.

20      JUDGE BUSCHMANN:  Yes.  Mr. Greenbaum, any objection

21  to -- how much time do we want?  Five minutes?  Because five

22  minutes is usually not five minutes.  Usually it becomes ten

23  minutes.

24      MR. GREENBAUM:  Right.

25      JUDGE BUSCHMANN:  So let's take ten minutes, no longer.

1       Ten minutes, please.

2   (Off the record.)

3       JUDGE BUSCHMANN:  On the record.

4       Mr. Greenbaum, you may proceed.

5       MR. GREENBAUM:  Thank you, Your Honor.

6   Q.  BY MR. GREENBAUM:  Good afternoon, Ms. Nunez.  My name is

7   Jonathan Greenbaum and I represent the hotel.

8       Did you provide, in the course of this proceeding, a

9   statement to the NLRB?

10  A.  Yes.

11  Q.  And prior to your testimony here today, did you discuss

12  your testimony with attorneys for the NLRB?

13  A.  No.  For what reason would there be to?

14  Q.  Did you meet with Mr. McCarthy prior to the hearing

15  today?

16  A.  No.

17  Q.  So it's your testimony that you did not prepare your

18  testimony with the counsel for the NLRB?

19  A.  I'm speaking about what I know about my work.  I don't

20  know what the question refers to.

21  Q.  Prior to your testimony here today --

22      MR. McCARTHY:  See if she understands that.

23  Q.  BY MR. GREENBAUM:  -- did you meet with the attorneys to

24  discuss your testimony?

25  A.  Days earlier, yes.

1  Q.    And when was that?

2  A.    Days earlier, I don't remember that day.  It was last

3  week, early in the week, but I met with him to speak about

4  the problems at work and the problems from earlier on.

5  Q.    Did you rehearse your testimony?

6  A.    Please, I have no need to rehearse.  One keeps in mind

7  all of the mistreatments that we've received at the hotel.

8  Q.    Did the attorney practice with you questions he would be

9  asking you?

10  A.    Excuse me?  Would you repeat the question?

11  Q.    Sure.  Did you rehearse or practice questions and

12  answers?

13  A.    I didn't rehearse.  Why would I need to rehearse?

14  Q.    In preparation for your testimony here today, did you

15  review the statement you provided to the NLRB?

16  A.    When I go to the meetings of Union Local 25, I talk about

17  the things that occur at work and I am here talking about

18  what I have said before.  I don't need to go over that in

19  order to know what I'm saying.

20  Q.    Now, you testified that you gave a statement to the NLRB,

21  correct?

22  A.    Yes.

23  Q.    When did you give that statement?

24  A.    I don't remember exactly, but yes, I did.

25  Q.    When was the last time you looked at that statement?

1  A.   I give my statement and the person who takes it asks me

2  if I'm going to tell the truth and the whole truth.  I don't

3  need to look at the statement in order to speak.

4  Q.   That was not my question.

5      JUDGE BUSCHMANN:  Mr. Greenbaum, let's go on to the

6  substance of the testimony instead of pursuing this line.

7      MR. GREENBAUM:  Okay.  Your Honor, at this time, I'd like

8  to look at the statement.

9      JUDGE BUSCHMANN:  Yeah, I wish you had asked that earlier

10  because we could have given that statement to you during the

11  break.

12      MR. McCARTHY:  Your Honor, I'd like the record to reflect

13  that I'm handing over a ten-page Spanish affidavit.  It has

14  also been translated to English, and there is a certification

15  from the Board Agent, who is fluent in English and Spanish,

16  that the attached English translation is an accurate

17  translation of the attached original Spanish affidavit.

18      JUDGE BUSCHMANN:  Okay.  Go ahead and turn it over to

19  him.

20  **(Whereupon, Mr. McCarthy handed documents to Mr. Greenbaum.)**

21      MR. McCARTHY:  These are the original documents, Your

22  Honor, so --

23      JUDGE BUSCHMANN:  You get them back.

24      MR. McCARTHY:  -- we would request Respondent not mark

25  them up.

1      JUDGE BUSCHMANN:  So you need some time, Mr. Greenbaum,

2  right?

3      MR. GREENBAUM:  I would think so, Your Honor.

4      JUDGE BUSCHMANN:  So how much, another ten minutes?

5      MR. GREENBAUM:  Ten minutes.

6      **JUDGE BUSCHMANN:  Okay.  We stand adjourned for another**

7  **ten minutes.  Off the record.**

8  **(Off the record.)**

9      **JUDGE BUSCHMANN:  On the record.**

10     Mr. Greenbaum, you may inquire.

11     MR. GREENBAUM:  Thank you, Your Honor.

12     May I approach, Your Honor?

13     JUDGE BUSCHMANN:  Yes.

14  Q.  BY MR. GREENBAUM:  Ms. Nunez, is this your statement?

15  A.  Yes.

16  Q.  Let me refer you to Page 10.

17     Is that your signature?

18  A.  Yes.

19  Q.  And the date on here is October 14, 2005?

20  A.  Yes.

21  Q.  When was the last time you saw this?

22     JUDGE BUSCHMANN:  Mr. Greenbaum, I instructed -- I didn't

23  instruct you, I ruled that that inquiry be foreclosed, any

24  inquiry along those lines.  We assume that that's her

25  affidavit now and that even if she reviews it, that's her

1    right to review that affidavit.  It's her affidavit.

2        MR. GREENBAUM:  I'll move on, Your Honor.

3        JUDGE BUSCHMANN:  Yes, please.  Okay.  Please,

4    Mr. Greenbaum.

5        MR. GREENBAUM:  Well, I'd like to give her a copy of it.

6    Q.  BY MR. GREENBAUM:  Ms. Nunez, Mr. Palenzona speaks a

7    little Spanish, correct?

8    A.  When it suits his needs he speaks quite a bit.

9    Q.  Well, that's not what you said in your affidavit,

10   correct?

11   A.  We spoke about whether he spoke Spanish and I said, yes,

12   he speaks Spanish.

13   Q.  All right.  I'd like to refer your attention to Page 1,

14   Line 19 to 20, and the affidavit states, "The manager's name

15   is Corrado Palenzona.  He speaks a little Spanish."

16       THE INTERPRETER:  The Interpreter is translating back

17   into Spanish what has been translated into English.  I don't

18   know if the Court would like me simply to read the relevant

19   portion?

20       JUDGE BUSCHMANN:  No, it's okay.

21       THE INTERPRETER:  All right.

22       JUDGE BUSCHMANN:  I think the question is enough.

23   Q.  BY MR. GREENBAUM:  That's what the statement says,

24   correct?

25   A.  Yes.

1  Q.    In your testimony you talked about a meeting that was had

2  in the Diplomat Room.

3        Do you remember that?

4  A.    Yes.  Do you remember when that meeting was?

5  A.    Not the exact date, but yes that it was in March.

6  Q.    Was it in early March?

7  A.    No, late March.

8  Q.    Well, when you say late March, what do you mean, the last

9  five days of March?

10  A.    It was like the 25th, 26th, something like that.

11  Q.    Is that your memory?

12        Is that what you recall?

13  A.    Yes.

14  Q.    I'd like to refer your attention to General Counsel

15  Exhibit 28.

16        Do you have that in front of you?

17  A.    Yes.

18  Q.    Okay.  And there's a date on top, March 21, 2005.

19        Do you see that?

20  A.    Um-hum.

21  Q.    Now, at this meeting at the Diplomat Room, how did that

22  meeting come about?

23  A.    How did it come about?  Would you repeat the question?

24  Q.    How did it come that you went to that meeting?

25        How did you know about it?

1  A.   All of us employees were at the meeting.  All of us who
2  were there that day were at the meeting.
3  Q.   And how did you find out about the meeting?
4  A.   Whenever we are working, the supervisor or someone will
5  advise that there is to be a meeting.
6  Q.   So who advised you that there was going to be a meeting
7  that day?
8  A.   The nightshift supervisor.  He, himself, is the one who
9  advised us there would be a meeting that night.
10  Q.   And what time was the meeting?
11  A.   It was after 2:00 p.m.
12       THE INTERPRETER:  Strike that.  It was from 2:00 p.m. on.
13  Q.   BY MR. GREENBAUM:  How long did the meeting last?
14  A.   With all of the employees, it was approximately 20
15  minutes.
16  Q.   How many employees were at the meeting?
17  A.   I can't tell you how many, I didn't count them.
18  Q.   Did they tell you what the purpose of the meeting was?
19  A.   In the meeting, it was said what the purpose was.
20  Q.   And what was that?
21  A.   To speak about the employees, this treatment, about the
22  supervisors' mistreatment of employees.
23  Q.   Did the employees call the meeting?
24  A.   Yes.  Marleni told Lisa that she wanted to hold the
25  meeting.

1  Q.   So it's Marleni who called the meeting?

2  A.   The dinner hour, everyone among themselves decided that

3  they wanted to speak to the manager.  So Lisa was told that

4  we wanted the meeting.

5  Q.   By whom?

6  A.   The employees.

7  Q.   Name them.

8  A.   Name who?

9  Q.   Who wanted the meeting?  Name the employees.

10     We have Marleni.  Who else?  Who else wanted the meeting?

11  A.   All of those who were working that day.  As a matter of

12  fact, there were three people off who attended as well.

13  Q.   Well, you said everyone wanted a meeting.

14     Who?  Who wanted the meeting?  We have Marleni.  Who

15  else?

16  A.   There was Marleni.  There was me.  There was Sandra.

17  There was the Chinese girl.  And Ms. Lozano herself was there

18  too.

19  Q.   So are those all the employees who were at the meeting?

20  A.   I already told you and I shall repeat it to you again

21  that it was everyone who worked that day.  I did not count

22  them.

23  Q.   So we have Marleni, you Sandra --

24     MR. McCARTHY:  Your Honor, I think there's been a

25  mischaracterization of the testimony.  He's asking her who

1  asked for the meeting.  She said Marleni and a few other

2  employees.

3      Now he's asking a different question, how many were at

4  the meeting.  The witness has already -- this has been asked

5  and answered.  The witness already said just about all the

6  employees were present.

7      JUDGE BUSCHMANN:  I agree.  I think that you've exhausted

8  her recollection of who was at the meeting.  She named those

9  individuals that she recalled.

10     Please move on, Mr. Greenbaum.

11     MR. GREENBAUM:  Well, Your Honor, I believe now she's

12  saying that all the employees asked for the meeting and I'm

13  trying to get to which employees asked for the meeting.

14     MR. McCARTHY:  I believe, Your Honor, again, all the

15  employees were at the meeting.  Certain employees asked for

16  the meeting, particularly Marleni asked for the meeting and

17  then they were all there.

18     MR. GREENBAUM:  Okay.  Well, I still don't have a handle

19  on how many people were at the meeting.

20  Q.  BY MR. GREENBAUM:  How many employees were at the

21  meeting?

22  A.  I don't know how many, but there were approximately 20 of

23  us.

24  Q.  And you testified that Marleni did most of the talking at

25  the meeting?

 1  A.   Yes.

 2  Q.   Did a lot of employees not like Marleni?

 3       MR. McCARTHY:  I would object, Your Honor.  What's the

 4  relevance of whether employees liked Marleni or not?

 5       JUDGE BUSCHMANN:  Objection overruled.

 6       THE WITNESS:  Not the employees, but the bosses because

 7  she was part of the Union.

 8  Q.   BY MR. GREENBAUM:  Were a lot of employees threatened,

 9  feel threatened by Marleni?

10       MR. McCARTHY:  Objection as to whether she can testify

11  how other employees feel, Your Honor.

12       JUDGE BUSCHMANN:  Objection overruled.

13       THE WITNESS:  Marleni is not the manager.  It's the

14  manager by whom one feels intimidated.

15  Q.   BY MR. GREENBAUM:  Now, at this meeting you indicated

16  that several employees stayed behind, correct?

17  A.   Several employees -- please repeat the question.  I don't

18  understand the question.

19  Q.   There was a meeting in the Diplomat Room and you

20  testified that when the meeting was over, several employees

21  stayed behind.

22       MR. McCARTHY:  Again, Your Honor, it mischaracterizes the

23  testimony.  She testified that two employees and herself

24  stayed behind.

25       JUDGE BUSCHMANN:  Well, she can answer that,

1   Mr. McCarthy.

2       THE WITNESS:  I said two other employees and myself.  I

3   did not say several.

4   Q.   BY MR. GREENBAUM:  So two other employees stayed behind.

5   One was Gladis?

6   A.   Yes.

7   Q.   And one was Castro?

8   A.   Correct.

9   Q.   And yourself?

10  A.   Yes.

11  Q.   Were there any other employees there?

12  A.   No.  When we stayed at the very end, it was just us.

13  Q.   Was there any there in the beginning?

14      Between the time the meeting was over and what you say is

15  the very end, were there any other employees there?

16  A.   No.  There were three of us that stayed behind.  There

17  was Mr. Corrado and Mr. Bello.

18  Q.   Was Paul Delisle there?

19      JUDGE BUSCHMANN:  Mr. Greenbaum, please move on.  This is

20  getting excruciating.

21      MR. GREENBAUM:  Well, Your Honor, I believe we will --

22      JUDGE BUSCHMANN:  Please do as I say.

23      MR. GREENBAUM:  I want to make a record Your Honor.

24      JUDGE BUSCHMANN:  Please follow my instruction,

25  Mr. Greenbaum.

1       MR. GREENBAUM:  Just for the record, Your Honor --

2       JUDGE BUSCHMANN:  No, just for the record, please follow

3  my instructions and don't argue with me.

4       MR. GREENBAUM:  Sorry, Your Honor.

5  Q.   BY MR. GREENBAUM:  At this meeting, did you initially

6  decide to stay behind or were you just following the other

7  two employees?

8  A.   I decided to stay.

9  Q.   And why did you decide to stay?

10 A.   I decided to stay to speak to Mr. Corrado.

11 Q.   What did you want to speak to Mr. Corrado about?

12      JUDGE BUSCHMANN:  I don't think that question is

13 appropriate.  The question should be what was said during

14 that conversation.

15 Q.   BY MR. GREENBAUM:  What was said during that

16 conversation?

17      Did you -- strike that.

18      Did you do any talking during that conversation?

19 A.   Yes, I spoke.

20 Q.   What did you say?

21 A.   At the start, I spoke to Mr. Corrado about problems in

22 the laundry, but he doesn't like to listen when someone

23 speaks to him about work problems.  And when the others spoke

24 against the Union and all of that, I acted as if I were on

25 their side and I stayed to see what he would say.

1    Q.    And the others are Castro and Bonilla?

2        JUDGE BUSCHMANN:  It's already been asked and answered,

3    Mr. Greenbaum.

4    Q.  BY MR. GREENBAUM:  Now, if I refer to your statement,

5    which you have in front of you,

6        THE INTERPRETER:  You may speak in a normal utterance,

7    counsel.  I'll interpret.

8        MR. GREENBAUM:  Okay.

9    Q.  BY MR. GREENBAUM:  I showed you before your statement.

10   And in your statement, you said, during that part of the

11   meeting, in your statement you said something like, and I'm

12   quoting from your statement, you said, "Yes, why don't we

13   leave the Union once and for all."

14   A.    Yes, I said that to Mr. Corrado.

15   Q.    And then the statement goes on, and I'm referring to the

16   top of Page 3, "I was acting as if I was on their side and

17   against the Union."

18   A.    Correct.

19   Q.    Why were you acting?

20   A.    Because I know that you are all acting against the

21   employees so that they will sign against the Union.  And this

22   way, Mr. Corrado, believing that I was on his side, could say

23   everything he cared to and everything he thought.

24   Q.    When did you start working at the hotel?

25   A.    In April of 2003.

1  Q.    And I just want to clear something up.  In your statement

2  here, you have you started working in April of '02.

3        Is it '03 or '02?

4  A.    2003.

5  Q.    Thank you.  Did you work for the Union prior to working

6  at the State Plaza?

7  A.    Yes, and it went very well for me.

8  Q.    Was that at a hotel, or for the Union itself?

9  A.    At a hotel I was very well treated when I worked there in

10 the Union.

11 Q.    And when did you stop working at that hotel?

12 A.    I only worked two months.  I just stayed there three

13 months to work for a lady who went to have her child.

14 Q.    And then right after that you got a job at the State

15 Plaza?

16 A.    No, not right after that.  I worked after that at a

17 restaurant.

18 Q.    Now, around this time there was this meeting, and you

19 indicated it was late March.

20       What were the hours of your shift?

21 A.    I never had a set schedule.  I worked night and they

22 changed me to the morning and so forth.

23 Q.    On this day of the meeting, do you recall what your hours

24 were?

25 A.    On that day I did go in at 2:00 p.m.

1    Q.    What time was the meeting?

2    A.    It was about 2:15 or 2:20.

3    Q.    And you indicated in your testimony that after the

4    meeting your supervisor instructed you to deliver some

5    linens, is that correct?

6    A.    Correct.

7    Q.    And you indicated that you were going to take the

8    elevator up to the floors?

9    A.    Yes.

10    Q.    And the elevator was on the same floor as the Food &

11    Beverage office?

12    A.    Yes.

13        MR. GREENBAUM:  Your Honor, could I approach the easel?

14        JUDGE BUSCHMANN:  Yes, but I think that -- I don't want

15    the questioning to follow the direct examination.  In other

16    words, some of those questions have been asked on direct

17    examination and just to repeat the same questions is not

18    going to be very useful.

19        MR. GREENBAUM:  I'm not, Your Honor.  I'm going to go

20    over the layout of where the conversation was heard.

21        JUDGE BUSCHMANN:  Yes, you may go ahead.

22    Q.    BY MR. GREENBAUM:  Okay.  Ms. Lozano -- sorry, Ms. Nunez,

23    you indicated that you overheard a conversation between

24    Mr. Corrado Palenzona, Ms. Lozano, and Alex Guillen, correct?

25    A.    That's right.

1  Q.   Was that conversation on the same day as the meeting in

2  the Diplomat Room?

3  A.   The same day and right about the same time.

4  Q.   Now, you were taking an elevator to what floor?

5  A.   I don't know what floor, 5 or 6.

6  Q.   How many elevators are there?

7       JUDGE BUSCHMANN:  Mr. Greenbaum, I'm not going to

8  interrupt you every time because there comes a certain point

9  where I'm just going to tell you that your cross-examination

10  is finished if these questions persist on how many elevators

11  and on which floor she got off.

12      Please continue with relevant questions.

13      MR. GREENBAUM:  Okay.  I'll go ahead and bear with me,

14  Your Honor.

15  Q.   BY MR. GREENBAUM:  Ms. Nunez, --

16      MR. McCARTHY:  Mr. Green -- Your Honor, can I ask that we

17  all see it?

18      We can't see what's there, Your Honor.  And my subpoena

19  requested a map or any diagram of this area and nothing was

20  provided to us.

21  **(Whereupon, Mr. Greenbaum drew on the easel.)**

22  Q.   BY MR. GREENBAUM:  Okay.  Ms. Nunez, what I drew and it's

23  not the most artful thing, is a layout of the bottom floor

24  elevators where I believe you were taking the elevator to

25  deliver the linens.

1       There are two elevators here.  Where were you standing?

2       JUDGE BUSCHMANN:  Mr. Greenbaum, that's so irrelevant I

3  can't believe it, particularly after I admonished you that

4  you are to go on with questions that are relevant.  As I said

5  before, I'm not kidding, I'll have to cut you off at a

6  certain point if this kind of question continues.

7       What difference does it make in which -- where in the

8  elevator she was standing?

9       MR. GREENBAUM:  Distance, Your Honor, how you could

10  overhear a conversation.

11       JUDGE BUSCHMANN:  She's not in the elevator; she's on the

12  floor.

13       MR. GREENBAUM:  Right in front of the elevator.

14       JUDGE BUSCHMANN:  Then ask her where she was at the time

15  when she overheard the conversation.

16       MR. GREENBAUM:  Okay.

17       JUDGE BUSCHMANN:  And not where she was in the elevator.

18  Q.  BY MR. GREENBAUM:  Ms. Nunez, do you want to come up here

19  and point out for me where you were standing when you

20  overheard the conversation?

21  A.  I could tell you by telling you, speaking.  I know this

22  floor perfectly well.  I worked there; I've been all over

23  there in the evenings.

24       Here is the little room where they store the food and

25  beverage.  Here is the room where they have the supplies and

1    the vacuum.  Here is the office and the bathroom.  It's all

2    there.

3        If I'm walking by and I hear that there are people, I'll

4    draw up to hear what they are saying.

5    Q.    Where were you standing?

6    A.    I was right next to the door of the Food and Beverage

7    office.

8    Q.    Would that be here?

9    **(Whereupon, Mr. Greenbaum indicates on the drawing.)**

10    A.    It would be -- I was next to the door.

11    Q.    And the door is here?

12        MR. McCARTHY:  Your Honor, the witness is looking at an

13    English diagram.

14        JUDGE BUSCHMANN:  I understand.  The diagram is

15    unintelligible, Mr. Greenbaum, to me too.  Besides, it's not

16    in the record.  I don't see what the purpose of this is.

17        MR. GREENBAUM:  I'm trying to get how far it was.

18        JUDGE BUSCHMANN:  Ask those questions.

19    Q.    BY MR. GREENBAUM:  How far were you standing between

20    where you were standing and the conversation was taking

21    place?

22    A.    I was standing by the door, very, very close to the door

23    and I was there, I stayed there to listen.  How could I not

24    be hearing?  I was very close.

25    Q.    How is very close?

```
 1      Was it from where you're standing to the end of the room?
 2      MR. McCARTHY:  Your Honor, this was asked on direct how
 3 many feet away she was.
 4      JUDGE BUSCHMANN:  I'll overruled the objection.  Let her
 5 answer again.
 6      THE WITNESS:  I was approximately three feet away.  I was
 7 very close.
 8 Q.  BY MR. GREENBAUM:  So from you to --
 9      JUDGE BUSCHMANN:  Three feet, Mr. Greenbaum.
10      MR. GREENBAUM:  Three feet.  Okay.
11 Q.  BY MR. GREENBAUM:  Like me and you?
12      JUDGE BUSCHMANN:  Three feet.  Please go on to the next
13 set of questions.
14 Q.  BY MR. GREENBAUM:  Now, you indicated that you didn't
15 take the first elevator up, correct?
16 A.  No, sir.
17 Q.  And the reason you stated that you didn't take the
18 elevator up, because you saw Mr. Palenzona speaking with
19 Ms. Guillen and Ms. Lozano, is that correct?
20 A.  Yes.
21 Q.  Were you eavesdropping on them?
22 A.  Yes, sir.
23 Q.  Why were you doing that?
24 A.  Because I heard that right away in two minutes he was
25 preparing the petition.
```

1  Q.   You heard that before the elevator came or after the

2  elevator came?

3  A.   Before.

4  Q.   Now, is it your normal position to clean the executive

5  office?

6  A.   Those in Housekeeping, in night Housekeeping, always do

7  that.

8  Q.   And what are the nightshift hours?

9  A.   From 2:00 in the afternoon till 7:30.

10  Q.   And what time were you cleaning the trash can when you

11  had the convers -- what time were you cleaning the executive

12  offices when you had the conversation with Mr. Palenzona?

13  A.   I don't know exactly, but they would always -- I would

14  always go at 3:30, or they would send me around 4:00, because

15  previously Housekeeping would go at 2:00.

16  Q.   And when you were working the p.m. shift, who was your

17  supervisor?

18  A.   Abdullah Va or on his two days off Fanny is.

19  Q.   And Mr. Va, what is his first language?

20  A.   Abdullah, he speaks English.  He knows a few words in

21  Spanish.  I don't know what his language is.  He's from

22  Africa.

23  Q.   When you say he speaks a few words in Spanish, are you

24  able to have fluent conversations with him in Spanish?

25  A.   Yes.  His Spanish is quite understandable.

1    Q.    Now, when you testified Mr. Palenzona was having a

2    discussion with Ms. Lozano and Ms. Guillen in the Food and

3    Beverage office, what language were they speaking?

4    A.    In Spanish.

5    Q.    Did you take any notes of that conversation?

6    A.    No, no notes, but I remembered perfectly well.

7    Q.    Did you talk to anyone about that conversation after it

8    happened?

9    A.    Yes, I spoke to several of my coworkers.

10   Q.    Who did you speak with?

11   A.    With Blanca Chavez.  You'll know who she is.  With

12   Claudia Raberas -- excuse me -- Claudia Romero, who said she

13   did it to get in well with Silvia and Reina.

14   Q.    Anyone else?

15   A.    With Marleni, because I know that she would feel bad

16   about what they were saying about the Union, what

17   Mr. Palenzona was saying to Gloria Castro and --

18         THE INTERPRETER:  The Interpreter requests a moment here.

19         MR. GREENBAUM:  Your Honor, we're going to object to the

20   translation.  It's our understanding --

21         THE INTERPRETER:  And Gladis.

22         MR. GREENBAUM:  It's our understanding that the

23   translation was that she did not speak to Marleni because

24   Marleni would feel bad.

25         THE INTERPRETER:  The Interpreter shall inquire of the

1  witness.

2      JUDGE BUSCHMANN:  Yes, go ahead.

3      THE INTERPRETER:  Okay.

4  **(Whereupon, the Interpreter asks the witness a question in**

5  **Spanish.)**

6      THE INTERPRETER:  The Interpreter thanks counsel and

7  remains corrected on the record.  The witness has responded,

8  "I didn't speak to her about what was said in the meeting.  I

9  knew that she would feel bad about what they said about her,"

10  so the previous language shouldn't have been negative, but

11  affirmative.

12      MR. GREENBAUM:  Okay.

13  Q.    BY MR. GREENBAUM:  Ms. Nunez, I was asking about the

14  meeting or the conversation you overheard when Mr. Palenzona

15  was in the Food and Beverage office later that day.

16      Did you tell anyone about what you    overheard, and I

17  believe you answered, you gave a few names, and then my

18  follow up was, anyone else, did you tell anyone else about

19  that?

20      And the names you gave me were Blanca Chavez, Claudia

21  Romero.

22  A.    No, not with anyone else.

23  Q.    Did you ever tape-record any meetings with your Employer?

24  A.    That's scary.  Why do you want to know whether I

25  recorded?

1  Q.    The question is have you.

2        Have you ever recorded any conversations you had with

3  anyone at the State Plaza Hotel?

4  A.    Do I have to answer?

5        JUDGE BUSCHMANN:  Yes.  Yes or no?

6        THE WITNESS:  No.

7  Q.    BY MR. GREENBAUM:  Do you know any other employees who

8  tape-recorded conversations at the State Plaza Hotel?

9        MR. McCARTHY:  Your Honor, I'm going to object on grounds

10 of relevancy.

11       JUDGE BUSCHMANN:  Sustained.

12 Q.    BY MR. GREENBAUM:  You indicated that after your

13 conversation with Mr. Palenzona in his office, while you were

14 cleaning his office, a colleague of yours told you to go back

15 and talk to him again.

16       Do you recall that?

17 A.    Yes.  It was a female coworker and she's one of his

18 friends.

19 Q.    Do you recall who that was?

20 A.    Yes.

21 Q.    Who?

22 A.    Claudia.

23 Q.    Last name?

24 A.    Romero.

25 Q.    And why did you go back?

1  A.    I don't know.  I wasn't going to go back, but she says,

2  look and see what he tells you.

3  Q.    Did you take any notes of that conversation?

4  A.    No, sir.

5  Q.    Do you recall when that conversation took place?

6  A.    I don't know exactly when it was, but it was the next day

7  when they began to get out the petition.

8  Q.    Was it in late March of '05?

9  A.    I know it was in March, but the date I can't give you

10  because I don't know it.

11      MR. GREENBAUM:  Nothing further, Your Honor.

12      JUDGE BUSCHMANN:  Thank you, Ms. Nunez.

13      Mr. McCarthy, do you have any questions?

14      MR. McCARTHY:  Yes, Your Honor, just a few, brief

15  questions.

16      JUDGE BUSCHMANN:  Okay.

17                    **REDIRECT EXAMINATION**

18  Q.    BY MR. McCARTHY:  Ms. Nunez, you were never on the

19  Union's payroll, or paid by the Union for employment, were

20  you?

21  A.    Can you repeat?  I don't understand.

22  Q.    Mr. Greenbaum asked you some questions about whether you

23  worked for a Union hotel.

24      Do you remember that?

25      THE INTERPRETER:  May the Interpreter note for the record

1    that I recall the question of whether the witness worked for

2    the Union and that was how I interpreted it.

3        JUDGE BUSCHMANN:  Just ask the witness whether or not she

4    worked for the Union, or was employed by the Union, and was

5    paid by the Union.

6        THE WITNESS:  No, as a hotel employee.

7    Q.    BY MR. McCARTHY:  And what was the name of that hotel?

8    A.    It was called Tabard Inn.

9    Q.    And were the hotel employees working at that hotel

10   represented by the Union?

11   A.    I didn't understand it thoroughly because I worked there

12   very quickly.  All I knew was that there was a Union at the

13   hotel.

14   Q.    I'm going to direct your attention to General Counsel

15   Exhibit 28.

16       JUDGE BUSCHMANN:  Go ahead and ask the question,

17   Mr. McCarthy.

18   Q.    BY MR. McCARTHY:  Are there any signatures next to the

19   names on that document?

20       I'm sorry.  Are there any dates next to the signatures on

21   that document?

22   A.    The date is at the top.

23       MR. McCARTHY:  I see a date at the top.  Okay.  I see the

24   document itself, Your Honor.  I'll withdraw that.

25   Q.    BY MR. McCARTHY:  Claudia Romero, I believe on

1  questioning from Mr. Greenbaum you said that she is a friend

2  of Mr. Corrado Palenzona?

3  A.   Yes, sir.

4  Q.   And do you know if Claudia Romero is related to Silvia

5  Romero, the fifth name on GC-28?

6  A.   I don't know what they are, but I do know that they are

7  related, relatives.

8  Q.   Is Claudia Romero's husband Silvia Romero's brother?

9  A.   I believe so.  She mentioned to me one time, but I don't

10 recall exactly what it was, whether it was that he is her

11 brother or that they, themselves, are siblings.  I think

12 they're siblings.

13     JUDGE BUSCHMANN:  Well, Mr. McCarthy, is it relevant,

14 inquiring into the familial relationships between these

15 people now?

16     MR. McCARTHY:  Just these two, Your Honor, Claudia Romero

17 and Silvia Romero, since Claudia Romero is one of the

18 individuals that Mr. Greenbaum has brought out on cross.

19     JUDGE BUSCHMANN:  Okay.  Any more questions?

20     MR. McCARTHY:  No, I have no further questions, Your

21 Honor.

22     JUDGE BUSCHMANN:  Okay.  Thank you very much.

23     You may step down.  Thank you.

24 **(Witness excused.)**

25     JUDGE BUSCHMANN:  Mr. McCarthy.

1    MR. McCARTHY:  Yes.  We have a short witness, Your Honor.

2    I'm going to take a witness out of order and Ms. Cotilla is

3    going to call the next witness, Your Honor.

4    **JUDGE BUSCHMANN:  All right.  Off the record.**

5    **(Off the record.)**

6    **JUDGE BUSCHMANN:  We're on the record.**

7    Does she need an interpreter as well?

8    MR. McCARTHY:  No, she doesn't, Your Honor.

9    JUDGE BUSCHMANN:  Okay.

10    (Whereupon,

11                    **JENNIFER SHYKULA**

12    was called as a witness by and on behalf of the General

13    Counsel and, having been first duly sworn, was examined and

14    testified on her oath, as follows:)

15    MR. McCARTHY:  Your Honor, this is the last witness

16    today.  Perhaps we could let the Interpreter go for the day?

17    JUDGE BUSCHMANN:  Yes.

18    THE INTERPRETER:  Thank you.  Good day.  The Court will

19    resume in the morning at the same time?

20    MR. McCARTHY:  What time would Your Honor like to resume

21    in the morning?

22    JUDGE BUSCHMANN:  Well, I'll stand -- you know, receive

23    your suggestion.

24    MR. McCARTHY:  Can we start at 9:00?  Would that be okay?

25    JUDGE BUSCHMANN:  I would say 9:30.  Right,

1   Mr. Greenbaum?

2        MR. GREENBAUM:  9:30 is better.

3        JUDGE BUSCHMANN:  9:30.

4        MR. McCARTHY:  Thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6   Q.   BY MS. COTILLA:  Can you state your name for the record,

7   please, and spell it as well?

8   A.   Sure.  It's Jennifer Shykula.  The first name is spelled

9   J-e-n-n-i-f-e-r.  Last name is spelled S-h-y-k-u-l-a.

10  Q.   And can you give us also a business address, please?

11  A.   Sure.  1003 8th Street N.W., Washington, D.C. 20001.

12  Q.   Are you currently employed?

13  A.   Yes, I am.

14  Q.   Who are you employed by?

15  A.   I'm an Organizing Director for UNITE HERE and I'm

16  currently assigned to Local 25 as the Director of Organizing.

17  Q.   And since when have you been assigned to Local 25 as the

18  Director of Organizing?

19  A.   I've been assigned to Local 25 as the Director of

20  Organizing since March of 2005.  Prior to that, I worked for

21  the Local from April of 2004.

22  Q.   And are you familiar with State Plaza Hotel?

23  A.   Yes, I am.

24  Q.   And in your capacity at Local 25, have you been involved

25  in any activities involving the State Plaza Hotel?

1  A.   Yes, I have.

2  Q.   And since when?

3  A.   Since late March of 2005.

4  Q.   And in what capacity have you been involved with the

5  State Plaza Hotel?

6  A.   As the Director of Organizing.

7  Q.   Now, I want to direct your attention to on or about May

8  12th of 2005.

9       Do you recall meeting with any employee of the State

10 Plaza Hotel that day?

11 A.   Yes.  Well, to the -- I remember it occurring on May

12 13th, but it was on or around May 12th that I met with

13 Margarito Velasquez on that day.

14 Q.   Where did you meet with Margarito Velasquez on or about

15 May 13th of 2005?

16 A.   I met with him outside the hotel.

17 Q.   And what time was it when you met with him?

18 A.   It was between 12:00 and 12:30 because I remember that he

19 was on his lunch break.

20 Q.   Why did you meet with Margarito Velasquez that day?

21 A.   Because he had called the Union to let us know he was

22 very concerned because Corrado Palenzona had accused him of

23 distributing Union literature in the hotel.  So we wanted to

24 meet with him during the break.

25 Q.   Was anyone else present when you met with Margarito

1  Velasquez that day?

2  A.   Yes, Miguel Cordova who was an organizer with the Union

3  at the time.

4  Q.   When you saw Mr. Velasquez, Margarito Velasquez, how

5  would you describe his demeanor?

6  A.   He was very upset and very nervous.

7  Q.   And what was the purpose of your meeting with

8  Mr. Velasquez outside the hotel that day?

9  A.   I was meeting with him to give him a tape recorder.

10  Q.   What kind of tape recorder?

11  A.   A digital voice recorder -- a digital voice recorder.

12  Q.   And why did you give him a digital voice recorder?

13  A.   Because I wanted him to protect himself in the case that

14  the hotel may be committing unfair labor practices.

15  Q.   Did you, in fact, give Margarito Velasquez the digital

16  voice recorder?

17  A.   Yes, I did.

18  Q.   What, if anything, did you tell Margarito when you gave

19  him the digital voice recorder?

20  A.   I told him that it was the best -- that the best way to

21  protect himself was to get evidence that the hotel was

22  committing unfair labor practices.

23  Q.   And did you give him any instructions on how to use that

24  digital voice recorder?

25  A.   I didn't instruct him, but I turned it on myself in front

1   of him.  I turned the recorder on and I hit the hold -- a

2   hold button on the recorder.

3   Q.    And what function does that hold button serve?

4   A.    The hold button makes it so that the recorder can't turn

5   off and so that if you hit a button, nothing changes on the

6   recorder.

7   Q.    And once you turned on that recorder, how long did it

8   continuously record?

9   A.    The digital voice pens record for eight hours.

10  Q.    Did you give Mr. Margarito Velasquez any instructions on

11  how to turn off that tape recorder?

12  A.    No, I did not.

13  Q.    And did Mr. Margarito Velasquez, in fact, take that

14  recorder?

15  A.    Yes, he did.

16  Q.    How did your conversation with Margarito Velasquez end?

17  A.    It ended by me saying to him, the best way to protect

18  yourself.  This is for protection.  I remember very clearly

19  saying that to him over and over because I don't speak

20  Spanish.  And then he and Miguel made arrangements later in

21  the evening by telephone.

22  Q.    And so you testified that you don't speak Spanish.

23       Was anyone interpreting for you?

24  A.    Yes, Miguel was with me.  I don't speak Spanish, but I

25  understand a great deal of it.

1  Q.   And how long did your conversation with Margarito

2  Velasquez last?

3  A.   No more than ten minutes.

4  Q.   And you testified that Miguel was interpreting for you.

5       Does he speak Spanish?

6  A.   Yes, he does.

7  Q.   And did you meet with Margarito Velasquez again later

8  that same day?

9  A.   I did not personally, but Miguel did.

10  Q.   And did the tape recorder -- I'm sorry.

11       Did the digital voice recorder, that you had given to

12  Margarito Velasquez earlier that day, did that come back into

13  your possession that same day?

14  A.   Yes, it did.

15  Q.   And who gave it to you?

16  A.   Miguel Cordova gave it to me.

17  Q.   And approximately what time did he give it to you?

18  A.   Late afternoon is the best memory that I have.

19  Q.   Was that digital voice recorder still turned on when you

20  received it in the late afternoon?

21  A.   Yes, it was.

22  Q.   What did you --

23  A.   I turned it off myself.

24  Q.   And what did you do with it when you received it?

25  A.   I took it from Miguel.  I remember turning it off.  I put

1  a pink sticky on it with the date, and I put it in the right-

2  hand drawer of my desk.

3  Q.    At this point I'd like to show you what's been marked as

4  General Counsel's Exhibit 115.  We just have one because it's

5  an original and it's something I was unable to make

6  duplicates of.

7  **(General Counsel's Exhibit 115 marked for identification.)**

8  Q.    BY MS. COTILLA:  Do you recognize that document, what's

9  been marked as GC-115?

10  A.    Yes, yes, I do.

11  Q.    What is that?

12  A.    This is a sealed envelope, which inside it has the tape

13  recorder that I received that day.

14      JUDGE BUSCHMANN:  It's a tape recording that you

15  received.

16      THE WITNESS:  Yeah, it's a digital voice recorder that

17  has the original recording on it.

18      JUDGE BUSCHMANN:  So the envelope contains the recorder

19  and the recording in that envelope?

20      THE WITNESS:  Yeah.  There's no tape because it's digital

21  so the recording is on the recorder.  The original recording

22  is in this envelope.

23      JUDGE BUSCHMANN:  I see.

24  Q.    BY MS. COTILLA:  I'm going to ask you to open that so you

25  can demonstrate -- you can show us what it is, what it looks

1  like.

2  **(Whereupon, the witness complies.)**

3  Q.    BY MS. COTILLA:  And can you also describe what that is

4  for the record?

5  A.    It's a digital voice recorder, which does not have a tape

6  in it, but records digitally.  And when turned on with the

7  hold button, records uninterrupted up to eight hours.

8  Q.    And what color is it?

9  A.    Silver.

10  Q.    And what are the approximate dimensions, for the record,

11  please?

12  A.    I would say it's about five inches.

13  Q.    Five inches long or --

14  A.    Five inches long.

15  Q.    And about how wide?

16  A.    Maybe two inches.

17  Q.    And that digital voice recorder you just took out from

18  the sealed envelope, when had you sealed that envelope?

19  A.    To the best of my memory, I probably sealed it sometime

20  in early April.

21  Q.    And is that the original digital voice recorder that

22  Margarito Velasquez used?

23  A.    Yes, it is.

24  Q.    Did you download the conversation that was captured on

25  that digital voice recorder?

1  A.   I gave it to our office manager, Lakisha Graves and asked

2  her to download it.  I instructed her to be very, very

3  careful with it because I knew that the information on it

4  needed to be preserved.

5  Q.   And can you describe what the process of downloading is?

6  A.   The process of downloading is you take the voice and you

7  connect it by a USB cable to a computer.  It imports the

8  information and then that information is saved on a file on

9  the computer.

10 Q.   And you said you instructed the office manager to

11 download it.

12      Did that office manager then give you back that same

13 digital voice recorder?

14 A.   Yes, she did.

15 Q.   And at that point, what did you do with it?

16 A.   At that point, I put it in the envelope and sealed it.

17 Q.   And does that digital voice recorder still contain the

18 conversation that Margarito Velasquez captured on it?

19 A.   It -- yes.  To my knowledge, yes.

20 Q.   Approximately how long is that, is the recording that's

21 on that digital voice recorder?

22 A.   My estimate is that the recording on this recorder is

23 probably five to six hours long, based on the time that we

24 gave the voice pen to Margarito and then when he returned it.

25      MS. COTILLA:  Your Honor, at this point I'd like to offer

1  General Counsel's Exhibit 115, I believe.

2      THE WITNESS:  Yes, 115.

3      JUDGE BUSCHMANN:  Mr. Greenbaum, what's your position on

4  this?

5      MR. GREENBAUM:  We object, Your Honor.  Number one,

6  there's a bunch of steps that are missing, that this witness

7  hasn't testified to.  You know, this whole thing seems very

8  attenuated to us.

9      We have a tape recording that they say the guy was

10  walking around work for five to six hours taping.  We have a

11  downloaded nine-minute tape.  I don't know how that tape

12  recording got into a minute CD.  There is definitely some

13  steps in between.

14      The office manager did something.  It had to be edited to

15  get down to nine minutes.

16      MR. McCARTHY:  Your Honor, the CD --

17      JUDGE BUSCHMANN:  Hold on a minute.  Let him finish.

18      MR. GREENBAUM:  It had to be edited in some fashion.  I

19  don't know the technology involved.  I don't think we have a

20  record of that.  We -- who did the recording?  What

21  conditions were there?  When was it?  We don't know any of

22  that.  It's extremely attenuated.

23      And, that said, I'm not quite confident of the legality

24  of the whole thing.  It seems to me a big setup.

25      MS. COTILLA:  May I?

1     MR. GREENBAUM:  And so we would object.  I don't think a
2  proper foundation has been made at all because I don't even
3  see a chain of custody here.  You know, that tape
4  recording --
5     JUDGE BUSCHMANN:  I think what you're saying also is that
6  Miguel should be the one that would have to be called to
7  testify as to what he did --
8     MS. COTILLA:  Yes, Your Honor.
9     JUDGE BUSCHMANN:  -- in order to lay the foundation.
10     MR. GREENBAUM:  Yes.
11     JUDGE BUSCHMANN:  I think your offer of proof is
12  premature.
13     MS. COTILLA:  If I may respond?  Well, Your Honor, I
14  think this is part of the chain.  We are going to call
15  Margarito Velasquez and he will be able to testify that he
16  keyed the link.
17     I also would like to point out that the digital -- the
18  tape, the actual CD we've given is a six-hour CD.  It
19  contains the whole conversation.  I am offering this digital
20  recorder.  If there's any doubt as to what's on the CD not
21  being the same as on the recorder, you know, we can certainly
22  allow Mr. Greenbaum to take it home with him, inspect and
23  compare both.
24     JUDGE BUSCHMANN:  Hold on a minute.  Is this GC-107?  Is
25  that somehow related to that?

1      MS. COTILLA:  Well, Mr. Greenbaum just brought that issue

2  up, yes.  GC-107 is a direct copy of what was in -- what's in

3  that digital voice recorder that's 115.

4  **(General Counsel Exhibit 107 marked for identification.)**

5      JUDGE BUSCHMANN:  So the bottom line is you want this GC

6  Exhibit 107, you want that, or that is the sum and substance

7  of what appears on that Exhibit 115, is that right?

8      MS. COTILLA:  That's correct, Your Honor.  These are

9  copies.

10     JUDGE BUSCHMANN:  So you offer no additional information

11 that is contained on 115, other than what is on 107?

12     MS. COTILLA:  That's right.

13     Do you understand my question?

14     MS. COTILLA:  Right.  The whole six hours that appear on

15 that 115 was the same that we have copied onto the CD that is

16 General Counsel's Exhibit 107.

17     I offer 115 only for the purpose if there is any question

18 to what's on our CD 107, if anyone wants to compare both

19 versions, we're providing an opportunity.

20     But yes, I'm representing, we're representing that what's

21 on GC-107 is exactly what's on that digital voice recorder.

22     JUDGE BUSCHMANN:  So then 115 is not being offered for

23 any information in addition to what's contained on 107, and

24 what has been transcribed into Spanish into English?

25     MS. COTILLA:  That's correct.  I would just like to point

1    out though that the transcription is of a nine-minute

2    conversation and the CD is six hours long.  I can indicate --

3    well, I believe, actually, that the transcription points to

4    what minute the conversation begins within those six hours,

5    and also points to what minute the conversation ends that was

6    transcribed.

7        JUDGE BUSCHMANN:  But the six hours of information on

8    there is, most of that is irrelevant, other than the ten

9    minutes that's contained on 107?

10       MS. COTILLA:  That's correct.  But because of the

11   technology, we're not able to pierce out nine minutes and

12   copy it separately on to another, at least I'm not -- I don't

13   know how to do that.

14       JUDGE BUSCHMANN:  I see.  So I understand now that 115 is

15   then being offered as background and as a basis for your

16   Exhibit 107.

17       MS. COTILLA:  Correct.

18       JUDGE BUSCHMANN:  It's a different story, right,

19   Mr. Greenbaum?  I mean I shouldn't say that.  It's --

20       MR. GREENBAUM:  I'm at a loss.

21       JUDGE BUSCHMANN:  My impression initially was that this

22   is going to be an independent piece of evidence, other than,

23   or in addition to General Counsel's Exhibit 107.

24       Now I understand this.  And so I view this now somewhat

25   differently.  And that is that it's for background purposes

1  to substantiate or to corroborate the Exhibit 107.

2      And what you're saying, Ms. Cotilla, is that you would

3  make this tape available to the Respondent for comparison

4  purposes, is that right?

5      MS. COTILLA:  Right.  And to the extent that they need

6  some assistance on how to download it, I think we would also

7  be able to provide some -- Ms. Shykula's been able to testify

8  as to how -- a little bit about what the process is in

9  downloading.

10      JUDGE BUSCHMANN:  I think still doing that, the person

11  that should also be there to corroborate this is this person

12  who carried the --

13      MS. COTILLA:  Yes.  And we do --

14      JUDGE BUSCHMANN:  -- instrument to those various

15  conversations, right?

16      MR. McCARTHY:  Yes, we agree.  And we will call him

17  tomorrow.

18      JUDGE BUSCHMANN:  Okay.  So this witness then has

19  testified she did and Exhibit 115 has been identified.  And

20  Mr. Greenbaum and I agree that it's not been sufficiently

21  substantiated at this point to make it part of the record,

22  but that will be coming forth in the next day.

23      Okay.  Is that agreeable?

24      MS. COTILLA:  Yes.

25      MR. McCARTHY:  Yes, Your Honor.

1      MR. GREENBAUM:  Yes, Your Honor.  We'll reserve argument
2  on it until tomorrow.
3      JUDGE BUSCHMANN:  All right.  Any questions that you have
4  of Ms. Shykula?
5      MR. GREENBAUM:  Yes, Your Honor.
6      MS. COTILLA:  I'm sorry, Your Honor, but I wasn't quite
7  done with her yet.
8      JUDGE BUSCHMANN:  All right.
9  Q.   BY MS. COTILLA:  I hand you now what's been marked for
10  identification as General Counsel's Exhibit 110.
11  **(General Counsel's Exhibit 110 marked for identification.)**
12  Q.   BY MS. COTILLA:  Do you recognize this document?
13  A.   Yes, I do.
14  Q.   And what is this document?
15  A.   It's a meeting announcement for a meeting that was held
16  at the Union with State Plaza workers.
17  Q.   And was this document maintained in the regular course of
18  business in the Union's files?
19  A.   Um-hum.
20      JUDGE BUSCHMANN:  You have to say or no.
21      THE WITNESS:  I'm sorry.  Yes.
22      MR. McCARTHY:  I offer General Counsel's Exhibit 110 into
23  evidence.
24      JUDGE BUSCHMANN:  Any objection to 110?
25      MR. GREENBAUM:  Well, I can't really even read it, Your

1  Honor.  It's in Spanish.  I could, you know, make some of it

2  out, but --

3      JUDGE BUSCHMANN:  Do you have an English translation for

4  this?

5  Q.  BY MS. COTILLA:  Are you able to understand what this

6  says?

7  A.  I mean I -- I don't know if I'm the perfect person.  I

8  understand enough Spanish to say what it says.

9  Q.  Can you tell me in general what it --

10 A.  Sure.  It's for a meeting of workers, State Plaza Hotel,

11 progress of the campaign, Tuesday, the 27th of July 2004,

12 5:00 p.m., our office, a meeting for the worker committee of

13 the State Plaza Hotel.

14     Should I continue?

15     JUDGE BUSCHMANN:  Yes.

16     THE WITNESS:  Okay.  We want to have a meeting with a

17 smaller group to make the meetings more productive and

18 faster.  We hope that you can come.  If you have any

19 questions, please call at, and then it has the Union's phone

20 number.

21     JUDGE BUSCHMANN:  Any --

22     MR. GREENBAUM:  I object.

23     JUDGE BUSCHMANN:  110 is hereby received.

24 **(General Counsel's Exhibit 110 received into evidence.)**

25 Q.  BY MS. COTILLA:  And are you familiar with someone named

1  Adriana Nunez?

2  A.   Yes, I am.

3  Q.   And to the best of your knowledge, has she ever been

4  employed directly by Local 25?

5  A.   No.

6       MS. COTILLA:  No further questions, Your Honor.

7       JUDGE BUSCHMANN:  Okay.  Mr. Greenbaum, you get cross.

8       MR. GREENBAUM:  Thank you, Your Honor.

9                     CROSS-EXAMINATION

10 Q.   BY MR. GREENBAUM:  Ms. Shykula, did Mr. Velasquez call

11 you on the phone to tell you that he had an issue with

12 Mr. Palenzona?

13 A.   The best memory that I have is that he calls Miguel

14 Cordova who calls me.

15 Q.   Do you recall when he called you?

16 A.   It would have been that morning.

17 Q.   And do you recall the date?

18 A.   To the best of my recollection, it's May 13th.  Around

19 May 12th or May 13th.

20 Q.   Were you in on the conversation with Mr. Cordova?

21 A.   (No response.)

22 Q.   Were you in that conversation?

23 A.   No.

24 Q.   So --

25 A.   The phone conversation?

1   Q.   Yes.

2   A.   No.

3   Q.   So Mr. Cordova came to you?

4   A.   As I remember.

5   Q.   And whose idea was it to tape?

6   A.   It was my idea.

7   Q.   How did you come up with that idea?

8   A.   Because I believe that the best way for workers to

9   protect themselves, if the hotel is committing unfair labor

10  practices, is to have the strongest evidence possible.

11  Q.   What did Mr. Velasquez, to the best of your knowledge,

12  indicate to Mr. Cordova what the issue was with

13  Mr. Palenzona?

14      MS. COTILLA:  Objection, hearsay.  Perhaps it's better

15  asked what did Mr. Cordova tell her that -- I don't know.

16  Hearsay, Your Honor.

17      JUDGE BUSCHMANN:  I know it's hearsay.

18      MR. GREENBAUM:  I think she indicated during her direct,

19  I'm just trying to bring that out, and then I'll ask a follow

20  up on it.

21      THE WITNESS:  I don't specifically remember what

22  Margarito said to Mr. Cordova on the phone.  I do remember

23  what Margarito said to Mr. Cordova outside the hotel with me

24  present.

25  Q.   BY MR. GREENBAUM:  Are you fluent in Spanish?

1  A.   No, I'm not fluent.

2  Q.   Was their conversation in Spanish or in English?

3  A.   Their conversation was in Spanish and Miguel was

4  translating back to me what Margarito was saying.

5  Q.   Okay.  What was said?

6  A.   He said that Mr. Palenzona had approached him earlier in

7  the day in the cafeteria and said something like, Margarito,

8  why did you bring the flyers into the hotel?

9       Margarito said, why do you think that it's me, or who

10 said that?  What I remember is that Margarito said, who said

11 that?  Bring that person here?

12      And then Margarito said that Mr. Palenzona had replied,

13 well, I'm not going to do that and then said something like,

14 you know, Margarito, I always thought you were a good worker,

15 but -- and made sort of a physical indication that he didn't

16 think so any more.  That's what I remember.

17 Q.   Okay.  Did Mr. Velasquez say he wanted to use the tape

18 recorder?

19 A.   No, he did not.  It was my idea.

20 Q.   Did he consent to using that tape recorder?

21 A.   Yes, he did.

22 Q.   Did you have to prod him to get him to consent?

23 A.   No, I would not say I had to prod him.  He was nervous.

24 Q.   What types of flyers were you talking about that he was

25 distributing?

1   A.    He had distributed a flyer that was an update on

2   negotiations the previous day.

3   Q.    Did you give him those to distribute?

4   A.    Yes, I did.

5   Q.    And did you instruct him to go back and talk with

6   Mr. Palenzona when he had the tape recorder on him?

7   A.    Yes, I did.

8   Q.    And did you tell him what to say?

9   A.    I advised him to tell Mr. Palenzona that he didn't do it

10  because I believed that his job may be in jeopardy.

11  Q.    But I thought you indicated that Mr. Velasquez had

12  already told Mr. Palenzona that he didn't do it?

13  A.    No.  What I indicated previously was that Mr. Velasquez

14  said who said that, that I did it.

15  Q.    So Mr. Velasquez, in the first conversation, what you

16  know of that first conversation with him and Mr. Palenzona,

17  did not deny, or did not admit or deny --

18  A.    From what I remember of the conversation, yes.

19  Q.    So you instructed him to go back and speak with

20  Mr. Palenzona, this time wearing a tape recorder, and telling

21  him that he didn't do it?

22  A.    Yes, I did.

23  Q.    Why would you need that tape-recorded?

24  A.    In order -- the reason that I advised him to do this was

25  because if the hotel was interrogating people about whether

1  or not they distributed Union literature, I felt that the
2  best way for Margarito to protect himself was to have proof
3  that it was going on.
4  Q.    Did you tell him to -- did you tell him not to tell
5  anyone else that he was going to do that?
6  A.    No.
7  Q.    Did you tell him to tell other employees that he was
8  going to do that?
9  A.    No, I did not tell him to tell anyone else to say that he
10  was going to do it.
11  Q.    Now, he had this tape recording on the whole day?
12  A.    To my knowledge, yes.
13  Q.    So he was tape recording conversations with all other
14  coworkers and other supervisors?
15  A.    The tape recorder was running.
16  Q.    Was running the whole day?
17  A.    To my knowledge, yes.
18  Q.    Did you listen to the whole thing?
19  A.    I haven't listened to the entire six hours of it.
20  Q.    But you had the whole day of conversations between
21  Mr. Velasquez and hotel employees, is that correct?
22  A.    That's my understanding that's what's on the tape, yes.
23  Q.    And you didn't tell Mr. Velasquez to tell any employee
24  that he was wearing a tape recorder?
25  A.    No, I did not tell him that.

1  Q.   And you don't know whether any employees consented to be

2  tape recorded, do you?

3  A.   No, I don't know the answer to that.

4  Q.   Do you know whether Mr. Palenzona consented to being tape

5  recorded?

6  A.   I believe that he did not because I don't think he knew

7  that Margarito was wearing a tape recorder.

8  Q.   Do you know whether or not the hotel has a policy with

9  respect to tape recording on the job?

10 A.   No, I do not.

11 Q.   Did you inquire?

12 A.   No, I did not.

13 Q.   If they did, would you be putting Mr. Velasquez at risk?

14      MS. COTILLA:  Objection, speculation.

15      JUDGE BUSCHMANN:  Yes, objection sustained.

16 Q.   BY MR. GREENBAUM:  Do you believe that employees have a

17 privacy interest at work?

18      MS. COTILLA:  Objection, relevance.

19      JUDGE BUSCHMANN:  Sustained.

20 Q.   BY MR. GREENBAUM:  Did you -- you instructed

21 Mr. Velasquez to go and initiate a conversation with

22 Mr. Palenzona, correct?

23 A.   Correct.

24 Q.   And wearing a tape recorder?

25 A.   Correct.

1   Q.   Did you tell him how to start the conversation?

2   A.   I don't think I instructed him how to begin the

3   conversation.

4   Q.   What did you tell him to say?

5   A.   I remember very briefly I said two things, because like I

6   said, I don't speak Spanish.  I said say I didn't do it and I

7   said this is to protect you.

8   Q.   Did you tell him to bring up the Union?

9   A.   Not to my memory, no.

10  Q.   Do you think it's possible?

11  A.   I suppose it could be possible, but I have no

12  recollection at all of telling him to bring up the Union.

13  Q.   Did you instruct him to bring up the substance of the

14  flyers?

15  A.   No, I did not instruct him to do that.

16  Q.   Did you instruct him to bring up any other employees?

17  A.   As I said, I only instructed him two things very briefly.

18  Q.   Did you instruct him to talk to any other employees --

19       JUDGE BUSCHMANN:  Just a minute.  Mr. Greenbaum, I

20  sustain the objection.  The witness was asked and answered

21  the questions repeatedly.

22  Q.   BY MR. GREENBAUM:  Ms. Shykula, referring to GC Exhibit

23  110, do you have that in front of you?

24  A.   Yes.

25  Q.   And this is a notice to employees dated July '04,

1   correct?

2   A.    Um-hum.

3   Q.    How many other ones of these do you have, if any?

4   A.    Of notices?  I'm sorry, can you clarify the question a

5   bit more?

6   Q.    Notices to employees.

7   A.    About meetings?

8   Q.    Meetings.

9   A.    We have lots of them.

10  Q.    To this particular group of employees?

11  A.    We have several.

12  Q.    After July '04?

13  A.    I don't know the exact amount that we have after July

14  '04.

15  Q.    How many employees showed up to this meeting?

16  A.    I don't know the answer to that.

17  Q.    Were you at the meeting?

18  A.    No, I was not.

19  Q.    After July '04, were there any other meetings you had

20  with employees?

21  A.    Certainly.

22  Q.    And how many employees showed up to those meetings?

23        MS. COTILLA:  Objection, relevance.

24        JUDGE BUSCHMANN:  I think you're going beyond direct

25  examination, Mr. Greenbaum.  I sustain the objection.

1    MR. GREENBAUM:  Okay.  Thank you, Your Honor.  Nothing

2  further.

3    JUDGE BUSCHMANN:  Anything further, Ms. Cotilla?

4    MS. COTILLA:  Yes.

5                    **REDIRECT EXAMINATION**

6  Q.  BY MS. COTILLA:  When you came up with this idea about

7  having Margarito Velasquez tape record the conversation with

8  his supervisor, were you aware of whether or not it was legal

9  in the District of Columbia?

10  A.  I was.  I knew that it was legal.

11  Q.  You had already checked on that before you instructed him

12  to do this?

13  A.  Yes, I had.  I would never ask him to do something

14  illegal.

15    MS. COTILLA:  General Counsel's 116.  I just have one

16  copy at this point.  We'll get you another copy.

17  **(General Counsel's Exhibit 116 marked for identification.)**

18    MR. GREENBAUM:  I'm going to --

19    MS. COTILLA:  I haven't offered it yet.

20  Q.  BY MS. COTILLA:  I'm showing you what's been marked as

21  General Counsel's Exhibit 116.

22  A.  Um-hum.  Yes, I'm sorry.

23  Q.  Do you recognize that document?

24  A.  No.  This is the first time I've seen this document.

25  Q.  Are you familiar with the District of Columbia codes that

 1  makes it -- that would make it unlawful or lawful for this

 2  recording to occur?

 3  A.   I'm familiar that it's lawful under the District of

 4  Columbia code.

 5  Q.   And who gave you that instruction?

 6  A.   I don't remember exactly, but my belief is that it was

 7  either John Boardman or Devki Virk, our counsel.

 8  Q.   And Devki Virk is an attorney?

 9  A.   Yes.

10  Q.   Present here today?

11  A.   Yes, she is.

12       MS. COTILLA:  No further questions.

13       JUDGE BUSCHMANN:  You withdraw the exhibit, right?

14       MS. COTILLA:  I'll take it back.

15  **(General Counsel's Exhibit 116 was withdrawn.)**

16       MR. McCARTHY:  We may offer it through another witness,

17  Your Honor.

18       JUDGE BUSCHMANN:  Okay.  Thank you very much.  You may

19  step down.

20       THE WITNESS:  Thank you.

21  **(Witness excused.)**

22       JUDGE BUSCHMANN:  So we'll stand -- at this point that's

23  all.  9:30 tomorrow morning.

24       You'll have your witnesses present tomorrow morning,

25  right, Mr. McCarthy?

1      MR. McCARTHY:  I do.

2      JUDGE BUSCHMANN:  And most of them -- Mr. McCarthy, I'm

3  talking to you.

4      MR. McCARTHY:  I'm sorry, Your Honor.

5      JUDGE BUSCHMANN:  Most of them will require the

6  assistance of the Interpreter?

7      MR. McCARTHY:  That's correct, Your Honor.

8      JUDGE BUSCHMANN:  It will be the same one?

9      MR. McCARTHY:  Yes, Your Honor.

10     MS. COTILLA:  Your Honor, may I just clarify?  What

11  should I do with General Counsel Exhibit 115, which is the

12  original recording?

13     Should it be put into the custody of the Court Reporter

14  or --

15     JUDGE BUSCHMANN:  Yes, that will be a good idea to put it

16  in the custody of the Court Reporter.  And it's not been

17  received into evidence, so at this point it is essentially an

18  exhibit that's been identified, but not admitted.

19     MS. COTILLA:  Okay.

20     MR. McCARTHY:  May I just add that I actually would

21  prefer that the Board holds on to that, because I have no way

22  of securing that.  You know, I'm not going to take it to my

23  house, keep it in my car.

24     JUDGE BUSCHMANN:  Are you keeping the exhibits and your

25  documents here in this courtroom?

1        MR. McCARTHY:  I was planning on it.

2        JUDGE BUSCHMANN:  Yes.  You can do that here, can't you?

3        MR. McCARTHY:  Yes.

4        JUDGE BUSCHMANN:  Then as far as I'm concerned, it

5   doesn't matter to me whether you retain custody of it.  As an

6   attorney for the Board, you have certain responsibility,

7   ethical responsibility and I trust that, or the Court

8   Reporter, but it's up to you.

9        MS. COTILLA:  Okay.

10       MR. McCARTHY:  Your Honor, I'd just like the record to

11  reflect Mr. Greenbaum has returned the English affidavit for

12  Ms. Adriana Nunez, and I'm retrieving the Spanish affidavit

13  that he showed to her in her testimony.  Thank you.

14       JUDGE BUSCHMANN:  And with that, we'll stand adjourned

15  until tomorrow morning at 9:30.

16  **(Whereupon, at 5:00 p.m., the hearing in the above-entitled**

17  **matter was adjourned, to reconvene the next day, Tuesday,**

18  **March 14, 2006, at 9:30 a.m.)**

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## CERTIFICATION

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 5, in the matter of **STATE PLAZA HOTEL**, Case No. 5-CA-32594, at Washington, D.C., on March 13, 2006, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.


_____
Timothy J. Atkinson
Official Reporter


_____
Edna J. Hollander
Transcriber