BEFORE THE

NATIONAL LABOR RELATIONS BOARD

---

In the Matter of:

**STATE PLAZA, INC., a wholly owned subsidiary of R.B. ASSOCIATES, INC., d/b/a STATE PLAZA HOTEL,**

        Respondent,

   and                   Case No.  **5-CA-32594**

**HOTEL AND RESTAURANT EMPLOYEES LOCAL 25, UNITE HERE INTERNATIONAL UNION,**

        Charging Party.

---

     The above-entitled matter came on for hearing pursuant to notice, before **KARL H. BUSCHMANN,** Administrative Law Judge, **National Labor Relations Board, 1099 14th Street, N.W., 5th Floor, Washington, D.C. 20570-0001,** on **Tuesday, March 14, 2006** at **9:30 a.m.**

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## A P P E A R A N C E S

**Counsel for the General Counsel:**

THOMAS P. McCARTHY, ESQ.
National Labor Relations Board
Region 5
1099 14th Street N.W.
Washington, D.C. 20570-0001
(202) 501-8859

STEPHANIE COTILLA, ESQ.
National Labor Relations Board
Region 5
103 South Gay Street
Baltimore Maryland 21202


**On behalf of the Charging Party:**

DEVKI VIRK, ESQ.
Bredhoff & Kaiser, PLLC
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600

**On Behalf of the Respondent:**

JONATHAN W. GREENBAUM, ESQ.
EMILY K. HARGROVE, ESQ.
Nixon Peabody, LLP
401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8326

**Also Present:**

CHARLES BECKER
Spanish Interpreter

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Margarito Velasquez | 207 | 258 | 279 | -- | -- |
| Ana Majano | 282 | 299 | 310 | -- | -- |
| Dilcia Segovia | 312 | 320 | 322 | -- | -- |
| Devki Virk | 337 | -- | -- | -- | -- |

E X H I B I T S

| EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-33 | 210 | 212 |
| GC-34 and 35 | 211 | 212 |
| GC-36 | 212 | 212 |
| GC-37 | 224 | 226 |
| GC-43 | 284 | 286 |
| GC-44 | 284 | 286 |
| GC-45 | 285 | 286 |
| GC-46 | 340 | 344 |
| GC-47 | 340 | 344 |
| GC-48 | 340 | 344 |
| GC-48(a) | 340 | 343 |
| GC-49 | 341 | 344 |
| GC-50 | 343 | 344 |
| GC-51 | 344 | 346 |
| GC-52 | 345 | 346 |
| GC-53 | 345 | 346 |

E X H I B I T S

| EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-54 | 345 | 346 |
| GC-55 | 347 | 349 |
| GC-56 | 347 | 349 |
| GC-56(a) | 348 | 349 |
| GC-57 | 352 | 354 |
| GC-58 | 352 | 354 |
| GC-59 | 353 | 354 |
| GC-60 | 353 | 354 |
| GC-61 | 354 | 357 |
| GC-62 | 354 | 357 |
| GC-63 | 355 | 357 |
| GC-64 | 355 | 357 |
| GC-65 | 355 | 357 |
| GC-66 | 357 | 360 |
| GC-67 | 358 | 360 |
| GC-68 | 358 | 360 |
| GC-69 | 359 | 360 |
| GC-70 | 360 | 362 |
| GC-71 | 360 | 362 |
| GC-72 | 361 | 362 |
| GC-73 | 361 | 362 |

## E X H I B I T S

| EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-90 | 362 | 363 |
| GC-107 | -- | 249 |
| GC-108 | -- | 249 |
| GC-109 | -- | 249 |
| GC-115 | -- | 249 |

1                    P R O C E E D I N G S

2                              (Time Noted:  9:15 a.m.)

3       ADMINISTRATIVE LAW JUDGE BUSCHMANN:  You can call your

4   next witness, please.

5       MR. McCARTHY:  Yes, Your Honor, the General Counsel calls

6   Margarito Velasquez.

7       JUDGE BUSCHMANN:  Do we need an interpreter for him?

8       MR. McCARTHY:  Yes.

9       JUDGE BUSCHMANN:  I have to swear you in.  Please raise

10  your right hand.

11  (Whereupon,

12                   MARGARITO VELASQUEZ

13  was called as a witness by and on behalf of the General

14  Counsel, and having been first duly sworn, was examined and

15  testified as follows:)

16      THE INTERPRETER:  The interpreter remains under oath?

17      JUDGE BUSCHMANN:  Yes.  Yes.  For the rest of the

18  proceeding, yes.

19                   DIRECT EXAMINATION

20  Q.  BY MR. McCARTHY:  Good morning, sir.

21  A.  Good morning.

22  Q.  I am suffering from a slight cold.  I'll try to keep my

23  voice up.  If you cannot hear me please ask me to repeat the

24  question.

25  A.  All right.  All right.

1  Q.   Will you state your name and address, for the record, and

2  spell your last name, please?

3  A.   My name is Margarito Velasquez; my address is 5049 East

4  Capitol Street Southeast, Washington, DC 20019.

5  Q.   Do you speak English or Spanish or both?

6  A.   Spanish.

7  Q.   Do you read Spanish?

8  A.   A little.

9  Q.   How much education have you had?

10  A.   Only up to third grade.

11  Q.   Are you testifying here pursuant to my subpoena?

12  A.   Yes.

13  Q.   Are you currently employed?

14  A.   Yes.

15  Q.   By whom?

16  A.   Well, right now I am working at the State Plaza Hotel.

17  Q.   Are you working there full-time?

18  A.   Yes.

19  Q.   What job do you have at the State Plaza Hotel?

20  A.   I'm houseman.

21  Q.   What hours do you work for the State Plaza Hotel as

22  houseman?

23  A.   I work from 6:00, 6:30 in the morning until 3:00 in the

24  afternoon.

25  Q.   Do you take lunch?

1  A.  Yes.

2  Q.  What time is your typical lunch break?

3  A.  I have lunch at 11:30.

4  Q.  Could you briefly describe for us your duties as a

5  houseman at the hotel throughout the morning and the

6  afternoon, briefly?

7  A.  All right.  My work is -- Well, the first thing to clean

8  up in front of the hotel.  To clean some brass tubing, and

9  then I take linen, clean linen up to the workers on the upper

10  floors.  I leave it in the closet.  And when there is dirty

11  linen I bring it down to the laundry so the laundresses can

12  wash it.  And after that sometimes I have to bring shampoo

13  into the hallways.  I'll do that too.  And sometimes I'll

14  strip the floors and wax them.

15  Q.  Do you have any responsibility regarding breakfast and/or

16  lunch?

17  A.  Yes.  At lunch hour, at 11:00, at 11:30 always I go to

18  the kitchen and I always bring out the breakfast and then I

19  later bring out the lunches.

20  Q.  Now, how long have you been employed as a houseman for

21  the State Plaza Hotel?

22  A.  I have been working since March 23, 1998 until today.

23  Q.  Do you usually work alone?

24  A.  I work alone in the south part and sometimes I also work

25  Northville (ph.).

1    Q.    Who are your immediate supervisors?

2    A.    The first is Lisa Alvarado, then Lidia Hernandez, Karen

3    Martinez and Corrado; I don't know his surname.

4    Q.    Do they speak to you in English or in Spanish?

5    A.    Only in Spanish.

6    Q.    How well does Lisa Alvarado the housekeeping manager

7    speak Spanish?

8    A.    Yes.  She speaks Spanish perfectly well.

9    Q.    The general manager, Corrado Palenzona, do you often,

10   does he often speak with you?

11   A.    We barely speak at all.  Very little.

12   Q.    When he does speak to you, does he speak to you in

13   English or in Spanish?

14   A.    In Spanish.

15   **(General Counsel's Exhibit 33 marked for identification.)**

16   Q.    BY MR. McCARTHY:  I'm going to direct your attention to

17   the packet of exhibits in front of you on the right-hand

18   side, General Counsel's Exhibit 33.

19   A.    May I look?

20   Q.    Yes.  It's about the seventh package in, I believe.

21   A.    Yes.

22   Q.    Do you recognize that document?

23   A.    Yes.  It's a list I was given February 8, 2006, of the

24   chores to do that day.

25   Q.    Do you receive a similar list of work assignments each

1  morning?

2  A.    Yes.

3  Q.    Do the other employees receive similar work assignments

4  from the supervisors?

5  A.    They receive a list but I don't know if it would be the

6  same as this or not.

7  **(General Counsel's Exhibit 34 and 35 marked for**

8  **identification.)**

9  Q.    BY MR. McCARTHY:  Now, I would like to direct your

10  attention to General Counsel's Exhibit 34.  I'd also like to

11  direct your attention to Government Exhibit 35.  Do you

12  recognize those two documents, 34 and 35?

13  A.    Yes.   Thirty-four is my pay stub.

14  Q.    For what pay ending date is that pay stub?

15  A.    July 1, 2005.

16  Q.    How much were you making on July 1, 2005?

17  A.    I was earning $11.26.

18  Q.    Then directing your attention to GC 35, what is that

19  document?

20  A.    This is also my pay stub now that I am earning $12.50 an

21  hour.

22  Q.    When did you begin making $12.50 an hour?

23  A.    As of July 8, 2005.

24  Q.    Had you ever received that large wage increase before

25  July 8, 2005?

1  A.   No.  Never.

2  Q.   Prior to July 8, 2005, did you receive an annual wage

3  increase in 2002, 2003 and 2004?

4  A.   Yes.

5  Q.   How much were those annual increases?

6  A.   They were $.35 an hour.

7  Q.   Are you still making $12.50 per hour?

8  A.   Yes.

9  **(General Counsel's Exhibit 36 marked for identification.)**

10  Q.   BY MR. McCARTHY:  I direct your attention to General

11  Counsel's Exhibit 36.  Do you recognize that document?

12  A.   Yes.

13  Q.   What is that?

14  A.   It's another pay stub for payment I received February 3,

15  2006.

16      MR. McCARTHY:  Your Honor, at this time I offer

17  Government Exhibit 33 through 36.

18      MR. GREENBAUM:  No objection.

19      JUDGE BUSCHMANN:  Thirty-three through thirty-six, as

20  General Counsel's Exhibits, are hereby admitted.

21      MR. McCARTHY:  Thank you, Your Honor.

22  **(General Counsel's Exhibits 33 through 36 received into**

23  **evidence.)**

24  Q.   BY MR. McCARTHY:  Mr. Velasquez, do you know Alexander

25  Guillen?

1   A.   Yes.

2   Q.   Do you know Reina Lozano?

3   A.   Yes.

4   Q.   What jobs do they perform at the hotel?

5   A.   Alexandra Guillen has always worked with the food and

6   beverage department.  And Reina Lozano previously worked as a

7   housekeeper cleaning rooms.

8   Q.   What does Reina do now?

9   A.   Now, he is helping Alexandra Guillen and she fills up the

10  minibars, that's because she stopped working as a housekeeper

11  and she's working with Alexandra Guillen in food and

12  beverage.

13  Q.   Have you seen them work together to restock or fill up

14  the minibars?

15  A.   Yes.

16  Q.   When did you first begin to see them working together to

17  restock the minibars?

18  A.   Between March and April.

19  Q.   Of what year?

20  A.   2005.

21  Q.   Have you ever seen Alex and Reina have breakfast with

22  anyone from  --

23  A.   Yes.  I have seen them several times.

24  Q.   And with whom have you seen them have breakfast?

25  A.   With Mr. Palenzona.

1   Q.   How often?

2   A.   Once in a while.

3   Q.   What did you observe on these occasions?

4   A.   Well, I see that they get along well and that they always

5   speak to each other as friends.

6   Q.   Where would they be having breakfast?

7   A.   Well, in the cafeteria in the north building.

8   Q.   Would you observe what they had?

9   A.   Yes.  Coffee, bread.

10   Q.   Now, did you ever see Alex and Reina meet with

11   Mr. Corrado Palenzona on other occasions?

12   A.   Yes.  Several times I have seen them together in the

13   hotel hallways but only one time did I hear their

14   conversation.

15   Q.   Now, what month did you begin seeing them together in the

16   hallway?

17   A.   From March to July of 2005.

18   Q.   How often did you see them together in the hallway?

19   A.   Well, I would see them from time to time.

20   Q.   Did there come a time when you no longer saw Alex and

21   Reina meeting with Mr. Palenzona in the cafeteria or in the

22   hallway?

23   A.   Yes.

24   Q.   When was that approximately?

25   A.   Three months.

1  Q.   Is that three months prior to the start of this hearing

2  in this case?

3  A.   Yes.  Before.

4  Q.   Now, Mr. Velasquez, did you ever see Alex and Reina go

5  from room to room?

6  A.   Yes.

7  Q.   Did you ever see them come out of Manager Corrado's

8  office, prior to filling up their carts to go room to room?

9  A.   Yes.  Sometimes they would meet with him in his office.

10  Q.   Then what would they do?

11  A.   Then they would go filling up the carts for the minibar

12  and go off.

13      MR. McCARTHY:  Your Honor, I'm going to direct testimony

14  to Paragraph 13 in.

15  Q.   BY MR. McCARTHY:  Did Alex Guillen or Reina Lozano ever

16  ask you to sign anything?

17  A.   Yes.

18  Q.   When?

19  A.   It was in early April 2005.

20  Q.   Where were you?

21  A.   We met up in the hallways of the hotel.

22  Q.   Was it after lunch or before lunch?

23  A.   After lunch.

24  Q.   Were you near the elevator?

25  A.   Yes.  It was in front of the elevator.

1  Q.    Was anyone else present in the area?

2  A.    There was no one in the hallway there but off to the side

3  was a housekeeper working?

4  Q.    What housekeeper was working off to the side?

5  A.    The housekeeper Anita Majano, excuse me, but Ana Majano.

6  Q.    What was Ana doing at the time?

7  A.    She was cleaning around.

8  Q.    What were you doing at the time?

9  A.    I was going around picking up the dirty linen from the

10  closet.

11  Q.    Did either Reina or Alex speak to you?

12  A.    Yes.

13  Q.    Who spoke to you?

14  A.    Reina Lozano.

15  Q.    What did she say?

16  A.    She said to me, "Margarito, we are collecting signatures

17  to get rid of the union.  The boss says he will give us a

18  raise if we vote to take the union out."  And so I asked

19  her --

20      MR. McCARTHY:  I'm not asking him what he asked her yet.

21      THE INTERPRETER:  I'm sworn to give the testimony and --

22      MR. McCARTHY:  Okay.

23      THE WITNESS:  So I said to her, did she have any document

24  that guaranteed we would get the raise if we signed it?

25  Q.    BY MR. McCARTHY:  Now, prior to you asking her if she had

1    any document that would guarantee that you would get the

2    raise if she signed it, did she ask you to sign anything?

3    A.    Yes.

4    Q.    What did she say?

5    A.    Margarito, you want to sign this document?

6    Q.    What did you say?

7    A.    And so I asked whether she had a document that said

8    whether if we signed it would guarantee that we would get the

9    raise.

10   Q.    Did either Reina or Alex respond?

11   A.    Yes.

12   Q.    Who responded?

13   A.    Reina did.

14   Q.    What did Reina say?

15   A.    No.  We are just carrying the word, the boss' word.

16   Q.    Do you recall whether you said anything else after you

17   were asked to sign the petition?

18   A.    Yes.

19   Q.    What did you say?

20   A.    I told her I wasn't going to sign the letter because I

21   was going to stick with the union.

22   Q.    Did either of them respond?

23   A.    Yes.

24   Q.    What was their response?

25   A.    Reina said to me, "That's fine.  We respect your

1  decision," and they went on.

2  Q.  Did they show you any petition when they asked you to

3  sign?

4  A.  No.

5  Q.  How did the conversation end?

6  A.  Well, just like that.  They told me they respected my

7  decision and that's how the conversation concluded.

8      MR. McCARTHY:  Your Honor, I'm going to move on and

9  address complaint paragraph 9(d) admitted by General

10  Counsel's Exhibit 2.

11      JUDGE BUSCHMANN:  Ninety or Nine.

12      MR. McCARTHY:  Nine (d).

13      JUDGE BUSCHMANN:  Nine (d).

14      MR. GREENBAUM:  Your Honor, I don't know why General

15  Counsel is directing the testimony to the complaint.  I have

16  never seen that before.  We would object.  I don't know maybe

17  it's some type of signal.  I just -- We would object.  I

18  don't think it's appropriate when the witness is on the stand

19  to say, I'm referring you to the complaint.  We are here for

20  a hearing.  The complaint is basically a document.  Not

21  testimony.  It's not evidence.  It's a complaint.  And I

22  don't think it's necessary and highly improper to in the

23  middle of a trial to indicate that counsel is directing the

24  court to a specific paragraph of the complaint with the

25  witness here.

1      Presumably this witness has been prepared.  They have

2  gone over the complaint and it just seems to me to be

3  improper.

4      JUDGE BUSCHMANN:  Well, if you prefer that Counsel for

5  the General Counsel refrain from doing this.  I have no

6  problem with it.  I think it's a matter of ease on the fact

7  finder to challenge or to funnel the testimony to a certain

8  specific relevant area.  But I can see your point.  Your

9  point is, if the witness were familiar with the complaint, he

10 might just repeat what's in the complaint rather than testify

11 from his own recollection.  That's what you are objecting to,

12 that's what your idea is, right?

13     MR. GREENBAUM:  Yes, Your Honor.  This testimony seems

14 all too perfect as was yesterday's and I believe it's just

15 going straight from the complaint and it is being directed

16 and that's my objection.

17     JUDGE BUSCHMANN:  Well, what do you think, Mr. McCarthy.

18     MR. McCARTHY:  I have no problem with that, Your Honor, I

19 just did it to assist the Court to know where we were in the

20 testimony.

21     JUDGE BUSCHMANN:  Yes.  I understand.  I think usually

22 it's very good to do that and I think it helps us --

23     MR. McCARTHY:  That's just my style, Your Honor.  But if

24 the Court prefers and based on the objection, that's just

25 fine with me.

1        JUDGE BUSCHMANN:  Well, I understand the objection, it's

2   the possibility of a suggestion that somehow the testimony is

3   being geared to a certain point, assuming that the witness is

4   familiar with the allegations in the complaint.

5        Okay.  I'll sustain the objection, Mr. Greenbaum.

6        MR. GREENBAUM:  Thank you, Your Honor.

7   Q.   BY MR. McCARTHY:  Mr. Velasquez, do you recall whether

8   employees ever met with management in the hotels in the

9   laundry department?

10  A.

11  A.   Yes.

12  Q.   Do you recall what month this meeting took place?

13  A.   Yes.  It was in April.

14  Q.   Was it in the beginning of April or the end of April?

15  A.   It was around the beginning of April.

16  Q.   Are you sure it was the beginning of April?

17  A.   Yes.

18  Q.   Now, approximately how many employees were present?

19  A.   There were like 25 of us.

20  Q.   Were any managers or bosses present?

21  A.   Yes.

22  Q.   Who was present for the meeting?

23  A.   Mr. Bello was there and Mr. Corrado, and some other

24  supervisors.

25  Q.   Do you know who the other supervisors were?

1  A.   Yes.  Lidia Hernandez was there, and Palen (ph.).

2  Q.   Who spoke at the meeting for management?

3  A.   Mr. Bello spoke and Mr. Corrado.

4  Q.   Did they speak in English or Spanish?

5  A.   They spoke in English.

6  Q.   Did anyone translate for them?

7  A.   Yes.  Alexandra Guillen was translating.

8  Q.   Now, was Lisa Alvarado at this meeting?

9  A.   I don't recall having seen her.

10 Q.   Do you recall what Mr. Corrado said at this meeting as

11 translated by Alexandra Guillen?

12 A.   Yes.  In the conversation he said that the hotel would

13 continue in discussions with the union, in the bargaining

14 with the union, excuse me.

15 Q.   Did he say anything else?

16 A.   And that the union may prepare more pamphlets to

17 distribute inside the hotel.

18 Q.   Did he use the word "Pamphlets" or propaganda?

19 A.   Excuse me, propaganda.

20 Q.   Did any employees ask any questions?

21 A.   Yes.  Miriam Berrios (ph.) asked a question.

22      THE WITNESS:  Berrios.

23      THE INTERPRETER:  The interpreter is correct; it's Miriam

24 Berrios.

25 Q.   BY MR. McCARTHY:  What did she ask?

1    A.    Well, she asked where the $250 that they had been

2    promised was.

3    Q.    Did any manager respond in English as translated by Alex

4    Guillen?

5    A.    Yes.  Mr. Corrado did.

6    Q.    What did Mr. Corrado Palenzona say?

7    A.    He said that no one could receive a raise because the

8    hotel was still involved in bargaining with the union and

9    that the raise would come when the bargaining had reached an

10   agreement.

11   Q.    Did anyone ask you any questions at the end of the

12   meeting?

13   A.    Yes.  Ms. Alexandra Guillen asked me question.

14   Q.    What did she ask you?

15   A.    She asked me if I had anything to say and I told her I

16   had nothing to say.

17   Q.    When Alex Guillen asked you at the end of this meeting

18   whether you had anything to say, Were Mr. Palenzona and

19   Mr. Bello still in the room?

20   A.    Yes.  They were all there present.

21   Q.    Do you recall where Alex was standing or sitting

22   physically in the room, who was seated next to you?

23   A.    She was standing, she was next to me.

24   Q.    How far away were Mr. Palenzona and Mr. Bello?

25   A.    We were at a distance like this, like those of us who are

1   here now.

2   Q.   Now, were Mr. Palenzona or Mr. Bello standing together?

3   A.   Yes.

4   Q.   And was Alexandra Guillen between you and those --

5   A.   Ms. Alex Guillen was beside me and they were in front a

6   ways.

7   Q.   How many feet away were they?

8   A.   Not much, about five to ten feet.

9   Q.   I'm going to turn to a new subject area now.  Do you

10  recall what you did on or about May 10, 2005 after work?

11  A.   Yes.

12  Q.   What did you do?

13  A.   After I got off work I went to the union hall, which is

14  between K Street and 10th Street.

15  Q.   What happened at the union hall?

16  A.   I went so we could prepare some pamphlets.

17  Q.   Were the pamphlets at that time?

18  A.   No.

19  Q.   Do you recall what happened the next morning?

20  A.   Yes.  The following morning I met up with Ms. Jennifer

21  between K Street and 10th Street at about 5:00 or 5:30 in the

22  morning and she brought them prepared.

23  Q.   Did she give you anything else at that time?

24  A.   Yes.  She gave me a recorder.

25  Q.   Now, I'd like to show you what has been marked for

1    identification as Government Exhibit 115.

2        MR. McCARTHY:  May I approach the witness, Your Honor?

3        JUDGE BUSCHMANN:  (No audible response.)

4    Q.   BY MR. McCARTHY:  Do you recognize that recorder?

5    A.   Yes.

6    Q.   What recorder is it?

7    A.   It's a digital, my voice.

8    Q.   Is that the recorder that Jennifer gave you that morning

9    on or about May 11th, 2005?

10   A.   Yes.  It's the same one.

11   Q.   Whose idea was it to take a recorder?

12   A.   Jennifer's.

13   Q.   Is Jennifer a union official?

14   A.   Yes.

15   Q.   Do you know her last name?

16   A.   No.

17   **(General Counsel's Exhibit 37 marked for identification.)**

18   Q.   BY MR. McCARTHY:  Now, I want to direct your attention to

19   General Counsel's Exhibit 37, both the front and back of that

20   document.  Do you recognize that document?

21   A.   Yes.

22   Q.   What is that?

23   A.   It's a union document.  It says, "The union is here."

24   Q.   Is that the document that you testified Jennifer gave to

25   you?

1  A.   Yes.

2  Q.   Did you bring this document and the recorder to work with

3  you that day?

4  A.   Yes.  The morning of that day I took them with me to

5  work.

6  Q.   Did you have extra copies of this document to distribute,

7  GC-37?

8  A.   Yes.

9  Q.   What time did you arrive at work on May 11th, 2005?

10  A.   I always get in at 6:00 in the morning but I began the

11  workday at 6:30.

12  Q.   Are you usually the first employee to arrive?

13  A.   Yes.

14  Q.   Is it unusual for you to arrive early at 6:00 a.m.?

15  A.   No.  It's normal.  I get in at 6:00 so I can fix a cup of

16  coffee and have it and then begin to work at 6:30.

17  Q.   Who else arrives at 6:30?

18  A.   Well, Yolanda gets in, another co-worker named Yolanda.

19  And there is also -- There used to be Silvia Romero but that

20  one comes in at 6:15.

21  Q.   Where is Silvia Romero now?  Is she still doing

22  housekeeping?

23  A.   No.  She is a cook's assistant in the kitchen, strike

24  that, She's an assistant chef in the kitchen.

25  Q.   Do you know whether that was a promotion for Silvia

1  Romero?

2  A.   I wouldn't how to say.

3  Q.   Now, what did you do when you arrived at the hotel that

4  day at about 6:00 a.m., after you made the coffee?

5  A.   No.  I got in at 6:00 in the morning and I began to put

6  the pamphlets on the cafeteria tables.

7  Q.   Did you put the pamphlets anywhere else?

8  A.   Yes.  I put them in the lockers where the employees get

9  dressed.

10  Q.   The pamphlets you are referring to, is that GC Exhibit

11  37?

12  A.   Excuse me, this?

13  Q.   Yes.  Is that the document that you distributed in the

14  cafeteria in the locker room?

15  A.   Yes.

16      MR. McCARTHY:  Your Honor, at this time I offer

17  Government Exhibit 37.

18      JUDGE BUSCHMANN:  Any objection?

19      MR. GREENBAUM:  No objection.

20      JUDGE BUSCHMANN:  Thirty-seven is hereby admitted.

21  **(General Counsel's Exhibit 37 received into evidence.)**

22  Q.   BY MR. McCARTHY:  To your knowledge, Mr. Velasquez, did

23  anyone see you do this?

24  A.   Nobody saw me.

25  Q.   Were any supervisors or managers present at the time?

1   A.   At that moment there was no one around.

2   Q.   Had you ever openly engaged in union activity prior to

3   your distribution of union literature on that day?

4   A.   No.  Never.  No.  Never.

5   Q.   After you distributed union literature in the cafeteria

6   and the employee locker area that day, what did you do?

7   A.   Well, when I finished I punched in with my card and I

8   began to work.

9   Q.   About what time was that?

10  A.   At 6:30 in the morning.

11  Q.   Do you recall whether anything happened about 7:00 a.m.,

12  in the morning?

13  A.   Yes.

14  Q.   What happened at that time?

15  A.   At 7:00 I saw the supervisor, Karen Martinez go by the

16  tables and pick up all of the pamphlets and take them into

17  her housekeeping office.

18  Q.   Did you observe anything at 8:00 a.m. that morning?

19  A.   Yes.  Mr. Palenzona always comes in at 8:00 and I saw

20  that he went in to the housekeeper's office and came out with

21  the papers or pamphlets in his hand.

22  Q.   What color was the original document, General Counsel's

23  Exhibit 37?  What color was the original, do you recall?

24  A.   Yes.  They were pink.

25  Q.   What color were the documents Mr. Corrado was fanning in

1   his hand when he left the housekeeping office?

2   A.   They were pink.

3   Q.   Did anything else of significance happen that day?

4   A.   No.  That day nothing else occurred.

5   Q.   Did you work the next day, on or about May 12th?

6   A.   Yes.

7   Q.   What time did you arrive that day?

8   A.   I always arrive 6:00 in the morning.

9   Q.   Did you distribute literature that day?

10  A.   No.

11  Q.   Did you see General Corrado Palenzona that day?

12  A.   Yes.  I saw him at lunch hour.

13  Q.   Do you see him now in the courtroom?

14  A.   Yes.

15  Q.   Where did you see him that day at about lunch hour?

16  A.   Well, as is my habit I always go that day to get lunch

17  from the kitchen at 11:20 in the morning.

18  Q.   Did Mr. Palenzona say anything to you in the kitchen that

19  morning?

20  A.   Yes.  When I arrived he said, "Margarito, what's going on

21  with you?  I've got three complaints about your work."

22  Q.   How would you describe his demeanor?

23  A.   Well, I would say a little furious.

24  Q.   Did he say what the first complaint was?

25  A.   Yes.

1  Q.    What did he say?

2  A.    Yes.  That the female employees had said that I had only

3  brought skim milk up.

4  Q.    Did he say what the second complaint was?

5  A.    And the second complaint was that I hadn't brought cereal

6  up for breakfast.

7  Q.    Was anyone else present during this course of the

8  conversation?

9  A.    Yes.  The chef and the assistant of the chef were there.

10  Q.    What is the chef's name?

11  A.    Her name is Sonia.

12  Q.    Who is the assistant?

13  A.    Silvia Romero.

14  Q.    Did Mr. Palenzona mention anything about a third

15  complaint?

16  A.    Yes.  He took me aside for the third complaint, so that

17  the cooks wouldn't hear these conversations.

18  Q.    What did he ask you?

19  A.    He said, "Margarito, were you the one who brought the

20  union pamphlets and put them out on the tables and in the

21  lockers?"

22  Q.    How far away were the cooks at this point?

23  A.    They were about 15 to 20 feet away.

24  Q.    Did you respond when Palenzona asked you if you were the

25  one who brought the union pamphlets into the cafeteria and

1  locker room?

2  A.   Yes.  I told him that I hadn't been the one.

3  Q.   Did anyone from the union tell you to tell Mr. Palenzona

4  that?

5  A.   Yes.

6  Q.   Who told you from the union?

7  A.   Jennifer told me to.

8  Q.   Now, do you recall whether Mr. Palenzona responded when

9  you told him that you did not bring the union papers into the

10 cafeteria and locker room?

11 A.   Yes.  He told me it couldn't be anybody else but me.

12 Q.   How did the conversation with Mr. Palenzona in the

13 kitchen end?

14 A.   Well, at that point I couldn't remain to talk any further

15 with him because I was taking lunch to the employees.

16 Q.   Did you take lunch to the employees?

17 A.   Yes.

18 Q.   Did you speak with them about the complaint?

19 A.   Yes.  I asked some of the housekeepers what kind of milk

20 I had taken them.  And, yes, they told me that I had brought

21 them the kind of milk that was right, not the dietetic type.

22 Q.   Did you realize anything at that point?

23 A.   Realize something, something how is that?

24 Q.   I'll withdraw the question.  Did you call anyone from the

25 union after your conversation with Mr. Palenzona in the

1   kitchen?

2   A.   Yes.  I called.  I told them what was going on.

3   Q.   Were you nervous or concerned about this conversation?

4   A.   Yes.  I was nervous.

5   Q.   Did you meet with anyone from the union outside the hotel

6   after this conversation?

7   A.   Yes.  Yes.

8   Q.   Who did you meet with?

9   A.   I met up with Miguel and Jennifer.

10  Q.   For what purpose did you meet with them?

11  A.   Well, I met with them because I had the tape recorder

12  that I had with the conversation with Mr. Corrado at that

13  time.

14       MR. McCARTHY:  I'm going to object to the translation and

15  ask the translator whether, in fact, the testimony was that

16  Margarito said the union was going to prepare the recorder

17  for him.

18       THE INTERPRETER:  I'll ask the witness to repeat his last

19  response.

20       THE WITNESS:  I met with them and I told them what was

21  happening.

22       MR. McCARTHY:  Okay.

23  Q.   BY MR. McCARTHY:  Did anyone show you how to work the

24  recorder at that time?

25  A.   Yes.  They just showed me how to turn it on so that it

1  would run so that it would record.

2  Q.   Did you speak with Mr. Palenzona at the meeting with the

3  union representative outside the hotel?

4  A.   Yes.

5  Q.   Where?

6  A.   In his office.

7  Q.   Was the recorder turned on when you went into his office?

8  A.   Yes.  I was carrying it turned on.

9  Q.   Was anyone else present?

10  A.   No.

11  Q.   Did you record the entire conversation you had with

12  Mr. Corrado in his office?

13  A.   Yes.

14  Q.   Where was the recorder during your conversation?

15  A.   I was carrying it in my pant's pocket.

16  Q.   How did the conversation start?

17  A.   When I arrived I said I wanted to address the complaints

18  that there have been.

19  Q.   What did Mr. Palenzona say to you?

20  A.   Mr. Palenzona said, "Margarito, I like you a lot.  I like

21  you for the good person you are and for the good worker that

22  you are.  You are a good person and a good worker.  And you

23  should do what your heart tells you.  I respect your

24  decision.  You can do whatever you please but not inside the

25  hotel."

1  Q.  Did he say what you could not do inside the hotel?

2  A.  Well, he said he didn't respect the propaganda.

3  Q.  Did you discuss the first complaint about the milk?

4  A.  Yes.

5  Q.  Briefly what was said about the milk?

6  A.  Well, I said I had fixed the question about the milk and

7  he told me that somebody had brought the complaint to him and

8  that it was his job to investigate complaints.

9  Q.  Did you discuss the second complaint about the cereal?

10  A.  Yes.

11  Q.  Briefly what was said about the cereal?

12  A.  I told him that I hadn't taken the cereal up to the

13  employees because the chef Sonia had kept it in a different

14  place and so I couldn't find it.

15  Q.  Did you discuss the third complaint about the union

16  propaganda?

17  A.  I asked who it was who had told him that I had put the

18  propaganda in the cafeteria and in the lockers.  And he told

19  me nobody did but that I could not have that kind of material

20  there.

21  Q.  Did you ask him anything else?

22  A.  I once again asked him who had told him that I had

23  brought in the propaganda and he told me nobody did but that

24  the night manager had come down at 6:00 in the morning and

25  that there wasn't any propaganda.

1    Q.    What else did you say to him and he say to you?

2    A.    And that I arrived at 6:00 and there was a supervisor

3    that had arrived at 6:30 and the propaganda was already on

4    the table.

5    Q.    What did you say?

6    A.    And I told him Yolanda and I had arrived at the same

7    time.  He could not be certain that I had been the one.

8    Q.    What did he say?

9    A.    He said that I could do as I pleased but that we should

10   respect the rules.  And he told me again that he didn't want

11   to see that kind of propaganda inside the hotel.

12   Q.    Did he say anything about Yolanda?

13   A.    He said, "Yes, that Yolanda had arrived at 6:00 and it

14   was arithmetic to figure out who had placed the propaganda

15   there."

16   Q.    Did he indicate in any way whether he had spoken to

17   Yolanda?

18   A.    I don't recall that.

19   Q.    Did he say anything about his boss?

20   A.    I don't remember.  No.

21   Q.    How long did the conversation last?

22   A.    It lasted like 10/15 minutes.

23   Q.    How did the conversation end?

24   A.    He said that he respected me and that things would stay

25   as if nothing had occurred.

1  Q.   What did you do after the conversation?

2  A.   After the conversation I went to have lunch.

3  Q.   What did you do with the recording?

4  A.   Afterwards I turned over the recorder to Miguel.

5  Q.   Who is Miguel?

6  A.   He was the janitor (ph.).

7  Q.   Did the recorder have the original digitized tape of the

8  conversation recorded on it?

9  A.   I believe it was the original.

10     MR. McCARTHY:  Now, Your Honor, at this time I would like

11  to play the tape and ask the witness to authenticate the

12  voices on the tape and ask him to testify as to the accuracy

13  of the recording consistent with the conversation he had with

14  Mr. Palenzona.

15     JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

16     MR. GREENBAUM:  Yes, Your Honor.

17     JUDGE BUSCHMANN:  Why?

18     MR. GREENBAUM:  Well, we took her testimony after the

19  conversation, so that is the best evidence for this trial.

20  That's number one.  Number two; General Counsel said

21  yesterday that he was putting the tape in to impeach

22  Mr. Corrado.  Under federally rule of evidence, I believe,

23  609.  I looked at the rule last night.  I didn't bring them

24  with me yesterday but that's an improper use of impeachment

25  testimony.  That will go to extreme evidence to impeach the

1    character of a witness.  This is not that type of evidence.

2        Lastly, based on the testimony this morning I even have a

3    bigger problem with this tape.  Number one, we have two

4    completely different stories.

5        Number two; under the rule of completeness we are

6    entitled to a translation of the entire tap before even

7    admissibility could be discussed.  That's the rule of

8    completeness.  They say it's a six-hour tape.  Let's hear

9    what it is.  He said it's a 10 to 15 minute conversation.  We

10   have a nine-minute translation.  I don't even know if it's a

11   translation.  Who translated it?  We just don't know.

12       So I don't even think the tape is necessary, we've had

13   testimony.  That's what this trial is about, testimony.  I

14   don't know the purpose -- I don't even know what the purpose

15   is of the tape at this point except to buttress the witness'

16   own credibility.  I don't know what this type of testimony

17   can do other than clutter and distort the record of something

18   that should not even be admissible and has very little

19   weight.

20       JUDGE BUSCHMANN:  Well, I think you do raise one

21   interesting point, and that is that you are saying that we've

22   had the testimony of this witness that talked about the

23   conversation and that that was his best recollection.  I

24   suppose this tape could be considered as corroborative

25   evidence of his conversation rather than the best evidence --

1     MR. McCARTHY:  Your Honor --

2     JUDGE BUSCHMANN:  Go ahead.

3     MR. McCARTHY:  -- may I have time?  Is the Court through?

4  I didn't mean to interrupt.

5     JUDGE BUSCHMANN:  No.  I'm thinking.  I don't really

6  know -- This is a strange situation and I just want to make

7  sure that particularly because this case is going to be

8  submitted to the District Court, this record is going to be

9  submitted to the District Court, that we have a clean and

10  flawless record here.  So, I want to make sure that whatever

11  we do here is entirely appropriate.

12     MR. McCARTHY:  I understand, Your Honor.

13     JUDGE BUSCHMANN:  Yes.  We are governed here by the

14  Federal Rules of Evidence to the best possible way.  Yet this

15  is still an administrative hearing so there is some latitude

16  here in terms of my discretion in what to do about the

17  admissions of evidence.

18     I think there has been proof of the or I should say there

19  has been some background shown about this particular tape,

20  plus you have the union business agent talk about the tape

21  and the fact that he has provided the tape to this particular

22  employee.  Then we've got the testimony of the employee that

23  has told us that he carried it and that he turned it on.

24     We also have the testimony of the supervisor with whom

25  the conversation was conducted who has recognized is own

1    voice on the particular tape.  So there's a great deal of

2    corroborative evidence that seems to indicate that there is

3    some validity or I should say that there isn't anyway of

4    competing misinformation that we are confronted with.

5        MR. McCARTHY:  My next time, Your Honor?

6        JUDGE BUSCHMANN:  Yes.  Go ahead.

7        MR. McCARTHY:  First of all, if, in fact, counsel read

8    Rule 609, that's not the rule I was relying upon yesterday

9    when the General Counsel initially offered this tape as

10   extrinsic evidence of a prior inconsistent statement by

11   Mr. Corrado at that time, who had testified on the witness

12   stand, that under oath in three affidavits he did not make

13   any of, did not interrogate Mr. Velasquez, nor did he ask him

14   whether he --

15       JUDGE BUSCHMANN:  Mr. Velasquez?

16       MR. McCARTHY:  Yes.  Margarito Velasquez.

17       JUDGE BUSCHMANN:  I didn't understand your statement,

18   what you just said.  Yesterday Margarito Velasquez wasn't

19   even on the witness stand.

20       MR. McCARTHY:  Yesterday Mr. Corrado denied that he had

21   interrogated Margarito Velasquez or that he had prohibited

22   him from bringing union propaganda into the hotel.  At that

23   time, my understanding that under the Federal Rules of

24   Evidence 613(b), General Counsel even without a foundation

25   was permitted to impeach the witness based on the

239

1  inconsistent statement.  The inconsistent statement is the
2  tape itself, which has not been admitted for impeachment
3  purposes at that time, up until now.
4      Today, counsel has raised the argument that the testimony
5  of the witness is the best evidence.  That is not the best
6  evidence, Your Honor.  The best evidence is the tape, which
7  has recorded the actual conversation.  That's one of the
8  reasons why the General Counsel has produced the tape.
9      Had we not and presumably on cross-examination
10 Mr. Greenbaum can go into exploration of the tape and where
11 is the tape, I would assume that we would be getting a best
12 evidence objection rather than testimony of the witness.  So,
13 the best evidence is, in fact, the tape and we are not
14 relying on Rule 609.
15     Third, the witness has testified to the best of his
16 recollection what happened during the conversation.  The tape
17 is now offered, it was offered yesterday for impeachment.  I
18 would again offer it for impeachment at least only those
19 portions that would impeach Mr. Palenzona.
20     I would also offer it based on the foundation that has
21 been established in this chain of custody, for corroborating
22 Mr. Velasquez' testimony today concerning the best evidence
23 of what was said in that conversation.
24     So, at this time the General Counsel would offer the tape
25 for two purposes, Your Honor.  First to impeach Mr. Palenzona

1  as was discussed yesterday.  Second, to corroborate as the

2  best evidence the testimony of Mr. Margarito Velasquez.

3       JUDGE BUSCHMANN:  So, in other words, as I suggested a

4  little earlier that it would be considered corroborating

5  evidence to the particular testimony that we have here under

6  oath?

7       MR. McCARTHY:  That's correct, Your Honor.

8       JUDGE BUSCHMANN:  Mr. Greenbaum, do you have any further

9  discussion on this?

10      MR. GREENBAUM:  Yes, Your Honor.  I believe it's not

11  proper under Rule 613(b), but the most important issue is we

12  still haven't authenticated the tape and there are numerous

13  problems with the tape.

14      One, who translated it?  How was the translation done?

15  Who put it on the CD?  Where you have a CD in court, which

16  theoretically they say has six hours, under the rule of

17  completeness, we are entitled to a translation of the entire

18  tape before we can even get into this discussion.  We don't

19  have it.  I mean, you can't come into court; a party can't

20  come into court and say, "I've got a tape of six hours but

21  I'm only going to play 13 and I'm not giving you the rest."

22  There's no excuse for that.

23      If General Counsel really wanted to use this tape, what

24  they should have done, was they should have translated the

25  entire tape.  They should have given us an opportunity to

1  review it and then they could have made their argument and

2  then they could have laid their foundation.  But we are

3  really going to -- They have pointed out nine minutes of this

4  tape.  We are entitled to the entire tape.  What happened in

5  the workplace during the rest of that day?  What's the other

6  six hours?  Is there evidence that will help us in that?

7      You can't just pick and choose the tape, if you are going

8  to use the tape.  I suggest that General Counsel should not

9  be allowed to use the tape.  They have the testimony of the

10  witness.  I don't know what they did with the tape prior to

11  the hearing, but they have the testimony.  It was presented

12  to the Court.  We have a record at least from this witness,

13  subject to cross-examination of the conversation and the tape

14  is really just a little part of the conversation.

15      JUDGE BUSCHMANN:  I know.  You made that point.  Okay.

16      MR. McCARTHY:  Your Honor, may I --

17      JUDGE BUSCHMANN:  Yes.  You know, what is this exhibit

18  now?  The tape-recording, the digital tape recording, what

19  exhibit is it?

20      MR. McCARTHY:  That's General Counsel's Exhibit 115,

21  that's the original recording.

22      What the General Counsel has done is through great time

23  and expense, Your Honor; the General Counsel has made copies

24  to satisfy the rule of completeness of the entire tape.

25  Mr. Greenbaum is absolutely incorrect that he does not have a

1  copy of the entire tape.  This Agency is not in a position I

2  am told to afford to transcribe that entire tape.  If he

3  wants to do it, he is free to do so.  We have transcribed

4  merely the conversation that Mr. Velasquez had with

5  Mr. Palenzona --

6      JUDGE BUSCHMANN:  In other words, the relevant --

7      MR. McCARTHY:  -- and we have certified that

8  transcription by two employees of the National Labor

9  Relations Board translators.

10     They were being -- Just like in an affidavit they would

11  certify that the translation is correct.

12     JUDGE BUSCHMANN:  Do you have those certifications of

13  translation?

14     MR. McCARTHY:  Yes.  We do, Your Honor, they were marked

15  for identification yesterday as General Counsel's Exhibit 108

16  and 109, 108 is the Spanish transcription of the nine minutes

17  on the tape that relates to the conversation in issue between

18  Mr. Velasquez and Mr. Palenzona.  GC-109 is the certified

19  English translation of the taped conversation and it has been

20  certified by two employees of the Board, our bilinguists in

21  the resident office and by another attorney who speaks

22  Spanish who is not involved in this case, just to double

23  check the translation, Your Honor, it's all certified.

24     JUDGE BUSCHMANN:  Is that person available as a witness?

25     MR. McCARTHY:  He would be available, Your Honor.  But as

1  you are aware under Rule 118, in order to call a Board

2  employee as a witness, General Counsel and/or Respondent

3  would have to seek special permission from General Counsel --

4       JUDGE BUSCHMANN:  I understand.  But you are putting this

5  particular person into the line of fire by having the

6  affidavits of those individuals certifying an accurate

7  transcription of a particular tape.

8       MR. McCARTHY:  Just like that with an affidavit, Your

9  Honor, I'm turning over an affidavit that was taken by a

10  Board agent in Spanish and certified to be accurate by

11  another Board agent who is a bilinguist and the same with the

12  English transcription of that Spanish affidavit.

13       JUDGE BUSCHMANN:  Now, is Exhibit 107, the entire six

14  hours or just the portion that you are concerned about?

15       MR. McCARTHY:  Absolutely the entire six hours.

16       JUDGE BUSCHMANN:  The 107 is the entire six hours.

17       MR. McCARTHY:  The entire six hours.

18       MR. GREENBAUM:  In Spanish, Your Honor.

19       JUDGE BUSCHMANN:  In Spanish.

20       MR. McCARTHY:  We have listened to the entire six hours

21  but we are not in a position to afford --

22       JUDGE BUSCHMANN:  I understand.

23       MR. McCARTHY:  -- transcribing that entire six hours.

24       MR. GREENBAUM:  Well, Your Honor, that's the problem.

25  And if General Counsel wants to come in here and use the tape

1  then they need to put the resources in to getting us the

2  complete record of the tape.  Otherwise, it's not fair.  And

3  it's not fair to our client under fundamental fairness rule,

4  the rules of completeness --

5      JUDGE BUSCHMANN:  Okay.  All right.

6      MR. GREENBAUM:  -- which apply in court to come in here

7  and give a little sliver of it in the name of they don't have

8  the resources to do it.

9      JUDGE BUSCHMANN:  Okay, Mr. Greenbaum.  I think what I

10  will do is this, as I said, we have the testimony of various

11  witnesses now as to the particular digital recorder, we have

12  the testimony of the CD that is it an accurate content of the

13  digital recording.  So we have 115, which is the recorder,

14  digital recorder, we have 107, which is the CD, which we

15  played the entire six hours of material on there, so it's a

16  matter of supplying this exhibit to the Respondent to make

17  sure that there are no inaccuracies or any prejudice shown to

18  the Respondent.  We have a translation of the pertinent

19  portion out of that conversation, which is General Counsel's

20  108 and 109; is that correct?

21      MR. McCARTHY:  That is correct, Your Honor.

22      JUDGE BUSCHMANN:  So, I think what I will do based upon

23  all that background, is that I will receive those documents,

24  General Counsel's 115, General Counsel's 107, General

25  Counsel's 108 and General Counsel's 109.  I will receive

1   those into the record but I will -- Oh, by the way, does

2   the -- Have you given to the Respondent General Counsel's

3   Exhibit 107?  Does he have a copy?

4        MR. McCARTHY:  The Respondent has had it since the start

5   of the hearing yesterday.  They should have listened to the

6   whole tape last night --

7        MR. GREENBAUM:  Your Honor --

8        JUDGE BUSCHMANN:  Okay.  Wait a minute.

9        MR. GREENBAUM:  It's in Spanish.

10       JUDGE BUSCHMANN:  I know.  But you have resources,

11   Mr. Greenbaum, in your client's expertise I think they can

12   listen to a Spanish recording.

13       The only thing that concerns me now is the fact that 107,

14   is an accurate reflection of 115.  So, if you have no

15   objection, I think that 115 should be turned over to the

16   Respondent to make sure that 115 matches 107 and then the

17   Respondent can listen to 107 and make sure that the pertinent

18   information on there matches the transcript and the

19   translation.

20       MR. GREENBAUM:  Your Honor, I'm going to ask for a recess

21   until tomorrow morning so we can listen to the entire tape.

22   If that's what Your Honor wants us to do, that's what we will

23   do.  But I would request a recess.  I think that's only fair.

24       JUDGE BUSCHMANN:  The recess will be denied.  But you can

25   listen to it this evening and, of course, once you have any

```
 1  problems with these exhibits, or with the translation or
 2  anything else, I may reconsider my ruling.  I may reconsider
 3  what my present ruling is.  So, I'm doing it for present
 4  purposes, and I think that you can present us with your
 5  opinion tomorrow morning or the next day even and tell us to
 6  what extent 107 is not accurate or I should say, may not
 7  reflect accurately what is contained in 115.  And you can
 8  also tell us how 108 and 109, and I'm of course referring now
 9  to the General Counsel's Exhibit, may be incorrect or
10  inaccurate of what is contained on those recordings.
11       MR. McCARTHY:  Your Honor --
12       MR. GREENBAUM:  Your Honor, I would request that the
13  witness then once he is excused today be subject, continued
14  subject to subpoena based on our review of the case.
15       JUDGE BUSCHMANN:  Well, that may be -- What,
16  Mr. McCarthy?
17       MR. McCARTHY:  I just have one concern with that approach
18  and that's the original recording 115, my concern is that
19  there be no alteration of documentation of that original
20  recording.  And I think that that cannot leave the building,
21  and/or that it be in the custody of a third party escrow so
22  that the original recording 115 cannot be altered in any
23  fashion.
24       JUDGE BUSCHMANN:  Can it be played by turning this
25  particular device once it's deemed on, can it be listened to
```

1    or do you need a computer to listen to it?

2        MR. McCARTHY:  We can consult with -- As long as the

3    batteries haven't died, Your Honor, it's my understanding you

4    can turn on the recorder right now and you can listen to it.

5        JUDGE BUSCHMANN:  Okay.  So --

6        MR. McCARTHY:  I am concerned about custody and control

7    of -- We have established a chain of custody where it was

8    under seal and it's the only original recording that there is

9    and now I would not like to have GC-115 leave the custody of

10   the court reporter or the building.

11       JUDGE BUSCHMANN:  Mr. Greenbaum, is it possible for you

12   to have a member of your staff or an employee of the

13   Respondent or someone designated to listen to the particular

14   device, General Counsel's 115, and make sure that that's an

15   accurate recording of what's also contained on 107 and so

16   have that person designated to come to the Board's offices

17   and be able in one of the rooms around here to listen to it?

18       MR. GREENBAUM: Your Honor, that's 12 hours.  Yeah, we --

19       JUDGE BUSCHMANN:  Six hours, right?

20       MR. GREENBAUM:  Well, 12.  It's six on that and six on

21   that.

22       JUDGE BUSCHMANN:  Well, what --

23       MR. GREENBAUM:  That's a long time, Your Honor, we

24   certainly could do it, but again, we would request an

25   adjournment to do that.

1      JUDGE BUSCHMANN:  I think, Mr. Greenbaum, anyone in his
2  right mind wouldn't listen to six hours of stuff.  I think
3  what you would do, is you would make sure that based on the
4  sampling of what is on 115 that's accurate on 107 by
5  listening to this and listening to that and make sure that
6  most of the stuff is correct.  And then, go to the pertinent
7  portion and make sure that 108 and 109 is an accurate
8  reflection on the tape.
9      MR. GREENBAUM:  The problem with that is that runs
10  contrary to the rule of completeness that we are entitled for
11  the --
12      JUDGE BUSCHMANN:  Well, then listen to the whole six
13  hours, if that's what you want to do.
14      MR. GREENBAUM:  But, Your Honor, again, final now
15  fairness, if you want us to take an adjournment we will be
16  glad to do that --
17      JUDGE BUSCHMANN:  It doesn't need an adjournment.  I
18  think you can designate anyone of your staff or anyone from
19  your client that speaks Spanish, is conversant in Spanish to
20  listen to this to just make sure that your side is accurately
21  informed, it's not prejudiced, that there's no flimflam here
22  in terms of what is contained in the printed documents,
23  General Counsel's 108 and 109.  I'm just giving you this so
24  that the supporting material is provided to you to make sure
25  that it is all accurate and it's aboveboard.

1    MR. GREENBAUM:  We will do that, Your Honor.  We will

2    designate someone.

3    JUDGE BUSCHMANN:  Okay.  So, as I ruled I am admitting

4    108, 109, 115, and 107, subject to General Counsel's 115 to

5    be made available on the Board's premises to the Respondent

6    or its designated agent.

7    **(General Counsel's Exhibits 107, 108, 109, and 115 received**

8    **into evidence.)**

9    JUDGE BUSCHMANN:  Do you have any more questions,

10   Mr. McCarthy, of this witness?

11   MR. McCARTHY:  Yes.  I do, Your Honor.  And it's my

12   understanding that 115 will be made available on the Board's

13   premises --

14   JUDGE BUSCHMANN:  Yes.

15   MR. McCARTHY:  Okay.  I would like to have the witness

16   authenticate the voices at least on the tape, Your Honor, so

17   that he can authenticate the voices and testify that in fact,

18   the recording is an accurate recording.

19   JUDGE BUSCHMANN:  Well, maybe you should have done that

20   before we got into this whole discussion.  But if you want to

21   do that now to make sure, then go ahead.

22   Q.  BY MR. McCARTHY:  Mr. Velasquez, we are going to play a

23   tape, a portion of the tape of the conversation between you

24   and Mr. Palenzona, and I'm going to ask you to listen to the

25   voices on the tape and then I will ask you if you can

1    identify the voices.

2        JUDGE BUSCHMANN:  At least he should be able to identify

3    his own voice, if he understands his own voice, or recognize

4    his own voice on there.  Go ahead and play it.

5    **(Tape played.)**

6    Q.  BY MR. McCARTHY:  Do you recognize your voice on that

7    tape?

8    A.  Yes.

9    Q.  Do you recognize anyone else's voice?

10   A.  Yes.  Mr. Palenzona.

11   Q.  Did you listen to the nine-minute recording of the

12   conversation with Mr. Palenzona --

13       MR. GREENBAUM:  Objection, Your Honor.  The witness

14   testified it was not nine minutes.  This is a leading

15   question.

16       JUDGE BUSCHMANN:  Okay.  Objection -- Can you rephrase

17   the question, please?

18   Q.  BY MR. McCARTHY:  Did you listen to the recording of the

19   conversation between Mr. Palenzona and yourself with

20   Ms. Cotilla and I in the building last week?

21   A.  Yes.

22   Q.  Does the recording accurately describe the conversation

23   that you recorded with Mr. Palenzona in his office?

24   A.  Yes.

25       MR. McCARTHY:  And I believe General Counsel has offered

1    115, 107, 108 and 109 subject to 115 being turned over to

2    Respondent to review in the building, Your Honor, is that

3    correct?

4            JUDGE BUSCHMANN:  Correct.

5            MR. GREENBAUM:  We just restate or objection, for the

6    record, Your Honor.

7            JUDGE BUSCHMANN:  Yes, Mr. Greenbaum.

8    Q.    BY MR. McCARTHY:  Are you sure that Mr. Palenzona told

9    you that you could not distribute union propaganda inside the

10   hotel that day?

11   A.    Yes.  I am sure.

12   Q.    How many times did he tell you that?

13   A.    He told me about three times.

14   Q.    Have you ever seen a sign or a written rule prohibiting

15   the distribution of literature inside the hotel?

16   A.    No.  I have never seen anything.

17   Q.    Did you work the 4th of July last year?

18   A.    Yes.

19   Q.    Do you recall whether you worked the next day, July 5th,

20   2005?

21   A.    Yes.

22   Q.    Was there a meeting that day?

23   A.    Yes.

24   Q.    Where was the meeting?

25   A.    In the cafeteria.

1  Q.   What time of day was the meeting held?

2  A.   At 2:00 in the afternoon.

3  Q.   Were all employees present?

4  A.   Yes.

5  Q.   Who arranged the meeting?

6  A.   Mr. Palenzona.

7  Q.   Who else was present from management?

8  A.   The housekeeping manager, Ms. Lisa as there.

9  Q.   Who spoke for management at the July 5th meeting in the

10 hotel cafeteria that afternoon?

11 A.   Well, Mr. Palenzona was speaking in English and Lisa the

12 housekeeping manager was acting like a translator.

13 Q.   Was Mr. Palenzona speaking in English or in Spanish?

14 A.   In English.

15 Q.   Who was translating for him from English to Spanish?

16 A.   Lisa.

17 Q.   Was Mr. Palenzona reading from anything?

18 A.   Yes.  He was.  He was reading a paper.

19      MR. McCARTHY:  Your Honor, I just note for the record

20 that we requested and subpoenaed that paper and it has not

21 been provided.  Respondents indicated that no such document

22 exists.

23      MR. GREENBAUM:  Move to strike, Your Honor, that was a

24 statement that is not part of testimony.  I don't know

25 what -- That was an aside comment.  It wasn't a proper

253

1  question and it certainly wasn't and objection.  I don't know

2  what that was.  It was running commentary.  Move to strike.

3      JUDGE BUSCHMANN:  I think the comment was not necessary,

4  was it?

5      MR. McCARTHY:  Okay.

6  Q.  BY MR. McCARTHY:  Do you recall what Mr. Palenzona said

7  as translated by Lisa?

8  A.  Yes.

9  Q.  What did he say?

10  A.  She said given the fact that not all of the employees

11  want to be represented by the union the hotel will be giving

12  a $2.50 per hour raise to all the employees.

13      MR. McCARTHY:  I'm going to object to the translation,

14  Your Honor, that in fact, the witness said to all the

15  employees did not want to be represented and that the witness

16  testified to $12.50.

17      MR. GREENBAUM:  I'm going to object, Your Honor, the

18  translator is here to be -- It's almost like objecting to

19  your witness, what your witness testified to.  I mean he's

20  making an objection to his own witness.

21      JUDGE BUSCHMANN:  Maybe the best thing, Mr. McCarthy,

22  would be for you to ask the court reporter to ask the witness

23  again what the witness' answer is and to accurately reflect

24  the testimony.  Rather than have you testify or translate

25  what the witness said.  You can indicate that you disagree

1    with the translation or the translation was not correct, but

2    I think maybe you ought not to indicate what, in fact, you

3    believe the translation should have been, because he is the

4    official translator here.

5        MR. McCARTHY:  May I reask the question, Your Honor.

6        JUDGE BUSCHMANN:  Yes.

7        THE INTERPRETER:  May the interpreter say this.  I stand

8    by the translation except I am corrected in that I misspoke

9    in stating a raise of $2.50, there was a raise to $12.50 an

10   hour.  But I stand by the rest of the translation, that given

11   the fact that not all the employees want the union, the hotel

12   will be paying $12.50 an hour.

13       MR. McCARTHY:  I'd like to rephrase if I could.

14       JUDGE BUSCHMANN:  Yes.  Go ahead.

15   Q.    BY MR. McCARTHY:  Do you recall what Mr. Palenzona said

16   as translated by Lisa?

17   A.    Yes.

18   Q.    What did he say as translated by Lisa?

19   A.    He said given the fact that all that employees do not

20   want to be represented by the union the hotel owners decided

21   to pay $12.50 an hour.

22   Q.    Did Lisa indicate when the employees -- Did Mr. Palenzona

23   as translated by Lisa indicate when the employees would

24   receive the pay raise to $12.50 per hour?

25   A.    Yes.  As of the 8th of July.

1    Q.    Do you recall anything else that was said at the meeting?

2    A.    No.  That day I don't recall nothing more was said.

3    Q.    How long was the meeting?

4    A.    It lasted a short time.  Three minutes.

5    Q.    Did you receive a pay raise on July 8th, 2005?

6    A.    Yes.

7    Q.    Is that pay raise reflected on General Counsel's Exhibit

8    35?

9    A.    Yes.

10   Q.    Now, one more area that I want to briefly go through with

11   you.  General Counsel's Exhibit 39 and 40, I'd like to direct

12   your attention to those documents.

13         MR. McCARTHY:  Actually I'm going to retract that, Your

14   Honor.

15   Q.    BY MR. McCARTHY:  I'm going to direct your attention to

16   General Counsel's Exhibit 29 and 30.  Do you recognize those

17   documents?

18   A.    Yes.

19   Q.    Were you present when those documents were created?

20   A.    Yes.

21   Q.    When were General Counsel's Exhibit 29 and 30 created?

22   A.    They were created in the first week of July?

23   Q.    Why were they created, if you know?

24   A.    Because they had suspended Marleni, a co-worker from work

25   and we were lending her support.

1  Q.   Did the employees do anything with the pamphlets after

2  they suspended Marleni?

3  A.   Yes.

4  Q.   What did you do?

5  A.   Well, with the companions we went and made the flyer and

6  then we passed it out that day to all of the employees who

7  were at work that day.

8  Q.   Where did you distribute the flyer?

9  A.   In the cafeteria inside the hotel.

10 Q.   Were you on work time or break time when you distributed

11 the flyer?

12 A.   We were on rest hour.

13 Q.   Now, I want to direct your attention to General Counsel's

14 Exhibit 31 and 32.  Were you present when those documents

15 were created?

16 A.   Yes.

17 Q.   Why were those documents created, if you know?

18 A.   That was the day they fired Marleni.

19 Q.   Did the employees do anything -- Did you do anything with

20 the pamphlets?

21 A.   Yes.  We passed them out to all of the employees?

22 Q.   Where did you do that?

23 A.   Once again in the cafeteria inside of the hotel.

24 Q.   Did your co-workers help you pass out these flyers?

25 A.   Yes, of course.

1  Q.    Were you on work time or break time?

2  A.    It was always on break time?

3  Q.    Were any supervisors present?

4  A.    Yes.

5  Q.    Who was present?

6  A.    Lisa the manager was there.

7  Q.    Did you give the flyer to any supervisor?

8  A.    Yes.  I gave it to Lisa.

9       MR. McCARTHY:  Your Honor, I don't have any more

10  questions for the witness.

11       JUDGE BUSCHMANN:  Okay.  Do you wish to take a short

12  recess?

13       MR. GREENBAUM:  Your Honor, but pursuant yesterday's

14  instructions, if there's a Board statement that I could

15  review it.

16       JUDGE BUSCHMANN:  Yes.

17       THE INTERPRETER:  Your Honor, the interpreter will

18  require 15 minutes rest before cross-examination.

19       JUDGE BUSCHMANN:  Okay.

20       MR. McCARTHY:  Your Honor, at this time I'm turning over

21  the original 12-page Spanish affidavit of Mr. Velasquez and a

22  certified 9-page English translation of that affidavit.

23       JUDGE BUSCHMANN:  Yes.  Is 15 minutes sufficient,

24  Mr. Greenbaum?

25       MR. GREENBAUM:  Yes.

1        JUDGE BUSCHMANN:  All right.  We will take a 15-minute

2    recess.

3        Off the record.

4    (Off the record.)

5        JUDGE BUSCHMANN:  We are on the record.

6        Mr. Greenbaum, you may proceed.

7        MR. GREENBAUM:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    Q.   BY MR. GREENBAUM:  Good afternoon, Mr. Velasquez, or good

10   morning.  Sorry.

11        Mr. Velasquez, have you ever won employee of the month at

12   the hotel?

13   A.   Yes.

14   Q.   When was the last time you won that?

15   A.   I don't remember the month but it was this year, December

16   something like that.  I don't remember.

17   Q.   Of 2005?

18   A.   No.  No.  It was this year -- Oh, excuse me.  Let me

19   think.  We are in 2006.  No.  It would have been June 2005.

20   Q.   Was that the first time you were awarded employee of the

21   month?

22   A.   No.  Sometimes earlier I had also been noted as the

23   employee of the month, twice previously.

24   Q.   Do you receive an annual increase at the hotel?

25   A.   Yes.

1    Q.    When is your anniversary at the hotel?

2    A.    My anniversary is March 23rd.

3    Q.    Do you recall an annual increase around your anniversary

4    date?

5    A.    Yes.

6    Q.    Last March, March 2005, did you receive an annual

7    increase?

8    A.    Yes.

9    Q.    Then you testified that you received an adjustment in

10   July of '05, correct?

11   A.    Yes.  Correct.

12   Q.    Now, do you work in the north building or the south

13   building?

14   A.    In the south building?

15   Q.    Where is the food and beverage office located?  Is it in

16   the south building or the north building?

17   A.    Excuse me.  Are you asking me about Mr. Corrado's office,

18   the food and beverage is in the north and his office is in

19   the south?

20   Q.    You work in the south?

21   A.    Yes.  Just about all my work is in the south.

22   Q.    Now, you testified that, I believe in April '05 Alex and

23   Reina approached you, do you remember that testimony?

24   A.    Yes.

25   Q.    Was that in the north building or the south building?

1  A.   In the south building.

2  Q.   Do you recall what floor that was on?

3  A.   No.

4  Q.   Do you recall the exact date?

5  A.   No.

6  Q.   Were you alone?

7  A.   Yes.  I was alone in the hallway.

8  Q.   They asked you to sign something?

9  A.   Yes.

10  Q.   Was anyone else with them?

11  A.   No.

12  Q.   Did you see what they were asking you to sign?

13  A.   No.

14  Q.   Did you ask to see it?

15  A.   No.

16  Q.   Do you know whether or Alex or Reina wanted the union at

17  that time?

18      MR. McCARTHY:  Your Honor, I'm going to object the

19  witness' is testifying about the suggestive intent of two

20  other employees.  The question was why, do you know why Alex

21  and Reina wanted the union.

22      MR. GREENBAUM:  That wasn't my question, Your Honor.

23      JUDGE BUSCHMANN:  Okay.  Could you rephrase the question?

24  Q.   BY MR. GREENBAUM:  Did you know, did you have any first

25  hand knowledge, yourself, whether Alex or Reina wanted the

1  union at the time they approached you?

2  A.   At the start they did.

3  Q.   When you say "the start," what do you mean the start?

4  A.   For example, when the union came in it came in through

5  Reina and Alexandra.

6  Q.   When did the union come in?

7  A.   Like 2003.

8  Q.   So then at some point Alex and Reina did not want the

9  union anymore?

10  A.   I think that they no longer wanted the union.

11  Q.   Were you at a meeting at the union where Reina had a

12  fight with the union?

13  A.   No.

14  Q.   Do you know someone named Olga (ph.)?

15  A.   Yes.

16  Q.   Were you at a meeting when Olga told the employees that

17  they didn't have time for that anymore?

18      MR. McCARTHY:  Your Honor, I'm going to object to outside

19  the scope of direct examination.  He's going into meetings

20  with the union that this witness didn't testify about.

21      JUDGE BUSCHMANN:  Yes.  Is it leading to something

22  relevant, Mr. Greenbaum?

23      MR. GREENBAUM:  I believe so, Your Honor.

24      JUDGE BUSCHMANN:  It's a person that I haven't heard yet

25  in a fight that's relevant?

1      MR. GREENBAUM:  It's leading to when they approached him

2  in the hall.

3      JUDGE BUSCHMANN:  All right.  Go ahead then.  I'll

4  overrule the objection.

5      MR. GREENBAUM:  Thank you, Your Honor.

6      THE WITNESS:  No.

7  Q.  BY MR. GREENBAUM:  I want to direct your attention to

8  General Counsel's Exhibit you have in front of you.  I want

9  to look at Number 29.  Do you have that in front of you?

10 A.  Yes.  Here it is.

11 Q.  Okay, 29 is a pamphlet, handout you talked about.  And it

12 states, "If you fire Marleni you will not stop us."

13 A.  Yes.

14 Q.  Now, there was another employee suspended at this time

15 too, correct?

16 A.  Yes.

17 Q.  And his name was Sang?

18 A.  Yes.

19 Q.  Did you put out a flyer for Sang?

20 A.  Yes.  We put out the flyer to support everyone.

21 Q.  Does it say Sang in the flyer?

22 A.  To everyone in general.

23 Q.  But the flyer was regarding Marleni, correct?

24 A.  Yes.

25 Q.  Does Sang's name appear in that flyer?

1  A.   No.  I don't believe it does.

2  Q.   Now, getting back to your hallway encounter with Alex and

3  Reina, at the time you met them in the hallway, did you know

4  at that time in your mind that Alex and Reina were not

5  supporting the union anymore?

6  A.   Yes.  I had realized that.

7  Q.   After that encounter did you take any notes?

8  A.   No.

9  Q.   Did you tell anyone about it?

10  A.   Yes.

11  Q.   Who did you tell?

12  A.   Those in the union.

13  Q.   Do you know whom?

14  A.   Yes.

15  Q.   Who was that?

16  A.   Miguel and Jennifer.

17  Q.   Did you call them from work?

18  A.   No.  I went to the office.

19  Q.   Did you go that day?

20  A.   Yes.  After I got off work.

21  Q.   Were you concerned that the union was losing support at

22  the hotel?

23  A.   Well, I always wanted to have someone who would defend me

24  in my work.

25  Q.   I'm asking about your co-workers.  Were you concerned

1   that your co-workers were losing interest in the union?

2   A.   No.  I was not concerned.

3   Q.   Now, you went to the union office after this encounter,

4   was that in April of '05?

5   A.   Yes.

6   Q.   Now, did you tape the conversation with Alex and Reina?

7   A.   No.

8   Q.   At the meeting when you went to the union, did they give

9   you a tape at that time, tape recorder at that time?

10  A.   What meeting are you referring to?

11  Q.   The one in April after talking with Alex and Reina you

12  said you went to the union that afternoon.

13  A.   Yes.

14  Q.   Were you given a tape recorder at that meeting?

15  A.   No.  No kind whatsoever.

16  Q.   When you went to the union did you tell them what

17  happened that day?

18  A.   Yes.

19  Q.   What did you tell them?

20  A.   Well, I told them what had happened but they said that we

21  needed to take things as they came.

22  Q.   What specifically did you tell them what happened?

23  A.   Yes.  That Reina and Alex had said to me whether I wanted

24  to sign the petition against the union.

25  Q.   Did Alex and Reina say anything else to you?

```
 1        MR. McCARTHY:  Your Honor, I'm going to object to the
 2   question.
 3        THE WITNESS:  That was all.
 4        MR. McCARTHY:  I'm going to object to that question.
 5        JUDGE BUSCHMANN:  Hold on a minute.
 6        MR. McCARTHY:  He's asking the witness whether Alex and
 7   Reina said anything else.  The witness has already testified
 8   on direct he's referring to a conversation that he's talking,
 9   the witness is talking to the union and it's a misleading
10   question with regard to --
11        JUDGE BUSCHMANN:  The objection is overruled.
12   Q.   BY MR. GREENBAUM:  Now, does Jennifer from the union
13   speak Spanish?
14   A.   No.
15   Q.   Now you testified that you met here at 5:00 in the
16   morning one morning?
17   A.   Yes.
18   Q.   Was she with anyone?
19   A.   No.
20   Q.   At that meeting she handed you a tape recorder?
21   A.   Yes.
22   Q.   Did you ask her to give you a tape recorder?
23   A.   Yes.
24   Q.   That was your idea?
25   A.   No.  Hers.
```

1  Q.   Was that the first time you were thinking about using a

2  tape recorder at work?

3       MR. McCARTHY:  I'm going to object to the question.

4  There's no foundation established that he was ever thinking

5  of using a tape recorder at work.  The testimony was that the

6  idea was Jennifer's and, therefore, it relies on facts not in

7  evidence.

8       JUDGE BUSCHMANN:  I'll sustain the objection.

9  Q.   BY MR. GREENBAUM:  That morning you met Jennifer outside?

10 A.   Yes.  The previous day we had agreed that we would meet.

11 Q.   Did she teach you how to use the tape recorder?

12 A.   Yes.

13 Q.   What language did she use to teach you how to use the

14 tape recorder?

15 A.   It wasn't so difficult.

16 Q.   My question was: what language was she speaking in?

17 A.   English but I understood her.

18 Q.   Did she turn it on for you?

19 A.   Yes.

20 Q.   Did you keep it on that whole day?

21 A.   Yes.

22 Q.   Did you put it in your locker at all that day?

23 A.   No.  I had it in my pocket.

24 Q.   The whole day?

25 A.   Yes.

1   Q.   Did you tell your co-workers you were walking around with

2   a tape recorder?

3   A.   No.

4   Q.   Why not?

5   A.   I couldn't.

6   Q.   Did Jennifer tell you what to say to Corrado that day?

7   A.   No.

8   Q.   Did Miguel from the union tell you what to say to Corrado

9   that day?

10  A.   No.

11  Q.   Why did you not tell your co-workers that you were

12  walking around with a tape recorder?

13  A.   Because it was a recorder I was carrying for personal

14  protection.

15  Q.   Now, you gave a statement to the National Labor Relations

16  Board, correct?

17  A.   Yes.  I gave them a statement, a decoration.

18       MR. GREENBAUM:  Could I approach, Your Honor?

19       JUDGE BUSCHMANN:  Yes.

20       MR. GREENBAUM:  What I'm handing the witness is NLRB

21  Statement, I'm giving him the Spanish version and I'm showing

22  the witness his signature.

23  Q.   BY MR. GREENBAUM:  Is that your signature?

24  A.   Yes.  That's correct.

25  Q.   And the date is August 18, 2005, correct?

1  A.    Correct.

2  Q.    I want to refer your attention to page --

3       MR. GREENBAUM:  Well, actually the Spanish may be on a

4  different page than the English, Your Honor.  So could I

5  approach?

6       JUDGE BUSCHMANN:  Yes.

7       THE INTERPRETER:  The interpreter was requested to locate

8  the corresponding paragraph in Spanish.  So the interpreter

9  shall ask the witness to pass the copy to him.

10      MR. McCARTHY:  We'd like to know what's going on, Your

11  Honor.

12      THE INTERPRETER:  The interpreter is being shown page 6

13  in the English version.

14      MR. GREENBAUM:  You can come up.

15      THE INTERPRETER:  How many are there altogether.

16      MR. GREENBAUM:  Well, the English has 9, and that has 12.

17      THE INTERPRETER:  Okay.  So it might be like page 7.

18      MR. GREENBAUM:  It says, anthrax -- the paragraph does.

19      THE INTERPRETER:  Okay.  The interpreter is referring to

20  line 17, in the Spanish version -- I'm sorry.  Line 17 of

21  page 7 in the Spanish version.

22      MR. GREENBAUM:  Okay.  I want to refer you to "then."

23      THE INTERPRETER:  The last line on page 7, which

24  continues on to page 8.

25  Q.    BY MR. GREENBAUM:  In your statement here you state,

1    "Then at that moment I found out that Palenzona was lying

2    when he told me that I had brought in the wrong milk.  After

3    I spoke with the girl I went --

4        MR. McCARTHY:  Your Honor, is there a question or is he

5    going to read that whole paragraph into the record?  That's

6    not a proper way to ask the witness a question.  I mean I

7    don't know for what purpose it's being read.

8        MR. GREENBAUM:  It's impeachment, Your Honor.  You will

9    see.

10       JUDGE BUSCHMANN:  Go ahead.

11   Q.   BY MR. GREENBAUM:  "After I spoke with the girl I went to

12   my locker and got a recorder that the union had given me for

13   my protection."

14       So, Mr. Velasquez, you had that recorder on your body the

15   whole time?

16   A.   Yes.

17   Q.   So when you said in your statement here that you had put

18   it in your locker, you had to go retrieve it from your locker

19   that's not true?

20   A.   No.  There's some confusion.

21   Q.   What version is true?  Is it true what's in here or what

22   you just told me?

23   A.   What I just told you.

24   Q.   That you kept it on yourself the whole time?

25   A.   Yes.  I had it on.

1  Q.  Did you have a meeting with Jennifer and Miguel from the

2  union before you spoke with Corrado?

3  A.  Yes.

4  Q.  Was the tape recorder on at that time?

5  A.  Yes.  I gave it to Jennifer so that she could fix it for

6  me again because I didn't know how to handle it right and she

7  fixed it for me.

8  Q.  What was wrong with it?

9  A.  I gave it to her to check for me and she said it was

10  running fine.

11  Q.  So it never was turned off?

12  A.  No.

13  Q.  So your conversation with Miguel and Jennifer was on tape

14  as well?

15  A.  I don't think so.

16  Q.  Now, if you look at the statement you gave to the NLRB,

17  there's nothing in there about meeting with Miguel and

18  Jennifer, is there?

19  A.  Yes.  As I'll say again some confusion.

20  Q.  Well, again, directing you to the statement it says,

21  "After I spoke with the girls I went to my locker and I got

22  the recorder that the union had given me for my protection.

23  I then went to Palenzona's office."

24  A.  Yes.  As I shall repeat this is a confusion.

25  Q.  Now, you indicated that there was a meeting in the

1   laundry room?

2   A.   Yes.

3   Q.   When was that?

4   A.   At the beginning of April.

5   Q.   Was that before or after Reina and Alex had asked you to

6   sign the petition?

7   A.   After.

8   Q.   And Steve Bello was there?

9   A.   Yes.

10  Q.   Did you tape that meeting?

11  A.   No.

12  Q.   Do you know whether anyone taped that meeting?

13  A.   No.

14  Q.   Was Marleni Jiron at that meeting?

15  A.   Yes.  She was there.

16  Q.   At that meeting did some of the employees accuse Marleni

17  Jiron of taping the meeting?

18  A.   I don't remember.

19  Q.   Do you remember Marleni Jiron being upset at that

20  meeting?

21  A.   I don't remember.

22  Q.   Do you remember Marleni having a discussion with

23  Mr. Bello after the meeting?

24  A.   No.

25  Q.   Was someone translating at this meeting?

1   A.   Yes.

2   Q.   Who was that?

3   A.   Alexandra Guillen.

4   Q.   Alexandra speaks English and Spanish?

5   A.   Yes.  She speaks the two languages.

6   Q.   Did any employees have any questions at that meeting?

7   A.   Yes.  Only one female employee asked a questions?

8   Q.   Who was that?

9   A.   It was Miriam Berrios (ph.).

10  Q.   Now, you made this recording on what day?

11  A.   May 12th.

12  Q.   How do you remember that date?

13  A.   I kept it in mind.

14  Q.   What was -- Did you keep the date in mind when Alex and

15  Reina approached you to sign the petition?

16  A.   No.

17  Q.   Did you keep in mind the date when you had the meeting in

18  the laundry room with Mr. Bello?

19  A.   No.

20  Q.   Did you keep it in mind the day you were awarded employee

21  of the month, the most recent one?

22  A.   No.  I don't have that in mind either.

23  Q.   Now, when you had discussion with Mr. Palenzona, which

24  you taped, was Mr. Palenzona concerned of outsiders coming in

25  the hotel?

1          JUDGE BUSCHMANN:  Mr. Greenbaum, I think the question is

2   inappropriate.  He doesn't know what Mr. Palenzona was

3   concerned about or not.

4          MR. GREENBAUM:  I'll rephrase the question, Your Honor,

5   thank you.

6          JUDGE BUSCHMANN:  By the way, I think we are getting to

7   the point we are jumping around and I would like to take a

8   luncheon recess at this point.  So I'm asking you, are you

9   going to be finished in a few seconds or we going to break

10  and then come back?

11         MR. GREENBAUM:  I think we could break, Your Honor,

12         JUDGE BUSCHMANN:  Break now?  Okay.

13         We will take a luncheon recess until what time; I'll

14  consider your suggestion, Mr. Greenbaum?

15         MR. GREENBAUM:  I'll leave it up to the Court.

16         JUDGE BUSCHMANN:  Okay.  1:30.

17         MR. McCARTHY:  That will be fine, Your Honor.

18         **JUDGE BUSCHMANN:  Okay.  Stand adjourned until 1:30.**

19  **(Whereupon, at 1:15 p.m., a lunch recess was taken.)**

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16                    A F T E R N O O N   S E S S I O N
17                              (Time Noted:  1:30 p.m.)
18        JUDGE BUSCHMANN:  We're on the record.
19        Mr. Greenbaum, you may continue.
20        MR. GREENBAUM:  Thank you, Your Honor.
21        JUDGE BUSCHMANN:  Would the court reporter please come
22   up.
23        MR. GREENBAUM:  Can you read back the last question.
24        COURT REPORTER:  Do you want me to play it?
25        JUDGE BUSCHMANN:  Yes.  Is it difficult to do?
```

1       COURT REPORTER:  It will just take a minute.

2       JUDGE BUSCHMANN:  Go ahead and do it.

3  **(Off the record.)**

4       **JUDGE BUSCHMANN:  We're on the record.**

5  Q.  BY MR. GREENBAUM:  Mr. Velasquez, before we took a break

6  I was asking you about your conversation you had with

7  Mr. Palenzona in which you had a tape recorder on.  Do you

8  recall that conversation?

9  A.  Yes.

10  Q.  Do you recall in that conversation that you and

11  Mr. Corrado discussed the issue, the potential issue of

12  outsiders coming in the hotel?

13  A.  Yes.

14  Q.  Did Mr. Palenzona express --

15       JUDGE BUSCHMANN:  I'm sorry.  When you say, Mr. Corrado

16  or Palenzona, are you talking about the same person?

17       MR. GREENBAUM:  The same person.  It has been used

18  interchangeably, I'm sorry.

19  Q.  BY MR. GREENBAUM:  During that conversation did

20  Mr. Palenzona express any concerns with outsiders coming into

21  the hotel?

22  A.  Yes.

23  Q.  And in particular coming into the basement part of the

24  hotel?

25  A.  Yes.

1  Q.    The non-public spaces of the hotel?

2  A.    Yes.

3  Q.    What do you recall Mr. Palenzona saying about that?

4  A.    Well, he said to me that should we see a stranger there,

5  we should let the person know we can call the police.

6       MR. McCARTHY:  Your Honor, I'm going to object to the

7  translation.

8       JUDGE BUSCHMANN:  Could you repeat the answer and then

9  the translation?

10      THE WITNESS:  Yes.  He said that were an unknown person

11 to come in that I should communicate that to him and we would

12 call the police.

13 Q.    BY MR. GREENBAUM:  Getting back to the meeting in the

14 laundry room where Mr. Bello was present.

15 A.    Yes.

16 Q.    How long did the meeting last?

17 A.    Well, I don't recall.

18 Q.    What was the subject matter of that meeting?

19 A.    Well, the subject matter was about the conversation

20 concern that they were in negotiations with the union and

21 that it was possible that the union may try to bring more

22 propaganda into the hotel.

23 Q.    Did any employees at that meeting express concern that

24 they were being harassed by the union at all?

25 A.    No.

277 of 167

1    Q.    Was safety addressed at that meeting?

2    A.    Yes.  That was dealt with too.

3    Q.    How was that dealt with?

4    A.    That for safety sake security would be established.

5    Q.    Did any employee express any safety concerns in that

6    meeting?

7    A.    I don't remember whom.

8    Q.    Did any employee in that meeting say they didn't want the

9    union anymore?

10   A.    No.  I didn't hear them say that at all.

11   Q.    In the July 5th meeting, when the employer said that they

12   no longer recognized the union, what did the employees do?

13   A.    Nobody said anything.

14   Q.    Did they cheer?

15   A.    Some of us were quite pleased because of the raise we had

16   been given.

17   Q.    Did the employees cheer?

18   A.    Yes.  That it was good.  We were happy that we would be

19   earning more.

20   Q.    Did you go to the union that day?

21   A.    No.

22   Q.    Did you tell the union what happened at that meeting that

23   day?

24   A.    I don't recall what I said -- Yes.  Yes.  I did tell

25   them.

1  Q.   Did you tell them that day?

2  A.   A different day.

3  Q.   Did you ever see any petitions, employee petitions to

4  remove the union?

5  A.   I haven't seen -- I haven't seen anything.

6  Q.   Did any employees tell you that they signed a petition?

7  A.   Yes.

8  Q.   How many?

9  A.   Miriam Berrios told me, Blanca Chavez told me and those

10  are the ones I remember.

11  Q.   Were you ever written up for distributing literature at

12  the hotel?

13  A.   Excuse me.  I don't follow the question.

14  Q.   Did you ever receive a warning from the hotel, written

15  warning or discipline action for distributing literature at

16  the hotel?

17  A.   No.  Only oral.

18  Q.   You received -- Your testimony is you received an oral

19  disciplinary warning?

20  A.   No.

21  Q.   After your discussion with Mr. Palenzona, the one which

22  you taped in May, did you continue to distribute literature

23  at that meeting?

24  A.   Yes.

25  Q.   In fact, while you were distributing literature you gave

1    a copy of one of the pamphlets to a supervisor?

2    A.    Yes.

3          MR. GREENBAUM:  No further questions.

4          MR. McCARTHY:  I just have some brief redirect, Your

5    Honor.

6          JUDGE BUSCHMANN:  Yes.

7          Mr. Interpreter, I think unless I'm corrected by the

8    counsel, it is unnecessary for you to inform the witness in

9    Spanish of what the dialogue is here unless a question is

10   posed to him.  In other words, only questions of counsel or

11   by me posed to the witness should be translated.

12         THE INTERPRETER:  The interpreter shall not interpret

13   anything other than questions or answers.  I have made

14   exceptions to that by interpreting some objections posed

15   simply to give a context to the witness.  But I shall refrain

16   from doing that at all.

17         JUDGE BUSCHMANN:  Yes.  I don't think it's really

18   necessary that he be --

19         THE INTERPRETER:  Thank you, Your Honor.

20         JUDGE BUSCHMANN:  -- informed of what's going on other

21   than the questions and answers.

22         THE INTERPRETER:  Okay.

23                       **REDIRECT EXAMINATION**

24   Q.    BY MR. McCARTHY:  Mr. Velasquez, I want to ask you a

25   couple questions about the recording.  Did you record the

1  entire day that you distributed the literature?

2  A.    No.

3  Q.    Now, you testified on cross-examination that Miriam

4  Berrios and Blanca Chavez told you they had signed a

5  petition, correct?

6  A.    Yes.

7  Q.    Did they tell you why they signed those petitions?

8  A.    They said that they were going to get a $2.50 raise if

9  they signed the petition.  They said that they were told --

10  strike that.  They said that they were told they would

11  receive a $2.50 raise if they signed the petition.

12  Q.    Now, you also testified on cross-examination that there

13  was some cheering after the raise was announced on July 5th,

14  do you recall that testimony?

15      MR. GREENBAUM:  Objection, to the characterization, Your

16  Honor.

17      JUDGE BUSCHMANN:  Why don't you just, Mr. McCarthy, why

18  don't you just ask the question, rather than repeat what you

19  may or may not have said.

20  Q.    BY MR. McCARTHY:  Did Reina and Alex lead the cheering?

21  A.    Where?

22  Q.    On July 5th when the raise was announced?

23  A.    I don't remember whether they were there.  Forgive me.

24  Q.    Does Jennifer at the union, speak a little bit of

25  Spanish?

1  A.    I think just a few words, very little.

2  Q.    Can you understand her when she speaks to you in Spanish?

3  A.    Some few words.

4       MR. McCARTHY:  That's all the redirect I have, Your

5  Honor.

6       JUDGE BUSCHMANN:  Okay.  Thank you, very much you may

7  step down.  Thank you.

8       THE WITNESS: Okay.  Thank you.  Is that all?

9       JUDGE BUSCHMANN:  Yes.  That's it.

10      MR. McCARTHY:  Your Honor, I'm retrieving the Spanish

11 affidavit from the witness and Mr. Greenbaum is giving back

12 the English version.

13      JUDGE BUSCHMANN:  Yes.  And you are ready to call your

14 next witness, right?

15      MR. McCARTHY:  Yes, Your Honor.  General Counsel would

16 call Ana Majano to the witness stand, please.

17      JUDGE BUSCHMANN:  Will that person need an interpreter as

18 well?

19      MR. McCARTHY:  Yes, Your Honor.  Then we have a witness

20 coming at 3:00 that we have to put on today, I believe, Your

21 Honor.

22      THE INTERPRETER:  Will the 3:00 witness requires an

23 interpreter as well?

24      MR. McCARTHY:  I believe so, yes.

25      JUDGE BUSCHMANN:  I have to swear you in.

 1   (Whereupon,

 2                          **ANA MAJANO**

 3   was called as a witness by and on behalf of the General

 4   Counsel, and having been first duly sworn, was examined and

 5   testified as follows:)

 6        JUDGE BUSCHMANN:  Please sit down.

 7        THE WITNESS:  Thank you.

 8                       **DIRECT EXAMINATION**

 9   Q.   BY MR. McCARTHY:  Good afternoon.

10   A.   Good afternoon.

11   Q.   Would you state your name and address for the record,

12   please, and spell your last name?

13   A.   Okay.  Okay.  You want the last name or the address

14   first?

15        JUDGE BUSCHMANN:  The full name.

16        THE WITNESS:  My name is A-n-a M-a-j-a-n-o.

17   Q.   BY MR. McCARTHY:  Would you state your address for the

18   record, please?

19   A.   Okay.  I now have a different address.  It's 5015 53rd

20   Place Riverdale.

21   Q.   Stating the zip code please?

22   A.   That's 20781.

23   Q.   Is that in the state of Maryland?

24   A.   Maryland, yes, it is.

25   Q.   Do you speak English?

1  A.   A little bit.

2  Q.   Do you speak Spanish?

3  A.   Yes.

4  Q.   Are you testifying here pursuant to my subpoena?

5  A.   Yes.

6  Q.   Are you currently employed?

7  A.   Yes.

8  Q.   What job -- Who are you employed by?

9  A.   I work, I'm employed at the State Plaza Hotel.

10 Q.   What job do you have at the State Plaza Hotel?

11 A.   I clean rooms, housekeeping.

12 Q.   How long have you worked at the State Plaza Hotel as a

13 housekeeper?

14 A.   I been working since '95, no, '93 until now.

15 Q.   Have you been working since 1993 or 2003?

16 A.   Oh, excuse me, from - how is it?  Since two ninety-three.

17 Q.   Who are your supervisors?

18 A.   Okay.  There are three during the day, Lidia, Fanny and

19 Karen.

20 Q.   Who do they report to?

21 A.   To Lisa the housekeeping manager.

22 Q.   Does Lisa report to Mr. Palenzona?

23 A.   Yes.

24 Q.   Do you operate on a first name basis between the

25 employees and the supervisors?

1  A.   By name, yes.

2  Q.   What hours do you work?

3  A.   From 8:00 in the morning until 4:30.

4  Q.   Do you recall a list of work assignments and special

5  projects each day from the supervisors?

6  A.   Yes.

7  Q.   Who is the hotel manager?

8  A.   The manager?  Mr. Palenzona is the general manager.

9  Q.   Do you see him here present in the courtroom today?

10  A.   Yes.

11  Q.   Does he speak to you in English or Spanish or both?

12  A.   In Spanish.

13  **(General Counsel's Exhibit 43 marked for identification.)**

14  Q.   BY MR. McCARTHY:  Now, I want to direct your attention to

15  General Counsel's Exhibit 43, on the right hand side, about

16  15 or so pages in, 17 pages in.

17  A.   Yeah.

18  Q.   Do you have General Counsel's Exhibit 43 in front of you?

19  A.   Where I am earning $9.35.

20  Q.   Yes.  Do you recognize that document?

21  A.   Yes.  It's a check stub.

22  Q.   Is it your check stub?

23  A.   Yes.

24  **(General Counsel's Exhibit 44 marked for identification.)**

25  Q.   BY MR. McCARTHY:  Then directing your attention, ma'am,

1    to the next document, General Counsel's Exhibit 44, do you

2    recognize that document?

3    A.    Yes.

4    Q.    What is that document?

5    A.    It's a check stub.

6    Q.    Did you receive an annual increase in 2004?

7    A.    Yes.

8    Q.    How much was that?

9    A.    Here I was earning $9.63.

10    Q.    How much were you earning the year before?

11    A.    $9.35.

12    Q.    After GC Exhibit 44, when was your next wage increase?

13    A.    (No response.)

14    Q.    When was it?

15    A.    It was July 8th.

16    Q.    Of what year?

17    A.    This past year.

18    Q.    How much were you making on July 8th, 2005?

19    A.    Before?

20    Q.    On July 8th?

21    A.    Before July 8th, I was earning $9.73.

22    Q.    What about after July 8th?

23    A.    I earned, I wound up earning $12.50.

24    **(General Counsel's Exhibit 45 marked for identification.)**

25    Q.    BY MR. McCARTHY:  Then directing your attention to GC-45.

1  A.    This is it.

2  Q.    Did you receive an increase after your wages were raised

3  to $12.50?

4  A.    Yes.  The word I cannot hear that we get every year when

5  we complete our anniversary, like a birthday.

6  Q.    Was your wage raised from $12.50 to $1291 at that point

7  time?

8  A.    Yes.

9  Q.    When is your anniversary?

10  A.    June 15th.

11     MR. McCARTHY:  Your Honor, I offer General Counsel's

12  Exhibits 43, 44 and 45.

13     JUDGE BUSCHMANN:  Mr. Greenbaum, any objection?

14     MR. GREENBAUM:  No objection.

15     JUDGE BUSCHMANN:  Those exhibits are hereby received.

16  **(General Counsel's Exhibit 43, 44 and 45 received into**

17  **evidence.)**

18     MR. McCARTHY:  Thank you, Your Honor.

19  Q.    BY MR. McCARTHY:  Now, Ms. Majano, before the July 8th

20  wage increase, do you recall any employee meeting with

21  Mr. Palenzona or Mr. Bello?

22  A.    Yes.

23  Q.    Do you recall what month this meeting was?

24  A.    It was like in March, yes.

25  Q.    Was there more than one meeting, do you recall?

1  A.   Yes.  Between March and April there were several

2  meetings.

3  Q.   Did Mr. Palenzona speak at these employee meetings?

4  A.   Yes.

5  Q.   Do you recall what Mr. Palenzona would say in these

6  meetings?

7  A.   Yes.  That he couldn't give us a raise because the union

8  was there.

9  Q.   Did he say this in more than one meeting with employees?

10  A.   Yes.  Yes.

11  Q.   Was anyone translating during these meetings?

12  A.   Yes.

13  Q.   Who do you recall translating?

14  A.   Alex.

15  Q.   Was Mr. Bello present during any of these meetings?

16  A.   Yes.

17  Q.   Do you know Reina Lozano?

18  A.   Yes.

19  Q.   What about Alexandra?

20  A.   Her too.

21  Q.   Do you know her last name?

22  A.   No.

23  Q.   What jobs do they perform at the hotel?

24  A.   Well, Reina was in housekeeping.  Well, Reina previously

25  was in housekeeping before the job she has now.

1  Q.    What job does she have now?

2  A.    Now, she fixes the breakfast for the guest.

3  Q.    What does Alex do?

4  A.    They do that together.

5  Q.    Did you ever see them meet with Mr. Palenzona?

6  A.    Yes.

7  Q.    When or what months of the year?

8  A.    I don't remember but it was in between March and June and

9  those months there, I recall that they were meeting more

10  regularly.

11  Q.    How often would you see Reina, Alex and Mr. Palenzona

12  meet in the months between March and June 2005?

13  A.    Regularly.

14  Q.    Where would you see them meeting regularly?

15  A.    Well, where they prepare the breakfast for the guest and

16  they go to his office.

17  Q.    Now, I want to direct your attention to General Counsel's

18  Exhibit 3, on the left hand side of the Exhibit 5.

19  A.    Yes.

20  Q.    Do you recognize that document?

21  A.    Yes.

22  Q.    Did anyone show that petition to you?

23  A.    Yes.

24  Q.    Who showed it to you?

25  A.    Reina and Alex.

1    Q.    When did they show it to you?

2    A.    When they were going around collecting signatures to

3    remove the union.

4    Q.    What month did they show it to you?

5    A.    It was like April.

6    Q.    Did you sign the document?

7    A.    Yes.

8    Q.    What page did you sign the document?

9    A.    I signed; I was the last one to.

10   Q.    What page did you sign the document on?

11   A.    On the second.

12   Q.    Is the document dated?

13   A.    (Non-verbal response.)

14   Q.    Is the top of the first page of the document dated?

15   A.    (Non-verbal response.)

16   Q.    Is the top of the first page of the document dated?

17   A.    (Non-verbal response.)

18   Q.    Does that refresh your recollection of what month you

19   signed the document?

20   A.    I don't remember what month it was but it was between

21   March and July.

22   Q.    Where were you at the time?

23   A.    Well, I was on the floor cleaning rooms.

24   Q.    What were Reina and Alex doing at the time?

25   A.    Checking the beverages that there were in the rooms and

1   the bar.

2   Q.   Is that the minibar?

3   A.   Yes.

4   Q.   Was anyone in the area?

5   A.   Yes.

6   Q.   Were you working at the time?

7   A.   Yes.

8   Q.   Were they working at the time?

9   A.   Yes.

10   Q.   Who else was in the area?

11   A.   Just the houseman.

12   Q.   What houseman was in the area?

13   A.   Margarito.

14   Q.   Where was Margarito?

15   A.   Margarito was pushing the elevator because he was going

16   downstairs to take down the dirty bed linens.

17   Q.   Do you know whether Margarito saw Alex and Reina approach

18   you?

19   A.   Yes.

20   Q.   How do you know that?

21   A.   Because he turned around to look because the elevator is

22   just across the way from where I was.

23   Q.   Now, did Reina or Alex say anything to you when they

24   showed you General Counsel's Exhibit 3?

25   A.   Yes.

1  Q.    What was said to you and by whom?

2  A.    Oh, Reina said it to me.

3  Q.    What did Reina say?

4  A.    She said, Ana, are you going to sign, we are going around

5  collecting signatures to get rid of the union.

6  Q.    Did you say anything?

7  A.    I said, why.

8  Q.    Did either of them respond?

9  A.    Reina did.

10  Q.    What did Reina say?

11  A.    Because Mr. Corrado had decided to give us a $2.50 raise.

12  Q.    Did she indicate whether you had to do anything to get

13  the $2.50 raise?

14  A.    Yes.  Sign the petition.

15  Q.    Did you ask any other questions?

16  A.    Yes.  And I said, how do you know what guarantee do you

17  have?

18  Q.    Did anyone respond?

19  A.    Yes.  She said I already spoke to Mr. Corrado.

20  Q.    Did she say what Mr. Corrado had told her when she spoke

21  with him?

22      MR. GREENBAUM:  Objection, hearsay.

23      JUDGE BUSCHMANN:  Objection, I think it's offered for the

24  truth of it, is it Mr. McCarthy?

25      MR. McCARTHY:  It's an admission by a party opponent,

1   Mr. Corrado.

2        JUDGE BUSCHMANN:  Okay.  Objection overruled.

3        THE INTERPRETER:  Could you address the question again,

4   counselor?

5   Q.   BY MR. McCARTHY:  Did she indicate what Mr. Corrado told

6   her?

7   A.   Yes.  She told me, I spoke to Mr. Corrado.

8   Q.   What did she tell you he said when she spoke to him?

9   A.   Yes.  That he would give the $2.50 raise if all the

10  employees signed the petition to get rid of the union.

11  Q.   Was there any discussion about how many employees had

12  signed the petition?

13  A.   She didn't tell me how many but she said you are the only

14  one missing.  That's all I know.

15  Q.   Did you ask any other questions?

16  A.   Yes.  I said, what's the validity of this paper?

17  Q.   Did they respond?  Did either one of them respond?

18  A.   Yes.  She did.  Reina did.

19  Q.   What did Reina say?

20  A.   She said, well, because I had said, Doesn't this paper

21  need to be notarized?  And she said, No, the hotel has

22  notaries, we will take it to them later.

23  Q.   Did you sign the document?

24  A.   Yes.  Because I wanted the $2.50.

25  Q.   Now you indicated you were the last one to sign.  How

1  come you signed on the top of page 2?

2  A.   Because there was no more room.

3  Q.   Why did you sign the document, GC 3?

4  A.   Huh?

5  Q.   Why did you sign General Counsel's Exhibit 3?

6       MR. GREENBAUM:  Asked and answered, Judge.

7       JUDGE BUSCHMANN:  I know.  She has already indicated why

8  she signed it, hasn't she?

9       MR. McCARTHY:  I didn't hear an answer, Your Honor.

10      JUDGE BUSCHMANN:  Before, hasn't she indicated why she

11 signed the document, petition?

12      MR. McCARTHY:  I'm sorry.  I guess she has, Your Honor.

13      JUDGE BUSCHMANN:  Okay.

14 Q.   BY MR. GREENBAUM:  Did you work the 4th of July last

15 year?

16 A.   Yes.

17 Q.   Was there a meeting at the hotel that day?

18 A.   Yes.

19 Q.   Where was the meeting?

20 A.   In the cafeteria.

21 Q.   Was the meeting the next day on July 5th?

22 A.   Yes.

23 Q.   Were all the employees present at this meeting in the

24 cafeteria on July 5th?

25 A.   Well, all of those of us who worked that day were, yes.

1   Q.   Approximately how many were at the meeting, how many

2   employees were at the meeting?

3   A.   I couldn't tell you.  I didn't count them all.  I

4   wouldn't know but certainly there were quite a few.

5   Q.   Was there more than 20 or less than 20?

6   A.   Less than 20.

7   Q.   Who arranged the meeting?

8   A.   Lisa was going around letting us know on the floors.

9   Q.   Do you recall whether there was anyone present from

10  management at the meeting?

11  A.   Yes.  Mr. Palenzona was there with Lisa.

12  Q.   Who spoke for management at the meeting?

13  A.   Mr. Palenzona spoke and Lisa translated.

14  Q.   Was Mr. Palenzona speaking in English?

15  A.   Yes.

16  Q.   Did Lisa translate the Spanish?

17  A.   Yes.

18  Q.   Was Mr. Palenzona reading from or holding anything in his

19  hands?

20  A.   Yes.  He had a piece of paper.

21  Q.   Do you recall what Mr. Palenzona said as translated by

22  Lisa in Spanish?

23  A.   Yes.

24  Q.   What did he say?

25  A.   Well, he said that management had decided to give a raise

1  because the employees had signed that they no longer wanted

2  the union.

3  Q.   Did he say when you would receive that wage increase?

4  A.   Yes.  July 8th.

5  Q.   Did you receive that wage increase on July 8th?

6  A.   Yes.

7  Q.   How long was the meeting?

8  A.   About five minutes.

9  Q.   Did anybody ask any questions at the meeting?

10  A.   There was no time to.  He left right away.

11  Q.   Were Reina and Alex at the meeting?

12  A.   Yes.

13  Q.   Did you see them lead any cheering?

14  A.   Yes.  Reina and Alex said we have to celebrate this.

15  Q.   I want to direct your attention now to what is in

16  evidence as General Counsel's Exhibit 29 and 30.

17  A.   Yes.

18  Q.   Do you recognize those documents?

19  A.   Yes.

20  Q.   Is your picture on the flyers?

21  A.   Yes.  Yes.

22  Q.   Where was the picture taken?

23  A.   At the union hall.

24  Q.   By whom?

25  A.   By Jennifer.

1   Q.   Did you do anything with these flyers with other

2   employees?

3   A.   Yes.

4   Q.   What did you do with the flyers?

5   A.   I passed them out to my fellow workers.

6   Q.   Where did you distribute the flyers?

7   A.   In the cafeteria.

8   Q.   Were you on work time or break time?

9   A.   When I was off for lunch.

10  Q.   Did you give the flyer to any supervisor?

11  A.   I gave one to Lisa.

12  Q.   What happened after you gave the flyer to Lisa?

13  A.   She passed it on to Mr. Corrado.

14  Q.   What happened after that?

15  A.   I was going upstairs to start working again.

16  Q.   What happened next?

17  A.   He called me.

18  Q.   Who called you?

19  A.   Mr. Corrado.

20  Q.   He called you where?

21  A.   In the hallway.

22  Q.   Was anyone else present?

23  A.   Lisa.

24  Q.   Did Mr. Corrado ask you anything?

25  A.   Yes.  Did you pass out the flyers?

297

1  Q.   Did you respond?

2  A.   I told him yes.

3  Q.   Did Mr. Palenzona say anything else at that point?

4  A.   Yes.

5  Q.   What did he say?

6  A.   He asked me whether I didn't know that it was forbidden

7  to pass out those flyers on the property.

8  Q.   Did you respond?

9  A.   Yes.  I said to him, why.

10  Q.   Did he respond?

11  A.   Yes.  He said because that's trash that you are bringing

12  into the cafeteria.  Ms. Maria Leiva said so.

13  Q.   Do you recall whether you said anything else?

14  A.   Yes.  He said that we could give them out outside.

15  Q.   But do you recall whether you said anything else?

16  A.   Yes.  Yes.

17  Q.   What did you say?

18  A.   I said, to whom, my co-workers are here inside, not

19  outside.

20  Q.   Do you recall whether he said anything else?

21  A.   Yes.  He said to me, "I don't want trouble."

22  Q.   Did you respond?

23  A.   I said, "Why, if this is a free country and I have

24  rights?"

25  Q.   Was there any discussion about cleaning up the flyers?

1  A.   Yes.  He said that there was a lot of trash on the floor

2  of the cafeteria that included the flyers.  And I said,

3  "Well, let me go see and clean it up then."  He said, "No.

4  Just leave it as it is."

5  Q.   Did you see any trash or flyers on the floor of the

6  cafeteria?

7  A.   No.  No, because everybody took them and took them

8  upstairs to read because they do, they are frightened of

9  them.

10 Q.   How did the conversation end?

11 A.   No.  That was all that he said to me.  Okay.  Fine.

12 That's all.  You are free to go.

13      MR. McCARTHY:  No further questions, Your Honor.

14      JUDGE BUSCHMANN:  Okay.

15      MR. GREENBAUM:  Your Honor, pursuant to your

16 instructions, if there is a statement I would like to review

17 it.

18      JUDGE BUSCHMANN:  Yes.

19      MR. McCARTHY:  Your Honor, let the record reflect that I

20 am turning over a 6-page, actually an original 6-page Spanish

21 affidavit and a certified translation from Spanish to

22 English, which is six pages long.

23      JUDGE BUSCHMANN:  Yes.  Thank you.

24      How much time, Mr. Greenbaum, ten minutes enough?

25      MR. GREENBAUM:  Ten/fifteen, Your Honor?  How about 15?

1      JUDGE BUSCHMANN:  Fifteen.  It's moving very slowly,

2  aren't we, Mr. McCarthy?  Are we moving slowly or as

3  anticipated?

4      MR. McCARTHY:  Well, Your Honor, I have not had a trial

5  where we have to repeat with a translator.  So it's a little

6  bit longer than anticipated but I think we are doing quite

7  well, if we keep to a tight scheduling.

8      JUDGE BUSCHMANN:  All right.  15 minutes, Mr. Greenbaum.

9      MR. GREENBAUM:  Thank you.

10      JUDGE BUSCHMANN:  Off the record.

11  **(Off the record.)**

12      **JUDGE BUSCHMANN:  We're on the record.**

13      Mr. Greenbaum.

14                      CROSS-EXAMINATION

15  Q.   BY MR. GREENBAUM:  Good afternoon, Ms. Majano.

16  A.   Good afternoon.

17  Q.   Now, isn't it true that Mr. Palenzona told you that it

18  was okay to distribute flyers as long as there was no litter?

19  A.   Yes.  But afterwards, because first he told me that I

20  could not distribute them inside.

21  Q.   But he told you that you can distribute them as long as

22  there is no litter, correct?

23      MR. McCARTHY:  Your Honor, I'm going to object.  It's

24  been asked and answered.

25      JUDGE BUSCHMANN:  Yes.  Objection, sustained.  I think

1  the answer is clear, right?

2      MR. GREENBAUM:  No.  I don't believe so, Your Honor.  She

3  said, yes, to the question and then she said at first.

4      JUDGE BUSCHMANN:  But later -- Would you repeat the

5  answer.

6      THE WITNESS:  Okay.  Yes.  He told me don't you

7  understand that it's forbidden to distribute them inside the

8  property here?

9  Q.   BY MR. GREENBAUM:  And then where did later come up in

10 the conversation?

11 A.   Yes.  Because he told me that Ms. Leiva said that there's

12 a lot of trash inside the cafeteria.  That what I'm bringing

13 in is a lot of trash.

14 Q.   And Ms. Leiva, what position does she hold at the hotel?

15 A.   Cleaning at the front desk.

16 Q.   She in charge of cleaning the cafeteria?

17 A.   Sometimes she is.

18 Q.   It's true, isn't it, that employees were throwing the

19 pamphlets on the floor, isn't it, in the cafeteria?

20 A.   No.  No.  All of them took them folded them up, held them

21 in their hands and took them upstairs to read.

22 Q.   Now, you gave a statement to the NLRB, correct?

23 A.   Uh-huh.

24     MR. GREENBAUM:  May I approach, Your Honor?

25     JUDGE BUSCHMANN:  Yes.

1  Q.   BY MR. GREENBAUM:  What I'm handing the witness is a

2  declaration, it looks like it's eight pages Spanish and I

3  just want to for the record, is that your signature,

4  Ms. Majano?

5  A.   Yes.

6  Q.   It's dated August 24th, '05?

7  A.   Uh-huh.

8      MR. GREENBAUM:  I have the English version and I want to

9  point the witness to, the second to the last paragraph, the

10 paragraph starting with "After the hotel."  Can I ask the

11 reporter to show --

12     THE INTERPRETER:  The interpreter.

13     MR. GREENBAUM:  The interpreter, sorry.

14     THE INTERPRETER:  Shall the interpreter show the witness

15 the document?

16     JUDGE BUSCHMANN:  Yes.  If you can help her out that's

17 fine.

18 Q.   BY MR. GREENBAUM:  Ms. Majano, I'd like you to read that

19 to yourself and tell me when you finish reading it.

20 A.   I can't read it because I don't read well.  I don't know

21 how to read well.

22     MR. GREENBAUM: Can I ask the translator to read into the

23 record and then - take it from there?

24     JUDGE BUSCHMANN:  Yes.

25     MR. GREENBAUM:  Mr. Translator, can you read into the

1  record in Spanish and then translate it?

2      THE INTERPRETER:  Yes.  The interpreter shall read it

3  into the record and then endeavor to cite read it back into

4  English.

5  **(Whereupon, the statement was read in Spanish.)**

6      MR. McCARTHY:  Your Honor, I'm going to object to the

7  reading of this concerning other employees and who created

8  the pamphlet.  That's not relevant unless the Respondent is

9  planning on taking some adverse action against those other

10  employees at some time in the further.  I mean I don't

11  believe it's a correct procedure, Your Honor, for the

12  translator to be reading protected concerted activity of

13  other employees into the record that's set forth in her

14  affidavit.

15      MR. GREENBAUM:  Your Honor, number one, we move to strike

16  the gratuitous statement again, by counsel.  But, that said,

17  we could strike the name.  The translator doesn't have to

18  read the names.  I'm not concerned about the names.

19      JUDGE BUSCHMANN:  All right.  Let's change procedure.

20  Instead of referring her to her affidavit, which is in

21  Spanish, which she cannot read, please read your portion in

22  English as the translator translate into Spanish.

23      MR. GREENBAUM:  Thank you, Your Honor.

24  Q.  BY MR. GREENBAUM:  Ms. Majano, in your affidavit here you

25  state that -- You are explaining what was in the flyer.  I'm

1    not going to describe what was in the flyer.  We all have it.

2    And, then you state, "We gave it to all the employees who

3    were in the cafeteria.  At the end of lunch break we stopped

4    passing out the pamphlets and we returned to work."

5    A.    Uh-huh.  Uh-huh.

6    Q.    Okay.  Is there anything in your declaration that you

7    gave to the NLRB indicating that you had a discussion with

8    Mr. Palenzona?

9    A.    Yes.  I said it because that's right.  He knows it is.

10   It's a good thing he's here in front of me.

11   Q.    That wasn't my question.  My question was:  In this NLRB

12   statement is there anything about a conversation you had with

13   Mr. Palenzona regarding the distribution of literature at the

14   hotel?

15   A.    Yes.  That's right.

16   Q.    That's in here?

17   A.    It may not be in there but it did occur.

18   Q.    Did you just forget to tell the Board agent about it?

19   A.    Yes.  Yes.  That's what happened.

20   Q.    Now, you indicated there were several meetings at the

21   hotel between March and April, do you remember that?

22   A.    Yes.

23   Q.    Do you recall specifically when the meetings were?

24   A.    I don't recall the exact date, but yes, yes, among those

25   dates.

1    Q.    Was there a meeting in the laundry room?

2    A.    Yes.

3    Q.    Was Mr. Bello at that meeting?

4    A.    Yes.  Yes.

5    Q.    Did employees accuse Marleni Jiron of taping that

6    meeting?

7    A.    No.

8    Q.    What was the purpose of that meeting?

9    A.    Well, I don't know.

10    Q.    Were you at the meeting?

11    A.    Yes.  I was there because it was a workday.

12    Q.    What was discussed at that meeting?

13    A.    They only said that they couldn't give a raise because

14    the union was there and they were bargaining.

15    Q.    Did employees ask for a raise?

16    A.    Yes.

17    Q.    How many employees asked for a raise?

18    A.    Well, all of us wanted a raise.

19    Q.    Who started the meeting?  Did someone from management

20    start the meeting or did an employee start the meeting?

21    A.    Well, all of us had been asking for a meeting with them

22    because we, no one was listening to us about how we were

23    doing, how it was going with us at work, nobody was.

24    Q.    Were safety issues discussed at that meeting?

25    A.    What type of safety?

1   Q.   Workplace safety, safety walking home.

2   A.   And who's going to worry about us.

3   Q.   Now, did employees at that meeting complain about visits

4   from the union to their house?

5   A.   No.

6   Q.   In fact, you visited an employee at their house, didn't

7   you?

8   A.   Yes.  That's right.

9   Q.   Do you recall the name?

10  A.   Yes.  Maria Chumpitaz.

11  Q.   Did you speak to her husband that day?

12       MR. McCARTHY:  Your Honor, I'm going to object on

13  relevance.  I'm going to object -- I make an objection on

14  relevance grounds, Your Honor.  Her husband, whether another

15  employee spoke to the husband of that employee, I don't see

16  what relevance this has at all.

17       MR. GREENBAUM:  I think it's highly relevant, Your Honor.

18  It goes to why the employees were dissatisfied with the

19  union.

20       MR. McCARTHY:  There has been no foundation established

21  for that, Your Honor.

22       JUDGE BUSCHMANN:  Objection overruled.  Go ahead.

23  Q.   BY MR. GREENBAUM:  Did you speak with her husband that

24  day?

25  A.   Yes.  We just asked him for her.

1  Q.   She wasn't home, correct?

2  A.   No.  She was not.

3  Q.   Did you call him a liar during that meeting?

4  A.   No.  Why?

5  Q.   Did he tell you she was at work?

6  A.   Yes.  He said, "Oh, she's at work.  She told me she is

7  going to take the day off."  That was his answer.

8  Q.   Your response to him was, "We know she's not working

9  today," correct?

10  A.   No.  No.

11  Q.   Ms. Majano, I want to refer your attention to General

12  Counsel's Exhibit 3.  This is what you signed?

13  A.   No.  It's not this sheet.

14  Q.   If you look at the next sheet, is that what you signed?

15  A.   Yes.  Yes.  It's up here.

16  Q.   Did you read what was written on the first sheet before

17  you signed?

18  A.   No.

19  Q.   Now, you signed, did you get a raise after this?

20  A.   Yes.

21  Q.   When?

22  A.   On July 8.

23  Q.   This is dated March 21st; did you receive a raise in

24  April?

25  A.   In April.  That was in July, not in April.

1  Q.   The question is:  Did you receive a raise in April?

2       JUDGE BUSCHMANN:  We know it's not in April,

3  Mr. Greenbaum.

4  Q.   BY MR. GREENBAUM:  Now, I would like to turn your

5  attention to Exhibit 4, General Counsel's Exhibit 4, just for

6  the record.  Did you ever see that before?

7  A.   I don't recall.

8  Q.   Turn your attention to General Counsel's Exhibit 5.  Did

9  you ever see that before?

10 A.   No.  I don't remember.

11 Q.   Were you -- Did either Reina and Alex approach you with

12 respect to General Counsel's Exhibit 4?

13 A.   Yes.  Yes.

14 Q.   Did you sign it?

15 A.   Yes.

16 Q.   You signed it?

17 A.   Yes.

18 Q.   If you could review that and tell me where your signature

19 is?

20      JUDGE BUSCHMANN:  I think the witness is confused.  I

21 think maybe Mr. Greenbaum your questions are not conducive to

22 her responding correctly.

23      MR. GREENBAUM:  Do you want me to go up and point it out,

24 Your Honor?

25      JUDGE BUSCHMANN:  Yes.

1    MR. GREENBAUM:  Just for the record I am pointing the
2  witness to General Counsel's Exhibit 5.
3    THE INTERPRETER:  Shall I interpret that?
4    MR. GREENBAUM:  Well, the question is, if you want to
5  wait for the question.  The question is: has she ever seen
6  this before?
7    MR. McCARTHY:  Your Honor, the prior question was has she
8  ever seen four and now I guess we are on five.
9    JUDGE BUSCHMANN:  No.  No.  It is five.
10    MR. GREENBAUM:  Because it's right in front of me --
11    JUDGE BUSCHMANN:  Just asks whether or not she recognizes
12  General Counsel's Exhibit 5.
13    THE WITNESS:  I don't remember that page.
14  Q.  BY MR. GREENBAUM:  The same question, do you recognize
15  General Counsel's Exhibit Number 4?
16  A.  No.  I don't remember that sheet.  No.
17  Q.  Did Reina Lozano approach you in May to sign a petition?
18  A.  I don't remember which month but I do remember that she
19  was going around collecting signatures.
20  Q.  How many times did she approach you?
21  A.  Like on three occasions.
22  Q.  Do you recall the month?
23  A.  No.
24  Q.  Now, Ms. Lozano no longer wanted the union; is that
25  correct?

1  A.    I don't know why.

2  Q.    Well, you were at the union meeting when she had a fight

3  with the union business agent, correct?

4  A.    What fight are you talking about?

5  Q.    Were you at a meeting where she had some words with Olga?

6        MR. McCARTHY:  Your Honor, I'm going to object that this

7  is beyond the scope of direct examination.

8        JUDGE BUSCHMANN:  Yes.  Let me get to the point of this

9  thing here and let's finish up this witness, Mr. Greenbaum.

10       You testified that you were approached three times to

11 sign a petition, correct?

12       THE WITNESS:  Yes.  Yes.  Yes.

13       JUDGE BUSCHMANN:  And you signed a petition once,

14 correct?

15       THE WITNESS:  Only once, that's right.

16       JUDGE BUSCHMANN:  Why did you not sign the other two

17 petitions?

18       THE WITNESS:  Because I didn't choose to.

19       JUDGE BUSCHMANN:  Fine.  Thank you.

20       All right, Mr. Greenbaum, move on, please.

21       MR. GREENBAUM:  Thank you, Your Honor.  Well,

22 unfortunately I have to follow-up, Your Honor.

23 Q.    BY MR. GREENBAUM:  But it is your testimony that you did

24 not see -- You do not recall seeing General Counsel's Exhibit

25 4 and General Counsel's Exhibit 5, correct?

1  A.    Because they never showed me these sheets of paper.  They

2  showed me these ones.

3  Q.    When you say "these ones," what do you mean?

4  A.    These are the ones that she was going around with.

5  Q.    Is she referring to General Counsel's Exhibit 3?

6         JUDGE BUSCHMANN:  I don't think the witness -- I don't

7  think it's going to be very helpful here for this witness --

8         MR. GREENBAUM:  I'll move on, Your Honor.

9         JUDGE BUSCHMANN:  Okay.

10  Q.    BY MR. GREENBAUM:  You knew though that Reina was no

11  longer supporting the union, correct?

12  A.    Well, I didn't know that because it was all of a sudden

13  that plans that.  I didn't know that she did.

14  Q.    Did you ever hear the union saying to employees that you

15  are wasting their time?

16  A.    No.

17  Q.    Did you ever hear them say you better get more people at

18  a meeting because we are not going to work for you anymore?

19  A.    No.  No.

20         MR. GREENBAUM:  No further questions.

21         JUDGE BUSCHMANN:  Anything in redirect?

22         MR. McCARTHY:  Yes.  I have one question on redirect,

23  Your Honor.

24                        **REDIRECT EXAMINATION**

25  Q.    BY MR. McCARTHY:  You indicated that you forgot to tell

311

1   the Board agent about the conversation with Mr. Palenzona.
2   A.   Yes.  When he told me about the flyers that I couldn't
3   give them out inside.
4   Q.   Did you tell me, and Ms. Cotilla about your conversation
5   with Mr. Palenzona during your preparation for testimony
6   today?
7   A.   Yes.  Yes.  Yes.  That's correct.
8   Q.   Do you recall how many weeks ago that was that you told
9   us for the first time?
10  A.   I told it to you the week before, last week.
11      THE INTERPRETER:  The interpreter shall repeat the
12  utterance.  I told it to you last week.
13      MR. McCARTHY:  No further questions, Your Honor.
14      JUDGE BUSCHMANN:  Thank you, very much.  You may step
15  down.
16      MR. McCARTHY:  Your Honor, Ms. Cotilla is going to call
17  the next witness.
18      MS. COTILLA:  Dilcia Segovia.
19      JUDGE BUSCHMANN:  What is the first name, I'm sorry,
20  Ms. Cotilla.
21      MS. COTILLA:  Dilcia.
22      JUDGE BUSCHMANN:  Ma'am, I have to swear you in.
23      THE WITNESS:  Okay.  Okay.
24  (Whereupon,
25                      **DILCIA SEGOVIA**

1    was called as a witness by and on behalf of the General

2    Counsel, and having been first duly sworn, was examined and

3    testified as follows:)

4        JUDGE BUSCHMANN:  Please sit down.

5                        **DIRECT EXAMINATION**

6    Q.    BY MS. COTILLA:  Can you state your name for the record,

7    and spell it as well?

8    A.    That's Dilcia Segovia, D-i-l-c-i-a S-e-g-i-o.

9    Q.    Would it help for you to write it and then spell it out?

10        THE INTERPRETER:  The interpreter shall read the surname

11    written by the witness, S-e-g-o-v-i-a.

12        JUDGE BUSCHMANN:  Thank you.

13        THE INTERPRETER:  You're welcome.

14    Q.    BY MS. COTILLA:  Do you speak Spanish?

15    A.    Yes.

16    Q.    That's your native language?

17    A.    Yes.

18    Q.    Do you also speak English?

19    A.    A little.

20    Q.    Are you more comfortable testifying in English or

21    Spanish?

22    A.    In Spanish.

23    Q.    Did you at one time go by the name of Juana DeRoman?

24    A.    Yes.

25    Q.    When did you use that name?

1  A.   Before 2003 I was a resident and then I got my

2  citizenship.

3  Q.   When you got your citizenship is that also when you

4  changed your name?

5  A.   Yes.  Yes.

6  Q.   Are you currently employed?

7  A.   Yes.

8  Q.   Where do you work?

9  A.   I work at Home Depot Fairfax, BNF Sales.

10  Q.   Did you, at one time, work at the State Plaza Hotel?

11  A.   Yes.

12  Q.   What were the dates of your employment at the State Plaza

13  Hotel?

14  A.   That was from 1998 till 2005.

15  Q.   Do you remember the month that you left your employment

16  at the State Plaza Hotel?

17  A.   Yes.  That was in February of 2005.

18  Q.   Was your departure from the hotel voluntary or were you

19  discharged?

20  A.   No.  I found a better job.

21  Q.   What job did you perform when you were working at State

22  Plaza?

23  A.   First I was in housekeeping and then they switched me to

24  the lobby.

25  Q.   While you were at the State Plaza Hotel did you vote in a

 1  union election that was conducted by our office?

 2  A.    Yes.

 3  Q.    Do you know who Alexandra Guillen is?

 4  A.    Yes.

 5  Q.    Directing your -- Who is Alexandra Guillen?

 6  A.    She works in the, she used to work in the restaurant.

 7  Now, she works in the cafeteria.

 8  Q.    Directing your attention to October, November of 2004, do

 9  you recall having a conversation with Alexandra Guillen at

10  that time?

11  A.    Yes.

12  Q.    Where were you?

13  A.    I was throwing the trash out into the container.

14  Q.    Where in the building were you when you were throwing out

15  the trash?

16  A.    I was in the north part in the parking lot to the north

17  part.

18  Q.    Do you recall what day or what month this conversation

19  took place exactly?

20  A.    The exact day I don't remember.  The only thing I know is

21  that it was either in October or November.

22  Q.    What time was it when this conversation took place?

23  A.    It was between 2:30 and 1:00.

24  Q.    Was anyone else present?

25  A.    No.

1  Q.    Did Alex approach you or did you approach her?

2  A.    No.  She approached me.

3  Q.    Who spoke first, Alexandra or you?

4  A.    She did.

5  Q.    What did she say to you?

6  A.    She said that Mr. Berti (ph.) wanted to know why we had

7  had the union.

8  Q.    What was the name of the person you mentioned there?

9        MR. GREENBAUM:  Your Honor, I'm going to object there is

10  no allegation in the complaint pre-March '05, I believe.

11        JUDGE BUSCHMANN:  I know.

12        MS. COTILLA:  If I may respond.

13        JUDGE BUSCHMANN:  Yes.

14        MS. COTILLA:  Your Honor, this goes toward background of

15  what the allegations that are in the complaint, this is

16  background evidence of the decertification.

17        JUDGE BUSCHMANN:  All right.

18        MS. COTILLA:  And it also goes to the issue of agency for

19  Alexandra Guillen.

20        JUDGE BUSCHMANN:  Yes.  I overrule the objection.  Please

21  proceed.

22        THE WITNESS:  Mr. Berti.

23  Q.    BY MS. COTILLA:  Do you know who that person was?

24  A.    Yes.

25  Q.    Who did you understand him to be?

1  A.   I understood because they were friends.

2  Q.   But who was he?

3  A.   The owner of the hotel.

4  Q.   What, if anything, did you respond when Alex said that

5  Mr. Bernstein wanted to know why you had gone with the union?

6  A.   That was when she spoke to me so that I would go speak to

7  those in housekeeping about signing a petition.

8  Q.   What words did you actually tell Alex when she told you

9  that Mr. Bernstein, wanted to know why you had gone with the

10  union?

11      JUDGE BUSCHMANN:  Was that question clear?  I think you

12  better rephrase that question.  I don't think it was very

13  clear.

14  Q.   BY MS. COTILLA:  What words did you say to Alex after she

15  asked you -- I'm sorry.  What words did you say, what actual

16  words did you use with Alexandra that day?

17  A.   I told her that I wasn't going to talk about signing a

18  petition because I wanted the union to win so that we would

19  have better benefits and a better salary.

20  Q.   What did Alex tell you with regard to a petition?

21  A.   What she told me was that first the union didn't work and

22  that it would only take money away from us.

23  Q.   Do you recall if she said anything else?

24  A.   She said that he wanted us to stop the union that if we

25  stopped the union we could have a meeting and we could talk

1  because he was losing a lot of money on attorneys.

2  Q.   Did Alex tell you who said that?

3  A.   Yes.

4  Q.   Who said that?

5  A.   The hotel owner.

6  Q.   Is that Mr. Bernstein?

7  A.   Yes.  Yes.

8  Q.   But what did she tell with regard to a petition?

9  A.   She said that she wanted us to sign a petition so that he

10 would speak to us and so that he would agree with us to give

11 us better benefits and salary.

12 Q.   Did she ask you to do anything?

13 A.   She said that she wanted us to stop with the union and I

14 said that we wanted the union to win because without them we

15 wouldn't have any benefits?

16 Q.   Did she say anything else about Mr. Bernstein?

17 A.   Yes.  She told me that he was very humane.  And I said,

18 "If he is so humane as you say, why doesn't he go see the way

19 in which his employees work?"

20 Q.   Do you recall if Alex said anything else with regard to

21 Ms. Guillen and Mr. Bernstein?

22 A.   She told me that he was very good people because he had

23 helped her economically.

24 Q.   Did she tell you anything else?  Did she give you any

25 more specifics about that?

1  A.    She only said that he had helped her very much

2  economically with her family.

3  Q.    Did she tell you whether she had spoken to Mr. Bernstein?

4      MR. GREENBAUM:  Objection hearsay.

5      JUDGE BUSCHMANN:  Objection overruled.

6      THE WITNESS:  Yes.

7  Q.    BY MS. COTILLA:  How did that conversation between you

8  and Alexandra end?

9  A.    She appeared to me to be because after that day she

10  appeared to me to be very displeased and we didn't speak

11  after that.

12  Q.    What language did the conversation take place in?

13  A.    In Spanish.

14  Q.    Do you know who Reina Lozano is?

15  A.    Yes.

16  Q.    What was her job while you were State Plaza?

17  A.    Before she used to be in housekeeping and then I don't

18  know since that point until now what happened but they

19  switched her over to the cafeteria with Alex.

20  Q.    When you left State Plaza in February 2005, was Reina

21  still working as housekeeper?

22  A.    No.

23  Q.    What was she doing at that point?

24  A.    She was already in the cafeteria with Alex.

25  Q.    Do you know who Corrado Palenzona is?

1  A.  Yes.

2  Q.  Who is he?

3  A.  He is the hotel manager.

4  Q.  Did you ever see Alex, Reina and Corrado speak to each

5  other?

6  A.  Yes.

7  Q.  Where did you see them?

8  A.  They were together all the time in the mornings in the

9  cafeteria.

10  Q.  What, if anything, did you see them do?

11  A.  Well, in December the farewell party they were dancing

12  together and just always dancing together and that was all.

13  Q.  When Alex told you that she had spoken to the owner

14  Mr. Bernstein, did you believe her?

15  A.  I believed her because in the restaurant was still open

16  he would come just to, just there and he would speak to her.

17  Q.  Did you ever observe Alexandra together with

18  Mr. Bernstein the owner?

19  A.  Yes.

20  Q.  What did you see?

21  A.  I could see that they would always greet each other with

22  hugs and that they would always be together talking together

23  and eating together.

24  Q.  Did you ever observe Alex serve Mr. Bernstein?

25  A.  When he would come to the restaurant he would ask her to

1    serve him and the two of them would eat together.

2    Q.    Did you ever see any other employee of State Plaza

3    together with Mr. Bernstein?

4    A.    Never.

5    Q.    Did any other employees of State Plaza have similar

6    interaction with Mr. Bernstein that Alexandra did, that you

7    observed Alexandra?

8    A.    I believe that she is the only privileged one in that

9    sense.

10          MS. COTILLA:  No further questions.

11          MR. GREENBAUM:  All right, Your Honor, pursuant to your

12    instructions if there is a statement, we would like to review

13    it.  I don't think I would need that long.

14          MS. COTILLA:  There is no affidavit, Your Honor.

15                        CROSS-EXAMINATION

16    Q.    BY MR. GREENBAUM:  Did you ever speak with Corrado

17    Palenzona?

18    A.    Sometimes, not many.

19    Q.    But you did speak with him?

20    A.    I could tell you that it was very little that I spoke

21    with him, but yes, I have spoken to him.

22    Q.    Were you at the hotel Christmas party?

23    A.    Yes.

24    Q.    Did you observe Mr. Palenzona dancing with other

25    employees?

1  A.    No.

2  Q.    Did you observe him dancing with Marleni?

3        MS. COTILLA:  Objection.  She has already testified that

4  she didn't observe him with anyone.

5        JUDGE BUSCHMANN:  Objection overruled.  You may answer.

6        THE WITNESS:  Marleni danced but not with him.

7  Q.    BY MR. GREENBAUM:  Did you know that Alex was the most

8  senior food and beverage employee at the hotel?

9  A.    When?

10  Q.    That she worked there the longest?

11  A.    I didn't see that as a job, as something more than a job.

12  Q.    Let me rephrase it.  Did you know whether or not

13  Ms. Guillen had the longest tenure at the hotel?

14        THE INTERPRETER:  Are we referring to Ms. Guillen?

15        MR. GREENBAUM:  Yes.

16        THE INTERPRETER:  Okay.

17        THE WITNESS:  Tell him the I know, I do know that she has

18  worked there for quite some time but that doesn't mean she

19  can do anything she pleases.  That's why there's a manager of

20  the hotel.

21  Q.    BY MR. GREENBAUM:  When did you see Mr. Bernstein eating

22  at the hotel?

23  A.    When he would arrive the few times he would get there he

24  would go to the restaurant.

25  Q.    When was that?

1  A.    I could not specify the month and the day because that

2  was when the restaurant was open.

3  Q.    Do you have a guess?

4  A.    I only know that it was in 2003, 2004, something like

5  that but really I don't know.

6  Q.    What were you doing in the restaurant when you observed

7  him in the restaurant?

8  A.    Okay.  I worked in the lobby.  There are two lobbies, the

9  south and the north.  In theory there are two people for the

10 lobby but actually more often there's only one and that's why

11 I was in both.

12 Q.    So you were in the lobby when you saw Mr. Bernstein in

13 the restaurant?

14 A.    Yes, because I also go to the north to do cleaning there

15 as well.

16 Q.    When you left the hotel, did you tell Mr. Palenzona that

17 you were having surgery?

18 A.    At no time did I speak to him.

19 Q.    Did you ever tell Mr. Palenzona that you were quitting?

20 A.    Not him but Lisa I told because she is my manager.

21 Q.    When did you tell her that?

22 A.    I told her that in the last few days of January.

23       MR. GREENBAUM:  No further questions.

24                      **REDIRECT EXAMINATION**

25 Q.    BY MS. COTILLA:  Where was the restaurant located?

1    A.    The restaurant is in the north area.

2    Q.    Where is it in relation to the lobby?

3    A.    Because here is --

4          THE INTERPRETER:  The interpreter is going to have the

5    witness repeat the response.

6          THE WITNESS:  Because here is the restaurant and here are

7    the bathrooms and here is the entrance and here are the

8    bathrooms and you have to go back and forth in order to

9    clean, and here is the first floor.

10   Q.    BY MS. COTILLA:  Just so that the record is clear, are

11   you saying that the bathrooms are next to the restaurant,

12   which is next to the lobby?

13   A.    It is part of the lobby.

14   Q.    Do you know if the restaurant is still open?

15         MR. GREENBAUM:  Objection, Your Honor, asked and

16   answered.

17         JUDGE BUSCHMANN:  Sustained.  Any other questions?

18         MS. COTILLA:  No further questions, Your Honor.

19         JUDGE BUSCHMANN:  Thank you very much.  You may step

20   down.

21         THE WITNESS:  Okay.  Okay.

22         JUDGE BUSCHMANN:  Thank you.  Do you want to have a short

23   recess or do you want to continue.  I think maybe the court

24   reporter needs a small recess, right.

25         THE INTERPRETER:  The interpreter.

1          JUDGE BUSCHMANN:  The interpreter.  By the end of this
2    hearing I will learn that it's the interpreter.
3          THE INTERPRETER:  As long as nobody asks me to produce
4    the record, I won't complain.
5          MR. McCARTHY:  I'd like to keep going for a little while,
6    Your Honor.  I don't think we are going to get through the
7    next witness, but certainly we can go for about an hour.
8          JUDGE BUSCHMANN:  We are going to continue, but I was
9    just wondering whether we should take a short recess.
10         MR. McCARTHY:  That's fine.
11         JUDGE BUSCHMANN:  Do you have a witness that we are going
12   to be able to finish up this evening?
13         MR. McCARTHY:  No.  I don't, Your Honor.
14         JUDGE BUSCHMANN:  How many more witnesses do we have?
15         MR. McCARTHY:  I have three more witnesses, Your Honor.
16         JUDGE BUSCHMANN:  So this one and two more.
17         MR. McCARTHY:  Maybe four but.  Three definitely.
18         JUDGE BUSCHMANN:  Are we going to finish up tomorrow?
19         MR. McCARTHY:  I think so, Your Honor, depending upon how
20   much we -- I'd like to get a good start on the next witness.
21         JUDGE BUSCHMANN:  Sounds to me like a long witness.
22         MR. McCARTHY:  It is.
23         JUDGE BUSCHMANN:  Okay.  Let's take how much time?  If I
24   say five minutes it usually extends longer.
25         THE INTERPRETER:  Five is fine with me, Your Honor.

1      JUDGE BUSCHMANN:  All right.  Let's come back at ten

2  after four, please.

3  **(Off the record.)**

4      **JUDGE BUSCHMANN:  Let's go back on the record.**

5      MR. GREENBAUM:  Your Honor, before the witness and issue

6  came up.  I don't know if there's anything to it.  It's my

7  understanding that one cannot tape these proceedings except

8  for the office court reporter; is that correct?

9      JUDGE BUSCHMANN:  Yes.

10     MR. GREENBAUM:  Okay.  Our representatives in the back

11 said they observed someone with a tape recording back there,

12 and I don't know whether it was on or not but they believed

13 it was on.  They put it in their bag after the last witness

14 and left.  And if that did happen, that's highly unusual and

15 I would assume not permitted.

16     JUDGE BUSCHMANN:  Well, this is a public hearing if

17 anyone in this public hearing wishes to record something --

18     **We are off the record.**

19 **(Off the record.)**

20     **JUDGE BUSCHMANN:  Let's go back on the record.**

21     With regard to making a tape recording here of the

22 proceedings, I would ask that if Mr. McCarthy or Ms. Cotilla

23 know anything about this to investigate the matter and to

24 make sure that we clear this thing up.  And that will be

25 cleared up promptly, correct, Mr. McCarthy, Ms. Cotilla?

1          MR. McCARTHY:  Yes, sir.

2          MS. COTILLA:  Yes, Your Honor.

3          JUDGE BUSCHMANN:  All right.  Now, next witness,

4     Mr. McCarthy.

5          MR. McCARTHY:  I call Devki Virk.

6          JUDGE BUSCHMANN:  Oh, okay.  At least we don't need a

7     translator, right?

8          MR. McCARTHY:  No.

9     (Whereupon,

10                         **DEVKI VIRK**

11    was called as a witness by and on behalf of the General

12    Counsel, and having been first duly sworn, was examined and

13    testified as follows:)

14         JUDGE BUSCHMANN:  Now, you are an attorney, right?

15         THE WITNESS:  I am, sir.  I'm counsel for Local 25 for

16    this proceeding.  And I have been called by the General

17    Counsel as a fact witness on some of the confusion.

18         JUDGE BUSCHMANN:  That's somewhat unusual to have counsel

19    be a witness, isn't it?  No.  I suppose it's okay if that's

20    what you want to do.

21         MR. GREENBAUM:  I'm going to object to the witness, Your

22    Honor, and for the primary point that and I believe in our

23    telephone conference call, we were reviewing the complaint

24    and General Counsel indicated that he was not going to go,

25    "This happened on this day during negotiation.  This happened

1    on this day.  This happened on that day."

2        I do not believe there are any allegations in the

3    complaint regarding the actual negotiations.  So, we would

4    object to anything with respect to that.

5        MR. McCARTHY:  Your Honor, that's absolutely untrue.

6    The complaint alleges bad faith bargaining chronicled at the

7    table and away from the bargaining table but specifically the

8    sponsorship in decertifications -- In bargaining cases the

9    Board has typically permitted the negotiators at the

10   bargaining table who are typically attorneys representing the

11   parties to be witnesses and aggregates.

12       I don't particularly the rule.  I discussed it with

13   Ms. Virk before her testimony.  She's the one that provided

14   the evidence to the Region during the investigation with

15   regard to bargaining.  And in order to put on the evidence

16   with regard to the bad faith bargaining allegations, Your

17   Honor, the General Counsel would like to call Ms. Virk.  In

18   support for authority for the Board's case law establishing

19   an attorney as fact witness I would cite Anderson Enterprises

20   d/b/a Royal Motor Sales where the ALJ asked the Board to

21   address this issue and the Board did not do so.

22       MR. GREENBAUM:  I'm going to object, Your Honor, the

23   Complaint is not as broad as General Counsel states.  Looking

24   at paragraph 18, there is no allegation with respect to

25   bargaining in good faith or in bad faith at the table.  In

1  fact, their request for injunctive relief, which they filed

2  with the Court, which contains the complaint is a little even

3  more specific and has no allegation of conduct at the table.

4      Our position is that's not part of this hearing and we

5  would object on those grounds.

6      MR. McCARTHY:  Your Honor, the Respondent is not the

7  party that defines the General Counsel's complaint.

8      JUDGE BUSCHMANN:  No.  No.  But he can look at the four

9  corners of the complaint.

10     What is the paragraph that you are referring to,

11 Mr. Greenbaum?

12     MR. GREENBAUM:  In the Amended Complaint paragraph 18, I

13 believe 18(a) states, "At various times during the months of

14 March, April, May and June, Respondent met with the union for

15 purposes of collective bargaining" and that (b) states,

16 "During the period in time described above in 18(a) March,

17 April, May and June, Respondent engaged in the following

18 conduct: 1) Sponsoring the decertification petition; 2)

19 Promising and granting benefits if employees signed the

20 decertification petition."  And then, "(c) By its overall

21 conduct, including the conduct described in 18(b)," which I

22 just described, "Respondent has failed and refused to bargain

23 in good faith with the union as the exclusive bargaining

24 representative of the unit."

25     Now, I do acknowledge that it says by its overall conduct

 1   including one and two.  But there is nothing in (b) setting

 2   forth number three, engaged in bad faith bargaining at the

 3   table, engaged in surface bargaining, failed to provide

 4   information to the union, failed to make proposals, anything

 5   like that.

 6        And, in fact, if you look at their 10(j) petition, that's

 7   even more specific and there's nothing in there.  So, I would

 8   say you have to read both together, which indicates that

 9   that's not part of this case.  And, in fact, when the Board

10   agent called us and told us that a complaint was issued, he

11   specifically informed us that no complaint was issued with

12   respect to the conduct at the table, failure to give

13   information, things like that.

14        MR. McCARTHY:  Your Honor, that's absolutely not true.

15   Paragraph (a) refers to the bargaining sessions.  Paragraph

16   (b) says that the parties engaged in -- During the time that

17   they were at the bargaining table in paragraph (a) they

18   engaged in the following conduct in paragraph (b).  Then by

19   it's overall conduct the Respondent refused and failed to

20   bargaining in good faith --

21        JUDGE BUSCHMANN:  Yeah.  I can read that.  Now, wait a

22   minute.

23        MR. McCARTHY:  Now --

24        JUDGE BUSCHMANN:  Wait a minute.  Hold on a minute.  Hold

25   on a minute.  You are referring to 18(a).

1        MR. McCARTHY:  Correct.

2        JUDGE BUSCHMANN:  And 18(a) states as sort of a preamble

3    that, "At various times during the months of March, April,

4    May, June, the exact dates unknown, the Respondent met."  And

5    you are not -- That's not disputed.

6        MR. McCARTHY:  No. That's not disputed but they didn't

7    meet for four months, Your Honor, and that is evidence that

8    we want to put on.

9        JUDGE BUSCHMANN:  "The union met for the purpose of

10   collective bargaining with respect to wages."  They met.  And

11   then it says, "During the period of time described above this

12   decertification petition and then promising and grant them

13   benefits," and then "(c) Concluding by its overall conduct."

14       I think that Mr. Greenbaum may have -- I think we are on

15   a fine line here, Mr. McCarthy.  There is no direct

16   allegation, as I can see it that has to do with surface

17   bargaining or with the union's conduct at the bargaining

18   table.

19       MR. McCARTHY:  Your Honor, paragraph (c) addresses

20   overall conduct.

21       JUDGE BUSCHMANN:  Yes.

22       MR. McCARTHY:  In order to establish bad faith bargaining

23   General Counsel shows both conduct at the table and conduct

24   away from the table.

25       Now, I don't want to belabor it but I would like to show

1  through this witness the background of what bargaining took

2  place through the parties.  There were only six bargaining

3  sessions.

4      With regard to Mr. Greenbaum's contention that there's

5  nothing in the 10(j) petition he is absolutely right.  The

6  General Counsel did not authorize 10(j) on the bad faith

7  bargaining because the General Counsel believes that that was

8  not necessary to establish a 10(j).

9      But the compliant definitely alleges bad faith

10  bargaining.  In fact, if you look at the formal papers, each

11  of the charges alleges bad faith bargaining.  If

12  Mr. Greenbaum, in fact, has a dismissal --

13      JUDGE BUSCHMANN:  The charges are not at issue here at

14  all.  The charges are totally irrelevant here.  We are

15  talking about the four corners of the complaint.

16      MR. McCARTHY:  And if Mr. Greenbaum has a dismissal

17  letter from the Region with regard to the surface bargaining

18  allegation, bad faith bargaining allegation set forth in the

19  charges for which complaint issue he can certainly produce it

20  on cross of the witness.

21      JUDGE BUSCHMANN:  Do you have that, Mr. Greenbaum?

22      MR. GREENBAUM:  You know, Your Honor, the complaint was

23  amended so many times and some things were withdrawn.  To be

24  honest with you, I don't know what I have.  But I do know

25  that I could read the complaint and --

1      JUDGE BUSCHMANN:  Well, no.  Do you have such a document

2   where the General Counsel has withdrawn or indicated to the

3   Respondent that certain charges dealing with bad faith

4   bargaining has been withdrawn?

5      MR. McCARTHY:  No.  The two charges that preceded this

6   charge, Your Honor, those charges were withdrawn but

7   additional allegations were composed into a third charge,

8   which is the charge you have before you in the formal papers

9   and there was never any withdrawal of the bad faith

10  bargaining allegation.

11     MR. GREENBAUM:  Your Honor, this is really just argument.

12  The 10(j) petition includes the amended complaint.  They are

13  seeking a 10(j) injunction based on the complaint.  It's the

14  same thing.  There's still an allegation of bad faith

15  bargaining in the 10(j).  He's absolutely -- Mr. McCarthy is

16  absolutely correct.  It has to do with conduct away from the

17  table.  Conduct at the table is not at issue here.  Reading

18  the complaint, reading the 10(j), he even indicated during

19  our telephone conference the other day that he's not getting

20  into what happened on this day, what happened on that day.

21     This to me is irrelevant and basically what I'm trying to

22  do is buttress the argument.

23     JUDGE BUSCHMANN:  It says, "By the conduct described

24  above in paragraph 18(b), (c)" -- So we are not talking about

25  (a), (a) is not an alleged allegation, 18(a)?

1      MR. McCARTHY:  Your Honor, it's our position --

2      JUDGE BUSCHMANN:  Correct?

3      MR. McCARTHY:  That paragraph you are reading from, Your

4   Honor, does not reference (a), but overall conduct and bad

5   faith bargaining, Your Honor, and the parties need to look at

6   conduct both at and away from the table.  You can't examine

7   whether a Respondent is actually bargaining in bad faith by

8   looking at conduct just away from the table.  You need to

9   have some evidence of what's going on at the table

10  specifically in this case.  But they didn't come to the table

11  for four months.

12     JUDGE BUSCHMANN:  Mr. McCarthy, but you would admit that

13  the concluding paragraph, paragraph 24, does not mention

14  paragraph 18(a), 18(a) is a preamble.  And then paragraph (c)

15  is by its overall conduct including the conduct described in

16  18(b), which is decert and the granting of benefits.

17     So, I would tend to agree with you by its overall conduct

18  it goes beyond (b) to some extent.  But it indicates to some

19  extent also that we are not talking about a conduct shown at

20  the bargaining table and I, frankly, don't want to get into

21  it, in what happened day 1, day 2, day 3, day 4.

22     MR. McCARTHY:  I don't need to go into what happened -- I

23  do need to show overall bargaining conduct though, Your

24  Honor, otherwise if, in fact, overall conduct does not refer

25  to anything else but what's set forth in (b) there would be

1    no need for the breaks.

2        JUDGE BUSCHMANN:  Well, I do agree with that.

3        MR. GREENBAUM:  I don't agree, Your Honor.

4        JUDGE BUSCHMANN:  Now, let me ask -- Wait a minute.  Let

5    me ask you this, then:  What are you intending to call this

6    witness about?  What is her proposed testimony?

7        MR. McCARTHY:  To establish the course, the significant

8    efforts that the union made to even get this Respondent to

9    the bargaining table; what happened briefly once they got

10   Respondent to the bargaining table; what proposal Respondent

11   made with regard to wages and management rights at the

12   bargaining table; and how negotiations concluded when the

13   Respondent withdrew recognition.

14       And I would like to walk Your Honor through the

15   background evidence that I referred to in my opening

16   statement in this matter.

17       MR. GREENBAUM:  Your Honor, you could rest assured that

18   if there was an allegation in this complaint that Respondent

19   failed to meet with the union that would have been in the

20   complaint.  And, in fact, 18(a) says, "Respondent did meet

21   with the union."  And it would follow logically that if they

22   didn't meet with the union there would be an allegation that

23   the Respondent refused to meet and bargain with the union.

24   That would be an everyday, normal allegation set forth in a

25   complaint and it's not in here.

335

1        In fact, what's in here, the way I would read this is
2    that we met and we bargained and there was no objectionable
3    conduct, at least as set forth in this, except for conduct as
4    alleged outside the table.
5        JUDGE BUSCHMANN:  Well, I disagree with you.  I mean the
6    paragraph 18(c) would be meaningless when it says, "by its
7    overall conduct including."  It means that that's a more
8    specific portion of its overall conduct.  So the General
9    Counsel is entitled to show by its overall conduct.
10        But I disagree as to the detail that I think may be
11    offered as to the details of the bargaining negotiations and
12    who said what and what proposals were made and what proposals
13    were not made and et cetera.  So --
14        MR. McCARTHY:  I'm not going to get into minute detail
15    with regard to whether there was a management rights proposal
16    made, whether there was a wage proposal made, the wage
17    proposal is directly relevant to whether, in fact, Respondent
18    bargained concerning wages and then granted a wage increase
19    after it was due recognition --
20        JUDGE BUSCHMANN:  Maybe there you have a point that may
21    be relevant.
22        MR. McCARTHY:  And the only other proposal I would bring
23    to you attention is the management rights proposal and
24    introduce generally the union's opening proposal.  Just kind
25    of walk you through the background and corresponding --

```
 1        JUDGE BUSCHMANN:  Well, don't worry -- Don't walk me
 2   through minute detail and agonizing, you know, facts.  I
 3   think when it -- When the paragraph is that curt in its
 4   specifications and it really doesn't raise anything but
 5   specifically the decert petition and the granting of benefits
 6   and then it talks about overall conduct including those
 7   matters, I agree that you are entitled to show some of its
 8   overall conduct but not as I said, I think the complaint
 9   would have said something to the effect that the Respondent
10   refused this and then proposed that, et cetera, et cetera.
11        So, I'm trying to figure out here how to make sure that
12   you are not going beyond what 18(c) has meant as an
13   allegation.  And I think you ought to make sure that the
14   overall framework is maintained.  That we are not going
15   beyond the allegations in 18(c).  I think as you said, I
16   think maybe the monetary matters may be of relevance and
17   maybe the Respondent's willingness to negotiate but I would
18   certainly urge that we are not going into any day-to-day
19   bargaining details.  Because I think that the complaint
20   should have disclosed that and I don't think it does.
21        MR. McCARTHY:  Now, Respondent has made the argument that
22   there has been some disaffection of the union and in order to
23   set forth the background leading to the bargaining it is
24   necessary to provide some background evidence through this
25   witness as to what was going on that may, in fact, have led
```

1  to the disaffection of employees as opposed to the argument

2  that the Respondents going to make.

3      I understand Your Honor's concern about going into the

4  detail, blow by blow proposals --

5      JUDGE BUSCHMANN:  Yeah, because it would talk about

6  surface bargaining, now wouldn't it?

7      MR. McCARTHY:  Correct.

8      JUDGE BUSCHMANN:  So, go ahead and we will see how far we

9  go and how much into detail we are going to go and I'll try

10 my best to make sure that we are not, you know, exploding

11 this thing into an allegation that's beyond what is actually

12 alleged.

13     MR. McCARTHY:  Thank you, Your Honor.

14                    **DIRECT EXAMINATION**

15 Q.   BY MR. McCARTHY:  Would you state your name and address

16 for the record, please and spell your last name?

17 A.   Yes.  My name is Devki Virk, first name is D, as in

18 David, e, v as in Victor, k-i.  Last name Virk, V as in

19 victor, i-r-k.  My office address is Bredhoff and Kaiser,

20 B-r-e-d-h-o-f-f, and Kaiser, K-a-i-s-e-r, 805 15th Street NW,

21 10th Floor, Washington, DC 20005.

22 Q.   Are you currently employed?

23 A.   I am.

24 Q.   By whom?

25 A.   I'm a partner at Bredhoff and Kaiser, a law firm here in

1   Washington.

2   Q.    Do you represent the Charging Party/Union?

3   A.    I do.

4   Q.    Who does Local 25 represent?

5   A.    Hospitality Industry employees throughout the

6   metropolitan Washington region.

7   Q.    Who is Local 25's principal elected officer?

8   A.    That would be John Boardman, executive

9   secretary/treasurer.

10  Q.    Are you familiar with his responsibilities?

11  A.    Generally.  He serves as chief negotiator for the union

12  in most if not all of its contract negotiations.  He's the

13  person with all of the authority with respect to

14  administering the affairs of the union.

15        JUDGE BUSCHMANN:  Who is that now that you are talking

16  about?

17        THE WITNESS:  John Boardman, B-o-a-r-d-m, as in Mary,

18  a-n.

19        JUDGE BUSCHMANN:  Is Mr. Bredhoff still there?

20        THE WITNESS:  No.  He passed away.  The day after

21  Election Day 2004.

22        JUDGE BUSCHMANN:  Yeah.  I think I once had him as a

23  lawyer, I think.

24        THE WITNESS:  You may have.

25        JUDGE BUSCHMANN:  Sorry.  Go ahead.

1  Q.   BY MR. McCARTHY:  Are you familiar the Respondent State

2  Plaza Hotel and its parent corporation R.B. Associates, Inc.?

3  A.   Generally I am as in my capacity as counsel for Local 25.

4  Q.   How are you generally familiar with them?

5  A.   I was counsel for Local 25 in connection with the R case

6  proceedings when the union petitioned for an election at the

7  State Plaza Hotel in July of 2003 and the subsequent post

8  election proceedings involving that election.  That went from

9  September 5th, 2003, which was the date of the election,

10  through June 29th, 2004, when the Board overruled objections

11  and certified Local 25 as the exclusive representative.

12      JUDGE BUSCHMANN:  Could you repeat that again.  You are

13  going awfully fast and you are making things very technical.

14      THE WITNESS:  I'm sorry.

15      JUDGE BUSCHMANN:  So, you are going to have to say that

16  again.

17      THE WITNESS:  Yes.  I'm sorry, Your Honor.

18      I serve as counsel for Local 25 and in that capacity I'm

19  familiar with the State Plaza Hotel through my representation

20  of Local 25 in the election that was held at the State Plaza

21  Hotel in September 2003.  There were both pre-election

22  proceedings, in the representation case and there were also

23  post-election proceedings --

24      JUDGE BUSCHMANN:  Okay.

25      THE WITNESS:  -- when the employer filed objections and a

1    ULP charge.  That unit was finally certified with all those

2    objections overruled on June 29, 2004.  The petition was

3    initially filed July of 2003.

4    **(General Counsel's Exhibit 46 marked for identification.)**

5    Q.    BY MR. McCARTHY:  Directing your attention to GC-46, is

6    that the petition that the union filed?

7    A.    Yes.  It is.

8    **(General Counsel's Exhibit 47 marked for identification.)**

9        MR. McCARTHY:  Could I seek a stipulation from counsel

10   that GC-47, the tally of ballots, is an accurate tally of

11   ballots and --

12       MR. GREENBAUM:  Yes.

13   **(General Counsel's Exhibit 48 marked for identification.)**

14   Q.    BY MR. McCARTHY:  I'm, Ms. Virk, directing your attention

15   to GC-48, do you recognize that document?

16   A.    Yes.  This is the complaint in the prior fair legal

17   practice case that the union as charging party filed against

18   the State Plaza Hotel in connection with the Hotel's pre-

19   election conduct, including the discharge of an employee as

20   well as various threats and promises and grants of benefits

21   made to employees prior to the election in 2003.  This is the

22   complaint issued in that case.

23   **(General Counsel's Exhibit 48(a) marked for identification.)**

24   Q.    BY MR. McCARTHY:  And then directing you attention to

25   General Counsel's Exhibit 48(a), do you recognize that

1  document?

2  A.    Yes.  This is a response by Mr. Greenbaum to my client

3  the chief officer at Local 25, John Boardman, dated November

4  26, 2003, the response to the union's first formal written

5  bargaining request to bargaining a contract for the entire

6  unit at the State Plaza.  The Regional Director had initially

7  overruled objections filed by the employer.  That ruling came

8  in on November 19th of 2003 and on November 26th the union

9  made a written bargaining demand.  I do not have a copy of

10  that letter, but I did get a copy of Mr. Greenbaum's response

11  refusing to bargaining and choosing instead to seek review of

12  the Regional Director's supplemental decision, which was then

13  granted.

14  **(General Counsel's Exhibit 49 marked for identification.)**

15  Q.    BY MR. McCARTHY:  Then directing your attention to GC-49,

16  do you recognize that document?

17  A.    Yes.  This is the decision, looks like a copy of the

18  decision by Judge Evans in the prior ULP case against the

19  State Plaza that I referred to, the one that involved the

20  threats to employees, promises and grants of benefits and the

21  discharge of an employee for protected concerted activity.

22  That decision came down on May 19th, 2004.

23  Q.    Did you represent Local 25 in that trial and

24  Mr. Greenbaum represented Respondent?

25  A.    I did, although I don't believe that the charging party

1  filed briefs except from the General Counsel.

2  Q.   Thank you, does that case remain pending before the Board

3  on exceptions from Respondent?

4  A.   It does.

5  Q.   Do you recall whether Respondent filed objections to the

6  election?

7  A.   Yes.  They did.

8  Q.   Do you recall whether there was a hearing?

9       MR. GREENBAUM:  Object, Your Honor, this is all

10 irrelevant to this case.

11      JUDGE BUSCHMANN:  It's actually all public documents,

12 isn't it?

13      MR. McCARTHY:  It is, Your Honor.

14      JUDGE BUSCHMANN:  Why go into it?  It's there, isn't it?

15      MR. McCARTHY:  Well, it's in this record, Your Honor, I

16 don't know -- I mean it's background evidence of what

17 happened in this case for the certified unit.

18      JUDGE BUSCHMANN:  The objections are they part of General

19 Counsel's Exhibit 49?

20      MR. McCARTHY:  No.  The objections -- No.  They are not,

21 Your Honor.  That's the -- GC-49 is the prior Judge Evan's

22 case.

23      JUDGE BUSCHMANN:  Right.  Where are the objections?

24 Where are they contained?

25      MR. McCARTHY:  GC-50 is the recommended decision and

1   objections.

2   **(General Counsel's Exhibit 50 marked for identification.)**

3       JUDGE BUSCHMANN:  So it's part of the -- It's there.

4   It's a public document?

5       MR. McCARTHY:  Yes, Your Honor.

6       JUDGE BUSCHMANN:  Okay.  So we don't have to really

7   object to that, right, Mr. Greenbaum?

8       MR. GREENBAUM:  I don't need to object to it but we also

9   don't need to have it in the record and I don't believe we

10  need testimony on that.  It's not --

11      JUDGE BUSCHMANN:  It's part of the -- It's public record

12  and you can refer to it in your briefs.

13      MR. GREENBAUM:  Exactly, Your Honor.

14      JUDGE BUSCHMANN:  Okay.  Go ahead.

15      MR. McCARTHY:  Your Honor, I would offer then GC-48(a) at

16  this time because that's not part of the public record.

17      JUDGE BUSCHMANN:  Yes.  Any objection to 48(a),

18  Mr. Greenbaum, that's your response.

19      MR. GREENBAUM:  Yes, I object, Your Honor.  It's

20  irrelevant to these proceedings.

21      JUDGE BUSCHMANN:  I receive, however, 48(a), because I

22  think there is no question as to its authenticity and I

23  believe it's relevant.

24  **(General Counsel's Exhibit 48(a) received into evidence.)**

25      JUDGE BUSCHMANN:  The other documents 47, 48, 19 and 50

1    are public documents and they are I supposed included in your

2    exhibits for ease of handling those matters, right,

3    Mr. McCarthy?

4        MR. McCARTHY:  That's correct, including 46, Your Honor,

5    which is the original petition.

6        JUDGE BUSCHMANN:  Original petition, all right.  I mean I

7    have no problem with having those in the record as exhibits

8    because it makes it easier to refer the those matters without

9    then having to extraneous documents flying around.

10       MR. McCARTHY:  That was my thinking, Your Honor, so I

11   would offer GC-46 through 50 for that purpose.

12       JUDGE BUSCHMANN:  Yes.  Any objection, Mr. Greenbaum?

13       MR. GREENBAUM:  Your Honor, I have no objection as long

14   as we don't have testimony on that.  I don't believe it's

15   relevant to this proceeding.  If General Counsel wants to

16   refer to those in argument that's argument but it's not a

17   fact for this proceeding.

18       JUDGE BUSCHMANN:  I hereby receive 46 through 50.

19   **(General Counsel's Exhibits 46 through 50 received into**

20   **evidence.)**

21   **(General Counsel's Exhibit 51 marked for identification.)**

22   Q.   BY MR. McCARTHY:  Then directing your attention Ms. Virk

23   to GC-51, do you recognize that document?

24   A.   Yes.  This is a letter dated about a month after Judge

25   Evan's pre-decision came down, dated June 23rd, 2004, from

1   Mr. Greenbaum to John Boardman notifying the union that
2   although the Hotel did not consider itself a duty to bargain
3   or recognize the union it was to notify the union that the
4   Hotel was intending to close the restaurant for renovations.
5   **(General Counsel's Exhibit 52 marked for identification.)**
6   Q.   BY MR. McCARTHY:   Then directing your attention to GC-52,
7   do you recognize that document?
8   A.   Yes.   Upon receiving, this is the letter that
9   Mr. Boardman wrote back to Mr. Greenbaum on June 29th, 2004,
10  requesting bargaining over both the decision to close the
11  restaurant as well a the facts.  I believe the restaurant
12  employed about between 15 and 25 people.  So it was a
13  significant closure.
14  **(General Counsel's Exhibit 53 marked for identification.)**
15  Q.   BY MR. McCARTHY:   And then directing your attention to
16  GC-53, do you recognize that document?
17  A.   Yes.   This is the certification that was issued by the
18  NLRB adopting Judge Giannasi's recommended decision
19  overruling the employer's objections and certifying Local 25
20  as the representative for the union at the State Plaza.
21  **(General Counsel's Exhibit 54 marked for identification.)**
22  Q.   BY MR. McCARTHY:   Now, directing your attention to GC-54,
23  do you recognize that document?
24  A.   Yes.   This is a letter that I wrote to Mr. Greenbaum upon
25  I believe in fact the same day that I received the Board's

1   certification of the unit.  This letter requested bargaining

2   for the terms and conditions of employment for all employees

3   in the unit.

4        MR. GREENBAUM:  What was that date?

5        MR. McCARTHY:  That's dated July 2nd, 2004.

6        MR. GREENBAUM:  The copies you gave me I just have a fax

7   cover sheet.

8        MR. McCARTHY:  Your Honor, at this time I'd offer General

9   Counsel's Exhibit 51 through 54.

10       JUDGE BUSCHMANN:  Any objection?

11       MR. GREENBAUM:  Same objection on relevance grounds, Your

12  Honor.

13       JUDGE BUSCHMANN:  These are what, 50 through 54?

14       MR. McCARTHY:  Fifty-one through fifty-four.

15       JUDGE BUSCHMANN:  Fifty-one through fifty-four.  General

16  Counsel's Exhibit 51 through 54 are hereby received.

17  **(General Counsel's Exhibit 51 through 54 received into**

18  **evidence.)**

19  Q.   MR. McCARTHY:  Did the parties engage in -- Now, did the

20  parties engage in effects bargaining on or about July 6th or

21  7th, 2004?

22  A.   I believe it was actually on July 7; we had a meeting at

23  Mr. Greenbaum's office to discuss the effects of the closure

24  of the restaurant for renovation on the affected employees.

25  Q.   Did you have a sidebar conversation with Mr. Greenbaum at

1  the July 6th or 7th meeting?

2  A.   Yes.  Either at the beginning of that, I believe it was

3  July 7th meeting, or at its conclusion I asked Mr. Greenbaum

4  to take a few minutes with me privately to discuss the status

5  of the union certification and what the Hotel's position was

6  going to be with respect to bargaining a contract for the

7  entire unit.  What I was trying to find out if they were

8  going to test certification or if they were going to be

9  willing to sit down at the bargaining table with us at that

10  point.

11       Mr. Greenbaum responded that although July and August

12  would be difficult months to schedule any meetings because of

13  vacation plans that they would get in touch with us with a

14  schedule for dates.  And by that I understood him to mean

15  that the hotel did not intend to test certification at that

16  time.

17  **(General Counsel's Exhibit 55 and 56 marked for**

18  **identification.)**

19  Q.   BY MR. McCARTHY:  Directing your attention to General

20  Counsel's Exhibit 55, do you recognize that document?

21  A.   Yes.  Fifty-five is the letter that Mr. Greenbaum wrote

22  to me confirming the effects agreement with respect to food

23  and beverage employees.  That's dated July 21st, 2004.

24       I believe the next document that you have, Exhibit 56, is

25  a letter that I wrote back to him two days later that

1  attaches a document that I think he was referring to in that

2  July 21st letter, and confirms that that document, which

3  shows the, I believe, vacation payouts to the food and

4  beverage employees and confirms that that's part of the

5  effects agreement.

6  **(General Counsel's Exhibit 56(a) marked for identification.)**

7  Q.    BY MR. McCARTHY:  Then directing your attention to

8  GC-56(a), do you recognize that document?

9  A.    Yes.  This is an e-mail message that I sent to

10  Mr. Greenbaum, which actually covers two topics.

11  Mr. Greenbaum represents, in addition to the State Plaza

12  Hotel a number of other unionized properties in town,

13  including the Governor's House, which is now the Beacon.  He

14  and I have had some discussions negotiating settlement of

15  agreements at the Governor's house.

16       The e-mail concerns execution of those agreements and

17  also prompts him for bargaining dates for the State Plaza

18  unit.  It's dated August 2nd, 2004, one month after we sent

19  our initial written demand and about three weeks after I had

20  a sidebar conversation with Mr. Greenbaum as I've described.

21       MR. McCARTHY:  Your Honor, I offer General Counsel's

22  Exhibit 55 through 56(a).

23       JUDGE BUSCHMANN:  Any objection?

24       MR. GREENBAUM:  Same objection, irrelevant.

25       JUDGE BUSCHMANN:  Fifty-five through fifty-six are hereby

1  admitted.

2  Q.   BY MR. McCARTHY:  Did Mr. Greenbaum respond --

3       MR. McCARTHY:  Through 56(a), Your Honor, 55, 56 and (a).

4       JUDGE BUSCHMANN:  That's 55, 56 and 56(a) are hereby

5  received.

6  **(General Counsel's Exhibit 55 through 56(a) received into**

7  **evidence.)**

8       MR. McCARTHY:  Thank you, Your Honor.

9  Q.   BY MR. McCARTHY:  Did Mr. Greenbaum respond to GC-56(a)?

10 A.   No.

11 Q.   Did he give you any dates for a certified meeting at that

12 time?

13 A.   No.

14 Q.   Was the union involved in other negotiations at that

15 time?

16 A.   I believe beginning on August 9th of 2004, the union had

17 its first meeting with the Hotel Association of Washington,

18 DC, which is the bargaining agent for multi-employer unit of

19 major hotels in the city.  There's a master agreement that

20 the parties negotiate, with the hotel association on the one

21 hand, and Local 25 on the other.  That master agreement

22 covers approximately 4,000 employees in the city.

23      That contract was set to expire on September 15th of

24 2004.  We were getting it I said on August 9th; negotiators

25 for the hotel association and for Local 25 began negotiations

350

1  for a successful agreement at that time.  We were

2  anticipating it to be a very difficult set of negotiations,

3  which is why we began early in hopes of being able to reach a

4  contract by September 15th.

5      JUDGE BUSCHMANN:  Is the Respondent here a member of that

6  hotel association?

7      THE WITNESS:  They are not -- Well, they may be a member

8  of the hotel association itself but in terms of having the

9  hotel association as a collective bargaining agent, I don't

10  believe they are.  I don't believe any of their hotels other

11  than the State Plaza is unionized.

12      JUDGE BUSCHMANN:  Are what?

13      THE WITNESS:  Are unionized.

14      JUDGE BUSCHMANN:  I see.

15  Q.  BY MR. McCARTHY:  When did those citywide negotiations

16  being?

17  A.  I believe we first sat down with the -- negotiators on

18  August 9th.  We met almost continuously from then through and

19  even after September 15th, 2004 because we did not, in fact,

20  reach a successful agreement.

21      JUDGE BUSCHMANN:  But that has not relationship to this

22  case then?

23      MR. McCARTHY:  That's my next question, Your Honor.

24      JUDGE BUSCHMANN:  I'm sorry.  Go ahead.

25  Q.  BY MR. McCARTHY:  Did that affect the union's resources

1   in bargaining strategy with the State Plaza Hotel?

2   A.    Well, it certainly affected the union's focus, I guess

3   the way I would put it, that the Local 25 during that period

4   of time from approximately August of 2004 straight through to

5   through probably end of November of 2004, was very focused on

6   our efforts to reach a new citywide agreement and the union's

7   resources were primarily directed at that effort.

8        Both Mr. Boardman and I were at the table and were

9   heavily involved in those negotiations.

10  Q.    Now, when did you reach agreement with the hotel

11  association?

12  A.    Right before the strike deadline, which was inauguration

13  day of 2005 so the first two weeks of January of 2005.

14  Q.    Was the union continuing to devote any resources to

15  meeting with the employees at the State Plaza Hotel?

16  A.    They were, as I understood it when they could the

17  organizers who were responsible for the State Plaza were in

18  communication with the employee and I believe were holding

19  meetings during that period, albeit much less frequently than

20  they had previously.

21  Q.    Do you recall whether there was a meeting in December of

22  '04?

23  A.    In December of 2005, my understanding is that there was a

24  meeting, although I was not present.  I also understand there

25  to be a meeting in, at least one meeting in July and possibly

1   some meetings in between the end of July and December as

2   well.

3   Q.   Of 2004 or 2005?

4   A.   I'm sorry, 2004, my apologies.

5   **(General Counsel's Exhibit 57 marked for identification.)**

6   Q.   BY MR. McCARTHY:  Now, I'd like to direct your attention

7   to General Counsel's Exhibit 57.  What is that document?  Do

8   you recognize that document?

9   A.   I do.  This is a letter that I wrote to Mr. Greenbaum

10  following up on the initial bargaining request made in July,

11  a follow-up to the request made by e-mail in August.  I wrote

12  to him on December 2nd of 2004 iterating the union's request

13  to bargain a contract for the entire unit and closing a

14  preliminary information request.

15  Q.   How many demands to bargaining had the union made in

16  writing prior to this time?

17  A.   In writing I believe three.  I think this was the fourth.

18  Q.   What response did you receive from Respondent to your

19  December 2nd, 2004, letter?

20  A.   Not at that time.

21  **(General Counsel's Exhibit 58 marked for identification.)**

22  Q.   BY MR. McCARTHY:  Directing your attention to GC-58, do

23  you recognize that document?

24  A.   Yes.  When I had received no response for about a month I

25  wrote back to Mr. Greenbaum on January 3rd and asked for a

1    response.

2    Q.    Is that the letter you wrote on January 3rd?

3    A.    Yes.  It is.

4    **(General Counsel's Exhibit 59 marked for identification.)**

5    Q.    BY MR. McCARTHY:  Then directing your attention to GC-59,

6    do you recognize that document?

7    A.    Yes.  When Mr. Greenbaum still did not respond to the

8    January 3rd, letter, this is the letter I wrote to him at the

9    end of January, on January 28th, letting him know that the

10   union considered the ignoring a bar request to meet, refusal

11   to bargain and would file charges unless we heard something

12   from them and received this.

13   **(General Counsel's Exhibit 60 marked for identification.)**

14   Q.    Then directing your attention to GC-60, do you recognize

15   that document?

16   A.    Yes.  This is the first response that I received back

17   from Mr. Greenbaum and it's a letter dated January 31st,

18   2005, that as it states, "As of now the hotel could

19   tentatively schedule a meeting for," and it goes for three

20   potential dates, the first was three weeks hence.

21        MR. McCARTHY:  Your Honor, I offer General Counsel's

22   Exhibits 57 through 60.

23        JUDGE BUSCHMANN:  Any objection?

24        MR. GREENBAUM:  Same objection, Your Honor, irrelevant.

25        JUDGE BUSCHMANN:  Fifty-seven through General Counsel's

1   Exhibit 60 are hereby received.

2       MR. McCARTHY:  Thank you, Your Honor.

3   **(General Counsel's Exhibit 57 through 60 received into**

4   **evidence.)**

5   **(General Counsel's Exhibit 61 marked for identification.)**

6   Q.   BY MR. McCARTHY:  Now, Ms. Virk, directing your attention

7   to GC-61, do you recognize that document?

8   A.   Yes.  This is a letter dated February 3rd, that I sent to

9   Mr. Greenbaum in response to his letter dated January 31st,

10  the union accepted all three of the dates that Mr. Greenbaum

11  had proposed and I had reserved, informed him that I had

12  reserved conference room space at my office for the meetings.

13  Asked him if he wanted to have a different site and also

14  prompted him to make some response to our information request

15  which we had not received response on as yet.

16  **(General Counsel's Exhibit 62 marked for identification.)**

17  Q.   BY MR. McCARTHY:  Directing your attention to GC-62, do

18  you recognize that document?

19  A.   Yes.  This is a letter I received from Mr. Greenbaum the

20  next day, February 4th of 2005, that advised that, first that

21  the hotel was no longer available on the first of the three

22  dates that had been mentioned in Mr. Greenbaum's January 31st

23  letter, and told us explicitly that all three of the dates

24  that they had offered were alternates, i.e., that they would

25  only agree to one date to meet at a time.  And then suggested

1    that the meeting not begin until 2:00 in the afternoon.

2    **(General Counsel's Exhibit 63 marked for identification.)**

3    Q.   BY MR. McCARTHY:   Directing your attention to GC-63, do

4    you recognize that document?

5    A.   Yes.   This is the letter I wrote back to Mr. Greenbaum

6    responding to his letter dated February 4th, accepting the

7    date that he offered and informing him that we believed that

8    it was not acceptable behavior to simply offer one date at a

9    time.

10   **(General Counsel's Exhibit 64 marked for identification.)**

11   Q.   BY MR. McCARTHY:   And then directing your attention to

12   GC-64, do you recognize that document?

13   A.   Yes.   This is the letter that I received from

14   Mr. Greenbaum on February 16th, advising me that the one date

15   that the hotel would agree to bargain on, which was March

16   3rd, was no longer available but suggesting an alternate date

17   March 2nd, again beginning at 2:00 in the afternoon and

18   asking if the union was available.

19   **(General Counsel's Exhibit 65 marked for identification.)**

20   Q.   BY MR. McCARTHY:   Directing your attention to GC-65, do

21   you recognize that?

22   A.   Yes.   This is the letter I wrote back to Mr. Greenbaum on

23   February 17th, responding to his letter of February 16th,

24   expressing our disappointment and also letting him know that

25   I was checking off my schedule as well as the schedules of

1  Mr. Boardman to determine if the March 2nd date that he had

2  now proposed was acceptable.

3  Q.   Had the Respondent supplied any of the requested

4  information at that time?

5  A.   As of February 17th they had not.

6      MR. GREENBAUM:  Objection, Your Honor, there was a

7  specific charge, complaint charged with respect to failure to

8  provide information, a complaint was not issued on that.

9  Rest assured if that was an allegation in the complaint that

10  would be in there.  There was not.

11      So I'm going to object to all of this because the

12  problem --

13      JUDGE BUSCHMANN:  I understand.

14      MR. GREENBAUM:  -- and I'd like to make a record.

15      The problem with this testimony is, you know, to refute

16  this testimony, I know where they are trying to go with this,

17  it means we are going to have to get into what happened day-

18  to-day of negotiations because our position is at negotiation

19  the union, we did the negotiation the union didn't do any

20  negotiating.  What they tried to do is stick us, stick the

21  employer with the Hotel Association agreement.  There was no

22  bargaining.  It was a sham on the union's part.  They

23  didn't --

24      MR. McCARTHY:  Your Honor, this -- Objection, closing

25  argument.

1        MR. GREENBAUM:  They had no intent to bargain and the

2   record would show, if we had to go into this, which I don't

3   believe is part of this, is that we bargained in good faith.

4   We gave in on a lot of issues.  The union gave in on nothing.

5   Their initial proposal was the Hotel Association agreement

6   take it or leave it.  And the problem with this line of

7   questioning I'm, you know, over objection we are putting in

8   all these exhibits.  That's fine.  But this is gratuitous

9   testimony.  It really adds nothing to this procedure.

10       JUDGE BUSCHMANN:  All right.  Thank you.

11       Please continue, Mr. McCarthy.

12       MR. McCARTHY:  Your Honor, I offer General Counsel's

13   Exhibit 61 through 65 at this time.

14       JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

15       MR. GREENBAUM:  Same objection.

16       JUDGE BUSCHMANN:  Sixty-one through what?

17       MR. McCARTHY:  Sixty-five.

18       JUDGE BUSCHMANN:  General Counsel's Exhibit 61 through 65

19   are hereby received.

20   **(General Counsel's Exhibit 61 through 65 received into**

21   **evidence.)**

22   **(General Counsel's Exhibit 66 marked for identification.)**

23   Q.   BY MR. McCARTHY:  Directing your attention to General

24   Counsel's Exhibit 66, Ms. Virk, do you recognize that

25   document?

1  A.   I do.  This is a letter that I wrote to Mr. Greenbaum on

2  February 22nd advising him that the union negotiators were,

3  in fact, available to meet on March 2nd at 2:00 in

4  Mr. Greenbaum's offices as he had proposed on February 16th.

5  And also advising him that we were still available on March

6  10th and requesting to bargain on that date as well.

7  Q.   Did the parties meet on March 3rd as agreed?

8  A.   By this letter we agreed to meet on March 2nd.  No.

9  Q.   Did the parties meet on March 2nd as agreed?

10  A.   No.  We did not.

11  Q.   Why not?

12  A.   Late in the afternoon on March the 1st, I received a call

13  or a voice mail message from Mr. Greenbaum's assistant, Maria

14  Sklar of Nixon Peabody who advised me that the meeting the

15  next day would have to be cancelled due to an emergency that

16  Mr. Greenbaum had experienced.

17  **(General Counsel's Exhibit 67 marked for identification.)**

18  Q.   BY MR. McCARTHY:  Were you notified by fax as set forth

19  in GC-67 of that?

20  A.   Yes.  Ms. Sklar sent me the fax and Exhibit 67 is that

21  fax.  She noted also that Mr. Greenbaum would contact me by

22  the end of the week to reschedule that meeting.

23  **(General Counsel's Exhibit 68 marked for identification.)**

24  Q.   BY MR. McCARTHY:  Then directing your attention to GC-68,

25  do you recognize that document?

1    A.    Yes.  This is the letter that I wrote to Mr. Greenbaum on

2    March 7th when after the week had passed we had not heard

3    anything further about scheduling bargaining dates and

4    expressing our concern.

5    **(General Counsel's Exhibit 69 marked for identification.)**

6    Q.    BY MR. McCARTHY:  Then directing your attention, Ms. Virk

7    to GC-69, do you recognize that document?

8    A.    Yes.  This is Mr. Greenbaum's response, I believe to my

9    March 7th letter, dated March 11th, which advises that they

10   are available to meet on Wednesday, March 16th, the

11   rescheduled the canceled March 7th meeting.

12        MR. McCARTHY:  Your Honor, at this time I would offer

13   General Counsel's Exhibit 66 through 69?

14        JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

15        MR. GREENBAUM:  Yes, Your Honor, same objection and I

16   would note for the record, that on March 2nd I had two deaths

17   in the family.  The union was notified of that.  They

18   continue to make an issue of it.  It's ridiculous and

19   inappropriate.

20        I would also note for the record, that when the union

21   requested all day bargaining we were there and they called

22   off the bargaining after several hours because they had no

23   proposal to make.

24        Thank you, Your Honor.

25        JUDGE BUSCHMANN:  I hereby receive Exhibit 66 through 69.

1    **(General Counsel's Exhibit 66 through 69 received into**

2    **evidence.)**

3         MR. McCARTHY:  Your Honor, at this time Ms. Cotilla will

4    hand out General Counsel's second pack of exhibits.

5         Are you ready to proceed, Your Honor?

6         JUDGE BUSCHMANN:  Yes.

7    **(General Counsel's Exhibit 70 marked for identification.)**

8    Q.   BY MR. McCARTHY:  Directing your attention, Ms. Virk, to

9    General Counsel's Exhibit 70, do you recognize that document?

10   A.   Yes.  This is a letter dated March 11th that I wrote to

11   Mr. Greenbaum letting him know that I would check with the

12   union's negotiating team and determine whether March 16th was

13   a viable date to meet.  It also responds in detail to the

14   information that the Hotel had provided on February 22nd.

15   They provided a packet of information and this letter, I

16   think, details the items that we requested on December 2nd

17   that I did not find in the February 22nd packet.

18   **(General Counsel's Exhibit 71 marked for identification.)**

19   Q.   BY MR. McCARTHY:  And then directing your attention to

20   General Counsel's Exhibit 71, do you recognize that document?

21   A.   Yes.  This is a letter that I wrote to Mr. Greenbaum on

22   March 15th, letting him know that due to an international

23   executive board meeting, I guess the letter just simply says,

24   "Mr. Boardman would be out of town."  He was out of town due

25   to an international executive board meeting that week, but

1  proposing several other dates on which the union's

2  negotiating team was available.

3  **(General Counsel's Exhibit 72 marked for identification.)**

4  Q.   BY MR. McCARTHY:  Then directing your attention to

5  General Counsel's Exhibit 72, do you recognize that document?

6  A.   Yes.  This is the letter that I received back from

7  Mr. Greenbaum on March 15th accepting one of the four dates

8  that we offered, that was March 30th, beginning at 2:00.

9  Q.   When did Respondent first meet with the union at the

10  bargaining table?

11  A.   That was on March 30th, 2005.

12  Q.   All right.  At that point on March 30th, 2005, was the

13  union aware of any decertification petition?

14  A.   I believe so, yes.

15  **(General Counsel's Exhibit 73 marked for identification.)**

16  Q.   BY MR. McCARTHY:  Directing your attention to General

17  Counsel's Exhibit 73, do you recognize that document?

18  A.   I do.  This is a petition that, a copy of a petition that

19  I believe had been delivered to the union.  I do not recall

20  the date that it was delivered since I was not present.  I do

21  know that it was faxed to my office on April the 6th.

22       MR. McCARTHY:  Your Honor, at this time I would offer

23  General Counsel's Exhibit 70 through 73.

24       JUDGE BUSCHMANN:  There's not objection to that, right,

25  Mr. Greenbaum?

1      MR. GREENBAUM:  Seventy to seventy-three?

2      JUDGE BUSCHMANN:  Yes.

3      MR. GREENBAUM:  Except for 73 same objection.

4      JUDGE BUSCHMANN:  Okay.  All right.  I'll hereby admit 70

5  to 73.

6  **(General Counsel's Exhibit 70 through 73 received into**

7  **evidence.)**

8      MR. McCARTHY:  Thank you, Your Honor.

9  Q.   BY MR. McCARTHY:  Now, Ms. Virk, do you know whose

10  initials those are at the top of 73?

11  A.   Yes.  The top left hand corner of the first page of 73, I

12  believe that those are markings that are made by the union to

13  internally route the document.  And the cc is made to JB, I

14  believe would be John Boardman, JF, would be Jan Foliate

15  (ph.), the office manager.  WA at the end I recall probably

16  William Aragon, who was assigned with Mr. Boardman and myself

17  to the State Plaza negotiations.  And the MC could be either

18  Miguel Cordova who was an organizer who worked on the State

19  Plaza campaign or Minor Christian who was another organizer

20  who work on the State Plaza campaign.

21  **(General Counsel's Exhibit 90 marked for identification.)**

22  Q.   BY MR. McCARTHY:  Now, directing your attention to

23  General Counsel's Exhibit 74 -- I'm sorry.  At this point in

24  time I'd like to direct your attention to General Counsel's

25  Exhibit 90, do you recognize this document?

1  A.   This is a document that was faxed to me from
2  Mr. Greenbaum's office on March 25th of 2005 in response to
3  my notifying him that the union had not received a list of
4  active employees, classifications and wage rates as of that
5  date.  Mr. Greenbaum sent this on March 25.
6       MR. McCARTHY:  Your Honor, at this time I would offer
7  General Counsel's Exhibit 90.
8       JUDGE BUSCHMANN:  Mr. Greenbaum?
9       MR. GREENBAUM:  No objection.
10      JUDGE BUSCHMANN:  Ninety is hereby received.
11  **(General Counsel's Exhibit 90 received into evidence.)**
12      MR. McCARTHY:  Your Honor, at this point we are at the
13  first bargaining session it might be a good time to take a
14  break and the General Counsel could think about how to
15  truncate any further testimony from this witness by the
16  Court's concerns about limiting any discussion about
17  bargaining.
18      JUDGE BUSCHMANN:  Until tomorrow.
19      MR. McCARTHY:  Until tomorrow, correct.  Unless you would
20  like to continue at this point, Your Honor.  It's just a good
21  breaking point and I could go back through and try to
22  truncate any testimony with regard to the six bargaining
23  sessions that began on this date set forth in GC-74, March
24  30th or we can continue on, Your Honor.
25      JUDGE BUSCHMANN:  No.  I think that's a good suggestion

1  and that would give you time to confine the inquiry with this

2  witness on any further proof to the allegation in the

3  complaint.

4       MR. McCARTHY:  Very good, thank you, Your Honor.

5       JUDGE BUSCHMANN:  So we stand adjourned until what time,

6  9:30.  Is that agreeable Mr. McCarthy?

7       MR. McCARTHY:  That's agreeable, Your Honor.  Thank you.

8       JUDGE BUSCHMANN:  The court reporter just left, but you

9  will have to notify him.  Do we need him any more in your

10 case?

11      MR. McCARTHY:  Yes.  We will need a court reporter

12 tomorrow.

13      JUDGE BUSCHMANN:  I'm tired -- Interpreter.

14      MR. McCARTHY:  I'm really tired, yes.

15      JUDGE BUSCHMANN:  Yes.  So am i.

16      MR. McCARTHY:  We will need an interpreter tomorrow and

17 we have agreed to furnish the interpreter for Respondent's

18 case, which is something we don't normally do, Your Honor.

19      JUDGE BUSCHMANN:  Who is the court reporter, I mean, the

20 interpreter tomorrow, Ernestine?

21      MR. McCARTHY:  Susanna.

22      JUDGE BUSCHMANN:  Oh, I see.  What do you usually not do?

23      MR. McCARTHY:  Well, we usually split the cost, when

24 Respondent presents its own case in chief; we usually split

25 the costs with the Respondent --

1    JUDGE BUSCHMANN:  Oh, I see.

2    MR. McCARTHY:  -- but in this case, since pretty much the

3    whole case is in Spanish we will assume that cost.

4    MR. GREENBAUM:  Our case will be put on in Spanish too

5    for the most part.

6    JUDGE BUSCHMANN:  So how are we proceeding at this point,

7    you have several more witnesses after this witness?

8    MR. McCARTHY:  After this witness, Your Honor, we made

9    considerable headway with her today, I have two more

10   witnesses, probably be two hours apiece.  Although we have

11   been going a little bit longer than that.  And I am

12   contemplating calling a third witness but I need to consult

13   with my co-counsel and with Ms. Virk concerning that.

14   MR. GREENBAUM:  Your Honor, I believe we can put on our

15   case in two days.  So, I would suggest if that's the case --

16   It's very hard coordinating witnesses.  It sounds like if he

17   has two more witnesses of two hours each and Ms. Virk, I

18   don't know how much longer she has, and if they have a third

19   witness, that may be all day tomorrow and then we could start

20   Thursday morning and we should be done by Friday I would

21   think, Monday morning at the latest.

22   JUDGE BUSCHMANN:  Sounds agreeable to me.

23   I'm glad, Mr. McCarthy, you are reconsidering your case

24   in chief in the light of the discussions that we have had

25   here today, right?

1          MR. McCARTHY:  Yes, Your Honor.

2          JUDGE BUSCHMANN:  So, we stand adjourned then at this

3     time until 9:30 tomorrow morning.

4          MR. McCARTHY:  Thank you, Your Honor.

5     **(Whereupon, at 5:15 p.m., the hearing in the above-entitled**

6     **matter was adjourned, to reconvene the next day, Wednesday,**

7     **March 15, 2005, at 9:30 a.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22


<u>**CERTIFICATION**</u>


Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 5, in the matter of **State Plaza Hotel**, Case No. 5-CA-32594, held at Washington, D.C., on Wednesday, March 14, 2006, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.

_____
Timothy J. Atkinson, Jr.
Official Reporter


_____
Letha J. Wheeler
Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947