BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

**STATE PLAZA, INC., a wholly owned subsidiary of R.B. ASSOCIATES, INC., d/b/a STATE PLAZA HOTEL,**

            Respondent,

   and

**HOTEL AND RESTAURANT EMPLOYEES LOCAL 25, UNITE HERE INTERNATIONAL UNION,**

            Charging Party.

Case No. **5-CA-32594**

The above-entitled matter came on for hearing pursuant to notice, before **KARL H. BUSCHMANN,** Administrative Law Judge, at **National Labor Relations Board, 1099 14th Street N.W., 5th Floor, Washington, D.C.,** on **Wednesday, March 15, 2006** at **9:30 a.m.**

## A P P E A R A N C E S

**Counsel for the General Counsel:**

THOMAS P. McCARTHY, ESQ.
National Labor Relations Board
Region 5
1099 14th Street N.W.
Washington, D.C. 20570-0001
(202) 501-8859

STEPHANIE COTILLA, ESQ.
National Labor Relations Board
Region 5
103 South Gay Street
Baltimore Maryland 21202

**On behalf of the Charging Party:**

DEVKI VIRK, ESQ.
Bredhoff & Kaiser, PLLC
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600

**On Behalf of the Respondent:**

JONATHAN W. GREENBAUM, ESQ.
EMILY K. HARGROVE, ESQ.
Nixon Peabody, LLP
401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8326

**Also Present:**

MARTA ARAGON
Spanish Interpreter

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|-----------|--------|-------|----------|---------|-----------|
| Devki Virk | 376 | 418 | 425 | -- | -- |
| Marleni Jiron | 428 | 450 | 463 | -- | -- |
| Gloria Melgar | 465 | 481 | -- | -- | -- |
| Reina Lozano | 510 | -- | -- | -- | -- |

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

# E X H I B I T S

| EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-10(a) | 507 | 508 |
| GC-22 through 24 | 507 | 508 |
| GC-38 | 437 | 445 |
| GC-39 | 439 | 445 |
| GC-40 | 439 | 445 |
| GC-74 | 377 | 384 |
| GC-75 | 381 | 384 |
| GC-76 | 381 | 384 |
| GC-77 | 382 | 384 |
| GC-78 | 382 | 384 |
| GC-79 | 382 | 384 |
| GC-80 | 385 | 386 |
| GC-81 | 385 | 386 |
| GC-82 | 385 | 386 |
| GC-83 | 386 | 386 |
| GC-84 | 387 | 395 |
| GC-85 | 387 | 395 |
| GC-86 | 387 | 395 |

## E X H I B I T S (cont.)

| EXHIBIT | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GC-86(a) | 389 | Withdrawn - 394 |
| GC-87 | 399 | Not Offered |
| GC-88 | 399 | 401 |
| GC-89 | 400 | 401 |
| GC-89(a) | 400 | 401 |
| GC-91 through GC-94 | 409 | 411 |
| GC-95 | 414 | 415 |
| GC-96 | 414 | 415 |
| GC-116 through GC-145 | 507 | 508 |
| GC-146(a) | 507 | 508 |
| GC-147 | 507 | 508 |
| RESPONDENT'S | | |
| R-1 | 422 | 425 |
| R-2 | 451 | Withdrawn - 452 |
| R-3 | 526 | 527 |
| R-4 | 537 | Not Offered |

1                    P R O C E E D I N G S

2                              (Time Noted:  9:30 a.m.)

3      JUDGE BUSCHMANN:  Mr. McCarthy, would you call your --

4  recall your witness?

5      MR. MCCARTHY:  Yes, Your Honor.  Before we do so, I

6  believe Ms. Virk, who is in the middle of her testimony and

7  is the representative of the Charging Party, would like to

8  make a representation to the Court with regard to certain

9  allegations raised by the Respondent on the record yesterday

10  concerning --

11      JUDGE BUSCHMANN:  I see.  Yes, please.

12      MS. VIRK:  Yes, Your Honor.  I have spoken with

13  Ms. Shykula, who I believe was the individual that

14  Mr. Greenbaum's representatives identified as potentially

15  having some device in her bag or having taken some device in

16  her bag, but they thought it might be a recording device.

17  Ms. Shykula was not in the room when the allegation was made

18  and so I promptly went and spoke to her after the proceedings

19  ended yesterday.  She carries with her a large backpack, a

20  black nylon backpack that has in it everything, probably,

21  that she's ever carried with her the last several months.

22      I asked her very carefully to look through that backpack

23  and not take anything out of it, not put anything into it,

24  and identify for me if there were any devices in there,

25  either recording devices similar to the voice pen device

1    that's been described by Mr. Velasquez and by Ms. Shykula in

2    her testimony, and more importantly if there was any other

3    item in that bag that could've possibly been misidentified in

4    good faith by Mr. Greenbaum's client as being a recording a

5    device.  She advised me that there was no recording device in

6    the bag, and she also advised me that she has cell phone

7    that's silver in color and very small and had -- it's a flip-

8    phone, so it had -- the front was separated from the back

9    part because the phone itself was nonfunctional, and that

10   item she did have with her in her bag and she did take it out

11   during the proceedings to show to Mr. Diaz (ph.).

12       She also had in the bag a -- I'll call it an iPod,

13   which, as I understand it, is a device for playing music and

14   recording music digitally.  She is downstairs waiting for

15   several of the General Counsel's witnesses right now and she

16   has advised me that should the court require the

17   representation on her part, or we should take any other

18   measures, she is happy to be here to answers those

19   allegations.

20       JUDGE BUSCHMANN:  Okay.  Is that sufficient,

21   Mr. Greenbaum?

22       MR. GREENBAUM:  Yes, Your Honor, I accept that.

23       JUDGE BUSCHMANN:  Fine.  Thank you.  Thank you,

24   Ms. Virk.

25       MR. MCCARTHY:  Your Honor, General Counsel would recall

1    Ms. Virk to the witness stand.

2        JUDGE BUSCHMANN:  Yes, Mr. Virk, you're still under

3    oath.

4        MS. VIRK:  Yes, Your Honor.

5        MR. MCCARTHY:  Good morning, Ms. Virk.

6        MS. VIRK:  Good morning.

7                    **DIRECT EXAMINATION (cont.)**

8    Q.   BY MR. MCCARTHY:  I believe when we left off yesterday,

9    we were at the parties' first bargaining session on March

10   30th, 2005.  Would you briefly describe what the discussion

11   focused on at that initial meeting?

12   A.   The initial meeting focused on the status of the

13   outstanding information requests -- what items were

14   outstanding, when Respondent intended to provide that

15   information, if they were going to provide that information,

16   the timeline for providing that information.  That was all

17   that was discussed at the March 30th meeting, which I believe

18   lasted less that two hours.

19   Q.   Was there any difficulty in scheduling additional

20   meetings?

21   A.   At the close of the meeting, we -- the Union requested

22   Mr. Greenbaum and his client, James Martins was one of the

23   representatives who was at that meeting.  I believe he's a

24   corporate officer within R.B. Associates and also has an

25   official position from State Plaza, Inc., the holding company

1  of the hotel.  We asked the two of them to check their

2  calendars so that we could schedule additional meetings.

3  Mr. Greenbaum indicated that he did not have his calendar

4  with him.  Since were in Mr. Greenbaum's office, we asked

5  that Mr. Greenbaum go get his calendar, given the difficulty

6  we had had scheduling this initial meeting, so that the

7  parties all there at the same time could look at their

8  calendars and determine several additional bargaining days.

9  Mr. Greenbaum then replied that he kept his calendar in his

10  head.  Mr. Martins, who was sitting directly to

11  Mr. Greenbaum's right and across the table, said that he took

12  kept his calendar in his head.  And at the close of that

13  meeting, I know that there were no additional bargaining

14  sessions scheduled.

15      MR. MCCARTHY:  Now directing your attention and moving

16  along to General Counsel's Exhibit 74.

17  **(General Counsel's Exhibit 74 marked for identification.)**

18  Q.   BY MR. MCCARTHY:  Do you recognize that document?

19  A.   I do.  This is a letter that I received from

20  Mr. Greenbaum.  I believe it was at my office by the time

21  that I returned there from our March 30th meeting.  It is

22  dated March 30th.  If I may elaborate.  At the close of the

23  meeting we had asked for dates and Mr. Martins and

24  Mr. Greenbaum had indicated that they kept their calendars in

25  their heads and that Union should simply offer dates and they

1    would get back to us.  Mr. Boardman insisted that they get

2    their calendars.  At this point, Mr. Martins, who was sitting

3    directly across from John Boardman, leaned across the table

4    and told Mr. Boardman, I'm sensing some hostility coming from

5    you.  Mr. Boardman responded that Mr. Martins had not seen

6    anything yet.

7        At this point Mr. Martins took a business card, or what

8    looked like a business card, out of his pocket and leaned

9    across the table while writing something on it and told

10   Mr. Boardman the hotel wants an apology for the Union's

11   conduct in breaking into the Washington Plaza Hotel, and we

12   want to be reimbursed for all of the legal fees that were

13   incurred in connection with that incident.

14   Q.   Is that a different hotel than Respondent in this case?

15   A.   It is.  The Washington Plaza is one of the five hotels

16   that is owned by R.B. Associates.  It's within the group of

17   hotels.  I believe Mr. Martins was referring to an incident.

18   There was a rally that the Union held at the Washington Plaza

19   on April 21st of 2004.

20       JUDGE BUSCHMANN:  Now, who is Mr. Martins again?

21       THE WITNESS:  I believe that Mr. Martins was introduced

22   to us as a corporate officer of R.B. Associates, which is the

23   holding company for five hotel properties.

24       JUDGE BUSCHMANN:  Okay.

25       THE WITNESS:  And I believe he also holds an officer

1    position in State Plaza.

2        JUDGE BUSCHMANN:  Now, was he the chief negotiator for

3    the -- for the Respondent?

4        THE WITNESS:  This was the only meeting that he

5    attended.  Subsequently, he did not attend --

6        JUDGE BUSCHMANN:  Uh-huh.

7        THE WITNESS:  -- other meetings.

8        JUDGE BUSCHMANN:  Okay.

9        THE WITNESS:  But we -- certainly understood him to be

10   Mr. Greenbaum's principal.  I believe that Mr. Martins was

11   referring to this April 21st, 2004 rally, in which the Union,

12   in delivering a demand to bargain, addressed to

13   Mr. Bernstein, who's the owner of the State Plaza and the

14   Washington Plaza Hotel.  During that delivery inside the

15   hotel a number of Union members who are at the rally

16   congregated inside the hotel building and blocked ingress and

17   egress for a short period of time, into and out of the front

18   doors of the hotel.  The State Plaza Hotel filed an unfair

19   labor practice charge against the Union, contending that not

20   only that that ingress and egress had been blocked

21   momentarily, but there had been an assault and property

22   damage and a number of other allegations.  The complaint was

23   issued on the ingress and egress blocking allegation, but

24   specifically not on the assault or break-in allegations.

25       MR. MCCARTHY:  Well, let's get down to the difficulties.

1    We're going into extremes.  I really kind of want to move on.

2         THE WITNESS:  Okay.  I'm sorry.  I apologize.

3         MR. MCCARTHY:  That's okay.

4         THE WITNESS:  I just didn't want to leave the reference

5    out there undescribed.  In any event, Mr. Martins threw this

6    business card across the table at Mr. Boardman and said

7    that's how much money we had to pay our lawyers in connection

8    with that incident, and we want the Union to pay and we

9    demand an apology.  Mr. Boardman, I don't know if he even

10   looked at the card, he may have, but he threw it back across

11   the table to Mr. Martins and then told Mr. Martins to go fuck

12   himself, at which point Mr. Greenbaum got up from the table

13   and said, well, based on that behavior, we're not giving the

14   Union any more dates, at which point Mr. Boardman said, are

15   you refusing to give us dates?  Mr. Greenbaum said yes, based

16   on that behavior we are,  And the management team got up and

17   walked out of the room.  Then subsequently I received this

18   letter, which is GC Exhibit 74, from Mr. Greenbaum, again not

19   giving us any dates, but referring to the incident between

20   Mr. Martins and Mr. Boardman at the March 30th meeting.

21   Q.   BY MR. MCCARTHY:  And then directing your attention to

22   GC-75, Ms. Virk, do you recognize that document?

23   A.   Yes, this is the letter I wrote back to Mr. Greenbaum

24   the next day, and noted that the Union was providing, I

25   believe, four or five additional -- excuse me -- six

1    additional dates which we were available to meet.

2    **(General Counsel's Exhibit 75 marked for identification.)**

3    Q.    BY MR. MCCARTHY:    And how did you select those dates?

4    A.    Mr. Boardman and I, who were going to be representing

5    the Union in these negotiations, shared calendars.    Later on

6    March 30th or early on March 31st, we came up with this --

7    with basically every available space that we had on our

8    calendars.

9    Q.    And directing your attention to GC-76, do you recognize

10   that document?

11   A.    Yes, GC-76 is the letter that I wrote on April 1st to

12   Mr. Greenbaum, following up on the information requests and

13   the status of those requests and --

14   **(General Counsel's Exhibit 76 marked for identification.)**

15   Q.    BY MR. MCCARTHY:    And is this the separate cover

16   regarding the outstanding information request that is

17   referred to in your March 31st letter?

18   A.    Yes, it is.

19   Q.    Okay.

20   A.    It confirms the agreements that we understood to have

21   been reached at the March 30th meeting with respect to

22   information that the hotel had been provided and the timeline

23   for providing that information.

24   Q.    And did Mr. Greenbaum respond to the Union's March 31st

25   offer of dates or alternative dates?

1  A.   Well, I believe a few days later Mr. Greenbaum

2  responded, and I see here GC-77 is a letter dated April 4th

3  from

4  Mr. Greenbaum.  He did not provide us with a response on the

5  dates.  He did not, in fact, accept any of those dates at

6  that time, but continued to insist upon an apology for the

7  incident at the rally and a reimbursement of legal fees.

8  **(General Counsel's Exhibit 77 marked for identification.)**

9  Q.   BY MR. MCCARTHY:  And then directing your attention to

10  GC-78, do you recognize that document?

11  A.   Yes, this is my response, again, back to Mr. Greenbaum

12  to his April 4th letter.  This is my letter dated April 6th,

13  asking the status of whether they were going to be accepting

14  any of the dates that we had offered via my letter of March

15  31.

16  **(General Counsel's Exhibit 78 marked for identification.)**

17  Q.   BY MR. MCCARTHY:  And again, directing your attention to

18  GC-79, do you recognize that document?

19  A.   Yes, this is a cover letter that I wrote to

20  Mr. Greenbaum, enclosing the unfair labor practice charge

21  that we filed against the hotel on April 6th, based on their

22  failure to meet and their refusal, even a week after our

23  first meeting, to give us any dates.

24  **(General Counsel's Exhibit 79 marked for identification.)**

25  Q.   BY MR. MCCARTHY:  And was that charge withdrawn without

1  prejudice to --

2  A.   Yes, it was, I believe, in early May.  About three days

3  after we filed this charge I sustained a disabling knee

4  injury and had a number of medical complications.  I was

5  simply unable to get the physician statement into the Board.

6       MR. GREENBAUM:  I'm going to object, Your Honor.  The

7  complaint was withdrawn.  I mean, a lot of this is --

8       JUDGE BUSCHMANN:   The charge was withdrawn.

9       MR. GREENBAUM:  The charge was withdrawn.  I'm sorry.

10  The charge was withdrawn.  There's no allegation in the

11  complaint about failure to provide information, failure to

12  meet.  The Board investigated those.  There's no complaint on

13  that.  There's clearly no complaint on failure to give

14  information.  There's clearly no complaint on failure to meet

15  and negotiate.  In fact, the complaint says we met on various

16  times.  I just object.  You know, I know this is background

17  information, but it's getting a little more than background

18  and it's going to make us come in and refute everything, and

19  I just think that clutters the issues that we're here for.

20       JUDGE BUSCHMANN:   I don't know enough about the case,

21  Mr. Greenbaum, in order to agree or disagree with you, but I

22  think the General Counsel is making an effort to alleviate

23  this heretofore plans, and I'm going to trust him that he

24  will do so and proceed expeditiously.

25       MR. MCCARTHY:  Your Honor, at this time I offer General

1  Counsel 74 through 79.

2     JUDGE BUSCHMANN:  Any objection to those?

3     MR. GREENBAUM:  Relevance, Your Honor.

4     JUDGE BUSCHMANN:  74 through 79 are hereby received.

5  **(General Counsel's Exhibits 74 through 79 received into**

6  **evidence.)**

7     MR. MCCARTHY:  Thank you, Your Honor.  Now, Ms. Virk,

8  directing --

9     MR. GREENBAUM:  Your Honor, if we're going to have 79, I

10  would like to have the withdrawal, and I don't believe that's

11  an exhibit here.

12     JUDGE BUSCHMANN:  Is that part of the exhibit?

13     MR. MCCARTHY:  No, it's not part of the exhibit.

14     JUDGE BUSCHMANN:  Do you have a copy of it,

15  Mr. Greenbaum?

16     MR. GREENBAUM:  Not with me, Your Honor, because I

17  didn't feel it was necessary to bring it.

18     JUDGE BUSCHMANN:  Well, I think that it ought to be made

19  a part of the record to make it complete, Mr. McCarthy, and

20  then you can supplement the record with that withdrawal.

21     MR. MCCARTHY:  I will do that, Your Honor.  Ms. Virk,

22  now I'd like to move along and summarize -- focus on the

23  major issues that are involved here.  Directing your

24  attention to GC-80, do you recognize that document, ma'am?

25     THE WITNESS:  Yes, this is the response I received back

1    from Mr. Greenbaum the same day that I sent my letter of

2    April 6th, and he accepted one of the six dates that we had

3    offered.

4    **(General Counsel's Exhibit 80 marked for identification.)**

5    Q.    BY MR. MCCARTHY:   And General Counsel 81 and 82, do you

6    recognize those documents?

7    A.    Yes, 81 is Mr. Greenbaum's response to my sending him

8    the charge, and 82 is a letter that I wrote to him on April

9    7th, again, confirming what I thought our understanding was

10   with respect to the provision of information and noting that,

11   again, the hotel had only agreed to provide one date at a

12   time to meet.

13   **(General Counsel's Exhibits 81 and 82 marked for**

14   **identification.)**

15   Q.    BY MR. MCCARTHY:   And then directing your attention GC-

16   83, do you recognize that document?

17   A.    Yes, this appears to be a copy of a one-page document

18   that the Union received from the hotel on or about April

19   13th, in response to our requests for information, and this

20   specifically was represented to be a list of active

21   bargaining unit employees as of that date, their -- and their

22   salary -- excuse me -- their wage increase history for the

23   past several years.  And as you can see, it lists a number of

24   employees, their positions, their seniority dates and then,

25   for 2003 and 2004 and 2005, the actual dollar amount of any

1  increase, in terms of cents per hour, as well as that number

2  expressed as a percentage of their base wage increase.

3  **(General Counsel's Exhibit 83 marked for identification.)**

4  Q.    BY MR. MCCARTHY:  And is Reina Lozano still listed as an

5  employee doing housekeeping on GC-83?

6  A.    Yes, she is.

7  Q.    And was this document provided to the Union doing the

8  bargaining?

9  A.    This was provided to the Union as part of a packet of

10  information that the General Counsel sent us around April

11  13th, yes.

12      MR. MCCARTHY:  Your Honor, I offer General Counsel's

13  Exhibits 80 through 83.

14      JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

15      MR. GREENBAUM:  Relevance, Your Honor.

16      JUDGE BUSCHMANN:  Yes.  General Counsel's Exhibits 80

17  through 83 are hereby admitted.

18  **(General Counsel's Exhibits 80 through 83 received into**

19  **evidence.)**

20  Q.    BY MR. MCCARTHY:  And then, Ms. Virk, if I could direct

21  your attention to GC-84 and 85, do you recognize those

22  documents?

23  A.    Yes, 84 is a letter dated April 13th that Mr. Greenbaum

24  wrote to the Union, objecting to our request to provide

25  Social Security numbers and provide Board authority for that

1    position, and also advising the Union that, based on

2    allegations by employees regarding abuse of telephone calls

3    from callers that Mr. Greenbaum at least here represents the

4    employees believe are associated with the Union, that the

5    hotel is refusing to provide the telephone numbers of the

6    bargaining unit to the Union.

7    **(General Counsel's Exhibits 84 and 85 marked for**

8    **identification.)**

9    Q.   BY MR. MCCARTHY:  Now, did the parties meet again on

10   April 18th?

11   A.   Yes, we did.  I'm sorry.  You also asked me to identify

12   GC-85, and that is a letter dated April 14th that I wrote

13   back to him, requesting that our April 18th meeting be held

14   in my office.  It would be difficult for me to get around.

15   And we did meet on April 18th at my office.

16   Q.   Did the Union present a comprehensive proposal at that

17   second meeting on April 18th?

18   A.   Yes.  Mr. Boardman and I, who were present for the

19   Union, along with one or two rank-and-file workers and some

20   Union staff presented what's marked here as GC Exhibit 86 to

21   the hotel's negotiators, who I believe were Mr. Greenbaum --

22   and I believe Mr. Palenzona was at that meeting as well, and

23   the hotel's then director of human resources --

24   **(General Counsel's Exhibit 86 marked for identification.)**

25   Q.   BY MR. MCCARTHY:  And whose writing is that at the top?

1  A.   That is my writing on the upper right-hand side that

2  indicates the date, 4/18/05, and the time, 10:45 a.m.

3  Q.   I believe it also says given to management.  Is that

4  your writing?

5  A.   Yes.

6  Q.   And did you give this proposal to a specific manager?

7  A.   I believe that they had -- my recollection -- according

8  to my recollection, we gave a copy of the proposal both to

9  Mr. Greenbaum and perhaps to the other managers who were

10  there as well.

11  Q.   Would you briefly, and I mean briefly, describe what the

12  discussion focused on at that meeting?

13  A.   On April 18th, I believe that we walked the hotel

14  through the proposal.  As I mentioned yesterday,

15  Mr. Greenbaum does represent other unionized hotels in the

16  city and has generally been familiar with the Master Hotel

17  Association contract that is bargained by Local 25 every

18  three years.  There have been a number of changes from that

19  master agreement in the settlement that was reached by the

20  Hotel Association and Local 25 in January of 2005.  Many of

21  those changes were requested in this document, GC-86, the

22  proposal that we gave to them.  So we especially focused on

23  those areas of the contract with which Mr. Greenbaum might

24  not otherwise be familiar.  That's my recollection of what

25  the conversation focused on.

1  Q.    And after the parties went through the highlights of the

2  Union's proposal, do you recall any remarks?

3  A.    I do recall Mr. Greenbaum express an opinion that the

4  proposal was very expensive and that the owner of the hotel

5  would simply sell the hotel if he wasn't able to operate --

6  if he was only able to operate at break-even or if he would

7  have to operate at a loss.  At least he would sell the hotel

8  under those circumstances.

9  Q.    And directing your attention to GC-86(a), do you

10  recognize that document?

11  A.    86(a).  I'm not sure that that is in mine.

12  **(General Counsel's Exhibit 86(a) marked for identification.)**

13      JUDGE BUSCHMANN:  Are you talking about 86(a)?

14      MR. MCCARTHY:  Yes, I am.  I believe that this was one

15  set they didn't have.

16      JUDGE BUSCHMANN:  It's a handwritten document?

17  **(Pause.)**

18      THE WITNESS:  Yes, I do recognize 86(a).  I believe that

19  these -- this is a copy of my handwritten notes of the

20  April 18th, 2005 negotiating session.

21  Q.    BY MR. MCCARTHY:  And directing your attention to page

22  three, is the remark that -- the remark that you previously

23  referred to reflected in those notes on page three?

24  A.    Yes, it is, along with Mr. Greenbaum's initials on the

25  left-hand side.

1    Q.   Did the Union have a wage and management rights

2    proposal?

3    A.   Yes, our proposal contained both proposals on wages,

4    which I believe were in conformity with what the recently

5    negotiated Hotel Association contract wage schedule was,

6    which was in excessive of, I believe, $13 for non-tipped

7    employees, which would include housekeeping staff, and we did

8    have a management rights proposal in Article -- I think it's

9    4.5 in the agreement.

10   Q.   How long did the meeting -- were any agreements reached

11   at that meeting?

12   A.   We did, in fact, agree to meet on several additional

13   dates.  I believe we scheduled five or six additional

14   bargaining sessions.

15   Q.   Were any agreements reached on any substantive

16   bargaining proposals?

17   A.   No.

18   Q.   How long did that meeting last?

19   A.   I believe it was a little less than two hours.

20        MR. MCCARTHY:  Your Honor, at this time I offer General

21   Counsel's Exhibits 84 through 86 and I offer 86(a), page

22   three, or if Mr. Greenbaum has an objection to the

23   completeness, I would offer both set of notes.

24        MR. GREENBAUM:  Bear with me, Your Honor.  Page three.

25   Well, I would -- if we're going to put the exhibit in, I have

 1  a relevance objection, but I would -- for completeness, we
 2  would move the entire document in.
 3      JUDGE BUSCHMANN:  That would be inclusive of 87 or what?
 4      MR. GREENBAUM:  Yes.
 5      MR. MCCARTHY:  I think that would be all of 86(a),
 6  Your Honor.
 7      MR. GREENBAUM:  Yes, Your Honor.
 8      JUDGE BUSCHMANN:  86(a)?
 9      MR. MCCARTHY:  Right.  87 is actually a different date.
10      JUDGE BUSCHMANN:  It's a different date?
11      MR. MCCARTHY:  Yes.
12      JUDGE BUSCHMANN:  So everything in here is to be
13  included or do you have anything in addition, Mr. Greenbaum,
14  that should be included in 86(a)?
15      MR. GREENBAUM:  Yes, Your Honor, the -- let me -- I was
16  confusing it with 87.  Let me just take another look at it.
17      JUDGE BUSCHMANN:  Ms. Virk, your notes, on the left
18  side, they seem to have some initials on there.  What is --
19  what are those?
20      THE WITNESS:  Those initials, Your Honor, are who the
21  speakers are.  So for instance, on page one, on the left-hand
22  side -- I know my writing is bad -- it says DV.  That would
23  indicate that I am the person who is saying the words that
24  are listed to the right.  JAB refers to John Boardman.  JG
25  refers to Mr. Greenbaum.  And I believe --

1          JUDGE BUSCHMANN:  You said something about this

2     contained Mr. Greenbaum's initials on 86(a) or no, you didn't

3     say that?

4          THE WITNESS:  I said as indicated.  If I did say that, I

5     misspoke.  I meant that it indicates --

6          JUDGE BUSCHMANN:  I see.

7          THE WITNESS:  -- behind Mr. Greenbaum's initials that he

8     is the person --

9          JUDGE BUSCHMANN:  I see.

10         THE WITNESS:  -- who is speaking.

11         JUDGE BUSCHMANN:  Those are your --

12         THE WITNESS:  This is my handwriting and my handwriting

13    alone.

14         JUDGE BUSCHMANN:  And that's all.  Now, what is the

15    purpose of having those notes in here?

16         MR. MCCARTHY:  Your Honor, I just offered the third page

17    of the notes to collaborate the statement that she testified

18    about.

19         MR. GREENBAUM:  Well, just for the record, what

20    statement was, because then I could compare it to the notes.

21         JUDGE BUSCHMANN:  Yeah, I'm not sure that we understand

22    each other, Mr. McCarthy.

23         MR. MCCARTHY:  Okay, the statement.

24         JUDGE BUSCHMANN:  The exhibit that -- the exhibit that I

25    see consists, I think, of about four pages.

1      MR. MCCARTHY:  That's correct.

2      JUDGE BUSCHMANN:  And you want the entire document

3  consisting of four pages in the record?

4      MR. MCCARTHY:  No, I only offered the third page of

5  GC-86(a).  On page three, that's the initials JG.  I believe

6  the remark is made there and --

7      JUDGE BUSCHMANN:  I see.

8      MR. GREENBAUM:  Well, Your Honor, just for the record,

9  it was indicated to the Union that the hotel was not losing

10  money.  This has to do with the restaurant, which was already

11  closed.  And if you look on top, it says R-e-s-t -- I believe

12  that's restaurant -- it's not the hotel.  And you know, if

13  you want the record clarified, that's what they were talking

14  about, it's talking about the restaurant, not the hotel.  The

15  hotel was not losing money and the Union knows that.

16      MR. MCCARTHY:  The -- okay.

17      MR. GREENBAUM:  I mean the hotel.

18      MR. MCCARTHY:  I could ask the witness about this,

19  Your Honor.

20      MR. GREENBAUM:  This was -- this was a discussion about

21  the restaurant, and that's the problem with these notes.

22      JUDGE BUSCHMANN:  Do you have any objection to the notes

23  going into the record, Mr. Greenbaum?  Do you want the entire

24  set of all four pages?

25      THE WITNESS:  And you'll note, Your Honor, that on page

```
 1   four there's actually an additional reference to --
 2        JUDGE BUSCHMANN:  To the meeting.
 3        THE WITNESS:  To the sale of the hotel.
 4        MR. GREENBAUM:  I don't see any reference there to --
 5   Your Honor, that's the problem.  And there was a charge filed
 6   by the Union, stating at bargaining, management indicated
 7   that it was going to sell the hotel.  There was no complaint
 8   issued on that.  We responded to the Regional Director with
 9   evidence that that wasn't true.  You could rest assure if
10   there was an allegation in this case that during bargaining,
11   management said they were going to close -- they were going
12   to sell the hotel, that would be in the complaint.  We
13   responded.
14        JUDGE BUSCHMANN:  I think you have -- you have a valid
15   reason to object to 86(a) and that is, what's the point of
16   these notes?
17        MR. MCCARTHY:  Your Honor --
18        JUDGE BUSCHMANN:  Wait minute.  These notes are not
19   taken under oath, it's not an affidavit, and the witness is
20   here to testify under oath and the notes would have to be
21   read --
22        MR. MCCARTHY:  I'll withdraw 86(a), Your Honor.
23        JUDGE BUSCHMANN:  Okay.
24   (General Counsel's Exhibit 86(a) withdrawn.)
25        JUDGE BUSCHMANN:  Okay.
```

1  Q.   BY MR. MCCARTHY:  Ms. Virk, without reference to your

2  notes, do you recall what was said about operation of either

3  the hotel or the restaurant by Mr. Greenbaum at that meeting?

4  A.   Yes, the April 18th meeting, it was referenced to the

5  operation of the restaurant, specifically, the Union

6  requested what the status was of the restaurant, which had

7  been closed for, at that point, not quite a year.  We asked,

8  since we represented the food and beverage workers as part of

9  a certified unit, of when the hotel anticipated reopening the

10 restaurant.  My recollection is that Mr. Greenbaum indicated

11 that there was an internal debate within R.B. Associates as

12 to whether to reopen the restaurant.  As to the operation of

13 the hotel, my recollection is, as I've testified,

14 Mr. Greenbaum commented that the Union's proposal appeared to

15 be expensive and that the owner of the hotel did not want to

16 operate the hotel at break-even or at a loss and would just

17 close the hotel down if he had to.  That's my recollection.

18    MR. MCCARTHY:  Your Honor, having withdrawn GC-86(a), I

19 re-offer GC-84 through 86.

20    JUDGE BUSCHMANN:  Any objection?

21    MR. GREENBAUM:  Relevance, Your Honor.

22    JUDGE BUSCHMANN:  Yes.  I hereby receive 84 through 86.

23 **(General Counsel's Exhibits 84 through 86 received into**

24 **evidence.)**

25 Q.   BY MR. MCCARTHY:  Thank you, Your Honor.  Now, Ms. Virk,

1  did the parties meet a third time on May 3rd?

2  A.   Yes, we did.

3  Q.   Okay.  Did the Respondent offer a formal counter-

4  proposal to the Union's proposal that's in evidence as GC-86?

5  A.   The hotel responded to many of the items contained in

6  the Union's proposal that we presented to them on April 18th.

7  However, they did not provide any response to any items that

8  were economic, such as wages, pension, and health care and

9  did not provide a response with respect to other items that

10  had economic implications such as, for instance, the quota of

11  rooms that each housekeeper would be required to clean each

12  day, which is called a room quota.

13       JUDGE BUSCHMANN:  And you're now testifying about a

14  meeting on May 3rd?

15       THE WITNESS:  Yes, sir.

16       JUDGE BUSCHMANN:  And you discussed the proposal at that

17  time that the Union has submitted to the Respondent, and your

18  testimony is now describing what the reaction is of the

19  company, of the hotel, vis-a-vis your proposal?

20       THE WITNESS:  Yes, sir, they responded --

21       JUDGE BUSCHMANN:  All right.

22       THE WITNESS:  -- on the -- several of the non-economic

23  items that the Union had proposed on April 18th.

24  Q.   BY MR. MCCARTHY:  And did they make any counter-

25  proposals on non-economic issues?

1 A.    I recall two non-economic items that were discussed,

2 items that traditionally we considered non-economic.  One was

3 the Union's management rights proposal, which is set forth in

4 the comprehensive proposal that's been entered into evidence.

5 Management made an oral response to that proposal and

6 countered with a proposal that said -- that had reserved to

7 management the right to subcontract out any and all

8 departments, any and all bargaining unit work, to abolish and

9 combine jobs at will, and to change workload based on the

10 technological advancements or changes.  That proposal was not

11 made in writing.  It was made orally across the table, and

12 there was some discussion about it, specifically, I believe

13 Mr. Boardman asked the management team whether in fact, under

14 their proposal, the hotel would have the right to essentially

15 subcontract out all the bargaining unit work, and

16 Mr. Greenbaum responded, on behalf of the hotel, that it

17 would, but that the owner didn't intend to use it in that

18 way.

19      I also recall some discussion about the Union's

20 successorship clause, which is -- I believe it's Article 1.12

21 of the agreement that we offered to the hotel on April 18th,

22 and Mr. Greenbaum's response on that was that the owner would

23 never agree to any encumbrance on his ability to sell the

24 hotel.  Those are two items that I recall being discussed on

25 May 3rd.

1    MR. GREENBAUM:  Your Honor, I move to strike this

2    testimony.  I mean, this is getting into the nitty-gritty of

3    negotiations and I don't know what bearing it has on this

4    proceeding.  It has no -- actually has no bearing on the

5    complaint and it's getting into what we were concerned about,

6    the give and take of negotiations, and it's just irrelevant

7    to this proceeding.  And I don't know -- I thought the

8    General Counsel said they weren't going to do this, what was

9    said at the negotiations, what the proposals were, the back

10    and forth, I thought we were not going to get into that, but

11    it seems as though --

12    JUDGE BUSCHMANN:  I think she's giving us the

13    highlights, Mr. Greenbaum.

14    MR. GREENBAUM:  But what do we need the highlights for,

15    Your Honor?  That's what happened in negotiations.  There

16    was --

17    JUDGE BUSCHMANN:  It's their burden and so I'm going to

18    permit him, Mr. McCarthy, to put on his case, giving us the

19    highlights of what went on, in order to make a determination

20    on what the allegations in the complaint are all about.

21    MR. GREENBAUM:  But there are no allegations in the

22    complaint about this --

23    JUDGE BUSCHMANN:  Well, it's a rather broad allegation

24    and I think that's -- and I think that is -- you're arguing

25    now with me.  I'm trying to -- I'm trying to tell you what my

1  opinion is and what I think goes to my instructions, which

2  are that he will confine himself to the overall conduct in

3  this case, and I think he's doing that.

4  Q.   BY MR. MCCARTHY:  Did the Respondent ever move on that

5  oral management rights proposal --

6  A.   No.

7  Q.   -- to abolish or combine jobs, introduce technological

8  changes that would eliminate or change the workload, and

9  subcontract or lease any department in whole or in part?

10  A.   No, they did not.

11  Q.   How long did the May 3rd meeting last?

12  A.   I would say approximately two hours.

13      MR. MCCARTHY:  Ms. Virk, I'm going to skip through your

14  notes of that meeting, which I believe are GC-87 and 88, and

15  some correspondence in -- well, let's briefly go into the

16  correspondence of early May.

17  **(General Counsel's Exhibits 87 and 88 marked for**

18  **identification.)**

19  Q.   BY MR. MCCARTHY:  Directing your attention to General

20  Counsel Exhibit 88, do you recognize that document?

21  A.   Yes, 88 is a letter that I received May 5th from

22  Mr. Greenbaum, in response to a discussion that we had had at

23  the May 3rd, 2005 meeting.  At that May 3rd, 2005 meeting,

24  one of the issues that came up was the room quota and the

25  appropriateness of the room quota.  The rooms at the State

1    Plaza are really suites.  They include kitchens and they're

2    sort of mini apartments, and there was an issue with respect

3    to the Union's proposal to reduce the number of rooms that

4    housekeepers were required to clean, which obviously has

5    economic consequences for the hotel as well.  There was a

6    discussion about that at the May 3rd meeting.  The Union

7    requested to actually tour one or more of the rooms on a

8    supervised visit with management so that the Union could

9    understand management's position with respect to the room

10   quota and perhaps would revise the Union's proposal and to --

11   Q.   I don't really want to get bogged down too much in the

12   room quota proposal.  So moving on to General Counsel's

13   Exhibit 89, do you recognize that document?

14   A.   Yes, General Counsel's 88 is Mr. Greenbaum's letter to

15   me, stating that the hotel was not going to permit the Union

16   to come on site to inspect the rooms.  And GC-89 is my letter

17   back to him on May 10th, that I suggested that the Union's

18   understanding was that we should have the right to do that

19   and that they, in fact, agreed to it on May 3rd and it was

20   just a matter of scheduling the date.

21   **(General Counsel's Exhibit 89 marked for identification.)**

22       THE WITNESS:  GC-89(a) is Mr. Greenbaum's letter back to

23   me on May 10th, which states that they're not going to allow

24   the Union to come on property to view those.

25   **(General Counsel's Exhibit 89(a) marked for identification.)**

1        MR. MCCARTHY:  And I would offer, Your Honor, GC-88, 89

2   and 89(a) at this time.

3        JUDGE BUSCHMANN:  Relevance, Mr. Greenbaum?

4        MR. GREENBAUM:  Yes, Your Honor.

5        JUDGE BUSCHMANN:  Okay.  I hereby receive General

6   Counsel Exhibit, what is it, 88 through 89?

7        MR. MCCARTHY:  88 through 89(a), I believe, Your Honor.

8        JUDGE BUSCHMANN:  89(a).

9        JUDGE BUSCHMANN:  I have an exhibit here that's not

10  marked, which is the letter of May 10th from Mr. Greenbaum to

11  the Union.  Is that --

12       MR. MCCARTHY:  89(a), yes, Your Honor.

13       JUDGE BUSCHMANN:  89(a).  Okay, those I hereby receive.

14  **(General Counsel's Exhibits 88 through 89(a) received into**

15  **evidence.)**

16  Q.   BY MR. MCCARTHY:  Thank you, Your Honor.  Now, Ms. Virk,

17  I'd like to direct your attention to the first exhibit packet

18  and GC-Exhibit 4.  It's just been identified -- well,

19  received into evidence.  My question is, had the Union

20  received this document by the 2nd of May of 2005?

21  A.   I believe so.  I believe that the Union received this

22  document -- I think, May 9th, 2005.

23  Q.   And did you receive a copy of it from the Union?

24  A.   I believe that I did.

25  Q.   Now, did the parties meet for a fourth time on May 10th?

1  A.   Yes --

2  Q.   Okay.

3  A.   -- we did.

4  Q.   Would you briefly discuss what the May 10th meeting

5  focused on with regard to any non-economic proposals?

6  A.   I believe that the May 10th meeting -- there was a

7  discussion of the Union's grievance and arbitration process

8  that had been proposed on April 18th.

9  Q.   All right.  Are you sure that wasn't the subsequent

10  meeting on May 11th?

11  A.   That's --

12       MR. GREENBAUM:  Objection.  Leading.

13       THE WITNESS:  I'm sorry.

14       JUDGE BUSCHMANN:  Your question --

15       THE WITNESS:  That's certainly possible.

16       JUDGE BUSCHMANN:  You had a meeting on May 10th and

17  May 11th?

18       THE WITNESS:  Yes, sir.

19  Q.   BY MR. MCCARTHY:  Do you recall whether there was any

20  discussion of workload and or leadership committee proposals

21  at the May 10th meeting?

22  A.   Yes, I do.  There was a discussion -- I believe it was

23  on May 10th -- about the Union's proposal to put in place a

24  leadership committee, otherwise known as a shop steward

25  committee, at the State Plaza Hotel.  That proposal, which is

1   included in the April 18th comprehensive proposal, was a

2   newly negotiated provision in the master citywide agreement

3   and as such was the subject of some discussion with

4   Mr. Greenbaum, as he would not have been familiar with it

5   prior to that time.

6        The proposal itself during the citywide negotiations, I

7   would note, was the subject of a great deal of contention

8   between the Hotel Association and the Union.  It was one of

9   the last items to be settled just prior to the strike

10  deadline.  Specifically the proportion of shop stewards or

11  leaders to the bargaining unit was a great concern to the

12  Hotel Association, and I believe that we reached a compromise

13  on that, in the overall master contract negotiations.  I

14  believe on May 10th Mr. Greenbaum, I believe, accepted the

15  leadership committee proposal by the hotel -- excuse me, by

16  the union.

17  Q.   And did the -- were the leadership committee proposal

18  and the workload proposal contentious -- the citywide

19  negotiations with the D.C. Hotel Association?

20  A.   Yes, the workload proposal, which appears as Article 20

21  of the April 18th comprehensive proposal, was likewise an

22  extremely contentious issue and one of the last issues to be

23  settled with the Hotel Association.  And without -- as my

24  recollection has, without too much discussion, Mr. Greenbaum,

25  on behalf of the State Plaza, accepted in full the workload

1    proposal that we had made, I think, on May the 10th.

2    Q.    Now, did the hotel, on May 10th, respond to any of the

3    major economic proposals in the Union's proposal,

4    particularly with regard to wages, which is at issue?

5    A.    Yes, the hotel responded orally to the Union's economic

6    proposals and did so on May 10th.  With respect to wages, the

7    hotel proposed that the non-tipped employees, which would

8    include housekeeping staff, which comprised really the

9    majority of the State Plaza unit, would receive $11 an hour,

10   and that the bell stand staff would receive -- I believe it

11   was $6 an hour.  Those are generally tipped employees who

12   work on the bell staff.  That is the proposal that I recall

13   the hotel making on wages.  The Union brought to their

14   attention, upon receiving that proposal, that several

15   bargaining unit employees probably made more than $11 an hour

16   and that the hotel's proposal would reduce their wages, upon

17   which the hotel had a brief caucus and came back a few

18   minutes later and advised the Union that they intended to red

19   circle those employees who made above $11 an hour, but

20   otherwise maintained their proposal.  With respect to other

21   economic issues, namely, health care and pension, I recall,

22   with respect to pension, the hotel responded to the Union's

23   proposal, which was a proposal for participation in a

24   traditional defined benefit pension plan, with the following

25   response: Mr. Greenbaum stated that the hotel would never

1  agree to a defined benefit pension plan because it -- if the

2  hotel was ever sold, the withdraw liability would accrue and

3  the hotel was not interested in incurring any risk of

4  withdraw liability.  They proposed maintaining the current

5  401k plan, which was a non-match plan, meaning that the

6  employer did not match and was based solely on contributions

7  by bargaining unit employees.

8       With respect to health insurance, the hotel proposed

9  maintaining its current health insurance plan, by which

10  employees, I believe, were required to contribute, certainly

11  for family coverage, in excess of $600 a month, which was a

12  very substantial proportion of the wages made by people on a

13  monthly basis who work for less than $10 an hour.

14  Q.   Were any management economic proposals ever put in

15  writing?

16  A.   No, no management proposals were ever put in writing.

17  Q.   Throughout negotiations, did Respondent ever offer

18  $12.50 per hour in wages?

19  A.   No, the wage proposal that I have described, which would

20  bring those employees who were under $11 an hour to $11 an

21  hour, and would red circle those employees who made more than

22  $11 an hour, was never modified.  I believe that for the

23  second and third years of the contract, the hotel also

24  proposed three percent wage increases for the entire

25  bargaining unit.  I did leave that out when I initially

1  described their proposal.

2  Q.   Now, do you recall whether the parties met for a fifth

3  time on May 11th, 2005 to discuss grievance and arbitration?

4  A.   Yes, I do recall that.  On May 11th the discussion

5  focused on the grievance and arbitration provision in the

6  Union's April 18th proposal.

7  Q.   And did the hotel make any counter-proposals at the

8  May 11th meeting?

9  A.   I recall there being a discussion, but I don't recall

10 there being any kind of proposals and there certainly were

11 none made in writing.

12 Q.   And how long did the May 11th meeting last?

13 A.   I believe it was less than two hours.

14 Q.   And did you miss the next meeting on May 23rd, 2005?

15 A.   I did.  The May 23rd, meeting, I was not present.

16 Q.   Were you briefed on what was discussed at that meeting

17 by anyone?

18 A.   Yes, Mr. Boardman spoke to me about what had occurred at

19 that meeting.

20 Q.   And --

21     MR. GREENBAUM:  Objection.  Hearsay.

22     JUDGE BUSCHMANN:  Is that the sixth meeting?

23     MR. MCCARTHY:  It's the --

24     THE WITNESS:  Yes.

25     MR. MCCARTHY:  -- sixth meeting, yes, Your Honor.

1    JUDGE BUSCHMANN:  That's hearsay.

2    MR. MCCARTHY:  Your Honor, I'm not --

3    JUDGE BUSCHMANN:  Any problem with that, Mr. Greenbaum,

4  to have this witness tell us what she understood occurred on

5  the 27th (sic)?

6    MR. GREENBAUM:  Yes.

7    MR. MCCARTHY:  I'm not asking -- Your Honor, I'll

8  withdraw the -- I'm just asking whether, in fact, as a matter

9  of fact, she was briefed, not what she was briefed on.

10    JUDGE BUSCHMANN:  I see.  Okay.  Yes.

11  Q.  BY MR. MCCARTHY:  Were you briefed by Mr. -- by anyone

12  after the May 23rd meeting?

13  A.  Yes, Mr. Boardman briefed me on what had occurred.

14  Q.  And did you frame any assessment of the overall dynamic

15  of bargaining at this time?

16  A.  Yes.

17  Q.  And --

18    MR. GREENBAUM:  Objection, Your Honor.

19    JUDGE BUSCHMANN:  Objection overruled.

20  Q.  BY MR. MCCARTHY:  And what was your opinion of the

21  overall bargaining at this time, Ms. Virk?

22  A.  My opinion was that the hotel, although they had agreed,

23  without much discussion, to many of the non-economic

24  proposals that the Union had made, had also proposed,

25  specifically with respect to the management rights clause and

 1  the right to subcontract out the entire unit and the
 2  rejection of any successorship protection at all, they had
 3  proposed language that they would know that the Union was not
 4  in a position to accept, and that the hotel was not intending
 5  to modify in any significant manner, if at all, any of the
 6  economic proposals which maintained the status quo with
 7  respect to pension and health care, particularly with respect
 8  to health care, which is such an important issues for lower-
 9  wage workers in the hotel industry, that management was
10  essentially placing poison pills in their contract proposals
11  that they knew the Union would not accept and was simply
12  attempting to run out the clock on the certification year,
13  which ended on June 29th, 2005.
14  Q.   How experienced are you as a negotiator for the Union --
15  A.   For this Union, I participated in several such
16  negotiations, including the citywide hotel negotiations.  I
17  was in every meeting.
18  Q.   And in your experience in negotiating, what type of
19  engagement is involved in order to reach an agreement?
20       MR. GREENBAUM:  Objection, Your Honor.
21       JUDGE BUSCHMANN:  What kind of an engagement?  What do
22  you mean by that?
23  Q.   BY MR. MCCARTHY:  Would you describe the process
24  involved for us, when you reached agreement --
25  A.   Usually the parties start with a whole lot of issues on

1    the table and then attempt through discussion to try to

2    determine what their priorities are, as well as what the

3    other side's priorities are, and attempt to meet in the

4    middle, and that requires engagement and give and take on

5    both sides.  I guess, in response to your question as to how

6    that compares with the dynamic in State Plaza bargaining, I

7    certainly felt that the Union was engaged in what was almost

8    a one-sided discussion, in that the Union was attempting to

9    engage the hotel to determine what the hotel's priorities

10   were and what really their objections were on issues like,

11   for instance, health care, in an attempt so that the Union

12   could try to address it, and it was very, very difficult, if

13   not impossible, to determine -- isolate out what their

14   objections were and try to address it, and we were losing

15   hope that the hotel would.

16        MR. MCCARTHY:  Now, directing your attention to GC

17   Exhibit 91 -- actually 91, 92, 93 and 94.

18   **(General Counsel's Exhibits 91 through 94 marked for**

19   **identification.)**

20   Q.   BY MR. MCCARTHY:  Do you recognize those documents and

21   could you identify them for the record, please?

22   A.   Yes, 91 is a letter that I wrote to Mr. Greenbaum on

23   June 13th.  At the May 23rd meeting, it was my understanding

24   that the parties had not actually scheduled any additional

25   bargaining dates, therefore I wrote on June 13th to

1  Mr. Greenbaum to initiate a discussion again about dates, and

2  assume that we would try to work around his schedule.  GC-92

3  is Mr. Greenbaum's response to me, providing me with one

4  date, June 24th, 2005, and asked me for a response.

5  Q.   Could I just back you up to GC-91, and it's the last two

6  pages.  They represent -- they represent what?

7  A.   I'm sorry.  The last two pages are the fax cover sheet

8  and then the fax transmission report --

9  Q.   Okay.

10  A.   -- which indicates that I sent it to Mr. Greenbaum.

11  Q.   Thank you.

12  A.   GC-92 is, as I described, Mr. Greenbaum's letter to me,

13  dated June 13th, with his fax cover sheet.  GC-93 is my

14  response back to him on June 17th, noting that unfortunately

15  the Union was not able to meet on the one date that he had

16  provided, June 24, but offering several other dates.  And

17  again, that contains also, as an attachment, the fax cover

18  sheet and the fax transmission report.  And GC-94 is

19  Mr. Greenbaum's letter back to me on June 20th, accepting one

20  of the four dates that we had proposed and that was

21  Wednesday, June 29th.  And that has an attachment,

22  Mr. Greenbaum's fax cover sheet.

23      MR. MCCARTHY:  Thank you, Ms. Virk.  Your Honor, at this

24  time I would offer GC-91 through 94.

25      JUDGE BUSCHMANN:  Any objections?

1      MR. GREENBAUM:  Relevance, Your Honor.

2      JUDGE BUSCHMANN:  Yes, 91 through 94 are hereby

3  admitted.

4  **(General Counsel's Exhibits 91 through 94 received into**

5  **evidence.)**

6  Q.   BY MR. MCCARTHY:  Ms. Virk, do you recall if the parties

7  met for a final time on June 29th, 2005?

8  A.   We did.

9  Q.   Were you present?

10  A.   I was.

11  Q.   Did that date have any particular significance?

12  A.   That was the anniversary of the certification by the

13  Labor Board.

14  Q.   And would you briefly describe what the discussion

15  focused on at the last meeting on June 29th, 2005?

16  A.   As I recall, the meeting began with me asking

17  Mr. Greenbaum what the status was of the Union's request for

18  costing data.  In an early meeting, Mr. Greenbaum had advised

19  the Union that the hotel had costed the first year of the

20  Union's proposal and the Union had asked for those

21  calculations.  My understanding was that Mr. Greenbaum had

22  agreed to provide that.  I asked him what the status of that

23  was on June 29th and he advised that the Union -- excuse

24  me -- the hotel would not provide the Union with that

25  information because it was work product.  And I believe he

1  then told the Union that he believed that the Union was

2  bargaining in bad faith and that the hotel had made a number

3  of agreements on issues and that the Union had not agreed to

4  anything and had not moved off of our proposals.

5       And I specifically recall Mr. Greenbaum saying on

6  June 29th that he knew that I had been at the Labor Board

7  that morning to give an affidavit, and if the Union spent as

8  much time bargaining as they did pursuing charges, that we

9  would have a contract.  I also recall Mr. Boardman following

10 up a discussion that was had, at least as I understood it, at

11 the May 23rd meeting, with respect to health care and health

12 insurance.  As we understood it, the State Plaza was one of

13 the hotels that participated in a health insurance plan, a

14 group plan, in which the other four hotels owned by R.B.

15 Associates also participated.

16      A representation had been made by the hotel, that if

17 State Plaza were to accept the Union's proposals and exit

18 that group health insurance plan, that that would have cost

19 implications for the rest of the hotels in the R.B.

20 Associates group who remained in that plan.  Mr. Boardman had

21 asked for some information from Mr. Greenbaum, I believe, and

22 that was followed up on at the June 29th meeting.  Management

23 took a caucus to determine whether that information could be

24 provided to the Union, and that's what I recall.  At least to

25 the extent there was any substance for that meeting, that's

1    what I recall the substance being.

2    Q.    Did the hotel ever, ever modify the oral wage proposal

3    that it made on May 10th?

4    A.    No.

5    Q.    Did it offer $12.50 per hour?

6    A.    No.

7    Q.    Was the hotel at this point adhering to its management

8    rights proposal?

9    A.    Yes, it was.

10    Q.    And how did the June 29th meeting end?

11    A.    The Union asked the hotel again for the costing data and

12    for the health insurance information that Mr. Boardman had

13    requested.  I believe that what Mr. Boardman suggested is

14    that the insurance broker and State Plaza representatives and

15    the Union have a joint conversation so that the Union could

16    better understand what the issue was with respect to State

17    Plaza's exit from the group insurance plan, the implications

18    of that.  Mr. Greenbaum, as I recall, said that they would

19    need to check with managers who were not available at that

20    time and would get back to the Union.  We did attempt to

21    schedule additional bargaining days.  In fact, the -- as I

22    recall, the leading dates that I had written on a piece of

23    paper that Mr. Boardman checked our calendars and said we

24    were available, and I believe I remember handing them to

25    Ms. Hargrove and she came back to the room and advised us

1    that they would get back to us on those dates.  I do recall

2    that the meeting was adjourned without scheduling any

3    additional dates.

4    Q.    Did the parties ever reach an agreement on the initial

5    contract?

6    A.    No.

7        MR. MCCARTHY:  I'm directing your attention to GC-95.

8    **(General Counsel's Exhibit 95 marked for identification.)**

9    Q.    BY MR. MCCARTHY:  Do recognize that document?

10   A.    Yes, this is the letter that I received from

11   Mr. Greenbaum on July the 1st.  That includes some of the

12   costing assumptions that the Union requested and also

13   provides a piece of information about extra rooms sold, which

14   is the number of extra rooms that housekeepers do above and

15   beyond the quota, which is information the Union had

16   requested.  And then it provides some information about the

17   insurance broker, however, not the information that we had

18   requested.  The fax cover sheet from Mr. Greenbaum is

19   attached to that letter.

20       MR. MCCARTHY:  And then directing your attention,

21   Ms. Virk, to GC-96.

22   **(General Counsel's Exhibit 96 marked for identification.)**

23   Q.    BY MR. MCCARTHY:  And do you recognize that document?

24   A.    Yes, this is the letter with the fax cover sheet that I

25   received from Mr. Greenbaum on July 5th, 2005, advising the

1    Union that the hotel would no longer recognize and bargain

2    with Local 25.

3        MR. MCCARTHY:  Your Honor, I offer General Counsel's

4    Exhibit 95 and 96.

5        JUDGE BUSCHMANN:  No objection, right, Mr. Greenbaum?

6        MR. GREENBAUM:  I don't object to 96.  I do object to

7    the others on relevance grounds.  Let me just make sure I

8    have the numbers right.  Correct, correct.

9        JUDGE BUSCHMANN:  95 and 96 are hereby admitted.

10    **(General Counsel's Exhibits 95 and 96 received into**

11    **evidence.)**

12   Q.   BY MR. MCCARTHY:  Now, when you received GC-96,

13   Ms. Virk, did Respondent provide any evidence of loss of

14   actual majority to the Union?

15   A.   They did not.

16   Q.   Have you ever seen a similar before from Mr. Greenbaum?

17   A.   I have.  The Union, while trying to negotiate a contract

18   with Charlie Palmer's Steakhouse --

19        MR. GREENBAUM:  Objection, Your Honor.  Irrelevant.

20        JUDGE BUSCHMANN:  What's the relevance?  Is it a

21   litigated case that other cases were cited to, Mr. McCarthy?

22        MR. MCCARTHY:  I don't know.

23        JUDGE BUSCHMANN:  Mr. McCarthy?

24        MR. MCCARTHY:  I believe -- I believe Ms. Virk and

25   Mr. Greenbaum know that, and I don't know, Your Honor.

1        THE WITNESS:  I believe it's not a litigated case.  The

2   charge was filed and an agreement was eventually reached

3   after the withdrawal of recognition -- recognition was

4   restored and an agreement was --

5        JUDGE BUSCHMANN:  And the other --

6        THE WITNESS:  In the Charlie Palmer case, yes.

7        JUDGE BUSCHMANN:  So it's not relevant to this, right,

8   Mr. McCarthy?

9   Q.   BY MR. MCCARTHY:  I'll withdraw the question.  Your

10  Honor, if I could just have the court reporter show me the

11  formal papers.  That it'd be it?  Okay.  Could I borrow your

12  stack for just a moment, Your Honor?  I'm showing the witness

13  the formal papers and I'd like to specifically draw your

14  attention to General Counsel's Exhibit 1(a), 1(c), 1(e), and

15  1(g), 1(a) being the initial charge filed, 1(c) being the

16  first amended charge, 1(e) the second amended charge, and

17  1(g) the third amended charge.  Have you had an opportunity

18  to review those, Ms. Virk?

19  A.   I have.

20  Q.   Thank you.  Did the Union include a bad faith bargaining

21  allegation in each of those charges?

22  A.   Yes, we did.

23  Q.   And did the Union ever withdraw that allegation?

24  A.   No, we did not.  We did withdraw the charge with respect

25  to failure to provide information.  But with respect to

1   the -- bargaining charge, that was not withdrawn, as

2   indicated that it is still included on the first, second and

3   third amended charges.

4       MR. MCCARTHY:  Your Honor, I have no further questions.

5       JUDGE BUSCHMANN:  Good.  Okay, Mr. Greenbaum.

6       MR. GREENBAUM:  Thank you.

7       JUDGE BUSCHMANN:  Is there an affidavit?  I assume there

8   is not.

9       MR. MCCARTHY:  There is, Your Honor.

10      JUDGE BUSCHMANN:  There is an affidavit?

11      MR. MCCARTHY:  Yes, there is.

12      MR. GREENBAUM:  I'll take a look at it, Your Honor.

13  Could I have 10 minutes, Your Honor?

14      JUDGE BUSCHMANN:  Yes.

15      MR. MCCARTHY:  Your Honor, let the record reflect that

16  I'm turning over a 21-page typewritten affidavit, and this is

17  the original, too, Mr. Greenbaum.

18      MR. GREENBAUM:  Thank you.

19      MR. MCCARTHY:  You're welcome.

20      **JUDGE BUSCHMANN:  We'll take a 10-minute recess.  We'll**

21  **be back here at 10 of 11:00.**

22  **(Off the record.)**

23      JUDGE BUSCHMANN:  You may proceed.

24      MR. GREENBAUM:  Thank you, Your Honor.  Ms. Virk, I want

25  to draw your attention to GC Exhibit 73.

1      THE WITNESS:  Yes.

2                    **CROSS-EXAMINATION**

3   Q.   BY MR. GREENBAUM:  How did the Union come into

4   possession with this document?

5   A.   I don't know the answer to that.  I can tell you what I

6   understand to be the case from the Union.  I believe that the

7   Union received via hand delivery from one or more employees

8   at State Plaza.

9   Q.   Do you know when they received it?

10  A.   I know that I received a faxed copy of it on April 6th,

11  and it represented to me that that was the date that the

12  Union had received it.

13  Q.   And --

14  A.   It's possible that it was earlier.

15  Q.   They received it by regular mail?

16  A.   I think I said just now that I think it was hand-

17  delivered.  I'm not sure, though.  I was not there.  I was

18  not present.

19  Q.   So hand-delivered by employees to the Union?

20  A.   That's what I said.

21  Q.   Now, I want to draw your attention to General Counsel

22  Exhibit 86.

23  A.   Yes.

24  Q.   And, well, 86 is your -- your initial proposal for a

25  contract?

1  A.    Yes.

2  Q.    Okay.  Is this ostensibly the Hotel Association

3  agreement?

4  A.    I believe that it is the agreement that was negotiated

5  between Local 25 and the Hotel Association, that had been

6  also adopted by several non-Hotel Association hotels after

7  January of 2005.

8  Q.    Did, during the negotiations, John Boardman say to

9  management that he would not stray from this agreement?

10  A.    Say to -- during the State Plaza negotiations?

11  Q.    Yes.

12  A.    Not that I recall.

13  Q.    Not that you recall?

14  A.    No.

15  Q.    You don't recall specifically a statement by

16  Mr. Boardman that he would not move off this agreement?

17  A.    No, I do not.

18  Q.    Did Mr. Boardman move off this agreement at any time

19  during negotiations at all?

20  A.    You mean with respect to any provisions?

21  Q.    Yes.

22  A.    Sure.

23  Q.    Which ones?

24  A.    I know that we indicated that -- while I was present,

25  that the Union was open to discussing the proportion of shop

1    stewards to bargaining unit members and talking about that

2    issue.  I know that we indicated that we were open to making

3    modifications to the grievance and arbitration procedures.

4    There was an objection raised about -- for the second step of

5    mediation being overly cumbersome.  And I know that at the

6    time that we met on June 29th, that the Union was certainly

7    thinking about how it could address the hotel's concerns with

8    respect to the health insurance issue, but we did not have an

9    opportunity to do that.

10   Q.   Did the Union make any counter-proposals off this once

11   management made proposals?

12   A.   Which management proposals are you referring to?

13   Q.   Well, we have -- if you want to take a look at your

14   bargaining notes, there were a number of items agreed to.

15   A.   Yes, there were.

16   Q.   Is that correct?

17   A.   That is correct.

18   Q.   And those were agreed to by the hotel, correct?

19   A.   Agreed to by the parties.

20   Q.   There were a number of items that were rejected.  Were

21   there any counter-proposals made by the Union?

22   A.   On the rejected items?

23   Q.   Yes.

24   A.   The items that I recall there being rejection were

25   certainly the highlights that I identified, the management

1    rights provision.  I know the Union did not make a counter-
2    proposal to the hotel's management rights proposal to
3    subcontract out the entire unit.  With respect to the hotel's
4    rejection of successorship, we attempted to try to identify
5    what the specific concerns were of the hotel with respect to
6    successorship, but no, we did not make a counter-proposal to
7    the hotel's rejection of successorship.  I do not recall,
8    other than the wage proposal that management made, I do not
9    recall any other proposals that the hotel made.
10   Q.   When the hotel made a wage proposal, did the Union make
11   a counter-proposal to that proposal?
12   A.   We did not by the time the hotel withdrew that
13   condition, no.
14   Q.   What did Mr. Boardman say about wages?  Did he say
15   accept the Hotel Association or nothing?
16   A.   I don't recall that.
17   Q.   What are the current Hotel Association -- what's the
18   base rate for a housekeeper?
19   A.   I believe, as negotiated in 2005, the base rate for
20   non-tipped employees, including housekeepers under the Hotel
21   Association agreement, was, I think, 13.50 an hour.  And
22   there were -- there is a time wage increase, I think, in
23   September of 2005.  I'm not -- I honestly don't have an
24   independent recollection of what the Hotel Association wage
25   scale is.

1  Q.   Okay.  If I draw your attention to General Counsel

2  Exhibit 86, if you look at the last page of that -- the

3  second to the last page, there's a Schedule A.

4  A.   Yes.

5  Q.   And then, if you look at the page after that, you have

6  State Plaza Hotel and then wages.

7  A.   Yes.

8  Q.   9/16/04, 13.50.  9/16/05, 13.70.  Do you see that?

9  A.   Yes, I do.

10  Q.   Are those the Hotel Association wages?

11  A.   I believe they are, yes.

12  Q.   Did you make any counter-proposals during negotiations

13  off those wages?

14  A.   We did not make -- we did not modify this after the

15  hotel proposed its $11 an hour, no.

16      MR. GREENBAUM:  May I approach, Your Honor?

17      JUDGE BUSCHMANN:  Yes.

18      MR. GREENBAUM:  What I've handed the witness and what

19  I'd like to mark for identification, I guess we call it

20  Respondent 1, is a National Labor Relations Board, Region 5

21  Complaint and Notice of Hearing, in Case 5-CD-9669.  It's a

22  document that includes a complaint and I believe it also

23  includes a settlement agreement.

24  **(Respondent's Exhibit 1 marked for identification.)**

25  Q.   BY MR. GREENBAUM:  Ms. Virk, have you seen this before?

1  A.    I have.

2  Q.    And the caption on the case is Hotel and Restaurant

3  Employees Union, Local 25 and State Plaza, Inc.  Do you see

4  that?

5  A.    I do.

6  Q.    And a complaint was issued in this matter, correct?

7  A.    Yes, it was.

8  Q.    And paragraph six of the complaint states, on or about

9  April 15th, 2004, Respondent, in the presence of John

10 Boardman and other agents presently unknown to the

11 undersigned, engaged in the following: A, a mass

12 demonstration at Charging Party's Washington Plaza Hotel,

13 resulting in confrontations and possible physical contacts

14 between employees and demonstrators.  Do you see that?  And

15 B, attempting -- preventing or attempting to prevent egress

16 or ingress.  Do you see that?

17 A.    I see the entire document.

18 Q.    So a complaint was issued on these allegations?

19 A.    Yes.

20 Q.    And you reached a settlement?

21 A.    Yes, we did.

22 Q.    Was there also a civil suit regarding these allegations?

23 A.    Yes, there was, Mr. Greenbaum.  Two employees of the

24 Washington Plaza Hotel filed a civil suit against the Union,

25 seeking several million dollars worth of damages.  And I

1   would note that they also admitted in depositions that they

2   were referred to an attorney by Crawford Sherman, who is an

3   official within R.B. Associates.

4   Q.   Was that case resolved?

5   A.   Yes, it was.

6   Q.   Okay.  The case wasn't -- was it litigated to trial?

7   A.   The case was dismissed for prejudice.

8   Q.   But did you reach a settlement?

9   A.   The case was dismissed for prejudice.

10   Q.   Did you reach a settlement with those employees?

11   A.   The case was dismissed for prejudice.

12   Q.   Was there money exchanged between the Union and those

13   employees?

14       MR. MCCARTHY:  Your Honor, this has been asked and

15   answered three times.

16       JUDGE BUSCHMANN:  I'll sustain the objection.

17   Q.   BY MR. GREENBAUM:  You indicated that there were two

18   contentious issues with the Hotel Association, one was on

19   workloads and one was on a committee, is that correct?

20   A.   There were certainly more than two contentious issues,

21   but those were two of them.

22   Q.   Those were two of them.  How long did it take you to

23   negotiate those proposals with the Hotel Association?

24   A.   We sat down in August of 2004 and reached a settlement

25   just before Martin Luther King holiday in 2005.

1  Q.   And the State Plaza Hotel accepted those -- agreed to

2  those provisions, didn't they?

3  A.   Almost immediately, yes.

4  Q.   Do you know how many proposals the hotel agreed to?

5  A.   I have not counted them, no, Mr. Greenbaum.

6  Q.   There's a number of them, right?

7  A.   There is a number.  They agreed to many proposals.

8      MR. GREENBAUM:  Nothing further, Your Honor.

9      JUDGE BUSCHMANN:  Thank you.

10     MR. MCCARTHY:  Your Honor, does Respondent intend to

11  offer what's --

12     MR. GREENBAUM:  Yes, Your Honor, I move Respondent 1

13  into evidence.

14     JUDGE BUSCHMANN:  Any objection?

15     MR. MCCARTHY:  Is Respondent moving all of Respondent 1

16  into evidence, Your Honor, including the -- including the

17  settlement agreement?

18     MR. GREENBAUM:  Yes, Your Honor.

19     MR. MCCARTHY:  I don't have any objection, Your Honor.

20     JUDGE BUSCHMANN:  Okay, Respondent's Exhibit 1 is hereby

21  received.

22  **(Respondent's Exhibit 1 received into evidence.)**

23                    **REDIRECT EXAMINATION**

24  Q.   BY MR. MCCARTHY:  Ms. Virk, directing your attention to

25  Respondent's Exhibit 1, is that settlement agreement contain

1   a non-admissions clause?

2   A.   Yes, it does.

3   Q.   And then Mr. Greenbaum asked on cross-examination some

4   questions about a civil suit and you referred to a

5   Sherman Colin, I believe.

6   A.   Crawford Sherman.

7   Q.   Crawford Sherman.  Who is that individual?

8   A.   I know that he is an official within the R.B. Associates

9   structure.  He, as we understood it and as was testified to

10  by the plaintiffs in that civil suit, Mr. Sherman referred to

11  them to the attorney that they retained to sue Local 25.

12  Q.   And was Mr. Crawford Sherman at any of the bargaining

13  sessions with the Union?

14  A.   He was at the -- the meeting on July the 7th of 2004 to

15  discuss the closure of the restaurant for renovations.  I

16  recall him being there.

17  Q.   And do you have any knowledge of whether R.B. Associates

18  funding the attorneys' fees for those two employees that

19  filed the civil suit?

20  A.   I do not have knowledge of that.  I do know the

21  plaintiffs refused to answer --

22  Q.   Was it Mr. Greenbaum's firm that brought the civil suit?

23  A.   No, it was not.

24       MR. MCCARTHY:  No further questions.

25       JUDGE BUSCHMANN:  Okay, thank you very much.  You may

1  step down.

2  **(Witness excused.)**

3      MR. MCCARTHY:  Your Honor, at this time the General

4  Counsel would call its next witness, Marleni Jiron.

5      JUDGE BUSCHMANN:  Yes.

6  **(Pause.)**

7      JUDGE BUSCHMANN:  I have to swear you in.  You haven't

8  been sworn previously, have you?

9      THE INTERPRETER:  Are you talking to the witness,

10  Your Honor?

11      JUDGE BUSCHMANN:  Yes.  Could you translate?

12      MS. JIRON:  Yes, I've been sworn in before.

13      JUDGE BUSCHMANN:  Has she testified in this case before?

14      MR. MCCARTHY:  No, Your Honor.

15      JUDGE BUSCHMANN:  Okay.  Then I have to swear you.  I

16  think I have to swear you in first.

17  (Whereupon,

18                          **MARTA ARAGON**

19  was first duly sworn to interpret the questions from English

20  into Spanish and the answers from Spanish into English to the

21  best of her knowledge and ability.)

22      JUDGE BUSCHMANN:  Thank you.  Now I'll swear her in.

23  (Whereupon,

24                          **MARLENI JIRON**

25  was called as a witness by and on behalf of the General

1  Counsel and, after having been duly sworn, was examined and
2  testified as follows:)
3      JUDGE BUSCHMANN:  Thank you.  Please be seated.
4      COURT REPORTER:  Your Honor, could we have the
5  interpreter identify herself for the record --
6      JUDGE BUSCHMANN:  Yes.
7      COURT REPORTER:  -- and spell her name?
8      THE INTERPRETER:  Marta Aragon, A-r-a-g-o-n.
9      COURT REPORTER:  Thank you.
10                  **DIRECT EXAMINATION**
11  Q.  BY MR. MCCARTHY:  Good morning, ma'am.  Could you state
12  your name and address for the record, please, and spell your
13  last name?
14  A.  Marleni Jiron.  That's M-a-r-l-e-n-i J-i-r-o-n.
15  Q.  And do you speak Spanish?
16  A.  Yes.
17  Q.  Do you speak English?
18  A.  No.
19  Q.  Are you more comfortable testifying in English or
20  Spanish?
21  A.  In Spanish.
22  Q.  Are you testifying here today pursuant to my subpoena?
23  A.  Yes.
24  Q.  And are you currently employed?
25  A.  Yes.

1  Q.   By who?

2  A.   At the Marriott Hotel.

3  Q.   And where's the Marriott Hotel located?

4  A.   North Connecticut.

5  Q.   Connecticut Avenue?

6  A.   I don't know.

7  Q.   Is that here in Washington, D.C.?

8  A.   Yes.

9  Q.   How long have you worked at the Marriott Hotel on

10 Connecticut Avenue in Washington, D.C.?

11 A.   Six months.

12 Q.   And what job do you perform at the Marriott?

13 A.   Housekeeping.

14 Q.   Did you ever work as a housekeeper for State Plaza

15 Hotel?

16 A.   Yes, the State Plaza Hotel.

17 Q.   And could you please wait until the question is

18 translated before you answer?

19 A.   Yes.

20 Q.   Thank you.  What were the dates of your employment at

21 the State Plaza Hotel?

22 A.   3/17/2002.

23 Q.   And were you discharged?  I'm sorry.  Could we have the

24 dates of her employment?  What were the full dates of your

25 employment, from when to when?

1   A.    Until 7/14/05.

2   Q.    Were you discharged from the State Plaza Hotel on

3   7/14/05?

4   A.    Yes.

5   Q.    And does that discharge affect your ability to testify

6   truthfully here today?

7   A.    Yes.

8   Q.    How would that discharge affect your ability to testify

9   truthfully?

10       THE INTERPRETER:  The interpreter didn't state it

11  clearly.  I misunderstood your question.  Please repeat your

12  previous question.

13  Q.    BY MR. MCCARTHY:  Does your discharge affect your

14  ability to testify truthfully here today?

15  A.    No.

16  Q.    Why not?

17  A.    Because I have another good job.

18  Q.    Are you upset or mad at the hotel because of your

19  discharge?

20  A.    No.

21       MR. MCCARTHY:  Your Honor, I would seek a stipulation

22  that Ms. Marleni Jiron participated as the observer for the

23  Union in the election that was held in 2003.

24       JUDGE BUSCHMANN:  Yes?

25       MR. GREENBAUM:  I believe that's right, Your Honor.  We

1  stipulate to that, although I believe such a stipulation is

2  irrelevant to this case.  There's no allegation of a wrongful

3  termination.

4         JUDGE BUSCHMANN:  Yes, I understand, but she was an

5  observed at the Union election.

6         MR. GREENBAUM:  That's correct, Your Honor.

7         JUDGE BUSCHMANN:  Okay.  So stipulated.

8  Q.  BY MR. MCCARTHY:  Thank you, Your Honor.  Have you

9  testified in other Board cases concerning the hotel?

10 A.  Yes.

11 Q.  Did you testify for the Union in a representation case

12 after the election?

13        THE INTERPRETER:  Would you repeat?

14 Q.  BY MR. MCCARTHY:  Did you testify for the Union in a

15 representation case after the election?

16 A.  Yes.

17 Q.  And did you also testify in a prior unfair labor

18 practice case concerning -- before Judge Evans?

19 A.  No.

20 Q.  Do you recall whether you testified in a case concerning

21 other alleged unfair labor practices by the hotel?

22 A.  No.

23 Q.  Before you discharge, what were your duties as

24 housekeeper while employed at State Plaza Hotel?

25 A.  Cleaning rooms.

1  Q.   And what hours did you work at the State Plaza Hotel
2  cleaning rooms?
3  A.   8:00 a.m. to 4:30 p.m.
4  Q.   And who were your immediate supervisors when you were
5  last employed at the State Plaza Hotel in 2005?
6  A.   Karen and Fanny.
7  Q.   And would Karen and Fanny speak to you in English or
8  Spanish?
9  A.   Spanish.
10  Q.   And who was the housekeeping manager?
11  A.   Lisa.
12  Q.   Do you know Lisa's last name?
13  A.   No.
14  Q.   Would Lisa speak to you in English or Spanish?
15  A.   Spanish.
16  Q.   And who was the hotel manager at the time of your
17  discharge?
18  A.   Mr. Corrado.
19  Q.   And would Mr. Corrado speak to you in English or
20  Spanish?
21  A.   In Spanish.
22  Q.   Were you responsible for cleaning the second floor hotel
23  rooms?
24  A.   Yes.
25  Q.   Of what building?

1  A.    North.

2  Q.    Did anyone from management ever approach you when you

3  were cleaning Room 208?

4  A.    Yes.

5  Q.    Who approached you?

6  A.    Mr. Corrado.

7  Q.    Do you recall the date that Mr. Corrado approached you

8  while you were cleaning Room 208?

9  A.    The first days of March it was.

10  Q.    And do you recall what year?

11  A.    2005.

12  Q.    And was it common or uncommon for Mr. Corrado to speak

13  to you while you were cleaning rooms?

14  A.    Uncommon.

15  Q.    And what did Mr. Corrado say to you in early March 2005?

16  A.    To tell him what was it that we wanted.

17  Q.    And did you respond?

18  A.    Yes.

19  Q.    What did you say?

20  A.    That what we wanted was for them to sign our contract.

21  Q.    And did you tell him that employees wanted a raise?

22  A.    No.

23  Q.    Do you see Mr. Corrado in the courtroom here today

24  during your testimony?

25  A.    Yes.

1  Q.    Was there anyone else in the area when Mr. Corrado

2  approached in the early days of March 2005 and asked what

3  employees wanted?

4  A.    Yes.

5  Q.    Who was in the area?

6  A.    Alex.

7  Q.    Did you see where Corrado went after he asked you want

8  the employees wanted?

9  A.    Toward the elevator.

10  Q.    Did you see him speak to anyone?

11  A.    Yes.

12  Q.    And who did he speak to?

13  A.    To Alex.

14  Q.    And did anyone speak with you a few minutes later?

15  A.    Yes.

16  Q.    And who was that?

17  A.    Alex.

18  Q.    And what did you say to Alex and Alex say to you?

19  A.    She asked me what did Mr. Corrado want.

20  Q.    And what did you say?

21  A.    I told her that he wanted to talk to me.

22  Q.    And what did she say?

23  A.    She said, what about?

24  Q.    And what did you say?

25  A.    I told her that he had asked me what was it that we

1  wanted.

2  Q.  And did she anything else?

3  A.  Yes.

4  Q.  What did you say and she say?

5  A.  That Mr. Corrado was a good person.

6  Q.  And did you ask any questions?

7  A.  Yes, how did she know that?

8  Q.  And did she respond?

9  A.  Well, she said, oh look.  He even sent Reina downstairs

10  and instead of cleaning rooms, she -- he sent her to the bar?

11  Q.  Did she say the minibar?

12  A.  Yes.

13  Q.  Now -- now I want to direct your conversation to --

14  direct your attention to another conversation.  Were you

15  responsible for cleaning Room 215 at the second floor?

16      MR. GREENBAUM:  Objection, Your Honor, it's leading.

17      JUDGE BUSCHMANN:  Objection's overruled.

18      THE WITNESS:  Yes.

19  Q.  BY MR. MCCARTHY:  And do you recall whether anyone ever

20  approached you while you were cleaning Room 215?

21  A.  Yes, Alex.

22  Q.  And did Alex approach you while you were cleaning Room

23  215 before or after Mr. Corrado approached you in Room 208?

24      MR. GREENBAUM:  Objection, Your Honor.  Leading.

25      JUDGE BUSCHMANN:  Before or after the meeting?

1      MR. GREENBAUM:  He's giving the names.

2      JUDGE BUSCHMANN:  Objection overruled.

3      MR. MCCARTHY:  Would you like me to repeat the question,

4  Your Honor?

5      JUDGE BUSCHMANN:  Yes.

6  Q.   BY MR. MCCARTHY:  Did Alex approach you while you were

7  cleaning Room 215 before or after Mr. Corrado approached

8  while cleaning Room 208?

9  A.   After.

10 Q.   And what month of what year?

11 A.   3/2005.

12 Q.   And was anyone else present with Alex?

13 A.   No, it was just her and me.

14 Q.   And did Alex speak to you at that time?

15 A.   Yes.

16 Q.   What did she say to you and you say to her?

17 A.   She told me that she was going to come to an agreement

18 with Mr. Corrado, in order to get a $2.50 or a $3 raise for

19 us.

20 Q.   And did you ask her any questions at that point?

21 A.   I asked her how was she going to do it.

22 Q.   And did she respond to your question?

23 A.   She told me that if we signed the paper saying that we

24 didn't want a union anymore, he would give us an additional

25 $2.50 or $3.

1  Q.   Do you recall whether anything else was said?

2  A.   Yes.

3  Q.   What else was said?

4  A.   I told her to sign whatever she wanted to, but that I

5  was not going to sign anything.

6  Q.   Did Alex present any paper for you to sign at that time?

7  A.   No.

8  Q.   Did she show you any paper to get rid of the Union at

9  that time?

10  A.   No.

11  Q.   Did she ask you to sign anything at that time?

12  A.   No.

13  Q.   Did anyone ever ask you to sign a paper against the

14  Union?

15  A.   No.

16     MR. MCCARTHY:  I want to now direct your attention to

17  General Counsel Exhibit 38.

18  **(General Counsel's Exhibit 38 marked for identification.)**

19     MR. MCCARTHY:  Let me direct your attention -- Your

20  Honor, may approach the witness?

21     JUDGE BUSCHMANN:  Yes.

22  Q.   BY MR. MCCARTHY:  Ms. Jiron, do you have General

23  Counsel's Exhibit 38 in front you?

24  A.   Yes.

25  Q.   Do you recognize that document?

1  A.  Yes, it's a check stub for me.

2  Q.  And what's the date on the check stub?

3  A.  7/8/05.

4  Q.  Okay.  And how much were you being paid on 7/8/05?

5  A.  Ten something.

6  Q.  On 7/8/05 you were being paid $10?

7  A.  Yes.

8  Q.  And did you receive a raise from $10 to $12.50?

9  A.  Yes.

10  Q.  Okay.  And when did you receive that raise?

11  A.  On 7/8/05.

12  Q.  Okay.  And how much were you making before your wage

13  rate was raised to $12.50?

14  A.  Ten something.

15  Q.  Had you ever received that large a wage increase before?

16  A.  No.

17  Q.  Had you received annual increases before this?

18  A.  Yes.

19  Q.  How much were those annual increases?

20  A.  Twenty-two cents.

21  Q.  Now, directing your attention to General Counsel's

22  Exhibits 39 and 40, do you recognize those documents?

23  A.  Did you say 39?

24  Q.  39 and 40.

25  A.  Yes.

1  Q.   And what are they?

2  A.   This is a flyer of Local 25.

3  **(General Counsel's Exhibits 39 and 40 marked for**

4  **identification.)**

5  Q.   Okay.  And were the flyers prepared in more than one

6  language?

7  A.   Yes.

8  Q.   And did the Union give you copies of this document?

9  A.   Yes.

10  Q.   Did you do anything with these documents?

11  A.   Yes, I distributed them at the State Plaza Hotel.

12  Q.   And what date did you distribute them at the State Plaza

13  Hotel?

14  A.   4/19/05.

15  Q.   And did you distribute the documents in both Spanish and

16  English?

17  A.   Yes.

18  Q.   What time did you distribute the documents?

19  A.   At 7:30.

20  Q.   And what time do you start work?

21  A.   At 8:00.

22  Q.   And where did you distribute the documents?

23  A.   In the cafeteria.

24  Q.   And who was present in the cafeteria?

25  A.   Esmeralda, Yessenia, Bea, Miriam, and Velma.

1   Q.   And what were they doing?

2   A.   Having coffee.

3   Q.   And was this before work started?

4   A.   Yes.

5   Q.   Did you give a copy of GC-39 and GC-40 to the employees

6   present?

7   A.   Yes.

8   Q.   And did you leave copies of GC-39 or GC-40 -- strike

9   that.  Did you leave copies of GC-39 and GC-40 anywhere?

10  A.   Yes, in the cafeteria and in the lockers.

11  Q.   Did anyone from management ever tell you that there was

12  a litter or trash problem?

13  A.   No.

14  Q.   And how long did it take to engage in this distribution

15  activity?

16  A.   Five minutes.

17  Q.   Were any supervisors present when you distributed the

18  documents?

19  A.   No.

20  Q.   After you distributed General Counsel's Exhibits 39 and

21  40, what did you do?

22  A.   I went to work.

23  Q.   Did you start your work at your normal time?

24  A.   Yes.

25  Q.   And what time is that?

1  A.   8:00.

2  Q.   Do you recall, Ms. Jiron, whether anything happened that

3  after of April 19th, 2005?

4  A.   Yes.

5  Q.   What room were you cleaning?

6  A.   I was cleaning Room 201, when Fanny the supervisor came.

7  Q.   And what did Fanny say to you?

8  A.   That Mr. Corrado needed me in his office.

9  Q.   Okay.  And what did you say to Fanny, if anything?

10  A.   I told Fanny to tell Mr. Corrado that I was going to

11  come down as soon as I finished cleaning the room because it

12  was an occupied room.

13  Q.   And did you finish cleaning the room?

14  A.   Yes, and right away I went downstairs to Mr. Corrado's

15  office.

16  Q.   Who was -- was anyone present when you went to

17  Mr. Corrado's office on April 19th?

18  A.   Yes, an assistant.

19  Q.   Did the assistant leave?

20  A.   Yes.

21  Q.   And after the assistant left, was the door open or

22  closed?

23  A.   Open.

24  Q.   Okay.  Was the conversation in English or Spanish?

25  A.   In Spanish.

1   Q.   What did you say to Mr. Corrado and Mr. Corrado say to

2   you?

3   A.   I came in and I asked him what's going on.

4   Q.   And did he respond?

5   A.   And he said, Marleni, that's what I would like to know,

6   what's going on?

7   Q.   And do you recall whether he said anything before that?

8   A.   Yes.

9   Q.   What did he say before that?

10  A.   What he was talking about was this.

11  Q.   But before he asked you what's going on, did he indicate

12  whether he had been waiting for you?

13  A.   Oh yes.

14  Q.   What did he say?

15  A.   He said, quite a while ago I asked for you, I asked for

16  you to come down.

17  Q.   Okay.  What did you say?

18  A.   I sent you the message with Fanny that I was going to

19  come down as soon as I finished cleaning the room.

20  Q.   And then what did he say?

21  A.   He told me to sit down.

22  Q.   Okay.  And who spoke next, you or him?

23  A.   I spoke first to him.

24  Q.   And what did you say?

25  A.   I asked him what was going on.

1  Q.    And what did he say?

2  A.    That's what I would like to know, what's going on?

3  Q.    And what did you say when he asked you what's going on?

4  A.    I said nothing, nothing as far as --

5  Q.    And do you recall what he said?

6  A.    He told me, do you know that it is bad and it is

7  forbidden to bring fliers here.

8  Q.    And did you respond?

9  A.    And I said, I don't know what you're talking about.

10  Q.    And what happened next?

11  A.    He said, I'm talking about this.

12  Q.    And what was he referring to?

13  A.    This flier that I distributed at the hotel.

14  Q.    And did he at that point in time have a flier that he

15  picked up in his hand?

16  A.    Yes.

17  Q.    Did you respond when Mr. Corrado told you it was

18  forbidden to bring that kind of flier into the hotel?

19  A.    Yes.

20  Q.    What did you say?

21  A.    I told him that how come Reina and Alex were going

22  around with a petition in order for us to exit the Union.

23  Q.    And did Mr. Corrado respond?

24  A.    He told me that he didn't know anything about that.

25  Q.    And did you challenge him?

1  A.   And I said how come he was not going to know about this

2  if he was the manager.

3  Q.   Did you recall what happened next?

4  A.   Yes.

5  Q.   How close were you and Mr. Corrado at this point?

6  A.   He was sitting at his desk.

7  Q.   And then what happened?

8  A.   He stood up from the desk, he came closer to me and he

9  slapped me in the back.

10  Q.   And what did he say?

11  A.   And he said, Marleni, you know that I respect you.

12  Q.   Did he say anything else?

13  A.   But you know that you cannot bring fliers here to the

14  hotel.

15  Q.   Now, did he slap you on the back or did he pat you on

16  the shoulder?

17  A.   No, he just patted.

18  Q.   Do you recall if you said anything when he said,

19  Marleni, I respect you, but you can't bring the Union papers

20  in the hotel?

21  A.   Yes.

22  Q.   What did you say?

23  A.   I said that I also respected him, but that I was going

24  to go on doing what I was doing.

25  Q.   And did Mr. Corrado respond?

1  A.    But -- and he told me, but you cannot bring in fliers

2  here because there is notice outside saying that you cannot

3  bring fliers here.

4  Q.    How did the conversation end?

5  A.    And I said -- I asked him if that was all, and he said

6  yes.  And I said, because I have many rooms to clean, so I

7  stood up and left.

8  Q.    Did you return to work?

9  A.    Yes.

10  Q.    And how long did the conversation last approximately?

11  A.    A minute.

12      MR. MCCARTHY:  Your Honor, at this time I offer General

13  Counsel's Exhibits 38 through 40.

14      JUDGE BUSCHMANN:  Any objection, Mr. Greenbaum?

15      MR. GREENBAUM:  I don't believe so, Your Honor.  Just

16  let me check.  No objection.

17      JUDGE BUSCHMANN:  39 -- are those General Counsel's

18  Exhibits 39 and 40?

19      MS. COTILLA:  38, 39 and 40.

20      JUDGE BUSCHMANN:  38, 39 and 40 are hereby received as

21  exhibits.

22  **(General Counsel's Exhibits 38 through 40 received into**

23  **evidence.)**

24  Q.    BY MR. MCCARTHY:  And, Ms. Jiron, do you recall giving

25  an affidavit to the Board agent here at the National Labor

1  Relations Board?

2  A.   Yes.

3  Q.   And do you recall whether the Board agent wrote down

4  everything that you told the Board agent?

5  A.   Yes.

6  Q.   Did the Board agent write down everything you told the

7  Board agent or not?

8      MR. GREENBAUM:  Objection, Your Honor.  Asked and

9  answered.

10     JUDGE BUSCHMANN:  That's overruled.

11     THE WITNESS:  No.

12 Q.   BY MR. MCCARTHY:  Now, do you recall whether you were

13 present at a July 5th, 2005 meeting?

14 A.   Yes.

15 Q.   And what happened that day?

16 A.   Mr. Corrado came to the cafeteria, and because the

17 majority had already signed the petition saying that they

18 didn't want the Union anymore, they were going to give us the

19 2.50.

20 Q.   Do you recall whether Mr. Corrado Palenzona was reading

21 from anything at the time?

22 A.   No.

23 Q.   No, I don't recall or no, he wasn't reading from

24 anything?

25 A.   No, he wasn't reading from anything?

1      MR. MCCARTHY:  I have no further questions of this

2  witness, Your Honor.

3      JUDGE BUSCHMANN:  Yes.

4      MR. GREENBAUM:  Your Honor, pursuant to your

5  instructions, if we could review the affidavit.  Your Honor,

6  I notice it's near the lunch hour.  Would this be a good time

7  to break and we could combine both into one?

8      JUDGE BUSCHMANN:  Yes.  Is that agreeable, Mr. McCarthy?

9      MR. MCCARTHY:  Certainly, Your Honor.  Your Honor, at

10  this time I'd like the record to reflect that I'm turning

11  over an original 11-page Spanish affidavit of the witness and

12  an eight-page certified English translation of that

13  affidavit.

14      JUDGE BUSCHMANN:  Thank you.  We stand adjourned until

15  one o'clock.  Is that okay, Mr. McCarthy, that we adjourn for

16  an hour?

17      MR. MCCARTHY:  Your Honor, we even have a last -- well,

18  we may recall Respondent's witness.  We have one more

19  witness.

20      JUDGE BUSCHMANN:  Okay.

21      MR. MCCARTHY:  The witness has had a family emergency.

22  The witness' husband is in the hospital today.  The witness

23  is here, but it's a fluid situation and I just wanted to

24  bring that the court's attention.  I mean, I expect to put

25  the witness on next, although things could change, depending

1    upon the gravity of the emergency as we speak, so I just

2    wanted --

3        JUDGE BUSCHMANN:  So what are you saying?  Should I do

4    anything?

5        MR. MCCARTHY:  I think perhaps that maybe a shorter

6    lunch break, Your Honor, until a quarter of 1:00, if

7    possible, may facilitate matters, because she's been here for

8    a little while now.  But I assume there's going to be some

9    extended cross of this witness.

10       MR. GREENBAUM:  Your Honor, what if we -- I don't know

11   how long the witness is.  What if we put her on now, out of

12   order, and then we'll postpone the cross to accommodate this

13   witness.  I don't know how long the witness is going to be.

14       MR. MCCARTHY:  I prefer not to operate that way,

15   Your Honor.

16       JUDGE BUSCHMANN:  I mean, that's a good suggestion if

17   you want to accommodate the other witness.

18       MR. MCCARTHY:  I'd prefer to stick with the order of the

19   witnesses, Your Honor, at this point in time, so I'm just

20   bringing -- raising the issue to the court's attention --

21       JUDGE BUSCHMANN:  Yes.

22       MR. MCCARTHY:  -- in case there is a change in

23   circumstances with regard to the witness' family that

24   requires her to leave because of an emergency at that time,

25   and I'd have to ask that we'd call her tomorrow morning, but

1  we'll do our utter best to put her on this afternoon.

2       JUDGE BUSCHMANN:  All right.  If that's your wish.  We

3  will be willing to accommodate you and have her testify now,

4  out of turn, but if that's what you prefer, that's fine with

5  me.  We're governed by your suggestion, Mr. McCarthy.

6       MR. MCCARTHY:  Thank you, Your Honor.

7       JUDGE BUSCHMANN:  We stand adjourned until a quarter of

8  1:00.  Is that what you're saying, Mr. McCarthy, would be a

9  better time than a full hour?

10      MR. GREENBAUM:  We would prefer the full hour, Your

11 Honor.

12      MR. MCCARTHY:  We're not going to object to the full

13 hour.  That's fine, Your Honor, but I would like to start

14 promptly at one o'clock.

15      JUDGE BUSCHMANN:  Yes, promptly at one o'clock.

16 **(Whereupon, at 12:00 p.m., a lunch recess was taken.)**

17

18

19

20

21

22

23

24

25

1                    <u>A F T E R N O O N   S E S S I O N</u>

2                              (Time Noted:  1:00 p.m.)

3      JUDGE BUSCHMANN:  Okay, we're on the record.

4      Mr. Greenbaum, you may proceed.

5      MR. GREENBAUM:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7  Q.  BY MR. GREENBAUM:  Good afternoon, Ms. Jiron.  You were

8  terminated from the hotel, correct?

9  A.  Yes.

10 Q.  Did you collect unemployment after you left the hotel?

11     MR. MCCARTHY:  Objection, Your Honor.  Relevance.

12     JUDGE BUSCHMANN:  Sustained.

13 Q.  BY MR. GREENBAUM:  Did you give a reason to the

14 unemployment office for your termination when you left the

15 hotel?

16     MR. MCCARTHY:  Objection, Your Honor.  That's the

17 same -- it's the same question.

18     JUDGE BUSCHMANN:  What's the point?

19     MR. GREENBAUM:  The credibility, Your Honor.  I'm not

20 going into whether she received unemployment, it's

21 credibility.

22     JUDGE BUSCHMANN:  All right, you may proceed.

23 Q.  BY MR. GREENBAUM:  Did you give a reason to the

24 unemployment as to why you were separated from the hotel?

25 A.  Yes.

1   Q.   And what reason did you give?

2   A.   That I had been unfairly dismissed.

3   Q.   Are you sure that's the reason you gave?

4   A.   Yes.

5        MR. GREENBAUM:  What I'd like to have marked for

6   identification and what we will mark as Respondent's 2.  And,

7   Your Honor, just for the record, it's a District of Columbia

8   form request for separation information.  It's for

9   Marleni Jiron.  I will acknowledge this is the employer's

10  portion so there's no employee's signature, but it's a

11  business record of the District of Columbia.

12  **(Respondent's Exhibit 2 marked for identification.)**

13  Q.   BY MR. GREENBAUM:  And, Ms. Jiron, my question to you

14  is, on this form it says the claimant indicated that the

15  reason for separation was laid off for lack of work.  Is that

16  the reason you gave to the District of Columbia?

17       THE INTERPRETER:  In order to --

18       MR. MCCARTHY:  Your Honor, I'm --

19       THE INTERPRETER:  Yeah.  In order to translate, when you

20  say lack of work, what do you mean exactly by that, there was

21  no work at the hotel --

22       MR. GREENBAUM:  Yes.

23       THE INTERPRETER:  -- or that she wasn't doing enough --

24  okay.

25       MR. MCCARTHY:  Your Honor, I'm going to object.  There

1    is no indication from this document that this is a statement

2    made by Ms. Marleni Jiron, because there is no signature on

3    the document and Mr. Greenbaum has represented that this is a

4    statement made by this witness to the District of Columbia

5    government.

6        JUDGE BUSCHMANN:  Okay.  I agree with Mr. McCarthy, but

7    you may inquire whether or not she said that.

8        MR. GREENBAUM:  That's all I'm doing, Your Honor.

9        JUDGE BUSCHMANN:  Just withdraw the exhibit.

10       MR. GREENBAUM:  Withdraw the exhibit, but -- and it's

11   only marked for identification.  I didn't move for it's

12   admission.

13       JUDGE BUSCHMANN:  Yes.

14   **(Respondent's Exhibit 2 withdrawn.)**

15   Q.    BY MR. GREENBAUM:  Ms. Jiron, did you give the District

16   of Columbia as the reason for your separation was lack of

17   work?

18   A.    No, at any time I haven't said that it was because of

19   lack of work.

20   Q.    Did you tell them that you were -- you got into a fight

21   with another employee?

22   A.    No, because I never got into a fight with any other

23   employee.

24   Q.    Ms. Jiron, you testified that you were cleaning Room 215

25   when Alex approached you.  Do you recall that testimony?

1  A.   Yes.

2  Q.   Are you sure it was Room 215?

3  A.   Yes.

4  Q.   Isn't it true that in -- when did this happen, was it

5  March?

6  A.   Yes.

7  Q.   Okay.  Isn't it true that March 2005, Room 215 was

8  occupied by a permanent resident and it was off limits to

9  hotel employees?

10  A.   Well, yes, but I was cleaning the room when Alex came to

11  set up the minibar.

12  Q.   You were cleaning Room 215?

13  A.   Yes.

14  Q.   But Room 215 was a room that doesn't get cleaned,

15  correct?

16  A.   Why?

17  Q.   Because 215 was occupied by a permanent resident of the

18  hotel.

19      MR. MCCARTHY:  That's been asked and answered.

20      THE WITNESS:  It's not a permanent resident.

21  Q.   BY MR. GREENBAUM:  Was that room under construction at

22  the time?

23  A.   No.

24  Q.   Were there guests in that room?

25  A.   Yes.

1   Q.   And you're sure it was Room 215?

2   A.   It was 215.

3   Q.   And it was in March of '05?

4        JUDGE BUSCHMANN:  You already asked that, Mr. Greenbaum.

5   I should say --

6   Q.   BY MR. GREENBAUM:  Thank you, Your Honor.  Do you recall

7   a meeting you attended with Mr. Bello?

8   A.   Yes.

9   Q.   Did you tape that meeting?

10  A.   No.

11  Q.   Did employees accuse you of taping that meeting?

12       MR. MCCARTHY:  Objection, Your Honor.  No foundation

13  stands for whether she has knowledge of whether employees

14  accused her of that.

15       JUDGE BUSCHMANN:  Now, was she then told by other

16  employees of getting recorded the meeting?

17       THE WITNESS:  Yes.

18  Q.   BY MR. GREENBAUM:  At that meeting, did other employees

19  accuse you of taping the meeting?

20  A.   Yes.

21  Q.   Did you deny it?

22  A.   Yes.

23  Q.   Who accused you?

24  A.   Veronica, Veronica Cruz.

25  Q.   Anyone else?

1   A.   No.

2   Q.   Did you tape that meeting?

3   A.   No.

4   Q.   Do you recall when that meeting was?

5   A.   Yes.

6   Q.   When?

7        THE INTERPRETER:  When?

8        MR. GREENBAUM:  When.

9        THE WITNESS:  I don't remember the date.

10  Q.   BY MR. GREENBAUM:  Do you remember the month?

11  A.   No.

12  Q.   Do you remember the year?

13  A.   2005.

14  Q.   Do you remember what the subject of that meeting was?

15  A.   Yes.

16  Q.   What?

17  A.   Mr. Bello came to have the meeting and the

18  representatives from the Union came, and so Mr. Bello came

19  and said that the representatives from the Union were not

20  prepared for membership.

21  Q.   Did you have a discussion with Mr. Bello after the

22  meeting?

23  A.   No.

24  Q.   Did you raise your voice at Mr. Bello in the meeting?

25  A.   It was not to Mr. Bello.

1   Q.   Did you raise your voice at that meeting?

2   A.   I didn't raise my voice.

3   Q.   Did you point in Mr. Bello's face at that meeting?

4   A.   He was in front of me, next to Mr. Corrado.

5   Q.   Did you raise your voice at Mr. Palenzona at that

6   meeting?

7   A.   No.

8   Q.   Now, you indicated that in April, I believe, April 19th,

9   2005, you distributed some literature at the hotel?

10  A.   Yes.

11  Q.   You also distributed some literature on May 4th at the

12  hotel, correct?

13  A.   Yes.

14  Q.   And you distributed that during your lunch break,

15  correct?

16      MR. MCCARTHY:  Your Honor, I'm going to object.  This is

17  outside the scope of direct examination and no questions

18  asked about distribution of literature on May 4th by this

19  witness.

20      JUDGE BUSCHMANN:  But I do have some notes here that she

21  did distribute some Union fliers, but you're saying it's

22  not --

23      MR. MCCARTHY:  That was on April 19th, Your Honor,

24  correct.  I asked no questions about distribution of

25  literature on May 4th.

```
 1        MR. GREENBAUM:  Your Honor --

 2        JUDGE BUSCHMANN:  Okay, I'll overrule the objection

 3        MR. GREENBAUM:  Thank you.

 4        JUDGE BUSCHMANN:  Go ahead.

 5   Q.   BY MR. GREENBAUM:  Where, on May 4th, you distributed

 6   Union literature during your lunch break, correct?

 7   A.   Yes.

 8   Q.   And there were employees in the lunch area?

 9   A.   Yes.

10   Q.   About how many?

11   A.   A majority of them.

12   Q.   Did anyone tell you not to do that?

13   A.   No.

14   Q.   And this was after the April 19th incident?

15   A.   Yes.

16   Q.   Did anyone talk to you about that May 4th distribution?

17   A.   No.

18   Q.   Did anyone tell you that you can't do that at the hotel?

19   A.   Not then.

20   Q.   Were you ever written up for distributing literature at

21   the hotel?

22   A.   No.

23   Q.   Now, do you know an employee named Reina Lozano?

24   A.   Of course I do.

25   Q.   And Reina Lozano used to be a union supporter, correct?
```

1  A.   Yes.

2  Q.   And did there come a time when Reina Lozano stopped

3  being a union supporter?

4  A.   Yes.

5  Q.   Did you call her from your cell phone about that?

6       MR. MCCARTHY:  I'm going to object, Your Honor.  Again,

7  we're outside the scope of direct.

8       JUDGE BUSCHMANN:  I'll overrule the objection and see

9  where we're going.

10      MR. GREENBAUM:  Thank you, Your Honor.

11      THE WITNESS:  Yes.

12  Q.  BY MR. GREENBAUM:  Do you recall what month that was?

13  A.   In the month where the petition was supposed to be going

14  around.

15  Q.   Did you ever see a petition?

16  A.   No.

17  Q.   Did anyone ever ask you to sign a petition?

18  A.   No.

19  Q.   How do you know a petition was going around?

20  A.   Because the majority of them were saying that.

21  Q.   Did you call Reina Lozano a backstabber?

22  A.   Yes.

23  Q.   Were you at a meeting at the Union hall with

24  Reina Lozano?

25  A.   No.

1   Q.   You were never at the meeting with the Union with

2   Reina Lozano, is that your testimony?

3        THE INTERPRETER:  Excuse me.  The interpreter

4   misunderstood the previous question.  A meeting that was

5   hold?  Did you say --

6        MR. GREENBAUM:  Held, held.  I'll rephrase the question.

7        THE INTERPRETER:  Yes.

8   Q.   BY MR. GREENBAUM:  Were you ever at a meeting at the

9   Union with Reina -- where Reina Lozano was present?

10  A.   In all of them.

11  Q.   Reina Lozano was present in all of them?

12  A.   Yes.

13  Q.   Did Reina Lozano have -- was there a Union person named

14  Olga there?

15  A.   Yes.

16  Q.   Did Reina and -- did Reina Lozano and Olga get in a

17  fight?

18  A.   No.

19  Q.   Did you ever call Reina Lozano after one of those

20  meetings and say, don't tell the employees what happened in

21  that meeting?

22  A.   No.

23  Q.   At one of those meetings, did Reina Lozano say, I'm

24  done, I'm not interested anymore?

25  A.   No.

1  Q.   Now, during your employment at the State Plaza, you

2  talked to Mr. Palenzona many -- on many occasions, correct?

3  A.   Yes.

4  Q.   Would you often go into his office?

5  A.   No.

6  Q.   Did you ever ask Mr. Palenzona how to get rid of the

7  Union?

8  A.   No.

9  Q.   Did you often visit Mr. Palenzona's office to complain

10  about work?

11  A.   No.

12  Q.   Did you ever complain to Mr. Palenzona about work?

13  A.   No.

14  Q.   Did you ever complain about your supervisors?

15  A.   Yes.

16  Q.   And who did you complain to?

17  A.   I complained about Fanny.

18  Q.   But did you complain to Fanny or about Fanny?

19  A.   About Fanny.

20  Q.   And who did you complain to?

21  A.   Mr. Corrado.

22  Q.   And how many times did you complain to Mr. Palenzona

23  about Fanny?

24  A.   Once.

25  Q.   Only once?

1   A.   Yes.

2   Q.   When you complained to Mr. Palenzona, did you go to his

3   office?

4   A.   Yes.

5   Q.   Do you recall what month that was?

6   A.   No.

7   Q.   Do you recall what year that was?

8   A.   2005.

9   Q.   Did you dance with Mr. Palenzona at the Christmas party?

10  A.   I've never danced with Mr. Corrado.

11  Q.   Did you ever threaten Alex Guillen with a knife?

12       THE INTERPRETER:  Threaten who?

13       MR. GREENBAUM:  Alex Guillen.

14       THE WITNESS:  Oh no.

15  Q.   BY MR. GREENBAUM:  Did you ever pick up a knife off your

16  cart and threaten someone with it?

17  A.   I don't have a cart.

18  Q.   How about off a -- did you ever pick up a knife off

19  Alex's cart?

20       THE INTERPRETER:  Pick up a card or --

21       MR. GREENBAUM:  A cart.

22       THE INTERPRETER:  Cart.

23       MR. GREENBAUM:  C-a-r-t.

24       THE INTERPRETER:  Could you repeat the question?

25  Q.   BY MR. GREENBAUM:  Did you ever pick up a knife off

1  Alex's cart?

2  A.   They don't have a cart.

3  Q.   Alex Guillen does not have a cart?

4  A.   No.

5  Q.   Now, you indicated that Mr. Palenzona asked you what do

6  employees want.  Do you recall that conversation?

7  A.   Yes.

8  Q.   When was that conversation?

9  A.   In March.

10  Q.   2005?

11  A.   Yes.

12  Q.   Did he mention the Union in that conversation?

13  A.   Yes.

14  Q.   And what did he say?

15  A.   When I said that what we wanted was for them to sign our

16  contract, he said that that was not within his power or his

17  hands.

18  Q.   Did he threaten you during that conversation?

19  A.   No.

20  Q.   Did you complain about work during that conversation?

21  A.   No.

22  Q.   Did you complain about your supervisor during that

23  conversation?

24  A.   No.

25       MR. GREENBAUM:  No further questions.

1        JUDGE BUSCHMANN:  Thank you.

2   **(Pause.)**

3        MR. MCCARTHY:  Okay.  Your Honor, may I have a brief

4   redirect?

5        JUDGE BUSCHMANN:  Yes, go ahead.  Please proceed.

6        MR. MCCARTHY:  Thank you.

7                    **REDIRECT EXAMINATION**

8   Q.   BY MR. MCCARTHY:  Did you dance at the Christmas party?

9   A.   Yes.

10  Q.   When you were dancing, was Mr. Corrado in the area?  In

11  the area.

12       THE INTERPRETER:  In the area?

13       JUDGE BUSCHMANN:  In the vicinity.

14       MR. MCCARTHY:  In the vicinity where she was dancing.

15       THE INTERPRETER:  Okay.  Would you repeat the question,

16  please?

17  Q.   BY MR. MCCARTHY:  At any time while you were dancing,

18  did you ever see Mr. Corrado dancing in the vicinity where

19  you were dancing?

20  A.   Yes, he was dancing.

21       MR. MCCARTHY:  No further questions, Your Honor.

22       JUDGE BUSCHMANN:  Okay, thank you very much.  You may

23  step down.

24  **(Witness excused.)**

25       MS. JIRON:  Can I take this?

```
 1        THE INTERPRETER:  The witness is asking a question.
 2        JUDGE BUSCHMANN:  No, just leave that.
 3        MR. MCCARTHY:  Your Honor, Ms. Cotilla is going to get
 4   the next witness.
 5        JUDGE BUSCHMANN:  Yes.
 6        MR. MCCARTHY:  Her name is Gloria Melgar.  That's
 7   G-l-o-r-i-a --
 8        JUDGE BUSCHMANN:  Say that again.  Wait a minute.
 9        MR. MCCARTHY:  It's Gloria, G-l-o-r-i-a --
10        JUDGE BUSCHMANN:  Yes.
11        MR. MCCARTHY:  -- Melgar, spelled M-e-l-g-a-r.  It's my
12   understanding that she's just had knee surgery and --
13        JUDGE BUSCHMANN:  Uh-huh.
14        MR. MCCARTHY:  -- is recovering.
15        JUDGE BUSCHMANN:  Is she the one that had the problem?
16        MR. MCCARTHY:  Yeah, her husband is in the hospital.
17        JUDGE BUSCHMANN:  Is she going to make a credible
18   witness, knowing that --
19        MR. MCCARTHY:  I think so, Your Honor --
20        JUDGE BUSCHMANN:  She needs an interpreter as well?
21        MR. MCCARTHY:  Yes, she does, Your Honor.
22   (Pause.)
23        JUDGE BUSCHMANN:  Let he sit down.  Yeah, I'll swear her
24   in when she's seated.  Just let her sit down.
25        MS. mg:  Thank you.
```

1      JUDGE BUSCHMANN:  Okay.  I have to swear you in.  Please

2  raise your right hand.

3  (Whereupon,

4                        GLORIA MELGAR

5  was called as a witness by and on behalf of the General

6  Counsel and, after having been duly sworn, was examined and

7  testified as follows:)

8      JUDGE BUSCHMANN:  Thank you.

9      MR. MCCARTHY:  Good afternoon, Ms. Melgar.

10     THE WITNESS:  Thank you.

11                     DIRECT EXAMINATION

12  Q.   BY MR. MCCARTHY:  Would you please state your name and

13  address for the record, please?

14  A.   I'm Gloria Melgar.  I live in Washington, D.C., Building

15  61 -- 6100, Apartment 301, 20011.

16  Q.   Are you testifying here today pursuant to my subpoena?

17  A.   Yes.

18  Q.   Do you speak English?

19  A.   No.

20  Q.   Do you speak Spanish?

21  A.   Yes, I do.

22  Q.   Can you read either English or Spanish?

23  A.   No, neither.

24  Q.   Did you have knee surgery last week?

25  A.   Yes.

1  Q.   Is your knee okay to testify here today?

2  A.   Yes.

3  Q.   And I understand your husband is in the hospital today,

4  is that correct?

5  A.   Yes.

6  Q.   Are you still able to testify?

7  A.   Well, we'll see.

8  Q.   Okay.  Are you currently employed?

9  A.   Yes.

10  Q.   And what job do you -- who are you employed by?

11  A.   I work at State Plaza.

12  Q.   And what job do you have at the State Plaza Hotel?

13  A.   Housekeeper.

14  Q.   And what duties do you perform as a housekeeper?

15  A.   Cleaning rooms.

16  Q.   How long have you been employed as a housekeeper at the

17  State Plaza Hotel?

18  A.   I started March 1999.

19  Q.   And what hours do you work?

20  A.   I work 8:00 to 4:30.

21  Q.   And who is your immediate supervisor?

22  A.   Lidia.

23  Q.   And does Lidia speak to you in English or Spanish?

24  A.   In Spanish.

25  Q.   And who is the housekeeping manager?

```
 1   A.   Her name is Lisa.

 2   Q.   And do you know Lisa's last name?

 3   A.   No.

 4   Q.   Does Lisa speak to you in English or Spanish?

 5   A.   In Spanish.

 6   Q.   And who is the general manager of the State Plaza Hotel?

 7   A.   Corrado.

 8   Q.   And does Mr. Corrado speak to you in English or Spanish?

 9   A.   In Spanish.

10   Q.   How much are you currently paid?

11   A.   12.50.

12   Q.   When did you start making $12.50 per hour?

13   A.   It was July the 8th.

14   Q.   Of what year?

15   A.   2005.

16   Q.   And how much were you making before you began making

17   $12.50 on July 8, 2005?

18   A.   10.94.

19   Q.   Do you know Alexandra?

20   A.   Yes.

21   Q.   Do you Alexandra's last name?

22   A.   No.

23   Q.   Do you know Reina?

24   A.   Yes.

25   Q.   Do you know Reina's last name?
```

1    A.    Yes, Lozano.

2    Q.    Is there only one Alex and Reina at the hotel?

3    A.    Yes.

4    Q.    What jobs do Alex and Reina perform at the hotel?

5    A.    She works at the cafeteria and taking care of the guests

6    in the morning, and at noon they're setting up the minibar.

7    Q.    Okay.  And did you ever see Alex and -- have you ever

8    seen Alex and Reina meet with Mr. Corrado Palenzona?

9    A.    Yes, I've seen -- I've seen them there in the morning.

10   Q.    And how often would you see them there in the morning?

11   A.    Almost every day.

12   Q.    And what would they be doing?

13   A.    Well, they were talking.

14   Q.    What room would you see them in?

15   A.    I would see them in the cafeteria.

16   Q.    Would you ever see them in the hallways together?

17   A.    No, I would always see them just there and talking.

18   Q.    See them where talking?

19   A.    In the cafeteria or sometimes at the entrance.

20   Q.    Did there ever come a time when you stopped seeing them

21   so frequently together?

22   A.    Well, yeah, the beginning of when -- when I used to see

23   them together, it was when they wanted them -- when they

24   wanted us to sign, but then after that I didn't see them so

25   often.

1  Q.   Do you see Mr. Corrado Palenzona in the courtroom here

2  today?

3  A.   Yes.

4  Q.   Did you ever clean rooms with another housekeeper named

5  Hilda Gonzalez?

6  A.   Yes.

7  Q.   Was there a particular floor that you and Hilda Gonzalez

8  worked on?

9  A.   Well, yes, because I worked on the first floor.  That

10  has only 10 rooms.  But from there they would send me to the

11  second floor and there's where I saw Hilda.

12  Q.   And do you recall ever seeing Alex and Reina together

13  when you were cleaning rooms with Hilda on the second floor?

14  A.   Yes, one day when she had a paper that she wanted us to

15  sign.

16  Q.   And what were you and Hilda doing?

17  A.   Cleaning rooms.

18  Q.   Did either Reina or Alex ask you and Hilda to sign

19  anything?

20       THE INTERPRETER:  Wait.

21       MR. MCCARTHY:  Let me repeat the question.

22       THE INTERPRETER:  Yes, please.

23  Q.   BY MR. MCCARTHY:  Did either Reina or Alex ask you and

24  Hilda to sign anything?

25  A.   Yes, Reina told me to sign the document.

1  Q.   And did you ask Reina any questions when she asked you

2  to sign the document?

3  A.   Well, yes, I asked why would we have to sign that paper

4  and she said that it was to see if we could get a raise to

5  12.50 and to see if we could get rid of the Union.

6  Q.   And did Reina mention Mr. Corrado Palenzona when she

7  made that statement?

8  A.   Yes, because she told me that Mr. Corrado had said that

9  if we got rid of the Union, we were going to have the raise

10  to 12.50.

11  Q.   Did you sign the document?

12  A.   Yes, I did.

13      MR. MCCARTHY:  And I want to direct your attention to

14  the exhibits in front of you, General Counsel's Exhibit 3.

15  May I approach, Your Honor?

16      JUDGE BUSCHMANN:  Yes.

17  Q.   BY MR. MCCARTHY:  Do you recognize your signature on the

18  document?

19  A.   Yes, this is the one.

20  Q.   And why did you sign the document?

21  A.   For the 2.50 that we are being told.

22  Q.   And do you remember if both pages were present when you

23  signed the document or only one page?

24      THE INTERPRETER:  Both pages?

25      MR. MCCARTHY:  Do you remember -- may I approach again,

1    Your Honor?

2         JUDGE BUSCHMANN:  Yes.

3    Q.    BY MR. MCCARTHY:  Do you remember if both pages of

4    General Counsel's Exhibit 3 were present when you signed the

5    document or only one page?

6    A.    No, it was only one.

7    Q.    Did you see Hilda sign the document?

8    A.    Yes.

9    Q.    Did Hilda tell you why she signed the document?

10   A.    Yes, because of the 2.50.

11   Q.    Did you ever sign any other petition to get rid of the

12   Union?

13   A.    No.

14   Q.    Were you working at the time that Reina asked you to

15   sign the document?

16   A.    Yes.

17   Q.    Was Hilda Gonzalez also working?

18   A.    Yes.

19   Q.    And were Reina and Alex working at the time?

20   A.    Yes, they were setting up the minibar.

21   Q.    Did you see Reina the day after you and Hilda signed the

22   petition?

23   A.    Yes.

24   Q.    Do you recall whether Reina said anything to you at that

25   time?

1  A.   Yes, that we were going to -- that she was going to call

2  Mr. Corrado to tell him to come to the Diplomat so I could

3  talk to him.

4  Q.   And did you attend a meeting in the Diplomat Room the

5  day after you signed the petition?

6  A.   Yes, because all the housekeepers were in the room.

7  Q.   Were all the housekeepers present at that meeting or was

8  there a separate meeting where only Alex, Reina and Sylvia

9  were present with Mr. Corrado?

10     MR. GREENBAUM:  Objection.  Leading.

11     JUDGE BUSCHMANN:  Objection overruled.

12     MR. MCCARTHY:  And Sylvia.

13     THE WITNESS:  Yes, just them.

14  Q.   BY MR. MCCARTHY:  And did Mr. -- how come all the

15  employees were not present?

16  A.   Because since they were the ones who were, you know,

17  going around with the paper, they were the only ones who

18  would be talking about this.

19  Q.   And did Mr. Palenzona speak at this meeting in the

20  Diplomat Room with Alex, Reina, yourself and Sylvia?

21  A.   Yes.

22  Q.   And did Mr. Palenzona speak in Spanish or English?

23  A.   In Spanish and in English.

24  Q.   And did anyone translate for him from English to

25  Spanish?

1  A.    Yes, Alex.

2  Q.    And what did he say?  What did Mr. Palenzona say?

3  A.    He said that he was not promising the 2.50, that he

4  couldn't promise that he could get that 2.50 for us.  But in

5  case that we got rid of the Union, then he would talk to

6  the -- to his attorney and see what he said about the

7  possibility.

8  Q.    And did you ask Mr. Palenzona any questions during this

9  meeting in the Diplomat Room?

10       THE INTERPRETER:  Would you repeat the question, please?

11  Q.    BY MR. MCCARTHY:  Did you ask Mr. Palenzona any

12  questions during this meeting in the Diplomat Room?

13  A.    Yes, I asked him how we could be sure that we were not

14  going to be fired if we didn't have any union, and he said

15  that as long as we didn't do anything wrong in our work,

16  there was no reason why we would be fired.

17  Q.    And how long did this meeting in the Diplomat Room last?

18  A.    About five minutes.

19  Q.    Now, do you recall whether there was another meeting in

20  the Diplomat Room when Marleni Jiron spoke to employees?

21  A.    Yes.

22  Q.    And were all the employees present at that meeting?

23  A.    Yes, we were all -- all the housekeepers were there.

24  Q.    And do you recall seeing Adriana Nunez, Gladis Bonilla

25  and Gloria Castro present at that meeting?

1        THE INTERPRETER:  And who Castro?

2        MR. MCCARTHY:  Gloria Castro.

3        THE WITNESS:  Yes, I saw them.

4   Q.   BY MR. MCCARTHY:  Now I want to turn your attention to

5   June 2005.  Do you recall whether anyone asked you to sign

6   anything in early June 2005?

7   A.   Yes, Alex.

8   Q.   What did Alex ask you to sign?

9   A.   To sign again another petition.

10  Q.   Were you working at the time?

11  A.   Yes.

12  Q.   Where were you?

13  A.   I was in a room on the third floor and I went to the

14  second floor to pick up my things.

15  Q.   Was Alex working at the time?

16  A.   Yes, she was in the cafeteria.

17  Q.   What did Alex say to you, if anything?

18       THE INTERPRETER:  The interpreter needs --

19       THE WITNESS:  For me not to sign another petition for

20  the Union.

21       MR. MCCARTHY:  Let me -- let me ask --

22       THE INTERPRETER:  It's still confusing.

23  Q.   BY MR. MCCARTHY:  Did Alex ask you to sign anything?

24  A.   Yes, another petition.

25  Q.   What did she say to you when she asked you to sign

1  something?  Do you recall whether she told you why she wanted

2  you to sign something?

3  A.    To get rid of the Union.

4  Q.    Do you recall whether she said anything else?

5  A.    No.

6  Q.    Do you recall whether she said anything about

7  Mr. Palenzona?

8  A.    Yes, that in case we got rid of the Union, then we would

9  get a raise to 12.50.

10     MR. GREENBAUM:  Object.  Move to strike.

11     JUDGE BUSCHMANN:  What basis?

12     MR. GREENBAUM:  I believe he said, did she say anything

13  about Mr. Palenzona?  The response was not responsive.

14     JUDGE BUSCHMANN:  Objection overruled.

15     MR. GREENBAUM:  It's also a leading question, Your

16  Honor.  The witness said she didn't remember anything else

17  and then he followed up with a leading question.

18     MR. MCCARTHY:  Your Honor, the witness has indicated

19  that she can't read.  If I showed her her affidavit, it would

20  not refresh her recollection.

21     JUDGE BUSCHMANN:  I understand.

22  Q.    BY MR. MCCARTHY:  What did anything -- did you say?

23  A.    That I was not going to sign another petition, because

24  that night two people from the Union had come to tell us what

25  they -- what has been said in a meeting here.

1  Q.   And did you tell Alex that two people from the Union had
2  come to visit you?
3  A.   Well, yes, the two people from the Union came and said
4  that somebody from the hotel --
5      THE INTERPRETER:  Again, the interpreter would need to
6  go back for some clarification.
7      THE WITNESS:  Someone from the hotel said that --
8  Q.   BY MR. MCCARTHY:  Let me withdraw the question and re-
9  ask it.  Did you tell Alex about whether the Union had
10 visited you, yes or no?
11 A.   Yes.
12 Q.   Did you sign the document that Alex asked you to sign?
13 A.   No.
14 Q.   Did she show a petition at that time?
15 A.   No.
16 Q.   Did you say anything else?
17 A.   Yes, that I was not going to sign the paper again.
18 Q.   And do you recall whether you said anything about the
19 hotel?
20 A.   Yes, I said that they were lying, because they were
21 saying that when were kind of behind in our work, they would
22 put the supervisor to help us clean dishes.
23 Q.   And was anyone else around?
24 A.   No, just --
25 Q.   Were you in Room 127 the next day?

1  A.   Yes.

2  Q.   What were you doing?

3  A.   I was cleaning.

4  Q.   And did anyone come to your room while you were cleaning

5  it?

6  A.   Yes, Corrado came.

7  Q.   And were you working at the time when Mr. Corrado came

8  the next day?

9  A.   Yes.

10 Q.   And what time of day was this, do you recall?

11 A.   It must've been around 9:00 a.m.

12 Q.   And did Mr. Corrado ask you anything?

13 A.   Yes, if it was true that somebody from the Union had

14 come to visit me.

15 Q.   And did you respond when Mr. Corrado asked you whether

16 it was true that someone from the Union came to visit you?

17 A.   Yes.

18 Q.   What did you say?

19 A.   Yes, that they had visited me at night.

20 Q.   And do you recall whether Mr. Palenzona asked you

21 anything else?

22 A.   Yes, if it was true that the Union had visited.

23 Q.   And did he ask you anything else after that?

24 A.   What have they told you?

25 Q.   And did you respond?  Did you respond when Mr. Palenzona

1   asked you what they had said?

2   A.   Yes.

3   Q.   What did you tell him?

4   A.   That they were liars because they had told them that the

5   supervisor would help cleaning the dishes.

6   Q.   And what did Mr. Palenzona say, if anything?

7   A.   And he told me not to believe them because they were

8   liars.

9   Q.   And do you recall whether he said anything else?

10  A.   That if I didn't want the Union to visit me, to let him

11  know about that.

12  Q.   And was this conversation in Spanish or English?

13  A.   In Spanish.

14  Q.   How long did the conversation last?

15  A.   Maybe four minutes.

16  Q.   Okay.  Now I want to direct your attention to the third

17  week in June 2005.  Do you recall speaking to anyone about

18  the third week of June 2005?

19  A.   Yes, with Alex.

20  Q.   Where did you speak with Alex?

21  A.   In the hallway near the cafeteria.

22  Q.   And was anyone else present?

23  A.   No, just the two of us.

24  Q.   What did Alex say to you and you say to her?

25  A.   For me to sign the document and I answered that to let

1  me think about it.

2  Q.   Did she ask you to sign another document or did she ask

3  you why you hadn't signed the prior document?

4  A.   No, she asked me why I hadn't signed the other document.

5  Q.   And did she say anything else?  Did she mention

6  Mr. Corrado?

7  A.   Yes, she told me that -- she said that she wanted me to

8  sign that because Corrado told her that I had betrayed him.

9  Q.   Did you respond?

10 A.   That in what manner I had betrayed him.

11 Q.   And do you recall whether Alexandra said anything else

12 when you asked her how you had betrayed Mr. Corrado?

13 A.   I don't remember.

14 Q.   Did you indicate to Alex whether or not you were going

15 to sign the most recent petition?

16 A.   No, I told her to let me think about it.

17 Q.   And do you recall whether Ms. Alex said anything else

18 after you asked her to let you think about it?

19 A.   Yes, she said that they didn't want the owner to sell

20 the hotel.

21 Q.   And did you respond?

22 A.   That I didn't care if they sold it or not.

23 Q.   Did you tell her why you didn't care?

24 A.   That I didn't care if they were going to sell it or not

25 because they made us work very hard.

1  Q.    And did you indicate whether or not you could find a job

2  elsewhere?

3  A.    Yes.

4  Q.    What did you say?

5  A.    That I was already -- that I couldn't find employment

6  somewhere else.

7  Q.    And do you recall how the conversation ended?

8  A.    Yes.

9  Q.    How did the conversation end?

10  A.    She said that we all needed our jobs and that she didn't

11  want them to sell the hotel because the owner had said that

12  he would like to know who were the loyal employees to him.

13      MR. MCCARTHY:  Your Honor, I have no further questions

14  of this witness.

15      MR. GREENBAUM:  Your Honor, pursuant to your

16  instructions, that there is a statement we would like to

17  agree --

18      JUDGE BUSCHMANN:  Yes.  Is there a statement?

19      MR. MCCARTHY:  Yes, Your Honor, there is.  Let the

20  record reflect that I'm turning over an original 11-page

21  affidavit that was taken in Spanish and I will represent, as

22  an officer of the court, that this affidavit was read to the

23  affiant after that transcription.  Also, I am turning over an

24  eight-page affidavit that was written in English and it has

25  the certified transcription of -- I'm sorry, a certified

 1  translation of the attached Spanish affidavit.  They're both

 2  original, Your Honor.  Thank you.

 3      JUDGE BUSCHMANN:  Mr. Greenbaum, how much?

 4      MR. GREENBAUM:  Ten to 15 minutes, Your Honor.

 5      JUDGE BUSCHMANN:  All right.  Is 15 minutes too liberal,

 6  Mr. McCarthy?

 7      MR. MCCARTHY:  That's fine with me, Your Honor.

 8      **JUDGE BUSCHMANN:  Fifteen minutes.**

 9  **(Off the record.)**

10      JUDGE BUSCHMANN:  Mr. Greenbaum, you may proceed.

11                      CROSS-EXAMINATION

12  Q.  BY MR. GREENBAUM:  Ms. Melgar, you were in a meeting

13  with Corrado Palenzona when he told you he could not

14  guarantee or promise you a raise to $12.50, correct?

15  A.  Yes.

16  Q.  And this was after you signed General Counsel Exhibit

17  Number 3, correct?

18  A.  Yes.

19  Q.  Now, do you recall -- do you know an employee named

20  Marleni Jiron?

21  A.  Yes.

22  Q.  And after Marleni Jiron was terminated from the hotel,

23  you created a pamphlet regarding her termination, correct?

24  A.  No.

25  Q.  Did you pass out a pamphlet regarding Marleni Jiron's

1    termination?

2    A.    No.

3    Q.    Were you in the cafeteria passing it out?

4    A.    No.

5        MR. GREENBAUM:  Your Honor, I don't know how to do this,

6    because if the witness doesn't --

7        MR. MCCARTHY:  Well, maybe the witness -- if Mr. --

8    Your Honor, if I may be heard?  Maybe if Mr. Greenbaum showed

9    the witness the pamphlets he's talking about.

10       MR. GREENBAUM:  Okay.

11       JUDGE BUSCHMANN:  Thank you.

12       MR. GREENBAUM:  May I approach, Your Honor?

13       JUDGE BUSCHMANN:  Yes.

14   Q.   BY MR. GREENBAUM:  Just for the record, I'm going to be

15   showing the witness General Counsel Exhibit 32.  Ms. Melgar,

16   does that refresh your memory of the pamphlet?

17   A.    Yes.

18   Q.    Have you seen that before?

19   A.    Yes, in the cafeteria.

20   Q.    Did you hand it out in the cafeteria?

21   A.    Yes, we did.

22   Q.    Did anyone tell you not to do that?

23   A.    No, nobody ever told me that.

24       MR. GREENBAUM:  Nothing further, Your Honor.

25       MR. MCCARTHY:  No further questions, Your Honor.

1      JUDGE BUSCHMANN:  Thank you.  Thank you very much.  You

2  may step down.

3  **(Witness excused.)**

4      MR. MCCARTHY:  Your Honor, at this time General Counsel

5  would just like to discuss with the counsel for Respondent

6  subpoena paragraphs and Respondent's compliance with the

7  subpoena.  We didn't want to delay the testimony in this case

8  to discuss those issues.  I wanted it to go full-speed ahead,

9  but Ms. Cotilla will be handling, or calling two of witnesses

10  in an effort to discuss the subpoena issues and I believe

11  that she would like to have a conversation on the record with

12  Mr. Greenbaum with regard to the extent of compliance.

13      JUDGE BUSCHMANN:  Off the record.

14      MR. MCCARTHY:  Off the record.  See if we can resolve

15  any outstanding subpoena issues.

16      JUDGE BUSCHMANN:  So what you're proposing now is you

17  have no further witnesses?

18      MR. MCCARTHY:  That's correct, Your Honor.

19      MS. COTILLA:  We have --

20      MR. MCCARTHY:  Well --

21      MS. COTILLA:  -- the custodian of records.

22      MR. MCCARTHY:  We'd like to call the custodian of

23  records, but we'd like to also -- before we do so, see if we

24  can determine whether, in fact, Respondent has fully complied

25  with the subpoena.

1        MR. GREENBAUM:  Your Honor, our custodian of records

2   isn't here.  I know we had -- the one who's been here is on

3   jury duty.  We can get another one.  If not, Mr. Palenzona --

4   he's not the custodian of records.  We could get him here

5   fast, but he's not here.

6        MS. COTILLA:  State Plaza -- oh, Mr. Corrado was --

7        MR. GREENBAUM:  Yeah, yes.

8        MS. COTILLA:  Yeah, we'd like to question someone on --

9        MR. GREENBAUM:  Well, maybe you could work it -- I don't

10  know what the extent of the -- I don't know what the issues

11  are.

12       JUDGE BUSCHMANN:  So you're proposing right now that we

13  go off the record, that you discuss this matter and then we

14  come back and see whether the custodian is needed?

15       MS. COTILLA:  Right, yes.

16       **JUDGE BUSCHMANN:  All right, then we'll go off the**

17  **record at this point.  How much time do --**

18  **(Off the record.)**

19       **JUDGE BUSCHMANN:  Thank you, Mr. McCarthy.  On the**

20  **record.**

21       MR. MCCARTHY:  Yes, Your Honor.

22       JUDGE BUSCHMANN:  Okay, we're on the record.

23       MR. MCCARTHY:  Your Honor, we're unable to reach

24  agreement on certain subpoena requests and Respondent's

25  compliance with the subpoena.  Specifically, what we're

1 unable to reach agreement on are payroll records as set forth

2 in the General Counsel's subpoena to both State Plaza Hotel

3 and parent company, R.B. Associates, Inc.  Respondent has

4 asserted to the region during the investigation and in

5 position statements that it gave a wage adjustment to all the

6 hotels and that its wage adjustment given on July 8, 2005 to

7 this hotel was simply in compliance with the wage adjustment

8 it had given to other hotels and that was its legitimate

9 business justification for granting that wage adjustment.

10 We've subpoenaed the payroll records, both from Respondent

11 and from the other hotels and have not received those payroll

12 records, Your Honor.  It was my understanding that

13 Mr. Greenbaum was going to have a custodian of records bring

14 those payroll records over at this point in time and when we

15 started to pursue other matters, discussions broke down.

16      JUDGE BUSCHMANN:  Okay, any the other documents that are

17 in dispute?

18      MR. MCCARTHY:  Well, Your Honor, there are two -- I have

19 a concern with regard to two paragraph requests, specifically

20 paragraph 4 of the General Counsel's subpoena.  This concerns

21 all documents related to the petition and the Respondent

22 replied that Respondent will produce non-privileged

23 responsive documents.  I asked Mr. Greenbaum if there are any

24 privileged documents; he indicated no.  And the same goes for

25 the response to 33, all documents regarding or relating to

1    Respondent's Withdrawal of Recognition.  Respondent will

2    produce non-privileged responsive documents.  We never got to

3    that, Your Honor, but I would ask Respondent whether, in

4    fact, there are any privileged documents that are responsive

5    to the General Counsel's subpoena to respond in paragraph 33.

6        JUDGE BUSCHMANN:  So --

7        MR. MCCARTHY:  If there are --

8        JUDGE BUSCHMANN:  So you have three categories.  You

9    have the payroll records, you have those documents relating

10   to the withdrawal and documents relating to the petition.

11       MS. COTILLA:  Your Honor, if I may also -- there were

12   some representations made in the petition to revoke that

13   Respondent would produce documents to us and yet when I went

14   through the -- all the subpoena documents we received, I

15   didn't see those documents.  So that's another issue.

16       JUDGE BUSCHMANN:  Well, we have to know what documents

17   you're talking about.

18       MS. COTILLA:  Paragraph -- for example, Your Honor,

19   paragraph 30.  Representation was made that we would -- that

20   they would produce all responsive documents.  Paragraph 30

21   deals with all documents, including letters, memos or e-mails

22   from Respondent's employees regarding the Charging Party.

23       JUDGE BUSCHMANN:  Now, that's pretty broad, isn't it?

24       MS. COTILLA:  Well, to the extent, Your Honor, I think

25   what we are asking there is for all documents that relate --

1   between employees --

2       JUDGE BUSCHMANN:  To this case?

3       MS. COTILLA:  Well, employees regarding Local 25, the

4   union, to this case, yes.  And there was limited definition

5   section had a time period, December 1, 2003 --

6       JUDGE BUSCHMANN:  I see.

7       MS. COTILLA:  -- to the hearing.

8       JUDGE BUSCHMANN:  Okay.  Well, you know, the solution is

9   simple.  You just either, you know, as far as far producing

10  those documents that are -- that were requested pursuant to

11  subpoena -- of course, the standard that, you know, I'm

12  familiar with is two documents that are in existence and --

13  under two, as to whether they're relevant and relevancy is a

14  very broad standard, so if these documents are relevant, they

15  have to be produced.  And if they're not produced, then you

16  can take an -- for non-production.  When you're talking about

17  the payroll records and so forth, applicable to other hotels,

18  Mr. Greenbaum, you have to consider that these documents are

19  relevant in the sense that they're --

20      MR. GREENBAUM:  I'm not maintaining -- Your Honor, we're

21  getting those documents.

22      JUDGE BUSCHMANN:  I see.

23      MR. GREENBAUM:  We can have a witness here to testify as

24  to what the other hotels got.  I believe we did provide some

25  documentation as to when other hotels did a market

 1  adjustment, but we'll bring those documents, but I'm --
 2  they're voluminous and I'm glad Your Honor's here because,
 3  you know, before Your Honor came in, Mr. McCarthy -- before
 4  we took a break, I thought there were two, they had two
 5  issues on the subpoena; I thought well, we can work that out.
 6  Then Mr. McCarthy started going through the whole thing, then
 7  he has an issue with everything and he's just arguing over
 8  wording.  The fact is, if you'll look at this request, it's
 9  extremely broad --
10      JUDGE BUSCHMANN:  Yes, it is.
11      MR. GREENBAUM:  -- it's vague.  We can't -- we don't
12  even know how to respond, but we did.  We provided a lot of
13  documents and interestingly, Mr. McCarthy as of, I believe,
14  yesterday said he hadn't even looked at them.  He didn't need
15  them for his case in chief, unless he's not finished yet, but
16  we are.  And they just set forth four issues.  The first one
17  was payroll records.  We're going to bring those payroll
18  records.  I don't think he's going to use them, but we'll
19  bring them.  The non-privileged on 4, we discussed that with
20  him and I told him there were none; that was just some
21  wording we wrote down.  We probably shouldn't have used it,
22  but we did.  But there are -- there is nothing else out
23  there.  The other one was documents related to the Withdrawal
24  of Recognition.  We provided them with the petition.  Those
25  are the documents.  The petitions.  Because there's really

1    only one we relied on, but there's other petitions we had

2    given them.  But that's another request they made.  On Number

3    30, we did respond and we said those are set -- those are

4    responded with Request Number 4 and 29, which we provided

5    responsive documents.  So it appears to me that we have an

6    issue with Number 1, payroll records, but it's not an issue

7    because we're going to provide that.

8        MR. MCCARTHY:  Your Honor, the other subpoena duces

9    tecum goes to R.B. Associates and Respondent has provided no

10   documents responsive to that subpoena, merely relying upon

11   documents that were provided by Respondent and the General

12   Counsel is entitled to subpoena more than just the Respondent

13   in this case.  Any party that has evidence that may lead to

14   the discovery of admissible evidence, particularly the parent

15   corporation, so we would like a custodian of the records here

16   from R.B. Associates to the extent that we can examine that

17   custodian concerning any pay adjustment that was given to any

18   of the five hotels within the R.B. Associates umbrella.

19   Finally, Mr. Greenbaum, during our efforts to work this out,

20   represented to counsel for the General Counsel that he, in

21   fact, did not conduct any personal search of these documents

22   for his client, that he merely delegated that task to his

23   client to turn over any of the documents, Your Honor.

24       JUDGE BUSCHMANN:  Now, what's wrong with that,

25   Mr. McCarthy?

1      MR. MCCARTHY:  I believe, Your Honor, that as the

2  attorney for the client, he has an obligation to go to the

3  client and to make sure that the client has fully complied

4  with the document request by asking questions of the client

5  and following through consistent with the fiduciary duty to

6  the client as to have you given me all the documents that

7  have been requested here, not just turning over to the client

8  what the request is, but to actually assist and direct and

9  conduct the search.

10      MR. GREENBAUM:  Your Honor, I've never heard such a rule

11  of evidence.  In fact, if you're responding to

12  interrogatories, the client signs, in a document request, we

13  can have the client do it.  In fact, some companies outsource

14  that function.  This -- these broad requests were served a

15  week before the hearing.  Actually, we had less than a week

16  to respond.  You know, we did our best, Your Honor.  I'm not

17  going to be camped out at the client for a week looking

18  through their documents.  That's what they did, so -- as to

19  the R.B., they're basically the same request.  The records at

20  each hotel are kept in the records at the hotels.  There's

21  not a centralized place for records, so --

22      JUDGE BUSCHMANN:  You're going to have a custodian of

23  the records coming here, right?

24      MR. GREENBAUM:  Yes.

25      JUDGE BUSCHMANN:  Would it be the individual who's the

 1  custodian --

 2      MR. GREENBAUM:  Yes.

 3      JUDGE BUSCHMANN:  -- for both operations?

 4      MR. GREENBAUM:  Yes, he's the president of the hotel

 5  company.

 6      JUDGE BUSCHMANN:  So you're going to have somebody here,

 7  Mr. McCarthy, to interrogate as to those documents.

 8      MR. MCCARTHY:  Very good.  Thank you, Your Honor.

 9      JUDGE BUSCHMANN:  Now, what we are now dealing with --

10  apparently, you're producing those payroll records.  When are

11  they going to be here?

12      MR. GREENBAUM:  They're putting it together now,

13  Your Honor.  It's going to take a while because there are

14  four separate hotels.

15      JUDGE BUSCHMANN:  Um-hum.  By this afternoon?

16      MR. GREENBAUM:  It could be tomorrow, Your Honor.

17      JUDGE BUSCHMANN:  By when tomorrow?

18      MR. GREENBAUM:  I mean, I think, Your Honor, if General

19  Counsel would be satisfied with some type of cover sheet

20  showing the pay has -- you know, when this market adjustment

21  was given, because I think that's the issue.  If that would

22  satisfy them, it wouldn't take long, at all.  But if they

23  want individual payroll records, that's going to take a

24  while.  I mean, I would make a burdensome objection because,

25  I mean, I think it's nice to have all the paper, but it

1    doesn't make their case.  But, you know, if that's what they

2    want, that's what they'll get, but I don't think they really

3    need it.

4        MR. MCCARTHY:  Your Honor, we need the payroll records

5    at least for ADP, the ADP payroll records for the Respondent

6    hotel before the Respondent calls Reina and Alex as

7    witnesses.  Otherwise -- I mean, certainly Respondent could

8    have a certain time to compile the payroll records from the

9    other hotels.

10       JUDGE BUSCHMANN:  What's ADP, now?

11       MR. MCCARTHY:  ADP is the -- basically, the payroll

12   vendor, contractor that provides the payroll services for the

13   Respondent and the other hotels.

14       JUDGE BUSCHMANN:  Can you have those documents here?

15       MR. GREENBAUM:  We gave them the Alex and Reina payroll

16   records, Your Honor.  They requested that and I believe we

17   gave it.

18       MR. MCCARTHY:  They did not give us the payroll records

19   for Alex and Reina for the time period requested, Your Honor.

20   The Personnel Action forms.

21       MR. GREENBAUM:  But that's --

22       MR. MCCARTHY:  They indicate --

23       MR. GREENBAUM:  Okay, that's the hotel's internal

24   payroll record.  It shows when they got a raise and what

25   they're --

1        MS. COTILLA:  No, that's not a payroll --

2        MR. MCCARTHY:  We want a payroll record, Your Honor,

3    that prints out -- that's showing the ADP payroll record.

4    Like, for example, Exhibit 26 for Adriana Nunez.  There's an

5    ADP earnings statement, payroll record that indicates what

6    she was paid on a certain day.  Also -- there's also a full

7    payroll run that's in evidence as GC Exhibit 10(a).  Those

8    are the documents that we would like before they call Reina

9    and Alex as witnesses so that we may examine them at that

10   time.

11       MR. GREENBAUM:  I believe, Your Honor, we provided the

12   Board, during its investigation, a month's full, even more

13   than a month's full of this run, ADP run, and in their

14   subpoena request they just said, you know, please tell us if

15   those documents are authenticate so they can use them and we

16   did.  We consented to that, so we do have a full run for the

17   State Plaza.  I don't know if they have a two-years' full.  I

18   don't know why they would need two years.

19       JUDGE BUSCHMANN:  You have those records?

20       MS. COTILLA:  Your Honor, the one that -- the paragraph

21   that I believe Mr. Greenbaum is addressing is a -- where we

22   said all documents that are produced as part of the

23   investigation, that they stipulate -- and they don't have to

24   reproduce those.  However, there was a separate paragraph in

25   the subpoena, paragraph 21, that asks for all payroll records

1  and we did ask for a wider time period because now we -- the

2  investigative stage had ended.  We're now in litigation and

3  we asked for -- we needed to compare the rates and we asked

4  for the time period beginning December 1, 2004 until the day

5  of the hearing.  Those we received none responsive to the

6  subpoena.

7       JUDGE BUSCHMANN:  So are we still talking about payroll

8  records?

9       MS. COTILLA:  Yes.

10      MR. MCCARTHY:  Yes, Your Honor.  And basic stuff.

11      JUDGE BUSCHMANN:  Now, that's going to be supplied to

12  you.  Now, you're assembling those, right?

13      MR. GREENBAUM:  Yes, Your Honor.

14      JUDGE BUSCHMANN:  Now, what other documents -- you're

15  talking about now there's non-privileged documents and

16  apparently, according to Mr. Greenbaum, they don't exist.

17      MR. GREENBAUM:  And Your Honor, I would note if

18  Mr. McCarthy said to me on Monday that's an issue, you know,

19  maybe we would've pulled those sooner, but I didn't know it

20  was an issue until just now.  He had our objections last

21  Friday.

22      JUDGE BUSCHMANN:  So does that take care of it,

23  Ms. Cotilla?

24      MS. COTILLA:  Well, for example, for paragraph 13, there

25  was --

 1      JUDGE BUSCHMANN:  See, the thing is now, what you have

 2   to do is you have to separate yourself from trying the

 3   subpoena case.  What you have to do --

 4      MS. COTILLA:  Right.

 5      JUDGE BUSCHMANN:  -- is to make sure that the documents

 6   that we're discussing are necessary for your case at this

 7   stage of the game.

 8      MS. COTILLA:  Yes.

 9      JUDGE BUSCHMANN:  And it is conceivable that the payroll

10   records for all other hotels may not even be all that crucial

11   to this case.

12      MS. COTILLA:  Well, we believe, Your Honor, that it goes

13   to a defense that Respondent will use when it goes into its

14   case and for that reason we subpoenaed them.  We'd like to

15   look at their --

16      JUDGE BUSCHMANN:  Supposing we get those documents,

17   then, tomorrow, those payroll records tomorrow, so that

18   you're prepared to examine the witnesses that the Respondent

19   puts on.  And then we have those other documents that you

20   were talking about, the non-privileged documents as to

21   withdrawal, as to the petition --

22      MS. COTILLA:  Correct.

23      JUDGE BUSCHMANN:  Now, Mr. Greenbaum represents, as an

24   attorney, that those documents don't exist, is that correct,

25   Mr. Greenbaum?

1    MR. GREENBAUM:  We gave -- the wording in there is we
2    will produce all non-privileged -- we gave them everything.
3    There are no privileged documents.
4    JUDGE BUSCHMANN:  There are no privileged documents --
5    MR. GREENBAUM:  Right.
6    JUDGE BUSCHMANN:  -- in your possession left?
7    MR. GREENBAUM:  That's right.  We gave them everything
8    we had --
9    JUDGE BUSCHMANN:  All right.
10   MR. GREENBAUM:  -- with respect to that question.
11   JUDGE BUSCHMANN:  So now, what other documents are you
12   talking about?  I mean, the payroll records can remain
13   relevant for purposes of rebuttal.
14   MS. COTILLA:  Right.  And there were two paragraphs in
15   which we requested any -- and I believe I mentioned this
16   one -- any documents between former employees about the
17   union.  And so one place where we asked for that is paragraph
18   13, but we also asked for that in paragraph --
19   JUDGE BUSCHMANN:  Thirty?
20   MS. COTILLA:  I think that's right, Your Honor.  Yes,
21   paragraph 30, right.
22   JUDGE BUSCHMANN:  The same definition?
23   MS. COTILLA:  Well, it was a little different.
24   Paragraph 13 asks for all documents concerning any topic and
25   then we listed a bunch of topics; one of them was the union,

1  Local 25.  And then in paragraph 30 we were more specific.

2  Any documents from the employees regarding the union.

3      JUDGE BUSCHMANN:  From the employees regarding the

4  union?

5      MS. COTILLA:  Right.  And --

6      JUDGE BUSCHMANN:  From the employees to the company

7  regarding the union.

8      MS. COTILLA:  Right.

9      JUDGE BUSCHMANN:  Do you have any such documents?

10     MR. GREENBAUM:  We produced those documents, Your Honor.

11  Those are the four petitions that have been produced.

12     MS. COTILLA:  Okay, so that's absolutely everything for

13  that paragraph, four -- I acknowledge that we did receive

14  four petitions.

15     MR. GREENBAUM:  There are some statements from employees

16  -- I know of one --

17     MS. COTILLA:  There was --

18     MR. GREENBAUM:  -- that said they were visited at home

19  and they felt threatened.

20     MS. COTILLA:  And we received only one statement.

21  That's all there is?

22     MR. GREENBAUM:  That's all we had.  I believe we

23  produced one to the Board.  We can't find it, but it's been

24  produced with our position statement, which they said they

25  have.

1      MR. MCCARTHY:  Those were unsigned statements.  There

2  were two of them, they were in September that we asked for

3  the unredacted versions.

4      MR. GREENBAUM:  Right.

5      MR. MCCARTHY:  Were those forms that you prepared for

6  employees to sign and they never signed?

7      MR. GREENBAUM:  No, and I -- Your Honor, are we on the

8  record?

9      MR. MCCARTHY:  I'm just asking you a question.

10      JUDGE BUSCHMANN:  Yes, we're on the record.

11      MR. GREENBAUM:  I really object to that

12  characterization.  Mr. McCarthy seems like he has some

13  grudge.  His assistant said they had two issues on the

14  subpoena before we broke and now he's all of a sudden

15  accusing us of destroying and manufacturing some --

16      JUDGE BUSCHMANN:  Well, let's stay away from the

17  accusations and let's just get down to business and make sure

18  that we are talking about the documents and get prepared to

19  rest.

20      MR. GREENBAUM:  Okay.  The names were redacted to --

21  they were both produced with the position statement.  We gave

22  them one, which is Reina Lozano.  The other one is Blanca

23  Chavez.  For some reason, they can't find that one.  We could

24  bring a witness and they could say is this your statement?

25  We did not make that statement, the hotel did not make that

1   statement, so --

2      JUDGE BUSCHMANN:  So that's the end of those documents?

3      MR. GREENBAUM:  That's it.

4      MS. COTILLA:  And then the very last one is one that

5   Mr. McCarthy mentioned earlier, paragraph 33 where we

6   requested all documents regarding the withdrawal of

7   recognition from the union and in the Petition to Revoke, the

8   Respondent stated that it would produce non-privileged

9   documents and to the extent that there are any privileged

10  documents, we at least wanted a listing of what there is that

11  is privileged and then perhaps --

12     JUDGE BUSCHMANN:  But we just talked about that.

13     MR. GREENBAUM:  That's what we just talked about.

14     JUDGE BUSCHMANN:  We just talked about the withdrawal,

15  documents, privileged regarding the withdrawal.  According to

16  Mr. Greenbaum, you've got everything and there are no

17  privileged documents --

18     MS. COTILLA: Okay.

19     JUDGE BUSCHMANN:  -- -in their possession, correct,

20  Mr. Greenbaum?

21     MR. GREENBAUM:  Correct, and I'll state it on the

22  record.

23     JUDGE BUSCHMANN:  So that takes care of that.

24     MS. COTILLA:  So that takes care of paragraphs 4 and 33

25  and they're both related.

1        JUDGE BUSCHMANN:  Yes.

2        MS. COTILLA:  I think with regard to the subpoena for

3    State Plaza, those are the issues we had.  Now, there's also

4    a subpoena that we served on R.B. Associates, the parent

5    company.  To that we received no documents, at all.  Many of

6    the objections there were that they had been produced during

7    the investigation, but we did not -- specifically, again, the

8    payroll records fro the other hotels.

9        MR. GREENBAUM:  But that's what we're producing,

10   Your Honor.

11       MS. COTILLA:  Okay.  The ADP records for the time period

12   from December 1, 2004 --

13       MR. GREENBAUM:  Does your request ask for -- I mean,

14   we're producing the payroll records, Your Honor.  The request

15   doesn't ask for ADP records, so now they're including ADP

16   records.  You know, these requests are extremely broad --

17       JUDGE BUSCHMANN:  I know.

18       MR. GREENBAUM:  -- and if Your Honor wants us to go one

19   by one, I am sure our objections would be sustained.  But

20   we're producing five sets of payroll records for all the

21   hotels.

22       JUDGE BUSCHMANN:  Um-hum.  Now, can you come up with

23   anything more?

24       MS. COTILLA:  Than payroll --

25       MR. GREENBAUM:  Than --

1       JUDGE BUSCHMANN:  Huh?

2       MS. COTILLA:  Than payroll records?

3       JUDGE BUSCHMANN:  No, I'm talking to you.

4       MR. MCCARTHY:  Yes, we've asked whether there has, in

5  fact, been any financial benefit given by Respondent's owner,

6  Richard Bernstein, to Alexandra Guillen.  I asked

7  Mr. Greenbaum whether he had asked Mr. Bernstein if he had

8  given any such document and he indicated that he did not make

9  that inquiry.  I don't know how you can do a legitimate

10  search of whether that subpoena request has been satisfied

11  without asking Mr. Bernstein a question.  He says he hasn't

12  talked to Mr. Bernstein.

13       MR. GREENBAUM:  Your Honor, I haven't talked to

14  Mr. Bernstein about that, but someone in the company did and

15  represented that there are none.  We produced her file, there

16  are none.

17       MR. MCCARTHY:  Who in the company spoke to

18  Mr. Bernstein?

19       MR. GREENBAUM:  Mr. Martens.

20       JUDGE BUSCHMANN:  Now, is Mr. Martens going to be a

21  witness?

22       MR. GREENBAUM:  No.  No, Your Honor.

23       JUDGE BUSCHMANN:  So you will get the payroll records

24  and the way I look at it, you get them by tomorrow -- but I

25  think by tomorrow and I think that you can use them -- in

```
 1   your affirmative case, but I assume that this is appropriate
 2   for rebuttal and we've discussed all the other documents.
 3   We've gotten the names of the two individuals who signed
 4   those documents -- what were they, again?
 5        MR. MCCARTHY:  Alex and Reina, I believe, Your Honor.
 6        MS. COTILLA:  No, Blanca.  I did get the names.
 7        JUDGE BUSCHMANN:  Yes.  Now, anything else?
 8        MR. MCCARTHY:  Your Honor, we would like the payroll
 9   records for Alex Guillen and Reina Lozano before they
10   testify, or at least the ability to question them about their
11   payroll records.  If not, the ability to recall --
12        JUDGE BUSCHMANN:  Yes.
13        MR. GREENBAUM:  That's their call, Your Honor?  He's
14   going to call the hotel and tell them to expedite those --
15   they're not going to be here in the next 10 minutes.
16        JUDGE BUSCHMANN:  Yes.
17        MR. GREENBAUM:  But, you know, what I do know, though,
18   they have a payroll run for the hotel, you know, it sets
19   forth their payroll, so --
20        JUDGE BUSCHMANN:  Um-hum.  Okay, I think that with that,
21   I think we have concluded the discussion on the subpoena, is
22   that right, Mr. McCarthy?
23        MR. MCCARTHY:  Yes, Your Honor.
24        JUDGE BUSCHMANN:  Mr. Greenbaum?
25        MR. GREENBAUM:  Yes, Your Honor.
```

1    JUDGE BUSCHMANN:  So what do we do now, Mr. McCarthy?

2    MR. MCCARTHY:  Your Honor, I have no further witnesses

3  at this point, but I'm not prepared to rest until we review

4  the payroll records.  Oh, actually we do have -- we do have

5  the custodian of records, so Ms. Cotilla, I understand, has

6  some questions of the custodian of records for the

7  Respondent, but he's not here, right?

8    MR. GREENBAUM:  He's not here.  He's coming.  The

9  custodian of records is on jury duty.  Mr. Bello will be the

10  custodian of records, but he's not here now.  He's been

11  called.

12    JUDGE BUSCHMANN:  I see.  Mr. Bello?

13    MR. GREENBAUM:  Yes.

14    JUDGE BUSCHMANN:  Okay.

15    MR. GREENBAUM:  And I thought -- I don't know the extent

16  of the questions, but if they were limited, maybe

17  Mr. Palenzona could do it as the general manager, but I don't

18  know.  I mean, just for the sake of getting it done.

19    JUDGE BUSCHMANN:  Yeah.  Now, I have to be clear,

20  Mr. McCarthy, about your position.  I can't just be sitting

21  here now and keep drawing things out one tidbit at a time, so

22  as it stands now, the only thing that you are still dealing

23  with are those payroll records that will be produced and the

24  custodian of the records for whatever purpose you're calling

25  that person.  Is he still necessary after all this

1  discussion?

2      MR. MCCARTHY:  I believe he is, Your Honor, yes.  I

3  believe the custodian of the records -- I mean, Mr. Palenzona

4  would be fine for the General Counsel.  I believe the

5  questions are limited that Ms. Cotilla has for the custodian

6  of the records and if Respondent's comfortable that way, that

7  would be fine with the General Counsel.

8      JUDGE BUSCHMANN:  Is that right?  Is there agreement

9  between you two?

10     MR. GREENBAUM:  I don't know what the extent of the

11  questions are.

12     MS. COTILLA:  Yes, yes.

13     MR. MCCARTHY:  Yes, there's an agreement between us,

14  Your Honor.

15     JUDGE BUSCHMANN:  So if you had your manager, general

16  manager here as the custodian of the records and if he can

17  testify to this, according to them, they are satisfied.

18     MR. GREENBAUM:  Well, let me go get him, Your Honor.

19     JUDGE BUSCHMANN:  Are you sure now?  Because he -- wait

20  a minute.

21     MR. MCCARTHY:  Perhaps we can work it out by stipulation

22  that we didn't receive certain documents, Your Honor, and

23  then there would be no need to call the custodian of the

24  records.

25     JUDGE BUSCHMANN:  Now, how much time -- can we do that

1  now?

2      MR. MCCARTHY:  Well, we can do --

3      MS. COTILLA:  Well, I guess -- I mean, I have two

4  things.  I think we can promptly reach some stipulation as to

5  what was or was not produced and we want it put on the

6  record, but I also have documents I'd like to introduce, so I

7  guess I would need -- you know, it would be shorter if we

8  could get some stipulations and then I would just introduce

9  documents to the custodian of records, but --

10     MR. GREENBAUM:  Well, maybe we can stipulate to the

11 documents, Your Honor.

12     JUDGE BUSCHMANN:  Yes.

13     MS. COTILLA:  Okay.  Well, I would propose a stipulation

14 that for paragraphs --

15     JUDGE BUSCHMANN:  Now, do I have to be here for this?

16 Can you -- you want to be on the record for this?

17     MR. MCCARTHY:  Yes, Your Honor.

18     JUDGE BUSCHMANN:  Now, remember, this record is going to

19 go to the District Court and I don't want having the District

20 Court belabored with a record, you know, that's, you know,

21 going through a lot of argumentation and technical

22 discussions of a subpoena issue.

23     MS. COTILLA:  Do you want me to propose it off the

24 record?

25     JUDGE BUSCHMANN:  I think what --

1      MR. GREENBAUM:  That was my issue with the judge,

2  Your Honor.

3      JUDGE BUSCHMANN:  -- should be done is that we should go

4  off the -- listen.  We should go off the record.  I think you

5  should explore a stipulation with Mr. Greenbaum as to the

6  documents and put the documents into the record by describing

7  them, with stipulation of counsel, describing what those

8  records are and the purpose for which they're offered.  Can

9  you do that?

10     MS. COTILLA:  We'll try.

11     JUDGE BUSCHMANN:  You have to do more than just shake

12  your head.

13     MS. COTILLA:  Yes.

14     JUDGE BUSCHMANN:  Mr. McCarthy, is that agreeable with

15  you, as well?

16     MR. MCCARTHY:  Yes, Your Honor.

17     JUDGE BUSCHMANN:  And you can do this now?

18     MR. MCCARTHY:  Yes, Your Honor.

19     **JUDGE BUSCHMANN:  Okay.  You're off the record at this**

20  **point.**

21  **(Off the record.)**

22  **JUDGE BUSCHMANN:  You're on the record.**

23     I understand that the parties have reached a

24  stipulation.  Ms. Cotilla, would you please propose your

25  stipulation at this point?

1      MS. COTILLA:  Your Honor, I propose a stipulation with

2  regard to documents, General Counsel's Exhibits 116 through

3  145.  These are Personnel Action Forms for employees of the

4  State Plaza Hotel.  They're being offered to show the

5  percentage of the increase that was given.  100 -- General

6  Counsel's Exhibit 146(a) and General Counsel's Exhibit 147

7  are also Personnel Action Forms.  In addition, I offer

8  General Counsel's Exhibit 22, which indicates Respondent's

9  attendance policy at the hotel; General Counsel's Exhibit 23,

10  which describes Respondent's Equal Employment Opportunity

11  policy at the hotel; General Counsel's Exhibit 24, which

12  describes Respondent's e-mail policy; and also the General

13  Counsel's Exhibit 10(a), which is payroll record for the

14  first week of June 2005.  At this time I offer these

15  documents --

16  **(General Counsel's Exhibits 10(a), 22 through 24, 116 through**

17  **145, 146(a), and 147 marked for identification.)**

18      JUDGE BUSCHMANN:  Could you repeat the first set?

19  That's 116 through what?

20      MS. COTILLA:  116 -- it's 116 through 145.

21      JUDGE BUSCHMANN:  I see.

22      MS. COTILLA:  And then it's just that there's a 146(a)

23  and there's no 146.

24      JUDGE BUSCHMANN:  And there's no 146(b)?

25      MS. COTILLA:  Correct.

1          JUDGE BUSCHMANN:  Then I'll summarized.

2          Mr. Greenbaum, you're requested to stipulate to General

3     Counsel's Exhibits 116 through 145, 146(a), 177, 22 through

4     24, and 10(a).  Do you so stipulate?

5          MR. GREENBAUM:  Yes, Your Honor.

6          MS. COTILLA:  Your Honor, I'm sorry.  If I can just make

7     a correction.  There was no 177.  It's 147.

8          JUDGE BUSCHMANN:  I'm sorry, 147.  I stand corrected.

9     Do you so stipulate, Mr. Greenbaum?

10         MR. GREENBAUM:  Yes, Your Honor.

11         JUDGE BUSCHMANN:  That stipulation is hereby accepted

12    and I hereby receive, as General Counsel's exhibits, 116

13    through 145, 146 (a), 147, 22 through 24, and 10(a).  These

14    documents are hereby admitted for stipulation.

15    **(General Counsel's Exhibits 10(a), 22 through 24, 116 through**

16    **145, 146(a) and 147 received into evidence.)**

17         MR. MCCARTHY:  Thank you.

18         JUDGE BUSCHMANN:  You're welcome.  Now,

19    Mr. McCarthy, what's next?

20         MR. MCCARTHY:  At this time, Your Honor, the General

21    Counsel rests subject to the production of payroll records by

22    the Respondent and the ability to examine Respondent's

23    witnesses on those payroll records.

24         JUDGE BUSCHMANN:  Fine, thank you.  Okay, Mr. Greenbaum,

25    then I suppose the ball is in your court now and I hear from

1  you what your plan is at this point?

2     MR. GREENBAUM:  We can call our first witness, Your

3  Honor, but it's Reina Lozano and I thought General Counsel

4  said they don't want to call any witnesses until they have

5  those records, so if they don't -- if they will allow us to

6  call the witness, we'll call the witness.

7     MR. MCCARTHY:  Your Honor, I have a proposal.  They

8  could certainly -- it's 20 until 4:00, I know.  They could

9  certainly do their direct and we could take an overnight

10  recess for cross, presumably that we'd have the payroll

11  records in the morning, we'll do the cross then.

12     JUDGE BUSCHMANN:  And you're making an expedited effort

13  to get those two employees' payroll records anyway, correct?

14     MR. GREENBAUM:  Yes, Your Honor.

15     JUDGE BUSCHMANN:  Is that acceptable?  They can call the

16  witness?

17     MR. GREENBAUM:  Well, I don't know if we're going to be

18  done with direct, but we'll call the witness.

19     JUDGE BUSCHMANN:  Yes.

20     MR. GREENBAUM:  I'd like to get through some of it.

21     JUDGE BUSCHMANN:  Okay.

22     MS. HARGROVE:  Your Honor, I'm going to be calling the

23  first witness.

24     JUDGE BUSCHMANN:  Yes.

25     MS. HARGROVE:  It's Reina Lozano.

1    JUDGE BUSCHMANN:  Please.

2    **(Off the record.)**

3    JUDGE BUSCHMANN:  Would you, then, begin calling your

4    first witness, please?

5    MS. HARGROVE:  Yes, Your Honor.  I'd like to call

6    Reina Lozano to the stand, please.

7    JUDGE BUSCHMANN:  Ms. Lozano, I have to swear you in.

8    Would you please stand up and raise your right hand?

9    (Whereupon,

10                        **REINA LOZANO**

11    was called as a witness by and on behalf of the Respondent

12    and, after having been first duly sworn, was examined and

13    testified as follows:)

14    JUDGE BUSCHMANN:  Thank you.  You can sit down.

15                        **DIRECT EXAMINATION**

16    Q.   BY MS. HARGROVE:  Good afternoon, Ms. Lozano.  Could you

17    please state your name and spell it for the record?

18    A.   Reina Lozano, R-e-i-n-a L-o-z-a-n-o.

19    Q.   And Ms. Lozano, could you please state your address for

20    the record?

21    A.   5907 87th Street, New Carrollton, Maryland, 20784.

22    Q.   Ms. Lozano, do you speak Spanish?

23    A.   Yes.

24    Q.   Do you speak English?

25    A.   A little bit, not much.

1  Q.    Are you currently employed?

2  A.    Yes.

3  Q.    Where are you employed?

4  A.    The State Plaza Hotel.

5  Q.    What is your current position?

6  A.    Housekeeper.

7  Q.    And how long have you held this position?

8  A.    I've been working there since October 3rd, '88.  And at

9  the present time I help out with the continental breakfast.

10  Q.    And how long have you helped out with the continental

11  breakfast?

12  A.    I think it was approximately since the end of

13  December 2004.

14  Q.    And what did you do before your duties included helping

15  out with the continental breakfast?

16  A.    I normally cleaned rooms, help the supervisors checking

17  the room.  I would help at the laundry room and sometimes the

18  general area.

19  Q.    Why did you change positions?

20  A.    I started helping Alex with the continental breakfast

21  because I like to help in all departments; wherever they

22  assign me, I like working.

23  Q.    Who changed your position?

24  A.    Alex needed help and I was looking for a house in

25  November 2004 and I was looking for a part-time job.  She

 1  needed help, so I said okay, I would like to work with you.

 2  We can talk with our boss, Mr. Corrado, so I can work with

 3  you Saturday and Sunday and Monday through Friday as a

 4  housekeeper.

 5  Q.    So who was the person that changed your position?  Who

 6  officially changed your position?

 7        THE INTERPRETER:  I think the witness misunderstood the

 8  question.  Would you repeat it, please?

 9  Q.    BY MS. HARGROVE:  Sure.  Who officially changed your

10  position for you to help --

11        MS. COTILLA:  I object, Your Honor.  They were -- she

12  was responding and I believe that that response needs to be

13  translated.

14        JUDGE BUSCHMANN:  Okay, would you translate what she

15  said?

16        THE INTERPRETER:  The -- trying to get the witness to

17  answer the question --

18        JUDGE BUSCHMANN:  No, no.  What did she just say?  Would

19  you translate what she just said?  Do you recall what she

20  said?

21        THE INTERPRETER:  No, that's why I'm asking her again,

22  Your Honor.

23        JUDGE BUSCHMANN:  Ask her to repeat what she just said.

24        THE WITNESS:  As to when they asked me who changed me

25  from position, from my position.  Is that --

1    JUDGE BUSCHMANN:  Yes.

2    MS. HARGROVE:  Yes.

3    THE WITNESS:  All right, okay.  Actually, nobody has

4  really changed my position telling me look, Reina, you are

5  going to take this position.  What I'm doing right now is

6  helping Alex with the continental breakfast because she needs

7  help and this is temporary.  Because the restaurant is

8  closed.

9  Q.   BY MS. HARGROVE:  Do you know who the general manager of

10 the State Plaza Hotel is?

11 A.   You mean the general manager of the State Plaza?

12 Q.   Yes.

13 A.   Mr. Corrado Palenzona.

14 Q.   Now, Ms. Lozano, were you involved in bringing the union

15 to the hotel?

16 A.   Yes, I was one who participated in the union.

17 Q.   How did you participate?

18 A.   I was a member.  We were looking for a union, all the

19 coworkers.

20 Q.   Did you campaign for the union?

21 A.   Campaign, campaign.  As I recall, yeah, I think so.  I

22 think so.

23 Q.   Did you attend union meetings?

24 A.   Yes.

25 Q.   Do you remember when these union meetings took place?

1    A.    What date?

2    Q.    Yes.

3    A.    I don't recall, but I went several times.

4    Q.    Do you know how many times?

5    A.    I think it was six, seven time, I think it was.

6    Q.    How many employees would attend the meetings?

7    A.    At the beginning, the majority.  At the beginning.

8    Q.    Did that change?

9    A.    Yes, it changed.

10    Q.    When did it change?

11    A.    We voted for the union -- we all participated.  Well,

12    then after we voted in favor of the union, we had several

13    meetings.  And then slowly we started going to the meetings

14    and to negotiate the contract.

15        MS. COTILLA:  I'm going to object to this being a

16    narrative.  She's no longer responding to the question that

17    was asked.

18        MS. HARGROVE:  May I respond, Your Honor?

19        JUDGE BUSCHMANN:  Yes.

20        MS. HARGROVE:  I believe I asked her when it changed and

21    I think she's explaining when the attendance at the meetings

22    changed.

23        JUDGE BUSCHMANN:  Yeah.  Of course, I don't know what

24    she said.  Now, Ms. Cotilla understands what she says in

25    Spanish, but I suppose -- do you agree by my suggestion to

1  her that she confine herself to answering the question?

2      MS. HARGROVE:  That's fine, Your Honor.

3      JUDGE BUSCHMANN:  Because she talks on for quite a bit.

4      MS. HARGROVE:  Yes.

5      JUDGE BUSCHMANN:  And we have a court interpreter -- I

6  got it right this time -- who has a hard time remembering the

7  entire colloquy.

8      MS. HARGROVE:  Yes, I'd appreciate if you did, Your

9  Honor, actually.

10      JUDGE BUSCHMANN:  Ms. Lozano, would you please answer

11  the question posed by counsel, just answer the question and

12  not explain the entire scenario?

13      MS. HARGROVE:  I'm going to re-ask my --

14      JUDGE BUSCHMANN:  Yes, sure.

15  Q.  BY MS. HARGROVE:  Did you -- or you testified earlier

16  that at the beginning the majority of the employees attended.

17  Did that change at some point?

18  A.  Yes, it changed.

19  Q.  When did that change?

20  A.  Probably, I think it probably was after six months.

21  Q.  Did you stop attending the meetings?

22  A.  I kept going.

23  Q.  When was the last union meeting you attended?

24  A.  I think it was in January, I think.  Not sure.

25  Q.  Why didn't you go to any meetings after that?

1  A.    When I attended the meeting, I got disappointed with the

2  union because of what Ms. Olga said.

3  Q.    What did Olga say?

4  A.    I don't know her last name, but she works for Local 25.

5  Q.    What did Olga say?

6      MS. COTILLA:  Objection, hearsay.

7      JUDGE BUSCHMANN:  Objection overruled.

8      THE WITNESS:  It has been some time, some time since we

9  have heard about the contract was going.  I asked Olga how

10  things were going and she said that they were very busy with

11  other campaigns for other hotels.

12  Q.    BY MS. HARGROVE:  What did you say to Olga after she

13  told you they were busy with other campaigns?

14  A.    Well, the thing is that she -- I said well, we need to

15  know what's going on because we're interested in knowing

16  what's going to happen to us and she answered -- and there

17  were six housekeepers there.  Would you like me to give the

18  names?

19  Q.    Yes, please.

20  A.    Sandra Blanco, Ana Majano, Silvia Romero, Anita Viera --

21  Q.    Were those employees standing near you when you were

22  talking to Olga?

23  A.    Yes.

24  Q.    Did you say anything else to Olga?

25  A.    Yes, I was telling Olga that maybe the other people were

1   also disappointed because so much time was happening and

2   nothing was coming out concerning the contract.

3   Q.    And did Olga say anything else?

4   A.    She said well, for the six of you, we won't have a good

5   contract.  You are wasting our time and your time.

6   Q.    Did any of the other employees say anything to Olga?

7   A.    No, they didn't say anything, but I stood up and told

8   Olga and I said to her if you think that we are wasting our

9   time, then I won't participate in Local 25 anymore.

10  Q.    What month again did this meeting take place?

11        MS. COTILLA:  Objection.  Asked and answered.

12        JUDGE BUSCHMANN:  Objection overruled.

13        THE WITNESS:  In January.

14  Q.    BY MS. HARGROVE:  In what year?

15  A.    I don't recall exactly.  It might have been between

16  December and January 2004-2005.

17  Q.    How did this meeting with Olga end?

18  A.    When I stood up and said that I was not going to

19  participate in Local 25 anymore, there was also one employee

20  from the restaurant there.  I think his name was -- or

21  something.  He stood up and said how is it that you want to

22  continue with us?  Because of you and the housekeeping

23  department, we have been fired.  I said no, no, you haven't

24  been fired or expelled because of us.  So then I said again,

25  well, I told everybody I will not participate in this anymore

1   and if you want to go home, go ahead.  The only --

2   Silvia Romero and Anita stood up with me and --

3   Q.   And that's when the meeting ended?

4   A.   And that's when the meeting ended.

5   Q.   What did you do after the meeting?

6   A.   Then I told my coworkers we are the heroes and --

7   Q.   Did you talk to Marleni Jiron about what Olga said?

8   A.   Yes, I told Marleni and also Sandra do you know what

9   Olga said, that we are wasting our time.

10  Q.   And did any of the employees that you told say anything

11  to you?

12       MS. COTILLA:  Objection.  Hearsay.

13       JUDGE BUSCHMANN:  What's the question again?

14       MS. HARGROVE:  She just testified that she told -- what

15  Olga had said and I said did any of the employees say

16  anything to her?  It's not for the truth of the matter, Your

17  Honor, just to see if there was any response.

18       JUDGE BUSCHMANN:  Objection overruled.

19       THE WITNESS:  Concerning what?

20  Q.   BY MS. HARGROVE:  Concerning what Olga had said to you.

21  A.   I told them what Olga had said and they say no, then we

22  won't go on with this.  If she thinks that we are wasting our

23  time, well then, we'll see what we're going to do.

24       MS. HARGROVE:  Can you turn your attention -- there's a

25  folder of documents in front of you.  Can you turn to what's

1    been marked as General Counsel Exhibit 3?  Your Honor, may I

2    approach to make sure she's in the right folder?

3        JUDGE BUSCHMANN:  Yes.

4    Q.  Do you have Exhibit -- General Counsel Exhibit 3 in

5    front of you?

6    A.  Yes.

7    Q.  Have you seen this document before?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a letter among all us, my coworkers, figure out in

11   order to see how we were going to exit the unit.

12   Q.  Did you write that letter?

13   A.  No, there we planned to ask Alex to help us because she

14   knows English and Spanish.

15   Q.  Did Corrado Palenzona tell you to write this letter?

16   A.  No.

17   Q.  Do you know whose handwriting that is?  At the top of

18   General Counsel Exhibit 3, do you know whose handwriting that

19   is?

20   A.  I don't remember.  Oh, no, excuse me, I'm wrong.  Oh,

21   yes, this is Alex.

22   Q.  Were you with Alex when she wrote this letter?

23   A.  Yes.

24   Q.  Did any supervisor tell you to write this letter?

25   A.  No.

1  Q.   Who came up with the words there at the top of General
2  Counsel 3?
3  A.   Alex told me that she had a brother, who I don't know if
4  he belonged to a union or worked with a union, I think he
5  told her how to write it.
6  Q.   Did Corrado Palenzona give you the words to write on the
7  top of General Counsel Exhibit 3?
8  A.   No.
9  Q.   Did Mr. Palenzona tell you that you would get a raise if
10 you created General Counsel Exhibit 3?
11 A.   No.
12 Q.   Did Corrado Palenzona tell you you'd get an extra $2.50
13 an hour if you created General Counsel Exhibit 3?
14 A.   No.
15 Q.   Did any supervisor tell you that you'd get a raise if
16 you created General Counsel Exhibit 3?
17 A.   No.
18 Q.   Did Corrado Palenzona give you any money or loans to get
19 you to create General Counsel Exhibit 3?
20 A.   No.
21 Q.   Did you receive any type of payment to create General
22 Counsel Exhibit 3?
23 A.   No.
24 Q.   Did you collect the signatures on GC 3?  How did you
25 collect the signatures?

1  A.    Since we had planned with the other girls how to get rid
2  of the union, they already knew that we were going to write a
3  letter so we just showed it to them.  We did not sign it.
4  Q.    Who are the other girls?
5  A.    All the ones who signed it are the ones that I'm talking
6  about.
7  Q.    Did you say anything to the employees when you were
8  collecting the signatures?
9  A.    No, I simply told them the letter has been written, if
10  you want to go on with the union, go ahead.  If not, here's
11  the letter, sign it.
12  Q.    Did you tell any of the employees that they would get a
13  raise if they signed the petition?
14  A.    No.
15  Q.    Did you tell any of the employees that Corrado Palenzona
16  told you to create the petition?
17  A.    No.
18  Q.    Did you tell Adriana Nunez that she would get a $2.50
19  raise if she signed the petition to get the union out?
20  A.    No.
21  Q.    Did you tell Margarita Velasquez that the boss will give
22  the employees a raise if they get rid of the union?
23  A.    No.
24  Q.    Did you tell Margarita Velasquez that you were just
25  carrying the boss's word?

1  A.   No.

2  Q.   Did you tell Ana Majano that Mr. Palenzona had decided

3  to give the employees a raise if the employees got rid of the

4  union?

5  A.   I never said anything to anybody.  I just -- would just

6  show them the letter and they would sign.

7  Q.   Did you ask Marleni Jiron to sign the petition?

8  A.   No.

9  Q.   Did you ask Gloria Melgar to sign the petition?

10  A.   Yes.

11  Q.   Did you tell Gloria Melgar that she would receive a

12  raise if she signed the petition?

13  A.   No.

14  Q.   Did you tell Gloria Melgar that Mr. Palenzona would give

15  the employees a raise if she -- if she signed the petition to

16  get rid of the union?

17  A.   No.

18  Q.   Did you ever talk to Dilcia Segovia about the petition?

19  A.   To whom?

20  Q.   Dilcia Segovia.

21  A.   Dilcia didn't work there anymore when we signed this

22  petition.

23  Q.   Did you ever talk to Dilcia Segovia about the union?

24  A.   While she was working there, yes.

25  Q.   And what did you talk about?

1    A.    All about the union, when the contract was going to be

2    coming out because we had voted for the union.

3    Q.    Did you tell Ms. Segovia that Corrado Palenzona told you

4    to get rid of the union?

5    A.    No.

6    Q.    What did you do with the petition after you collected

7    the signatures?

8    A.    I talked to Miguel -- I don't remember his last name --

9    the guy who works there at Local 25.

10   Q.    What did you say to Miguel?

11   A.    I told him that we had written a letter saying that we

12   didn't want to go on with them.

13   Q.    Why did you decide you did not want to go on with the

14   union?

15   A.    I already mentioned before because Olga had told me that

16   we were wasting our time and we were wasting their time.

17   Q.    Did you give the petition to Miguel?

18   A.    When I went down to Local 25 he was not there.  I left

19   it with his secretary.

20   Q.    When did you go to Local 25 to deliver the petition?

21   A.    I think it was at the end of March.

22   Q.    Did you go by yourself?

23   A.    No, I went with Alex Guillen.

24   Q.    Did you talk to anyone at the union when you delivered

25   the petition?

1  A.    No, just to the secretary.  I told her that we were

2  leaving this letter for Miguel.

3  Q.    Did you talk to Miguel about the petition that day?

4  A.    When he read the petition, he called me.

5  Q.    Do you recall what he said to you?

6  A.    Why we have written this letter.

7  Q.    And what did you tell Miguel?

8  A.    Because of what Olga has said, that we were wasting

9  their time and we were also tired of waiting and waiting for

10  the contract to come out and it never happened.

11  Q.    Did Miguel say anything to you?

12  A.    Yeah, he told me that he couldn't believe that Olga had

13  said that, that she wasn't supposed to say that.  And I told

14  him that's why I don't want to go on because I'm

15  disappointed.  So to be very clear that that's the reason why

16  I won't go on with you.

17  Q.    Did anyone from the union ever come to your house?

18  A.    Yeah, Miguel came with -- the last time that Miguel came

19  to my house, it was with her, I think.  I don't know what her

20  name is.

21  Q.    Is the person you're talking about in the room right

22  now?

23  A.    Yes, I think that's her, the one with the -- shirt.

24  Q.    Do you remember if her name's Jennifer?

25  A.    The truth is I don't remember.  I don't really remember,

1  but I think it was her.

2  Q.   Did you talk to Miguel and this woman when they came to

3  your house?

4  A.   Yes, I did.  I talked to them.

5  Q.   And what did you say to them?

6  A.   Well, Miguel told me the same thing, that why I have

7  stopped going to the union.  I told him Miguel, I already

8  told you what Olga said and also the girls are tired of

9  waiting.

10  Q.   Do you remember when Miguel and this woman came to your

11  house?

12  A.   I think it was when we presented the second petition.  I

13  think it was in April.  I don't remember exactly.  I think it

14  was the end of April.

15  Q.   Did anyone from the union ever call your house?

16  A.   Well, yes.  The two of them, they called me several

17  times, sometimes threatening me, telling me that I was going

18  to pay for what I've done to the union and Olga.

19  Q.   Do you remember the first time someone called you?

20  A.   After the first petition, I think it was, and they

21  called me around 2:00 a.m. in the morning.

22  Q.   Do you know who called you?

23  A.   It was a man who called me, but I don't know who it was.

24  Q.   And what did the man say to you?

25  A.   You're going to pay for this, you damn bitch, because

1  you have betrayed us.

2  Q.   Did you ever tell anyone about the phone call?

3  A.   Yes, I told Corrado Palenzona and I told Alex what had

4  happened.  So he told me to write something down.

5       MS. HARGROVE:  Your Honor --

6       JUDGE BUSCHMANN:  Yes, of course.

7       MS. HARGROVE:  I'm going to ask what -- we'll call it

8  Respondent Exhibit 3.

9  **(Respondent's Exhibit 3 marked for identification.)**

10  Q.   BY MS. HARGROVE:  Ms. Lozano, is that the statement you

11  wrote?

12  A.   Yes, I made that statement.

13  Q.   And it's the statement about the phone call you just

14  described?

15  A.   Yes.

16  Q.   And what's the date on the statement?

17  A.   It was April the 7th, 2005.

18  Q.   And did you sign that statement?  That's your signature

19  at the bottom?

20  A.   Yes.

21       MS. HARGROVE:  Your Honor, at this time I'd move

22  Respondent's 3 into evidence.

23       JUDGE BUSCHMANN:  Any objection?

24       MS. COTILLA:  No, Your Honor.

25       JUDGE BUSCHMANN:  Respondent's 3 is hereby admitted.

1   **(Respondent's Exhibit 3 received into evidence.)**

2   Q.    BY MS. HARGROVE:  Ms. Lozano, did you tell anyone else

3   about the phone call on April 7th, or excuse me, the phone

4   call --

5   A.    Yes, I called Miguel and told him what they were doing.

6   Q.    What did Miguel say?

7   A.    To report this to --

8   Q.    Did you receive any other phone calls, threatening phone

9   calls?

10  A.    Yes, two or three times, I think it was.

11  Q.    Do you know who made those calls?

12  A.    No.

13  Q.    Do you remember when those -- when you received those

14  calls?

15  A.    It was always, like, 2:30 a.m. and I think one of them

16  was in the evening, like, 6:00 in the evening.

17  Q.    Do you remember the date of those phone calls?

18  A.    It was after April 7th when I received them.

19  Q.    Do you have any personal knowledge of any other employee

20  who was getting threatening phone calls?

21  A.    No.

22  Q.    Did you attend -- ever attend a meeting where management

23  talked about safety issues at the hotel?

24  A.    I think there was some of those meetings, but I was off

25  those days.

1  Q.   Did you ever -- after the meeting with Olga, did you

2  ever talk with Marleni Jiron about the union?

3  A.   You mean the meeting I had with Olga?

4  Q.   Yes, after that meeting.

5  A.   I talked to Marleni and told her that if she wanted to

6  go on that she could do it, but I was not going on.

7  Q.   Did Marleni ever threaten you?

8  A.   Well, yes, I remember that after receiving this letter

9  she called me on the phone -- I think it was around 4:30 --

10 and she threatened me.  She told me that it wasn't fair what

11 I had done, it wasn't fair.  And I told her that Marleni, you

12 know what Olga said.  She said that we were wasting our time.

13 If you want to continue, just go ahead, but I won't.  Please

14 leave me alone.

15 Q.   Did Marleni ever call you a backstabber?

16 A.   Yes, she told me you're a traitor.  You have stabbed us

17 in the back.  And I have witnesses because there were several

18 of us on the bus.

19 Q.   Do you know the names of who was on the bus?

20 A.   Gloria Castro, Gloria Melgar.  I was told about that

21 because I wasn't there.  A supervisor was on the bus.

22 Q.   What supervisor was on the bus?

23     MS. COTILLA:  Your Honor, I'm going to object.  It's a

24 lack of knowledge because she just testified that she was

25 told of this from someone else.  She wasn't there.

1      JUDGE BUSCHMANN:  I understand.  I'll sustain the

2   objection.

3   Q.   BY MS. HARGROVE:  Ms. Lozano, did you ever ask

4   Corrado Palenzona if the employees could have a raise?

5   A.   Yes, I asked Mr. Corrado about a raise because in other

6   hotels they were paying more than ours.

7   Q.   And what did Mr. Palenzona say to you in response?

8   A.   That they couldn't do it because they had the claim from

9   the union.

10  Q.   Did Miguel from the union ever tell you that the hotel

11  could give you a raise?

12  A.   Yes, I asked the question.  I asked Miguel that question

13  during a meeting and he said yes, the hotel could give us a

14  raise, but they didn't want to.

15  Q.   Did Mr. Palenzona tell you -- promise you a raise if you

16  helped get rid of the union?

17  A.   No.

18  Q.   If you could look at the packet of papers again in front

19  of you and find GC Exhibit 4.  I believe it's on the left

20  side of the -- do you have GC Exhibit 4 in front of you?

21  A.   Number 4's here.

22  Q.   Do you recognize that document?

23  A.   Yes.

24  Q.   What is that document?

25  A.   Another petition.

1  Q.   Did you create this petition?

2  A.   No, I didn't because I can't type.

3  Q.   Do you know who typed it?

4  A.   Alex.

5  Q.   Were you with Alex when she created this?

6  A.   No, she wrote it.

7  Q.   Do you know why she created a second petition?

8  A.   Because they say that the first petition, there were

9  counterfeit signatures.  They were not valid.

10  Q.   Who said they were fake signatures?

11  A.   Well, all the girls there, the girls were talking there

12  in the workplace.

13  Q.   Do you know any of their names?

14  A.   No, I just heard them talk.

15  Q.   Did you collect signatures on this petition, GC Exhibit

16  4?

17  A.   This was for them not to come visit us at our house.

18  Q.   Who was visiting you at your house?

19  A.   Members of the union.

20  Q.   Did Corrado Palenzona tell you to collect signatures for

21  GC Exhibit 4?

22  A.   No.

23  Q.   Did any supervisors or management tell you to collect

24  signatures on GC Exhibit 4?

25  A.   No.

1  Q.   Did Corrado Palenzona promise you you'd get a raise if
2  you collected signatures on GC Exhibit 4?
3  A.   No.
4  Q.   Did any supervisors or management promise you you'd get
5  a raise if you collected signatures on GC Exhibit 4?
6  A.   No.
7  Q.   Did you receive any type of payment for collecting
8  signatures on GC Exhibit 4?
9  A.   No.
10  Q.   Did you sign GC Exhibit 4?
11  A.   Yes.
12  Q.   Why did you sign?
13  A.   For them to leave us alone, not to keep visiting us in
14  our house and to respect our decision.
15  Q.   Did you talk to the employees when you were collecting
16  signatures on GC Exhibit 4?
17  A.   They told me that they were tired of waiting and now,
18  after the first petition was rescinded, the union members
19  were going to the homes, visiting them in their homes and
20  they were tired of it.
21  Q.   Did you say --
22      MS. COTILLA:  Your Honor, I'm going to object to hearsay
23  and move to strike that answer as being both nonresponsive
24  and hearsay.
25      MS. HARGROVE:  Your Honor, may I respond?

1       JUDGE BUSCHMANN:  Yes.

2       MS. HARGROVE:  I was going to repeat my question because

3  I realized that she did not answer the question that I had

4  asked, but at the same time I was -- the follow-up was going

5  to be what did the employees say to you, so --

6       JUDGE BUSCHMANN:  Well, now, this is offered for the

7  truth, so it's hearsay, what the employees tell her.  They're

8  not supervisors.  And that's an exception to the hearsay

9  rule.

10      MS. HARGROVE:  May I repeat my first question?

11      JUDGE BUSCHMANN:  Yes.

12  Q.   BY MS. HARGROVE:  Did you say anything to the employees

13  when you were collecting the signatures?

14  A.   The second petition?

15  Q.   Yes, GC Exhibit 4.

16  A.   The employees told me --

17      MS. COTILLA:  I object again on hearsay because once

18  again she's saying what employees have told her.

19      JUDGE BUSCHMANN:  Ask her to address the question of

20  what she said to the employees when she solicited Exhibit 4.

21      THE WITNESS:  To sign this to get them to leave us alone

22  and not visit our homes anymore.

23  Q.   BY MS. HARGROVE:  Thank you.  Did you tell the employees

24  that they would get a raise if they signed the petition,

25  GC Exhibit 4?

1  A.    No.

2  Q.    Did you tell any of the employees that Mr. Palenzona

3  told you to collect these signatures?

4  A.    No.

5  Q.    Did you tell any employees that Mr. Palenzona would give

6  the employees, if they got -- if they signed this to get rid

7  of the union?  Let me repeat.  Did you tell any employees

8  that Mr. Palenzona said that they would get a raise if they

9  signed this to get rid of the union?

10  A.    No.

11  Q.    Did you collect the signatures by yourself?

12  A.    Together with Alex, both of us together.

13  Q.    And what did you do with GC Exhibit 4 when you were

14  finished collecting signatures?

15  A.    Several of the girls offered to go and drop it off.

16  Q.    Do you know the names of the employees that dropped it

17  off?

18  A.    Not all of them, but I can tell you one was Silvia

19  Romero and Maria Gonzalez and Gloria Castro and Miranda (ph.)

20  and I don't recall her last name.  Gladis Bonilla, I think.

21  And some others that I don't remember.

22  Q.    Did you go with them?

23  A.    No.

24  Q.    Could you turn your attention to the next document on

25  the left side, it's marked GC Exhibit 5?  Do you have that in

1    front of you?

2    A.    Yeah, this is Number 5.

3    Q.    And can you look at that and tell me if you recognize

4    GC Exhibit 5?

5    A.    I don't know --

6         MS. HARGROVE:  Is that the first page of the exhibit?

7    Your Honor, may I approach and show her?

8         JUDGE BUSCHMANN:  Yes.

9    Q.    BY MS. HARGROVE:  Is the first page front desk?  And

10   what about -- do you recognize the second page?

11   A.    I do recognize this.

12   Q.    And what is the second page of GC Exhibit 5?

13   A.    We're telling them once again to, Local 25, that we do

14   not want to be members anymore and to respect our decision.

15   Q.    Did you write the top -- is that your handwriting on the

16   top of the second page of GC Exhibit 5?

17   A.    No.

18   Q.    Do you know whose handwriting that is?

19   A.    I don't remember if it was Silvia.  As a matter of fact,

20   I really don't remember.  But this letter was not written by

21   Alex.

22   Q.    Did Alex help -- do you know if Alex helped pass out

23   this petition?

24   A.    No.

25   Q.    Did you help pass out GC Exhibit 5?

1  A.   Yes, Silvia and I helped --

2  Q.   Did Corrado Palenzona tell you to pass around GC

3  Exhibit 5?

4  A.   No.

5  Q.   Did anyone from management tell you to pass around

6  GC Exhibit 5?

7  A.   No.

8  Q.   Did Corrado Palenzona tell you that the employees would

9  get a raise if they signed GC Exhibit 5?

10  A.   No.

11  Q.   Did any of the supervisors or management tell you

12  that -- tell the employees, they would get a raise if they

13  signed GC Exhibit 5?

14  A.   No.

15  Q.   And you said you didn't collect signatures for

16  GC Exhibit 5?

17  A.   The signatures were collected by Silvia Romero.  Maybe I

18  helped with a couple of them, but not really.

19  Q.   Did you sign GC Exhibit 5?

20  A.   Yes.

21  Q.   And what date did you sign GC Exhibit 5?

22  A.   6/23/05.

23  Q.   And why did you sign?

24  A.   We didn't want to go on with the union and were asking

25  them to please respect our decision.

1  Q.    Now, did you say anything to the employees when you were

2  collecting signatures?

3  A.    No.

4  Q.    Did you tell the employees that Corrado promised to give

5  them a raise if they sign the petition?

6  A.    No.

7  Q.    Did you receive any type of payment for helping pass

8  around GC Exhibit 5?

9  A.    No.

10 Q.    What did you do when you were finished collecting the

11 signatures on GC Exhibit 5?

12 A.    I don't remember if we sent it.  I don't remember.

13 Q.    Do you remember taking the petition to the union?

14 A.    I don't remember.

15 Q.    Do you know if the petition was sent to the union?

16       MS. COTILLA:  Objection.  She said she didn't recall.

17       JUDGE BUSCHMANN:  Objection overruled.

18 Q.    BY MS. HARGROVE:  Do you recall if the petition was sent

19 to the union at all?

20 A.    Yeah, it got there, but I don't remember how.

21       MS. COTILLA:  Your Honor, I move to strike the answer

22 that it arrived to the union because she says that she didn't

23 know how it arrived there --

24       JUDGE BUSCHMANN:  Yes, but I think the record reflects

25 that.

1          MS. HARGROVE:  May I approach the witness?

2          JUDGE BUSCHMANN:  Yes.

3          MS. HARGROVE:  Your Honor, I'm handing the witness what

4     has been marked as Respondent's Exhibit 4.

5     **(Respondent's Exhibit 4 marked for identification.)**

6     Q.   BY MS. HARGROVE:  Ms. Lozano, do you recognize what I've

7     handed you, what's been marked as Respondent's Exhibit 4?

8     A.   Yes, I recognize it.

9     Q.   And what is it?

10         MS. COTILLA:  Your Honor, I'm going to object to any

11    questions regarding this exhibit because it was not something

12    that's at issue in this case.  It was not relied upon by

13    Respondent in withdrawing recognition and for that reason

14    it's irrelevant to these proceedings.

15         MS. HARGROVE:  Your Honor, it goes to the relevance of

16    why the employee -- whether there is discontent with the

17    union and whether that's continuing and their reasoning for

18    signing these petitions.

19         MS. COTILLA:  Your Honor, it doesn't go to the unfair

20    labor practices and the date is way, much beyond the time of

21    recognition to withdraw, that was in July.  This is November

22    of 2005.

23         MR. GREENBAUM:  Your Honor, it goes to the overall issue

24    since we're making a record for the District Court.  It does

25    go to the Section 7 issues and whether their request -- is

1    warranted in this case.  It also does go to the ULP issues,

2    unfair labor practice issues, in that did the employees have

3    a bona fide disinterest in the union?  There's been testimony

4    from the General Counsel's position that they feel it wasn't

5    bona fide.  We need to rebut that.  This is evidence of that.

6        MR. MCCARTHY:  Your Honor, General Counsel's --

7        JUDGE BUSCHMANN:  I don't think so.  I think that I'm

8    satisfied with -- the objection is well taken.  This goes

9    beyond material alleged in the complaint and if anything, the

10   ultimate inference could be drawn and that is that the --

11   this attraction continues.  So I believe that the document is

12   not -- it is something that is alleged conduct.

13   Q.    BY MS. HARGROVE:  Ms. Lozano, do you receive an annual

14   raise?

15   A.    With the review, I receive a 35 cents raise.

16   Q.    Do you receive a review each year?

17   A.    Yeah, every year.

18   Q.    And is that review usually on or around your anniversary

19   date?

20   A.    Yes.

21   Q.    What is your anniversary date?

22   A.    2/30.

23   Q.    What year did you start at the hotel?

24   A.    '88.

25   Q.    Did you receive your annual raise in 2004?

1   A.   Yes.

2   Q.   Do you remember what that raise was?

3   A.   Thirty-five, 40 cents.  I don't remember.

4   Q.   Did you receive your raise in 2005?

5   A.   Yes.

6   Q.   And do you remember what that raise was?

7   A.   Forty-six, I think.  Forty-six cent.

8   Q.   Did you attend a meeting in the cafeteria in July of

9   2005?

10  A.   Yes.

11  Q.   Do you recall who from management was there?

12  A.   Mr. Corrado came to talk to us.

13  Q.   Did Mr. Corrado speak in English?

14  A.   I don't remember if it was in English or Spanish.

15  Q.   Do you remember what Mr. Palenzona said?

16  A.   Yes, he said if you were -- starting July 8th, we're

17  going to have a raise of $2.50.

18  Q.   Did you receive a raise on July 8th?

19  A.   Yes, the whole department received it.

20  Q.   Did you receive your annual raise -- I'm sorry.  What is

21  your current salary?

22  A.   At the present time, my salary is $12.95, I think.

23  Q.   Do you know who Richard Bernstein is?

24  A.   I know he's the owner.

25  Q.   Have you ever met Mr. Bernstein?

1  A.   In person, I think I've seen him once.

2  Q.   Did you ever talk with Mr. Bernstein?

3  A.   No.

4  Q.   Did you attend the Christmas party?

5  A.   Yes.

6  Q.   Did you dance with Mr. Palenzona?

7  A.   My friends and I, coworkers and I danced and he was

8  dancing with all of us.

9  Q.   Did you see Mr. Palenzona dancing with Marleni Jiron?

10  A.   I don't remember, but most of us were dancing.  I don't

11  remember.

12  Q.   Do you meet with Mr. Palenzona regularly?

13  A.   Frequently, yes.  After I started helping with the

14  continental breakfast, yes.

15  Q.   And what are the subjects of those meetings?

16  A.   Because there's no restaurant manager to whom we can

17  tell, you know, what we're going to have on the menu, that we

18  need apples, that we need any other products, and we have to

19  tell him.

20  Q.   Did you ever meet with Mr. Palenzona about the union?

21  A.   Yes, I talked about it with him once.

22  Q.   Did you ever ask Mr. Palenzona how the employees could

23  get rid of the union?

24  A.   Yes.

25  Q.   And what did Mr. Palenzona say?

1  A.    He told me that that was something that he couldn't talk

2  about with us and that it was something that concerned us,

3  therefore he couldn't talk to us about it.

4  Q.    One moment, Your Honor.  Ms. Lozano, did you ever attend

5  a meeting with Mr. Palenzona and Mr. Bello in the Diplomat

6  Room?  And Mr. Bello.

7  A.    No.

8  Q.    Did you ever attend a meeting with Mr. Palenzona and

9  Mr. Bello in the laundry room?

10  A.    No.

11  Q.    Do you meet with Mr. Palenzona in the food and beverage

12  office?

13  A.    No.

14  Q.    Do you ever meet with Alex in the food and beverage

15  office?

16  A.    Yes, with Alex I did because there's a cart in there

17  that we need for work.

18  Q.    When -- sorry, Your Honor.  Do your duties include

19  filling the mini-bar?

20  A.    My responsibility is to check the rooms and the --

21  replace whatever has been taken from the mini-bar.

22  Q.    Do you use a cart when you refill the mini-bar?

23  A.    Yes.

24      MS. HARGROVE:  No further questions, Your Honor.

25      JUDGE BUSCHMANN:  Okay.

1    MS. COTILLA:  Your Honor, we believe this is a good time

2    to break for the day.  That was my understanding, that we

3    were going to do that.

4    JUDGE BUSCHMANN:  You'll have a few questions, I assume,

5    right?

6    MS. COTILLA:  Well, she did provide a statement, so it's

7    going to be -- I believe it will be more than just a few.

8    JUDGE BUSCHMANN:  Any objection to break now and

9    continue tomorrow morning?

10    MR. GREENBAUM:  Your Honor, I'd leave it up to the

11    witness.  She would have to come back.  If we could this done

12    in a half hour, I would assume continue.  It's up to the

13    witness whether the witness has someplace to go --

14    JUDGE BUSCHMANN:  Okay, let me ask, how many witnesses

15    will we have in total?

16    MR. GREENBAUM:  We have quite a bit, Your Honor.

17    They're all -- this will probably be the longest.  The next

18    one will be maybe the same, but then they're going to be very

19    fast.  But there's a number of them, at least -- other than

20    this witness and the next witness, like 15 at the most.

21    JUDGE BUSCHMANN:  Well, as far as I'm concerned, it's

22    okay for us to break at this time because you're going to

23    review the affidavits?

24    MS. COTILLA:  Correct.  And I would also be able to then

25    review the payroll records that we received tomorrow morning

543

1   and then wouldn't have to recall anyone later if there are

2   any questions related to that.

3        JUDGE BUSCHMANN:  This witness works just down the

4   street, on East Street, right?

5        MR. GREENBAUM:  Yes.

6        JUDGE BUSCHMANN:  So we'll adjourn until tomorrow

7   morning at 9:30.

8   **(Whereupon, at 5:00 p.m., the hearing in the above-entitled**

9   **matter was adjourned, to be reconvened the next day,**

10  **Thursday, March 16, 2006 at 9:30 a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 5, in the matter of **State Plaza, Inc.**, Case No. 5-CA-32594, Washington, D.C., on March 15, 2006, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.


_____
Timothy Atkinson
Official Reporter


_____
David Martini
Transcriber


Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947