BEFORE THE

NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| In the Matter of:<br><br>**STATE PLAZA, INC., a wholly owned subsidiary of R.B. ASSOCIATES, INC., d/b/a STATE PLAZA HOTEL,**<br><br>         Respondent,<br>   and<br><br>**HOTEL AND RESTAURANT EMPLOYEES LOCAL 25, UNITE HERE INTERNATIONAL UNION,**<br><br>      Charging Party. | Case No. **5-CA-32594** |

The above-entitled matter came on for hearing pursuant to notice, before **KARL H. BUSCHMANN,** Administrative Law Judge, at **National Labor Relations Board, 1099 14th Street, N.W., Fifth Floor, Washington, D.C.,** on **Thursday, March 16, 2006,** at **9:30 a.m.**

## A P P E A R A N C E S

**Counsel for the General Counsel:**

THOMAS P. McCARTHY, ESQ.
National Labor Relations Board
Region 5
1099 14th Street N.W.
Washington, D.C. 20570-0001
(202) 501-8859

STEPHANIE COTILLA, ESQ.
National Labor Relations Board
Region 5
103 South Gay Street
Baltimore Maryland 21202


**On behalf of the Charging Party:**

DEVKI VIRK, ESQ.
Bredhoff & Kaiser, PLLC
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600

**On Behalf of the Respondent:**

JONATHAN W. GREENBAUM, ESQ.
EMILY K. HARGROVE, ESQ.
Nixon Peabody, LLP
401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8326

**Also Present:**

CHARLES BECKER
Spanish Interpreter

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Reina Lozano | -- | 558 | 577 | -- | -- |
| Alexandra Guillen | 591 | 622 | 658 | -- | -- |
| Silvia Romero | 660 | 670 | 676 | -- | -- |
| Consuela Esmeralda Mejia | 678 | 688 | 693 | 694 | -- |
| Maria Chumpitaz | 695 | 701 | -- | -- | -- |
| Paul N. Kulanda | 708 | 715 | -- | -- | -- |
| Gloria Castro | 719 | 724 | -- | -- | -- |

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

<u>E X H I B I T S</u>

| EXHIBIT NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-150 and 150(a) | 580 | 581 |

1                    P R O C E E D I N G S

2                                (Time Noted:  9:30 a.m.)

3        MR. GREENBAUM:  Your Honor, last night the accountants at

4    each hotel totaled what we thought were the payroll records.

5    It turns out they are payroll and they marked them payroll

6    but they're ADP personnel change reports which show, I

7    guess -- I don't even know what they show.  Mr. Cotton could

8    explain.  I guess they show changes in payroll and that's not

9    apparently what they want.  Two of the other hotels are on a

10   different ADP system and we have what we thought were payroll

11   records, they're saying they aren't, which show the wage

12   rates through from December '04 through current for each

13   employee, and they are ADP, it's just a different system.

14   They've indicated that that's not what they want.  So,

15   Mr. Cotton is calling to see if we have something else, but

16   for these, I understand that's not what they want because

17   these just show changes and I'm not quite sure what they want

18   because yesterday when we showed them the workload reports,

19   my understanding was that's not what they wanted which is in

20   the record for State Plaza.

21       So, I'm very confused as to what they want and how we

22   could accommodate them.  We've got the accountants at each

23   hotel --

24       JUDGE BUSCHMANN:  Well, don't you have samplings of

25   payroll records that are already in the record and that --

1        MR. GREENBAUM:  I thought so, Your Honor.

2        JUDGE BUSCHMANN:  And -- wait a minute.  And that the

3   General Counsel is asking you to produce the same payroll

4   records only for all the employees in the other hotels.

5        MR. McCARTHY:  And for Respondent hotel, Your Honor, yes.

6        JUDGE BUSCHMANN:  Yeah.

7        MR. McCARTHY:  GC-26 is an example, Your Honor.

8        JUDGE BUSCHMANN:  Yeah.

9        MR. GREENBAUM:  Let me just --

10       MR. McCARTHY:  And that's what I told them to get

11  yesterday.

12       JUDGE BUSCHMANN:  Um-hum.

13       MR. McCARTHY:  This right here, Mr. Greenbaum, GC --

14       MR. GREENBAUM:  Oh, I thought they were talking about

15  GC Number 9, which is the workload report.  GC-26, Your

16  Honor, if I could approach?

17       JUDGE BUSCHMANN:  Yes.

18       MR. GREENBAUM:  This is an individual one for each

19  employee.

20       JUDGE BUSCHMANN:  Yes.

21       MR. GREENBAUM:  That's going to be -- they have about 600

22  employees, hotel employees.

23       JUDGE BUSCHMANN:  Well, give them half or some sampling

24  of the -- of them.

25       MR. GREENBAUM:  This is a pay stub, Your Honor.

1    JUDGE BUSCHMANN:  Um-hum.

2    MR. GREENBAUM:  If you want to do a sampling, that may

3    speed things up.  I didn't even think from yesterday that

4    this is what they wanted.  I thought they wanted the ADP runs

5    which --

6    MR. McCARTHY:  We've asked for both, Your Honor, the ADP

7    runs and the individual payroll records for each of the

8    employees at each of the hotels and we had our request

9    outstanding now for about ten days.

10    MR. GREENBAUM:  Your Honor, this is a pay stub.

11    JUDGE BUSCHMANN:  So, can you produce those pay stubs?

12    MR. GREENBAUM:  I don't believe so.  I don't believe so,

13    Your Honor, but I believe we can produce the runs.

14    JUDGE BUSCHMANN:  What do the runs show?  Do they show

15    the --

16    MR. GREENBAUM:  The runs --

17    JUDGE BUSCHMANN:  -- the pay rate of each.  Wait a

18    minute.  Don't -- when I speak, don't speak.  The ADP runs,

19    do they show the pay scale of each employee, the rate of pay?

20    MR. GREENBAUM:  Yes.

21    JUDGE BUSCHMANN:  They do?  What records are there in the

22    hotel that show the rate of pay that the employees are

23    getting?

24    MR. McCARTHY:  Your Honor, maybe I can make this a little

25    bit easier.  The General Counsel would be willing to accept

1   the payroll runs that show each of the employees wage rates

2   at each of the hotels for the time period in question,

3   December 2004 until the present, and with regard to the

4   individual weekly payroll earnings statement, as reflected on

5   GC-26, General Counsel would just like those for Reina Lozano

6   and Alex Guillen.

7       JUDGE BUSCHMANN:  Tell them that.  I don't --

8   Mr. Greenbaum, can you respond to what Mr. McCarthy just

9   said?

10      MR. GREENBAUM:  Yes, Your Honor.  Could I approach?

11      JUDGE BUSCHMANN:  Yes.  Don't show me that but --

12      MR. GREENBAUM:  I've showed Mr. McCarthy this.  These --

13      JUDGE BUSCHMANN:  Is that agreeable with you,

14  Mr. McCarthy?

15      MR. McCARTHY:  No, Your Honor, we -- what I just said is

16  what we would like is the individual payroll runs from each

17  of the hotels that show the pay rate --

18      JUDGE BUSCHMANN:  What is payroll runs, I mean, do we

19  have a --

20      MR. McCARTHY:  We --

21      JUDGE BUSCHMANN:  Do they know what payroll run is?

22      MR. McCARTHY:  GC-10, Your Honor, and GC-9 are the weekly

23  payroll runs.

24      JUDGE BUSCHMANN:  Now that's what Mr. Greenbaum just

25  referred to as being the sample that he tried to obtain.

1      MR. McCARTHY:  Right.  And apparently they obtained the

2  wrong weekly report.  So, we would like those for each of the

3  hotels for the time period in question, 2003 to present, and

4  with regard to the individual -- Mr. Greenbaum.

5      MR. GREENBAUM:  Yes.

6      MR. McCARTHY:  With regard to the individuals weekly

7  payroll, payroll, earning statements for employees as

8  reflected in GC-26, we would like those for Alexandra Guillen

9  and for Reina Lozano.

10     MS. HARGROVE:  Can I ask a --

11     MR. McCARTHY:  And that should significantly -- there's

12  only two employees involved --

13     MR. GREENBAUM:  I understand.

14     MR. McCARTHY:  -- that should significantly reduce any

15  time and effort.

16     MR. GREENBAUM:  Sorry, Your Honor.

17     MS. HARGROVE:  Mr. McCarthy, may I ask a question of

18  clarification of the time period.  Just now you said 2003, I

19  thought yesterday we had said December 1, 2004.  I just

20  wanted --

21     JUDGE BUSCHMANN:  No, he said 2004.

22     MR. McCARTHY:  2004.

23     MS. HARGROVE:  Oh, okay.

24     MR. McCARTHY:  We're cutting that back.

25     MS. HARGROVE:  Okay.

1      MR. McCARTHY:  December 1, 2004 --

2      MS. HARGROVE:  All right.

3      MR. McCARTHY:  -- to present.

4      MS. HARGROVE:  Thank you.

5      MR. GREENBAUM:  Could I approach, Your Honor?

6      JUDGE BUSCHMANN:  What?

7      MR. GREENBAUM:  Could I approach?

8      JUDGE BUSCHMANN:  Yes.  Go ahead.

9      MR. GREENBAUM:  And Mr. McCarthy is more then willing to

10 come up.

11     JUDGE BUSCHMANN:  But it's not going to be me making the

12 decision at this point.

13     MR. GREENBAUM:  I understand.

14     JUDGE BUSCHMANN:  And even if I understand it, it's going

15 to be their, the respondent's --

16     MR. GREENBAUM:  This is --

17     JUDGE BUSCHMANN:  I mean the General Counsel's request

18 and not mine.

19     MR. GREENBAUM:  Two hotels are on a different system.

20 This is an ADP system, and what we have for these two hotels

21 from the time period they want, 12/04 to current, the

22 employees with their rates.

23     JUDGE BUSCHMANN:  Well, are you satisfied with those,

24 Mr. McCarthy?

25     MR. McCARTHY:  No, Your Honor.

 1        JUDGE BUSCHMANN:  What do you need in addition to

 2   those -- to that?

 3        MR. McCARTHY:  We would like the individual payroll runs,

 4   GC-9 and 10 for each hotel under R.B. Associates, Inc.

 5        MR. McCARTHY:  If we could just today Ms. Cotilla explain

 6   the difference why --

 7        MR. GREENBAUM:  Yes.

 8        MR. McCARTHY:  -- this is unsatisfactory.

 9        MS. COTILLA:  It appears, Your Honor, that for each name

10   there's only one page showing only how much they were making

11   as of one date, one pay date, not all the pay dates that we

12   asked for from December 1st, 2004, on.  It also appears that

13   it's not, I mean, it looks like something created for

14   purposes of litigation.  At the top they've handwritten --

15        JUDGE BUSCHMANN:  Yes, I understand.

16        MS. COTILLA:  Okay.

17        JUDGE BUSCHMANN:  Ms. Hargrove, you understand what

18   Mr. McCarthy is saying?

19        MS. HARGROVE:  Yes.  I believe I do, Your Honor.

20        JUDGE BUSCHMANN:  That's Exhibit 9 and 10 --

21        MS. HARGROVE:  Yes.

22        JUDGE BUSCHMANN:  -- is the sample

23        MS. HARGROVE:  Yes.

24        JUDGE BUSCHMANN:  Can you produce those documents now?

25   Do you have them in your possession here?

1       MS. HARGROVE:  No, I do not.

2       JUDGE BUSCHMANN:  Can your people obtain that

3   information?

4       MS. HARGROVE:  I believe, but may I just double-check

5   with Mr. Palenzona --

6       JUDGE BUSCHMANN:  Yes.

7       MS. HARGROVE:  -- on how that would --

8   **(Pause.)**

9       JUDGE BUSCHMANN:  Can you make a copy of one of those

10  exhibits and give it to the hotel manager and make sure that

11  he knows what we're talking about and then he can go and

12  order that?

13      MR. McCARTHY:  Yes, Your Honor.  I'll make a copy of

14  GC-9 --

15      JUDGE BUSCHMANN:  Exhibit 9.

16      MR. McCARTHY:  -- and 10.

17      JUDGE BUSCHMANN:  Yes.

18      MR. McCARTHY:  And also, Your Honor, just so we're clear,

19  GC-26.

20      JUDGE BUSCHMANN:  Yes, I know, the two employees.

21      MR. McCARTHY:  For two employees.

22      MS. HARGROVE:  Mr. Palenzona is saying that 26 cannot --

23  these type of documents, those cannot be provided because

24  they're pay stubs and they don't have records of those.

25      JUDGE BUSCHMANN:  Okay.

1        MS. HARGROVE:  If I understanding correct.

2        JUDGE BUSCHMANN:  Now, what about those pay stubs for

3    Alexandra and Reina?

4        MS. HARGROVE:  That's -- thing is it's up to them if

5    they've kept them.  The hotel does not have their pay stubs,

6    the 26.

7        JUDGE BUSCHMANN:  Now, do you have an Exhibit 9 and 10,

8    does that indicate what their pay scale was, the Alexandra,

9    and Reina?

10       MR. McCARTHY:  No, Alexandra is not on there.  What we're

11   really concerned with, Your Honor, is Alexandra Guillen's pay

12   stubs.  ADP is their vendor.  They should have custody or

13   control --

14       JUDGE BUSCHMANN:  Okay, let's --

15       MR. McCARTHY:  -- of those pay stubs.

16       JUDGE BUSCHMANN:  We're talking side by side.  I

17   understand from them, from the respondent, that the pay stubs

18   don't exist or they cannot get them.  Are the ADP runs that

19   is similar to Exhibit 9 and 10, are they satisfactory for

20   your purposes for those two individuals as well?

21       MR. McCARTHY:  No, Your Honor.  We would like them to ask

22   ADP to obtain the pay stubs and earning statements for

23   Alexander Guillen.  ADP is their vendor.

24       JUDGE BUSCHMANN:  Yeah, I know.

25       MR. McCARTHY:  They should be able to ask ADP --

1      JUDGE BUSCHMANN:  Now, don't those ADP runs indicate what

2  their pay is?

3      MR. McCARTHY:  The runs 9 and 10 do not indicate what the

4  pay of Alexander Guillen is.  She's not on here.

5      JUDGE BUSCHMANN:  What records do you have showing the

6  pay scale of those two individuals?

7      MR. McCARTHY:  Actually, she is on 10(a), Your Honor, I

8  believe, but it's only a very small sample, one week, and we

9  need to trace her pay for --

10     JUDGE BUSCHMANN:  Okay.  The record is being clogged up

11 with nothing but discussions and misunderstandings --

12     MR. McCARTHY:  Yeah.

13     JUDGE BUSCHMANN:  -- and difficulties --

14     **Let's go off the record.**

15 **(Off the record.)**

16     **JUDGE BUSCHMANN:  Okay.  We're on the record.**

17 (Whereupon,

18                         **REINA LOZANO**

19 was recalled as a witness by and on behalf of the Respondent

20 and, having been first duly sworn, was examined and testified

21 as follows:)

22                     **CROSS-EXAMINATION**

23 Q.  BY MS. COTILLA:  Ms. Lozano, my name is Stephanie Cotilla

24 and I work for the National Labor Relations Board, and I'm

25 going to ask you some questions this morning.

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

1  A.    All right.

2  Q.    In preparation for your testimony here at this trial, you

3  met with the attorneys representing the State Plaza Hotel,

4  correct?

5  A.    The hotel attorneys, yes.

6  Q.    You met with Ms. Emily Hargrove and Mr. Jonathan

7  Greenbaum, correct?

8  A.    Only with Ms., how is it?  Only with the young lady.

9  Q.    Okay.  And Ms. Hargrove does not speak Spanish, correct?

10  A.    Um-hum, yes.

11  Q.    And there was someone translating when you met with

12  Ms. Hargrove, wasn't there?

13  A.    Yes.

14  Q.    And Corrado Palenzona was translating when you met with

15  Ms. Hargrove?

16  A.    He was there a little time translating for me,

17  introducing her to me and then Alex.

18  Q.    And Alex sat through all of the questions with the

19  attorney, Ms. Hargrove, is that right?

20  A.    Yes.

21  Q.    And you met with Ms. Hargrove more then one time,

22  correct?

23  A.    Once.

24  Q.    And that one time you went through and practiced your

25  testimony, isn't that right?

1  A.    Practiced the testimony, I don't understand that
2  question.
3  Q.    Ms. Hargrove asked you question in that meeting, correct?
4  A.    Yes, she asked me question.
5  Q.    And you gave her answers, correct?
6  A.    Yes.
7  Q.    And it was similar to what you did here yesterday when
8  Ms. Hargrove asked you questions and you gave answers, right?
9  A.    Yes.
10  Q.    And during that entire meeting, Alexandra Guillen was
11  present, correct?
12  A.    Yes.
13  Q.    And you were present when Alex Guillen was practicing her
14  own testimony, is that right?
15  A.    When she was interpreting for me, I was present.
16  Q.    And have you read -- you read Alex Guillen's affidavit,
17  right?
18  A.    Alex's, no.
19  Q.    And you showed her your affidavit though, right?
20  A.    No.
21  Q.    And when you met with Ms. Hargrove, Emily Hargrove, and
22  Alex Guillen was there, was anyone else present in the room?
23  A.    We were in the kitchen.  Yes, working there was Silvia
24  Romero.
25  Q.    And Silvia was close enough that she could hear what you

```
 1  and Ms. Hargrove were saying, is that right?
 2  A.   No.  No, I don't believe so.
 3  Q.   Did you review your affidavit before testifying here
 4  yesterday?
 5  A.   The previous one, yes, lightly I did.
 6  Q.   And did you review any other documents before testifying?
 7  A.   No.
 8  Q.   Now, yesterday you testified that the last union meeting
 9  you attended was in January, correct?
10  A.   Yes.  I said it was almost in the month of January or
11  March.  I don't quite recall but yes it was around January.
12  Q.   But in your sworn statement to the Board you said it was
13  in the beginning of March 2005, right?
14       THE INTERPRETER:  Do we have a date or just early March,
15  I'm sorry.
16       MS. COTILLA:  Early March 2005.
17       THE INTERPRETER:  Yeah.
18  Q.   BY MS. COTILLA:  Okay, I asked you a yes or no question.
19  A.   Yes, that's correct, because after I left the court I
20  looked at my affidavit and that is the correct one.
21  Q.   Okay.  So, you realized you made a mistake yesterday when
22  you said it was January?
23  A.   Yes, because I didn't recall.
24  Q.   Okay.  So, that meeting took place in March, right?
25  A.   Yes.
```

1  Q.    And that was March of 2005, right?

2  A.    Yes.

3  Q.    You testified yesterday that in -- that you moved to a

4  new house, right?

5  A.    Yes.

6  Q.    In fact, you bought a new house some time in October of

7  2004, correct?

8  A.    Yes.

9  Q.    And before you bought that new house you were living in

10 an apartment, right?

11 A.    Yes.

12 Q.    And when you bought that new house you needed some extra

13 money, right?

14 A.    Yes.

15 Q.    And you went and you spoke to Corrado, right?

16 A.    No.

17 Q.    You testified yesterday that you spoke to Corrado and

18 asked him for a raise, isn't that right?

19 A.    No.  A wage raise I never asked him for.  I went to him

20 and I asked for a part time.

21 Q.    Isn't it correct that in the sworn statement that you

22 gave the Board you stated that you asked Corrado if the hotel

23 could give us a raise.

24 A.    A raise?  I don't recall ever having asked for a raise.

25 I asked him for extra work so that I could have a part time

1  in order to help me pay the mortgage.

2  Q.   You said in court yesterday that you asked Corrado if he

3  could give a raise, isn't that correct?

4      MR. McCARTHY:  Objection, Your Honor.

5      JUDGE BUSCHMANN:  Objection overruled.

6      THE WITNESS:  I don't recall having said that.

7  Q.   BY MS. COTILLA:  You testified yesterday that Corrado

8  said he could not give you a raise because the hotel, the

9  union had a claim against the hotel.

10     MS. HARGROVE:  Objection, Your Honor.  I think she's

11  testifying to evidence that's not in the record and confusing

12  the witness.  Those are two separate incidents.

13     MS. COTILLA:  This is based on testimony she gave

14  yesterday on the direct, Your Honor, about --

15     MS. HARGROVE:  No, it's not, Your Honor.

16     MS. COTILLA:  -- Mr. Palenzona.

17     MS. HARGROVE:  I believe there are two separate instances

18  that she's discussing and she's confusing the witness by

19  confusing them.

20     MS. COTILLA:  I --

21     JUDGE BUSCHMANN:  You mean there's two incidents when she

22  discussed pay or when she discussed a part-time job, two

23  different occasions?

24     MS. HARGROVE:  Yes, Your Honor, I believe so.

25     JUDGE BUSCHMANN:  Why don't you satisfy -- clarify that.

1  Ask whether at one time she asked for a part-time job and

2  another time she had asked for additional money or a wage

3  raise.

4      MS. COTILLA:  Okay.

5  Q.  MS. COTILLA:  It's correct, isn't it, that one time you

6  did go and ask Mr. Palenzona for a part-time job, right?

7  A.  Yes.

8  Q.  But it's also correct, isn't it, that on another occasion

9  you went and asked Mr. Palenzona if they could give you a

10  raise.

11  A.  Yes.  I asked Mr. Corrado a question whether they could

12  give a raise.

13  Q.  And you testified yesterday that Mr. Corrado said he

14  couldn't do it because the union had a claim against the

15  hotel, correct?

16  A.  Yes.

17  Q.  And, in fact, Mr. Palenzona also told you that he would

18  speak to his attorney to see what they could do about the

19  raise, isn't that right?

20  A.  Yes.

21  Q.  And Mr. Palenzona also told you that perhaps when the

22  problem with the union was resolved, the hotel could give all

23  of the employees a raise of pay up to 12.50 per hour like the

24  other hotels.

25  A.  Yes.

1  Q.    And Alex was also present at that conversation with

2  Corrado, right?

3  A.    Yes.

4  Q.    And after you spoke to Corrado you realized you weren't

5  going to get a raise right then, correct?

6  A.    I'm sorry?  How is that?  Could you repeat that word, I

7  mean that question?

8  Q.    When Corrado told you that they couldn't give you a

9  raise, you realized that you weren't going to receive a raise

10 any time soon, correct?

11 A.    Yes.

12 Q.    And then you got a job working in the food and beverage

13 department, correct?

14 A.    Yes.

15 Q.    And it was in the end of December 2004 that you started

16 to help out with the banquets, correct?

17 A.    With the continental breakfast and the minibar.

18 Q.    And as of December 2004, you no longer did a full quote

19 of cleaning 12 rooms, correct?

20      JUDGE BUSCHMANN:  A quota?

21      MS. COTILLA:  I'm sorry, quota.

22      THE WITNESS:  Yes.

23 Q.    BY MS. COTILLA:  And since then you've never had to clean

24 a full quota of 12 rooms anymore, right?

25 A.    Yes.

1  Q.    But before you worked with Alex you did housekeeping,

2  right?

3  A.    Yes.

4  Q.    And you did that job for about 15 years at the hotel?

5  A.    Yes.

6  Q.    And as part of that job you had to clean it used to be 13

7  rooms a day, correct?

8  A.    Yes.

9  Q.    And sometime in 2003 it got down to 12 rooms, that you

10 were cleaning 12 rooms a day, right?

11 A.    Yes, I believe so.

12 Q.    And when you clean the rooms you have to replace the

13 linens, right?

14      MS. HARGROVE:  Objection, Your Honor, this is beyond the

15 scope of the direct.

16      JUDGE BUSCHMANN:  Sustained.

17      THE WITNESS:  Yes.

18 Q.    BY MS. COTILLA:  The smallest room in the hotel has 700

19 square feet, right, approximately?

20      MS. HARGROVE:  Objection again, Your Honor, beyond the

21 scope of direct.

22      JUDGE BUSCHMANN:  Yeah, what's the point?

23      MS. COTILLA:  Well, it shows, Your Honor, the type of

24 duties that she was doing before she started working as --

25 within the banquet.

1     JUDGE BUSCHMANN:  There's no evidence in the record of

2 any size of the rooms or any quotas and so forth as far as I

3 know.  I think you ought to just go on and I'll sustain the

4 objection.

5 Q.   BY MS. COTILLA:  And this first petition was dated

6 March 21st, 2005, you signed this petition, correct?

7 A.   Yes.

8 Q.   And since December of 2004, you've only been helping in

9 the food and beverage department, correct?

10 A.   Yes.

11 Q.   Yet you testified yesterday that that was a temporary

12 job, isn't that right?

13 A.   Yes, because right now the restaurant is closed and I am

14 helping her because they don't have a way to pay somebody

15 from the outside and so I am helping her and they are paying

16 with my check as a housekeeper.

17 Q.   And you're the only housekeeper who's been transferred to

18 work in the food and beverage department, right?

19 A.   In food and beverage there's me and Silvia who's helping

20 the other lady in the kitchen, Silvia Romero.

21 Q.   And Silvia used to be a housekeeper, right?

22 A.   She had already been working in the public area in the

23 lobby.

24 Q.   And you testified yesterday that Silvia participated in

25 the third petition, in circulating the third petition,

1  correct?

2  A.   Yes.

3  Q.   You testified yesterday that this first petition, you

4  didn't say anything to the employees, correct?

5  A.   Yes.

6  Q.   You testified yesterday you gave it to them and they

7  signed it, right?

8  A.   Yes, because I had already spoken to them.

9  Q.   Now, do you know who Sang Nguyen is, correct?

10      THE INTERPRETER:  Sang Nguyen, I'm sorry, is that a name

11  that appears here?  No.

12      MS. COTILLA:  Yes.  Do you see -- it's not there though

13  but I think --

14      THE INTERPRETER:  Okay.  I think I can handle it.  Sorry.

15      THE WITNESS:  Yes.

16  Q.   BY MS. COTILLA:  And he's Vietnamese, correct?

17  A.   Yes.

18  Q.   And he doesn't speak English, does he?

19  A.   Yes.

20  Q.   And he doesn't speak Spanish either, right?

21  A.   Yes, but he does understand a little bit of English.

22  Q.   But he can't read English, can he?

23  A.   No, I don't know.  That I couldn't tell you.

24  Q.   But there are also, in addition to Sang, there are other

25  Vietnamese employees at the hotel, isn't that right?

1  A.    Yes.

2  Q.    And among -- there are also a lot of housekeepers who

3  speak only Spanish, correct?

4  A.    Yes.

5  Q.    And some of them can't even read in Spanish, right?

6  A.    Among the Hispanics?

7  Q.    Correct.

8  A.    The majority know how to speak -- how to read Spanish.

9  Q.    But you know who Gloria Melgar is, correct?

10  A.    Oh, yes.

11  Q.    And you know that Gloria Melgar cannot read in Spanish,

12  isn't that right?

13  A.    Yes.

14  Q.    Now, you testified yesterday that you only gave them the

15  petition, they read it and signed it, correct?

16  A.    Yes.

17  Q.    Now, you showed this first petition to Mr. Corrado, isn't

18  that right?

19  A.    Yes.

20  Q.    And that --

21      JUDGE BUSCHMANN:  Hold on just a minute.  I think there

22  was testimony that she had talked to the employees -- don't

23  translate this, talked to the employees prior to them signing

24  the petition.  I think there's been testimony about that.

25      MS. COTILLA:  Prior, yes, but at the time that she gave

```
 1  it to them she --
 2      JUDGE BUSCHMANN:  Yes.
 3      MS. COTILLA:  It's my understand she just gave it to
 4  them --
 5      JUDGE BUSCHMANN:  Okay.
 6      MS. COTILLA:  -- and they signed it.
 7      JUDGE BUSCHMANN:  Yes.  All right.  So, you may proceed.
 8  Q.  BY MS. COTILLA:  And when you showed this petition to
 9  Corrado, Alex was also present, right?
10  A.  Yes.
11  Q.  You testified yesterday that you received some phone
12  calls after this first petition was circulated, correct?
13  A.  Yes.
14  Q.  But you also testified you didn't recognize the voice who
15  called, right?
16  A.  Yes.  I said yesterday that I only noticed it was a man's
17  voice who called me at 2:30 in the morning on one occasion
18  and at six.  It was just a couple times, two or three times.
19  Q.  But it was not Miguel's voice, correct?
20  A.  I didn't recognize the voice.  I don't know.
21  Q.  But you do recognize Miguel's voice, don't you?
22  A.  No.
23  Q.  In fact, didn't Miguel call you and tell you you should
24  file a police report?
25  A.  I called Miguel because I was afraid they were
```

1  threatening me.  I called Miguel because it seemed to me they

2  were threatening me because I passed around the petition that

3  we didn't want Local 25.

4  Q.  And you had spoken to Miguel prior to that, right?

5  A.  Yes.

6  Q.  And you know it wasn't Miguel who called you, right?

7  A.  No.

8  Q.  In fact, you have no evidence that there was any union

9  official who made those calls, correct?

10 A.  I have no idea who called me, but it was after doing this

11 petition that they began calling.

12 Q.  Didn't Miguel also come to your house?

13 A.  Yes.  He went -- visited the house, yes.

14 Q.  And that happened after the second petition, correct?

15 A.  I believe so.

16 Q.  And he came to your house and he was with another person.

17 You think it was a woman.  It might have been --

18 A.  Yes.

19 Q.  And you told them, I've been expecting that you were

20 going to come, right?

21 A.  I don't recall having said it that way.

22 Q.  And when they came to the door you let them into the

23 house, correct?

24 A.  Yes.

25 Q.  In fact, they sat on your couch, right?

1  A.   Yes.

2  Q.   And you had a conversation, right?

3  A.   Yes.

4  Q.   And they stayed there for almost an hour, right?

5  A.   I think.  I think so, almost.

6  Q.   And at no time did you tell them they had to leave,

7  right?

8  A.   We just had a conversation.  They finished saying what

9  they had to say and then they left.

10  Q.   Now, this second petition, you testified yesterday the

11  purpose of the petition was so that the union wouldn't visit

12  employees at home, correct?

13  A.   Yes.

14  Q.   And, in fact, it says in the petition that you didn't

15  want to continue being approached by the employees of Local

16  25, correct?

17  A.   Yes.

18  Q.   And it says that you wanted to let them know that you

19  were facing harassment in your own home, correct?

20  A.   Yes.

21  Q.   And you signed this petition, right?

22  A.   Yes.

23  Q.   In fact, you were the second person to sign it, right?

24  A.   Yes.

25  Q.   Yet, the union has only visited you once in 2005.

1      THE INTERPRETER:  Union had.

2    Q.    BY MS. COTILLA:  That the union only visited you at your

3    house once in 2005, correct?

4    A.    Yes.

5    Q.    And you testified yesterday that that happened after the

6    second petition, correct?

7    A.    I believe so.  I'm not sure.  I believe so.

8    Q.    And that's the visit that you just described for me,

9    right?

10   A.    Yes.

11   Q.    So, at the time that -- now you did tell your co-workers

12   that perhaps the hotel would give us a pay raise up to 12.50,

13   didn't you?

14   A.    Yes, but that that was my opinion.

15   Q.    And you told them that that would happen, the 12.50 would

16   happen if the hotel resolves its issues with the union,

17   correct?

18   A.    I believe so.  I don't remember.  I'm not sure.  I really

19   don't remember.

20   Q.    You gave an affidavit to the Board, right?

21   A.    Yes.

22   Q.    And in that affidavit you said you told your co-workers

23   perhaps that the perhaps the hotel would give us a pay raise

24   up to 12.50, correct?  Yes -- a yes or no.

25   A.    Yes, because that was my opinion.

1  Q.   The affidavit doesn't say anything about opinion, isn't

2  that right?  Yes or no?

3  A.   I'm sorry, how's that?

4  Q.   The affidavit doesn't say anything about it being your

5  opinion, isn't that correct?

6  A.   But in my statement affidavit it does say that it is my

7  opinion.

8  Q.   I'm going to show you what's been marked as General

9  Counsel Exhibit 150(a).  It's the Spanish declaration that

10 you gave to the Board.

11 A.   Okay.  Yeah.  Better if you show them to me because I

12 don't remember.

13 **(Pause.)**

14      UNIDENTIFIED MALE:  Excuse me, Your Honor, that was

15 150(a) or 158?

16      MS. COTILLA:  It's just marked 150(a).

17      UNIDENTIFIED MALE:  150(a)?

18      MS. COTILLA:  (a), right.

19      THE INTERPRETER:  The witness is indicating line seven,

20 Page 5 to the interpreter and pointing to the word, opinion.

21 Q.   BY MS. COTILLA:  But on mine -- no, I want to -- you're

22 on Page 5, correct?

23 A.   Yes.

24 Q.   And in lines three through five of the Spanish which

25 begins with, since that meeting you told your co-workers that

1  perhaps the hotel would give us a raise -- pay raise of 12.50
2  like the other hotels if the issue with the union was
3  resolved.  That's what it says, right?  Yes or not, that's
4  what it says.  Is that what it says?
5  A.  I said that that's my opinion.
6  Q.  Yes.
7      MS. HARGROVE:  Objection, Your Honor.  This has been
8  asked and answered --
9  Q.  BY MS. COTILLA:  Line three --
10     JUDGE BUSCHMANN:  No, it hasn't.
11     THE WITNESS:  I was saying what I, myself, believe and I
12  was giving my opinion what I was behind.
13 Q.  BY MS. COTILLA:  Line three through five of this
14  affidavit, don't say anything about opinion, isn't that
15  correct?  Yes or no?
16 A.  May --
17 Q.  It doesn't --
18 A.  May I see?
19 Q.  -- say anything about opinion.
20     JUDGE BUSCHMANN:  Tell her to answer the questions with
21  yes or no.
22     THE WITNESS:  From three to five it doesn't say opinion.
23 Q.  BY MS. COTILLA:  And that 12.50 number, that's not
24  something you thought of yourself, is it?
25 A.  No, not just me.

1  Q.   In fact, Corrado Palenzona had already told you that

2  perhaps the hotel could give the employees a raise up to

3  12.50, isn't that right?

4  A.   Yes.

5  Q.   And in fact, on or about July 8, 2005, you did get a

6  raise of 12.50, right?

7  A.   The 8th?  Yes, in July 2005, yes.

8  Q.   And the other housekeepers got the same raise up to

9  12.50, right?

10 A.   Yes.

11 Q.   Now, you also testified yesterday about a meeting on

12 July and that 12.50 number, that's not something you thought

13 of yourself, is it?

14 A.   No, not just me.

15 Q.   In fact, Corrado Palenzona had already told you that

16 perhaps the hotel could give the employees a raise up to

17 12.50, isn't that right?

18 A.   Yes.

19 Q.   And in fact, on or about July 8, 2005, you did get a

20 raise of 12.50, right?

21 A.   The 8th?  Yes, in July 2005, yes.

22 Q.   And the other housekeepers got the same raise up to

23 12.50, right?

24 A.   Yes.

25 Q.   Now, you also testified yesterday about a meeting on

1  July 5th, 2005, correct?

2  A.   Yes.

3  Q.   And that's the meeting where Corrado said that the

4  employees were going to get 12.50, right?

5  A.   Yes.

6  Q.   And isn't it correct that at that meeting Palenzona said

7  the problem with the union is over?

8  A.   Yes.

9  Q.   And he also said now the hotel can give you a raise up to

10 12.50, isn't that right?

11 A.   Yes.

12      MS. COTILLA:  May I have a few minutes, Your Honor?

13      JUDGE BUSCHMANN:  Yes.

14 **(Pause.)**

15      MS. COTILLA:  No further questions, Your Honor.

16      JUDGE BUSCHMANN:  Thank you.

17                    **REDIRECT EXAMINATION**

18 Q.   BY MS. HARGROVE:  Good morning, Ms. Lozano.

19 A.   Good morning.

20 Q.   When I came to meet with you before the hearing, did I

21 tell you it was voluntary to speak with me?

22 A.   Yes.

23 Q.   Did I tell you what to say here today?

24      MS. COTILLA:  Objection, leading.

25      JUDGE BUSCHMANN:  Objection overruled.

1          THE WITNESS:  Only the truth.

2    Q.  BY MS. HARGROVE:  When did you ask Corrado Palenzona to

3    help Alex?

4          THE INTERPRETER:  To help Alex?

5          MS. HARGROVE:  Alex, yes.

6          THE INTERPRETER:  Okay, excuse me.  The interpreter did

7    not understand the question.

8          JUDGE BUSCHMANN:  --

9          THE INTERPRETER:  Are you asking when she, when the

10   witness asked Mr. Palenzona for him to help her or for her to

11   help him.  It was not clear and I don't believe I interpreted

12   it correctly.

13         MS. HARGROVE:  I'll rephrase my question.

14   Q.  BY MS. HARGROVE:  When did you ask Mr. Palenzona to

15   assist Alex with the continental breakfast and minibar?

16         THE INTERPRETER:  I assume you mean for the witness to

17   assist?

18         MS. HARGROVE:  Yes.

19         THE INTERPRETER:  To allow the witness to assist?

20         MS. HARGROVE:  Yes.

21         THE INTERPRETER:  Okay.  All right.  I'm sorry.

22         THE WITNESS:  Around October of 2004 I asked

23   Mr. Palenzona to have me help Alex with the continental

24   breakfast and the minibar because I needed a part-time job.

25   Q.  BY MS. HARGROVE:  And you testified that the -- your last

1  union meeting was in March?

2  A.    Yes.

3  Q.    When did you ask Mr. Palenzona if he could give you a

4  raise?

5  A.    It was when we had a meeting with Miguel but I don't

6  remember the date.  We had a meeting at Local 25 and Miguel

7  told us that the hotel could give us a raise but that they

8  didn't care to.

9  Q.    Didn't Mr. Corrado promise that he'd get you a raise to

10 12.50?

11 A.    He never assured me of anything.

12 Q.    Did you ever tell the employees that Mr. Corrado promised

13 to get them a raise of 12.50?

14 A.    No.

15 Q.    You testified that you spoke to the housekeepers before

16 you passed around, I believe it's GC Exhibit 3?

17 A.    Yes.

18 Q.    You testified that you showed Corrado GC Exhibit 3, the

19 petition, is that correct?  Did the petition already have

20 signatures on it?

21 A.    Yes.

22 Q.    Had you delivered this petition to the union yet?

23 A.    Yes.

24 Q.    What did Mr. Palenzona say about the petition?

25 A.    That he couldn't get involved in that, that that was our

1  matter, that being General Manager it would reflect poorly on

2  him, or prejudice him.

3      THE INTERPRETER:  Strike that.

4      THE WITNESS:  That being the General Manager, that that

5  would put him in a bad situation.

6  Q.  BY MS. HARGROVE:  Ms. Lozano, do you still have your

7  affidavit in front of you?

8  A.  Yes.

9  Q.  I believe General Counsel referred to Page 5, lines 3 to

10  5.

11  A.  Yes.

12  Q.  I don't have the Spanish version in front of me but what

13  line does say the word opinion?

14  A.  Line seven.

15  Q.  And can you please read that whole sentence?

16      MS. COTILLA:  Your Honor, I object.  This is not in

17  evidence yet.  I object to her reading it into the record.

18  In fact, I would move to introduce Exhibit 150, which is the

19  English one, and General Counsel's Exhibit 150(a), the

20  Spanish, and I do have copies of that for everyone.

21  **(General Counsel's 150 and 150(a) marked for identification.)**

22      JUDGE BUSCHMANN:  Would you have any objection?

23      MS. HARGROVE:  No, Your Honor.

24      MR. GREENBAUM:  No, Your Honor.

25      JUDGE BUSCHMANN:  I hereby received General Counsel

1  Exhibit 150 and 150(a).

2  **(General Counsel's 150 and 150(a) received into evidence.)**

3      JUDGE BUSCHMANN:  You may inquire.

4  Q.   BY MS. HARGROVE:  Ms. Lozano, can you please read the

5  complete sentence containing the word opinion?

6      THE INTERPRETER:  Shall the interpreter point to the

7  beginning of the sentence?

8      MS. HARGROVE:  Yes, please.

9      THE WITNESS:  Besides, when I was asked whether I

10 believed that we would be given the raise once the union

11 matter was resolved, I told them that it was my opinion that

12 perhaps so.

13 Q.   BY MS. HARGROVE:  Did anyone go with you when you gave

14 this statement?

15 A.   That day they subpoenaed me and Alex.

16 Q.   When Alex in the room with you when you gave this

17 statement?

18 A.   No.

19     MS. HARGROVE:  One moment.

20     THE INTERPRETER:  Can I just ask off the record an

21 interpreting matter?  Is one subpoenaed to give affidavits or

22 is one asked to give an affidavit?  Because the term in

23 Spanish can be used interchangeably.

24     JUDGE BUSCHMANN:  I didn't understand the question.  The

25 subpoena is --

1        THE INTERPRETER:  When a person -- I understand that a
2   witness is subpoenaed to come to court.
3        JUDGE BUSCHMANN:  Right.
4        THE INTERPRETER:  Is an affiant subpoenaed to give an
5   affidavit?
6        JUDGE BUSCHMANN:  No.
7        THE INTERPRETER:  Okay.
8        JUDGE BUSCHMANN:  So, one -- it's a voluntary one or the
9   other or it depends from witness to witness.
10       THE INTERPRETER:  And so in this case the term I was
11  subpoenaed would not be correct.  The term would be I was
12  asked or given a date.
13       JUDGE BUSCHMANN:  No, I think that witnesses are
14  subpoenaed to appear here.
15       THE INTERPRETER:  Yes.  But for the affidavit.
16       JUDGE BUSCHMANN:  The affidavit is a different matter.
17       THE INTERPRETER:  And that's why --
18       JUDGE BUSCHMANN:  And --
19       THE INTERPRETER:  -- I used the term subpoena in that
20  context.
21       JUDGE BUSCHMANN:  I see.
22       THE INTERPRETER:  So, it would be --
23       JUDGE BUSCHMANN:  Yeah, asked to sign an affidavit, not
24  subpoenaed to --
25       THE INTERPRETER:  Exactly.  And so I just wanted to

1  correct for the record the proper response would have been if

2  the reference was to the affidavit, I was notified to come.

3      JUDGE BUSCHMANN:  Yes.

4      MS. HARGROVE:  Are we still on the record?

5      JUDGE BUSCHMANN:  Yes.

6  Q.   BY MS. HARGROVE:  Ms. Lozano, did you ever tell any of

7  the employees that they would get a 2.50 raise if they signed

8  to get rid of the union?

9      MR. McCARTHY:  Your Honor, that's been asked and answered

10  three times I believe.

11      JUDGE BUSCHMANN:  Objection overruled.

12      THE WITNESS:  No.  No.

13  Q.   BY MS. HARGROVE:  What was the reason you did the

14  petition?

15  A.   Because I was disappointed because of what Olga told me

16  at a meeting.

17      MS. HARGROVE:  No further questions, Your Honor.

18      MS. COTILLA:  Well, I have a clarification.  Just with

19  regard to the affidavit that we entered into evidence,

20  Exhibit 150 and 150(a), that was offered only for purposes of

21  impeachment correct because otherwise it's hearsay but I just

22  want a clarification that only to the extent that it was used

23  during cross and redirect, that's the extent to which the

24  affidavit should be used, not the entire document, all of it.

25      JUDGE BUSCHMANN:  I didn't know.  You made the offer,

1  so --

2      MS. COTILLA:  I do.  I apologize for not putting that,

3  but I had used it in impeachment and that was the purpose I

4  was offering it for so I'd like to get that clarification.

5      JUDGE BUSCHMANN:  Are you offering the affidavit for

6  purposes of showing what is stated on line three to five and

7  six and seven?

8      MS. COTILLA:  For that purpose.

9      JUDGE BUSCHMANN:  For that purpose, Ms. Cotilla?

10      MS. COTILLA:  Yes.

11      JUDGE BUSCHMANN:  And no --

12      MS. COTILLA:  For impeachment only.  Right.  For those --

13  that paragraph that you mentioned, Your Honor, yes.

14      JUDGE BUSCHMANN:  And not for the other matters contained

15  in the affidavit which may or may not be consistent with her

16  testimony.

17      MS. COTILLA:  Correct.  To which I never questioned her,

18  correct.

19      JUDGE BUSCHMANN:  All right.  Any problem with that.

20      MS. HARGROVE:  Well, it is a prior statement that's under

21  oath and she's here to testify about it so we think it's a

22  prior consistent statement.

23      MR. McCARTHY:  Right.  The prior consistent statement,

24  Your Honor, inadmissible like prior inconsistent statements,

25  for impeachment purposes.  Prior consistent statement is

1  hearsay.

2      JUDGE BUSCHMANN:  This is the General Counsel's exhibit.

3  I'm hereby receiving the document for purposes indicated by

4  the General Counsel.

5      MR. GREENBAUM:  Your Honor, just for clarification, it is

6  admitted as an exhibit, correct?

7      JUDGE BUSCHMANN:  As an exhibit but for purposes of what

8  is indicated by the General Counsel --

9      MR. GREENBAUM:  But --

10     JUDGE BUSCHMANN:  In other words, as far as the --

11  Mister, I'm talking to you.

12     MR. GREENBAUM:  I know.

13     JUDGE BUSCHMANN:  For purposes of the record in this

14  case, it's her testimony that's controlling and no the

15  affidavit or the content of the affidavit other then the

16  portion that was raised and discussed in her cross-

17  examination.

18     MR. GREENBAUM:  Just for the record, Your Honor, because

19  we're making a record here.  General Counsel put in and moved

20  this exhibit into evidence.  It was admitted into evidence.

21  It's an exhibit.  They could use it for whatever purpose they

22  want.  We submit that it's already in evidence.  So, we could

23  use it -- we would use it for any reason we deem necessary.

24  They're going to use it for every reason they deem necessary.

25  We understand the testimony is controlling but it is an

1  exhibit in total.

2      JUDGE BUSCHMANN:  No, it's not.

3      MR. GREENBAUM:  Well, we would move for the completeness

4  of the entire affidavit.

5      JUDGE BUSCHMANN:  And you have to have a reason,

6  Mr. Greenbaum, why the affidavit would be necessary to be in

7  the record for reasons other then what the General Counsel

8  offered it for.

9      MR. GREENBAUM:  Your Honor --

10     JUDGE BUSCHMANN:  In other words, let me say this, the

11 record as far as I understand it is not confusing or was

12 confusing and may be cleared up by reading the affidavit as

13 to this one portion of her testimony which dealt with whether

14 or not the request or the expectation of a pay raise was

15 something that had to do with her opinion or not.  The rest

16 of the affidavit is irrelevant at this point.

17     MR. GREENBAUM:  I understand, Your Honor.  I guess the

18 point we're making is, they told her to read line one through

19 three.  The opinion is -- the statement is in the next line.

20     JUDGE BUSCHMANN:  Right.

21     MR. GREENBAUM:  We would just move that the entire

22 paragraph be put into evidence.

23     JUDGE BUSCHMANN:  That's fine.  Then the entire paragraph

24 will be in evidence and be part of the record in this case.

25 The rest of the document is not.

1    MS. COTILLA:  Your Honor, just because -- what we were

2  talking about is the Spanish one, Page 5, line 3 through 8,

3  and then I just want to point out that in the English

4  affidavit, which is Exhibit 150, that same paragraph is on

5  Page 4, lines 1 through 6.

6    JUDGE BUSCHMANN:  Fine.

7    MS. COTILLA:  Okay.

8    JUDGE BUSCHMANN:  It's agreeable.  I want to make sure

9  that the record is clear on that and that the rest of the

10  affidavit is not relevant and is not to be considered or not

11  part of the record.  Okay.  You have any more questions?

12    MS. COTILLA:  No, Your Honor.

13    JUDGE BUSCHMANN:  And you were finished, right?

14    MS. HARGROVE:  Yes, Your Honor.

15    JUDGE BUSCHMANN:  Okay.  Oh, ask -- I'd like to know --

16    THE INTERPRETER:  And may I request that the Court direct

17  the question directly --

18    JUDGE BUSCHMANN:  Yes.

19    THE INTERPRETER:  -- to the witness and I'll be happy to

20  interpret.

21    JUDGE BUSCHMANN:  The work of cleaning rooms, is it more

22  difficult to clean rooms as a housemaid then to work in the

23  minibar and the continental breakfast work?

24    THE WITNESS:  It's the same.  They're both demanding

25  because I also clean.

1      JUDGE BUSCHMANN:  How many rooms do you clean today or

2  under the current change of her work?

3      THE WITNESS:  I clean two rooms.  The room where the

4  houseguest come to eat I also clean and the room where I

5  prepare the coffee I clean, also.

6      JUDGE BUSCHMANN:  Do you clean any guest rooms and how

7  many?

8      THE WITNESS:  Two rooms where the guest come to eat and

9  where I prepare.

10      JUDGE BUSCHMANN:  That's not what I asked.  I want to

11  know, do you clean the guest rooms?

12      THE WITNESS:  No.

13      JUDGE BUSCHMANN:  Okay.  Thank you very much.  You may

14  step down.

15  **(Witness excused.)**

16      JUDGE BUSCHMANN:  Your Honor, if I could go and get our

17  next witness.

18      JUDGE BUSCHMANN:  Okay.  Thank you.

19      MS. COTILLA:  Your Honor, I -- permission to remove the

20  affidavit from the table --

21      JUDGE BUSCHMANN:  Yes.

22      MS. COTILLA:  -- where the witness is.

23      JUDGE BUSCHMANN:  Um-hum.

24      THE INTERPRETER:  Your Honor, the Interpreter has been

25  interpreting for an hour and a half --

1        JUDGE BUSCHMANN:  I know.

2        THE INTERPRETER:  -- I think 15 minutes would be in order

3   in order to --

4        JUDGE BUSCHMANN:  How about --

5        THE INTERPRETER:  -- maintain the --

6        JUDGE BUSCHMANN:  How about --

7        THE INTERPRETER:  -- concentration.

8        JUDGE BUSCHMANN:  How about 10 minutes?

9        THE INTERPRETER:  The problem is, if I step outside for a

10  breath of fresh air and I can't come up here without

11  security, so --

12       MS. HARGROVE:  We actually don't need an interpreter for

13  this next witness.

14       THE INTERPRETER:  Oh, well, that resolves the issue right

15  there.  I'll be back in 15 minutes regardless.

16       JUDGE BUSCHMANN:  Well, that --

17       MS. HARGROVE:  Your Honor, if you want to take a break

18  anyway?

19       JUDGE BUSCHMANN:  Is it a short witness or is it the

20  long --

21       MS. HARGROVE:  It's going to be --

22       JUDGE BUSCHMANN:  Long.

23       MS. HARGROVE:  -- a long  -- for a 10 minute break, Your

24  Honor.

25       **JUDGE BUSCHMANN:  Let's take a 10 minute break at this**

1  **point.**

2  **(Off the record.)**

3      JUDGE BUSCHMANN:  Ms. Hargrove, would you call your next

4  witness?

5      MS. HARGROVE:  Yes, Your Honor.  I'd like to call

6  Alexandra Guillen to the stand, please.

7      JUDGE BUSCHMANN:  I have to swear you in.  Please stand

8  up.  Raise your right hand.

9  (Whereupon,

10                      **ALEXANDRA GUILLEN**

11  was called as a witness by and on behalf of the Respondent

12  and, after having been first duly sworn, was examined and

13  testified as follows:)

14      JUDGE BUSCHMANN:  Please be seated.

15      MR. McCARTHY:  Your Honor, I noticed that Ms. Reina

16  Lozano is still in the room.

17      MS. HARGROVE:  We were wondering if that was okay since

18  she'd already testified.  If you prefer not, she just was

19  sitting in the room by herself and asked if that be all right

20  if she sat in.

21      MR. McCARTHY:  I think we have a sequestration rule.

22      JUDGE BUSCHMANN:  I know we do.  The question is, would

23  she be recalled as a witness.

24      MS. HARGROVE:  We are not planning on recalling her.  I

25  don't know if you are.  If you are, we'll be glad to have her

1  go back to the other room.

2      JUDGE BUSCHMANN:  Once they've testified and they're not

3  testifying anymore, not any more potential witness, I don't

4  see any reason why they cannot stay in the courtroom.  You

5  agree?

6      MR. McCARTHY:  As long as there's no signaling to the

7  witness or anything like that, Your Honor, yes.

8      JUDGE BUSCHMANN:  Okay.

9                    **DIRECT EXAMINATION**

10  Q.   BY MS. HARGROVE:  Good morning, Ms. Guillen.

11  A.   Good morning.

12  Q.   Could you please state and spell your name for the

13  record?

14  A.   My first name is Alexandra, A-l-e-x-a-n-d-r-a.  My last

15  name is Guillen, G-u-i-l-l-e-n.

16  Q.   Do you speak Spanish or English or both?

17  A.   Both.

18  Q.   Are you comfortable testifying here today in English?

19  A.   Yes.

20  Q.   Now, did you meet with me in preparation for the hearing

21  today?

22  A.   Not today.

23  Q.   Did you meet with me in --

24  A.   Prior, yes.

25  Q.   -- preparation before today?  Did you speak with me

1   voluntarily?

2   A.    Yes, I did.

3   Q.    How many times did we meet?

4   A.    Once.

5   Q.    Did I tell you what to say here today?

6   A.    No, you didn't.

7   Q.    Are you currently employed?

8   A.    Yes, I am.

9   Q.    Where are you employed?

10  A.    State Plaza Hotel.

11  Q.    How long have you been working for the State Plaza?

12  A.    Since 1981.

13  Q.    And what's your current position?

14  A.    Right now I'm in the status of doing -- helping with the

15  breakfast, continental breakfast for the guest and also

16  minibar.

17  Q.    How long have you held that position?

18  A.    Since June, since 2-0-4 since they closed the restaurant.

19  Q.    What were you doing before you did the minibar and

20  continental breakfast?

21  A.    I was doing waitressing and also banquet.

22  Q.    And when did they close the hotel, I'm sorry, excuse

23  me --

24  A.    I believe it was --

25  Q.    -- the restaurant?

1  A.    June, yeah, it was in June of 2-0-4.

2  Q.    Were you the most senior of the restaurant employees?

3  A.    Yes, I am.  I was.  Yes, I am.

4  Q.    What do your current duties include?

5  A.    Now, it's, one -- we open seven days a week.  We have the

6  guests, they have no place to go eat, so, we have, give them

7  the complimentary breakfast to the guests, which is just

8  muffins and coffee and pastries for the guest in the mornings

9  from seven to nine, and from after that we finish and we do

10 the minibar, which is, you know, we provide the guests some

11 waters and, in each room for the hotel.

12 Q.    Do you use a cart when you're doing the minibar?

13 A.    Yes, we do.

14 Q.    Do you know who the General Manager of State Plaza Hotel

15 is?

16 A.    Yes, I do.

17 Q.    What's his name?

18 A.    Corrado Palenzona.

19 Q.    Ms. Guillen, were you involved in bringing the union to

20 the hotel?

21 A.    No, I wasn't.

22 Q.    When did you become at all involved with the union at the

23 hotel?

24 A.    It was when I spoke to Reina back in, I believe it was in

25 November.

594

1  Q.   Of what year.

2  A.   2-0-4.

3  Q.   There's a packet of papers in front of you.  If you could

4  please turn to, it's been marked as GC Exhibit 3.

5  A.   Say it again, which --

6  Q.   GC --

7       MS. HARGROVE:  Your Honor, may I approach to show her?

8       JUDGE BUSCHMANN:  Yes.

9       THE WITNESS:  Over here?

10  Q.  BY MS. HARGROVE:  Um-hum.  Do you recognize that

11  document?

12  A.   Yes, I do.

13  Q.   What is that document?

14  A.   This document was done by me in my own --

15  Q.   Is that --

16  A.   -- you know, my handwriting.

17  Q.   That is your handwriting at the top?

18  A.   Yes, it is.

19  Q.   When did you prepare this document?

20  A.   We prepare this in March.

21  Q.   You said, we, did anyone prepare it with you?

22  A.   Reina and myself.

23  Q.   And why did you write this petition?

24  A.   Reina asked me to help her.

25  Q.   Help her what?

1  A.    To do the petition for the employees so they can sign for

2  the petition because all the employees are not, all the staff

3  in housekeeping did not want the union.  They don't want to

4  be involved with the union anymore, so, they asked us to

5  write a petition.  We, I wrote this because they asked me to

6  do it and I did it and in both English and Spanish.

7  Q.    Why did the employees not want the union?

8  A.    I understood from Reina told me their story is about, you

9  know, that what happened --

10     MR. McCARTHY:  Your Honor, I'm going to object based on

11  the hearsay rules.

12     JUDGE BUSCHMANN:  Yes.

13  Q.   BY MS. HARGROVE:  Are these your --

14     JUDGE BUSCHMANN:  I sustained your objection.

15     MS. HARGROVE:  Yes.

16     JUDGE BUSCHMANN:  What --

17     MS. HARGROVE:  Thank you, Your Honor.

18  Q.   BY MS. HARGROVE:  Are these your words at the top of GC

19  Exhibit 3?

20  A.    Yes, they are.

21  Q.    Did Corrado Palenzona tell you what to write?

22  A.    No.

23  Q.    Who told you to write this?

24  A.    Myself.  I did it this upon myself with the -- before I

25  did this I -- when Reina asked me to help her, I, the only

1 thing I did is I asked my brother, as he worked a long time

2 ago with the union, I asked him to coach me and then he just

3 said, there's no words.  You just have to do your own thing

4 and just say what they want to do.

5 Q.    Did any supervisor tell you to write this petition?

6 A.    No.

7 Q.    Did Corrado Palenzona tell you to write --

8 A.    No.

9 Q.    -- this petition?  Did Corrado Palenzona promise to give

10 you money if you'd write this petition?

11 A.    No.

12 Q.    Did any supervisor or management --

13 A.    No.

14 Q.    -- give you money to write this petition?  Did you

15 collect signatures on this --

16 A.    Yes, I did.

17 Q.    -- GC Exhibit 3?

18 A.    Yes, I did.

19 Q.    How did you collect signatures?

20 A.    Okay.  All the staff in housekeeping department, they

21 already knew about the letter, you know, being passed, so,

22 the only thing we did is show them and, you know, they read

23 it and they sign it.

24 Q.    Did you attend a meeting in the Diplomat Room in spring

25 of 2005?

1  A.   No, I didn't.

2  Q.   Did you ever have a meeting with Mr. Palenzona and Reina

3  in the food and beverage office?

4  A.   No, I didn't.

5  Q.   Did you ever meet with Mr. Palenzona and Alex --

6  A.   We do --

7  Q.   Or, excuse me --

8  A.    -- meet once a week or twice a week when we have to do,

9  prepare about, you know, the scheduled events and meetings

10 for the upcoming of the hotel.

11 Q.   And where do you --

12 A.   --

13 Q.   I'm sorry.

14 A.   Usually in his office.

15 Q.   They're recording everything we say so we have to make

16 sure we don't talk over one another.  So, I'll --

17 A.   Okay.

18 Q.   -- try not to talk --

19 A.   All right.

20 Q.   -- over you.

21 A.   All right.

22 Q.   All right.  Thanks.  I'm sorry, did you -- you said -- do

23 you ever meet in the food and beverage office?

24 A.   We never meet in the food and beverage office.  Only his

25 office, one sales department.

1  Q.   Did you ever slam the door on Ana Majano, the food and

2  beverage office door on Ana Majano?

3  A.   No, I never.  That door closes, you know, we open that

4  door it close by itself, so, I mean, there's no reason for me

5  to close the door.

6  Q.   Did you ever shut the door on Adriana Nunez, the food and

7  beverage office door?

8  A.   No, I didn't.

9  Q.   Did you say anything to the employees when you were

10 collecting signatures?

11 A.   No, I didn't.

12 Q.   Did you ever tell the employees that they would receive a

13 raise if they signed the petition --

14 A.   No, I didn't.

15 Q.   Did you ever tell Adriana Nunez that the petition comes

16 with a 2.50 raise and other benefits?

17 A.   No, I didn't.

18 Q.   Did you ever tell Adriana Nunez that the hotel would give

19 the employees a raise if they signed the petition?

20 A.   No, I didn't.

21 Q.   Did you ever ask Margarito Velasquez to sign the

22 petition?

23 A.   No, I didn't.

24 Q.   Did you ever tell Ana Majano that she would receive a

25 raise if she signed the petition?

1  A.    No, I didn't.  She signed the petition by herself.  No

2  one -- she read the letter the first time she signed this

3  letter, the first time.  She didn't ask any questions.  She

4  was with, she's the one that -- the union at the beginning

5  and she signed the petition without asking anything.  Her

6  signature is right here.  I think it's number 23.

7  Q.    Where were you when you asked Ana Majano to sign the

8  petition?

9  A.    She was in one of her rooms.

10 Q.    Was anyone with her?

11 A.    No, nobody was with her.

12 Q.    Did you ever talk to Dilcia Segovia about the petitions?

13 A.    No, I didn't.

14 Q.    Did you ever tell -- talk to Dilcia Segovia about the

15 union?

16 A.    No, I didn't.  She talked to me about it.

17 Q.    Did you ever tell Dilcia Segovia, Mr. Bernstein would

18 close the hotel if the union was there?

19 A.    No, I didn't.

20 Q.    Do you know who Richard Bernstein is?

21 A.    Yes, I do.

22 Q.    Who's Mr. Bernstein?

23 A.    He's the owner.

24 Q.    Have you ever met Mr. Bernstein?

25 A.    Yes, I have.

```
 1  Q.   How many times?

 2  A.   Usually maybe once a year he comes to -- he used to come

 3  to the restaurant and have lunch there.

 4  Q.   Did you serve Mr. Bernstein at the restaurant?

 5  A.   All the time.

 6  Q.   Did you ever eat with Mr. Bernstein?

 7  A.   No, I didn't.

 8  Q.   Did you ever talk with Mr. Bernstein about the union?

 9  A.   No, I didn't.

10  Q.   Did Mr. Bernstein ever ask you to talk to the employees

11  about the union?

12  A.   No, he didn't.

13  Q.   Did Mr. Bernstein ever give you any money or loans or

14  payments?

15  A.   Never.

16  Q.   Did Mr. Bernstein ever help you economically?

17  A.   Never.

18  Q.   Do you know if Ms. Segovia still works for the hotel?

19  A.   Who's Ms. Segovia?

20  Q.   Dilcia Segovia.

21  A.   No, he -- she doesn't work there anymore.

22  Q.   Do you know when she stopped working at the hotel?

23  A.   In 2-0-4, maybe in the summer of 2-0-4.  I don't remember

24  exactly, but maybe between the time -- it was in the fall for

25  that she was working.  I hardly see her, so I don't remember.
```

1  Q.    Okay.  Do you know Marleni Jiron?

2  A.    Who?

3  Q.    Marleni Jiron.

4  A.    Marleni?

5  Q.    Marleni.

6  A.    Yes, I do.

7  Q.    Who is Marleni Jiron?

8  A.    She was one of the housekeepers.

9  Q.    Did you ever talk to Ms. Jiron about the union?

10  A.    We talked about it, yes.

11  Q.    What did you say to her?

12  A.    The complaint they she -- they always had is about they

13  are working hard and they don't make any money.  People say

14  help me to get the union out of here, out of the hotel.  I

15  say, I can't do that, you know, I don't know what to do

16  because at the time I didn't know anything.

17  Q.    Okay.

18  A.    Nobody knew me in the hotel actually.

19  Q.    Why did no one know you at the hotel?

20  A.    Because I was always working the restaurant, all my life,

21  since 1981 for 20-some years.  And in 2-0-4 I become, you

22  know, doing the minibar so I was going to the floors and

23  that's how I meet the people there.

24  Q.    Does the State Plaza Hotel ever use rooms as permanent

25  residences?

1  A.    Yes.

2  Q.    Are you aware in March 2005, Room 215 was occupied as a

3  permanent residence?

4  A.    Yes, it was.

5  Q.    Do housekeepers clean the permanent residences?

6  A.    No, they don't.

7  Q.    In March 2005, did you ever speak with Ms. Jiron while

8  she was cleaning Room 215?

9  A.    215 was occupied by a permanent guest and I think it was

10 under construction after the person passed away or something.

11 They were on construction for a long time, so, that room was

12 not available.

13 Q.    Did you ever tell Ms. Jiron that you were going to make a

14 deal with Mr. Palenzona to get them a raise?

15 A.    No, I didn't.

16 Q.    Did you ever tell any employees that Corrado Palenzona

17 told you the hotel would give them a raise if they got rid of

18 the union?

19 A.    Never.

20 Q.    When you finished collecting signatures on this GC

21 Exhibit 3, did you do anything with the petition?

22 A.    Yes, we -- I did.

23 Q.    What did you do?

24 A.    I give a -- we give a copy to Mr. Miguel with Reina we

25 went to their office and we give to the secretary a letter

1  sealed with a copy making one to Mr. Palenzona and one for

2  myself.

3  Q.   When did you give the letter to Miguel?

4  A.   I believe it was one week or maybe couple days after, you

5  know, we had everybody's signatures, so we went in person

6  after work.

7  Q.   Is there a date on GC Exhibit 3?  It's the packet in

8  front of you.  It's marked GC-3.

9  A.   Um-hum.

10  Q.   That --

11      MS. HARGROVE:  Your Honor, may I?

12      JUDGE BUSCHMANN:  Yes.

13      THE WITNESS:  Right here?  Right here?  This one?  It

14  says four.

15  Q.   BY MS. HARGROVE:  This one is three, this first one here.

16  A.   Oh, okay.

17  Q.   Is there a date on that document?

18  A.   When we wrote the letter, yes, it was June, I'm sorry,

19  March the 31st.

20  Q.   And is that the date you wrote the letter?

21  A.   Yes, that's the date I wrote the letter and the same day,

22  we went, you know, people were, you know, working, while we

23  were working, we was having them sign it.

24  Q.   What day did you give the letter to Mr. Corrado

25  Palenzona?

1  A.    The same day that we, the next day, okay, we give the

2  letter to Mr. Miguel first.  It was in the afternoon when we

3  went home and then the next day we give it to him.

4  Q.    What did Mr. Palenzona say to you about the letter?

5  A.    He just grabbed it and he said -- and we said we got to

6  go and so we just left him alone.  So the union was going to

7  read it.

8  Q.    Did you speak with Miguel at the union when you gave him

9  this petition?

10  A.    No, I didn't.

11  Q.    Have you ever spoken with Miguel?

12  A.    No, I didn't.

13  Q.    Has anyone from the union ever called you at home?

14  A.    No, I didn't.

15  Q.    Has anyone from the union ever come to visit you at home?

16  A.    Yes, they did.

17  Q.    Who came to visit you?

18  A.    I don't remember the lady's name but it was a lady who

19  came to try to sign up for the union.

20  Q.    Do you remember when?

21  A.    It was while the restaurant was open.

22  Q.    Excuse me, what?

23  A.    While the restaurant was open.

24  Q.    Okay.  Did Marleni Jiron ever threaten you?

25  A.    Yes, she did.

1  Q.    How did she threaten you?

2  A.    When I was doing minibar by myself one day, I was going

3  to --

4        MR. McCARTHY:  Your Honor, I'm going to object on the

5  grounds of relevance.

6        JUDGE BUSCHMANN:  Well, isn't there something in the

7  record about some sort of a dispute already in there?

8        MR. McCARTHY:  That was between, an alleged dispute

9  between Marleni Jiron and Sang Nguyen.

10       JUDGE BUSCHMANN:  Uh-huh.

11       MR. McCARTHY:  And both employees were discharged,

12  Your Honor.

13       JUDGE BUSCHMANN:  Is this relevant?

14       MS. HARGROVE:  Yes, Your Honor.  I believe it goes to the

15  credibility of your other -- Ms. Jiron and her testimony.  I

16  did ask her about those issues as well.

17       JUDGE BUSCHMANN:  Oh, I see.  Okay.  Go ahead.  I'll

18  overrule the objection.

19       THE WITNESS:  I'm sorry.

20  Q.    BY MS. HARGROVE:  Do you want me to repeat my question?

21  A.    Okay, what happened, while I was doing minibar, I was in

22  the second floor, she used to work in the second floor in the

23  north building so I put my cart there quietly, so I went --

24  because she was off that day, so I to do it, you know, I had

25  like maybe 15, I mean, 10 rooms to check in that floor.

1  While I was putting my cart aside, it was her day off.  She

2  was in her street clothes.  She was in one of the rooms, I

3  believe it was 423.  She came out with Adriana, Sandra, and

4  Marleni and Marleni had her daughter with her, and she came

5  up -- she came to me and she said, you know, oh, you doing

6  minibars.  I said, you know, yes, I did but I was like -- I

7  carried this steak knife in my cart --

8  Q.   Ms. Guillen, can I ask you to slow down a little bit we

9  have to understand everything.

10 A.   I was -- I, oh, you know, carried this steak knife in my,

11 in our cart because the -- water that we serve in our, you

12 know, the plastic is very hard so we have to like, you know,

13 cut it off, take the water out.  So, that's like, we don't

14 use that nothing just to cut the plastic.  So, she grabbed

15 the knife and she went like that and she said, this sharp

16 [sic] is very sharp.  I can use this knife to cut the meat.

17 She didn't -- I don't know what she was referring to but she

18 just poked it, you know, the knife in the cart and throw it

19 away and she just left.

20 Q.   Did you say anything to Ms. Jiron?

21 A.   I didn't say anything to her.  I just, you know, just, I

22 was like -- I just left the floor and I just went to another

23 floor and I called -- and I went to Mr. Palenzona and they

24 put me, the security was doing minibar when I had to go in

25 the north building.

607

```
 1  Q.    Did you tell anyone else about this incident,
 2  Ms. Guillen?
 3  A.    No, I didn't.
 4  Q.    Did you ever attend a meeting in a laundry room with --
 5  regarding employee safety?
 6  A.    Yes, I did.
 7  Q.    Do you remember who from management was at that meeting?
 8  A.    It was Mr. Bello and Mr. Corrado.
 9  Q.    Who did the majority of the talking at that meeting?
10  A.    Mr. Bello.
11  Q.    Did he speak in English or Spanish?
12  A.    Only in English.
13  Q.    Was there anyone to translate for him?
14  A.    I was.
15  Q.    You translated for him?
16  A.    Yes, I did.
17  Q.    Do you recall what Mr. Bello said at that meeting?
18  A.    It was just about safety issues about people, you know,
19  that making phone calls and they were not, you know, just the
20  rules of the hotel and they offer, I believe, you know, they
21  offer shuttle to escort people out of the hotel if you're
22  uncomfortable leaving the hotel by yourself.
23  Q.    Did Mr. Bello say they're sponsoring a petition to get
24  rid of the union?
25  A.    Never.
```

1  Q.   Did Mr. Bello say anything about a 2.50 raise?

2  A.   Never.

3  Q.   Was Marleni Jiron present at that meeting?

4  A.   She was.

5  Q.   Did you accuse Marleni Jiron of taping that meeting?

6  A.   No, I didn't.

7  Q.   Did anyone accuse Ms. Jiron of taping that meeting?

8  A.   Nobody accused her but somebody said something about, you

9  know, people taping in the room but nobody says anybody's

10 name.

11 Q.   Did you stay in the laundry room after that meeting?

12 A.   Yes, I did.

13 Q.   Was anyone else in the laundry room after the meeting?

14 A.   Yes.

15 Q.   Why did you stay?

16 A.   Because I was -- when I was leaving to punch out, Marleni

17 came to Mr. Bello in Spanish, knowing that he does not speak

18 Spanish, he went to her -- she went to him and asked him, you

19 know, talking, with, you know, like with her finger in her

20 face, and saying, you are, you know, you should have stopped

21 that girl who was accusing me.  I said like nobody was

22 accusing you of anything and please -- she was yelling really

23 loud and, you know, like screaming at him.  I said, young

24 lady, please put your voice down.  Do not scream at me.  I'm

25 talking to you with respect.  Talk to me with respect.

1  Q.    Did you translate for Mr. Bello?

2  A.    Yes, I did.  And she just was, you know, just saying

3  things and I don't want to say whatever she was saying.  She

4  was very vulgar about it and, you know, I don't want to say

5  any of them words.

6  Q.    Okay.  Can you turn your attention to GC Exhibit 4?  Do

7  you see that document?

8  A.    Yes.

9  Q.    Have you seen this document before?

10  A.    Yes.

11  Q.    What is it?

12  A.    This is the document in regards to a visit to my house

13  because all the -- when we were doing minibar, all the

14  employees, housekeeping employees were telling us, you know,

15  people going to their houses and they were like, I don't want

16  to say harassed but it's, they're like, you know, there was

17  people that just sitting in, you know, in the doorstep for

18  hours and knocking the door and saying to people, you know, I

19  know you're there.  When the family time is there, you know,

20  people were sleeping --

21  Q.    Okay.

22  A.    -- and they were like, you know, so everyone asked us to

23  make them stop.  I said, there's nothing I can do.  And

24  again --

25  Q.    Okay.  Did you write the words that are on --

1  A.    Yes, I did.

2  Q.    Do you know when you wrote this petition?

3  A.    I did this in May.  In May, after the first letter,

4  because, you know, the first letter when it went out, of

5  course they were coming to the people and visiting them in

6  the houses.  I believe because Miguel already told, you know,

7  Marleni that they was, State Plaza employees was going, some

8  okay, some people were going to the house.

9  Q.    Okay.  Just try to answer my questions, if you can,

10  please.

11  A.    Okay.

12  Q.    Thank you.  Did you collect the signatures on this

13  petition?

14  A.    Yes, I did.

15  Q.    How did you collect the signatures?

16  A.    The same way I -- we collect the first, you know, the

17  first, you know, while I was doing the minibar with Reina,

18  you know, we, you know, people stopping, you know, they knew

19  also about this letter.

20  Q.    Did anyone ever accuse you of forging the signatures on

21  GC Exhibit 3?

22  A.    Yes, they did.

23  Q.    Who accused you of doing that?

24  A.    It was said -- it was not accused directly to me, but

25  what they were saying, they were making fun because I believe

1 the, Marleni's part, they also had a letter of, one of these

2 letters also with signatures, collecting signatures, they

3 making people sign again, you know, with the union, going

4 back to the union and they were saying because our signatures

5 are not valid because they won't, it's not printed.  They

6 wanted to have, to see, you know, name and print and date.

7 The first letter we didn't -- I didn't have it the way, you

8 know, it was supposed to be done.  No date and no print

9 names, only signatures.

10 Q.   Did you speak to the employees when you were collecting

11 these signatures?

12 A.   And I -- I -- we -- I talked to Reina and I said, you

13 know, we need to talk to the girls again because, you know,

14 they, now that they're not making this valid because they

15 said there's no dates and there's no print names so we have

16 to do it again.  So, we did it again, I said, but this time I

17 didn't want to get involved.

18 Q.   Okay.  When you were collecting the signatures, though,

19 did you speak to the employees?

20 A.   No, I didn't.

21 Q.   Did you ever promise any employee that they would get a

22 2.50 raise if they signed --

23 A.   No, I didn't.

24 Q.   -- GC Exhibit 4?

25 A.   No, I didn't.

1  Q.   Did you ever tell them Corrado would get them a raise if
2  they got rid of the union?
3  A.   No, I didn't.
4  Q.   Did you receive any payments to pass around GC Exhibit 4?
5  A.   No, I didn't.
6  Q.   Did any supervisor tell you to pass around GC Exhibit 4?
7  A.   No, I didn't.
8  Q.   Did any supervisor tell you what to write on GC
9  Exhibit 4?
10 A.   No, they didn't.
11 Q.   Did Mr. Palenzona tell you --
12 A.   No, they didn't.
13 Q.   -- what to write on GC Exhibit 4?
14 A.   No, he didn't.
15 Q.   What did you do with GC Exhibit 4 when you were finished
16 collecting the signatures?
17 A.   We give one to Miguel and again this letter, we took it
18 to Mr. Miguel's office.
19 Q.   Did you speak to Miguel?
20 A.   No, we didn't.  And --
21 Q.   Did you leave the letter?
22 A.   No, I didn't.  It was other girls that did.
23 Q.   Do you know who went to take the letter?
24 A.   I believe it was some, a bunch of girls.  I'm not
25 familiar with their names very well, because, you know, I'm

1  not, I'm -- it was like Gladis, Gloria, Silvia.

2  Q.    Did you go with them to deliver this letter?

3  A.    No, I didn't.

4  Q.    If you could turn to GC Exhibit 5, please.

5  A.    Um-hum.

6  Q.    Do you have that in front of you?

7  A.    Um-hum.

8  Q.    Do you recognize that document?

9  A.    This one?

10  Q.    It's a couple pages.  It's three pages.

11  A.    This --

12  Q.    Do you see what I'm looking at?

13  A.    This one right here?  I see -- this is the -- this is for

14  the front desk.

15      MS. HARGROVE:  Your Honor, if I --

16      JUDGE BUSCHMANN:  Yeah.  Yeah.

17      THE WITNESS:  I'm sorry.

18  **(Pause.)**

19  Q.    BY MS. HARGROVE:  Oh, this is -- it's this one.

20  A.    This is the same as, you know, the second time we did the

21  letter, you know, with dates and everything, it was part of

22  the --

23  Q.    Do you recognize GC --

24  A.    Yes, I do.

25  Q.    -- Exhibit 5?

1  A.    Um-hum.

2  Q.    Did you sign GC Exhibit 5?

3  A.    Yes, I did.

4  Q.    Did you write GC Exhibit 5?  Is that your handwriting at

5  the top?

6  A.    The petition for people going to the houses.

7  Q.    It's Number 5, now.  I think --

8  A.    Um-hum.  This one I did not write.  No, this one, no, I

9  didn't.

10  Q.    Did you collect signatures on that -- for that one?

11  A.    No.

12  Q.    Do you know whose handwriting in on the second page of GC

13  Exhibit 5?

14  A.    This is, I believe it was -- I'm not sure but this -- I

15  didn't want to get involved anymore so I think Silvia did it.

16  I'm not sure exactly if she did it or it was Reina and

17  somebody else did it.

18  Q.    Did anyone promise you a raise to get you to sign this

19  petition?

20  A.    No, they didn't.

21  Q.    Did anyone tell you that Corrado would give you a raise

22  if you signed this petition?

23  A.    No, he didn't.

24  Q.    Did you take this petition to the union?

25  A.    No, I didn't.

1  Q.   Do you know who did?

2  A.   I -- this again, you know, they got a bunch of girls,

3  they delivered themselves.  I believe it was at least ten

4  girls that went to the union.

5  Q.   Why did you sign -- did you sign --

6       MS. HARGROVE:  Excuse me, Your Honor.

7  Q.   BY MS. HARGROVE:  Did you sign GC Exhibit 3?

8  A.   Exhibit 3?

9  Q.   Um-hum.

10  A.   The first one?

11  Q.   Um-hum.

12  A.   Yes, I did.

13  Q.   Did you sign GC Exhibit 4?

14  A.   Yes, I did.

15  Q.   Why did you sign GC Exhibit 3, 4, and 5?

16  A.   Because this one, because I want to be -- I'm not part of

17  the union, but, you know, I wanted to support them, I was

18  helping so they did -- I signed it first because so they'd

19  see my handwriting there because, you know, I was helping

20  them and they say, you know, there's nothing, you know, wrong

21  with, you know, what we're doing.  It's legal.  There's

22  nothing illegal what we're doing, and the second part also

23  because many times, every time, you know, I pass by, Marleni

24  and other girls, they used to like, you know, not harass me,

25  but they would always pick a fight with me.

1  Q.   Who picked a fight with you?

2  A.   Marleni and other girls they were like always doing, you

3  know, things to me and I was out in my --, I just --

4  Q.   Do you know the other girls' names?

5       MR. McCARTHY:  Your Honor, I'm going to object to

6  relevance?

7       MS. HARGROVE:  It goes to -- she's saying why she signed

8  the petitions, Your Honor.

9       JUDGE BUSCHMANN:  Is it clear that she signed the

10  petition from her testimony because I don't know whether she

11  initially said that she signed petition, Exhibit 5.

12      MS. HARGROVE:  I had asked that previously so I didn't

13  re-ask it, but I can if you'd like me to, Your Honor.

14      JUDGE BUSCHMANN:  No, but I just wondered, is it to clear

15  in the record that she had admitted signing the petition on

16  Exhibit 5.

17      MS. HARGROVE:  I thought so, but I can ask again,

18  Your Honor, to clarify the record.

19      JUDGE BUSCHMANN:  All right.

20  Q.   BY MS. HARGROVE:  Ms. Guillen, did you sign GC Exhibit 5?

21  A.   Yes, I did.

22  Q.   What page is your signature on?

23  A.   In the second page.

24  Q.   Well, there are three pages.  Do you see that?

25  A.   Yeah, but my signature is in the back because when they

1  did the third petition, I very clearly, you know, told Reina,

2  there's a lot of things that was going on in the hotel, you

3  know, with the girls, you know, fighting in the cafeteria,

4  saying things and I don't want to get involved because I was

5  not used to that kind of, you know, treatment or the

6  vulgar -- was going on there.

7  Q.   Okay.

8  A.   So, I told them I didn't want to be involved so that was

9  why my signature is in the back but I was asked to sign later

10 on.

11 Q.   Okay.  Now, you were saying why you had signed the

12 petitions.  Can you tell me why you signed GC -- I think you

13 were speaking before about GC Exhibit 4.  Why did you sign GC

14 Exhibit 4?

15 A.   The first one?

16 Q.   Number 4.

17 A.   The petition for the harassment?  This one?

18 Q.   GC --

19 A.   Okay.  Yeah, um-hum.  The reason I signed this because,

20 you know, there was a lot of people saying things that wasn't

21 true.

22     MR. McCARTHY:  Objection on the grounds of hearsay,

23 Your Honor.

24     JUDGE BUSCHMANN:  Objection overruled.

25 Q.   BY MS. HARGROVE:  You can continue.

1  A.   Oh.  The reason I signed this because there was a lot of

2  things said about myself, like, you know, mentioning, you

3  know, things I -- that I was paid to do this stuff and that

4  was not, that wasn't true.  I was just trying to help the

5  girls because we -- they asked me to help them.

6  Q.   And why did you sign GC Exhibit 5?

7  A.   For the same reason.  I wanted, you know, for them

8  because, you know, they were like -- they asked me to help

9  them.

10 Q.   Do you receive an annual raise?

11 A.   Yes.

12 Q.   And is that raise in conjunction with your yearly review?

13 A.   Yes.

14 Q.   Is that raise given on your anniversary date?

15 A.   Yes, they are, um-hum.

16     JUDGE BUSCHMANN:  I noticed that the questions are very

17 leading questions.

18     MS. HARGROVE:  Oh --

19     JUDGE BUSCHMANN:  But, I mean, I think that the

20 information that's being elicited is not that crucial so I'm

21 letting it go.

22     MS. HARGROVE:  I'll --

23     JUDGE BUSCHMANN:  But I think from now on if there's

24 anything that may be controversial or may be new, I think you

25 may want to make sure that it's not a leading question.

 1       MS. HARGROVE:  Yes, Your Honor.

 2  Q.   BY MS. HARGROVE:  When do you receive a raise -- your

 3  raise each year?

 4  A.   In May.

 5  Q.   Okay.  Did you receive a raise in 2004?

 6  A.   Not really because my salary before that was upon -- I'm

 7  a waitress, okay?  And my salary was $7.00 and some.  When

 8  they offered me the job to do minibar and the continental

 9  breakfast, they raised my salary to $10.00 an hour and I

10  accepted.  So, upon that the $10.00 that I was receiving in,

11  starting in July after the restaurant was closed, they give

12  me a raise for $.35 and my anniversary was in May.

13  Q.   Of 2004?

14  A.   2005.

15  Q.   Okay.  So, you received --

16  A.   Thirty-five cents.

17  Q.   -- in May of 2005.

18  A.   Yes, um-hum.  I was making $7.35 in June '04, before

19  June, okay?  Seven, because I was make -- I make tips, so,

20  upon my salary, and then after the restaurant was closed in

21  June they raised me to $10.00 and then 2005 to 10 35.

22  Q.   Okay.  Did you attend a meeting in the cafeteria in July

23  2-0-5?

24  A.   Yes, I did.

25  Q.   Do you recall what that meeting was about?

1  A.    July 2-0-5?

2  Q.    Um-hum.

3  A.    Yes.

4  Q.    Who --

5  A.    I remember.

6  Q.    Who from management was at that meeting?

7  A.    Mr. Palenzona and Lisa Alvarado.

8  Q.    Did -- who spoke at that meeting?

9  A.    Mr. Corrado.

10  Q.    What language did he speak in?

11  A.    He spoke in English because a lot of people, you know,

12  speak, they wanted English so he wanted to be fair to

13  everybody, but Lisa, I believe she was translating.

14  Q.    Who was translating?

15  A.    Lisa Alvarado.  She's the housekeeper manager.  She's

16  fluent in Spanish.

17  Q.    And do you remember what Mr. Palenzona said at that

18  meeting?

19  A.    In July 2-0-5, July 2-0-5, he -- the reason that we had

20  that meeting is to tell the employees that they don't

21  recognize the union has to be part of the, you know,

22  negotiations.  So, he, the raise is going to go up to 12.50

23  starting in July 2-0-5.

24  Q.    Did you receive a raise in July of 2005?

25  A.    No, I didn't.

1  Q.    What's your current salary?

2  A.    $10.35.

3  Q.    Do you receive gratuities or tips?

4  A.    Yes, I do.

5  Q.    Did you attend the holiday party, the Christmas party?

6  A.    Of which year?  2-0-4?

7  Q.    Yes.

8  A.    Yes, I did.

9  Q.    Did you dance with Mr. Palenzona?

10 A.    My husband was with me and Mr. Palenzona and I was

11 invited to go there and so my husband and Mr. Palenzona was,

12 you know, just taking everybody to dance.  I didn't ask to

13 dance with him.  He was making everybody enjoy themselves,

14 not that he danced with me only because I was with my

15 husband, and, you know, and other families.  So, everybody --

16 he danced with everybody.

17       MS. HARGROVE:  Just a second, Your Honor.

18 **(Pause.)**

19       MS. HARGROVE:  No further questions, Your Honor.

20       JUDGE BUSCHMANN:  Okay.  Thank you.

21       MR. McCARTHY:  May I have just a moment, Your Honor?

22       JUDGE BUSCHMANN:  Yes.

23 **(Pause.)**

24       MR. McCARTHY:  Your Honor, I, before I begin my cross-

25 examination, I just note -- are we off the record?

1     JUDGE BUSCHMANN:  No, we're on the record.

2     MR. McCARTHY:  I just note for the record that we still

3 have not received the payroll records and should the payroll

4 records show inaccuracy or inconsistency with the testimony

5 of the witness today, I'd like the opportunity to recall the

6 witness.

7     JUDGE BUSCHMANN:  Yes.

8     MR. McCARTHY:  Thank you, Your Honor.

9     JUDGE BUSCHMANN:  Um-hum.

10                    **CROSS-EXAMINATION**

11 Q.   BY MR. McCARTHY:  Good afternoon, Ms. Guillen.

12 A.   Good afternoon.

13 Q.   Am I pronouncing your name correctly?

14 A.   Yes, you did.

15 Q.   My name is Thomas McCarthy and I represent the National

16 Labor Relations Board in this matter.

17 A.   Yes.

18 Q.   On behalf of the General Counsel of our Agency.  I'd like

19 to ask you a few questions.  I think it will take about maybe

20 ten minutes.

21 A.   Okay.

22 Q.   You speak Spanish well, correct?

23 A.   Yes, I do.

24 Q.   And you are very fluent in Spanish, aren't you?

25 A.   Yes, I do.  Yes, I am.

1  Q.   And you testified here today that you translated for

2  Mr. Corrado Palenzona on more then one occasion with

3  employees, correct?

4  A.   Yes, I have.

5  Q.   And, in fact, you've testified with -- for him a few

6  times, isn't that correct?

7  A.   Say it again, I'm sorry.

8  Q.   You testified for Mr. Corrado a few times, correct?

9  A.   Testified?  What do you mean testify?

10  Q.   You translated, I'm sorry.  You translated for him a few

11  times, correct?

12  A.   At the hotel, yes.

13  Q.   Okay.  And you testified here this morning, just a moment

14  ago, that on July 5th, Lisa translated at that meeting, isn't

15  that correct?

16  A.   Yes.

17  Q.   Now, you recall giving an affidavit to the National Labor

18  Relations Board, don't you?

19  A.   Yes, I remember.

20  Q.   And when you gave that affidavit you were signed in under

21  oath and swore to tell the truth, correct?

22  A.   Yes, I did.

23  Q.   And you testified to the best of your recollection that

24  those were truthful events, correct?

25  A.   Yes, um-hum.

```
 1        MR. McCARTHY:  Your Honor, may I approach the witness?
 2        JUDGE BUSCHMANN:  Yes.
 3   Q.   BY MR. McCARTHY:  Can you read English, ma'am?
 4   A.   Yes, I can.
 5   Q.   And you gave your affidavit in English or in Spanish?
 6   A.   With Mr. --
 7   Q.   Yes.
 8   A.   It was in Spanish.
 9   Q.   In Spanish.
10   A.   We did it in Spanish.
11   Q.   So, which affidavit would you prefer?
12   A.   I would like in English, please.
13   Q.   The English affidavit, okay.
14   (Pause.)
15        MR. McCARTHY:  Your Honor, may I approach?
16        JUDGE BUSCHMANN:  Yes.
17   Q.   BY MR. McCARTHY:  Ms. Guillen, I'm showing you the
18   affidavit that you gave to the National Labor Relations
19   Board.
20   A.   Okay.
21   Q.   You recognize that document, correct?
22   A.   In July 2-0-5, Mr. Bello was not present there.
23   Q.   You recognize that affidavit, correct?
24   A.   Yes, I do, but this is incorrect.
25   Q.   And that's your signature at -- on the last page?
```

 1  A.    There's no signature by me here.  My signatures were done

 2  in Spanish.  There's no signatures here by me because these

 3  are translations.

 4      MR. McCARTHY:  Your Honor, I -- at this time I'm showing

 5  the witness her Spanish affidavit.

 6      JUDGE BUSCHMANN:  Yes.

 7  Q.    BY MR. McCARTHY:  Do you recognize that document, ma'am?

 8  A.    Yeah, this one I do remember.

 9  Q.    And that's the Spanish affidavit taken by the Board

10  Agent, correct?

11  A.    Hold on one second.

12  **(Pause.)**

13  Q.    BY MR. McCARTHY:  I'd like to direct your attention to

14  Page 9, line 3 through 13 of the Spanish affidavit, or

15  Page 6 --

16  A.    I remember now.

17  Q.    -- line 20 through --

18  A.    On Page 6?

19  Q.    -- the next page, line 7 --

20  A.    Page 6?

21  Q.    -- on the next page.  Right.

22  A.    On Page 6?

23  Q.    Yeah.

24  A.    I'm sorry, what line did you say?

25  Q.    Page 6, line 20 in the English affidavit --

1  A.    Oh.

2  Q.    -- through the next page, Page 7, line 6.

3  A.    In English version you said line?

4  Q.    Line -- Page 6, line 20.

5  A.    Line 20.  Okay.

6  Q.    Through the next page, Page 7, line 6.

7  **(Pause.)**

8      THE WITNESS:  What it says here in -- this is a little

9  different.

10  Q.    BY MR. McCARTHY:  Well, I -- just -- I would just like

11  you to review those paragraphs.

12  **(Pause.)**

13      THE WITNESS:  Okay.

14  Q.    BY MR. McCARTHY:  Now, at the time that you signed those

15  documents the Board Agent swore you to tell the truth,

16  correct?

17  A.    Yes, he did.

18  Q.    And you were giving the events to the -- at -- to your

19  most accurate recollection, correct?

20  A.    Yes.

21  Q.    Now, you testified here today that Lisa was

22  translating --

23  A.    Lisa --

24  Q.    -- does that refresh your recollection as to who was

25  translating?

1  A.    I was asked to translate that day but Lisa was late

2  because she was -- she came late.  So, I stopped and she

3  finished it.

4  Q.    Okay.

5  A.    And that's exactly what I told him.

6  Q.    But you did translate for Mr. Palenzona at the July 5th

7  meeting.

8  A.    Maybe -- I stood by him but I did not finish probably

9  because Ms. Lisa was there, it was, you know, she finished

10 translating.

11 Q.    Okay.  You did translate portions of that meeting for

12 Mr. Palenzona?

13 A.    No, I did not translate anything because she arrived at

14 the time that he met with everybody.

15 Q.    Okay.  Your affidavit says that Mr. Palenzona asked me to

16 translate for him, correct?

17 A.    Yes, he did.

18 Q.    And did you or did you not translate for him?

19 A.    No, I didn't.  I was going to but I didn't finish because

20 Lisa came --

21 Q.    Okay.

22 A.    -- in to finish it.

23 Q.    And Mr. Palenzona and Mr. Bello were standing in the

24 middle of the room, correct?

25 A.    Not at that particular meeting.

1  Q.   Okay.  Let me direct your attention to your affidavit,

2  Page 6, line 23, where you indicate I was standing between

3  Mr. Palenzona -- where you indicate, Palenzona, Bello and I

4  were standing in the middle of the room.  I was standing in

5  between Mr. Palenzona and Mr. Bello.  Do you recall that?

6  A.   Yes.  This meeting was done -- was held in the laundry

7  room with all the employees of the hotel where -- for the

8  safety reasons, not for the raise.

9  Q.   Now, you were standing between Mr. Palenzona and

10  Mr. Bello, correct?

11  A.   I was not sitting between them, I mean, standing between

12  them.  I was -- they were across from me.

13  Q.   This was on July 5th, correct?

14  A.   No, it's not.

15  Q.   Okay.  Your affidavit says it was -- on July 5th we had a

16  meeting at the hotel, doesn't it?

17  A.   We had a meeting for the safety reasons, for the safety,

18  particularly we had a lot of things going on in the hotel.

19  We had that meeting in the laundry room on -- it was not in

20  July, it was in May.

21  Q.   Your affidavit says on July 5th we had a meeting at the

22  hotel, doesn't it.

23  A.   Yes.

24  Q.   Okay.  And your affidavit indicates that Mr. Palenzona

25  asked me to translate for him.

1  A.   Yes, he did.

2  Q.   And you were standing between Mr. Palenzona --

3  A.   No, I wasn't.

4  Q.   -- and Mr. Bello.  Okay.  Where were you standing?

5  A.   I was sitting -- I was standing besides Lisa and

6  Mr. Bello was not present at the meeting.

7  Q.   Okay.  And you told the Labor Board that both

8  Mr. Palenzona and Mr. Bello were talking, correct?

9  A.   That was in the laundry room.  That's another meeting.

10 This is -- meeting.  The meeting in the cafeteria, which is

11 across from the laundry room, it held -- it was held there

12 when they announced that they were not part of the union

13 negotiation anymore.  That meeting was only held,

14 Mr. Palenzona, Lisa, and myself when I was asked to translate

15 that day but I didn't translate, Lisa did it.  It was only

16 the three of us, you know, first and I stood beside her, you

17 know, next to, with the other employees.

18 Q.   Okay.

19 A.   And the other meeting that we had in May, at the end of

20 May, it was done in the laundry room with the entire, you

21 know, entire hotel, about Mr. Bello, he conduct the meeting,

22 Mr. Bello, Palenzona and myself.  I was translating for the

23 entire place.

24 Q.   Okay.  Now, I want to direct your attention to the last

25 line on Page 6 of your English affidavit and the first line

1  on Page 7.

2  A.    I'm sorry.  Say it again.

3  Q.    The last line on Page 6 of your English affidavit and the

4  first line on Page 7.

5       MS. HARGROVE:  Your Honor, just for the record, I'd like

6  to note that that's not the affidavit, the English

7  translation that she's looking at.

8       THE WITNESS:  What is this here is --

9       MS. HARGROVE:  She didn't translate, Your Honor --

10      THE WITNESS:  This is --

11      MS. HARGROVE:  -- is what -- my point.

12      THE WITNESS:  This is -- this Page -- line 22, what it

13  says here, it was -- this is not -- I never said this.

14      JUDGE BUSCHMANN:  Okay.

15  Q.    BY MR. McCARTHY:  Let me --

16  A.    I never said this line here because Mr. Bello was not

17  present in July 5th, he was not present at that meeting, only

18  it was held in the cafeteria in the morning when

19  Mr. Palenzona announced to the employees what happened.

20  Q.    But you told the Labor Board in your affidavit --

21  A.    I never told him that.

22  Q.    -- at Page 6.  Let me finish, ma'am, okay?  That both

23  Mr. Bello and Mr. Palenzona were saying through the lawyers

24  that the hotel didn't recognize the union as part of the

25  hotel, correct?

1    A.    I never mentioned -- I --

2    Q.    That's what your affidavit says, doesn't it?

3    A.    In -- let me, can I read my Spanish because --

4    Q.    Sure.

5    A.    We had to do this like maybe three times with Mr. --

6    Q.    It's Page 9 in Spanish.

7    A.    Page 9.

8    Q.    Line 3.

9    **(Pause.)**

10        THE WITNESS:  This is -- I -- maybe I overlooked this

11   because in that meeting Mr. Bello was not there.

12   Q.    BY MR. McCARTHY:  Okay.  I'll let you explain but I just

13   want to know, did you tell the Labor Board in that affidavit

14   that both Mr. Palenzona and Mr. Bello were saying through the

15   lawyers that the hotel didn't recognize the union as far as

16   the hotel?

17   A.    No.

18   Q.    You didn't say that in that statement?

19   A.    I'm sorry.  Say it again.  In the -- okay.

20   Q.    Did you say in that statement that Mr. Palenzona and

21   Mr. Bello were saying through the lawyers that the hotel

22   didn't recognize the union as part of the hotel.

23        MR. GREENBAUM:  Your Honor, we don't have a copy -- I

24   can't follow this.  I don't have a copy of this --

25        JUDGE BUSCHMANN:  Come on, this is enough confusion now.

1    Let me ask you this.

2        THE WITNESS:  The dates are really wrong in, I'm sorry,

3    but, you know --

4        JUDGE BUSCHMANN:  Miss --

5        THE WITNESS:  Um-hum.

6        JUDGE BUSCHMANN:  Okay.  Just slow down.  In your Spanish

7    affidavit --

8        THE WITNESS:  Um-hum.

9        JUDGE BUSCHMANN:  -- did you make reference, in your

10   Spanish affidavit, that a meeting in July and that at that

11   meeting present were Mr. Bello, Mr. Palenzona and yourself

12   where the announcement was made about the union?  Did you --

13   was that in that Spanish affidavit?

14       THE WITNESS:  Yes, it is, but at this part right here --

15       JUDGE BUSCHMANN:  Well, now, we want to know only what's

16   in that affidavit.  You can explain later.  Does it say that

17   in that affidavit?

18   **(Pause.)**

19       THE WITNESS:  Yes.

20       JUDGE BUSCHMANN:  Okay.

21   Q.   BY MR. McCARTHY:  And it also says in that affidavit that

22   they said there would not be any change, correct?

23   A.   There will be any change?

24   Q.   There will not be any change.

25   A.   For what?  I'm sorry, I'm not following you.

1  Q.    Well, if you'd look at the affidavit --

2  A.    Um-hum.

3  Q.    -- and let me know whether the affidavit says that, Line

4  9, that there would not be any change.  Mr. Bello and

5  Mr. Palenzona said there would not be any change.

6  A.    Okay.

7  **(Pause.)**

8        THE WITNESS:  They were talking about any changes upon,

9  you know, the --

10  Q.   BY MR. McCARTHY:  Does your affidavit indicate that they

11  said there would not be any change, yes or no.

12  A.    But it was -- yes.

13  Q.    Okay.  And does your affidavit also indicate that

14  Veronica Cruz asked, what happened with our pay raises.  Does

15  your affidavit indicate that?

16  A.    When -- in this particular --

17  Q.    Yes or no, ma'am.  Does your affidavit indicate Veronica

18  Cruz asked what happened with our pay raise.

19  A.    In the laundry room, yes.

20  Q.    Okay.

21        MS. HARGROVE:  Objection, Your Honor.  At this point I'm

22  not sure how this is impeachment.  There weren't any

23  questions about this raised to counter.  I think he's -- is

24  he just questioning the witness on the affidavit at this

25  point or is this still impeachment?

1    JUDGE BUSCHMANN:  There's been no discussion about that

2  change business in direct, right?

3    MS. HARGROVE:  We move to strike, Your Honor, the

4  testimony --

5    JUDGE BUSCHMANN:  It's not stricken, but it's -- the

6  record is clear on what is being said and what's not being

7  said.  There was no direct testimony on changes.

8    MR. McCARTHY:  Well, my next question will get to the

9  issue of change, Your Honor, and it goes directly to

10  Mr. Corrado's testimony in this matter and the credibility of

11  the Respondent's case.

12    MS. HARGROVE:  Your Honor, may I respond?

13    JUDGE BUSCHMANN:  Yes.

14    MS. HARGROVE:  Maybe we should just -- it doesn't have

15  anything to do with the affidavit then at this point if it

16  hasn't been asked yet.

17    JUDGE BUSCHMANN:  Yes.

18    MR. McCARTHY:  Well, the witness, Your Honor, initially

19  said that she wasn't translating for the -- for Mr. Bello and

20  Mr. Palenzona at that meeting.  Her affidavit says she was

21  translating for that meeting.

22    JUDGE BUSCHMANN:  Well, I think you ought to clear up

23  first and see whether the witness recalls whether or not she

24  was translating at the July meeting and then go into the

25  situation of what Mr. Corrado said or Mr. Palenzona said.

1  Q.   BY MR. McCARTHY:  You were supposed to translate at the

2  July meeting, weren't you?

3  A.   Yes.

4  Q.   Did you translate at all?

5  A.   No, I didn't.

6  Q.   Lisa translated.

7  A.   Yes, she did.

8  Q.   And according to your affidavit, as translated by what

9  you heard by -- from Lisa, Palenzona said he didn't know

10 anything about a pay raise, did he.

11 A.   He said that he --

12 Q.   Does your affidavit indicate that?

13 A.   Yes.

14 Q.   Okay.  Now, when you serve as a translator for

15 Mr. Corrado Palenzona, you always begin by saying, Palenzona

16 says and you try to translate word for word, correct?

17 A.   Yes.

18 Q.   And you've been employed by the State Plaza Hotel for 25

19 years, isn't that right?

20 A.   Since 1981.

21 Q.   Since May of 1981 --

22 A.   Yes.

23 Q.   -- correct?  That's a long time.  You're proud of your

24 service, aren't you?

25 A.   Yes, I am.  Very proud.

1  Q.    And during that 25 years of your employment, you served

2  as a waiter in the restaurant.

3  A.    Yes, I have, yes.

4  Q.    And you met the owner, Mr. Bernstein.

5  A.    Yes, I did.

6  Q.    About once a year I think you said.

7  A.    Sometimes he goes -- go into the hotel for maybe two or

8  three years and then he comes by and stay there for one week

9  or something and he comes to the restaurant to say hello and

10  have lunch and I have served him.

11  Q.    And you personally would serve him in the restaurant --

12  A.    Yes.

13  Q.    -- when he has lunch.

14  A.    With his guests.

15  Q.    In fact, he would ask for you because he likes you,

16  wouldn't he?

17  A.    He doesn't like me, but, I -- it's like, you know, I was

18  by my manager, she was giving it to me because, you know, I

19  know what he likes to eat.

20  Q.    Okay.

21  A.    Because it happened before that he was served things that

22  he didn't like, I mean, he's a vegetarian.

23  Q.    And he spoke to you when he visited the hotel.

24  A.    He just say hello, how are you and how is your family and

25  that's it.  We never spoke anything else.

637

1  Q.    So just an interest in wanting to know about your family.

2  A.    He always say how is everything because back in the old

3  days his son and his daughter used to work with me and they

4  know my family.

5  Q.    Oh, so, his son used to work with you.

6  A.    Yes, as a waiter, yes.

7  Q.    Oh.  And did he take an interest in your son?

8  A.    No, he didn't.

9  Q.    Now, despite your long service at the hotel, you were

10 only making $7.41 before the restaurant closed in June of

11 2004.

12 A.    Yes, plus tips.

13 Q.    And at the time that the restaurant closed, the hotel

14 kept you employed, correct?

15 A.    Yes.

16 Q.    You weren't laid off like the other food and beverage

17 people.

18 A.    No, I wasn't.

19 Q.    And then after the restaurant closed I believe you began

20 to serve continental complimentary breakfasts?

21 A.    Yes.  Yes, I did.

22 Q.    And you restocked the minibars is that --

23 A.    Yes.

24 Q.    How much would you make in tips when you would serve the

25 continental breakfasts?

1  A.    Okay.   So, from June to December, nothing, because we

2  don't have any equipment in the hotel for the    beverage.

3  So, but in -- back in December, I believe, they have a group

4  come in and we collect equipment like I say, you know, things

5  to serve the breakfast for the guests that were staying in

6  the hotel.   It's called -- so, from that I make some

7  gratuities.

8  Q.    And how do you make the gratuities?  Do they leave it out

9  for you or --

10  A.    No.   They -- it was by some contract with the sales

11  department, they have offered them to give them breakfast and

12  someone had to serve them, so I the one who served the

13  breakfast with Reina.

14  Q.    And you don't receive any gratuities for restocking the

15  minibars.

16  A.    No, I don't.

17  Q.    So, your gratuity comes solely from serving the

18  complimentary breakfast?

19  A.    No.   When I serve from a special group that come in, for

20  example, in this case it was --

21  Q.    Oh, so it would be like a banquet function?

22  A.    It's not a banquet because we don't have the equipment to

23  work a banquet but we make --

24  Q.    And when you worked in the minibar, you would go from

25  room to room restocking the minibars --

1  A.    Yes.

2  Q.    -- correct?  And is that in both the north building and

3  the south building of the --

4  A.    Yes.

5  Q.    -- hotel?  Okay.  Now, you recall before Mr. Palenzona

6  came to the hotel but after the union election, there was

7  another General Manager there, correct?

8  A.    Yes.

9  Q.    And in October of 2004 [sic], that was John Rich, I

10  believe, correct?

11  A.    In -- what date?  I'm sorry.

12  Q.    About October 2003.

13  A.    Three, yes.

14  Q.    Three, right.  And in your affidavit you indicated to us

15  that former General Manager John Rich told employees that

16  they couldn't give employees a pay raise until the union

17  left, correct?

18  A.    Yes, he did.

19  Q.    And in July of 2004, you did receive a pay raise from

20  $7.41 per hour to $10.00 per hour, correct?

21  A.    Because my duties was different.  I was not collecting

22  any more tips so they offered me like a new position and

23  doing the continental breakfast and doing the minibar.

24  Q.    And you received about a 2.50 pay raise at that time.

25  A.    I believe it was, that was they used to pay the other

640

1  person who used to do the minibar before.

2  Q.   So, you went from $7.41 to $10.00 in July of 2004.

3  A.   Yes.

4  Q.   Okay.

5  A.   But I took the position of the other person who was doing

6  minibar.

7  Q.   That was a nice increase in pay, right.  You liked that.

8       MS. HARGROVE:  Objection, Your Honor.

9       THE WITNESS:  Without any tips --

10      JUDGE BUSCHMANN:  Sustained.

11      THE WITNESS:  -- you know, it was not the same.

12  Q.   BY MR. McCARTHY:  The union never visited you at home,

13  did they?

14  A.   No, they didn't.

15  Q.   And, in fact, you did not want the union, did you?

16  A.   No, I didn't.

17  Q.   You circulated the March 21st, 2005, petition to get rid

18  of the union, correct?

19  A.   Yes, I did.

20  Q.   With Reina.

21  A.   Yes, I did.

22  Q.   And in the months before you and Reina circulated the

23  first petition, the months before that --

24  A.   Um-hum.

25  Q.   Tracy, a co-worker named Tracy, she was supposed to help

1  you with banquet rooms on the weekends, correct?

2  A.   Not banquets, with the breakfast and the minibar.

3  Q.   The breakfast and the minibar.  And she wasn't showing

4  up, was she?

5  A.   No, she was not showing up.

6  Q.   So you told Mr. Palenzona, correct?

7  A.   No, I didn't.

8  Q.   Okay.  Well, Mr. Palenzona eventually assigned Reina to

9  help you out with the banquets and the minibars --

10  A.   No, he didn't.

11  Q.   -- on weekends, correct?

12  A.   No.

13  Q.   He didn't?

14  A.   No.  Reina asked him to -- Reina asked me if she can help

15  me because I asked, you know, I needed somebody to help me

16  because I was working seven days a week because this girl was

17  never showing up.  Previous that it was another General

18  Manager, her name was, I believe, I don't remember her name

19  right now.  She knew the situation that we have and I was

20  working seven days a week.  When Mr. Palenzona came to the

21  State Plaza, he already knew about the situation that we had

22  on the weekends.  So, Reina was doing, where she was doing

23  the lobbies and cleaning out the, you know, the public areas.

24  She was helping me, you know, back in the Ember Room and I

25  say, you know, I need somebody to help me.  She said, well

1  I'll help you if you teach me how.

2  Q.   Okay.  And Reina told you that she had just bought a new

3  house --

4  A.   Yes, she did.

5  Q.   -- and she needed the overtime to help pay --

6  A.   Yes.

7  Q.   -- her mortgage --

8  A.   Um-hum.

9  Q.   -- correct?  Okay.  Now, but she continued to work as a

10 housekeeper Monday through Friday until about February 2005,

11 correct?

12 A.   I believe.  Yes, I --

13 Q.   And that's tough work, isn't it, the housekeeping?

14 A.   It is.

15 Q.   It involves sometimes getting down on your hands and

16 knees and scrubbing floors and cleaning toilets and

17 bathrooms, correct?

18      MS. HARGROVE:  Objection, Your Honor --

19      THE WITNESS:  Not when we're doing the continental --

20      MS. HARGROVE:  -- this is outside of the scope.

21      THE WITNESS:  -- breakfast.

22      JUDGE BUSCHMANN:  Yes.  Objection sustained.

23 Q.   BY MR. McCARTHY:  And then Reina began helping you in the

24 minibar full time about March 2005, correct?

25 A.   Yes.

643

1  Q.   Okay.  And during the time that you and Reina began

2  filling the minibars, you and Reina became pretty good

3  friends, didn't you.

4  A.   Yes, we did.

5  Q.   Okay.  And you talked about everything like family and

6  your job and the union situation, correct?

7  A.   Yes, we did.

8  Q.   And Reina told you that she had gone to a union meeting

9  and only a few people were present, correct?

10  A.   Yes, she did.

11  Q.   And that was in early March 2005, wasn't it?

12  A.   Yes.

13  Q.   Okay.  And she told you at that time that she didn't want

14  to be involved in the union anymore.

15  A.   -- told me.  She was very quiet and I asked her what's

16  wrong.  She say -- she didn't want to tell me what, you know,

17  what happened, and I say, you know, finally she told me she's

18  upset because she had gone to a meeting and the union, the

19  particular day, I don't remember it was in the afternoon and

20  she told me what happened there --

21  Q.   Okay.

22  A.   -- and she say, you know, I don't want to be part of the

23  union anymore.

24  Q.   Okay.  And that was about in early March, right?

25  A.   March.

1  Q.    Yeah.  Now, you also told the Labor Board that you did
2  not discuss the union or the petition with Mr. Palenzona,
3  didn't you?
4  A.    I didn't, Reina did.
5  Q.    Were you with Reina when Reina did it?
6  A.    I was off that day.
7  Q.    You were off that day?
8  A.    I believe.  I don't remember.
9  Q.    So, you -- is it your testimony that you never showed the
10 petition to Mr. Palenzona with Reina?
11 A.    I don't remember if I was with her or not.
12 Q.    Well, as a long time employee of the hotel, you were
13 loyal to the hotel, weren't you?
14 A.    Yes, I am.
15 Q.    And didn't you feel it was important that Mr. Palenzona
16 know what was going on in the hotel?
17 A.    He knew about it after we give the letter to Mr. Miguel.
18 We giving a copy to Mr. Palenzona, also.
19 Q.    And so, you did give a copy to Mr. Palenzona.
20 A.    Yes.
21 Q.    Okay.  But in your affidavit you told the Labor Board
22 that you never showed a petition to Mr. Palenzona, didn't
23 you?
24 A.    We give him a copy, yeah, we did.  I told Mr. -- that I
25 give him -- we give him a copy.

1  Q.   But your affidavit indicates that you told the Labor

2  Board that you never showed a copy of the petition to

3  Mr. Palenzona, correct?

4  A.   At the beginning we didn't.  When we were doing the

5  petition we didn't.  He didn't know anything about it.  We

6  did it upon ourselves.

7  Q.   Let me ask you one more time.  Did you or did you not

8  tell the Labor Board twice that you never showed a petition

9  to Mr. Palenzona.

10  A.   No, what I say, at the beginning we didn't show him the

11  petition.  We show -- we give him a copy of the letter after

12  we give a copy to Mr. Miguel.

13  Q.   I'm going to direct your attention, ma'am, to Page 6,

14  line 8 of your Spanish affidavit and also Page 6, line 14,

15  line 15 of your English affidavit.

16  Q.   Page what?

17       JUDGE BUSCHMANN:  I think that's a little confusing going

18  back and forth.  Just direct her attention to the Spanish

19  affidavit.

20       MR. McCARTHY:  Thank you, Your Honor.

21  Q.   BY MR. McCARTHY:  Ms. Guillen, Page 6, line 8 of the

22  Spanish affidavit says, we never showed the petition to

23  Mister, the first petition to Mr. Palenzona, doesn't it?

24  A.   I didn't.

25  Q.   It says, I didn't show the first petition to

1  Mr. Palenzona.

2  A.    No, I didn't.  We gave a copy to him after we, you know,

3  Reina, you know, had saw him and we give a copy to

4  Mr. Palenzona, the entire, with all the signatures in it.

5  Q.    You were with Reina at that time, correct?

6  A.    No, I was not.  I was not with her.

7  Q.    Did you ever show Mr. Palenzona a copy of any petition?

8  A.    We give him, like, we give a sealed envelope to him with

9  the petition what we had done and we left the room.

10  Q.    I want to direct your attention to General Counsel's

11  Exhibit 3.  That's the petition, the first petition you have

12  in front you.

13  A.    Okay.

14  Q.    You were the first to sign that, correct?

15  A.    Yes, I did.

16  Q.    And that's your handwriting at the top of the petition,

17  correct?

18  A.    Yes, it is.

19  Q.    And you a Reina circulated that, right?

20  A.    Yes.

21  Q.    And you and Reina showed that petition to Mr. Corrado,

22  didn't you?

23  A.    After we have everybody signatures in it.

24  Q.    After you had the signatures in it.

25  A.    All the signatures.

1  Q.   And that was about the second week in April, correct,

2  when you showed it to Mr. Palenzona?

3  A.   It was the day that we delivered the letter to

4  Mr. Miguel.  It was the same -- at the same time because all

5  the signatures were completed so we have three copies, one

6  for myself -- one for ourselves and one for Miguel and one

7  for Mr. Palenzona.

8  Q.   You and Reina took the first petition to the union,

9  correct?

10  A.   Yes, we did.

11  Q.   Together.

12  A.   Together, yes.

13  Q.   And about April or May 2005, you and Reina had a meeting

14  with Mr. Palenzona, correct, where Veronica Cruz, Esmeralda

15  and Silvia Romero were present.  Do you recall that?

16  A.   No.

17  Q.   Okay.  Let me direct your attention in your affidavit --

18      MR. McCARTHY:  Might we have just a moment, Your Honor.

19  **(Pause.)**

20      JUDGE BUSCHMANN:  Do you have a question --

21      MR. McCARTHY:  Okay.

22      JUDGE BUSCHMANN:  -- pending?

23      MR. McCARTHY:  I do, Your Honor.

24  Q.   BY MR. McCARTHY:  I'm going to direct your attention to

25  Page 7, line 7 through 12 of the Spanish --

1  A.   Um-hum.

2  Q.   -- affidavit.

3  A.   Okay.  Yeah.

4  Q.   Could you read that paragraph to yourself?

5  **(Pause.)**

6       THE WITNESS:  Okay.

7  Q.   BY MR. McCARTHY:  And in that affidavit you indicated

8  that about April or May you and Reina had a meeting with

9  Mr. Palenzona, correct?

10 A.   Yes.

11 Q.   And Veronica Cruz, Esmeralda and Silvia Romero were

12 present --

13 A.   Yes.

14 Q.   -- correct?  And at that meeting, Mr. Palenzona said he

15 could not give a raise now because everything was being

16 handled by the attorneys in --

17 A.   Yes, he did.

18 Q.   -- negotiations, correct?

19 A.   Yes, he did.

20 Q.   Now, let me direct your attention to General Counsel

21 Exhibit 4.  You were the first to sign that petition,

22 correct?

23 A.   Yes.

24 Q.   And you typed up the petition?

25 A.   Yes.  Actually, my daughter did.

1  Q.   Your daughter did?

2  A.   Yes.

3  Q.   She typed it at home?

4  A.   Yes, she did.

5  Q.   All right.  She typed up the paragraph in Spanish?

6  A.   I wrote it in Spanish and she typed it in the computer.

7  Q.   So, you wrote it up for your daughter and she typed

8  the --

9  A.   Yes, um-hum.

10 Q.   -- Spanish.  And you and Reina also circulated that

11 petition, correct?

12 A.   Yes.

13 Q.   And I'm showing you General Counsel's Exhibit 5, the

14 third petition.  You signed that petition, correct?

15 A.   Yes, I did.

16 Q.   On June 23rd, 2005, is when you signed that petition,

17 correct?

18 A.   Yes, I did.

19 Q.   So, as of late June 2005, you were aware that a third

20 petition was being circulated, correct?

21 A.   This one, yes, um-hum.

22 Q.   And Rona wrote the third petition, didn't she?

23 A.   Reina.

24 Q.   Reina, I'm sorry.  Reina.

25 A.   Reina is the one who started doing this because they were

1  not, for some reason it was not being -- the first petition

2  that we did it was not valid because it had no dates or

3  printed names.

4  Q.  And Silvia helped Reina circulate that petition.

5  A.  Yes.

6  Q.  Silvia Romero.

7  A.  Yes, she did.

8  Q.  And Silvia Romero, she used to be a housekeeper, correct?

9  A.  Yes, she --

10  Q.  And now she works with Sonya, the cook, in the kitchen.

11  A.  She's helping Sonya.

12  Q.  She's helping Sonya.

13  A.  Yes.

14  Q.  Is that a temporary position?

15  A.  Yes, a temporary position.

16  Q.  Okay.  And Silvia is the assistant chef to Sonya,

17  correct?

18  A.  No.

19  Q.  The assistant cook?

20  A.  Silvia only helps to do the dishes and clean the kitchen.

21  Q.  Okay.  But she doesn't clean the rooms anymore, does she?

22  A.  When -- after she get off from labor she will go back to

23  housekeeping.

24  Q.  And who told you that?

25  A.  Silvia, herself.

1  Q.    And who did she say told her that?

2  A.    I'm sorry?

3  Q.    Who did she say told --

4        JUDGE BUSCHMANN:  That's all hearsay, isn't it?

5        THE WITNESS:  I don't understand.

6        MR. McCARTHY:  I'll withdraw the question, Your Honor.

7  **(Pause.)**

8  Q.    BY MR. McCARTHY:  Your current wage rate, you make more

9  then $10.35 including gratuities, don't you?

10  A.    When I have no banquets, I make $10.35 in my regular

11  hours, when I work 40 hours.  Only when I have banquets I

12  make extra money.

13  Q.    When was your last pay raise?

14  A.    Last week, last Friday.

15  Q.    Last Friday?  And how much was your pay raise last

16  Friday?

17  A.    I do not remember.  I do -- I don't remember because I --

18  it -- right now it's -- I have automatically deposit in my

19  checking account and I have not seen it, but I believe it

20  was --

21  Q.    And that was the first time that you received your new

22  pay raise, last Friday?

23  A.    No, I have received since January.  I don't -- every

24  Friday we receive a paycheck.

25  Q.    Your last pay raise was last Friday, correct?

1  A.    I'm sorry, pay raise?  It was in May.  Pay raise, it was

2  in May of 2005.

3  Q.    And how much was that pay raise?

4  A.    Thirty-five cents.

5  Q.    Okay.  You're paid every Friday?

6  A.    Yes.

7  Q.    And did you receive a pay raise last Friday?

8  A.    No, I didn't.

9  Q.    How many banquets do you do a week?

10  A.    Maybe once.  In February I think we have this special

11  group come in, the ballet dancers, they stay with us for 11

12  days so we serve them breakfast and I receive a gratuity from

13  them, the first time in this year, of 2-0-6.

14  Q.    And how much do you earn in gratuities for a banquet?

15  A.    Depends, you know, how much, you know, the contract is

16  for.

17  Q.    Well, how much do you usually earn?

18  A.    It all depends, you know, how many people and how many --

19  what is the contract, you know.  I don't get involved in

20  that.  It's the sales --

21  Q.    It's a percentage of the amount of the --

22  A.    I think --

23  Q.    -- banquet service, correct?

24  A.    I think it's 18 percent and I think I get, you know,

25  sales department gets some percentage, also, I believe.  I

1   don't know.  I'm not --

2   Q.   And do you get 15 or 20 percent, or more then that?

3   A.   I have no idea how much I get paid.  They put it in my

4   paycheck and sales department is the one who puts the money

5   in my -- does the payroll.  I don't do payroll and I don't --

6   Q.   You don't know what percentage of gratuity you receive

7   when --

8   A.   When I read the bills --

9   Q.   -- there's a banquet.

10  A.   -- it says 18 percent.  From that it's given to the

11  houseman, a percentage, the houseman, and the also the sales

12  department.  And I believe they give her, like one percent to

13  the kitchen.

14  Q.   So, you get an 18 percent gratuity or all the people that

15  participate in putting on a banquet getting 18 percent?

16  A.   All the people that participate in doing the banquet.

17  Q.   And in your experience, how much does a banquet cost?

18  A.   I all depends how many people and how much.  It's

19  different prices.

20  Q.   On a thousand dollar check, how much do you make?

21  A.   A thousand dollar check, maybe $80.00, maybe.

22  Q.   $80.00.  Are gratuities reflected on your paychecks?

23  A.   Yes.

24  Q.   They are?  And what were the gratuities in the last

25  week's paycheck?

1  A.   I don't recall.  I didn't -- I don't remember.  It was

2  1400, I believe because I had worked one, I had worked --

3  plus eight, a reception that was served at night.  It was a

4  reception on Thursday that I did it.  I don't know how much I

5  got paid for that.

6  Q.   And you started doing banquets in 2005, correct?

7  A.   2005, yes.

8  Q.   All right.  And that was before you circulated the first

9  petition, correct?

10  A.   It was in 2-0-5 before.  I believe it was in 2-0-4 that

11  we started doing banquets, little banquets.

12     MR. McCARTHY:  Your Honor, if we may take a two minute

13  break to receive a document and then I'll be through with

14  this witness.

15     JUDGE BUSCHMANN:  Okay.

16     **We'll go off --**

17  **(Off the record.)**

18     **JUDGE BUSCHMANN:  Yeah, on the record, please.**

19     Go ahead.

20     MR. McCARTHY:  At this time I have no further questions

21  of the witness.  However, I do reserve the right to question

22  the witness should we receive the payroll records --

23     JUDGE BUSCHMANN:  Okay.

24     MR. McCARTHY:  -- for purposes of brief questioning.

25     JUDGE BUSCHMANN:  Well, you say you have some extensive

1  redirect?

2      MS. HARGROVE:  Not extensive, but it's --

3      JUDGE BUSCHMANN:  Five minutes or more?

4      MS. HARGROVE:  Five minutes or more.

5      JUDGE BUSCHMANN:  Okay.  Why don't we just take a recess

6  at this time until 1:30.

7      MS. HARGROVE:  Thank you.

8      JUDGE BUSCHMANN:  Okay.

9  **(Whereupon, a lunch recess was taken.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9              A F T E R N O O N   S E S S I O N

10       JUDGE BUSCHMANN:  And I think you were talking about the

11  pay records and I think you were going to redirect, right?

12       MS. HARGROVE:  Yes, Your Honor.

13       JUDGE BUSCHMANN:  All right.

14       MS. HARGROVE:  May I continue.  I didn't know if --

15       JUDGE BUSCHMANN:  Yes, please.  Has you gotten the pay

16  records yet, Mr. McCarthy?

17       MR. McCARTHY:  No, Your Honor.

18       JUDGE BUSCHMANN:  They're here?

19       MR. GREENBAUM:  They're here.  Your Honor, are we on the

20  record?

21       JUDGE BUSCHMANN:  Yes.

22       MR. GREENBAUM:  They're here but I think we have a

23  sampling for each hotel of each employee for the different

24  time periods.  We are getting the specialized reports week by

25  week for Alex and Reina and those are being compiled right

1  now, but we do have a stack of documents which are

2  responsive.  It shows all the employees at all the hotels,

3  even employees outside the unit, so to speak, for time period

4  December '04 through current.  They're just not week to week.

5  They're compilations.  To do week to week --

6      JUDGE BUSCHMANN:  Okay.

7      MR. GREENBAUM:  -- I think the stack of documents will go

8  up to the ceiling, higher then the ceiling.

9      JUDGE BUSCHMANN:  Could you turn them over?

10     MR. GREENBAUM:  Yes.  But I would note for the record,

11 Your Honor, these documents have people's addresses, Social

12 Security Numbers.  There's managers on there.  So, we would

13 either like these to be under seal or returned to us or, you

14 know, obviously they could look at them.  We haven't made

15 copies, but we would suggest before any copies are made, that

16 we be notified and we could take some precautions because we

17 haven't redacted any information or any privacy information,

18 anything like that.

19     JUDGE BUSCHMANN:  That's fine.  Okay.

20     MR. GREENBAUM:  Now, Mr. -- if General Counsel needs an

21 explanation, Mr. Cotton is here to explain the documents.

22     JUDGE BUSCHMANN:  Okay.

23     MR. GREENBAUM:  Because they are a little confusing to

24 look at.

25     JUDGE BUSCHMANN:  Let's see whether we can finish with

1  this witness.

2       MS. HARGROVE:  Okay.

3       JUDGE BUSCHMANN:  Yeah.

4                    **REDIRECT EXAMINATION**

5  Q.   BY MS. HARGROVE:  Good afternoon, Ms. Guillen.  Did you

6  translate during the July 5th meeting?

7  A.   No, I didn't.

8  Q.   Was Mr. Bello present at the July 5th meeting?

9  A.   I don't remember.  To tell you the truth, I don't

10  remember.

11  Q.   Do you remember what month you started doing banquets?

12  A.   It was, I believe, I think that the hotel dropped

13  Windows, the company Windows, they -- I also, myself, do, you

14  know, whatever coffee service that we have provided to the

15  guests.  I believe it was back in December 2-0-4, just for

16  coffee services and stuff like that, little banquets.

17  Q.   Who was the General Manager in December 2004?

18  A.   It was a lady.  I forgot her name.

19  Q.   Was Mr. Palenzona the General Manager?

20  A.   I don't believe so.  I don't remember.  I think it was

21  another lady -- it was a lady.  She stayed for maybe six

22  months or something.

23  Q.   Was it Mary Alice Drew?

24  A.   Mary Alice, yes, um-hum.

25  Q.   How often did you hold banquets?

1  A.    Okay.  The banquets were held like maybe it was done by

2  this company called Windows.  Windows was the company who

3  used to do banquets for the hotel because they have, you

4  know, things so after they, you know, I offered my services.

5  I needed to make extra money because the money that I was

6  making.  I started in 2-0-4/2-0-5.

7  Q.    Okay.  When you started in 2004/2005, how many

8  banquets -- how often did you have banquets?

9  A.    Okay.  The major one that I did is -- was in 2-0-4, 2-0-5

10  was for, I'm sorry, and then after that it was maybe once a

11  week or twice, you know, once a week, you know, minor things,

12  two or three banquets, you know, a month.

13  Q.    Did Corrado Palenzona tell you to create GC Exhibit 3 or

14  GC Exhibit 4, or GC Exhibit 5?

15      MR. McCARTHY:  Your Honor, that's outside the scope of

16  cross?

17      JUDGE BUSCHMANN:  Yes.  Just answer the question anyway.

18  I don't --

19      THE WITNESS:  No.  No, he didn't.

20      MS. HARGROVE:  One moment, Your Honor.  Nothing further,

21  Your Honor.

22      JUDGE BUSCHMANN:  Okay.

23      MR. McCARTHY:  Your Honor, as long as we have the right

24  to recall this witness if necessary after review of the pay

25  records, I have no further questions.

1    JUDGE BUSCHMANN:  Okay.  Thank you very much.  You may

2  step down.  You're excused.  Thank you.

3  **(Witness excused.)**

4    MS. HARGROVE:  Your Honor, may I check and see if our

5  next witness -- we've called a group over from the hotel.

6  May I --

7    JUDGE BUSCHMANN:  All right.

8  **(Off the record.)**

9  **(On the record.)**

10    JUDGE BUSCHMANN:  Miss, I have to swear you in as the

11  next witness.

12    MS. ROMERO:  All right.

13  (Whereupon,

14                  **SILVIA ROMERO**

15  was called as a witness by and on behalf of the Respondent

16  and, after having been first duly sworn, was examined and

17  testified as follows:)

18    JUDGE BUSCHMANN: Please be seated.

19                **DIRECT EXAMINATION**

20  Q.  BY MR. GREENBAUM:  Good afternoon, Ms. Romero.  Please

21  state your name for the record.

22  A.  My name is Silvia Romero.

23  Q.  And where do you work, Ms. Romero?

24  A.  At the State Plaza Hotel.

25  Q.  What's your position there?

1  A.    Housekeeper.

2  Q.    How long have you worked at the hotel?

3  A.    It's almost 19 years I have been working.

4  Q.    In those 19 years you've a housekeeper?

5  A.    Yes, but I've also done other functions.  I've always

6  worked as a housekeeper.  When they've needed a supervisor,

7  I've done that.  I've worked in the lobby.

8  Q.    What are you currently doing at the hotel?

9  A.    To a year ago I was working in the rooms and then I asked

10  for the lobby position.

11  Q.    And did you get the lobby position?

12  A.    Yes.  But for the time being I'm helping the lady in the

13  kitchen.

14  Q.    For how long have you been doing that?

15  A.    No, it's been about five months, something like that,

16  maybe six.

17  Q.    Do you want to transfer back to your other job?

18  A.    Yes, afterwards I will go back.

19  Q.    What do you do in the kitchen?

20  A.    Cleaning, too.

21  Q.    Now, you said afterwards you would go back.  After what?

22  A.    Yes.  Yes, because right now there's no restaurant,

23  right, so right now I'm helping the lady who cooks for the

24  employees and then I clean, too.

25  Q.    Are you pregnant?

1  A.   Yes.

2  Q.   Was there a time when you supported the union?

3  A.   Yes.

4  Q.   Did there come a time when that changed?

5  A.   Yes.

6  Q.   Why did that change?

7  A.   Because of the version they gave the last time we had a

8  meeting with them.

9  Q.   What was the version they gave?

10  A.   Well, when we went to the meeting there were only about

11  seven of us female employees and one of the co-workers spoke

12  there to those of the union and we spoke to them and we asked

13  when would, well, when we would we get the benefits that they

14  promised us.

15  Q.   And what benefits did they promise you?

16  A.   Oh, well, that we would get good insurance and that we

17  would have holidays, like 12 holidays a year, the 12 holidays

18  a year.

19  Q.   Who was -- who told you that?

20  A.   They are the ones who did the meetings, were Miguel and

21  Olga.

22  Q.   When was the last union meeting you went to?

23  A.   Listen, I don't recall exactly what the date was but,

24  yes, it was the last one I went to.

25  Q.   Did Olga speak at that last meeting?

1  A.   Yes.

2  Q.   Do you remember what she said?

3  A.   Yes.

4  Q.   What did she say?

5  A.   When we asked her when it was we would get the contract,

6  she told us that in order to get a contract, we had, all of

7  us who had joined the union had to attend.

8  Q.   Was it hard getting people to attend?

9       MR. McCARTHY:  Objection, Your Honor, as to the basis for

10 this witness to know.

11      JUDGE BUSCHMANN:  Sustained.

12 Q.   BY MR. GREENBAUM:  Did Olga say anything else at that

13 meeting?

14 A.   Yes.

15 Q.   What else?

16 A.   Yes.  When we asked Olga that she said that all of us who

17 voted for the union have to be there and so we told her that

18 in order for everyone who had voted for the union to attend,

19 for her to please speak to each one of them and so what she

20 answered was that they did not have time to speak to every

21 single one of us because they also had to devote time to

22 other hotel contracts which had expired.

23 Q.   How did that make you feel?

24 A.   Well, but she -- but we had said unless we could get

25 everybody back then we would not come back because then she

1  had said that if only seven of us showed up that we were just

2  wasting our time and wasting theirs, too.  And so we said,

3  well, if we're just wasting our time and wasting yours, too,

4  we won't come back if we don't bring everybody with us.

5  Q.    Was Reina Lozano at that meeting?

6  A.    Yes, she was also at the meeting.

7  Q.    After that meeting did you decide not to be with the

8  union anymore?

9  A.    Yes.  We decided not to have any more meetings.

10  Q.    Was Marleni Jiron at that meeting?

11  A.    Yes.

12  Q.    Ms. Romero, have you ever spoken with me before?

13  A.    I don't remember.

14  Q.    Have you spoken with Ms. Hargrove before?

15  A.    With her?  I don't remember well.

16  Q.    Do you recall Ms. Hargrove speaking with you several

17  weeks ago?

18  A.    Yeah, she was the one who -- no, I don't remember.

19        MR. GREENBAUM:  Could I approach, Your Honor?

20        JUDGE BUSCHMANN:  Yes.

21  Q.    BY MR. GREENBAUM:  Ms. Romero, you have in front of --

22  I'd like to direct your attention to General Counsel Exhibit

23  3.

24        THE INTERPRETER:  With the permission of the Court and

25  the two parties, I shall the page to the witness.

1        THE WITNESS:  This here?

2    Q.   BY MR. GREENBAUM:  Yes.

3        MR. GREENBAUM:  Just for the record, I've pointed to

4    General Counsel Exhibit 3.

5    Q.   BY MR. GREENBAUM:  Have you seen that before?

6    A.   Yes.

7    Q.   Did you sign this document?

8    A.   Yes.

9    Q.   Do you recall when?

10   A.   I don't remember, but, yes, I did sign it.

11   Q.   Was it after the meeting you had with Olga?

12   A.   Yes.

13   Q.   Who gave you this to sign?

14   A.   This was a decision that a little group of us employees

15   of the hotel took.

16       MR. McCARTHY:  Your Honor, I'm going to object, non-

17   responsive.

18   Q.   BY MR. GREENBAUM:  Did someone hand it to you to sign?

19   A.   This we did it.

20   Q.   Did anyone promise you anything to sign this document?

21   A.   No, nobody.

22   Q.   Did anybody promise you a raise to $12.50 if you signed

23   this document?

24   A.   No, nobody.

25   Q.   And why did you sign it?

1  A.   Because we didn't want a union anymore.  We were very

2  disillusioned to have to have waited so long.

3  Q.   Now, did Mr. Palenzona hand this to you?

4  A.   No.

5  Q.   Did Mr. Palenzona ever promise you a raise to 12.50 if

6  you got rid of the union?

7  A.   No.

8  Q.   Did Alex -- do you know Alex Guillen?

9  A.   Yes.  Yes.

10 Q.   Do you know Reina Lozano?

11 A.   Yes.

12 Q.   Are they your supervisors?

13 A.   No.

14 Q.   Did either of them ever promise you a raise if you signed

15 this document?

16 A.   No, neither of the two.

17 Q.   I'd like to point your attention to General Counsel

18 Exhibit 4.

19      THE INTERPRETER:  With the Court and the parties'

20 permission, the interpreter shall indicate the corresponding

21 exhibit.

22      MR. GREENBAUM:  Yes.

23 Q.   BY MR. GREENBAUM:  You have that in front of you?

24 A.   Okay.

25 Q.   Have you seen that before?

1  A.    I have to check it.

2  **(Pause.)**

3      THE WITNESS:  Yes.  Yes, I have seen it before.

4  Q.    BY MR. GREENBAUM:  Did you sign this document?

5  A.    Yes.  Yes.

6  Q.    Did anyone ever promise you anything to sign this

7  document?

8  A.    No.

9  Q.    Do you recall who gave this to you?

10  A.    No.  This one too we also decided on a group of us

11  employees, a group of us -- a group of employees who had been

12  visited by the union.

13  Q.    Were you ever visited by the union?

14  A.    No, not me.

15  Q.    Were -- the other employees indicate to you that they

16  were visited by the union?

17      MR. McCARTHY:  Objection, Your Honor.

18      JUDGE BUSCHMANN:  She doesn't know.  What's the

19  reasoning, Mr. McCarthy?

20      MR. McCARTHY:  Hearsay whether other employees indicated

21  to her whether they had been visited by the union.

22      MR. GREENBAUM:  It's not for the truth, Your Honor.

23      JUDGE BUSCHMANN:  You may answer.  Objection overruled.

24      THE WITNESS:  Yes.  Talking there in the cafeteria when

25  we would all get together, we would remark one to the other.

1  Q.   BY MR. GREENBAUM:  did you ever see employees handing out
2  union literature in the cafeteria?
3  A.   Papers from the -- that they bring from the union, yes,
4  they would take them there.
5  Q.   Did you ever observe anyone tell employees handing out
6  union literature not to do it?
7  A.   No, nobody.
8  Q.   Did you ever see those -- that literature, that union
9  literature on the floor?
10 A.   No.
11 Q.   I'd like to turn your attention to General Counsel
12 Exhibit 5.
13      MR. GREENBAUM:  And just for the record, if the reporter
14 could turn to the second page of General Counsel Exhibit 5?
15 Interpreter, I'm sorry.
16 Q.   BY MR. GREENBAUM:  Do you have that in front of you?
17 A.   Um-hum.
18 Q.   Have you seen that before?
19 A.   Yes.
20 Q.   And your signature appears at the top, correct?
21 A.   Yes.
22 Q.   Did anyone make any promises to you to sign this?
23 A.   No.
24 Q.   Did you pass this one around?
25 A.   Yes.  Some of the, yeah, I went around showing it to the

1  girls.

2  Q.   Did Mr. Palenzona tell you to pass this around?

3  A.   No.

4  Q.   Now, is -- when you passed it around, did you tell

5  employees that they would get a raise to $12.50 if they

6  signed?

7  A.   No.

8  Q.   After you received all these signatures, what did you do

9  with this?

10  A.   I came with some of the others here to Local 25 to turn

11  them in a letter but I don't recall if this was the one.

12  Q.   Do you recall when that was?

13  A.   I don't remember when it was but I did come down with a

14  group of girls.  I drove them down in my car.

15  Q.   What -- which girls came with you?

16  A.   One of them was named Esmeralda.  There was Gloria

17  Castro, Gladis, Yessenia.  We were quite a good size group.

18  There were about nine or ten of us.

19  Q.   Did you speak to anyone when you went down to the union?

20  A.   Yes, Olga was there and another girl, another lady.

21  Q.   Did you speak with them?

22  A.   No much, just that Olga -- I said there, Olga, we're

23  bringing this letter to you.

24  Q.   And what was her response?

25  A.   She asked, what is it that's there in the letter and we

1  said for her to read it to see what was there.

2  Q.    And did she read it while you were there?

3  A.    No, but what she did -- what she told me was that,

4  instead of bringing letters, why don't you come down here and

5  tell me personally.

6  Q.    And what was your response?

7  A.    No, that was all.  We just went to the elevator and she

8  followed us to the elevator and she said to the others there,

9  you all, I've never even met you.  Silvia, yes, she's been

10  here.

11  Q.    And how did the meeting end?

12  A.    No.  With that, we got in the elevator and she stayed

13  there and we went on down and we left.

14  Q.    Were the other employees with you employees of the State

15  Plaza Hotel?

16  A.    Yes.  But there were some who had never been to the

17  meetings but had been supporting them.

18        MR. GREENBAUM:  Nothing further, Your Honor.

19        JUDGE BUSCHMANN:  Mr. McCarthy, you may inquire.

20        MR. McCARTHY:  I believe I'm ready to begin, Your Honor.

21        JUDGE BUSCHMANN:  Yes, please.

22                        CROSS-EXAMINATION

23  Q.    BY MR. McCARTHY:  Good afternoon, Ms. Romero.

24  A.    Good afternoon.

25  Q.    My name is Mr. McCarthy and I represent the General

1  Counsel of the National Labor Relations Board in this matter.

2  A.    Okay.

3  Q.    And I would like you to ask you a few questions about

4  your testimony on direct examination from Mr. Greenbaum.

5  A.    Okay.  That's fine.

6  Q.    I believe you testified that you met with Ms. Emily

7  Hargrove at the hotel?

8  A.    No, I don't recall having seen here there.

9  Q.    But you did meet with somebody in preparation for your

10  testimony here today, correct?

11  A.    No.

12  Q.    You never met with Ms. Hargrove or Mr. Greenbaum in

13  preparation for your testimony here today?

14  A.    No.

15  Q.    You're not under subpoena in this case, are you?  You did

16  not receive a subpoena to testify here, did you.

17  A.    No.

18  Q.    You're related to Reina Lozano, aren't you?

19  A.    Family, family, no, we're companions.  We'll, yes, no.

20  Q.    You're married to Reina's brother, correct?

21  A.    Yes, we're together.

22  Q.    And you're also related to Claudia Romero, correct?

23  A.    No.

24  Q.    Now, I believe you testified that you currently work in

25  the kitchen, correct?

1  A.   Yes.

2  Q.   But you also testified on direct that you had always

3  worked as a housekeeper.

4  A.   Yes.

5  Q.   And that sometimes you worked as a supervisor.

6  A.   Yes, when they needed it.

7  Q.   And when was the last time that you worked as a

8  supervisor?

9  A.   No, I don't even remember.  That would have been like

10 three years ago, I think.

11 Q.   Okay.  I want to show you what's in evidence as General

12 Counsel's Exhibit 141.

13      THE INTERPRETER:  With the permission of the Court and

14 the two parties the interpreter shall turn to the --

15      MR. McCARTHY:  Your Honor, let me withdraw that question.

16 I don't believe that that document is actually in the packet

17 but it has been marked and received into evidence and will be

18 distributed to the witness at this time, Your Honor.

19 Q.   BY MR. McCARTHY:  And directing your attention to the

20 first page of that document, Ms. Romero, you received an

21 annual increase on -- in November of 2003, raising your rate

22 of pay from $11.00 to $11.36 correct?

23 A.   Um-hum.  Yes.

24 Q.   Okay.  And then directing your attention to the second

25 page, you received an annual increase from $11.36 to $11.73

1  in November of 2004, correct?

2  A.   Yes.

3  Q.   And then directing your attention to the third page, you

4  received an increase from $11.73 to $12.50 on July 5th of

5  2005, correct?

6       MR. GREENBAUM:  Object to the characterization,

7  Your Honor.  The document says wage adjustment.

8       JUDGE BUSCHMANN:  Objection overruled.

9       THE WITNESS:  Yes.

10 Q.   BY MR. McCARTHY:  And then you received another annual

11 increase from -- you received an annual -- an increase from

12 $12.50 to $12.94 effective November 2005, correct?

13      THE INTERPRETER:  The date again?  I apologize.  In when

14 2005?

15 Q.   BY MR. GREENBAUM:  Effective November of 2005.

16 A.   Yes.  That was when they gave me my review for my

17 anniversary.

18 Q.   And you testified that that's about when you started in

19 the kitchen about five months ago, correct?

20 A.   Yes.

21 Q.   Now, you testified that you attended a union meeting.

22 A.   Yes.  Not just one.  I went to almost all of them when we

23 had recently started.

24 Q.   But I'm talking about the last union meeting that you

25 testified about, correct?

1  A.   Yes.  Yes, I -- yes.

2  Q.   You testified about certain remarks that Olga made at

3  that meeting, do you remember that?

4  A.   Just now?

5  Q.   Yes.

6  A.   Yes.

7  Q.   And you testified that Olga said that the union also

8  needed to devote time to other hotel contracts that had

9  expired, correct?

10  A.   Yes.

11  Q.   And that meeting was in early March 2005, wasn't it?

12  A.   No, no.  I don't remember, but yes, we did go to that

13  meeting.

14  Q.   Okay.  Reina was at that meeting, correct?

15  A.   Yes.

16  Q.   And you were at that meeting.

17  A.   Yes.

18  Q.   And Anita Viera, and Susan McGuire, Susan McQueen?

19  A.   No, I don't remember if she was there.

20  Q.   Marleni Jiron was there.

21  A.   Uh-huh.

22  Q.   Jose Varuko.

23  A.   The fellows in the restaurant, I don't recall their

24  names, but yes, there were -- there was a fellow from the

25  restaurant there.

1  Q.   And Sandra Blanco?

2  A.   Yes, she was there.

3  Q.   Ana Majano.

4  A.   Uh-huh.

5  Q.   And Justina Gonzales, Justina, Justina Gomez?  Justino

6  Gomez.

7       THE INTERPRETER:  How is --

8       MR. McCARTHY:  Justino.

9       THE INTERPRETER:  -- the name spelled?

10      MR. McCARTHY:  J-u-s-t-i-n-o Gomez.

11      THE WITNESS:  I don't know who -- no, no I don't

12  remember.

13  Q.   BY MR. McCARTHY:  Concepcion Majano (ph.).

14  A.   Yes, he was there with his wife or partner.  Yes, they

15  were there.

16  Q.   And this was the meeting that Reina got up at the end and

17  walked out, correct?

18  A.   Yes.

19  Q.   And she said I'm not coming back to the union anymore.

20  A.   Yes.

21  Q.   Now, did you walk out with Reina?

22  A.   After a little later I left and Anita Viera.

23  Q.   Okay.  A little later you left, correct?

24  A.   Yes.

25  Q.   And you were driving, correct?

1  A.    Yes.  I always go in my car.

2  Q.    The meeting was over at that time, correct?

3  A.    Yes.  The rest of the people there stayed, those from the

4  restaurant and some of the housekeepers who had arrived.

5  Q.    Okay.  And you stayed for the whole meeting, didn't you?

6  A.    Yes.

7  Q.    And you were driving Anita Viera, correct?

8  A.    Not to that last meeting.  To that meeting she got a ride

9  from Miguel or Olga.

10      MR. McCARTHY:  No further questions, Your Honor.

11      JUDGE BUSCHMANN:  Any redirect?

12      MR. GREENBAUM:  Yes, Your Honor.

13                      REDIRECT EXAMINATION

14  Q.    BY MR. GREENBAUM:  When is your anniversary at the hotel,

15  what month?

16  A.    In October 13th.

17  Q.    So, when you get an annual raise, you get that in October

18  or November?

19  A.    Yes, most of the times, almost of all at the end of

20  October, beginning November.

21  Q.    If you could turn to General Counsel Exhibit 141, that

22  last page, and the question is, was that your anniversary

23  raise for this year?

24  A.    Of the 12?  This one?  Yeah, exactly, for this year.

25  Q.    And it says next review date October 2006.

1  A.    Yes.

2       MR. GREENBAUM:  No further questions.

3       JUDGE BUSCHMANN:  Thank you very much.  You may step

4  down.  Thank you.

5  **(Witness excused.)**

6       MS. HARGROVE: Your Honor, I'll go get our next witness.

7       JUDGE BUSCHMANN:  Okay.

8  **(Off the record.)**

9       MS. COTILLA:  For State Plaza, Your Honor, we had

10  requested all of the payroll records for a certain period and

11  we only received three weeks worth of that and for the other

12  hotels, same thing.  We only received -- it was my

13  understanding that we were going to get all of the --

14       MR. GREENBAUM:  The payroll records that we got were a

15  sampling of what was going on in all of the hotels.  We have

16  three weeks.  Each one of the weeks is the end of the year

17  for them.  We do have State Plaza coming and creating the --

18  putting us together all of the records for Alexandra and

19  Reina week to week.  Otherwise --

20       MR. McCARTHY:  Your Honor, are we on the record?

21       JUDGE BUSCHMANN:  Yes.

22       MR. McCARTHY:  Perhaps we should go off the record

23  maybe --

24       JUDGE BUSCHMANN:  All right.

25       **Off the record.**

1    **(Off the record.)**

2        JUDGE BUSCHMANN:  Respondent, call your next witness.

3        MR. GREENBAUM:  Consuela Mejia.

4        MS. MEJIA:  Yes.

5        JUDGE BUSCHMANN:  She needs an interpreter as well?

6        MR. GREENBAUM:  Yes, Your Honor.

7        JUDGE BUSCHMANN:  I have to swear you in, ma'am.  Raise

8    your right hand.

9    (Whereupon,

10                    **CONSUELA ESMERALDA MEJIA**

11    was called as a witness by and on behalf of the Respondent

12    and, after having been first duly sworn, was examined and

13    testified as follows:)

14        JUDGE BUSCHMANN:  Please sit down.

15        THE WITNESS:  Thank you.

16                       **DIRECT EXAMINATION**

17    Q.   BY MR. GREENBAUM:  Good afternoon, Ms. Mejia.  My name is

18    John Greenbaum and I represent the State Plaza Hotel.  Please

19    state your name for the record.

20    A.   Consuela Esmeralda Mejia.

21    Q.   Do you also go by the name Esmeralda?

22    A.   Yes.

23    Q.   And where do you work?

24    A.   At State Plaza.

25    Q.   And what's your job there?

```
 1  A.   Housekeeping.

 2  Q.   How long have you worked there?

 3  A.   Three years.

 4  Q.   Do you clean rooms?

 5  A.   Yes.

 6  Q.   Who's your supervisor?

 7  A.   Who are they?

 8  Q.   Yeah.  What are their names?

 9  A.   Lidia, Fanny, Karen, Abdullah.

10  Q.   I'd like to turn your attention to General Counsel

11  Exhibit Number 3.

12       MR. GREENBAUM:  If the court, I mean, if the interpreter

13  could point that to her.

14  Q.   BY MR. GREENBAUM:  Do you have that in front of you?

15  A.   Whether I signed this, or --

16  Q.   Have you seen this before?

17  A.   Yes.

18  Q.   Have you signed this document?

19  A.   Yes.

20  Q.   Who -- did anyone give it to you to sign?

21  A.   If it's, yeah, I don't know if it's the first one because

22  I've signed three.

23  Q.   The date -- do you see a date on top?

24  A.   Yes.

25  Q.   Okay.  Can you read that date?
```

1  A.   Um-hum.

2  Q.   What's the date?

3  A.   3/21/2005.

4  Q.   Is this your -- refresh your recollection as to whether

5  this was the first petition?

6  A.   I believe it is the first.

7  Q.   Did any employee give this to you to sign?

8  A.   Yes.

9  Q.   Do you recall who that was?

10 A.   Reina.

11 Q.   Do you know Reina's last name?

12 A.   Lozano.

13 Q.   Is Reina Lozano your supervisor?

14 A.   No.

15 Q.   Did Reina -- what did Reina Lozano tell you when she gave

16 this to you?

17 A.   First we commented on whether we were in agreement to

18 sign this paper that we didn't want any more problems and

19 that we didn't need the union.

20 Q.   Did Reina promise you a raise to 12.50 if you signed

21 this?

22 A.   No, never.

23 Q.   Did Reina say she was doing this for the boss?

24 A.   No.

25 Q.   Did Reina say Mr. Palenzona told her to do this?

1  A.   No.

2  Q.   Did you feel by signing this document you would be

3  getting a raise to $12.50 an hour?

4  A.   No, because we've never been promised anything.

5  Q.   Did you ever go to any union meetings?

6  A.   With the union?

7  Q.   Yes.

8  A.   No, never.  Never.

9  Q.   Have you ever talked to Corrado about the union, Corrado

10  Palenzona?

11  A.   No, never, because he didn't permit that.

12  Q.   I'd like to turn your attention to General Counsel

13  Exhibit 4.  Have you seen that before?

14  **(Pause.)**

15       MR. McCARTHY:  Your Honor, we'll stipulate that she

16  signed all three petitions.

17       THE WITNESS:  Yes.

18  Q.   BY MR. GREENBAUM:  And then briefly, if you could look at

19  General Counsel Exhibit 5, second page.

20  A.   Yes.

21  Q.   Did anyone make any promises to you to sign General

22  Counsel Exhibit 4 or 5?

23  A.   No, because, as a matter of fact, the third one, the

24  third of the three exhibits, I was passing -- we --

25       THE INTERPRETER:  Strike that.

 1       THE WITNESS:  No, because, in fact, the third of the
 2  exhibits we had taken the decision to do.  In fact, I was
 3  taking it around showing it to the others for them to sign.
 4  Q.   BY MR. GREENBAUM:  And when you were taking it around,
 5  were you doing that at Mr. Palenzona's direction?
 6  A.   No.
 7  Q.   When you were taking it around, did you tell other
 8  employees that if they signed they would be getting a raise?
 9  A.   No, because I wasn't receiving any raise.  Why would I
10  say to my co-workers that they were going to get a raise?
11  Q.   Now, this -- what did you do with this third one, third
12  petition?
13  A.   Yes.  This is the last one, the third of the three.  Yes,
14  this is the one that I took around.  The second one we took
15  to the office, to the union office.
16  Q.   Did you take General Counsel Exhibit Number 5 to the
17  union office?
18       MR. McCARTHY:  Your Honor, that's been asked and
19  answered.
20       JUDGE BUSCHMANN:  A lot of the questions have been asked
21  and answered, different witnesses.
22       THE WITNESS:  Which is Exhibit 5?  Oh, the last one we
23  didn't take to the union office.  The second one we took to
24  the union office, not the last one.
25  Q.   BY MR. GREENBAUM:  Did you do another petition in

1  November of '05?

2      MR. McCARTHY:  Your Honor, I'm going to object to any

3  testimony about that.  That's been offered, excluded from

4  evidence as irrelevant and subsequent to the withdrawal of

5  recognition and not applicable in this case.

6      JUDGE BUSCHMANN:  Are you talking about the November

7  petition?

8      MR. GREENBAUM:  Yes, Your Honor.

9      JUDGE BUSCHMANN:  Yeah.  Sustained.

10 Q.  BY MR. GREENBAUM:  By signing these documents, did you

11 believe you were going to get a raise?

12 A.  No, because they never promised it.  They never confirmed

13 that we would get a raise.  As a matter of fact, we had

14 proposals from the union.  Why would I disdain the union

15 proposals as they were higher then 12.50.

16 Q.  What did the union promise you?

17     MR. McCARTHY:  Your Honor, I'm going to object on the

18 lack of foundation.

19     MR. GREENBAUM:  I'll rephrase.

20 Q.  BY MR. GREENBAUM:  Did the union make any promises to

21 you?

22 A.  Yes.

23 Q.  What kind of wages did the union promise you?

24     MR. McCARTHY:  Could we have a timeframe, Your Honor?

25 Q.  BY MR. GREENBAUM:  In 2005.

1       THE INTERPRETER:  What kind of wage did the union promise

2  you in 2005 is the question?

3       MR. GREENBAUM:  Well, we'll start with 2004.

4  Q.  BY MR. GREENBAUM:  What wage did the union promise you in

5  2004 if you can recall?

6       MR. McCARTHY:  Your Honor, it's a leading question.  It

7  assumes that the union promised her a wage.

8       MR. GREENBAUM:  Well, she said they did.

9       JUDGE BUSCHMANN:  What, if any.

10      THE WITNESS:  I think it was 14.

11 Q.  BY MR. GREENBAUM:  Did they make any other promises to

12 you?

13 A.   That I would get more holidays, that I would have good

14 insurance for free for my family, that I would get sick

15 leave, that I would get a higher wage.

16 Q.   Does -- has the State Plaza changed their insurance?

17      MR. McCARTHY:  Your Honor, I'm going to object on the

18 basis of no foundation for this witness to know.

19      JUDGE BUSCHMANN:  Objection, sustained.  There has been

20 no discussion about any benefit changes.

21      MR. GREENBAUM:  Will the General Counsel stipulate that

22 there's been no changes to the benefits?

23      MR. McCARTHY:  No, Your Honor.  We don't believe it's

24 relevant, I mean, it's --

25      MR. GREENBAUM:  Well, I think so.

1      JUDGE BUSCHMANN:  All right.  You may ask whether or not

2  any promises were made as far as working conditions are

3  concerned with respect to the petition.

4  Q.   BY MR. GREENBAUM:  Were any promises made with respect to

5  working conditions with respect to the petitions, the three

6  documents we looked at?

7  A.   No.  That was outside of work at a demonstration that

8  they had done.

9  Q.   Since -- let's just take General Counsel Exhibit 5.  Do

10  you have that in front of you?  Do you have that in front of

11  you?

12  A.   Yes.

13  Q.   Since you signed that document has your insurance changed

14  at all at the hotel?

15      MR. McCARTHY:  Your Honor, I'm going to object.

16      JUDGE BUSCHMANN:  Objection overruled.

17      THE WITNESS:  No, because I'm still paying the same.  I

18  haven't seen that there's been any change.

19  Q.   BY MR. GREENBAUM:  Since you signed that document, has

20  the number of holidays you have increased at the hotel?

21      JUDGE BUSCHMANN:  I mean -- I agree with Mr. McCarthy

22  that we're going into an arena here that's not even part of

23  the allegation that the parties --

24      MR. GREENBAUM:  I'll move on.

25      JUDGE BUSCHMANN:  But, you know, you're inquiring about

 1  any conditions of improvement in order to sign this thing

 2  here and I think if you're going to ask these questions, I

 3  think you're just -- the inquiry.

 4        THE INTERPRETER:  So, the interpreter --

 5        JUDGE BUSCHMANN:  No.

 6        THE INTERPRETER:  -- can interpret the last -- okay.

 7        JUDGE BUSCHMANN:  No.

 8        THE INTERPRETER:  Objection sustained.

 9        JUDGE BUSCHMANN:  No.  I think you should confine

10  yourself to the allegations in the complaint.  I think I

11  should have sustained your objection, Mr. McCarthy.

12  Q.   BY MR. GREENBAUM:  Do you know an employee name Marleni

13  Jiron?

14  A.   Yes.  I work with -- she had been my co-worker.

15  Q.   Did she ever threaten you?

16  A.   She didn't threaten us but, yes, it's as if she wanted

17  to, she had a personality like would always intimidate you.

18  If you don't want to be with the union, you'll all wind up in

19  the street without the union.

20        MR. McCARTHY:  Your Honor, I would move to strike that.

21  Again, we're getting into irrelevant about this witness'

22  description of personalities.  I think it's far a field.

23        JUDGE BUSCHMANN:  Well, I'm not going to strike this, but

24  I think that she should confine herself -- would you tell the

25  witness, please, to confine her answers to the questions

687

1  posed by counsel?

2      THE WITNESS:  Okay.

3  Q.   BY MR. GREENBAUM:  Were you ever at a meeting attended

4  by -- do you know who Steve Bello is?

5  A.   Yes.

6  Q.   And who is he?

7  A.   He's the president of the company.

8  Q.   Did you ever attend a meeting where Steve Bello was

9  present?

10  A.   He's done many meetings.

11  Q.   Did Mr. Bello ever promise you a raise to 12.50 at any of

12  these meetings?

13  A.   No.

14  Q.   Did -- at one of these meeting with Steve Bello, did an

15  employee accuse Marleni of taping the meeting?

16  A.   Yes.

17  Q.   Did you observe at that meeting Marleni talking with

18  Steve Bello?

19  A.   Yes.

20  Q.   Was she talking in a loud voice?

21  A.   Yes.  She was pointing to him.  She was speaking in a

22  loud voice and pointing to him.

23  Q.   Do you recall what she was saying?

24  A.   She said that she was not taping but that that accusation

25  they were making against her was going to cost them a lot.

1       MR. GREENBAUM:  Nothing further.

2       MR. McCARTHY:  May I have a brief moment, Your Honor?

3       JUDGE BUSCHMANN:  Yes.

4   **(Pause.)**

5       MR. McCARTHY:  I'm ready, Your Honor.

6       JUDGE BUSCHMANN:  Yes, please.

7                       **CROSS-EXAMINATION**

8   Q.   BY MR. McCARTHY:  Good afternoon, Ms. Mejia.

9       THE INTERPRETER:  Mejia.

10  Q.   BY MR. McCARTHY:  Mejia.  Ms. Mejia, my name is Thomas

11  McCarthy and I represent the General Counsel of the National

12  Labor Relations Board in this matter.  I want to ask you a

13  few questions about your testimony on direct examination from

14  Mr. Greenbaum.

15  A.   Okay.

16  Q.   You met with Mr. Greenbaum and Emily Hargrove in

17  preparation for your testimony, correct?

18  A.   Yes, with her I did but not with him.

19  Q.   Okay.  And Lisa was translating during that meeting,

20  correct?

21  A.   Yes.

22  Q.   And Lisa is your immediate supervisor as the housekeeper

23  manager, correct?

24  A.   Yes.  Yes.

25  Q.   And do you see Mr. Corrado here in the courtroom?

1  A.    Yes.

2  Q.    And you're not testifying here pursuant to subpoena, are

3  you?

4  A.    You mean compelled?

5  Q.    Yes, by paper, compelled by paper or subpoenaed.

6  A.    No.

7  Q.    Mr. Corrado asked you to come down here and testify,

8  didn't he?

9  A.    Today, yes.

10 Q.    He asked you today to come down here and testify?

11 A.    Yes.

12 Q.    Now, the union never visited your house, did they?

13 A.    No, because I didn't allow it.  They arrived one time but

14 they didn't find me.

15 Q.    And you never attended any union meetings, did you.

16 A.    No.

17 Q.    And you talked about union promises.  Do you recall that

18 testimony?

19 A.    Yes.  Yes.

20 Q.    Who at the union promised you anything if you didn't

21 attend any union meetings or they didn't visit you at your

22 house?

23 A.    Not necessarily at my house.  They were outside the hotel

24 when they did the demonstration.  That was when they stopped

25 me coming off work.

1  Q.   And when you prepared for your testimony today, you met

2  in the hotel with Ms. Emily Hargrove, correct?

3  A.   Today?

4  Q.   When you prepared for your testimony, you met with

5  Ms. Emily Hargrove on the hotel at that time, correct?

6  A.   Yes.  Yes.  Um-hum.

7  Q.   And that testimony -- that preparation lasted about 45

8  minutes or an hour, correct?

9  A.   No, like 20 minutes.

10  Q.   You were paid for that time, correct?

11  A.   I don't know.  It was on my work schedule.  My paycheck

12  hasn't come out since.  I don't know.

13  Q.   Okay.  Now, I want to direct your attention to what's in

14  evidence as General Counsel's Exhibit 127.

15        THE INTERPRETER:  The right is here?  There are a lot of

16  documents here.  The interpreter has explained that

17  references to GC Exhibit 127 refer to the document in front

18  of the witness.

19        MR. McCARTHY:  Okay.

20  Q.   BY MR. McCARTHY:  And what year was it that you began

21  working at the hotel?

22  A.   July 23rd, 2003.

23  Q.   And then a year later, if you look at the first page of

24  General Counsel's 127, you received a annual wage increase

25  from $9.35 to $9.63, correct?

1 A.    Exactly, yes.

2 Q.    And then if you would look at the second page of GC-127.

3 A.    The second?

4 Q.    Correct.  You received a raise from $9.63 to $12.50

5 effective July 5th, 2005, didn't you?

6 A.    That's right, um-hum.

7 Q.    So, you did receive a raise after you circulated the

8 third petition, didn't you?

9     MS. HARGROVE:  Objection, Your Honor.

10     JUDGE BUSCHMANN:  Why?

11     MS. HARGROVE:  To the characterization.

12     JUDGE BUSCHMANN:  You mean the wage adjustment?

13     MS. HARGROVE:  Yes.

14     THE WITNESS:  That's right.

15     THE INTERPRETER:  I'm sorry.  I should have waited.

16     JUDGE BUSCHMANN:  Let the record show that the Respondent

17 characterizes the wage increase as a pay adjustment.

18     Go ahead, sir, tell her that.

19     THE WITNESS:  Adjustment of what?

20     JUDGE BUSCHMANN:  Pay adjustment, the wage adjustment or

21 pay adjustment.  I think if you're going to make it a little

22 bit more --

23     MR. McCARTHY:  I'll --

24     THE WITNESS:  Wage?  I don't understand.

25     MR. McCARTHY:  Your Honor, let me rephrase --

1        MR. GREENBAUM:  Let's just move on.

2        MR. McCARTHY:  Let me rephrase the question.

3        JUDGE BUSCHMANN:  Yes.  Let's move on.

4        MR. McCARTHY:  Okay.

5    Q.  BY MR. McCARTHY:  Okay.  So, you did receive it.

6        MR. McCARTHY:  Do we have an answer in the record, Your

7    Honor?  Did she answer?

8        THE INTERPRETER:  The answer was affirmative, yes.

9    Q.  BY MR. McCARTHY:  And you testified on direct that you

10   never took the third petition to the union office, correct?

11   That was the second.

12   A.  No.  To the union office I never took.  I took it to

13   Mr. Corrado's office.

14   Q.  And you took the second petition to the union office with

15   other housekeepers, correct?

16   A.  To the office of, yes, that's right.

17   Q.  And then directing your attention to the last page of

18   General Counsel's Exhibit 127, you received another annual

19   pay increase from $12.50 to $12.91 on your anniversary in

20   August of 2006, correct?  That may be an --

21   A.  My review --

22   Q.  That may be --

23   A.  My review was in July.  This was before.

24   Q.  Okay.  So, the document may be dated incorrectly.  Did

25   you receive an annual wage increase last August?  Last year?

1  How much are you currently making?

2  A.    No, it was in July.

3  Q.    How much are you currently making?

4  A.    Twelve ninety-one.

5       MR. McCARTHY:  No further questions, Your Honor.

6       MR. GREENBAUM:  Limited, Your Honor.

7       JUDGE BUSCHMANN:  What's that?

8       MR. GREENBAUM:  Limited.

9       JUDGE BUSCHMANN:  Okay.

10                    REDIRECT EXAMINATION

11 Q.    BY MR. GREENBAUM:  When you met with Ms. Hargrove, do you

12 recall that?

13 A.    Yes.

14 Q.    Did she tell you it was voluntary to talk to her?

15 A.    Yes.

16 Q.    Did she tell you there would be no reprisals for talking

17 to her?

18 A.    Yes.  She told me that it was my decision -- whether or

19 not I wanted to speak to her.

20 Q.    Did she tell you you wouldn't get in trouble for speaking

21 with her?

22 A.    Yes.  She told me that there was not going to be any

23 problem if I spoke to her on my own consent.  It was my

24 pleasure to speak to her.

25 Q.    Did she also tell you you didn't have to speak with her?

1  A.   Yes, that I wasn't obligated, that if I didn't want to, I

2  didn't have to.

3  Q.   Did she tell you what to say?

4  A.   Yes.  She asked me, do you want to go, and I said, I did.

5  Q.   But did she tell you what to say in your testimony?

6  A.   What I was to say?

7  Q.   Yes.

8  A.   No.  What I'm answering here, no, she didn't.

9  Q.   Did she tell you to tell the truth?

10  A.   Yes.

11      MR. GREENBAUM:  Nothing further.

12      MR. McCARTHY:  One question, Your Honor.

13                        RECROSS-EXAMINATION

14  Q.   BY MR. McCARTHY:  When you met with Lisa and

15  Ms. Hargrove, did you sign a piece of paper.

16  A.   No, we didn't sign no paper.

17  Q.   Did Ms. Hargrove ask Lisa to tell you it was voluntary

18  and there would be no reprisals and that you could leave and

19  you wouldn't be obligated to stay?

20  A.   Yes.

21      MR. McCARTHY:  No further questions.

22      JUDGE BUSCHMANN:  Thank you very much.  You may step

23  down.

24      THE WITNESS:  May I leave?

25      JUDGE BUSCHMANN:  Yes.

```
 1   (Witness excused.)

 2       MS. HARGROVE:  Your Honor --

 3       JUDGE BUSCHMANN:  Short recess.

 4       MR. GREENBAUM:  Could we take a recess?  Yes.

 5       JUDGE BUSCHMANN:  Ten minutes.

 6       MR. GREENBAUM:  Your pleasure.

 7       JUDGE BUSCHMANN:  Ten minutes.

 8   (Off the record.)

 9       JUDGE BUSCHMANN:  I have to swear you in.  Would you

10   please stand up?

11   (Whereupon,

12                        MARIA CHUMPITAZ

13   was called as a witness by and on behalf of the Respondent

14   and, after having been first duly sworn, was examined and

15   testified as follows:)

16       JUDGE BUSCHMANN:  Okay.  Please sit down.

17                      DIRECT EXAMINATION

18   Q.  BY MR. GREENBAUM:  Please state your name for the record.

19   A.  Maria Chumpitaz.

20   Q.  Can you spell that?

21   A.  Maria, and then C-h-u-m-p-i-t-a-z.

22   Q.  And, Maria, where do you work?

23   A.  At the State Plaza.

24   Q.  How long have you worked there?

25   A.  One year.
```

1  Q.    What's your position there?

2  A.    Housekeeping.

3  Q.    Do you clean rooms?

4  A.    Yes.  Yes.

5  Q.    Do you speak English?

6  A.    Just a little bit but it's better in Spanish.

7        THE INTERPRETER:  The interpreter shall ask the witness

8  to refrain from answering until the interpreter --

9        JUDGE BUSCHMANN:  Yes.

10       THE INTERPRETER:  -- completes the interpretation.

11       JUDGE BUSCHMANN:  I'm just wondering whether it would be

12 easier for her to understand the English and respond in

13 Spanish.  That would make it easier on you, right?

14       THE INTERPRETER:  Your Honor, I will do as the Court

15 directs, but there's no way to know what part of a phrase one

16 understands or misunderstands.  It may actually be more

17 expeditious for me to proceed --

18       JUDGE BUSCHMANN:  Okay.

19       THE INTERPRETER:  -- by interpreting the questions as

20 well.

21       JUDGE BUSCHMANN:  Okay.

22       THE WITNESS:  Okay.

23 Q.    BY MR. GREENBAUM:  Who's your supervisor at the hotel?

24 A.    Well, my supervisor, there are several supervisors.

25 There are three supervisors that we have.

```
 1  Q.    And who are they?

 2  A.    Karen, Fanny, Lidia.

 3  Q.    Who is the General Manager of the hotel?

 4  A.    Oh, Mr. Corrado.

 5  Q.    Corrado Palenzona?

 6  A.    Yes.

 7  Q.    Did you ever speak with Corrado about the union?

 8  A.    No, never.

 9  Q.    Did Mr. Palenzona ever tell you that you would get a

10  raise to $12.50 if you got rid of the union?

11  A.    That's false.  Never.

12  Q.    Do you know who Reina Lozano is?

13  A.    Yes, the lady who works for the -- in the minibar.

14  Q.    Did she ever promise you a raise to 12.50 if you sign a

15  piece of paper?

16  A.    No, never.

17  Q.    Do you know Alex Guillen?

18  A.    Yes.  She is also one who took the same -- works with the

19  minibar.

20  Q.    Did she ever promise you a raise to 12.50 if you signed a

21  piece of paper?

22  A.    That's false.  Never.

23  Q.    I'd like to direct your attention to General Counsel

24  Exhibit 5.

25        MR. GREENBAUM:  And I would like to direct the translator
```

1   or interpreter to point that out to the witness.  And direct

2   the witness to the second page.

3   Q.   BY MR. GREENBAUM:  Have you ever seen that before?

4   A.   Of course, it's, of course, yes.

5   Q.   Did you sign that document?

6   A.   Yes.

7   Q.   Did anyone promise you a raise to 12.50 if you signed

8   that?

9   A.   Oh, yes, yes, we signed this because we don't have any

10  interest in working with the union.  We want to work in a

11  spirit of good companionship.  We don't want to know anything

12  about the union.  We just want to work there.  I personally

13  am very happy to work there.  Mr. Corrado is very good people

14  and I at least have no interest whatsoever in anything to do

15  with the union.  In other words, all of us who work there,

16  the manager, the gentlemen, all of us.

17  Q.   Has the union ever been to your house?

18  A.   Oh, yes, many times and one time they went there and my

19  husband got upset and they said I wasn't at work and my

20  husband got very upset because they told him I hadn't been at

21  work.

22      MR. McCARTHY:  Your Honor, I'm going to object to --

23  well, I'll with the objection.

24  Q.   BY MR. GREENBAUM:  Do you know who came to visit your

25  house?

1  A.   Well, my husband since he knows they were people from

2  work, co-workers there, Ana Majano, and Susan Benda.  Benda.

3  Since I'm new I don't know very well.

4  Q.   And what --

5       MR. McCARTHY:  Your Honor, I'm going to strike all this

6  testimony because -- move to strike because the witness said

7  she wasn't home when this occurred and this is all hearsay

8  through her husband.

9       JUDGE BUSCHMANN:  Yeah, but --

10      MR. GREENBAUM:  It's not for the truth, Your Honor.

11      JUDGE BUSCHMANN:  It's --

12      MR. GREENBAUM:  It's whether they came.  They spoke to

13 her husband.  It's not for the truth, and it's not hearsay

14 because it's not offered for the truth.

15      JUDGE BUSCHMANN:  I think it's not --

16      MR. McCARTHY:  What is it's purpose, Your Honor.

17      JUDGE BUSCHMANN:  Well, the union came to visit her at

18 the house.  That's all.  Isn't it?

19      MR. GREENBAUM:  Yes.

20      JUDGE BUSCHMANN:  Okay.

21      MR. McCARTHY:  Thank you, Your Honor.

22      JUDGE BUSCHMANN:  Um-hum.

23 Q.   BY MR. GREENBAUM:  Did you ever see employees handing out

24 union literature at work?

25 A.   No.  The truth is I never saw who passed them out.  The

1  fact of the matter is that I went to eat and they were there

2  in the places around the table but I never saw who put them

3  there.

4  Q.   Did you see any on the floor?

5  A.   No, no, always on the table.

6  Q.   Did employees talk about the handouts, the union

7  literature?

8  A.   Of course, because we all said how it was false that what

9  it was saying there was that they were going to give us a

10 raise, that we were obligated to, well, I don't know, but

11 yes, it was all false what was written on that paper.

12         **JUDGE BUSCHMANN:  I have to go off the record for a**

13 **moment.**

14 **(Off the record.)**

15 Q.   BY MR. GREENBAUM:  Maria, did you meet with Ms. Hargrove

16 before you testimony here today?

17 A.   She came once, yes she did, to the hotel.

18 Q.   And before speaking with her, did she tell you that it

19 was voluntary to speak with her?

20 A.   Yes.

21 Q.   Did she identify herself?

22 A.   Yes.

23 Q.   Did she tell you she was an attorney for the State Plaza

24 Hotel?

25 A.   Um-hum, yes.

1  Q.   Did she tell you that you wouldn't get in trouble if you
2  decided not to speak with us?
3  A.   It's certain but it was my decision -- it was my choice
4  to come and I wanted to come and I wanted to testify because
5  I want to do this ad I don't want the union and it was my
6  choice to come.
7  Q.   Did she tell you to tell the truth?
8  A.   Yes.
9       MR. GREENBAUM:  Nothing further.
10      JUDGE BUSCHMANN:  Okay.
11      MR. McCARTHY:  Can I have just a moment, Your Honor.
12      JUDGE BUSCHMANN:  Yes.
13  **(Pause.)**
14      MR. McCARTHY:  Okay, I believe I'm ready to proceed now.
15      JUDGE BUSCHMANN:  All right.  Please do.
16                    **CROSS-EXAMINATION**
17  Q.   BY MR. McCARTHY:  Good afternoon, Ms. Chumpitaz.  My name
18  is Thomas McCarthy.  I'm with the General Counsel of the
19  National Labor Relations Board.
20  A.   Okay.  Thank you very much.
21  Q.   And you're a new employee at the hotel, aren't you?
22  A.   Um-hum, yes.
23  Q.   Who recommended you for the job at the hotel?
24  A.   Nobody recommended me.  I went on my own.  I went to the
25  hotel.  I got an application and nobody recommended me.

1  Q.   Isn't it true that you learned about the job through
2  Gloria Castro or Hilda Guillermo (ph.)?
3  A.   Not at all.  I just went in -- I had very recently gone
4  in to work.  I didn't know them before.  I met them there.  I
5  didn't know anybody there.  I don't know anybody there at
6  all.  I'm brand new there and everything.
7  Q.   Okay.  And your hire date was April 9th, 2005?
8  A.   Yes.
9  Q.   And at the time of your hire you were making $9.35 per
10 hour, correct?
11 A.   Yes.  Yes.
12 Q.   And during your first 90 days of employment you had a
13 probationary period, correct?
14 A.   That's correct.
15 Q.   And that probationary period ended on or about July 9th,
16 2005, correct?
17 A.   For sure.  I don't know a lot about that.  It should be.
18 I'm not real good with accounts.
19 Q.   And during your 90 day probationary period, you signed
20 General Counsel's Exhibit 4 and 5, correct?
21      THE INTERPRETER:  For the record, the interpreter is,
22 with the permission of the Court and the parties, indicating
23 corresponding documents to the witness.
24      THE WITNESS:  Yes.
25 Q.   BY MR. McCARTHY:  And then on July 5th, 2005, you

1    received a raise from $9.35 to $12.50, didn't you.

2        THE INTERPRETER:  To $12.50?

3        MR. McCARTHY:  Correct.

4        THE WITNESS:  Um-hum.  Yes.  That's right.

5    Q.   BY MR. McCARTHY:  And that was after you were asked to

6    sign GC -- the second petition and the third petition, wasn't

7    it?

8        MR. GREENBAUM:  Objection to the characterization,

9    Your Honor, asked to sign.

10       JUDGE BUSCHMANN:  Objection overruled.  You can inquire.

11       MR. GREENBAUM:  Your Honor, I object to the

12   characterization of asked to sign.  She testified that she

13   signed.  If he wants to make a foundation that -- whether she

14   was asked to sign --

15       JUDGE BUSCHMANN:  Well, I understand, but I overruled the

16   objection.  The witness can correct the question if it's

17   somehow incorrect.  I think that she's able to distinguish

18   the accuracy of the particular question.

19       THE INTERPRETER:  And the question is that you were given

20   the raise after you were asked to sign exhibits 4 and 5?

21       MR. McCARTHY:  Correct.

22       THE WITNESS:  No, please, can you repeat the question

23   because I didn't understand it, please.

24   Q.   BY MR. McCARTHY:  You received a raise from $9.35 to

25   $12.50 after you were asked to sign General Counsel's

1  Exhibits 4 and 5, didn't you?

2  A.   This has nothing to do with the raise because the raise

3  was for everyone.  It has nothing to do with me.  That was

4  for everyone.

5  Q.   My question is, you received the raise after you were

6  asked to sign those petitions, correct?

7  A.   I was not asked to sign this petition.

8  Q.   You received the raise after you signed this petition,

9  didn't you?

10  A.   But not because I signed it.

11  Q.   Now -- and that raise was a substantial increase within

12  90 days of the beginning of your employment, wasn't it?

13       MS. HARGROVE:  Asked and answered, Your Honor, objection.

14       JUDGE BUSCHMANN:  Objection overruled.

15       THE WITNESS:  Yes, but I asked my co-workers, will the

16  raise be for everyone and they said, yes, of course,

17  Chumpitaz, the raise is going to be for everyone.  Just

18  because you're new doesn't mean you won't get it.  The raise

19  will be for everyone.

20  Q.   BY MR. McCARTHY:  And how many of your co-workers did you

21  speak with that said the raise would be for everyone, 10, 20,

22  25?

23  A.   At least 10.  I was there at the table with at least 10

24  workers and I asked the workers who were there and they said

25  that the raise would be for everybody who was there.  There

1  were at least 10 workers there.

2  Q.   And where was this?  What room was this in?

3  A.   Where we eat, in the cafeteria.

4  Q.   And who was there?

5  A.   Gladis Bonilla was there.  Yessenia was there.  There was

6  Esmeralda and there was Veronica and Veronica told me, yes,

7  you too, Chumpitaz.  There was Veronica, there was -- who

8  else was there?  Oh, I don't remember.  Norris was there, to,

9  and Juanita.  Juanita.  Juanita.  Um-hum.

10  Q.   Gloria Castro?

11  A.   And Gloria was there, too, but the ones who were

12  listening to me said, were Veronica and Esmeralda and they

13  said, yes, you too, Chumpitaz, and Yessenia.

14  Q.   You're not here under subpoena today, are you?

15  A.   Oh, no, it's my choice.  I wanted to come.

16  Q.   And Mr. Corrado asked you to come down here, didn't he?

17  A.   Mr. Corrado, yes, because he told us, all of us, that we

18  could come down if we wanted to but it was entirely voluntary

19  and I wanted to come down because I don't want the union.  I

20  want to work in peacefulness and I wanted to come down.

21  Q.   And prior to your testimony here today, did you meet with

22  either Ms. Hargrove or Mr. Greenbaum?

23      MR. GREENBAUM:  Objection, Your Honor.  This has been

24  covered in direct.

25      JUDGE BUSCHMANN:  I know it has been, but -- can inquire

706

1  about that.

2     THE WITNESS:  No, not the gentleman.  This is the first

3  time I see him.  Yes, the lady, she came to the hotel one day

4  I saw her.

5  Q.   And Lisa came to get you off the floor and said, I want

6  you to come meet with Ms. Hargrove, didn't she?

7  A.   Of course.  She was the one who told us for us to go for

8  a little while to the office.

9  Q.   And then Lisa sat in with you when you met with

10  Ms. Hargrove, didn't she?

11  A.   Yes, because Lisa was the lady who translated into

12  Spanish.

13  Q.   Right.  And Lisa is your immediate -- she's the

14  housekeeping manager, isn't she?

15  A.   Um-hum, that's right.

16  Q.   And what room did you meet with Ms. Hargrove and Lisa in?

17  A.   In the office.

18  Q.   Whose office?

19  A.   The office where Lisa -- well, I mean the office.  In the

20  supervisor's office in the office of Lisa and the office

21  where Lisa stays.

22  Q.   And was anyone using a computer in the office?

23  A.   No, no, no.

24  Q.   Did you sign any paper that day?

25  A.   Yes.

1      MR. McCARTHY:  I don't have any further questions,

2  Your Honor.

3      JUDGE BUSCHMANN:  Okay.

4      THE WITNESS:  Did I sign?  I don't remember.

5      JUDGE BUSCHMANN:  Anything --

6      MR. GREENBAUM:  No questions.

7      JUDGE BUSCHMANN:  Okay.  Thank you very much.  You may

8  step down.

9      THE WITNESS:  Thank you so much.  Thank you.

10      THE INTERPRETER:  You're welcome.

11      THE WITNESS:  Thank you.  Thank you.  Thank you.  Thank

12  you.

13      UNIDENTIFIED MALE:  Thank you.

14      MS. CHUMPITAZ:  Thank you.

15  **(Witness excused.)**

16      MS. HARGROVE:  Your Honor, I'll see if I can get our next

17  witness, Your Honor.

18      JUDGE BUSCHMANN:  All right.

19  **(Off the record.)**

20      JUDGE BUSCHMANN:  Ms. Hargrove, would you call your next

21  witness.

22      MS. HARGROVE:  Your Honor, I'd like to call Paul Kulanda.

23      JUDGE BUSCHMANN:  Mr. Kulanda.  I have to swear you in.

24  Would you please raise your right hand?

25  (Whereupon,

1                          **PAUL N. KULANDA**

2   was called as a witness by and on behalf of the Respondent

3   and, after having been first duly sworn, was examined and

4   testified as follows:)

5        JUDGE BUSCHMANN:  Please be seated right there.  Thank

6   you.

7        THE WITNESS:  You're welcome.

8                          **DIRECT EXAMINATION**

9   Q.   BY MS. HARGROVE:  Mr. Kulanda, could you please state and

10  spell your name for the record?

11  A.   K -- my last name is K-u-l-a-n-d-a.

12  Q.   Is English your first language, Mr. Kulanda?

13  A.   Huh?

14  Q.   Is English your first language?

15  A.   Well, yes, English is my first language in my country.

16  Q.   Are you currently employed?

17  A.   Employed by the State Plaza.

18  Q.   How long --

19       JUDGE BUSCHMANN:  Could you repeat his name?

20       MS. HARGROVE:  I don't -- I'm not sure if I'm spelling it

21  correctly.

22  Q.   BY MS. HARGROVE:  Kulanda?

23  A.   K-u-l-a-n-d-a.

24  Q.   Am I pronouncing it correctly?  Is that how you say it?

25       JUDGE BUSCHMANN:  Could you repeat your name?

1        THE WITNESS:  Paul Kulanda, my, P-a-u-l, Paul.

2        JUDGE BUSCHMANN:  Yes.

3        THE WITNESS:  My middle initial is N.

4        JUDGE BUSCHMANN:  N.

5        THE WITNESS:  My last name is Kulanda.

6        JUDGE BUSCHMANN:  K-u-l-a-n-d-a.

7        THE WITNESS:  n-d-a.

8        JUDGE BUSCHMANN:  Thank you.

9   Q.   BY MS. HARGROVE:  Mr. Kulanda, how long have you been

10  employed at the State Plaza?

11  A.   Well, this is my third year.

12  Q.   Third year?

13  A.   Yes.

14  Q.   And what position do you hold?

15  A.   Well, I'm a houseman in housekeeping.

16  Q.   And what do you duties include?

17  A.   Well, my duties to is to supply the ladies with their

18  linens and other basic needs and also to clean in and outside

19  the hotel and also to solve the guests of their needs.

20  Q.   Mr. Kulanda, do you remember attending a meeting in the

21  Diplomat Room?

22  A.   I do.

23  Q.   Who from management was at that meeting?

24  A.   Well, that meeting was held monthly by we, the workers.

25  Q.   Was anyone from management at the meeting?

1  A.    Anyone from where?

2  Q.    From management?  Was Mr. Palenzona at that meeting?

3  A.    Well, the meeting, the particular meeting we had in

4  Diplomats Room was we, the workers, but later they called the

5  management.

6  Q.    Do you remember who from management came?

7  A.    Well, I cannot recall that stuff now.

8  Q.    Do you remember if Mr. Palenzona was there?  Do you know

9  Corrado Palenzona?

10  A.    I know Corrado Palenzona.

11  Q.    Who is Mr. Palenzona?

12  A.    Well, he's the gentleman in charge of hotel.

13  Q.    Do you remember if Mr. Palenzona was at that meeting?

14  A.    Yes, he was, I believe.

15  Q.    Do you know if there was anyone else from management at

16  that meeting?

17  A.    Well -- was invited by we, the workers, but he didn't

18  come there by himself.  He was invited by we, the workers.

19  Q.    Do you know who Steve Bello is?

20  A.    What?

21  Q.    Do you know Steve Bello?

22  A.    Bello?

23  Q.    Do you know Mr. Bello?  Stephen Bello?

24  A.    Stephen Bello?  Yes, I do.

25  Q.    And who is Mr. Bello?

1  A.    Well, he within the management of the hotel.

2  Q.    Was he at that meeting?

3  A.    No.

4  Q.    Mr. Kulanda, if you could look at the documents in front

5  of you and find GC Exhibit 3.

6        MS. HARGROVE:  Your Honor, if I --

7        JUDGE BUSCHMANN:  Yeah, I think you better help him out.

8        THE WITNESS:  My -- I left my glasses in my coat pocket.

9        MS. HARGROVE:  Do you want me to grab your bag for you?

10       THE WITNESS:  Yes, my glasses.

11       MS. HARGROVE:  Are they in your coat?

12       THE WITNESS:  Yes, they is.  Thank you.

13       MS. HARGROVE:  This document here.  I indicated GC

14  Exhibit 3 to the witness.

15  Q.    BY MS. HARGROVE:  Mr. Kulanda, have you seen that

16  document before?

17  A.    Oh, yes, I'm already -- I signed this document.

18  Q.    You did sign the document?

19  A.    Yes.

20  Q.    Did anyone promise you anything to sign the document?

21  A.    Nobody promised me to sign this document.

22  Q.    Did Mr. Palenzona ask you to sign the document?

23  A.    No.

24  Q.    Do you recall who asked you to sign the document?

25  A.    Well, this was all of us, we, all the workers who signed

1  this particular document, we decided that we don't want the

2  union.  That's why we signed the document.

3  Q.   Do you remember who brought the document to you to sign?

4  A.   Well, this particular document was brought to us by

5  Reina.

6  Q.   Do you know Reina's last name?

7  A.   No, I don't know.

8  Q.   Did Reina tell you you would get a 2.50 raise if you'd

9  sign the document?

10  A.   No.

11  Q.   Did Reina tell you Mr. Palenzona would get the employees

12  a raise if you signed the document?

13  A.   No.

14  Q.   If you could turn next to GC Exhibit 4.  It's the next

15  document on that side.

16  A.   This?

17  Q.   Here, I'll show you.  Do you recognize GC Exhibit 4,

18  Mr. Kulanda?  It's a couple of pages long.  I believe it's

19  two pages, three pages, excuse me.

20  **(Pause.)**

21  Q.   BY MS. HARGROVE:  Do you recognize this document?

22  **(Pause.)**

23     JUDGE BUSCHMANN:  I'm not sure that he's reading the

24  right document.  Maybe you out to --

25     THE WITNESS:  I recognize this document.

1  Q.   BY MS. HARGROVE:  GC Exhibit 4.  Have you ever seen these

2  three pages before or this document at all?  If I could

3  maybe -- Mr. Kulanda, if you could look at the second page of

4  GC Exhibit 4.  Did you sign that document?

5  **(Pause.)**

6       JUDGE BUSCHMANN:  I think you better refresh his

7  recollection.

8       THE WITNESS:  I signed this document.

9  Q.   BY MS. HARGROVE:  Do you see your signature?

10  A.   Yes, I saw it and I signed it.

11  Q.   Okay.  Do you remember who asked you to sign this

12  document?

13       JUDGE BUSCHMANN:  Mr. Kulanda --

14       THE WITNESS:  I --

15       JUDGE BUSCHMANN:  -- can you answer the question.

16       THE WITNESS:  Yes.  I cannot recall that especially now

17  because this document is an old document.

18  Q.   BY MS. HARGROVE:  Did anyone promise you a 2.50 raise to

19  sign this document?

20  A.   No, nobody promise us a raise, to make a raise.

21  Q.   Did Mr. Palenzona bring you this document to sign?

22  A.   No.

23  Q.   And I'll show you the next exhibit.  It's GC Exhibit 5.

24  Do you recognize this document, Mr. Kulanda?

25  **(Pause.)**

```
1        THE WITNESS:  Yes, I --

2   Q.   BY MS. HARGROVE:  Did you sign this document?

3   A.   Yes, I signed it.

4   Q.   Do you recall who asked you to sign this document?

5   A.   This document, this particular document was brought by

6   Veronica.

7   Q.   Okay.  Did Veronica tell you you'd get a raise if you

8   signed this document?

9   A.   No.

10  Q.   Do you know Veronica's last name?

11  A.   I don't know.

12  Q.   Mr. Kulanda, did I come speak with you at the hotel

13  before you came here to testify today?  Have you ever spoken

14  with me before?

15  A.   Before?  Well, your face, I can remember you face now.

16  Q.   Do you remember me coming to the hotel a few weeks ago to

17  speak with you?

18  A.   In housekeeping?

19  Q.   Yes.

20  A.   Oh, yes, somebody like you, yes.

21  Q.   Do you remember if I said -- tell you it was voluntary to

22  speak with me?

23  A.   Oh, yes, I do.

24       MS. HARGROVE:  No further questions, Your Honor.

25       MR. McCARTHY:  If I may have just a moment, Your Honor.
```

1       JUDGE BUSCHMANN:  Yes.

2   **(Pause.)**

3       MR. McCARTHY:  Okay, I'm ready.

4       JUDGE BUSCHMANN:  Yes, go ahead, please.

5                       **CROSS-EXAMINATION**

6   Q.   BY MR. McCARTHY:  Mr. Kulanda --

7   A.   Yes.

8   Q.   -- good afternoon, sir.

9   A.   Good afternoon.

10  Q.   My name is Thomas McCarthy and I represent the General

11  Counsel of the National Labor Relations Board in this matter.

12  A.   I --

13  Q.   I'd like to ask you just a few questions about the

14  testimony that you've given to Ms. Hargrove, okay?

15  A.   Okay.

16  Q.   Now, you were hired as a houseman, sir, on or about

17  June 22nd of 2003, correct?

18  A.   Yes.

19  Q.   And at that time you were making $9.63 per hour, is that

20  correct?

21  A.   You may be correct because I -- it was $9.35 or 63.  I

22  think 63.  You may be correct.

23  Q.   Okay.  And then some time after you signed the third

24  petition, can you read your signature on the third petition,

25  sir, which is GC-5.

```
 1       JUDGE BUSCHMANN:  I think you better point that out to
 2  him, Mr. McCarthy.
 3       MR. McCARTHY:  May I approach, Your Honor?
 4       JUDGE BUSCHMANN:  Of course.
 5  Q.   BY MR. McCARTHY:  Mr. Kulanda, do you -- can you tell me
 6  the date that you signed this third petition?
 7  A.   It was on the 6/23.
 8  Q.   6/23 of '05, correct?
 9  A.   Um-hum.
10  Q.   And then after that, after signing that petition, your
11  wages were increased to $12.50 on July 5, 2005, correct?
12  A.   Well, that, my raises was reviewed but it doesn't concern
13  about my signature here.
14  Q.   Your wages did increase to $12.50 on July 5th, 2005,
15  didn't they?
16  A.   Well, you may be correct.
17  Q.   Okay.  And your -- you were trained as a houseman by
18  Margarito Velasquez, correct?
19  A.   Yes, he was a senior man --
20  Q.   A senior man.
21  A.   Yes.
22  Q.   And he was the houseman on the day shift in one building
23  and you were the houseman on the day shift in the other
24  building, correct?
25  A.   Oh, well, the time they hired me Margarito was not -- he
```

1  used to work outside.

2  Q.    Okay.

3  A.    Yes.

4  Q.    And did you work inside?

5  A.    No, he used to work outside because the work was divided.

6  He used to work outside and prepare banquets.  So, we the

7  housemen by that time it was me, Sam, Abdullah, so we use to

8  change the house, one person can work in north building, the

9  other one work on south building.

10 Q.    And your testimony here today, did you receive a paper or

11 any type of subpoena or legal document that required you to

12 come to court today?  Do you understand my question, sir?

13 A.    Yes, I do.  Well --

14 Q.    Isn't it true that Mr. Corrado asked you to come down and

15 testify today?

16 A.    No, he didn't ask me to come down because we, the union

17 people, who decided that we don't want the union, so when

18 they call for, we come here.

19 Q.    Who asked you to testify here today?

20 A.    What who testify before the Court.

21 Q.    Who asked you to come testify?

22 A.    What?  Management, the management they have to call us to

23 come here.

24 Q.    And did they call all of you together or did they call

25 you alone?

1  A.    They called me.

2  Q.    And who called you?  Who from management called you?

3  A.    Well, my -- one of my supervisor went over and collect me

4  from coming over here.

5  Q.    And what supervisor was that?

6  A.    Fanny.

7  Q.    And did she tell you what she wanted you to do?

8  A.    No, she brought me to the office.  Then when she brought

9  me to the office, the deputy manager told us that they want

10  us here in the court.

11  Q.    Okay.  And did you come with other employees?

12  A.    Well, we came in our own batch, yes.

13  Q.    And how many other employees did you come with?

14  A.    Well --

15  Q.    How many other employees did you --

16  A.    Five.

17  Q.    -- come here with today?

18  A.    Five plus me.

19  Q.    Five employees.  And did you drive over here together or

20  did you take the Metro?  How did you get here?

21  A.    Well, I came with taxi.

22        MR. McCARTHY:  I don't have any further questions, Your

23  Honor.

24        MS. HARGROVE:  Nothing further, Your Honor.

25        JUDGE BUSCHMANN:  Okay.  You may step down Mister -- you

1  may step down.  Thank you.

2      THE WITNESS:  Thank you.

3  **(Witness excused.)**

4      MS. HARGROVE:  Your Honor, our next witness will also be

5  about the same length, we should be finishing --

6  **(Pause.)**

7      JUDGE BUSCHMANN:  Okay.  You want to call your next

8  witness?

9      MS. HARGROVE:  Your Honor, I call Gloria Castro.

10     JUDGE BUSCHMANN:  Okay.  Ms. Castro, I have to swear you

11 in.  Please raise your right hand.

12 (Whereupon,

13                      **GLORIA CASTRO**

14 was called as a witness by and on behalf of the Respondent,

15 and after having been first duly sworn, was examined and

16 testified as follows:)

17     JUDGE BUSCHMANN:  Okay.  Thank you.  Okay.

18                  **DIRECT EXAMINATION**

19 Q.  BY MS. HARGROVE:  Good afternoon, Ms. Castro.  Could you

20 please state your full name for the record?

21 A.  Good afternoon.  Gloria Castro Rodriguez.

22 Q.  Ms. Castro, are you currently employed?

23 A.  Yes, I am currently employed.

24 Q.  And where do you work?

25 A.  I work at the State Plaza.

1  Q.    How long have you worked for the State Plaza?

2  A.    On March 22nd, it'll be 12 years.

3  Q.    And what position do you currently hold at the State

4  Plaza Hotel?

5  A.    Housekeeping.

6  Q.    Ms. Castro, have you ever attended a meeting in the

7  Diplomat Room?

8  A.    Diplomat Room?  Yes.

9  Q.    Do you recall when that meeting was?

10  A.    No, I don't remember.

11  Q.    Do you remember 2004 or 2005?

12  A.    That was exactly -- no, I don't remember, but, yes, I was

13  at that meeting.

14  Q.    Was anyone from management at that meeting?

15  A.    No.

16  Q.    What was the subject of that meeting?

17  A.    Yes.  The subject of the meeting that we had was that

18  because we wanted to do the meeting because we didn't want to

19  have a union.

20  Q.    Were there any supervisors at that meeting?

21  A.    No.  No.

22  Q.    Do you know Corrado Palenzona?

23  A.    No.  Not either.  I know him because he is my boss at

24  work.

25  Q.    Was Mr. Palenzona at that meeting?

1  A.    Palinson?  No, I don't know who Palinson is.

2  Q.    Mr. Palenzona.

3  A.    No, I don't know.  I don't know who is he because --

4  Q.    And who is the General Manager of the State Plaza?

5  A.    Well, we just -- I'm not good with the names and with the

6  management I just know that I meet with Mr. Corrado when I

7  have a problem and I speak to him.

8  Q.    Was Mr. Corrado at that meeting?

9  A.    No, he wasn't there either.

10  Q.    If you could --

11        MS. HARGROVE:  Your Honor, may I approach the witness to

12  show her the exhibit?

13        JUDGE BUSCHMANN:  Yes.

14  Q.    BY MS. HARGROVE:  Ms. Castro, if you could please look at

15  what's marked General Exhibit, or General Counsel Exhibit 3.

16  Do you recognize that document, Ms. Castro?

17  A.    Yes, we -- I recognize it because it's a document that we

18  signed because we don't want to have the union.

19  Q.    Do you see your signature on GC Exhibit 3?

20  A.    Yes.  There's my signature.

21  Q.    Do you remember who asked you to sign this document?

22  A.    I remember one time that I signed it because we were

23  looking for -- we got together with Reina Lozano.  We signed

24  one letter.  We signed another letter with Esmeralda, the

25  letter.

1  Q.   Do you remember who asked you to sign this specific

2  letter, GC Exhibit 3?

3  A.   No, that I asked somebody to sign it?

4  Q.   No, who asked Ms. Castro to sign it.

5  A.   The people who were in the union were going around

6  provoking us so that we would sign, but we -- I said that we

7  don't want a union.  I said I don't want a union.  I never

8  did.

9       MS. HARGROVE:  I'll move on.

10  Q.   BY MS. HARGROVE:  Did anyone make any promises to you to

11  get you to sign this letter?

12  A.   No.

13  Q.   Did anyone --

14  A.   No, no, no, none.

15  Q.   Did anyone tell you you'd get a raise if you signed GC

16  Exhibit 3?

17  A.   Nothing.  Nothing.

18  Q.   If you could look at GC Exhibit 4.

19       MS. HARGROVE:  And if I could ask the interpreter to show

20  her GC Exhibit 4, please.

21  Q.   BY MS. HARGROVE:  Ms. Castro, do you recognize this

22  document?

23  A.   Yes.

24  Q.   Did you sign this document?

25  A.   Yes.

1  Q.    Do you recall who brought you the document to sign?

2  A.    This document was presented to me by Reina and Alexandra.

3  Q.    Did Reina or Alexandra say that you'd get a raise if you

4  signed this document?

5  A.    No.  We wanted to sign it.  We asked for it.

6  Q.    Why did you ask for it?

7  A.    Because we -- I -- we don't want the union.  We simply do

8  not.

9  Q.    If you could turn to GC Exhibit 5.

10     MS. HARGROVE:  I'd like to ask the interpreter to please,

11  the second page of GC Exhibit 5.

12  Q.    BY MS. HARGROVE:  Ms. Castro, do you recognize this

13  document, GC Exhibit 5?

14  A.    Yes.

15  Q.    Did you sign GC Exhibit 5?

16  A.    Yes.

17  Q.    Do you recall who brought the document to you to sign?

18  A.    Esmeralda did.

19  Q.    Did Esmeralda tell you you'd get a raise if you signed

20  this document?

21  A.    No, um-hum.

22  Q.    Did you ever talk to Mr. Corrado about the union?

23  A.    No, um-hum, they don't have anything to do with this.

24  Q.    Did anyone in the union ever come to your house?

25  A.    Yes.

1  Q.    How many times?

2  A.    One time.  I was working.

3         MS. HARGROVE:  Just a second, Your Honor.

4  Q.    BY MS. HARGROVE:  Ms. Castro, do you remember speaking to

5  me at the hotel a few weeks ago?

6  A.    Yes.

7  Q.    Did I identify myself.

8  A.    Yes.

9  Q.    Did I tell you I was a lawyer for the State Plaza Hotel?

10 A.    Yes.  Yes.

11 Q.    Did I tell you it was voluntary?  That if you wanted to

12 speak with me you could but you did not have to.

13 A.    Exactly.

14        MS. HARGROVE:  No further questions, Your Honor.

15        MR. McCARTHY:  If I may just have a moment, Your Honor.

16        JUDGE BUSCHMANN:  Yes.

17 **(Pause.)**

18        MR. McCARTHY:  I'm ready to proceed, Your Honor.

19        JUDGE BUSCHMANN:  Yes, please.

20                        **CROSS-EXAMINATION**

21 Q.    BY MR. McCARTHY:  Good afternoon, Ms. Castro.

22 A.    Good afternoon.

23 Q.    My name is Thomas McCarthy and I represent the General

24 Counsel of the National Labor Relations Board in this matter.

25 A.    Um-hum.  Okay.

1  Q.   You recommended Maria Chumpitaz for a job, didn't you?

2  A.   Yes.  Yes.

3  Q.   And what did you tell Maria Chumpitaz when you

4  recommended her for a job?

5  A.   I simply said to her whether she liked her work and what

6  the price of the wage was that she could earn.

7  Q.   And what was the price of the wage that she would earn

8  at -- what did you tell her was the price of the wage that

9  she would earn if she got a job at State Plaza Hotel?

10  A.   When she went in, she could earn 9 35 an hour.

11       MR. McCARTHY:  Your Honor, may I approach the witness?

12       JUDGE BUSCHMANN:  Yes.

13  Q.   BY MR. McCARTHY:  I'm showing you what's in evidence as

14  General Counsel's Exhibit 119.  Do you recall what your hire

15  date was?

16  A.   The date that I was hired?

17  Q.   Yes.  You were hired on --

18  A.   I just remember that I started in March 23, but I don't

19  remember the year.

20  Q.   Was your hire date April 7, 1996?  Does that sound

21  accurate to you?

22  A.   I can't remember.  I don't remember.  I don't remember.

23  Q.   In May of 2002, you were being paid $10.41 per hour, do

24  you remember that?

25  A.   Yes.  Yes.

1   Q.   And then the next May you received annual increase,

2   bringing your wage up to $10.72 per hour, correct?

3   A.   Exactly.

4   Q.   And then in May of 2005, you received a wage increase

5   from $11.07 up to $11.45, correct?

6   A.   Yes.  Yes.  Yes.

7   Q.   And then two months later on July 5th, 2005, your wage

8   was again increased from $11.45 to $12.50 per hour, correct?

9   A.   Yes.  Yes.

10  Q.   Your not testifying here under subpoena, are you?

11  A.   Exactly.  I came on my own account.

12  Q.   And did anyone from management ask you to come and

13  testify here today?

14  A.   No.  I came on my own account.  On my own account because

15  I --

16  Q.   Today --

17  A.   -- wanted to come here.

18  Q.   Is today your day off?

19  A.   No, it's a work day.

20  Q.   And you just decided that you would come down here on

21  your workday yourself?

22  A.   No.  No, because I received, that is, Mr. Corrado said if

23  anybody wants to go and I said I did.  I was the first to say

24  I wanted to go.

25  Q.   Okay.  And how many people were present when Mr. Corrado

1  asked if anybody wants to go?

2  A.   Well, quite frankly I had asked him several times that I

3  had wanted to come down here.

4  Q.   And how many people were present when he asked you if you

5  wanted to go as you just testified?

6  A.   There were only three of us who were there, no more.

7  Q.   Okay.  And who were those three?

8  A.   There was Chumpitaz, whatever her name is, and this,

9  what's his name, the black guy, what's the name of the, oh,

10  the name goes out of my head.

11  Q.   Mr. Kulanda?

12  A.   No, I don't know who Kulanda is.  The truth is I don't

13  know.  I don't know.

14  Q.   Who is the third person?

15  A.   The third person was Esmeralda.

16  Q.   And where was this meeting with Mr. Corrado?

17  A.   That was in the cafeteria.  He asked us whether anybody

18  wanted to go and I said yes, I want to be the first to go.

19  Q.   And was that this morning or yesterday?

20  A.   Now.  Now.

21  Q.   And did you drive over here with anyone today?

22  A.   No.  I came all by myself, just me.

23     MR. McCARTHY:  No further questions, Your Honor.

24     MS. HARGROVE:  Nothing further, Your Honor.

25     JUDGE BUSCHMANN:  Okay.  Thank you very much.  You may

1  step down.

2     THE WITNESS:  Okay.  Thank you.

3  **(Witness excused.)**

4     JUDGE BUSCHMANN:  So, what about tomorrow, Mr. Greenbaum?

5     MR. GREENBAUM:  We have a full slate of witness for

6  tomorrow, Your Honor, but they'll be fast.  I think we could

7  finish up tomorrow.  The managers may take a little more but

8  they speak English, so --

9     JUDGE BUSCHMANN:  Um-hum.

10    MR. GREENBAUM:  -- they shouldn't take that long.

11    JUDGE BUSCHMANN:  So, do you want to start at 9:30 or

12  10:00 to make sure that we finish tomorrow?

13    MR. GREENBAUM:  Ten would be fine with us, Your Honor.

14    JUDGE BUSCHMANN:  But I still want to make sure we'll

15  finish.

16    MR. GREENBAUM:  Yeah, I --

17    MR. McCARTHY:  Your Honor, we may have one or two

18  rebuttal witnesses.

19    MR. GREENBAUM:  Oh, well then, 9:30.  Are we on the

20  record?

21    JUDGE BUSCHMANN:  We're on the record right now.

22    MR. GREENBAUM:  Can we go off?

23    **Let's go off the record.**

24  **(Off the record.)**

25    JUDGE BUSCHMANN:  We stand adjourned until 9:30 tomorrow

1   morning.

2   **(Whereupon, at 5:15 p.m., the hearing in the above-entitled**

3   **matter was adjourned, to be reconvened the next day, Friday,**

4   **March 17, 2006, at 9:30 a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## CERTIFICATION

    This is to certify that the attached proceedings before

the National Labor Relations Board (NLRB), Region 5, in the

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

matter of **STATE PLAZA HOTEL**, Case No. 5-CA-32594, at

Washington, D.C., on March 16, 2006, were held according to

the record, and that this is the original, complete, and true

and accurate transcript that has been compared to the

reporting or recording, accomplished at the hearing, that the

exhibit files have been checked for completeness and no

exhibits received in evidence or in the rejected exhibit

files are missing.

_____
Timothy J. Atkinson, Jr.
Official Reporter


_____
Mary Anne Jones
Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947