JD-62-06
Washington, DC

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

STATE PLAZA, INC., A WHOLLY-OWNED
SUBSIDIARY OF RB ASSOCIATES, INC.,
D/B/A STATE PLAZA HOTEL

        and                                                   Case 5-CA-32594

HOTEL AND RESTAURANT EMPLOYEES,
LOCAL 25, UNITE HERE INTERNATIONAL
UNION

*Thomas P. McCarthy, Esq.* and
*Stephanie Cotilla, Esq.,*
  for the General Counsel.
*Jonathan W. Greenbaum* and
  *Emily K. Hargrove, Esqs.*
  *(Nixon Peabody, LLP),*
  of Washington, D.C.,
  for the Respondent.
*Devki Virk, Esq.*
  *(Bredhoff & Kaiser, PLLC),*
  of Washington, D.C.,
  for the Charging Party.

DECISION

Statement of the Case

      Karl H. Buschmann, Administrative Law Judge. This case was tried in Washington D.C., on March 13 to 17, 2006. The charges were filed by Hotel and Restaurant Employees, Local 25, Unite Here International Union (the Union or Local 25) on July 25, 2005 and amended August 11, 2005, October 14, 2005, and October 31, 2005. On October 31, 2005, Region 5 of the National Labor Relations Board issued the complaint charging State Plaza, Inc., a wholly-owned subsidiary of RB Associates, Inc., d/b/a State Plaza Hotel (the Hotel or the Respondent) with violations of Section 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act). More specifically, the Respondent is accused of making coercive statements to employees, interrogating employees about the Union, promulgating overly broad no-distribution rules, creating the impression that the employees' union activities were under surveillance, directly dealing with employees and promising pay raises if they signed a petition to decertify the Union, soliciting employees to sign decertification petitions, withdrawing recognition from the Union and by its overall conduct failing and refusing to bargain in good faith with the Union. The Respondent filed a timely answer denying the commission of any unfair labor practices.

JD-62-06

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, the Union, and the Respondent, I make the following

## Findings of Fact

### I. Jurisdiction

5

The Respondent, a District of Columbia corporation, has been engaged in the business of owning and operating a hotel and providing food, beverage, and lodging at its District of
10 Columbia location, where it annually derived gross revenues in excess of $500,000 and purchased and received goods and services valued in excess of $5000 directly from points outside the District of Columbia. The Respondent admits and I find that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and that the Union is a labor organization within the meaning of Section 2(5) of the Act.
15
### II. Alleged Unfair Labor Practices

The Hotel with approximately 68 employees was the subject of an organizing campaign by the Union in early 2003. At the election on September 5, 2003, the employees voted for the
20 Union by vote of 44 to 21. The Respondent filed objections to the election which the Board overruled, and on June 29, 2004, the Union was certified as the collective-bargaining representative for unit employees at the Hotel (GC Exh. 53). The following employees were found to constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act:
25
> All full-time and regular part-time employees, including cooks, prep cooks, dishwashers, pantry, utility, waiters, busers, hosts, bartenders, room servers, servers, housekeepers, room attendants, lobby attendants, housemen, turn-down attendants, laundry attendants, guest service agents, bell captains, mini-bar attendants and
30 > restaurant cashiers, employed by the Employer at the State Plaza Hotel in Washington, D.C.; excluding all reservation sales representatives, office clericals, engineers, painters, guards and supervisors as defined by the Act.

In the meantime, the Hotel was the subject of an unfair labor practice proceeding and
35 found to have violated the Act in *State Plaza, Inc.*, 347 NLRB No. 70 (2006). According to that case the Respondent threatened employees if they supported the union, solicited grievances, and granted benefits to dissuade employees from their union support and discharged a union organizer.

40 Shortly after the Union was certified, it requested to bargain on behalf of the employees by letter of July 2004 (GC Exh. 54). At a meeting, Respondent's counsel orally assured the union representative that it would provide a bargaining schedule. However, the Respondent failed to keep its promise. The Union contacted the Hotel by e-mail on August 2, 2004, but the Respondent ignored the Union's request. By letter of December 2, 2004, to Respondent's
45 counsel, the Union made another request to bargain and requested dates on which management would be available to meet. The letter also made a demand for relevant information (GC Exh. 57). Again, there was no answer from the Respondent. A month later, the Union sent another letter reminding the Respondent to furnish the information and to supply dates on which to meet (GC Exh. 58). Not until the Union informed the Respondent by letter of
50 January 28, 2005, that it considered its continued failure to respond to requests for information and bargaining dates to constitute a refusal to bargain, did Respondent's counsel respond (GC

2

JD-62-06

Exhs. 59, 60).  The Respondent finally suggested certain dates. However, for one reason or another it canceled and rescheduled dates (GC Exhs. 62, 63, 64, 67, 69).  The parties finally met on March 30, 2005.  Yet no progress was made. In the words of the Union in a letter, dated March 31, 2005, the Union aptly described the Respondent's conduct (GC Exh. 75): "you --

5

       (1) ignored our requests to meet for several months,
       (2) finally provided us with a date only after we told you that we would file charges,
       (3) refused to provide us with more than one date,
       (4) when we accepted that date, told us that it was no longer available,
10      (5) when we accepted the next date, told us that one of your team had a conflict,
       (6) when we accepted the next date, cancelled the meeting, and
       (7) when you finally met with us yesterday, did not bring your calendars,"

     The letter concluded that the failure to meet has been a consistent theme to stall this
15 process at every stage (GC Exh. 75).  Thereafter, the parties met on about seven occasions without ever agreeing to a contract.

    In the meantime, after most of the Union's certification year had elapsed and having rendered ineffective any efforts by the Union to successfully represent its employees during that
20 time, the Respondent engaged in a series of actions at the Hotel designed to oust the Union. Two employees, Reina Lozano and Alexandra Guillen, became the leaders among the housekeeping staff to solicit other employees to join a decertification effort.  It began when Lozano approached Respondent's General Manager Corrado Palenzona in late 2004 and asked for additional hours of work, so that she could afford her recently purchased house.  In
25 response, Palenzona assigned her in December 2004 to assist Guillen in the food and beverage department to prepare continental breakfasts and to stock the minibars in guest rooms.  As a result of the transfer, Lozano who had cleaned up to 12 or 13 rooms, the daily quota, for 15 years, was relieved of those assignments.  Guillen, a 25-year veteran at the Hotel, had not been laid off but survived the closure of the restaurant.  She was assigned to prepare the continental
30 breakfasts at the Hotel and to work on the minibars.  Her income from gratuities in connection with banquets at the Hotel exceeded that of most other employees.  Following Lozano's reassignment both employees, Guillen and Lozano, worked closely together.  They frequently met with Palenzona and other management officials in the cafeteria for breakfast.  In March 2005, they met with Palenzona when Lozano asked for more money and suggested that the
35 employees receive a pay raise.  Palenzona blamed the Union, replying that the Hotel could not give a raise because the Union had a claim against the Hotel.  Palenzona assured the two employees that he would speak to his attorney to see what could be done and when the problem with the Union was resolved, that the Hotel could give all employees a pay raise to $12.50 per hour in line with the other hotels owned by the Company.
40
     In March 2005, the Respondent conducted a meeting with the employees to discuss their concerns about supervisors' treatment. After the meeting three housekeeping employees, including Adriana Nunez, stayed behind.  Nunez testified that the two employees asked Palenzona and Stephen Bello, a division president of Classic Hospitality, about a pay raise.
45 Palenzona replied that it was subject to bargaining with the Union.  The employees indicated that it would take too long and inquired whether they could get rid of the Union.  Palenzona advised the employees that the majority of the employees would have to sign a decertification petition.  At that point Palenzona and Bello consulted their attorney about this issue and told the employees (Tr. 122), "ladies time to go to work, everything will be worked out.  We'll get a
50 petition out on the Union and we'll no longer have any problems with the Union at this hotel." According to Nunez's credible testimony, Palenzona also "said that what we said was simply

3

JD-62-06

among us, that we were the only ones that would know about this, and not to say anything to any of the other employees about what we had spoken."

5      Shortly after the meeting Palenzona met with Lozano and Guillen in the food and beverage office. Nunez testified that she overheard their conversation while waiting for an elevator, and that Palenzona said to the two employees that they should go from door-to-door with the petition to get the signatures of the housekeeping employees. Palenzona also said that everyone would sign the petition because they would want a raise. I find Nunez's testimony in this regard credible, particularly because she had no reason to lie and because of her sincere
10    and forthright manner of testifying. Respondent's witnesses disagreed with this scenario. But they appeared less candid and were obviously interested in promoting their positions at the Hotel. Significantly, subsequent events proved the accuracy of what Nunez had overheard.

       On the following day, March 21, 2005, Lozano and Guillen followed management's
15    instructions and during their worktime circulated a document in the form of petition written in English and Spanish, stating (GC Exhs. 3, 28): "We are the employees of the State Plaza Hotel. The reason of this letter is to inform you that we do not want to be part of Local 25 it is our own decision." Lozano and Guillen were the first to sign the petition. Other employees signed because they were told that they would get a raise. For example, Nunez testified that
20    Guillen told her that the petition came with a $2.50 increase and that if we signed it they would get an increase in pay. Margarito Velasquez, a houseman at the Hotel, testified that he frequently saw Palenzona with Guillen and Lozano, particularly at breakfast. According to Velasquez, Lozano said that they were carrying the boss' word and that signing the petition would guarantee a raise in pay. Similarly Gloria Melgar, housekeeper, testified that she
25    observed Palenzo meet with Lozano and Guillen in the cafeteria almost daily in the morning. She signed the petition because she was told that signing the paper would get rid of the Union so that they would get pay raise to $12.50. Sang Nguyen, a houseman at the Hotel, similarly testified that both Guillen and Lozano told him that if he signed the petition then he would get paid a higher salary. The testimony of other employees corroborated the scenario, that Guillen
30    and Lozano solicited the employees with promises of a pay increase if they signed the petition to decertify the Union. They testified with the assistance of an interpreter because of their limited language skills. They appeared honest, particularly because they had nothing to gain by testifying contrary to the interest of their Employer.

35     Several witnesses testified that they signed the petition without any inducement of a pay raise that they were simply interested in getting rid of the Union. They were frustrated with the lack of progress in the negotiations between the Respondent and the Union. Even Lozano, an earlier supporter of the Union, testified that initially a majority of the employees attended union meetings but after about 6 months fewer employees were present at those meetings. During
40    that entire time, the Hotel had resisted all efforts by the Union to commence bargaining. As a result of the Respondent's tactics, the employees saw no progress with the Union and were easily persuaded to sign the petition to decertify the Union. In any case, the record shows that Lozano and Guillen, at the behest of Palenzona, solicited signatures on the petition by promising them higher wages. Although denying that Palenzona had suggested it, Lozano
45    conceded in her testimony that she had told her coworkers that the Hotel would give them a raise of $12.50 like the other hotels if the issue with the Union were resolved. Having observed Palenzona's frequent meetings with Lozano and Guillen, their coworkers concluded that representations of more money by getting rid of the Union were realistic.

50     In late March 2005, Guillen and Lozano delivered the petition with nearly 36 signatures to the Union's office (GC Exh. 3). The Union then contacted several employees privately in an effort to change their minds about the decertification efforts. Several employees in the

4

JD-62-06

housekeeping staff perceived the Union's visits to their homes and other personal contacts as harassment.  Management officials, Palenzona and Bello, conducted a meeting in the laundry room in April 2005 with the employees to discuss safety and hotel rules.  Guillen translated their remarks into Spanish.  During the meeting, one of the employees asked about the promised raise.  Palenzona replied that no one could receive a raise, because the Hotel was still involved in bargaining with the Union.  Clearly, the Respondent acknowledged that it had considered a $2.50 pay hike, but blamed the Union for the failure of an increase in pay.  Thereafter, Guillen and Lozano circulated another antiunion petition during their working time asking the Union to stop harassment of employees.  That document with about 30 signatures was delivered to the Union in May 2005 (GC Exh. 4).

In the meantime from March to July 2005, employees Marleni Jiron, Margarito Velasquez and Ana Majano distributed union material at the facility.  These flyers were prepared by the Union to inform the employees of the Union's difficulties in arranging bargaining sessions with the Respondent.  The flyers also reflected the Union's proposals and its demands for employee benefits (GC Exhs. 39, 40, 41, 43).  In the morning on April 19, 2005, Jiron had distributed the union flyers in the cafeteria in the presence of other employees.  Later in the day she was asked to report to Palenzona's office.  There he demanded to know what was going on.  When she answered, nothing, he showed her a copy of the union flyer and told her that it was bad and forbidden to bring union material to the Hotel.  On May 21, 2006, Palenzona also questioned Velasquez about his role in placing union propaganda on a table in the Hotel, suggesting that he suspected Velasquez of bringing the union literature to the Hotel.  Palenzona told him to respect the rules that union propaganda was not permitted at the Hotel. Majano had a similar experience on July 8, 2005.  She had passed out union flyers in the cafeteria on her lunchtime. One of the union flyers was passed on to Palenzona who then proceeded to question Majano as to whether she had passed them out.  Majano admitted that she had.  Palenzona asked whether she knew that it was forbidden to pass out those flyers on the property, adding that it was trash.  In sum, the Respondent interrogated the employees about their union activities, namely their role in passing out union material, he gave the impression that he knew about their union activities by surveillance, and he broadly prohibited the distribution of union literature on company property during the employees' own time.

I find the Respondent's denial of this conduct unpersuasive, particularly after considering a recording of the conversation between Palenzona and Velasquez (GC Exhs. 109, 115).  Considering the forthright and honest demeanor of the employee witnesses, I have credited their recollection of the incidents.

The employees circulated a third antiunion petition in June 2005, and again Lozano collected employees' signatures (GC Exh. 5).  According to her testimony she and several other employees, including Silvia Romero, passed the decertification petition on to her coworkers for their signatures.  Although Guillen did not join Lozano in circulating the third petition, she did question employee Gloria Melgar in the hallway near the cafeteria during the third week in June 2005, why she had not signed it and said that Palenzona felt that she had betrayed him.  That Palenzona questioned employees about their failure to sign a petition is supported by Nunez.  She had entered his office located near the lobby during evening hours to clean the area.  He was still in his office when he asked her why she had not signed the petition.  He said the petition was to get rid of the Union, that the majority of the employees had signed and then the Hotel would not have any more problems with the Union.

The alleged comment by Guillen about a threat to sell the Hotel is not supported by any other witness.  I have not credited Melgar's recollection of the statement.  However, Melgar related how on a certain day in June 2005, Palenzona came to her at 9 a.m. as she was

5

cleaning a room. Palenzona asked her whether union representatives had visited her and suggested that they were liars. He told her to let him know if they were bothering her.

5     The third petition contained about 34 signatures mostly from employees who had signed the previous ones and were collected with promises of an increase in pay and with the support of management. In early July 2005, the employees delivered the petition to the Union and to management of the Hotel. On July 5, 2005, the Respondent addressed the employees at a meeting in the cafeteria and informed them that the problem with the Union was over, that the Respondent was withdrawing recognition from the Union and that all housekeeping employees
10    would get a pay raise to $ 12.50 per hour. Lisa Alvarado, executive housekeeper and member of management, testified that she translated Palenzona's speech at the meeting of housekeeping employees in July 2005. She recalled that Palenzona "said that they realized that most people didn't want the Union so they were going to act as if the Union was not in place at this time and they were going to give them the raise that the rest of the Company had already
15    received" (Tr. 801). The record accordingly shows that the Respondent withdrew recognition from the Union on the basis of a petition that was tainted by the Respondent's own involvement with it, that management dealt directly with the employees to dissuade them from supporting the Union, stating that the Union was the problem which had prevented the pay raise, and that the pay raise was effectuated without bargaining with the Union.
20
      On July 8, 2005, the Hotel raised the pay of its housekeeping staff to $12.50 an hour. By that time, the certification year had expired and the Respondent had skillfully avoided any substantive or comprehensive agreement with the Union.

25    Finally, in late July 2005, the Union created pamphlets entitled, "We Stand With Marleni. We Stand With The Union!" (GC Exhs. 29, 30). The pamphlets which were prepared to protest the discharge of Marleni Jiron, a prominent union organizer, showed photographs of several employees, including Adriana Nunez. Alvarado who had recognized Nunez in the picture on the union pamphlet, cautioned her, saying that she liked her work but warned that if Palenzona
30    dismissed or fired her, she (Alvarado) could not help her. Abdulla Va, a night supervisor, also warned Nunez about her union support. He told her to be careful because Palenzona did not like the Union and there may not be any more work. Similarly Fanny Reid, a supervisor in housekeeping, spoke to Nunez about the photo in the cafeteria in late July. Reid said, "I thought you had changed, that you no longer went around with those Union people." Reid warned her to
35    be careful with those photos she was passing out, because she could be dismissed. Such comments are obvious threats of loss of jobs because of an employee's union activity, and they also show that the Employer created the impression of surveillance of an employee's union activity.

40                                     Analysis

      A fair appraisal of the evidence shows that this Respondent resorted to every illicit means to thwart the employees' union support and to destroy the Union's certified status as the employees' collective-bargaining representative in its incipiency. An election on September 5,
45    2003, determined the employees' decision to be represented by the Union. But the Respondent refused to recognize the Union and filed objections which were heard by an administrative law judge. The Board affirmed the judge's decision which overruled the objections and certified the Union in a decision on June 29, 2004. In the meantime, the Respondent discouraged the employees' union activities, and, in a decision referred to above, was found to have engaged in
50    unfair labor practices in violation of the Act. The Judge issued an order requiring the Respondent to cease its unlawful conduct and to comply with the law. In spite of

this background, the Respondent continued its assault on the employees' rights to be represented by the Union.

5    For more than six months, from the inception of the certification of the Union on June 29, 2004, as the employees' bargaining representative, the Respondent has ignored the Union's repeated attempts to bargain with the Respondent and rejected all initial requests by the Union to meet and negotiate. The Union made at least four written demands in July, August, and December 2004, and again in January 2005. Yet the Respondent failed to cooperate and simply refused to answer the Union's letters. This conduct effectively blocked any progress in
10   the negotiations. Not until the Union notified the Respondent by letter of January 28, 2005, that its continued failure to respond to the Union's requests constituted a refusal to bargain, did the Respondent respond by letter of January 31, 2005. It took the Respondent 6 months to acknowledge the Union's demands. Even then State Plaza continued its stalling tactics by canceling scheduled bargaining sessions, by agreeing to only one date at a time, by rejecting
15   dates submitted by the Union and by delaying to provide relevant information. The Union had made an information request on December 2, 2004, but State Plaza waited until April 13, 2005 to respond. On March 30, 2005 the parties had their first face-to-face meeting during which one of the union negotiators lost his temper and was required to apologize, so that no economic proposals were exchanged until May 10, 2005. Seven bargaining sessions between March and
20   June 2005, produced nothing except the employees' exasperation with the lack of progress and their waning interest in the Union. The law in this area is well settled, that procrastination in scheduling meetings, or the willful avoidance of meetings, or resorting to delaying and evasive tactics is considered evidence of bad faith. *Exchange Parts Co.,* 139 NLRB 710 (1962), enfd, 339 F.2d 829 (5th Cir. 1965); *Crane Co.*, 244 NLRB 103 (1979); *Atlanta Hilton & Towers*, 271
25   NLRB 1600 (1984); *Calex Corp.*, 322 NLRB 977 (1997). The Board has held that the persistent failure to agree to meet at suggested times, and the canceling of scheduled meetings without proposing additional dates is evidence of bad faith bargaining. *United Technologies Corp.,* 296 NLRB 571 (1989).

30   In addition, during the negotiations the Respondent rejected all union proposals relating to economic issues, particularly those relating to health insurance and pension plans. Company negotiators demonstrated their intransigence on other issues as well, particularly by repeatedly stating that the owners would rather sell the Hotel than agree to certain economic proposals. Although the complaint does not raise an issue relating to surface bargaining, the Respondent's
35   conduct in this regard is consistent with its overall strategy. The most glaring evidence of bad-faith bargaining in violation of Section 8(a)(1) and (5) of the Act was the Respondent's recalcitrance in cooperating with the Union to meet at reasonable times. This is particularly so here, considering not only the Respondent's dilatory tactics, but also its overall conduct of violations of the Act, including its collaboration in sponsoring decertification petitions with the
40   assistance of two employees, Lozano and Guillen and with promises of benefits. Instead of meeting and bargaining with the Union, State Plaza was conducting a clandestine course of action to rid itself of the Union. As alleged in the complaint, the Respondent violated Section 8(a)(1) and (5) of the Act by its overall conduct.

45   Illustrative of this scenario is Lozano, an early union supporter, who admitted her leading role in the antiunion drive. She testified that she had been disillusioned by the slow process of the union negotiations, saying that she was tired of waiting for a contract to come out. Her reaction was not unexpected after the long delays carefully planned by the Respondent. Not only did she become an antiunion activist, she and Guillen became agents for the Respondent
50   in circulating three decertification petitions.

The issue whether the employees initiated the antiunion drive on their free will or with the active collaboration of management depends on a resolution of the alleged agency status of Alexandra Guillen and Reina Lozano.

5      In *Pan-Oston Co.,* 336 NLRB 305, 306 (2001) (emphasis added), the Board explained the test for determining agency status:

> The Board's test for determining whether an employee is an agent of the employer is whether, under all of the circumstances, employees would
> 10   reasonably believe that the employee in question was reflecting company policy and speaking and acting for management. *Waterbed World*, 286 NLRB at [425] 426-427 [(1987)] (and cases cited therein). The Board considers the position and *duties* of the employee in addition to the context in which the behavior occurred. *Jules V. Lane*, 262 NLRB 118, 119 (1982).
> 15
> Although not dispositive, the Board will consider whether the statement or actions of an alleged employee agent were consistent with statements or actions of the employer. The Board has found that such consistencies support a finding of apparent authority.
20

More recently, the Board reached a similar result. *Dish Network Service Corp.,* 347 NLRB No. 69 (2006). The apparent authority of Lozano and Guillen was immediate and obvious to the employees, first, when management elevated them to more enhanced responsibilities in the dining room and minibars, then their frequent, almost daily, meetings and close associations
25   with management officials, as well as their occasional function as translators for management. The most persuasive evidence of agency status was their role in circulating three decertification petitions during working time, going from room-to-room at the behest of Palenzona. He was overheard to direct Lozano and Guillen to contact the housekeeping staff and to solicit signatures with promises of higher pay to $12.50 per hour. Proof positive of their actual
30   authority was that the promises were realized when management put into effect the promised increase in pay following the successful antiunion campaign. Their complicity with management was also apparent when employees were interrogated by Palenzona as to why they had not signed the petition. Not only were employees on notice that management was aware that the petitions were going around, but it became obvious that management had sponsored the
35   decertification effort.

The Respondent's argument that the employees signed the petitions on their own accord, simply out of frustration with the Union and independent of management's influence, is not persuasive. Too many employees testified consistently and against their own interest that
40   Lozano and Guillen had approached them with promises of more money if only they signed the petition. Other witnesses, professing to have signed because they were disenchanted with the Union, were frustrated with the lack of progress, a result which the Respondent created in the first place. In this regard, the Board had this to say: "Lengthy delays in bargaining deprive the union of the ability to demonstrate to employees the tangible benefits to be derived from union
45   representation. Such delays consequently tend to undermine employees' confidence in the union by suggesting that any such benefits will be a long time coming, if indeed they ever arrive." *Lee Lumber & Building Material Corp.*, 322 NLRB 175, 177 (1996). In any case, the subjective reasons given by some of the employees that they did not want to be represented by the Union are not the deciding factor, especially because I question their sincerity and motives
50   in appearing on behalf of their Employer. In these cases, the Board applies an objective test, namely to assess the tendency of the unlawful action. *Lee Lumber & Building Material Corp.,* supra at 177. Clearly, State Plaza is responsible for the actions of the two employees, Lozano

and Guillen, whose activities on behalf of their Employer undermined the union sentiment among the employees.  The Respondent's conduct in soliciting signatures from employees during their working time and in working areas violated Section 8(a)(1) of the Act.  *Equipment Trucking Co.,* 336 NLRB 277, 286 (2001).  There, as here, the Employer solicited employees' signatures for a decertification petition.  I also find that the Respondent unlawfully promised benefits to influence the employees to sign the antiunion petitions.  *NLRB v. Exchange Parts Co.*, 375 U.S. 405 (1964); *Dish Network Service Corp.*, supra at 15.

Bypassing the Union and dealing directly with the employees has been found to violate the Act.  For example, in *Fairhaven Properties*, 314 NLRB 763 (1994), the Board found a violation where the employer asked employees to sign a petition to oust the union and promising them that wages would remain the same even without union representation.  Similarly in *Equipment Trucking Co.*, supra, 336 NLRB at 287, the employer was found to have violated the Act for dealing directly with employees and offering them higher pay for signing a decertification petition.  I have no difficulty in finding that State Plaza violated Section 8(a)(1) and (5) of the Act, as alleged in the complaint, when it dealt directly with the employees by sponsoring decertification petitions with promises of benefits if the employees signed the petitions.  *Dish Network Service Corp.,* supra at 31.

In addition, the Employer violated the Act by withdrawing recognition from the Union on the basis of a tainted petition.  Not only did the Respondent fail to bargain in good faith with the Union by resorting to dilatory tactics and frivolous negotiations, by bypassing the Union and having its agents dealing directly with the employees, and by soliciting their signatures with promises of benefits, the Respondent also engaged in unfair labor practices during the same timeframe by unlawful interrogations, by creating the impression of unlawful surveillance and by an unlawful no-distribution rule, all of which affected the Respondent's unlawful withdrawal of recognition.

Evidence of an 8(a)(1) violation was reflected in the testimony Nunez and Melgar who testified that Palenzona interrogated them as to why they had not signed the petition.  Consideration of the totality of circumstances shows that the interrogation was coercive.  Not only was Palenzona the highest executive on the premises, he sought highly sensitive information by individually confronting the unsuspecting employees.  *Rossmore House,* 269 NLRB 1176 (1984), affd. sub nom.  *Hotel Employees Local 11 v. NLRB,* 760 F.2d 1006 (9th Cir. 1985); *Emery Worldwide*, 309 NLRB 185 (1992).

As already reported, Palenzona told several employees in one form or another that union pamphlets were prohibited on the hotel premises.  Such a flat prohibition is presumptively unlawful.  Employees are permitted to distribute literature in nonwork areas during nonworktime unless the employer can establish that a more restrictive rule is necessary to maintain discipline or production.  *Our Way, Inc.*, 268 NLRB 394 (1983); *United Parcel Service*, 327 NLRB 317 (1998); *Lafayette Park Hotel,* 326 NLRB 824 (1998).  Here the Hotel has not made such a showing but issued a blanket oral prohibition without regard to the employees' own time or the particular location of the material.  According to the same employees (Velasquez, Jiron, and Majano), Palenzona expressed his suspicion that they had distributed the prohibited material.  Clearly, the Respondent created the impression that their union activities were under surveillance.  It is well settled that such conduct designed to impede or discourage union involvement violates the Act.  *Ichikoh Mfg.*, 312 NLRB 1022 (1993), enfd. 41 F.3d 1507 (6th Cir.1994); *United Charter Service,* 306 NLRB 150 (1992).

As alleged in the complaint, the record shows that in June 2005, Guillen questioned Melgar why she had not signed the petition, adding that Palenzona felt betrayed by her failure to

JD-62-06

sign. Again Guillen demonstrated her agency role by appearing to speak on behalf of management and expressing Palenzona's keen interest in the success of the decertification efforts. Management's expression of disappointment by an employee's failure to sign a decertification petition interferes with the employees' Section 7 rights and is clearly coercive in
5   violation of Section 8(a)(1) of the Act.

        The complaint alleges as violations of Section 8(a)(1) the conduct of Supervisors Lisa Alvarado, Abdullah Va and Fanny Reid in July 2005 who had recognized the picture of Nunez in a prounion pamphlet. On separated occasions they warned her about her union support adding
10  that Palenzona was aware of her union sentiment and that it could cost her job. Threats of loss of jobs have long been considered unlawful under the Act. *Bestway Trucking, Inc.*, 310 NLRB 651, 671 (1993). Their conduct also created the impression that the employees' union activities were under surveillance. Accordingly, I find that the Respondent violated Section 8(a)(1) of the Act.
15
        Finally, the Respondent does not deny that it withdrew recognition from the Union on July 5, 2005. At a meeting in the cafeteria, Palenzona announced to the assembled employees that it was no longer dealing with the Union and that the employees would get a raise to $12.50 in their next paycheck, because the problem with the Union was over. On July 8, 2005,
20  approximately 35 unit employees received the increase in pay. Any suggestion that the Hotel merely acted to raise the pay in order to bring it up to the level of its other hotels in the chain is an afterthought and insincere. That suggestion could have been, but was not, made during the negotiations with the Union. Moreover, I find the testimony on this point by the president of the hotel division, Bello, unpersuasive. He conceded that the pay was raised simultaneously with
25  the Company's withdrawal of recognition. The timing, as well as the entire record clearly shows that the increase in benefits was directly linked to the decertification efforts and the withdrawal of recognition. It cannot be gainsaid that the decertification petition was tainted by the Company's direct involvement and the unfair labor practices. As shown above, the Respondent had orchestrated the effort with the cooperation of its agents, Lozano and Guillen, and by
30  delaying any progress in the negotiations with the Union in order to frustrate the employees' faith in their Union, and by engaging in a barrage of unfair labor practices to intimidate and coerce the employees to dissuade them from their continued support of the Union. Under these circumstances I find that the Respondent violated Section 8(a)(1), (3) and (5) of the Act. *Dish Network Service Corp.,* supra at 28; *Equipment Trucking*, supra at 286-287; *Flying Foods*, 345
35  NLRB No. 10 (2005).

## CONCLUSION OF LAW

    1. The Respondent is an employer within the meaning of Section 2(2),(6), and (7) of the
40  Act.

    2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

    3. The following employees of the Respondent constitute a unit appropriate for the purpose
45  of collective bargaining within the meaning of Section 9(b) of the Act:

        All full-time and regular part-time employees, including cooks, prep cooks,
        dishwashers, pantry, utility, waiters, busers, hosts, bartenders, room servers,
        servers, housekeepers, room attendants, lobby attendants, housemen, turn-down
50      attendants, laundry attendants, guest service agents, bellmen, bell captains, mini-
        bar attendants and restaurant cashiers, employed by the Employer at the State

JD-62-06

Plaza Hotel in Washington, D.C.; excluding all reservation sales representatives, office clericals, engineers, painters, guards and supervisors as defined by the Act.

Since June 29, 2004, the Union has been the certified collective-bargaining
5   representative of the employees within this unit.

    4.  The Respondent violated Section 8(a)(1) of the Act by:

       (a)  Telling employees that the Hotel would sponsor a petition to get rid of the Union.

10

       (b)  Telling and instructing employees to circulate petitions to decertify the Union.

       (c)  Soliciting employees to sign decertification petitions.

15          (d)  Promising employees increased benefits and more money if they signed petitions to decertify the Union.

       (e)  Telling employees that they had betrayed the Respondent by not signing the petitions.
20

       (f)  Coercively interrogating employees about their union activities.

       (g)  Creating the impression among the employees that their union activities were under surveillance.
25

       (h)  Promulgate a blanket no-solicitation rule prohibiting prounion literature to be distributed at any time anywhere in the Hotel.

       (i)  Threatening employees with termination or the loss of their jobs if they continued
30   their union activities.

    5.  The Respondent violated Section 8(a)(1) and (3) of the Act by granting all employees in the housekeeping department a wage increase, in order to discourage employees from supporting the Union or to encourage them to refrain from their union support.
35

    6.  The Respondent violated Section 8(a)(1) and (5) of the Act by:

       (a)  Its overall conduct, including its dilatory and evasive tactics in meeting with the Union, the sponsoring of decertification petitions and the promising and the granting of benefits
40   if the employees signed the petitions.

       (b)  On the basis of a tainted petition withdrawing its recognition of the Union as the exclusive collective-bargaining representative of the unit.

45          (c)  Granting all employees in the housekeeping department a wage increase, a mandatory subject of bargaining, without prior notice to the Union and without affording the Union an opportunity to bargain.

       (d)  Bypassing the Union and dealing directly with the employees in the unit by
50   promising benefits to employees who signed the petitions.

JD-62-06

7. The unfair labor practices set forth above affect commerce within the meaning of Section 2(6) and (7) of the Act.

### Remedy

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Because the Respondent has a proclivity for violating the Act, and because of the serious nature of the violations and because of the Respondent's tenacious refusals to deal responsibly with the Union, demonstrating a general disregard for the employees' fundamental rights, I find it necessary to issue a broad Order requiring the Respondent to cease and desist from infringing in any other manner on rights guaranteed employees by Section 7 of the Act. *Hickmont Foods*, 242 NLRB 1357 (1979).

Considering all the circumstances, in particular the Respondent's unlawful sponsorship in decertifying the Union and its refusal to bargain in good faith, a bargaining order is necessary. *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). Moreover, this case certainly satisfies all the considerations set forth in *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727 (D.C. Cir. 2000). First, this Employer not only seriously and repeatedly interfered with the employees' Section 7 rights in this case, but is also the Respondent in the case referred to above, now pending before the Board. Moreover, the employees who opposed the Union were mostly frustrated with the slow process without seeing any tangible results. Second, a bargaining order will more likely further the purpose of the Act by requiring the Respondent to take seriously the law of the Land. Third, alternative remedies such as a cease and desist order would merely further the Respondent's opportunities for more delays and inactivity in the bargaining process. For these reasons and those effectively argued by the General Counsel and the Charging Party, I also find that the remedy should include a period required by *Mar-Jac Poultry Co.*, 136 NLRB 785, 787 (1962). Finally the Respondent must be ordered to rescind the pay increase If requested by the Union.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[1]

### ORDER

The Respondent, State Plaza, Inc., a wholly-owned subsidiary of RB Associates, Inc., d/b/a/ State Plaza Hotel, Washington, D.C., its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Engaging in bad-faith bargaining with the Union in its overall conduct, including its dilatory and evasive tactics in meeting with the Union, the sponsoring of decertification petitions and the promising and granting of benefits if the employees signed the petitions, to get rid of the Union as the exclusive collective-bargaining representative in the following appropriate unit:

---

[1] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

12

JD-62-06

> All full-time and regular part-time employees, including cooks, prep cooks, dishwashers, pantry, utility, waiters, busers, hosts, bartenders, room servers, servers, housekeepers, room attendants, lobby attendants, housemen, turn-down attendants, laundry attendants, guest service agents, bellman, bell captains, mini-bar attendants and restaurant cashiers, employed by the Employer at the State Plaza Hotel in Washington, D.C.; excluding all reservation sales representatives, office clericals, engineers, painters, guards and supervisors as defined by the Act.

(b)  Engaging in bad-faith bargaining with the Union by withdrawing recognition from the Union as the exclusive collective-bargaining representative on the basis of tainted petitions.

(c)  Engaging in bad-faith bargaining with the Union by granting all housekeeping employees a wage increase, without prior notice to the Union and without affording the Union an opportunity to bargain with respect to this conduct and the effects of this conduct.

(d) Engaging in bad-faith bargaining with the Union by dealing directly with the employees in the unit and bypassing the Union by promising wage increases or benefits if they sign a petition to get rid of the Union.

(e) Telling the employees that they betrayed the Respondent by not signing a decertification petition.

(f)  Telling the employees that it is going to get rid of the Union by sponsoring a decertication petition.

(g)  Telling and instructing employees to circulate petitions to decertify the Union.

(h)  Promising employees increased benefits and more money if they signed petitions to decertify the Union.

(i)  Soliciting employees to sign decertification petitions.

(j)  Announcing or promulgating a rule prohibiting the employees from distributing union literature inside the Hotel at any time.

(k)  Making remarks that suggest or create the impression that the employees' union activities are under surveillance.

(l)  Threatening employees with termination or the loss of their jobs because of their support or activity on behalf of the Union.

(m)  Coercively interrogating employees about their union activities

(n)  Granting pay increases to employees in order to discourage employees from supporting the Union.

(o)  In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights as guaranteed by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

JD-62-06

      (a) Rescind its withdrawal of recognition from the Union and recognize the Union as the exclusive collective-bargaining representative in the above described unit.

      (b) On request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the employees in the bargaining unit described above concerning terms and conditions of employment for the period required by *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962), and, if an understanding is reached, embody the understanding in a signed statement.

      (c) On request of the Union rescind the wage increases given to housekeeping employees on or about July 8, 2005.

      (d) Pay to the Union its expenses incurred in collective bargaining from about June 29, 2004 to the last negotiation session.

      (e) Within 14 days after service by the Region, post at its facility in Washington, D.C., copies of the attached notice marked "Appendix."[2] Copies of the notice, on forms provided by the Regional Director for Region 5, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 29, 2005.

      (f) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

      Dated, Washington, D.C., August 25, 2006.

_____
Karl H. Buschmann
Administrative Law Judge

---

[2] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

JD-62-06
Washington, DC

APPENDIX

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

    Form, join, or assist a union
    Choose representatives to bargain with us on your behalf
    Act together with other employees for your benefit and protection
    Choose not to engage in any of these protected activities

WE WILL NOT engage in bad-faith bargaining with the Union in overall conduct, including dilatory and evasive tactics in meeting with the Union, the sponsoring of decertification petitions and the promising and granting of benefits if the employees signed the petitions, to get rid of the Union as the exclusive collective-bargaining representative in the following appropriate unit:

    All full-time and regular part-time employees, including cooks, prep cooks, dishwashers, pantry, utility, waiters, busers, hosts, bartenders, room servers, servers, housekeepers, room attendants, lobby attendants, housemen, turn-down attendants, laundry attendants, guest service agents, bellman, bell captains, minibar attendants and restaurant cashiers, employed by the employer at the State Plaza Hotel in Washington, D.C.; excluding all reservation sales representatives, office clericals, engineers, painters, guards and supervisors as defined by the Act.

WE WILL NOT engage in bad-faith bargaining with the Union by withdrawing recognition from the Union as the exclusive collective-bargaining representative on the basis of tainted petitions.

WE WILL NOT engage in bad-faith bargaining with the Union by granting all housekeeping employees a wage increase, without prior notice to the Union and without affording the Union an opportunity to bargain with respect to this conduct and the effects of this conduct.

WE WILL NOT engage in bad-faith bargaining with the Union by dealing directly with the employees in the unit and bypassing the Union by promising wage increases or benefits if they sign a petition to get rid of the Union.

WE WILL NOT tell the employees that they betrayed us by not signing a decertification petition.

WE WILL NOT tell the employees that we are going to get rid of the Union by sponsoring a decertification petition.

WE WILL NOT tell and instruct employees to circulate petitions to decertify the Union.

JD-62-06
Washington, DC

WE WILL NOT promise employees increased benefits and more money if they sign petitions to decertify the Union.

WE WILL NOT solicit employees to sign decertification petitions.

WE WILL NOT announce or promulgate a rule prohibiting the employees from distributing union literature inside the Hotel at any time.

WE WILL NOT make remarks that suggest or create the impression that the employees' union activities are under surveillance.

WE WILL NOT threaten employees with termination or the loss of their jobs because of their support or activity on behalf of the Union.

WE WILL NOT coercively interrogate employees about their union activities.

WE WILL NOT grant pay increases to employees in order to discourage employees from supporting the Union.

WE WILL NOT in any other manner interfere with, restrain, or coerce employees in the exercise of their rights as guaranteed by Section 7 of the Act.

WE WILL take the following affirmative action necessary to effectuate the policies of the Act.

WE WILL rescind the withdrawal of recognition from the Union and recognize the Union as the exclusive collective-bargaining representative in the above described unit.

WE WILL on request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the employees in the bargaining unit described above concerning terms and conditions of employment for the period required by *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962), and, if an understanding is reached, embody the understanding in a signed statement.

WE WILL on request of the Union rescind the wage increases given to housekeeping employees on or about July 8, 2005.

JD-62-06
Washington, DC

WE WILL pay to the Union its expenses incurred in collective-bargaining from about June 29, 2004 to the last negotiation session.

STATE PLAZA, INC., A WHOLLY-OWNED<br>
SUBSIDARY OF RB ASSOCIATES, INC. D/B/A<br>
STATE PLAZA HOTEL<br>
(Employer)

Dated _____ By _____
                               (Representative)              (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

103 South Gay Street, The Appraisers Store Building, 8th Floor

Baltimore, MD  21202-4061

Hours: 8:15 a.m. to 4:45 p.m.

410-962-2822.

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, 410-962-3113.